# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION, and OAKLAND COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAC HOLDINGS INC., AARON JAGDFELD, and YORK A. RAGEN,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System (together, "Oakland County" or "Plaintiffs"), individually and on behalf of all others similarly situated, bring this securities class action on behalf of all investors who purchased or otherwise acquired Generac Holdings Inc. ("Generac" or the "Company") common stock between April 29, 2021, and November 1, 2022, inclusive (the "Class Period"). Plaintiffs assert violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5, against Generac, its Chief Executive Officer Aaron Jagdfeld ("Jagdfeld"), and its Chief Financial Officer York A. Ragen ("Ragen" and, together with Generac and Jagdfeld, "Defendants"). Plaintiffs also assert violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Jagdfeld and Ragen (together, the "Individual Defendants").

Plaintiffs allege the following based upon personal knowledge as to their own acts, and information and belief as to all others. Plaintiffs' information and belief is based upon an ongoing independent investigation by Plaintiffs' undersigned counsel, which includes, among other things, review and analyses of: (i) regulatory filings made by the Company with the SEC; (ii) public statements issued by the Company, including press releases, earnings call transcripts, industry conference transcripts, and slide decks; (iii) securities analyst reports about the Company and its industry; (iv) other publicly available documents and information; and (v) media reports about the Company.

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This action arises from repeated misrepresentations by Generac and its senior executives that concealed from investors a defective component at the core of Generac's solar power products. That component—the "SnapRS"—was intended to perform an essential safety function by rapidly shutting down solar devices in certain dangerous situations. Rather than protecting consumers, the SnapRS would overheat, melt and, in some cases, start fires.

2.     Defendants knew that the versions of the SnapRS installed in thousands of homes were defective and dangerous. Numerous consumers filed complaints with regulators, and Generac's business partners that sold, installed, and serviced Generac's solar products informed the Company of the SnapRS defect.

2

3.     Instead of warning investors and consumers, Defendants continued to tout the success and reliability of Generac's solar energy products while quietly making minor modifications to the SnapRS, including issuing a firmware update. After these modifications failed to fix the SnapRS, Defendants continued to mislead investors.

4.     Generac relied on "channel partners" to sell, service, and install its solar battery storage systems, including Power Home Solar, LLC d/b/a Pink Energy ("Pink Energy"), Baker Electric Home Energy, Posigen, and Valley Solar. During the Class Period, Pink Energy was the largest of these partners, with operations in 15 states. Among other deceptions, Generac misled investors about its dependence on Pink Energy, falsely assuring investors that no single customer or partner drove more than 6% of its sales and that Generac had a broad and diverse network of distribution partners.

5.     Generac also misled investors about its financial condition by failing to account for its liability for warranty claims arising from the defective SnapRS. By misrepresenting its warranty liability, Generac also overstated its earnings throughout the Class Period, and falsely assured investors that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

6.     Investors began to learn the truth about Generac's defective SnapRS on August 1, 2022, when Pink Energy filed a lawsuit against Generac, revealing that the Company's "defective" SnapRS components caused millions of dollars of damage, giving rise to liability that threatened Pink Energy's solvency (the "Pink Energy Complaint"). The disclosures in the Pink Energy Complaint caused the price of Generac shares to decline by $3.31 per share. The liability created by defective SnapRS components ultimately forced Pink Energy to declare bankruptcy on October 7, 2022.

7.      In the wake of Pink Energy's bankruptcy, on October 19, 2022, Generac revealed that it had taken "pre-tax charges totaling approximately $55 million, including approximately $37 million of clean energy product warranty-related matter and approximately $18 million of bad debt expense related to a clean energy product customer that has filed for bankruptcy." The $37 million charge related to warranty expenses appears to reflect Generac's belated acknowledgment of its increased liability to redress defective SnapRS units. The $18 million charge related to "bad debt expense" reflects receivables owed by Pink Energy, and possibly other partners or customers burdened with defective SnapRS products, that would not be paid. The October 19 disclosures caused the price of Generac shares to decline by $37.44 per share, or 25%.

8.      On November 2, 2022, Generac released its earnings results for the third quarter of 2022, and lowered sales guidance on its solar energy business for the remainder of the year by approximately 40%. On a conference call with investors and analysts held that same day, Generac's CEO, Defendant Jagdfeld, attributed the lowered guidance to "the loss of a major customer during the quarter, along with the specific warranty-related issue"—*i.e.*, the defective SnapRS component and the Pink Energy bankruptcy that resulted directly from that defect. Analysts expressed shock upon learning how dependent Generac's clean energy business was on Pink Energy, with several analysts noting that investors had not been told of the significant concentration of that business with a single partner. As a result of these disclosures, the price of Generac shares declined by $8.99 per share, or 8%.

