UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

OAKLAND COUNTY VOLUNTARY
EMPLOYEES' BENEFICIARY
ASSOCIATION, et al., Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

GENERAC HOLDINGS INC., et al.,

                Defendants.

Civil No. 2:22-cv-01436-BHL

<u>CLASS ACTION</u>

---

CALIFORNIA IRONWORKERS FIELD
PENSION TRUST, on Behalf of Itself and All
Others Similarly Situated,

                Plaintiff,

    vs.

GENERAC HOLDINGS INC., et al.,

                Defendants.

Civil No. 2:23-cv-00081-BHL

<u>CLASS ACTION</u>

---

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF TAMPA'S MOTION FOR
APPOINTMENT AS LEAD PLAINTIFF

---

4855-9327-8292.v1

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...........................................................................................................1

II.     ARGUMENT ................................................................................................................2

        A.      Tampa Suffered the Greatest LIFO Loss and Is the Presumptive Lead
                Plaintiff ............................................................................................................2

                1.      The Store Brand Group's Belated Introduction of Novel
                        Methodologies Should Be Rejected as Gamesmanship.............................2

                2.      *Dura* Confirms that Tampa Is the Presumptive Lead Plaintiff...................4

                3.      The Court Should Reject the Store Brand Group's Request to
                        Shrink the Class by Ignoring the Complaint's Well-Pled
                        Allegations It Previously Embraced .........................................................9

                4.      Tampa Has the Largest Loss of Any Investor Before the Court,
                        Even Under The Store Brand Group's Rejected Loss Methodology
                        and Post-Motion Revisionism of the Complaint.......................................13

        B.      The Store Brand Group's Motion Should Be Rejected .........................................14

III.    CONCLUSION.............................................................................................................15

4855-9327-8292.v1

# TABLE OF AUTHORITIES

Page

**CASES**

*Bang v. Acura Pharm., Inc.*,
2011 WL 91099 (N.D. Ill. Jan. 11, 2011) .................................................................5

*Bensley v. FalconStor Software, Inc.*,
277 F.R.D. 231 (E.D.N.Y. 2011) .............................................................................11

*Blitz v. AgFeed Indus., Inc.*,
2012 WL 1192814 (M.D. Tenn. Apr. 10, 2012) .........................................................4

*Bodri v. GoPro, Inc.*,
2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) ............................................................4

*Chandler. v. Ulta Beauty, Inc.*,
2018 WL 3141763 (N.D. Ill. June 26, 2018) ..........................................................4, 6

*Christian v. BT Grp. PLC*,
2017 WL 3705804 (D.N.J. Aug. 28, 2017) ..............................................................12

*City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*,
No. 2:13-cv-01159-CNC (E.D. Wis. Nov. 25, 2013) .................................................3

*City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*,
2021 WL 396343 (S.D.N.Y. Feb. 4, 2021) ............................................................2, 5

*Constr. Workers Pension Tr. Fund v. Navistar Int'l Corp.*,
2013 WL 3934243 (N.D. Ill. July 30, 2013) ..........................................................3, 5

*Cook v. Allergn PLC*,
2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) ........................................................4, 5

*Dura Pharm., Inc. v. Broudo*,
44 U.S. 336 (2005) ............................................................................................. *passim*

*Eichenholtz v. Verifone Holdings, Inc.*,
2008 WL 3925289 (N.D. Cal. Aug. 22, 2008) .....................................................11, 13

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ....................................................................................7

*Goss v. Roadrunner Transp. Sys., Inc.*,
2017 WL 10742612 (E.D. Wis. May 19, 2017) .........................................................3

*Hedick v. Kraft Heinz Co.*,
2019 WL 4958238 (N.D. Ill. Oct. 8, 2019) ...................................................6, 10, 11

Case 2:22-cv-01436-BHL   Filed 03/07/23   Page 3 of 22   Document 26

*Hoang v. ContextLogic, Inc.*,
2022 WL 1539533 (N.D. Cal. May 16, 2022) ...................................................................8, 9

*In re Bally Total Fitness Sec. Litig.*,
2005 WL 627960 (N.D. Ill. Mar. 15, 2005) ..........................................................................3

*In re BP, PLC Sec. Litig.*,
758 F. Supp. 2d 428 (S.D. Tex. 2010) ................................................................................11

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) ..............................................................................................14

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ...............................................................................................13

*In re Comverse Tech., Inc. Sec. Litig.*,
2007 WL 680779 (E.D.N.Y. Mar. 2, 2007) .......................................................................6, 7

*In re Crocs, Inc. Sec. Litig.*,
306 F.R.D. 672 (D. Colo. 2014) ...........................................................................................8

*In re Gentiva Sec. Litig.*,
281 F.R.D. 108 (E.D.N.Y. 2012) ........................................................................................13

*In re Harley-Davidson, Inc. Sec. Litig.*,
No. 2:05-cv-00547-CNC (E.D. Wis. Feb. 14, 2006) ............................................................3

*In re LDK Solar Sec. Litig.*,
2010 WL 3001384 (N.D. Cal. July 29, 2010) .......................................................................8

*In re Network Assocs., Inc., Sec. Litig.*,
76 F. Supp. 2d 1017 (N.D. Cal. 1999) ................................................................................13

*In re Watchguard Sec. Litig.*,
2005 WL 8188936 (W.D. Wash. July 13, 2005) ................................................................4, 5

*Iron Workers Local No. 25 Pension Fund v. OshKosh Corp.*,
No. 2:08-cv-00797-WCG (E.D. Wis. Feb. 11, 2009) ...........................................................3

*Lifson v. Assisted Living Concepts, Inc.*,
2012 WL 12929878 (E.D. Wis. Nov. 14, 2012) ...................................................................3

*Lucas v. United States Oil Fund, LP*,
2020 WL 5549719 (S.D.N.Y. Sept. 16, 2020) ......................................................................9

4855-9327-8292.v1

*Maiden v. Merge Techs., Inc.*,
2006 WL 3404777 (E.D. Wis. Nov. 21, 2006)............................................................3, 13, 14

