UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

| | |
|---|---|
| OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION, et al., Individually and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiff, <br><br>    v. <br><br> GENERAC HOLDINGS INC., et al., <br><br>                 Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )  Case No. 22-CV-1436 <br> ) <br> )  Milwaukee, WI <br> ) <br> ) <br> )  April 10, 2023 <br> )  1:41 p.m. <br> ) |

---

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE BRETT H. LUDWIG
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Movant<br>CITY PENSION FUND FOR<br>FIREFIGHTERS AND POLICE<br>OFFICERS IN THE CITY OF<br>TAMPA: | Robbins Geller Rudman &<br>Dowd, LLP<br>By:  MR. DARREN J. ROBBINS<br>655 W. Broadway, Ste. 1900<br>San Diego, CA  92101<br>Ph:  618-231-1058<br>darrenr@rgrdlaw.com |
| For the Consolidated Plaintiff<br>CALIFORNIA IRONWORKERS<br>FIELD PENSION TRUST: | Ademi, LLP<br>By:  MR. GURI ADEMI<br>3620 E. Layton Ave.<br>Cudahy, WI  53110<br>Ph:  414-482-8000<br>gademi@ademilaw.com |
| For the Movants<br>INDUSTRIENS PENSIONSFORSIKRING A/S,<br>et al.: | Kessler Topaz Meltzer &<br>Check, LLP<br>By:  MR. RYAN T. DEGNAN<br>280 King of Prussia Road<br>Radnor, PA  19087<br>Ph:  610-667-7706<br>rdegnan@ktmc.com |

APPEARANCES CONT'D.:

For the Movants                              Saxena White PA
INDUSTRIENS PENSIONSFORSIKRING A/S,          By:  MR. ALEC COQUIN
et al.:                                      10 Bank St., 8th Fl.
                                             White Plains, NY  10606
                                             Ph:  914-437-8551
                                             acoquin@saxenawhite.com


For the Movant                               Cross Law Firm, SC
OFFICE OF THE TREASURER AS                   By:  MS. MARY C. FLANNER
TRUSTEE FOR THE CONNECTICUT                  505 Arcadian Ave.
RETIREMENT PLANS AND TRUST                   Waukesha, WI  53186
FUNDS:                                       Ph:  414-209-7021
                                             mflanner@crosslawfirm.com


U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

TRANSCRIPT OF PROCEEDINGS

THE CLERK:  The Court calls Case No. 22-CV-1436, Oakland County Voluntary Employees' Beneficiary Association, et al., versus Generac Holdings Inc., et al.  Appearances, please, starting with the Plaintiffs.

MR. ROBBINS:  Good afternoon, your Honor.  Darrin Robbins of Robbins, Geller, Rudman & Dowd together with my local counsel Guri Ademi on behalf of the City Pension Plan for Firefighters and Police Officers of the City of Tampa.

MR. DEGNAN:  Good afternoon, your Honor.  Ryan Degnan of Kessler, Topaz, Meltzer & Check here on behalf of the Institutional Investor Group.

MS. FLANNER:  Mary Flanner of the Cross Law Firm appearing as local counsel.

MR. COQUIN:  Alec Coquin with the law firm of Saxena White on behalf of the Institutional Investor Group.

THE COURT:  Anyone else making an appearance?

(No response.)

THE COURT:  Okay.  Excuse me.  We are here this afternoon for oral argument on cross motions for appointment of lead counsel in this class action.  The case began on December 1st of 2022 when plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees Retirement System filed a securities fraud class action complaint against defendant Generac Holdings, Inc., its CEO and CFO.  The

complaint concerns alleged failures to disclose issues with a defective component used in the defendant's solar power products, asserts claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5, also violations of Rule 20(a) of the Exchange Act. The complaint seeks to represent a class of investors who purchased Generac stock between April 29th of 2021 and November 1 of 2022.

On January 20th of 2023, a second complaint was filed, this one by the California Ironworkers Field Pension Trust, involved similar allegations and claims, seeks to represent I think an identical class. On January 30th, the City Pension Fund for Firefighters and Police Officers in the City of Tampa filed a motion for consolidation of the related actions, appointment as lead plaintiff, and approval of lead plaintiff's selection of lead counsel. The parties have referred to that entity or that movant as "Tampa" or "Tampa plaintiff." I'll follow that approach as well. According to the motion, the Tampa plaintiff purchased 235,000 shares and suffered 16.2 million in compensable losses as a result of the misconduct alleged in the underlying complaints.

Later that same day, the Office of the Treasurer as Trustee for the Connecticut Retirement Plans and Trustee Funds, Industriens -- I'm going to butcher this -- and Storebrand Asset Management AS, a series of different groups collectively referred to as the "Institutional Investor Group" filed their

own motion for consolidation, appointment as lead plaintiff, and approval of selection of lead counsel. That group of stockholders seeks -- also seeks consolidation, seeks their appointment as lead plaintiff or plaintiffs, as well as approval of their counsel as lead counsel for the putative class. They claim to have incurred losses of 15.6 million. They also requested oral argument, which is one of the reasons we're having argument today.

There was a third group, Kujawiak family plaintiffs that filed a motion, but that has since been withdrawn.

On February 10th, the parties filed a stipulation to extend the defendant's deadline to respond to the complaint. The -- under the -- there's a protocol, essentially, that the lead plaintiff that is chosen will file and serve a consolidated complaint or designated -- designate one of the existing complaints as the operative complaint. And within 60 days of this Court's ruling on the lead plaintiff issue, the defendant will then have 60 days to file a response to that complaint. And the lead plaintiff will have 60 days to file the opposition to presumably a motion to dismiss, and defendant will then have 30 days to reply.

On February 13th, the Court entered a text only order approving the stipulation with respect to timing. On February 21st, the parties filed opposition briefs to one another's motions -- lead plaintiff motions. On March 7th, the parties

filed reply briefs. On March 14th, the Court entered a text only order granting the motions to consolidate putting that issue behind us, because it didn't seem anybody was arguing about that. I also set today for oral argument on the motions.

There was a filing by the Institutional Investors Group of some supplemental authority. That was on March 22nd. Other than that, we've had some notices of appearance. But beyond that, I think that's where things stand in terms of the procedural posture.

Are there any corrections or updates from the parties?

MR. ROBBINS: No, your Honor.

MR. DEGNAN: No, your Honor.

THE COURT: All right. Well, thank you for coming in this afternoon. As I said, we're really here to have a -- have some discussion of the issue of appointing the lead plaintiff and I guess the consequence of that lead counsel.

I have reviewed the briefs, and I've set aside about an hour for argument. We can go a little longer if we need to. But, again, I've read the briefs. I think I understand the gist of the parties' arguments, but I wanted to give you a chance to present them in person.

Obviously, I think the issue here is governed by the statute 15 USC Section 78u-4 and in particular Subsection (a)(3)(B)(iii)(I)(bb) which provides that for presumption with respect to appointment of lead plaintiff as the lead plaintiff

with the largest financial interest and the relief sought by the class. And I think that essentially is the primary issue here.