9.      Through this action, Plaintiffs seek an award of damages to compensate Generac stockholders for Defendants' misrepresentations as set forth herein.

## JURISDICTION AND VENUE

10.     This action asserts federal securities law violations pursuant to the Exchange Act and rules promulgated thereunder.  Thus, this Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

11.     This Court has personal jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as Generac is headquartered in this District and conducts extensive business here.  Many of the acts and transactions that constitute violations of law complained of herein, including the preparation and/or dissemination to the public of untrue statements of material facts and statements that omitted material facts necessary to make the statement not misleading, occurred in this District.

13.     In connection with the acts, conduct, and wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

14.     Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System are governmental employee benefit plans for

employees and retirees of Oakland County, Michigan. As indicated in the certification submitted herewith (Exhibit A), Plaintiffs purchased Generac common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15. Defendant Generac is a Delaware corporation with its principal executive offices located at S45W29290 Highway 59 in Waukesha, Wisconsin. Generac is a diversified energy solutions company providing an array of energy management technology as well as prime and backup power solutions. The Company manufactures, markets, and distributes a variety of products across North America and abroad. At all relevant times, Generac's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GNRC."

16. Defendant Jagdfeld joined Generac in 1994 and served as Generac's Chairman, President, and Chief Executive Officer throughout the Class Period. During his career at Generac, Jagdfeld previously served as a Director of the Board and as Chief Financial Officer. Prior to joining Generac, Jagdfeld worked in the audit practice of Deloitte & Touche LLP ("Deloitte"). Deloitte is currently Generac's independent auditor. Jagdfeld routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences. During the Class Period, he commented regularly on the Company's supposedly positive growth of its solar energy solutions business.

17. Defendant Ragen joined the Company in 2005 and served as Generac's Chief Financial Officer throughout the Class Period. Ragen held the positions of Director of Finance and Vice President of Finance at Generac before becoming Chief Financial Officer. Ragen routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences.

6

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Generac's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

19.     Generac's primary business is manufacturing electric generators and backup power solutions.  The SnapRS component and products that rely on it are made by Generac's Residential Solar Energy Solutions division.  Generac also refers to their Residential Solar Energy Solutions division and products as Clean Energy division and products.

20.     In recent years, Generac expanded from its legacy business of backup power and traditional generators into renewable energy generation, focused predominantly on solar energy systems.  Generac's Residential Solar Energy Solutions division manufactures a battery-based storage solution called PWRcell that stores and manages electricity generated from solar panels.  Generac heavily promoted PWRcell as a way to mitigate high energy costs by storing solar energy for use during peak demand hours when traditional electricity costs are high.

21.     Solar power management systems, like the PWRcell, are required by state regulation to include a rapid shutdown device meant to isolate solar panels that have exceeded safe

operation voltage thresholds. The Generac SnapRS was the rapid shutdown device manufactured by Generac and used in Generac's PWRcell. The SnapRS unit is considered a type of inverter. At various points during the Class Period, Generac produced different models of the SnapRS, including: SnapRS801, SnapRS801A, and SnapRS802.

22. Throughout the Class Period, Generac advertised that its SnapRS component was compliant with the National Electric Code's ("NEC") 690.12 Rapid Shutdown of PV Systems on Buildings and Underwriters Laboratories ("UL") standard UL 1741, and was manufactured in an International Organization for Standardization ("ISO") 9001 certified manufacturer facility. The UL 1741 standard was specifically created as "a product safety standard that lays out the manufacturing (including software) and product testing requirements with the goal of producing inverters more capable of riding through grid excursions or even actively managing grid reliability functions."

23. Due to the SnapRS defect, many PWRcell systems were operating without an effective rapid shutdown device outlined in NEC 690.12. Many states have adopted NEC standards as part of their building and compliance rules and regulation.

24. In touting the Company's engineering acumen, the Company assured investors that "safety is paramount" and explained that: "Generac maintains a robust product safety function that is involved in all aspects of product design and production. We have a Product Safety Committee that participates in our new product development process in an effort to ensure that our products meet all applicable internal engineering design and safety standards . . . ."

25. Channel partners played an essential role in Generac's solar business, as outlined in Generac's quarterly report, filed with the SEC on Form 10-Q on May 4, 2021: "These products are predominantly sold through independent residential dealers . . . . The residential products

revenue consists of the sale of the product to our distribution partners, who in turn sell or rent the product to the end consumer, including installation and maintenance services. In some cases, residential products are sold direct to the end consumer."

26. Contrary to the Company's assurances that "safety is paramount," by April 2021, Pink Energy had reported to Generac its discovery of defective SnapRS units during service calls. Pink Energy described the phenomenon as an over-heating event in which SnapRS units, engineered to be a system failsafe, showed clear signs of heat deformation, charring, and melting. In addition to contacting Generac to alert it of the deformed SnapRS components, Pink Energy also provided detailed photos of the defective units.