*Marcus v. J.C. Penney*,
2014 WL 11394911 (E.D. Tex. Feb. 28, 2014) ...................................................................12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .......................................................................................5, 7, 11

*New Hampshire v. Maine*,
532 U.S. 742 (2001)............................................................................................................12

*Norfolk Cty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009).......................................................................7

*Owens v. FirstEnergy Corp.*,
2020 WL 6873421 (S.D. Ohio Nov. 23, 2020).....................................................................4

*Pio v. Gen. Motors Co.*,
2014 WL 5421230 (E.D. Mich. Oct. 24, 2014) ....................................................................2

*Plaut v. Goldman Sachs Grp., Inc.*,
2019 WL 4512774 (S.D.N.Y. Sept. 19, 2019)......................................................................7

*Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*,
256 F.R.D. 620 (E.D. Wis. 2009) .........................................................................3, 5, 11, 12

*Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) ...............................................................................10

*Puskala v. Koss Corp.*,
No. 2:10-cv-00041-LA (E.D. Wis. May 11, 2010)................................................................3

*Ray v. Citigroup Global Mkts., Inc.*,
482 F.3d 991 (7th Cir. 2007) ................................................................................................7

*Richman v. Goldman Sachs Grp., Inc.*,
274 F.R.D. 473 (S.D.N.Y. 2011) ..........................................................................................4

*Rieckborn v. Velti plc*,
2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ..........................................................................8

*Sallustro v. CannaVest Corp.*,
93 F. Supp. 3d 265 (S.D.N.Y. 2015)......................................................................................5

*Saye v. NIO Inc.*,
2022 WL 17666398 (S.D.N.Y. Dec. 14, 2022) ................................................................6

*Schultz v. TomoTherapy Inc.*,
No. 3:08-cv-00314-slc (W.D. Wis. Sept. 2, 2008) ..........................................................3

*Singer v. Nicor, Inc.*,
2002 WL 31356419 (N.D. Ill. Oct. 17, 2002)..................................................................4

*Topping v. Deloitte Touche Tohmatsu CPA*,
95 F. Supp. 3d 607 (S.D.N.Y. 2015)............................................................................6, 7

*W. Pa. Elec. Emps. Pension Tr. v. Plexus Corp.*,
2007 WL 3342593 (E.D. Wis. Nov. 8, 2007) ..................................................................3

*Wagner v. Spectrum Brands Legacy, Inc.*,
2019 WL 2443036 (W.D. Wis. June 12, 2019) ................................................................3

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 23 ..................................................................................................................1, 11, 15
Rule 23(a)(4)....................................................................................................................13

4855-9327-8292.v1

# I.     INTRODUCTION

The only opposition to City Pension Fund for Firefighters and Police Officers in the City of Tampa's ("Tampa's") motion comes from an assemblage of 18 entities located in Denmark, Norway, Sweden, and Connecticut joined together by their two law firms in an effort to amass the largest aggregated LIFO (last-in, first-out) loss. The Store Brand Group's opposition brief confirms several essential undisputed facts:

- Tampa has the largest loss under the LIFO loss method that all movants embraced as determinative of financial interest in their opening motions;

- Tampa has the largest loss under the method used by the minority of courts that elect to add loss causation principles to lead plaintiff loss calculations (the "*Dura* Method");

- Tampa also suffered the greatest individual loss of any Store Brand Group member under the two novel loss calculation theories first advanced in the Store Brand Group's opposition brief;

- No district court cited by the Store Brand Group has found at the lead plaintiff stage that a corrective event adequately pled in a complaint was "unrelated" to the case, as the Store Brand Group asks the Court to find for the November 2, 2021 disclosure to the detriment of all three movants (including the Store Brand Group) and the class; and

- Tampa has made the requisite Fed. R. Civ. P. 23 showing for its appointment.

Accordingly, pursuant to Seventh Circuit precedent and all district court decisions within this Circuit concerning the appointment of a lead plaintiff, Tampa's motion should be granted.

Implicitly acknowledging that Tampa possesses the largest financial interest in the relief sought by the putative class under the LIFO methodology **and** the *Dura* Method, the Store Brand Group switches gears and now urges the Court to utilize two **other** methods for selecting a lead plaintiff, that is: (1) adopt a novel loss methodology that no court has ever relied upon and inexplicably discounts losses that are recoverable under Seventh Circuit precedent; and (2) rewrite the *Cal. Ironworkers* complaint's allegations to remove the same November 2, 2021 disclosure that the Group itself initially embraced **and**, once excised, apply the *Dura* Method. Tampa respectfully requests that the Court reject the Store Brand Group's untimely and meritless invitation to deviate from existing law regarding the appointment of a PSLRA lead plaintiff.

## II.    ARGUMENT

### A.    Tampa Suffered the Greatest LIFO Loss and Is the Presumptive Lead Plaintiff

The Store Brand Group does not dispute that Tampa suffered the largest LIFO loss of any movant – $16.2 million.  Facing a clear (but undesired) outcome under the rational and consistently applied LIFO loss methodology it initially urged the Court to use in its motion, the Store Brand Group's opposition jettisons LIFO loss in favor of two novel approaches to the financial interest inquiry.  These approaches, however, are predicated on an incorrect interpretation of *Dura Pharm., Inc. v. Broudo*, 44 U.S. 336 (2005) ("*Dura*") and on the deletion of allegations from the *Cal. Ironworkers* complaint that the Store Brand Group credited in its opening brief.  The Store Brand Group's *ex post facto* attempt to manipulate the "largest financial interest" inquiry should be rejected.