So I'd ask you to be guided by that. As I -- you know, in looking through the papers based on the initial motion papers, this would -- it seemed easy, right, because one paper said 16.2 million and the other said 15.6 million. And 16.2 is greater than 15.6. There's not much dispute about that. But I understand the Institutional Investors Group have arguments that the Tampa claim of 16.2 needs to -- needs to be adjusted downward based and a couple of different issues. I understand the Tampa plaintiff disputes that. The Tampa plaintiff also questions the propriety of the Institutional Investors Group I guess amalgamating a number of different claim -- shareholders together, doesn't -- at least doesn't appear to the Court that they had any sort of relationship prior to the -- prior to this litigation. But I'm happy to hear -- happy to be corrected on that.

So that -- those are the -- in broad strokes, those are -- that's my high-level summary of the issues. What I'd ask the parties to do is to focus on the language in the statute and explain your position in front of the Court and why your position is consistent with the language in the statute and why your competing moving party's position is not. The Tampa plaintiffs filed their motion first, albeit not by a

significant amount of time, but I'll have you go first.

MR. ROBBINS: Thank you, your Honor. As an initial matter, I would like to introduce to the Court, my client, the chairman of the Tampa fund. Mr. Patrick Messmer is attending the hearing here today.

May it please the Court, your Honor, you laid out all of the issues. And I think what the reams of briefing, assignments, declarations, and exhibits have started to obscure is what -- what is the purpose behind the Private Securities Litigation Reform Act of 1995. It was enacted, your Honor, with the express purpose of altering the balance between counsel and investors so that actions such as this one were prosecuted for the benefit of class members, as opposed to counsel.

And what we are attempting -- what the statute charges this Court with doing is identifying the most adequate plaintiff, that is, the class member with the most at stake who can speak with a unified voice. And I say that, your Honor, because there is no doubt that the statute provides that it is the person or group of persons with the largest financial interest that otherwise satisfies the adequacy and typicality prong to Rule 23 that is to be appointed. But it's very important to note, your Honor, that the statute speaks in the singular. So while it may be a group of persons or a person that has the largest stake, it always speaks of a lead plaintiff, not

co-lead plaintiffs, not multiple lead plaintiffs.

And so what we have before your Honor is two remaining motions, as you pointed out. The first by a public pension fund for first responders that has no assignments or assumptions based on foreign law. It is a single movant with the largest financial interest using the loss metric that was utilized by all movants before they saw how the table was set. The Tampa fund, as we're referring to it in short, your Honor, is the paradigmatic lead plaintiff contemplated by the PSLRA.

Now, this notion that was brought up in the opposition in reply brief once it was recognized that the largest financial stake was my client's is this so-called recoverable loss. That's the term that's used. And in Docket 22, which is the opposition brief filed by what is referred to as the Institutional Investor Group, they say that their own loss, their own stake, their own, quote, "recoverable loss is $15,458,288," end quote.

Now, this type of shifting metric starting with LIFO loss and shifting afterwards is something that has been repeatedly rejected by courts. Here what we have is the largest financial stake is the Tampa fund, and it has made the prima facie showing.

If I may, can I just walk through the financial --

THE COURT: Sure.

MR. ROBBINS: -- interests?

As your Honor noted, Docket 12-4 is the chart in support of the motion which shows Tampa's LIFO loss, the same metric used by all movants initially, was 16.27 million.

Now, just like the Tampa fund in its motion, the investor group, this is at Page 1 of its initial motion, says the group, quote, "incurred losses of more than 15.6 million as calculated under the widely accepted last in first out loss calculation," end quote. That's Docket 8 at Page 1. Even more poignantly, at Page 8 of that same brief, there's a heading in there, Section 2b, your Honor, where they say, and again I quote, "The Institutional Investor Group has the largest financial interest in the relief sought by the class," end quote. So they're defining: This is our stake in the outcome. And what do they say right below that? The group, quote, "suffered a LIFO loss of $15,667,761," end quote, not to put too fine a point on it. But my point in saying that is there was no mention at all of recoverable loss.

And so we've cited, your Honor, cases from within the circuit and without the circuit -- outside the circuit, I should say, Judge Der-Yeghiayan in the *Navistar* case and Judge Tigar out in California, who dealt with this issue of we start with one thing and then when we see that somebody else has a larger loss, we shift. And that is laid out.

So they pivot, your Honor, to this new metric of what they call recoverable loss. And they say: But wait, your Honor, we

have to do this. There's binding Supreme Court precedent in the *Dura* case, D-U-R-A, which says we have to look at the specific disclosure approach to loss causation. So we don't want to operate in a fictional world, we have to look at what's actually recoverable, and so it's okay that we shifted. We didn't say that in our initial brief, but this is mandated.

So I'd just like to walk through, because this notion that the specific disclosure model and *Dura* mandates the approach that's advocated is not so. And if I can, I'd just like to direct your attention your Honor, to ECF 9-2, because they're not using a *Dura* compliant method at all. What they suggest -- let me just get this -- okay. So exhibit -- sorry, ECF 9.2 at Page 6 of 7 in that document, if you have that up, your Honor, I can walk you through.

THE COURT: I have the document. Just give me a chance to get to Page 6. All right, go ahead.

MR. ROBBINS: Okay. So what they're saying is they're essentially saying that Tampa is trying to take all kinds of losses that are not compensable. But here's what they're actually doing. If you look at -- at the top of that page, this is one of the about dozen entities that assigned their claim to Storebrand Asset Management. It's called Storebrand Global Index. Do you see that at the top of the page?

THE COURT: Yes.

MR. ROBBINS: Okay. And you see the first purchase,

your Honor, on July 9th, 2021, 266 shares at $436.37, okay. Now, according to the investor group, your Honor, there was no leakage or disclosure of anything about this fraud until August 1st, 2022. That's really important. So they have essentially told the Court that all of the declines from over $500 a share down to the day before August 1st, 2022, are not compensable. To give you a sense, the day before August 1st, the trading day before August 1st, 2022, was July 29th. And reason that is, your Honor, is it -- a weekend fell on the 30th and 31st.

And so on August 1st, the stock closed at $268.30. Now, again, this stock declined from over 500 to 268. But the important part for this exercise is when this information that supposedly first reached the market was revealed, the stock dropped $3.31 to $264.99.

Now, going back to the top of that page, as you see, the first sale on September 28th, 2022, is 347 shares, so that includes the 266 plus some others. So, now, the decline from $436 a share where it was purchased to $187.37 where it was sold on that date in September 28th is $150 roughly -- sorry, $250 roughly per share.

THE COURT: Share price, yeah.

MR. ROBBINS: Yes. Now, they would leave you with the impression from this argument we must focus on the specific disclosure. Well, 266 shares times $3.31 a share is less than $1,000. Do you think they took 1,000 in their loss

calculation? Absolutely not. They took the entire decline.

So I just point out that all -- although they claim that this is following *Dura*, it's nothing but. And there's a more fundamental issue here, your Honor. The Docket 31, which you referred to as their supplemental authority, a decision called *Exicure* from Judge Kness of the Northern District of Illinois. It follows a decision that they emphasize throughout their briefing involving Kraft Heinz. The case is called *Hedick*, H-E-D-I-C-K, from Judge Dow before he left the bench.