27. Channel partners and owners of PWRcell systems were given access to Generac's "PWRfleet" online dashboard which "gives granular insight into all of your installed PWRcell systems." On information and belief, Generac had access to operational data of many PWRcell systems, access to PWRcell lockout data, and system error data nationwide. Generac highlights in its terms of use policy for PWRfleet:

> You agree that Generac may use certain of Your information and the data collected about You, including without limitation Your electricity usage and usage of the Services, for the purpose of providing information, services, and products, such as conservation or energy reduction programs, services, or products, of Generac, business partners of Generac, your utility, or other third parties. Further, you agree that Generac may use such data for analyzing, maintaining, and grouping data as well as analyzing and predicting usage and other trends . . . .

28. By Summer 2021, several of Generac's channel partners had communicated with each other to confirm that defective SnapRS units were not an isolated occurrence and, in actuality, were being found nationwide.

29. In early August of 2021, the first known residential fire occurred in a home with a PWRcell system.

30.     No later than early August 2021, Generac responded to the reports it received about the SnapRS defect by engineering two solutions:

> 1. a safety firmware update for PWRcell systems; and

> 2. a replacement for the defective SnapRS801 unit called "SnapRS801A."

31.     According to Pink Energy, on August 12, 2021, Generac and Pink Energy participated in a conference call on which Pink Energy inquired about the cause of the fire and related hazards associated with the SnapRS. Generac's Vice President of Engineering informed Pink Energy that Generac was investigating the cause of the SnapRS overheating issues. Critically, Generac acknowledged that it was developing and testing a new model of the SnapRS801, the SnapRS801A, in an attempt to correct the SnapRS defect.

32.     Other consumers with Generac PWRcells reported to Pink Energy that defective SnapRS units disabled blocks of solar panels, resulting in significantly reduced output. In some instances the defective SnapRS components disabled the entire solar energy system, rendering the system useless and requiring time consuming and expensive service calls by the Company's channel partners. According to Pink Energy, it promptly shared these reports with Generac.

33.     According to the Pink Energy Complaint, by August 18, 2021, at least two residential fires broke out in homes with PWRcell systems. The Pink Energy Complaint also alleges that, on June 30, 2022, a third residential fire occurred in a home with a PWRcell system. According to local news outlets, the cause of this fire is under investigation. However, Pink Energy alleges in their Complaint that preliminary information thus far points to defective SnapRS units as the catalyst.

34.     Generac did not make public its knowledge of the SnapRS defect, or the fact that the Company developed the new SnapRS versions to try and correct that defect.   Generac deceptively referred to the new SnapRS versions as an "upgrade."

35.     On August 19, 2021, Generac's Director of Sales for its East Region informed Pink Energy, via email, that Generac discovered a few SnapRS units to be "overactive," causing malfunctions.   In the email, the Generac Director of Sales assured Pink Energy that Generac was already developing new firmware that would address this issue.

36.     By late 2021, Generac began supplying the SnapRS801A, and told Pink Energy that the SnapRS801A was redesigned to mitigate the known issues with the SnapRS801 model.

37.     Despite Generac's reassurances to its channel partners that the firmware update and the revised SnapRS801A would bring the PWRcell into working order, firmware updates were only available to PWRcell systems that were connected to the internet.   Many PWRcell systems were not connected to the internet, and were therefore unable to receive the firmware update, and remained at risk of inconsistent or dangerous performance.   Moreover, for those units that did receive the firmware update, Generac knew that the firmware update, held out as a fix for the SnapRS issues, had known adverse effects and could shut down entire PWRcell systems. Significantly, the SnapRS801A suffered from the same defects as the SnapRS801, and thus failed to correct the dangerous defects that it was purportedly designed to rectify.

38.     Since at least April 2021, service calls to channel partners to address defective SnapRS components grew exponentially.   For example, Pink Energy calculated internally that the SnapRS defect caused "an approximately 3,650% increase in customer service calls during [the period between late 2021 and early 2022]."   Pink Energy also noted that Generac was unable to supply enough replacement SnapRS units to keep up with the volume of defective SnapRS units.

39.     Despite knowing the truth about the defective SnapRS component, Defendants repeatedly touted the safety of Generac's products, the rapid growth of its home solar division, and the PWRcell system, specifically, to investors throughout the Class Period.

40.     In December 2021, Generac and Pink Energy entered into an agreement that, among other things, required Generac to indemnify Pink Energy for warranty expenses related to product defects. This indemnification applied not only to products after the date of the agreement, but also applied retroactively to any defects in previously sold SnapRS components, including issues that developed after the effective date of the agreement. By this time, Generac had also received multiple notices of the issues that rendered the SnapRS defective.