### 1.    The Store Brand Group's Belated Introduction of Novel Methodologies Should Be Rejected as Gamesmanship

It has become increasingly common for movants with smaller losses to jettison the conventional loss metric used in their lead plaintiff motion in favor of "devis[ing] [their] own methodology" in an opposition brief that "tak[es] into consideration particular nuances of the parties' transactions in th[e] case."  *Pio v. Gen. Motors Co*., 2014 WL 5421230, at *7 (E.D. Mich. Oct. 24, 2014).[1]  For this reason, "[p]resenting new methodologies, loss calculations, or substantive allegations only in opposition, after the PSLRA deadline for moving to be appointed lead Plaintiff has closed, is the type of opportunism that is generally unfavored in appointing lead plaintiffs."  *City of Sunrise Firefighter's Pension Fund v. Citigroup Inc*., 2021 WL 396343, at *4 (S.D.N.Y. Feb. 4, 2021).  Indeed, "courts are especially skeptical of a movant who initially presents one position in their opening brief and switch[es] to another in their opposition [brief] after a new movant comes in alleging a greater loss."  *Id.*  This mid-game maneuvering is precisely what the Store Brand Group attempts to do here.

---

[1]    Unless otherwise noted herein, all emphasis is added and citations and footnotes are omitted.

4855-9327-8292.v1

In its opening motion, the Store Brand Group represented its combined financial interest as "$15.6 million, as calculated under the **widely accepted** last-in-first-out ('LIFO') loss calculation method." ECF 8 at 2. Tampa and the Kujawiak Family likewise represented their interests using LIFO loss. *See* ECF 11 at 5; *Cal. Ironworkers*, ECF 5 at 1. **The movants' uniform use of out of pocket loss is consistent with every single Wisconsin district court lead plaintiff decision issued in a non-merger PSLRA case since the passage of the statute almost three decades ago**.[2] There was no mention of *Dura* or its relevance to financial interest anywhere in the Store Brand Group's opening papers. "It was only after [the Store Brand Group] discovered that it did not have the largest loss amount when compared to other Plaintiffs that [the Group] changed its position in later filings as to the proper loss calculation …." *Constr. Workers Pension Tr. Fund v. Navistar Int'l Corp.*, 2013 WL 3934243, at *3 (N.D. Ill. July 30, 2013).[3] "This fact alone counsels in favor of adopting

---

[2]    *See Maiden v. Merge Techs., Inc.*, 2006 WL 3404777, at *2 (E.D. Wis. Nov. 21, 2006) ("the amount of loss suffered by the plaintiff" is "the most important factor" for determining a movant's financial interest"); *Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 624 (E.D. Wis. 2009) (same); *Lifson v. Assisted Living Concepts, Inc.*, 2012 WL 12929878, at *1 (E.D. Wis. Nov. 14, 2012) (evaluating **only** approximate losses suffered); *Iron Workers Local No. 25 Pension Fund v. OshKosh Corp.*, No. 2:08-cv-00797-WCG, ECF 69 at 2 (E.D. Wis. Feb. 11, 2009) (same); *Goss v. Roadrunner Transp. Sys., Inc.*, 2017 WL 10742612, at *2 (E.D. Wis. May 19, 2017) (same); *W. Pa. Elec. Emps. Pension Tr. v. Plexus Corp.*, 2007 WL 3342593, at *1 (E.D. Wis. Nov. 8, 2007); *see also In re Harley-Davidson, Inc. Sec. Litig.*, No. 2:05-cv-00547-CNC, ECF 34 (E.D. Wis. Feb. 14, 2006) (appointing movants with largest losses who set forth their financial interest in their motions as their out of pocket loss); *Wagner v. Spectrum Brands Legacy, Inc.*, 2019 WL 2443036, at *3 (W.D. Wis. June 12, 2019) (same); *Schultz v. TomoTherapy Inc.*, No. 3:08-cv-00314-slc (W.D. Wis. Sept. 2, 2008) (same); *Puskala v. Koss Corp.*, No. 2:10-cv-00041-LA, ECF 21 at 6 (E.D. Wis. May 11, 2010) (same); *City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*, No. 2:13-cv-01159-CNC, ECF 39 at 5 (E.D. Wis. Nov. 25, 2013) (same).

[3]    The Store Brand Group half-heartedly asserts that it "purchased more net shares and expended more net funds than Tampa" and that "[t]hese financial metrics further reinforce the [Store Brand] Group's status as the presumptive Lead Plaintiff." ECF 22 at 12-13. As the Store Brand Group is well aware, these secondary financial metrics "'do not advance the ball.'" *Merge Techs.*, 2006 WL 3404777, at *2 (quoting *In re Bally Total Fitness Sec. Litig.*, 2005 WL 627960, at *1 (N.D. Ill. Mar. 15, 2005)). For good reason, "**the best yardstick by which to judge 'largest financial interest' is the amount of loss, period**. The inquiry need not and should not be complicated by also considering the number of shares or the net expenditures involved because those statistics do not advance the ball." *Bally*, 2005 WL 627960, at *4. To Tampa's knowledge, no court has found that a movant prevailing on these two metrics possessed a larger financial interest when a competing movant was found to have the larger loss and more total shares purchased. Unsurprisingly, the Store Brand Group does not cite any.

the LIFO methodology, as opposed to the [Store Brand Group's novel] methodolog[ies]." *Bodri v. GoPro, Inc*., 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016).[4] And, if the Court does so, it is undisputed that Tampa has the largest financial interest.

Even if the Court considers the Store Brand Group's alternative methods, Tampa should still be appointed Lead Plaintiff.

## 2. *Dura* Confirms that Tampa Is the Presumptive Lead Plaintiff

The Store Brand Group claims that its novel loss calculation theories should be applied because "more than half of Tampa's losses are unrecoverable under controlling Supreme Court case law [*Dura*]." ECF 22 at 3 (cleaned up). Not so.