And in each of those cases, they say: Look, those judges are excluding losses that happened before the first specific disclosure because, again, we have to act consistent with the loss causation principles articulated by the Supreme Court in *Dura*. Both those cases, your Honor, cite and rely on a Seventh Circuit precedent from 2014, that is both *Exicure* from Judge Kness and *Hedick* from Kraft Heinz -- Judge Dow.

And they cite this case called *Wong vs. Accretive*, which was a settlement that we reached with a defendant. And the Seventh Circuit was evaluating the plan of allocation to assess whether the district court abused its discretion in approving that plan of allocation. And they said -- in connection with that discussion, the Court said the plan of allocation was fine because those -- after the, you know, completion of the case, completion of all the proceedings, the plan reflected those who had suffered compensable loss. What they don't cite, your

Honor, which is fundamental, is six months after that case, Judge Sykes issued a decision directly on point on this point. It's nowhere in their briefing. It's called *Household*.

*Household* was a case, your Honor, I settled for $1.575 billion after trial, after this appeal. And in that case, the Court goes through extensively evaluating loss causation principles that are compliant with *Dura*. And what it concludes, your Honor, is you absolutely can use the specific disclosure model, and we did. We presented that. My partners presented that to the jury. But what they also did in conjunction with Professor Dan Fischel -- and he's quoted extensively in that decision, Footnote 3, Judge Sykes acknowledges that he's one of the premier damages experts in the country -- is you can use something called the leakage model. And the Seventh Circuit endorsed a *Dura* approach in that case that had never been adopted by anyone else. And Judge Sykes talks about that.

And here's the most telling part, your Honor, is that the specific disclosure model which is emphasized throughout their briefing and referred to in this decision yields $7.97 of compensable harm in that case. When the Court reviewed at Page 415 and 416 of the *Household* decision the leakage model, it came up with $23.94. So the compensable harm was three times larger.

Why would a plaintiff at the very beginning of a case -- I

understand my friends on the other side of the bar, that is their job, to give you every argument to reduce the claims. But why would a plaintiff at the beginning of a case shrink the kingdom, except if they wished to become king, as one judge put it. And that's what we face here. There is no mention of anything except the specific disclosure model which we know is not limited in this circuit. We sit in the Seventh Circuit, as we all know.

Equally fundamental, your Honor, is even if this group had the largest financial stake -- and they decidedly do not -- they could not make the Rule 23 showing required. And your Honor referred to the statute. The statute says very clearly, "In the determination of the Court," that's a quote, has to make a determination of the most adequate plaintiff. And there's two components to that, as you pointed out, a financial stake and a showing as to Rule 23.

And there's another aspect here because they can't make the showing either individually or as a group. And, your Honor, going back about 15 years, former Chief Judge Randa issued an opinion in *Merge Technology*, which we cited, which cited to the seminal opinion in this area issued by the Third Circuit, Chief Judge Becker penned an opinion that was very extensive. And we both cited it in our paper, 60, 70 pages long talking about that when you move as a group, you have to make another showing. That's the adequacy of the group. And it gives how

you do that. And in this case, they fail on both accounts.

I recount for your Honor that you struggled with the name of one of the movants. I think I won't torture it, either. But, you know, you have Industriens, which I will refer to it as which is a Danish insurer and investment manager. You have the Connecticut treasurer, who manages funds and pensions for about ten or so entities. And then you have what they refer to as Storebrand. And Storebrand, your Honor, is inarguably not a class member itself. It didn't own a single share. It received assignments from 11 other investors, nine from an entity called Storebrand Fonder, that's F-O-N-D-E-R, AB, which itself did not own any shares but rather says under Swedish law we have the right to assign the claims for these other investment vehicles. And then they do it, your Honor.

They assign it to yet another vehicle, the Norwegian entity known an Storebrand -- Storebrand Asset Management, who also gets assignments from two other Norwegian entities. So there are assignments going all over. And then the assignments between a Swedish entity and a Norwegian entity are then made designating New York law. This case isn't in New York. The company isn't based in New York. There's no connection to New York, but they pick New York law. Nowhere do they attempt to justify if that's appropriate or warranted. They simply say: It's done.

And then when you look at their reply brief -- and I want

to hearken back to the statute. Their reply brief, your Honor, at Footnotes 12 and 13 acknowledge some other disabling issues. The statute requires "all," I put that in quotes, "all transactions of the plaintiff." Yet if you look at Footnotes 12 and 13 Docket 25, which is the group's reply brief, they acknowledge that they only selected some entities to transfer the claims for. And then to support their argument, your Honor, at Exhibit 26 -- I think it's 26-8, it's the exhibit showing the prospectuses, they say it's inarguable that we had the authority at Storebrand Fonder to assign these claims. It's a 19-page exhibit. Nine pages of it are in Swedish. And they expect you to read that, unless they know something about your Honor that I don't. You know, most of us aren't trained in Swedish. So that's the support for their authority.

To date -- again, the Court has to make a prima facie finding as to the adequacy and typicality. But to date, the Court hasn't been told did Storebrand Asset Management receive from Storebrand Fonder an assignment in which all of the proceeds after there's a recovery here have to be given back? Because if so, your Honor, then the entity before the Court has no stake in the relief. Or does it get to keep all of the proceeds, and it was just gifted this amount? If, your Honor, that's the case, then it's the only plaintiff who didn't own a single share of stock and suffered no loss. Your Honor does not want someone representing a class who suffered no harm.

This is a serious litigation. And optimizing the outcome is a product of myriad judgments. You know, it's clearly better to resolve a case today for $.70 on the dollar of harm than to go through, as we did in *Household* perhaps, 14 years of appeals and almost two trials, you know, and so those balancing assessments need to make -- need to be made.

It -- we've asked, your Honor. We reached out in February -- and I'd be glad to provide the Court with the e-mail -- to ask some of these questions. What are the terms of the assignment? Is there a fee being charged for providing this? And there was silence, your Honor. There was no response. And this is why we cited in our -- in our brief, your Honor, several cases including *Baydale*, B-A-Y-D-A-L-E, *vs. American Express*, which is a 2009 decision, *2009 WL 2603140 at *4*.

And in that case Judge Pauley, because of these issues surrounding a Swedish entity who also actually submitted documents that were in a foreign language, said it is not going to appoint that lead plaintiff applicant, even though it had 14 times the losses. And he was particularly frustrated with a refusal to disclose all of the related entity's trading because here with the Footnote 12 and 13 in the reply brief that the IIG filed, or the investor group, there's a real issue. You can pick and choose and manufacture a plaintiff with a certain financial stake. Some of the claims that are being transferred are $15,000, and they're aggregated, as you can see from the

briefing, to get up to what is 40% of the claimed interest by transferring these via assignment.

It's interesting in that decision, the judge relied on the same Seventh Circuit authority. Judge Pauley's in the Second Circuit but he cited back to *Koos*, K-O-O-S, which your Honor cited just last month in the *Reichardt v. Electrolux* case where your Honor recognized that being subject to a meaningful defense separates you from other members of the class. And your Honor declined to certify a class for that reason. No showing has been made to trigger the presumption, even if they did have the largest stake.