41.     GAAP, specifically Accounting Standards Codification ("ASC") 460, required Generac to book warranty liability as soon as it became probable, meaning more likely than not, and estimable, meaning that Generac could estimate the cost of its liability. ASC 460 applies to warranty liability and is utilized in conjunction with ASC 450 which outlines disclosure and contingency accounting criterium. Even if the cost could not be estimated, GAAP required disclosure of the increased warranty liability once Generac knew of the SnapRS defect.

42.     During the Summer of 2022, channel partners such as Pink Energy and Solar Valley conducted large-scale replacements and removed charred and melted SnapRS801 units, as well as SnapRS801A units that showed the same defects as the SnapRS801 model. Generac sent letters to select PWRcell customers about the issues related to SnapRS801 and SnapRS801A models promising that the upcoming SnapRS802 model would be a true fix. Still, Generac made no public disclosure of the defective nature of the SnapRS801 and 801A models.

43.     Owners of Generac's PWRcell were left with solar energy systems that could become unusable or dangerous. Irate Generac customers filed numerous complaints with state

Attorneys General and federal regulators, and filed lawsuits against Pink Energy and, recently, Generac.

44.     Spurred by these consumer complaints, at least two state Attorneys General have filed lawsuits against Pink Energy relating to the defective Generac products, among other things. At least three other Attorneys General, as well as multiple U.S. regulatory agencies, have ongoing investigations related to Generac's defective products.

45.     On November 22, 2022, Attorneys General of Kentucky, North Carolina, Illinois, Indiana, Michigan, Pennsylvania, South Carolina, Tennessee, and Virginia sent a joint letter to companies that provided financing for consumer purchases of solar power systems from Pink Energy.  The letter asks for a suspension of repayments for non-working systems.

46.     To date, Generac has not issued any recall of the SnapRS, nor has it provided any broad warning about the hazards related to the SnapRS.

**DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS**

47.     The Class Period begins on April 29, 2021, when Generac held a conference call to discuss the Company's first quarter 2021 results.  On that call, Defendant Jagdfeld touted the broad network of partners that Generac had developed to sell and install its products, stating that "[w]e also have had encouraging success further building out our installer network as we've trained and certified approximately 2,000 dealers as of the end of the quarter with approximately 800 dealers registered on our PowerPlay CE selling system."[1]  Defendant Ragen made clear that the breadth of the distribution network was directly related to the success of the Company's clean energy products, telling investors that "higher demand for our PWRcell energy storage systems as we

---

[1] "PowerPlay CE" is a Generac software platform that connects customers interested in Generac's clean energy products to Generac's partners that can sell and install those products.

continue to make further progress in building out distribution partners in the clean energy market" was "contributing to the improved outlook."

48.     On July 28, 2021, Generac filed a press release with the SEC on Form 8-K, announcing the Company's earnings for the second quarter of 2021. The Company touted the success of the Company's solar business, and noted "very strong growth" of PWRcell core sales as "demand for PWRcell energy storage systems continues to increase." During the Company's second quarter earnings call with investors and analysts held the same day, Defendant Jagdfeld expanded, saying that "[s]hipments of PWRcell systems also experienced strong growth sequentially as we gained further traction in the rapidly expanding solar plus storage market. In addition to the strong revenue growth, key performance indicators for Clean Energy continue to show favorable trends." Defendant Jagdfeld once again noted "we further built out our installer network during the quarter, and we ended the first half of the year with approximately 2,200 trained and certified dealers with nearly 900 of those dealers registered on our PowerPlay CE selling system."

49.     On that same call, Defendant Ragen confirmed that Generac was doubling its sales guidance for its solar energy business for 2021:

> We've publicly said we did about $115 million of sales last year, looking to double that here in 2021. And sequentially, that's going to ramp from Q2 to Q3. And then again into Q4 so that we're looking to successively ramp our output of those products over the quarters here, and really into next year, that's the expectation. The market is there, the demand is there. We've said publicly that the demand is outstripping our supply and that's what we're working on right now to ramp up 2022.

50.     On September 27, 2021, the Company published its Environmental Sustainability Policy and reports. The Company promoted that "[a]s a manufacturer, we go beyond regulatory

compliance with an all-encompassing philosophy that involves our employees, training efforts, production processes, and products."

51.      On September 29, 2021, Generac hosted its annual investor day meeting.  Generac praised its "dramatic growth" with "a lot of earnings power from an EPS standpoint."  In a presentation given during that meeting, Generac called its solar business "Clean, reliable, and affordable."

52.      On October 5, 2021, Generac published its "Supplemental Code of Ethics for the CEO, CFO, and other Senior Offices" (the "Code of Ethics").  The Code of Ethics outlined that Generac executives must "[a]ct in good faith, responsibly, with due care, competence, and diligence, without misrepresenting material facts" and "[p]roduce full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications."