As a preliminary matter, *Dura* "was not a case involving the appointment of a Lead Plaintiff under the PSLRA." *Blitz v. AgFeed Indus., Inc*., 2012 WL 1192814, at *4 (M.D. Tenn. Apr. 10, 2012). Additionally, "*Dura* does not discuss FIFO or LIFO losses." *Id*. As such, courts outside of the Second Circuit are generally reluctant to apply *Dura* principles to the financial interest calculation at the lead plaintiff stage as doing so can be a speculative endeavor that necessarily implicates merits determinations early on in a litigation, particularly where, as here, there are multiple disclosures alleged in both complaints.[5] *See, e.g.*, *Owens v. FirstEnergy Corp*., 2020 WL

---

[4] *See also Singer v. Nicor, Inc*., 2002 WL 31356419, at *3 (N.D. Ill. Oct. 17, 2002) ("the court will not consider the candidates' amendments of [financial interest arguments] made after the filing deadline"); *Cook v. Allergn PLC*, 2019 WL 1510894, at *3 (S.D.N.Y. Mar. 21, 2019) ("The fact that DeKalb used the same methodology as BRS in its original moving papers – only to alter its calculation when it learned that someone else had a larger loss – lends validity to the conclusion that the impact of *Dura* on the proposed lead plaintiffs' loss calculations is at best uncertain, and so should be discounted."); *Chandler v. Ulta Beauty, Inc.*, 2018 WL 3141763, at *3 n.5 (N.D. Ill. June 26, 2018) ("Indeed, courts have rejected proposals to alter a proposed loss calculation method made after it was apparent that the proponent of the change would not have the largest financial interest under the initially proposed method."); *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 477 (S.D.N.Y. 2011) (rejecting shifting arguments and adopting the original loss metric while wryly observing that "the test is changed and adjusted, depending on conditions, so that the lead plaintiff status (and the right to select counsel) may be achieved").

[5] *See, e.g.*, *In re Watchguard Sec. Litig*., 2005 WL 8188936, at *4 & n.6 (W.D. Wash. July 13, 2005) (declining to overlay *Dura* at the lead plaintiff stage, finding that a "host of market influences can operate to inflate or deflate the fraud premium during the class period" and the "ups and downs in the fraud premium may be difficult to ascertain even after discovery, much less at the outset of the litigation," and concluding that the "***Supreme Court did not suggest that a court should guess about***

6873421, at *7 (S.D. Ohio Nov. 23, 2020) ("Courts in the Second Circuit read *Dura* to require courts to consider this causal connection when evaluating financial interest at the lead plaintiff stage. . . . Most courts in the Sixth Circuit do not adopt the *Dura* analysis to calculate financial interest at the lead plaintiff stage.").  Indeed, even within the Second Circuit, "the appropriateness of employing *Dura* analysis at the lead plaintiff stage is subject to considerable dispute."  *Allergan*, 2019 WL 1510894, at *3.[6]  And with the exception of Judge Robert Michael Dow Jr. in the Northern District of Illinois, none of the scores of lead plaintiff opinions from this Circuit have applied *Dura* at the lead plaintiff stage.  There is no reason for this Court to do so here.  *See MGIC*, 256 F.R.D. at 620 ("[T]he best way to calculate financial interests in this case is to use each movant's estimation of the 'loss' it suffered ….").

More importantly, even Judge Dow and the minority of out-of-Circuit courts adding a *Dura* loss causation component to the "largest financial interest" inquiry do so in a rational and consistent manner; that is, by excluding losses incurred before the *first* alleged revelation of the fraud.[7]  Unsurprisingly, when applying this method – *which is the method used in all but one of the cases cited by the Store Brand Group* – Tampa again possesses the largest recoverable loss.

---

*the effect of these as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue*").

[6]  *See id.* ("Here, allegations of fraud in the complaint suggest that the 'fraud premium' may have varied throughout the Class Period as a result of, *inter alia*, partial corrective disclosures of Allergan's malfeasance. . . . Given the length of the pleaded class period (beginning in early 2017 and going to December 2018) and the documented decline in Allergan's share price during that period (at points dramatically), it would be unwise to embrace DeKalb's convoluted loss calculation methodology at the expense of BRS' considerably more straightforward calculations."); *see also Bang v. Acura Pharm., Inc*., 2011 WL 91099, at *2 (N.D. Ill. Jan. 11, 2011) (holding that the movant with the larger loss had "the largest financial interest" and noting "[t]o determine which plaintiff has the largest financial interest, courts look to the plaintiff with the greatest **net loss** during the proposed class period"); *Navistar*, 2013 WL 3934243, at *3 ("it is premature at this juncture to determine that . . . any Plaintiff will be unable to recover for losses prior to [the first corrective disclosure alleged in the complaint]").

[7]  *See Sallustro v. CannaVest Corp*., 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015) ("Under *Dura* and the last-in, first-out ('LIFO') accounting method that is preferred in this Circuit, Ish must match the last shares purchased to the first shares sold prior to the **first** corrective disclosure, and then exclude those transactions from her loss figure."); *Citigroup*, 2021 WL 396343, at *3 ("courts in this district ordinarily will not include losses that occurred prior to the **first** corrective disclosure of the alleged fraudulent misrepresentation made by the defendant").

4855-9327-8292.v1

| "*Dura* Method" Recoverable Losses | |
|---|---|
| (excluding losses on in-and-out before first corrective disclosure of the fraud) | |
| **Tampa** | **$16.27 million** |
| Store Brand Group | $15.66 million combined |

*See* Declaration of John D. Blythin in Support of Reply Memorandum of Law in Further Support of

Tampa's Motion for Appointment as Lead Plaintiff ("Blythin Reply Decl."), Exhibit A.[8]

Because they lose under this outlier method as well, the Store Brand Group instead proposes

an entirely new method (confusingly misnamed the *Dura* Method) which asks the Court to go one

step further and exclude losses incurred by class members ***after*** the first corrective disclosure of the

alleged fraud. To borrow the Store Brand Group's own words, "[t]his is nonsense." ECF 22 at 10.