And, your Honor, finally, I just want to make this point: I talked about failing to make the showing individually. They've made no showing as to the adequacy of the group. In fact, that joint declaration, Docket 9.3, if you go through that and compare that to *Cendant*, which is *264 F.3d 201* at 266, which is the opinion from the Third Circuit, which really was the seminal opinion in this area, it says if you have a group, you have to make this extra showing to be the presumptive lead plaintiff. How was the group formed? How will the group operate? And, finally, what is your evidence of cohesion? Because here we have, again, a Norwegian entity assigned claims by other, you know, Swedish and Norwegian entities. We have a Connecticut public fund. And then we have a Danish entity.

And what we know from the factual record, your Honor, is

what your Honor's been given to make this decision is things like, and I cite Paragraph 10, "We discussed with each other the importance of joint decision-making," end quote. That's pretty vacuous. Quote, "We exchanged direct contact information with each other," end quote. And here's the best one, your Honor, in Paragraph 10, the investor group, quote, "has a shared goal of achieving the best possible recovery for the class," end quote. What kind of lead plaintiff would not have that? And it goes on in Paragraph 8, they say, "The Institutional Investor Group is committed to prosecuting the litigation against defendants in an independent, efficient, and vigorous manner," end quote. Again, all the same things.

What we know is when you read that declaration which they submit to try to trigger a showing, a prima facie showing, is there's no evidence in the record that they've ever worked together or even knew one another. It's kind of interesting, in the declaration they cite, this is Exhibit 9 -- or sorry, ECF 9-3 as evidence of their past experience independently, for Connecticut they cite a couple of cases where they recovered money, including one 20 years ago. And for Industriens, they cite another one. And in both cases, 80 or 85% of the money they've recovered have been as individual lead plaintiffs, not appointed as member or group, which is -- you know, it's not coincidental, your Honor.

Here's a simple fact: In the last five years in Private

Securities Litigation Reform Act cases, there have been three cases that have recovered more than $1 billion. In every single one, there has been a single lead plaintiff and a single lead counsel. That's not coincidental.

And immediately following that decision in *Cendant*, your Honor, Connecticut had been appointed in *Waste Management*. And the *Enron* case was assigned to the same judge, Judge Melinda Harmon, that appointed Connecticut in *Waste Management*, which they cite in their declaration. She had before her a group. She relied on *Cendant* in part. And she had a group before her of three state retirement systems who had hundreds of millions of dollars in losses and another two public pension funds. And she instead found a single lead plaintiff that in that case, unlike here, had a smaller financial stake was still the best applicant because they had not made the showing required to trigger their appointment.

And in that case, your Honor, she was prescient because once again a single lead plaintiff was appointed, a single lead counsel, and that case yielded $7.2 billion, which today remains the largest recovery ever. And one of the things that she noted was multiple lead counsel -- and I know this is just common sense -- but multiple lead counsel leads to duplication and delay. And that decision is *206 FRD 427* at 456 and 457 where she goes through the factors, including there that, your Honor, they had extensive working history with one another,

which is not the case here.

So, finally, I guess, your Honor, I come back to the statute. Tampa is the presumptively most adequate plaintiff. It has the largest loss. It satisfies the initial showing required under Rule 23. And the criticism, it can't be rebutted. The only criticism is that Tampa is trying to maximize the recovery for the class, implicitly that's what their papers say. And that's a criticism that we will accept all day long every day.

They spent months carefully evaluating this case starting on October 31st. They're committed to vigorously prosecuting the case, and they've selected counsel with experience and accomplishments in this area in -- in this district and in this circuit. And so we respectfully request that you appoint Tampa as the lead plaintiff. They certainly know how to enforce the law. It's a pension fund formed and overseen by people whose day-to-day job is enforcing the law.

And unless you have any question of me, your Honor, I think I've covered most of what you wanted. If there's anything else you'd like me to cover, I'd be glad to do it.

THE COURT: No, that's good.

Counsel.

MR. DEGNAN: Thank you, your Honor, for the opportunity to address some of these issues. Before I begin, I wanted to introduce the representatives of the Institutional

Investor Group who are on the conference call line with us today. Karen Grenon from Connecticut, Uffe Berg from Industriens, and Bård Bringedal from Storebrand.

Perhaps the best place to begin with the PSLRA --

THE COURT: If you could move a little closer to the microphone.

MR. DEGNAN: I'm sorry.

THE COURT: I can hear you, but I worry about the court reporter --

MR. DEGNAN: Sure. Thank you, your Honor.

THE COURT: -- and people on the phone.

MR. DEGNAN: Perhaps the best place to start is with the language of the PSLRA itself, which requires the appointment of the movant or movant group with the largest financial interest in the relief sought by the class. Critically, the statute doesn't talk about the movant with the largest loss. And while counsel acknowledges that LIFO was the methodology put forth first, LIFO is only the starting place. And that's an important distinction.

What we have today is not a pivot from losses to another methodology, but it's a refinement based on the information that became available once all of the motions were before the Court. To start, you could look at the *Teva* case from the District of Connecticut, which speaks to the fact that a movant cannot be faulted for addressing *Dura* only in its opposition

briefing when that movant, like the Institutional Investor Group here, is largely unaffected by the application of *Dura*.

So, for example, the Institutional Investor Group had $15.566 million in losses under LIFO. When applying *Dura*, their loss is de minimisly reduced to 15.458, a loss of difference of only $200,000, your Honor. And that's an important distinction, because unlike the bulk of the cases that Tampa has cited where it's questioning this pivot from one loss methodology to a different methodology entirely, those situations like *GoPro* and *Richman vs. Goldman* deal with situations where a movant is presenting LIFO losses to start and then says, you know what, losses aren't working. Let's go to a completely different analysis. Let's look at the total number of shares we've purchased, or let's look at the total number of shares we retained at the end of the class period. And that's an important distinction, because *Teva* talks about how *Dura* is an application of losses. It's still putting losses as the most important financial interest metric.

And so starting with that kind of premise, I think it's -- I think it's critical to take a look at the Supreme Court's decision in *Dura* and the Seventh Circuit's decision in *Wong*. Both of these cases deal with the important aspect of an Exchange Act claim which there must be loss causation. And as the *Exicure* court explained just three weeks ago in the Northern District of Illinois, both *Dura* and *Wong* stand for

this proposition that only losses occurred in connection with the revelation of fraud can be recoverable. And taking that -- that principle to mind, it makes sense that when looking at the financial interests that a movant stands to recover, the relief that the class is seeking to obtain, only those losses that are recoverable are relevant.

And Tampa kind of raises three -- three different arguments for why *Dura* shouldn't be applied. You know, first they start with this notion that *Dura* is not a lead plaintiff decision so, therefore, it's not relevant here. But courts have looked at *Dura* and taken its principles and argued that they would be abdicating their own responsibilities to the class and to the PSLRA if they were to ignore this issue of recoverable losses and to let a movant that didn't stand to recover as much as another movant take the lead.