53.      On November 2, 2021, the Company filed a Form 8-K with the SEC.  Generac outlined in its "Product Liability; Product Warranties and Recalls" section that "an accurate and complete list of warranty claims and rebate reports, in each case with respect to product malfunctions or property damage issues, for the three years ended on the date of this Agreement. . . . [D]uring the past three years there has been no Action pending or, to the Company's Knowledge, threatened, relating to alleged defects in Company Products or the failure of any such products to meet the warranty specifications or material contractual commitments applicable to such products."

54.      On November 4, 2021, Generac filed with the SEC its Quarterly Report on Form 10-Q for the third quarter of 2021.  In the Form 10-Q, Generac reported changes in preexisting warranty reserves of approximately $1 million and noted that "[t]he Company records

a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable." In the Form 10-Q, Generac also reported earnings per share of $1.98, and touted net income of "$407.6 million as compared to $225.6 million in the prior year period." The Company represented that, "[i]n the opinion of management, all adjustments (which include only normal recurring adjustments except where disclosed) necessary for the fair presentation of the financial position, results of operation, and cash flows have been made."

55.     The November 4, 2021 Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Jagdfeld and Ragen certified that "[t]he [10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." In addition, these Defendants certified that they had disclosed "(a) [a]ll significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

56.     On February 22, 2022, Generac filed with the SEC its Annual Report on Form 10-K for fiscal year 2021. In the Form 10-K, Generac reported changes in preexisting warranty reserves of approximately $4.4 million and kept its product warranty obligations disclosure unchanged, noting that "[t]he Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific

warranty matters when they become known and are reasonably estimable." In the Form 10-K, Generac reported earnings per share of $8.51, and claimed to have earned net income of "$550.5 million as compared to $350.6 million in the prior year period."

57. The February 22, 2022, Form 10-K contained signed certifications pursuant to SOX, wherein Defendants Jagdfeld and Ragen certified that "[t]he [10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." In addition, these Defendants certified that they had disclosed "(a) [a]ll significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

58. On May 9, 2022, Generac filed with the SEC its Quarterly Report on Form 10-Q for the first quarter of 2022. In that Form 10-Q, Generac reported changes in preexisting warranty reserves of approximately negative $1.1 million and kept its product warranty obligations disclosure unchanged, noting that "[t]he Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable." In the Form 10-Q, the Company reported earnings per share of $1.61 and outlined the net income attributable to Generac of "$113.9 million as compared to $149.0 million in the prior year first quarter."

59. The May 9, 2022, Form 10-Q contained signed certifications pursuant to the SOX, wherein Defendants Jagdfeld and Ragen certified that "[t]he [10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information

contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." In addition, these Defendants certified that they had disclosed "(a) [a]ll significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

60. On June 29, 2022, Generac published its 2021 Environmental, Social, and Governance Report. In the report the Company discussed its commitments to product safety and promoted that:

> Generac maintains a robust product safety function that is involved in all aspects of product design and production. We have a Product Safety Committee that participates in our new product development process in an effort to ensure that our products meet all applicable internal engineering design and safety standards, including those issued by the Consumer Product Safety Commission. This team performed 22 hazard reviews for products under development in 2021, and also regularly reviews any safety concerns associated with products in the field, including potential product recalls. Our engineering team maintains rigorous design standards that account for product safety at every stage of product development, and products go through multiple rounds of design review to ensure that safety is paramount.

61. On August 8, 2022, Generac filed with the SEC its Quarterly Report on Form 10-Q for the second quarter of 2022. In the Form 10-Q, Generac reported changes in preexisting warranty reserves of approximately $5.6 million and kept its product warranty obligations disclosure unchanged, noting that "The Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for specific warranty matters when they become known and are reasonably estimable." In the Form 10-Q, the Company reported earnings per share of $2.24 and outlined the net income attributable to Generac of "$156.4 million as compared to $127.0 million in the prior year second quarter."

62.     The August 8, 2022, Form 10-Q contained signed certifications pursuant to SOX, wherein Defendants Jagdfeld and Ragen certified that "[t]he [10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."    In addition, these Defendants certified that they had disclosed "(a) [a]ll significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

63.     The statements described above in paragraphs 47 through 62 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants misrepresented or failed to disclose the full scope of the economic harm flowing from the defective SnapRS units—particularly failing to disclose them in product liability sections of their SEC filings and failing to take increased warranty liability charges once Defendants knew of the SnapRS defect.

## THE TRUTH EMERGES

64.     On August 1, 2022—just one month after Generac assured the market that its products were rigorously tested and safe—Pink Energy filed a lawsuit against Generac.  Pink Energy brought the action against Generac for, among other claims, "wanton, willful, and reckless conduct . . . by (i) concealing the SnapRS defects from [Pink Energy], (ii) failing to inform [Pink Energy] of the devastating effect the firmware update would have on its customers' solar energy system production, and (iii) fail[ing] to develop a suitable alternative to the defective SnapRS units [which] has had a devastating effect on [Pink Energy's] business."