Indeed, the last time the Store Brand Group's counsel tried to conflate this very same unsupported

methodology with the *Dura* Method, Judge Broderick rejected the gambit, noting that counsel's

client "***has not identified a single court that has endorsed the approach it proposes, under which I***

***would exclude in-and-out transactions that occurred subsequent to the first alleged corrective***

***disclosure***:"

---

[8]    *See Hedick v. Kraft Heinz Co*., 2019 WL 4958238, at *6, *8 (N.D. Ill. Oct. 8, 2019) (Dow, J.)
(excluding only those losses incurred by sub-entities that sold their entire position before the first
corrective disclosure alleged in the case); *see also Hedick*, No. 1:19-cv-01339, ECF 86 at 5
(calculations relied on by Judge Dow, which only exclude losses of Store Brand Group's client's
sub-entities which sold all their shares prior to the first alleged corrective disclosure); *Chandler*,
2018 WL 3141763, at *4 (excluding only those losses incurred before either of the two alleged
corrective disclosures in the case); *Chandler*, No. 1:18-cv-01577, ECF 34-3 at 5 (calculation relied
on by Judge Dow under the *Dura* Method; crediting losses incurred on shares purchased and sold
between corrective disclosures); *In re Comverse Tech., Inc. Sec. Litig*., 2007 WL 680779, at *4
(E.D.N.Y. Mar. 2, 2007) ("any losses that [a movant] may have incurred before [a defendant's]
misconduct was ***ever*** disclosed to the public are not recoverable, because those losses cannot be
proximately linked to the misconduct at issue in th[e] litigation"); *Saye v. NIO Inc*., 2022 WL
17666398, at *4 (S.D.N.Y. Dec. 14, 2022) (Judge Vernon S. Broderick – who explicitly refused to
apply the Store Brand Group's method in *Plaut v. Goldman Sachs Grp., Inc.*, 2019 WL 4512774, at
*4 (S.D.N.Y. Sept. 19, 2019) – applying the *Dura* Method by excluding only those losses incurred
"where an investor buys stock and sells it during the class period but before ***any*** disclosures.");
*Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 618 (S.D.N.Y. 2015) ("[W]hen
calculating movants' financial interests on a lead plaintiff motion, courts should not include 'losses
result[ing] from "in-and-out" transactions, which took place during the class period, but ***before the***
***misconduct identified in the complaint was ever revealed to the public***.'"

4855-9327-8292.v1     Case 2:22-cv-01436-BHL    Filed 03/07/23    Page 12 of 22    Document 26

Applying the Supreme Court's finding in *Dura* . . . , that securities actions only provide recoveries for "economic losses that misrepresentations actually cause," courts have elected not to include losses incurred based on "in-and-out" trades that occur prior to any corrective disclosure. . . . AP7 adds a new element to this approach, by excluding not only those in-and-out transactions that occurred prior to the first corrective disclosure pled in the complaint, but also all those in-and-out transactions that occurred in the periods between the various corrective disclosures during the Class Period. . . . AP7 has not identified a single court that has endorsed the approach it proposes, under which I would exclude in-and-out transactions that occurred subsequent to the first alleged corrective disclosure. . . . In light of the various factual issues related to the causation of any losses occurring after the first corrective disclosure, I will not apply the approach proposed by AP7. However, under *Dura*, I am inclined to exclude in-and-out transactions prior to the first alleged corrective disclosure, i.e., those "losses that [each movant] may have incurred before [Defendants'] misconduct was ever disclosed to the public." *Comverse*, 2007 WL 680779, at *4; *see also Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 617-18 (S.D.N.Y. 2015).

*Plaut*, 2019 WL 4512774, at *4. For the same reasons, this Court too should reject the Store Brand Group's modified *Dura* Method.

The reason why the Store Brand Group's modified methodology was rejected by Judge Broderick and has not been adopted by courts at the lead plaintiff stage is simple – it does not comport with the loss causation principles articulated by the Seventh Circuit and other circuit courts, or *Dura* itself. Indeed, to adequately plead loss causation, the lead plaintiff appointed by a district court must simply allege the fact that defendants' actions "had something to do with the drop in value." *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007); *see generally Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("Revelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause."). And, "[l]oss causation may be pled on a theory of partial disclosures." *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *6 (N.D. Ill. July 28, 2009) (citing *Dura*, 544 U.S. at 342 (acknowledging that truth can "leak out" into the marketplace)). By taking the position at this earliest stage of a PSLRA case that losses during the disclosure period are not recoverable, the Store Brand Group entirely ignores and, as a practical matter, forecloses the lead plaintiff's ability to utilize the leakage theory to prove damages. *See generally Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 416 (7th Cir. 2015) (expressly affirming "leakage model" of

loss causation which jury adopted at trial which "model calculates every difference, both positive and negative, between the stock's predicted returns . . . and the stock's actual returns during the disclosure period" and the "total sum of these residual returns is assumed to be the effect of the disclosures" and the "amount the stock is overpriced on any given day is the sum of all subsequent residual returns") (emphasis omitted).[9]

In fact, the **only** court that has applied the Store Brand Group's method at the lead plaintiff stage is readily distinguishable. *See Hoang v. ContextLogic, Inc.*, 2022 WL 1539533, at *6 (N.D. Cal. May 16, 2022). In *Hoang*, Judge Beth Labson Freeman used the LIFO loss method – not the Store Brand Group's method – to "conclud[e]" who the movant with the largest financial interest was, and only after doing so, used the Store Brand Group's method as a secondary metric to cross-check the court's earlier conclusion. *Id.* at *7 ("The losses calculated under the [Store Brand Group's] method confirm the court's conclusion *under the LIFO method* that Yang & De Block have the greater approximate losses."). Moreover, the specific dispute between the movants here – whether to exclude losses on shares sold during the disclosure period – does not appear to have been a point of serious dispute in *Hoang*. *Id.* at *5 ("counsel [for the competing movant] did not articulate any substantive reasons for rejecting Yang & De Block's figures").[10]

Simply put, the Store Brand Group cannot have its *Dura* cake and eat it too. If the Group does not want the Court to apply *Dura's* loss causation principles to apply at the lead plaintiff stage, Tampa has the largest financial interest under the LIFO loss methodology. If it does, Tampa has the largest loss under the standard analysis used by the majority of courts applying *Dura* at this stage.

---

[9]   Tampa's proposed lead counsel successfully established the leakage theory at trial in *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.* and successfully defended it on appeal, which enabled the class to obtain a $1,575,000,000 recovery – the largest securities class action recovery ever obtained in the Seventh Circuit.