THE COURT: So one of the concerns I have with that approach is that doesn't it risk turning selection of lead plaintiff into this -- if we're going to start getting into defenses, damages defenses, defenses to the claims, we end up with a mini trial at the lead plaintiff stage. And that seems utterly inconsistent with the goals of class action litigation itself because we're trying to do things efficiently for a group. If we get all bogged down into a big back and forth as to -- as to defenses to one lead plaintiff's request for -- or calculation of its financial interests, is -- I mean, is that a

legitimate concern that I should be worried about? And if not, why not?

MR. DEGNAN: I don't think it is a legitimate concern because if you look at the procedural posture of *Dura* it was not a decision, you know, after trial, after discovery. It was a motion to dismiss decision. So the Court, the Supreme Court, the lower courts, didn't have the benefit of expert testimony, didn't have the benefit of discovery and looked simply at the pleadings and makes the determination that on the pleadings facially, there are no recoverable losses, because there is no allegation in the complaint that would lead to those losses being recoverable.

If -- if you look at the chart that the Institutional Investor Group submitted in its opposition brief, ECF 22, Page 9, you'll be able to track the purchasing pattern for Tampa. And you will see that they start with a large investment at the beginning of the class period. They make an incremental addition in February of 2022, a smaller addition in May of 2022 and then sell all of those shares. And that sale where they liquidate their entire position occurs months before the first corrective disclosure that was plead in the initial complaint, which occurred in August of 2022.

And when looking at that trading pattern, you could start with the segment that begins in February of 2022 and then is sold in May of 2022. There's no corrective disclosure that

occurs in that time period. There's no allegation that the truth was revealed. If you look at the initial complaint, the Oakland complaint Paragraphs 56 to 59, the only allegations are that there are more misrepresentations that were made. There's no allegation of the disclosure. While Tampa argues that there could be this leakage, there's no leakage alleged in that complaint.

If you then look at the California complaint which was filed by Tampa's counsel ten days before the lead plaintiff deadline, again Paragraphs 57 to 61, virtually identical allegations of additional misrepresentations and no allegations that the fraud was revealed during that period of time.

So getting back to your concern that *Dura* and applying this approach is overly technical and is a battle of experts, facially from the complaints there's no allegation that the fraud was revealed. And as such, a purchase in that time period that is then sold during that time period, while it might have recorded out-of-pocket losses, there's no allegation from any of the parties that those losses were the result of fraud or the revelation of fraud.

So when you look at that situation, you know, Tampa then argues the next layer, which is: Well, okay, courts that applied *Dura*, they only removed shares that are in and out before the first corrective disclosure. But that's not true. Starting with the *ContextLogic* case that was submitted in our

opposition brief, it dealt with a situation much like here where there was a lead plaintiff, you know, dispute between who had the largest financial interest. And implying the *Dura* methodology to LIFO, it removed all gains and losses from sales that were in between those subsequent corrective disclosures.

In addition to *ContextLogic*, both the *Africa* decision and the *Citigroup* decision also relied upon *Dura* calculations that excluded in and out transactions between partial corrective disclosures. So this is not a novel methodology. All these cases are relatively recent. They've all had the benefit of hearing, you know, subsequent -- or prior disputes about, you know, should *Dura* be considered, is it too technical or is it not too technical. And these courts approach it fairly simply and say: Based on the allegations in the complaint, there's no claim that these losses are the result of fraud.

Additionally, when considering why the bulk of the case law deals with situations where the removed in and out transactions are occurring prior to the first corrective disclosure, it's a matter of common sense. In some of these cases, there's only one corrective disclosure, like the *CannaVest* case. So naturally those are the only shares that can be removed. And then in other situations like *Exicure, Converse, Kraft*, *NIO*, *Ulta*, *Topping*, et cetera, they're dealing with situations where the movants that are before the Court happen to not be buying and selling in between corrective disclosures. And that makes

complete sense because investors often times don't continue to buy shares after that's been a revelation of fraud.

Turning back to this -- this issue of whether *Dura* should not be applied simply because the Institutional Investor Group didn't raise it in its opening motion, that thought process kind of ignores the realities of the lead plaintiff process. When movants file their motions, they're doing so blind. They don't know the losses of competing movants. They don't know the particularity -- particularities of those movants' trading patterns. And naturally, as *Teva* explains, a movant can't be faulted for not being clairvoyant, not knowing that a movant like *Tampa* would come forward, who suffered substantial unrecoverable losses both in terms of these in and out transactions as well as transactions that we'll get to in a minute that were -- are only arguably recoverable due to this late added November, 2021, disclosure, which we believe is not a viable disclosure.

So ultimately Tampa doesn't argue that there's a legitimate basis to ignore Supreme Court and Seventh Circuit law. Counsel for Tampa talked about the *Wong* decision, which the Seventh Circuit analyzed a settlement and ultimately found to be appropriate because in and out transactions were excluded. It's important to note that while Tampa talks about this as being occurring in the context of prior to the first corrective disclosure, if you look at the plan of allocation for that

settlement, Tampa's counsel negotiated a settlement that did not afford in and out purchasers between corrective disclosures the opportunity to recover consistent with the *Dura* principles.

So while we're moving Tampa's in and out transactions from February and May of 2022 alone as dispositive in terms of the financial interest test here, Tampa's losses, as I noted before, are further inflated because more than 6 million of losses are dependent upon this -- this unviable November of 2021 disclosure. And as we explained in our opposition brief, Tampa's theory is predicated that -- predicated on the fact that the company concealed declining legacy generator demand and that this November, 2021, disclosure revealed the truth about that.

However, if you look at the pleadings, that's not what occurred on that day. The California complaint at Paragraph 52 expressly discusses how negative financial results and disappointing forward guidance were the result of supply chain and logistics issues, not demand. Additionally, the complaint notes that there was a revelation that there was a sixth acquisition by Generac of a clean energy company. It's unclear why a sixth disclosure would somehow reveal something that five prior disclosures wouldn't have done, especially when there was a well-publicized pivot on behalf the company to switch from traditional home generator backups to clean and solar systems. And that's noted in Footnote 7 of our opposition, the evidence

that reveals that this was not a corrective disclosure.

And I think it's also important to take a step back and think about even if the Court on this record was to find this November allegation to be plausible, Tampa's outsized reliance on that disclosure is still problematic. Tampa is likely distracted by the fact that it has to succeed on this theory, this theory that the company was concealing declining legacy generator demand in order to recover roughly half of its claimed financial interest, half of its losses.

And in *Kraft*, Judge Dow dealt with a similar situation where there was a -- where there was a theory of liability. There was a claim that was being questioned. And there was a movant that was beholden to that theory for such a sizable portion of its losses that Judge Dow found that movant to be atypical and inadequate. And the reason for this is simple. Tampa, if you -- if you, again, go back and look at the chart that lays out their transactions across time, you'll see that they only hold shares for two of the four corrective disclosures that are even alleged in the complaint filed by their counsel. They only hold shares in November of 2021 and October of 2022. As a result, they have no interest in advocating for the August, 2022, disclosure or advocating for the corrective disclosure in November of 2022 that ends this -- ends this class period.