65.     The Pink Energy Complaint criticized Generac's failure to recall the dangerous SnapRS unit in light of Pink Energy's urging that they do so—both for the sake of their business, and for the safety of their customers.  The Pink Energy Complaint alleged that: (i) Generac breached express and implied warranties regarding the SnapRS; (ii) Generac misrepresented "critical information regarding the root cause of the SnapRS product failures, resulting in further and more widespread failures of PHS customers' solar energy systems;" (iii) Generac engaged in negligent conduct resulting in a failure to "identify product defects in the SnapRS units by conducting proper product testing and quality control," constituting a breach of standard of care owed by Generac to Pink Energy; (iv) the SnapRS contained design, manufacturing, and failure to warn defects; and (v) Generac fraudulently induced Pink Energy to enter into a buy-sell agreement, the terms of which limited potential damages Pink Energy could recover from Generac.

66.     Pink Energy alleged that it suffered a $155 million loss in revenue due to contract cancelations related to the SnapRS defect and millions of dollars of damage due to the unprecedented influx of customer service calls related to the faulty SnapRS units.

67.     Pink Energy also alleged that Generac did not disclose to Pink Energy that the firmware update, held out as a fix for the SnapRS issues, had known adverse effects and was shutting down entire PWRcell systems.

68.     Additionally, Pink Energy alleged that Generac had represented that the firmware update would fix the SnapRS defects, though it was later revealed to be merely a temporary patch. The Pink Energy Complaint alleges that Generac withheld from Pink Energy the critical information "that a large number of its customers never received the firmware update owing to internet connectivity; and, that the 801 and 801A were only intended as a temporary fix . . . ."

69. The Pink Energy Complaint further asserts that defective SnapRS units caused Pink Energy to experience a wave of 30,000 inbound customer complaint calls per month and the need to replace approximately 50,000 SnapRS units out of its own pocket.

70. In response to the serious allegations in the Pink Energy Complaint, the price of Generac shares declined by $3.31 per share.

71. After the Pink Energy Complaint was filed, analysts at Roth Capital Partners questioned Generac's solar energy business: "As it relates to the company's clean energy business, we wonder if the inverter/storage business may be experiencing some challenges."

72. The liability created by the defective SnapRS ultimately forced Pink Energy to declare bankruptcy on October 7, 2022.

73. A spokesperson from Generac responded to that news, saying "We are aware of Pink Energy's recent Chapter 7 bankruptcy filing . . . . Over the past few weeks, we have already contracted with high-quality third-party providers to perform warranty services on Generac's products, now that Pink Energy will no longer be providing this service to its customers." Generac went on to blame Pink Energy's faulty installation for creating problems, further concealing the known defects with the SnapRS components:

> In certain situations, especially when product installation guidelines have not been followed, as appears to be the case with some Pink Energy installations, customers may have experienced certain issues with a particular Generac component of their solar energy system – the SnapRS 801 or 801A. We have introduced a new next-generation rapid shutdown device, which has been designed and engineered to the highest reliability standards. We are committed to getting those upgrades and warranty replacements taken care of as quickly as possible and those steps are well underway. It is unfortunate that Pink Energy, as the installer and service provider of such products, made the unilateral decision to quit offering Generac warranty support despite the availability of parts.

74.     On October 19, 2022, Generac published preliminary earnings showing dismal financial results for the third quarter of 2022.  Generac took "pre-tax charges totaling approximately $55 million, including approximately $37 million of clean energy product warranty-related matters [ostensibly related to Pink Energy] and approximately $18 million of bad debt expense related to a clean energy product customer that has filed for bankruptcy."  Generac reported that "[p]reliminary net income attributable to the Company during the third quarter was approximately $58 million, or $0.83 per share, as compared to $132 million, or $1.93 per share, for the same period of 2021."  Generac also reported preliminary adjusted net income of "approximately $112 million, or $1.75 per share, during the third quarter as compared to $151 million, or $2.35 per share, for the same period of 2021."  The Company also reported that "[p]reliminary adjusted EBITDA before deducting for noncontrolling interests, as defined in the accompanying reconciliation schedules, was approximately $184 million, or approximately 17% of net sales, during the third quarter as compared to $209 million, or 22% of net sales, for the same period of 2021."

75.     These disclosures caused the price of Generac shares to decline by $37.44 per share, or 25%.

76.     Analysts at Bank of America commented a day later that, "[a]lthough likely one-time in nature, these charges are worse than we previously expected, given mgmt.'s limited comments around its exposure to issues with its clean energy products.  Ultimately, net income comes in well below our prior expectations of $159 mn vs. $58 mn preliminarily reported."