[10]   In a footnote, the Store Brand Group cites three out-of-circuit cases where courts decided, at the **conclusion of the litigation** and in connection with a settlement plan of allocation to exclude class members who suffered losses from in-and-out transactions pursuant to an inflation-based plan of allocation. *See* ECF 22 at 5 n.3 (citing *In re LDK Solar Sec. Litig.*, 2010 WL 3001384, at *3 (N.D. Cal. July 29, 2010); *Rieckborn v. Velti plc*, 2015 WL 468329, at *9 (N.D. Cal. Feb. 3, 2015); *In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 682 (D. Colo. 2014)). In none of these three cases was the "largest financial interest" inquiry at the **lead plaintiff stage** conducted using the Store Brand Group's method (or any method under which the Group would have the largest financial interest).

Thus, to the extent this Court is inclined to overlay *Dura* on the movants' loss calculations (and there is no reason that it should), Tampa ***still*** possesses a larger financial interest than all competing movants combined.

**3.**     **The Court Should Reject the Store Brand Group's Request to Shrink the Class by Ignoring the Complaint's Well-Pled Allegations It Previously Embraced**

With no other available path to success, the Store Brand Group's final uphill challenge is to convince the Court that the *Cal. Ironworkers* complaint is "both entirely unrelated to the theory of fraud set forth in the *Oakland County* action and implausible." ECF 22 at 9. But this endeavor also falls short, as the Store Brand Group's own opening brief confirms.

Indeed, the Store Brand Group included the November 2, 2021 disclosure and corresponding stock decline in its "Factual Background" section of its brief, (ECF 8 at 4), agreed that the actions should be consolidated because they "present substantially similar factual and legal issues," (*id.* at 6), and included in its loss calculations the losses associated with the November 2021 decline. *See* ECF 9-2.[11] Viewed in this light, the Store Brand Group's newly-adopted position that the *Cal. Ironworkers* complaint is "entirely unrelated to the theory of fraud set forth in the *Oakland County* action" (ECF 22 at 9) simply does not hold water.

Moreover, it is readily apparent that the *Cal. Ironworkers* complaint alleges that Generac made false and/or misleading statements regarding the fact that "Generac had been suffering substantial declines in demand for its legacy generator product offerings, causing the Company to slash product prices by nearly 20% and engage in a massive acquisition spree in an attempt to offset waning demand." *Cal. Ironworkers*, ECF 1 at ¶51(a). This is ***precisely*** what came to light through multiple of the *Oakland County* complaint's alleged corrective disclosures. For example, the *Cal. Ironworkers* complaint alleges on November 2, 2021, Generac released financial results that "missed revenue, margin, EBITDA, and income projections." *Id.* at ¶52. This revelation partially revealed

---

[11]    "That [the Store Brand Group] – in its moving papers – calculated its losses based on the [more inclusive] class . . . , and changed its approach only after learning that [Tampa's] losses exceeded its own, is all the more reason to reject [the Store Brand Group's] attempt to truncate the class . . . ." *See Lucas v. United States Oil Fund, LP*, 2020 WL 5549719, at *4 (S.D.N.Y. Sept. 16, 2020).

4855-9327-8292.v1

Generac's declining demand. *See generally supra* at 7-8 (discussing availability of numerous ways of pleading loss causation, including through a partial disclosure or leakage theory). Similarly, the *Oakland County* complaint explains the October 19, 2022 revelations (which is included in both complaints) by including a Bank of America analyst comment which attributed Generac's resulting stock decline to "net income com[ing] in well below our prior expectations of $159 mn vs. $58 mn preliminarily reported." ECF 1 at ¶76. Analysts widely agreed the slowdown of legacy demand and sales was disastrous for Generac.[12] Indeed, declining demand is exactly what the *Cal. Ironworkers* November 2, 2021 disclosure similarly brought to light.[13] Given the clear overlap between the *Oakland County* and *Cal. Ironworkers* allegations – such that the Store Brand Group embraced them without reservation in its motion – the Group's attempt to distance itself from the November disclosure is disingenuous.

The Store Brand Group's authorities offered in support of its quest further highlight the deficiencies in its position. For example, the Store Brand Group primarily relies on *Hedick*, 2019 WL 4958238, where the issue was whether the court should include losses on shares purchased

---

[12] *See* Blythin Reply Decl., Ex. B ("Continued softness in home-standby generator orders was the primary reason for the shortfall."); Blythin Reply Decl., Ex. C ("[W]e believe the negative preannouncement will add fuel to the bearish argument that demand is deteriorating."); Blythin Reply Decl., Ex. D ("We reduce our TP to $181, from $395, due to weaker-than-expected home standby generator & clean energy sales and lower long-term growth."); Blythin Reply Decl., Ex. E ("We account for this $600-700 mn revenue cut by sizably reducing our expectations for home standby (HSB) volumes and revenues through the remainder of 2022 ***and beyond***. In our view, this guidance cut indicates markedly weaker HSB demand than our recently lowered expectations. We cut our FY23 HSB revenue expectations to $1.4 bn from $2.0 bn and FY24 to $1.7 bn from $2.2 bn, accounting for weaker volumes and reducing benefits from pricing increases, as promotional activity remains high. We also reduce our expectations for PWRcell and Ecobee growth to account for elevated execution risk."); Blythin Reply Decl., Ex. F ("Generac admitted yesterday what was becoming apparent already, which is that the company's home standby power (HSB) business has weakened as result of more modest demand and excess channel inventory.").

[13] *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1307 (N.D. Ga. 2021) (upholding complaint alleging a theory that company concealment of a slowdown in demand exacerbated harm caused by product defects; rejecting defendants' challenge to first alleged corrective disclosure which was the company's announcement of "'lower sales than [ ] anticipated'" and "'that margins were down'"; and rejecting defendants' arguments that "none of the alleged corrective disclosures concern the schemes asserted by Plaintiff or reveal 'the Company's purported misstatements or omissions'").