In contrast, the Institutional Investor Group holds shares

across all four corrective disclosures. They're incentivized to maximize the recovery for the class in connection with all four of those if they're viable. And that's important. While the Institutional Investor Group does not believe that November 2021 disclosure is viable, it's committed to investigating and continuing to analyze the claims and find all sources of recovery in connection with these disclosures, even if that means taking the appropriate knee and deciding that this disclosure does not stand up to scrutiny.

So ultimately what you're left with is the Institutional Investor Group having the largest financial interest in the relief sought by the class. Now, Tampa is arguing that despite the sophistication of the members of the Institutional Investor Group, despite their prior track record, despite the fact that they've submitted a joint declaration, they've taken the time to speak with one another, they've negotiated a competitive fee agreement here that incentivizes class counsel while maximizing the relief to the class, despite all of these factors, the Institutional Investor Group can't be considered simply because they're unrelated. But that takes all the meaning out of the PSLRA's language that allows the -- allows courts to appoint the movant or the movant group.

As explained by the Ninth Circuit recently in *Mersho* and by numerous courts in this circuit, including *LJM* and *Allscripts*, the PSLRA expressly authorizes the appointment of groups of

investors, and competing movants bear the burden of showing that those movants are inadequate once that group has made a prima facie showing of cohesiveness. And this is done typically just like in *LJM* and *Allscripts* through the submission of a joint declaration that shows that these members are committed to working together.

Tellingly, Tampa hasn't identified any cases in the Seventh Circuit that refuse to appoint a group of sophisticated institutional investors that filed a joint motion. While Tampa notes the *Merge* decision out of this Court, it's important to note that *Merge* dealt with the situation where competing movants, after filing separate motions, then decided to join together to beat another movant that had already filed. That's a vastly different situation than what is before the Court where you have movants that are taking deliberate steps, in our situation, to make decisions that they believe are best for the class and file a joint motion and have demonstrated evidence that they're working together, not just to get appointed as lead plaintiff, but to maximize the relief for the class.

I think it's also important to note that Tampa's counsel itself has been repeatedly appointed with groups of investors in the Seventh Circuit, including *Allscripts*, *Hospira*, *LJM*, *Household* which was mentioned by Tampa's counsel earlier, as well as the *Harley Davidson* decision in the Eastern District of

Wisconsin where a group was appointed.

It's also important to note that counsel for Tampa has sought the appointment on behalf of more than 50 unrelated groups in the last five years alone. That includes a group that was filed on the same day it filed its opposition here. That includes a group that included Connecticut in *Rivian* just last year, and it includes three more additional cases in the last three weeks alone.

Ultimately, it's clear that groups of sophisticated institutional investors are beneficial to the representation of classes. They have the benefits of joint decision-making. They also have the benefits that if for one reason or another a group member was disqualified through discovery or some issues raised by defendants later, there would be other group members that would remain, and there would be cohesive representation.

Now, the final argument that Tampa raises here deals precisely with Storebrand standing. And it's critical that we consider that the PSLRA specifically requires proof. It doesn't say mere speculation is sufficient to disqualify a movant. Proof. And so courts have taken that very seriously. The fact that someone can stand up and say, "Well, I don't understand it, so therefore there are questions," isn't sufficient. Courts have raise -- Court have rejected virtually identical arguments about standing, about assignments, and about the prudential exception to standing that have been

raised by Tampa's counsel in a number of cases, including two in the last six or seven months. First in *Chegg* in September, the Court rejected claims that an assignment was invalid. And in December, the Court rejected claims that a Swedish asset manager lacked standing because it didn't qualify for the prudential exception.

But Tampa's inability to provide proof here isn't particularly surprising. As an initial matter, the use of assignments is widely accepted. The Supreme Court itself in *Sprint* explained that assignments, quote, "have long been permitted." And courts regularly appoint movants relying on assignments, including *LJM* and *Kraft* in this district -- or in this circuit -- sorry, your Honor -- and the *HCP* decision in which a European investor was represented by Tampa's counsel, as well as in *Longtop* where the Court in the Southern District of New York specifically analyzed substantively identical assignments to those before you, your Honor, viewed them in terms of what *Sprint* required, and found them to be valid.

When looking at the case law that Tampa cites here, it's simply irrelevant. First, in *Purecycle*, the movant never provided the assignment to the court for its review. So it's hard to imagine a situation where a court can make a decision that an assignment is valid when it's simply not before the court. And then in *Array*, too, that same movant who had been previously rejected in *Purecycle*, there were serious questions

about the document that was presented, whether it was an assignment of claims which transferred ownership of those claims, rather than being a power of attorney that was simply giving the fund manager the power to make legal decisions.

And if you look at the assignments that were submitted with the Institutional Investor Group's initial motion here, it's very clear that there's a complete transfer of ownership of those claims. And only -- only the receiver, only Storebrand itself, can void that assignment. It can't be clawed back. It's a permanent transfer.

Turning next to the issue of prudential standing which generally allows a party to bring claims on behalf another that can't exercise its own rights, much like a trustee trust relationship. That prudential standing has been repeatedly applied to Swedish asset managers. In addition to the *Coinbase* decision, more than a dozen other cases have found prudential standing under virtually identical situations to that before the Court, including *Luckin*, *General Electric*, *Ocwen*, *Western Union*, *Kraft*, et cetera.

Now, counsel for Tampa identified both in this argument and as well in its opening papers a pair of decisions, *Baydale* and *Pipefitters*, from the Southern District of New York as saying that this is a complex issue and that because there are questions, we could simply ignore what the result is and leave it for another day, and we should appoint someone else. But

those -- those two decisions, which are more than a decade old at this point, were from the same judge and have been repeatedly criticized by other courts as failing to apply the PSLRA's requirement of proof. Both of those classes simply relied on conjecture and dodged the issue. And *OFI*, *Coinbase*, and *Ocwen* specifically rejected that approach as being inconsistent with the PSLRA.

And so what you have here, your Honor, is you have unrebutted standing. While Tampa has raised questions and said there are unanswered questions, it hasn't said why these assignments would be invalid, why the assignments aren't valid, why prudential standing shouldn't be applied here. It simply said: Well, there are questions. And that's insufficient to rebut the presumption under the PSLRA.

And as such, when including these three movants together as the cohesive group that they are and applying Supreme Court precedent in *Dura*, it's clear they have the largest financial interest in the relief sought by the class and they're adequate and typical in all respects and should be appointed, your Honor.

THE COURT: So you said it's a cohesive group.

MR. DEGNAN: Yes.

THE COURT: I am -- I guess I -- what's the -- what was the -- well, am I correct that prior to this motion, prior to this litigation, these disparate entities were not

connected?

MR. DEGNAN: That's correct, your Honor.

THE COURT: So what makes them cohesive, other than this litigation?

MR. DEGNAN: Well --

THE COURT: And the reason to be concerned is, okay, so we're -- and this is sort of -- this gets to sort of my earlier point of not wanting to have a mini trial on all of these issues at the start. We're trying to find somebody who can adequately represent the class and do a fine job. And as I sit here today, it looks like both sides would do fine, from the presentations.