77.     An analyst report issued by William Blair commented that Generac's "dependence on distributor Pink Energy was more significant than we understood.  Management has consistently indicated Generac works with many distributors in the solar and energy storage

market, and that Generac has trained and certified over 2,000 dealers on the company's solar/energy storage product portfolio. We believe it will come as a surprise to many investors that Pink Energy likely accounted for more than half of Generac's solar/energy storage sales. Pink Energy filed for bankruptcy on October 7 and is no longer installing Generac products." The William Blair analysts concluded that "[t]he realization of customer concentration makes it clear that Generac has not been as successful as we believed at attracting distribution partners in the solar market, and recent quality issues will make building that distribution even more challenging."

78. On November 2, 2022, Generac released third quarter earnings and lowered guidance on sales by its solar energy business for the remainder of the year by approximately 40%. Specifically, on a conference call with investors and analysts held that same day, Defendant Jagdfeld told investors that "[w]e now expect the combination of clean energy technology products and services to deliver sales between $300 million to $330 million for the full-year 2022, as compared to our previous guidance of approximately $500 million."

79. Defendant Jagdfeld attributed the lowered guidance to "the loss of a major customer during the quarter, along with the specific warranty-related issue"—*i.e.*, the defective SnapRS component, which led to the Pink Energy's bankruptcy.

80. Defendant Jagdfeld expanded, saying that "shipments of PWRcell energy storage systems in the third quarter were negatively impacted by the significant liquidity challenges of a large customer that ceased operations and subsequently filed for bankruptcy. Additionally, during the quarter, we continued to address certain warranty-related matters for the upgrade of a component within our PWRcell energy storage system."

81.     Defendant Jagdfeld assured investors that Generac swiftly "engaged a number of third-party service companies to assist with the completion of these upgrades and these efforts are well underway."

82.     During the same November 2 conference call, an analyst asked for clarification on the revenue reduction stemming from the clean energy business, and whether that reduction was driven by Pink Energy's bankruptcy. Defendant Jagdfeld answered: "Yeah. The majority of the market is related to the loss of the customer. It was a . . . really important customer for us. And the diversification of our customer base is going to be the primary focus here going forward."

83.     Another analyst asked for clarification on the "certain component needed to be upgraded." Defendant Jagdfeld responded: "It's a rooftop-mounted shutoff device, and that device is the previous generation of that device, has a higher failure rate than what we'd like to see. So, we're proactively replacing those devices for customers so they don't see an interruption of the production of their systems. . . . And that upgrade, the total effort there is what's reflected in that additional warranty reserve charge that we took here in the quarter."

84.     In response to the November 2 disclosures, Generac common stock fell an additional $8.99 per share, or 8%. The specific disclosures discussed above revealed to investors the truth about Generac's clean energy business.

85.     Analysts at Bank of America were surprised by the November 2 disclosures, saying "we believe GNRC is facing greater challenges with its clean energy segment than we previously understood."

86.     Analysts at William Blair commented that "[t]hese realizations regarding clean energy hurt management's credibility, given there was no indication Generac had material customer concentration in this business. . . . We now also believe the quality issues Generac has

been experiencing with solar components, particularly a rapid shutdown device called the SnapRS, are severe enough that the company's reputation in the solar industry has been damaged."

87. Analysts at William Blair now believed that the approximate 80% reduction in run-rate revenue for Generac meant "that on top of a customer concentration issue with Pink Energy, Generac is now finding it challenging to do business with other installers given the recent quality issues."

88. William Blair analysts estimated that Generac may be in the process of replacing about 300,000 SnapRS devices in the field. They also observed that these replacements are extremely labor intense and noted that Generac management publicly conveyed that replacement costs are "significantly weighted towards" labor, with hardware being the minority. They concluded: "We believe the valuation expansion driven by the solar business has essentially completely reversed."

## LOSS CAUSATION AND ECONOMIC LOSS

89. As detailed above, Defendants made material misstatements and omissions during the Class Period and engaged in a scheme to deceive the market. These misrepresentations artificially inflated the price of Generac common stock and operated as a fraud or deceit on the Class. On August 1, October 19, and November 2, 2022, the true state of the SnapRS defects and their impact on Generac's financial results were disclosed, revealing Defendants' prior misrepresentations and fraudulent conduct. As a result, the price of Generac common stock fell precipitously, as the prior artificial inflation came out of the share price.