- 10 -

before the start of the class period, which is obviously not at issue here.[14]  Other cases the Store Brand Group relies on are similarly inapposite.[15]  It's not surprising that the Store Brand Group could not find case law to support its position because no court has ever declined to include losses that resulted from an adequately alleged partial corrective disclosure.

Indeed, the case law is overwhelmingly clear that "'the class' . . . should be defined as the broadest, most inclusive potential class." *MGIC*, 256 F.R.D. at 625 (noting that this assumption "makes some sense, because at the outset of a case the court should view the facts in the light most favorable to the plaintiffs and should narrow the allegations only after the parties have had the opportunity to develop the record").[16]  And "[i]n determining what is a partial disclosure for loss causation purposes, the case law instructs courts to hew closely to the allegations of the complaint."

---

[14]  The specific issue in *Hedick* was not whether a more inclusive class than was adequately alleged in a complaint should be considered for loss calculation purposes, but rather whether the court could *sua sponte* expand the class period (even though no complaint alleged that longer class period) so that a movant who acquired Kraft shares pursuant to a merger, but before the start of any alleged class period, could count those pre-class period acquisitions in its loss calculation.  2019 WL 4958238, at *4-*5.

[15]  In *MGIC*, Judge Lynn Adelman **adopted the most inclusive class** because it was not "obviously frivolous."  256 F.R.D. at 625.  Likewise, Judge Keith P. Ellison, in *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428 (S.D. Tex. 2010) used the most inclusive class to calculate losses because the complaints "give rise to claims of securities fraud . . . that are not obviously frivolous."  *Id.* at 437.  Finally, the court in *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231 (E.D.N.Y. 2011) disqualified a movant on Rule 23 grounds where **all of its losses** were a result of a single partial disclosure that was **not** adequately pled.  *See id.* at 241.  In contrast, not only is the November 2, 2021 disclosure adequately pled, but Tampa suffered the largest *Dura* Method loss of any investor before the Court even assuming arguendo that the November 2, 2021 disclosure is ignored.  *See infra* at 13-14; ECF 12-4 at 2.

[16]  *See also Hedick*, 2019 WL 4958238, at *5 ("For the purpose of calculating losses in determining the proper lead plaintiff in securities class actions, courts use the most inclusive class period."); *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *2 (N.D. Cal. Aug. 22, 2008) ("it would be premature for the court to use a class period that disregards damages potentially suffered due to [defendant's] alleged misrepresentation").  Given the "infinite varieties" of causation theories available to the lead plaintiff, as well as the expert-intensive nature of disaggregating fraud-related portions of share price declines, the sort of determination that the Store Brand Group urges the Court to make here can even be premature at the **summary judgment** stage.  *Mineworkers' Pension Scheme*, 881 F.3d 750 at 754 (affirming district court's denial of defendants' motion for summary judgment on loss causation grounds and finding that a "plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss").

*Christian v. BT Grp. PLC*, 2017 WL 3705804, at \*7-\*8 (D.N.J. Aug. 28, 2017). Courts decline to consider the most inclusive class period in circumstances when "the allegations supporting the longer class period are . . . obviously frivolous." *MGIC*, 256 F.R.D. at 625 & n.7 (rejecting "superficial" argument for the court to review complaint allegations for plausibility at the lead plaintiff based on "poor record for making an informed finding concerning plausibility"). The Store Brand Group has not even attempted to meet its burden by so much as asserting – much less demonstrating – that the November 2, 2021 partial disclosure is "obviously frivolous." *Id.* Nor could it, as the allegations associated with the November 2, 2021 disclosure are not just plausible, they significantly strengthen the claims asserted in both complaints by tying Generac's declining demand for legacy products to defendants' misrepresentations and omissions associated with the SnapRS parts. It is therefore not mere happenstance that the Store Brand Group embraced this disclosure in its opening brief. A quick review of the stock declines associated with the four alleged partial disclosures reveals that the magnitude of the November 2, 2021 associated stock decline **alone** is greater than the other three associated stock declines **combined**:

| Disclosure Date | Alleged Associated GNRC Stock Decline |
|---|---|
| November 2, 2021 | ($52.40) |
| August 1, 2022 | ($3.31) |
| October 19, 2022 | ($37.44) |
| November 2, 2022 | ($8.99) |

Consequently, the Court should be skeptical of any movant's short-sighted arguments which, if successful, would foreclose the lead plaintiff's ability to attempt to pursue a recovery for the most significant alleged partial disclosure and the majority of the alleged fraud-based stock price inflation in this case.[17] *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase'").[18] Given the "duty of undivided loyalty to

---

[17] The Store Brand Group's loss chart indicates that several of the Store Brand Group entities held shares through the November 2, 2021 partial disclosure and thus would also have damages claims resulting from the associated stock decline. *See* ECF 9-2.

[18] *See Marcus v. J.C. Penney*, 2014 WL 11394911, at \*7 (E.D. Tex. Feb. 28, 2014) ("At this stage of the litigation, a shorter class period would have the effect of reducing the class size and limiting

the interests of the class" that a lead plaintiff and its counsel owe to class members, such arguments raise serious questions as to whether the Store Brand Group can "fairly and adequately protect the interests of the class." *In re Cendant Corp. Litig.*, 264 F.3d 201, 254 (3d Cir. 2001); Fed. R. Civ. P. 23(a)(4).

At this early stage of the litigation, the Court should decline to entertain the Store Brand Group's invitation to shrink the class's (and its own) damages, and should include, not ignore, losses that class members suffered from the November 2, 2021 partial disclosure.