But I worry about -- and maybe this is wrong -- I worry about inviting issues that defense counsel could take advantage of down the road, if there are differences between the constituents in this group -- and I don't know that that's going to happen, and maybe that's enough. Maybe that's what you're saying, that's enough -- without proof that that's going to happen, I should just disregard it. But it seems to me as we try to get this case going and get relief or get a resolution of the claims for the class, I ought to not be borrowing trouble down the line. Does that make sense?

MR. DEGNAN: Yeah, I think that makes sense facially, but I think you have to look at what the PSLRA, the statute itself requires of you. And the statute doesn't ask you to

pick who is better. It's not a beauty contest. It's not who -- who might be more adequate than the other. It's who has the largest financial interest in the relief sought by the class and who has made a prima facie showing of adequacy and typicality.

And so the Ninth Circuit was faced with very similar question in *Mersho*, which was cited in our papers. And there, the district court had misgivings about appointing a group. It said: Okay, there's a joint declaration. You know, they've made this showing that they're committed to working together, but I just don't know. And -- and the Ninth Circuit said that's not appropriate.

The Ninth Circuit reversed that decision and said: Once there's been a prima facie showing of adequacy and typicality and that this group is committed and is acting as a group, which is the situation here, the group has conducted a joint conference call. They've spoken with each other. They've negotiated a competitive fee agreement with counsel. They've taken these steps. They're staying abreast of the litigation. All three members are on the phone today.

Once you have that showing, the burden then switches to the other side, to the competing movant, to say: Well, why are they nevertheless still inadequate? And I haven't heard anything other than counsel suggesting that because they're unrelated and because they're coming to this as a group in

terms of litigation, that that's enough. And that's -- that's wholly inconsistent with the PSLRA and what the Ninth Circuit has spelled out. And it's also, you know, inconsistent with what the Third Circuit in *Cendant* has said.

You know, *Cendant* said that while existence of a prior relationship, you know, is a relevant factor to consider, it's not dispositive. And in *Cendant*, ultimately the Court appointed a group of investors on the basis that they had made a showing that they're committed to working together. And I think -- I think that's the situation that the Court is in here -- is faced with here today is a cohesive group. And while there might be global questions about whether that's the best thing or not, that's irrelevant to the PSLRA.

THE COURT: So if there is a difference in -- so we sort of started -- maybe it was Tampa's counsel that said this, but, you know, the premise of the PLSRA -- PSLRA, is that Congress wanted to take control -- put control of these actions back in front of clients and away from counsel. If we accept that, where you've got essentially three clients and one counsel, what happens if the clients disagree or am I supposed to just assume that they're just going to go around -- along with what counsel recommends? Do you understand my point? It almost seems like we're flipping around the whole -- the purpose of the statute.

MR. DEGNAN: Sure. So the PSLRA was designed to put

power back into the client's hands. It also was designed to place a premium on institutional investors.

THE COURT: Well, we've got that on both sides.

MR. DEGNAN: Right. But the reason why that was important was because there was a presumption that institutional investors who have large sums of assets at stake are incentivized, much more so than groups of 75 investors that are being cobbled together.

THE COURT: Right.

MR. DEGNAN: These are three highly sophisticated institutional investors. They collectively oversee more than $180 billion. Two of the members have recovered more than $700 million for investors while serving as a lead plaintiff. They're highly committed to recovering. They have a track record. And I think it's also important, you know, not to harp on this too much, because while this isn't a beauty contest as I mentioned and, you know, the retainer agreements signed by one movant versus another isn't relevant for comparison's sake, but the fact that the Institutional Investor Group has negotiated a highly competitive retainer, which I'm prepared to offer to the Court for in camera review if it would like to read it, that fact alone demonstrates that they're not beholden to counsel. They're taking steps already to make sure that the class recovers. And so I'm not aware of any situation in my practice where at my firm there's been a situation where a

group of institutional investors has struggled to come together to make a decision. And naturally, they're going to rely on their counsel for advice about the facts and merits. But the decision is in their hands. And I think they're committed to making an appropriate decision if they're faced with one.

THE COURT: How did they come together?

MR. DEGNAN: So there's -- there's two pieces to this. So all three clients have a longstanding relationship with my firm Kessler Topaz. We have a relationship in which we're tasked with monitoring their investments, reviewing existing securities cases, advising these clients of whether they have losses, whether they should take an active role in the case, whether they should remain a passive class member. My cocounsel Saxena White has a similar relationship with Connecticut in which they do the same thing. This is a kind of standard in the practice.

And so when disclosures first started occurring in this case, our respective firms were investigating claims. The initial complaint was filed, and there were discussions as set forth in the joint declaration between respective counsel and the clients. And then the decision was made that they were interested in potentially pursuing a lead plaintiff motion with a group of like minded institutional investors that had similar losses and were similarly incentivized to maximize relief for the class.

And so at that point, the investors had a joint conference call. They discussed the merits of the case. They discussed the facts of the case, their obligations, the benefits of joint decision-making. And at that point, the investors made their decision that they wanted to proceed as a group.

THE COURT: Did they connect with one another, or did counsel connect them?

MR. DEGNAN: The initial connection was through counsel, your Honor.

THE COURT: I think that covers everything in my notes. Anything further from the --

MR. ROBBINS: May I respond to three or four discrete points that counsel made?

THE COURT: Briefly.

And I'll give you a chance to reply as well.

MR. ROBBINS: One, your Honor started with the statute. And while you're hearing that this district court did this 15 years ago and this 20 years ago, as the Court inferred initially, what is the Court charged with by the statute? And we've heard a number of things. You know, ultimately you asked the question, and the cohesiveness appears to be, of the group, a single call that took place.

And remember, we know a few things from *Cendant*, which addressed this adequacy of the group issue. The three questions are: How was the group formed? Your Honor's now

been given the answer. How will the group operate? And your Honor asked that. And it's pretty telling, as well. Paragraph 11 of Docket 9-3 says, "We do not envision having any disagreement that could not be resolved with each other", so there is no stated mechanism to establish the adequacy, we just don't foresee. Then it goes on and says, "and with counsel," again ensuring that counsel is in the mix and deciding. As to the third, the evidence cohesion, we've talked about that.

And I think one thing that's being conflated in many of the decisions, whether it's *OFI* which was referred to by my colleague, or the recent *Coinbase* decision where, of course, the foreign applicant had a much larger financial stake, unlike here where the largest interest is Tampa's, is there's a conflation of the standard, whether you look at *Mersho* from the Ninth Circuit, the recent decision, or *Cendant*. And that is that there has to be a prima facie showing, and we know what that means in this circuit.

And I appreciate the citations my colleague made to me. I'm now going to return the favor. I like to stay with the law, but I'm going to look at the opening brief that was filed by the group. On Page 10, they lay out the standards for the initial showing, your Honor, to trigger any presumption, because we hear about it has to be rebutted, it has to be rebutted, but that's not what the statute says. A showing has to be made of the adequacy and, in this case, both individually

and as a group.  And they haven't made that.