90. Because Plaintiffs and other members of the Class purchased Generac common stock at inflated prices during the Class Period, they suffered economic loss – *i.e.*, damages under the federal securities laws. Defendants' material misstatements and omissions directly or

proximately caused the damages suffered by the Plaintiffs and other Class members. Plaintiffs and other Class members experienced economic loss as a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price, and the subsequent significant decline in the value of the Company's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

91. The timing and magnitude of the Generac stock price declines negates any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## SCIENTER ALLEGATIONS IN SUPPORT OF EXCHANGE ACT VIOLATIONS

92. As alleged herein, Defendants acted with scienter in that they knew that the public statements and documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth above in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Generac, their control over, and/or receipt and/or modification of Generac's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Generac, participated in the fraudulent scheme alleged herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

93. At all relevant times, the market for Generac common stock was an efficient market for the following reasons, among others:

a. Generac common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. During the Class Period, Generac common stock was, in fact, actively traded, demonstrating a strong presumption of an efficient market;

c. As a regulated issuer, Generac filed periodic public reports with the SEC and NYSE during the Class Period;

d. Generac regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, conference calls with financial analysts, and similar reporting services; and

e. Generac was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period, each of which reports were publicly available and entered the public marketplace.

94. Because of the foregoing, the market for Generac common stock promptly digested current information regarding Generac from all available sources and reflected such information in the price for Generac common stock during the Class Period. Under these circumstances, all purchasers of Generac common stock during the Class Period suffered similar injury through their purchase of Generac common stock at artificially inflated prices and a presumption of reliance applies.

95. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery

pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the omitted facts about the true status of the SnapRS defect were withheld and material, as an investor would have considered this information in deciding whether to purchase and/or sell Generac stock.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

96. The statutory safe harbor provided for "forward-looking statements" under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

97. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as forward-looking statements when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

98. Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Generac who knew that the forward-looking statement was false.

99. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or

forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

100.     Plaintiffs bring this action on behalf of all individuals and entities who purchased or otherwise acquired Generac common stock on the public market during the Class Period and were damaged (the "Class").  Excluded from the Class are the Company; its directors and officers; the Individual Defendants; any of their respective legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

101.     The members of the Class are so numerous that joinder of all members is highly impracticable.  Throughout the Class Period, Generac common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, it can be ascertained through appropriate discovery.  Record owners and other members of the Class may be identified from records maintained by Generac or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions.   Upon information and belief, as of November 3, 2022, there were more than 63,350,000 shares of Generac common stock outstanding.  Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country and possibly the world.

102.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

103. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws through their respective acts as alleged herein;

b. whether Defendants misrepresented and/or omitted material facts;

c. whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e. whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

f. whether the price of Generac common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein;

g. whether Defendants' conduct caused the Class members to sustain damages; and

h. the extent of damages sustained by Class members and the appropriate measure of damages.

104. Plaintiffs have and will continue to fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

105.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Against All Defendants**

106.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

107.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other Class members to purchase Generac common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

108.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Generac common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

109.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Generac as specified herein.

110.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

111.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal from the investing public the defective nature of SnapRS products, the liability resulting therefrom, and its impact on Generac, in order to support the artificially inflated prices of the Company's common stock.

112.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Generac's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Generac's publicly traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Generac's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

113. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Generac common stock. At the time of the misrepresentations and omissions, Plaintiffs and other Class members were ignorant of their falsity and believed them to be true. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Generac common stock had been artificially inflated by Defendants' fraudulent course of conduct.

114. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

115. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

116. The Individual Defendants have both primary liability and controlling person liability arising from the following facts: (i) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to information regarding defective SnapRS units and their impact, and the creation, development, and reporting of the Company's financial and operational condition; (iii) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances and operations at all relevant times; and (iv) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

117.    This action was filed within two years of discovery of the fraud and within five years of each of Plaintiffs' purchases of common stock giving rise to the cause of action.

118.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

119.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120.    The Individual Defendants acted as controlling persons of Generac within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

121.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the Consolidations giving rise to the securities violations as alleged herein, and exercised the same.

122. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

123. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of common stock giving rise to the cause of action.

124. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a. Determining that this action is a proper class action, and certifying Plaintiffs as class representative under Federal Rule of Civil Procedure 23 and Plaintiffs' counsel as class counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained because of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d. Granting extraordinary equitable and/or injunctive relief as permitted by law; and

e. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: December 1, 2022

Respectfully submitted,

*/s/ Tamar B. Kelber*

Tamar B. Kelber, SBN 1101802
Jerome C. Mohsen, SBN 1097525
**GASS TUREK LLC**
241 North Broadway, Suite 300
Milwaukee, WI 53202
Telephone: (414) 223-3300
Facsimile: (414) 224-6116
kelber@gassturek.com
mohsen@gassturek.com

*Liaison Counsel for Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System*

Hannah Ross (*Admission Pending*)
Avi Josefson (*Admission Pending*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue Of The Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System*

Aaron L. Castle (*Admission Pending*)
**VANOVERBEKE MICHAUD
   & TIMMONY P.C.**
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Plaintiffs Oakland County
Voluntary Employees' Beneficiary Association
and Oakland County Employees' Retirement
System*