### 4. Tampa Has the Largest Loss of Any Investor Before the Court, Even Under The Store Brand Group's Rejected Loss Methodology and Post-Motion Revisionism of the Complaint

Tampa has a larger financial interest than the Store Brand Group under any objective loss calculation method. However, even if the Court accepted either one of the Store Brand Group's self-contradicting loss calculation proposals, Tampa ***still*** possesses a larger loss than any investor seeking lead plaintiff status (*i.e.* any one of the individual three Store Brand Group members). *See* ECF 23-1, 23-2 (Store Brand Group's loss charts under each of its proposals reflecting Tampa has the largest individual loss). Moreover, even after scouring the country for case law and/or methodologies that might otherwise allow it to legitimately claim the largest loss, the Store Brand Group's proposals are nonetheless insufficient to "avoid the impression that 'a group of unrelated investors has been cobbled together . . . to displace a single competing institutional investor.'" *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 120 (E.D.N.Y. 2012); *see generally Merge Techs.*, 2006 WL 3404777, at *3; *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1025 (N.D. Cal. 1999) ("It seems clear that Congress intended a single, strong lead plaintiff to control counsel and the litigation."); ECF 20 at 7-11.

---

the potential amount of damages. It is unclear why a potential lead plaintiff would argue for a shorter class period, unless it was in the best interest of that particular plaintiff. This self-serving behavior is precisely the type of rebuttable evidence provided in the PSLRA that would prohibit this Court from appointing Ifantides lead plaintiff.); *Eichenholtz*, 2008 WL 3925289, at *2 ("[N]o benefits accrue by shortening the class period at this stage in the litigation. Indeed, it is unclear why a plaintiff would argue for a shorter class period at this stage, which would have the effect of reducing the class size and limiting the potential amount of damages, unless it was in the best interest of that particular plaintiff only.").

4855-9327-8292.v1    Case 2:22-cv-01436-BHL    Filed 03/07/23    Page 19 of 22    Document 26

## B. The Store Brand Group's Motion Should Be Rejected

As illustrated herein, the Store Brand Group does not possess the largest financial interest in the relief sought by the class. Moreover, the Store Brand Group has failed to rebut the presumption that lies decidedly in favor of Tampa. Thus, the Store Brand Group's motion should be denied. *See In re Cavanaugh,* 306 F.3d 726, 732 (9th Cir. 2002) ("So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job" because "this is not a beauty contest").

As discussed in Tampa's opposition brief (*see* ECF 20), Store Brand Group would not be entitled to presumptive lead plaintiff status even absent the existence of a competing lead plaintiff movant with a larger financial interest (*i.e.* Tampa) because the purpose behind the Store Brand Group's creation precludes it from satisfying Rule 23's requirements. *See id.* at 8-10. Specifically, the record in this case confirms that the 18-entity Store Brand Group was assembled to allow it to claim a loss in excess of the ***known*** $10 million+ loss advertised in the PSLRA notice published in connection with the *Oakland County* complaint. *Id.*; *see also* ECF 9-3 (the Store Brand Group's "Joint Declaration" failing to provide any alternate explanation of how or why a Norwegian asset manager, an affiliated Swedish investment company, a family of Connecticut state funds, and a Danish pension company came together to file a lead plaintiff motion). "Allowing lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would 'allow and encourage lawyers to direct the litigation.'" *Merge Techs.,* 2006 WL 3404777, at *3 (rejecting post-motion grouping to exceed the known loss of a competing movant; observing that "[t]he transparency of this maneuver is plain to see, and it has been consistently rejected by other courts in similar circumstances").[19]

_____

[19] The drawbacks of appointing an unrelated lawyer-driven group extend beyond running afoul of the policy goals behind the PSLRA. Indeed, the inefficiencies and increased costs associated with this 18-entity/multiple lead counsel Store Brand Group would plague absent class members and the Court throughout this litigation. For example, at class certification, there are typically two fact depositions: the lead plaintiff and its investment manager, as would be the case with Tampa. However, with the Store Brand Group, that number could easily increase tenfold, with two sets of plaintiffs' lawyers attending or at least following each one of the multiple entities' discovery.

Former Chief Judge Randa's warning was prescient, as the Store Brand Group has already demonstrated its willingness to jettison a majority of the class's alleged recoverable damages to bolster its chances of becoming the lead plaintiff. The artificiality of the Store Brand Group's formation is underscored by the fact that even after two rounds of briefing (and an unanswered email from Tampa's counsel seeking clarification about the Store Brand Group's standing and veracity of group member Storebrand Asset Management AS' PSLRA Certification), the Store Brand Group has still failed to clearly establish its members' standing. *See* ECF 20 at 11-17. In sum, beyond its lack of the largest financial interest, the Store Brand Group cannot be appointed as lead plaintiff because it cannot satisfy the Rule 23 inquiry.

## III.   CONCLUSION

The Store Brand Group's attempt to shrink Tampa's losses by limiting the causation theories available to plaintiffs or by gerrymandering the *Cal. Ironworkers* complaint should be rejected. Tampa is the paradigmatic candidate for appointment as lead plaintiff. Its motion should be granted.

DATED:  March 7, 2023                          Respectfully submitted,


                                    s/ John D. Blythin
                          JOHN D. BLYTHIN (SBN 1046105)

                          ADEMI LLP
                          GURI ADEMI
                          JESSE FRUCHTER
                          JOHN D. BLYTHIN
                          3620 East Layton Avenue
                          Cudahy, WI  53110
                          Telephone:  414/482-8000
                          414/482-8001 (fax)
                          gademi@ademilaw.com
                          jfruchter@ademilaw.com
                          jblythin@ademilaw.com

                          Local Counsel

---

Similarly, written discovery from each of the 18 entities would needlessly mean additional burden for the Court and costs for the class associated with multiple sets of documents to be collected, reviewed for relevance and privilege, redacted, and ultimately produced.

4855-9327-8292.v1

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS
SCOTT H. SAHAM
DANIELLE S. MYERS
NICOLE Q. GILLILAND
RAPHAELLA FRIEDMAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
scotts@rgrdlaw.com
dmyers@rgrdlaw.com
ngilliland@rgrdlaw.com
rfriedman@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead
Plaintiff

KLAUSNER, KAUFMAN, JENSEN
 & LEVINSON
ROBERT D. KLAUSNER
STUART A. KAUFMAN
7080 NW 4th Street
Plantation, FL 33317
Telephone: 954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
stu@robertdklausner.com

Additional Counsel for Proposed Lead Plaintiff