And on Page 10 of their brief, they say the adequacy showing has three components, and they cite a case called *Tellabs*, 214 FRD 228 -- at 228.  That opinion, your Honor, is from Judge St. Eve before she was elevated to the Seventh Circuit, and it's the second one I focus on, which is we know, of course, that you can't have antagonistic interests and that you have to have counsel that will prosecute the case vigorously.  But you have to have a sufficient interest in the outcome of the case to ensure vigorous advocacy.

And what we've pointed out, your Honor, is that with respect to Storebrands, they still haven't answered the question:  Where's the money go?  Does Storebrands the entity that claims to be the plaintiff here that had no ownership in the underlying claim or shares, is it going to keep the money?  In which case it's a complete windfall with no loss.  Or, as I pointed out earlier, is it going to transfer the money back, in which has no financial interest in the relief sought.  That showing was never made to your Honor.  You can't answer that from the evidence that's been provided to you.  And counsel didn't answer that.

Beyond that, *Mersho*, your Honor, we think is very insightful because one thing we can agree on is that while relevant as my colleague acknowledged, a preexisting relationship is not the only factor, it's just one of the

factors that's considered. And here they didn't have it.

But *Mersho* expressly says that the district court has wide latitude in evaluating the adequacy and typicality. And in that case, the group not only claimed the largest financial stake, but also had the largest individual loss. And the footnotes in that are very telling.

There's another comment that was made that I need to address which is we have no interest in advocating certain disclosures. If I'm not mistaken, your Honor, it's been Tampa that has taken the aggressive position to maximize the claim. And there was repeated references to *Dura* and we can't ignore *Dura*. I just want to be clear, your Honor, that the decision in *Household* following *Wong* is entirely consistent with *Dura*. It embraces *Dura*, of course it does. It cites *Dura*. And so I don't want the Court to misunderstand my argument which is both *Wong vs. Accretive*, the specific disclosure model and the leakage model are both *Dura* compliant. And so that -- that I found to be a bit of a misnomer. And then -- and so we embrace *Dura* and *Wong* absolutely.

We heard counsel say that November, 2021, is not a viable disclosure. Your Honor, in this case on April 29th, 2021, when the case commenced, there were statements that were made about revenue growth and even our margins expanding dramatically, and the stock moved up. It reached $500 in late October, 2021. Days before that November 2nd, it was either October 30th or

November 1st, the CEO at as much as $500 a share sold millions of dollars of stock. And while we're hearing how aggressive counsel will be, nowhere in the complaint that they advocate is there any disclosure of the $40 million of insider trading that was conducted in this case. And, your Honor, that's at Paragraphs 26 and 27 of the California Field Ironworkers Complaint and at Paragraph 75.

I think to come into this at the initial stages before discovery which, you know, we heard my colleague mention the, quote, "benefit of discovery," we know that discovery, as your Honor alluded to, will dramatically alter the landscape here. And we -- we know what the Ninth Circuit and the Seventh Circuit have both said in regard to disclosures.

And I just want to just end with this citation, if I may, your Honor, on -- we cited *First Solar*, which is a loss causation case, and just one cite at it's *881 F.3d 750* at 754, and it says expressly, the Ninth Circuit, "A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss," comma, "even if the market was unaware at the time that fraud had concealed the miss," period, end quote. And this is consistent with the Citibank case -- *Citigroup* case by the Seventh Circuit about a decade earlier that says that loss causation requires that the defendant's actions, quote, "had something to do with the drop in value," end quote.

This is consistent. And what we have articulated, your Honor, is that we are not going to walk away from the majority of the declines associated with the unraveling of this fraud. And Paragraph 52 revealed for the first time dramatically declining margins, 380 basis points declines in gross margins. And that's Paragraph 52 of the California Field Ironworkers complaint. So -- and ultimately what was revealed at the end of this case in October 19th of 2022 and then on November 2nd, with the final disclosure, is that margins had deter -- had eroded dramatically. And so I think the Court can rest assured that Tampa will advocate not just for the specific disclosure method, but for the leakage method as well, which was roundly endorsed by the Seventh Circuit.

And I just -- I come back to the initial comment. If this so-called recoverable loss was truly sine qua non of financial interest, why wasn't it in the opening papers? To say that, well, we didn't know, why would you tell the Court what is not the real financial interests in the relief sought, but only the one after you see someone else's? And so that number of $15,458,000 for the financial stake of the IIG was nowhere in their papers until they concluded that Tampa had the largest financial stake.

With that, I think I've addressed, unless there's any of the points that your Honor would like me to address, I can address them.

THE COURT: Okay.

Counsel.

MR. DEGNAN: Just two brief points in response. As an initial matter, the assignment of claims here is clear that it's a complete transfer of claims from the Storebrand entities to Storebrand itself. As such, it is Storebrand's claim to prosecute and it's Storebrand's claim to recover. Naturally, in its exercise of its fiduciary duties as the asset manager for these vehicles, it will return those funds to those funds. But it's still its claim and what it decides to do with it is up to it.

Second, on this point of *Household* and leakage, I -- you know, I noted this earlier, that while the Seventh Circuit has blessed a leakage theory as a viable means to recover in established loss causation, there's two -- two important points here. One is that even under a leakage theory, you still have to make an allegation and then ultimately a showing that the losses suffered by the class were the result of revelation of the fraud. And while the Seventh Circuit blessed this leakage approach, ultimately it vacated the jury verdict that had found leakage damages finding that -- that plaintiffs had not adequately separated nonfraud from fraud-related declines with respect to the company. And that's important here because, as I noted before, neither of the complaints makes any allegation about leakage. There's no allegation at all. It's purely a

construct of this argument. And the Southern District of New York in *NIO* expressly rejected an attempt to insert a leakage theory after the fact, you know, on this basis that just because there was losses that investors suffered perhaps it was due to the leakage of fraud. Without evidence, without allegations, it's purely speculation.

And with that, I have nothing further, your Honor.

THE COURT: Well, thank you all for your time today. I will take the motion under advisement. I need to go back through and read these cases again. That is very helpful. But I -- and I'm going to try to get this done as promptly as I can. I've got a bunch of other stuff stacked up right now, but I'm going to prioritize this with one of my law clerks, because I do not -- I don't want this case to get -- you know, to fall down out of the starting block, which is where we're at. So I will try to get you something soon. How soon that is will depend on some other things that I don't have control over. But thank you for your time today.

MR. DEGNAN: Thank you, Judge.

THE COURT: We're adjourned.

MR. ROBBINS: Thank you, your Honor.

THE BAILIFF: All rise.

(At 3:05 p.m. the hearing ended.)

C E R T I F I C A T E

I, JENNIFER L. STAKE, RDR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of all the proceedings had in the above-entitled matter as the same are contained in my original machine shorthand notes on the said trial or proceeding.

Dated this 26th day of April, 2023.
Milwaukee, Wisconsin.

Jennifer L. Stake, RDR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 324
Milwaukee, WI  53202

Jennifer_Stake@wied.uscourts.gov

ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR
_____