# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

OAKLAND COUNTY VOLUNTARY
EMPLOYEES' BENEFICIARY
ASSOCIATION, et al., Individually and on
Behalf of All Others Similarly Situated,

                        Plaintiff,

     vs.

GENERAC HOLDINGS INC., et al.,

                    Defendants.

Civil No. 2:22-cv-01436-bhl (Consolidated
with Civil No. 2:23-cv-00081-bhl)

CLASS ACTION

---

## CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

    Defendants Concealed Weakening Demand in Generac's Home Generator
        Business ....................................................................................................3

    Defendants Concealed a Dangerous Product Defect in Generac's Solar Business ............7

    Defendants Concealed Generac's High Concentration of Sales in a Single Solar
        Dealer .......................................................................................................9

JURISDICTION AND VENUE ..........................................................................11

PARTIES ............................................................................................................12

    Plaintiffs ...................................................................................................12

    Defendants ................................................................................................12

FACTUAL BACKGROUND ..............................................................................12

    Generac's Legacy Home Generator Business............................................12

    Generac's Expansion into Solar Energy ...................................................14

    Generac's Product Dealers........................................................................17

    COVID-19 Results in Unprecedented Generator Sales in 2020.................19

NEGATIVE TRENDS DEVELOP LEADING UP TO AND INTO THE CLASS
    PERIOD .....................................................................................................23

    Generator Demand Weakens in 2021 .......................................................23

    Generac's Dangerous Solar Product Drastically Increases Risk and Liabilities ..............26

    Generac's Solar Sales Are Highly Concentrated in a Single Dealer .................................34

DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ..................37

    False and Misleading Statements Concealing the Weakening Generator Demand...........37

    False and Misleading Statements Concealing Generac's Dangerous and Defective
        Solar Product............................................................................................55

    False and Misleading Statements Concealing Generac's High Concentration of
        Sales in a Single Solar Dealer..................................................................68

4882-8376-1778.v2

GENERAC'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING BECAUSE THEY FAILED TO DISCLOSE REQUIRED INFORMATION .........................................................................78

Defendants Failed to Disclose Information in Violation of SEC Disclosure Requirements .....................................................................................78

Defendants Failed to Disclose Information in Violation of GAAP..................................85

THE TRUTH BEGINS TO EMERGE ............................................................................89

November 2021 Disclosures ........................................................................90

January 2022 Through April 2022 Disclosures ...........................................91

June 2022 Disclosures.................................................................................93

August 2022 Disclosures ............................................................................95

September 2022 Disclosures .......................................................................98

October 2022 Disclosures ...........................................................................99

November 2022 Disclosures .....................................................................103

ADDITIONAL SCIENTER ALLEGATIONS ..............................................................108

The Individual Defendants Controlled the Company's Messaging to the Investing Public ..........................................................................................108

The Critical Importance of the Generator and Solar Businesses Supports a Strong Inference of Scienter ................................................................110

Generac and the Individual Defendants Closely Monitored the Generator and Solar Businesses............................................................................112

The Individual Defendants' Public Admissions Support a Strong Inference of Scienter ...................................................................................114

The Individual Defendants' Insider Sales and Incentive Compensation Support a Strong Inference of Scienter ..................................................116

LOSS CAUSATION AND ECONOMIC LOSS ...........................................................117

PRESUMPTION OF RELIANCE ................................................................................126

- ii -

NO SAFE HARBOR ..................................................................................................127

CLASS ACTION ALLEGATIONS ..........................................................................128

COUNT I .................................................................................................................129

    For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against
        Defendants Generac, Jagdfeld, and Ragen .........................................129

COUNT II ...............................................................................................................131

    For Violation of §20(a) of the Exchange Act Against Defendants Jagdfeld and
        Ragen ....................................................................................................131

PRAYER FOR RELIEF ...........................................................................................132

DEMAND FOR TRIAL BY JURY ..........................................................................132

Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa, and additional named plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust (together, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Generac Holdings Inc. ("Generac" or the "Company"); (ii) Company press releases, quarterly earnings call transcripts, and other analyst or investor conference call transcripts; (iii) information posted on the Company's website; (iv) analyst reports, media reports, and online posts and commentary about the Company and the industry; (v) public court dockets and filings, including the complaint filed in *Power Home Solar, LLC d/b/a Pink Energy v. Generac Power Systems, Inc.*, No. 6:22-cv-00043 (W.D. Va.); (vi) insiders' trades of Generac stock; (vii) other publicly available media, news, and information; and (viii) information from Generac dealers and partners through analyst reports, online videos, and other public sources. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal securities class action on behalf of all purchasers of Generac common stock between April 29, 2021, and November 1, 2022, inclusive (the "Class Period"). The clams are alleged against Generac, its Chief Executive Officer ("CEO") Aaron Jagdfeld ("Jagdfeld"), and its Chief Financial Officer ("CFO") York A. Ragen ("Ragen" and, together with Generac and Jagdfeld, "Defendants") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      By way of background, Generac is a publicly-traded company that sells a variety of energy-based products, such as power generators, solar power storage systems, home electricity controls, and gasoline-powered tools.  While Generac manufactures and sells an array of products for both residential and commercial use, the Company has made clear that its future growth and success is dependent on two core strategies: (i) growing its legacy business of home standby ("HSB") generators that provide backup electricity to homes; and (ii) expanding into the rapidly growing industry of residential solar power systems by manufacturing and selling products that capture and store energy from solar panels.[1]

3.      Historically, growth in the HSB generator business was largely driven by unpredictable and severe storms that would lead homeowners to buy generators to avoid inconvenience and loss from power outages.  Absent such storms, Generac struggled to find ways to significantly increase the very low percentage of households with generators.  As a result, for years leading up the Class Period, Defendants had been trying to transition the Company into a more broad-based energy company to make it more attractive to investors.  This made Generac's expansion into solar power products in late 2019 critical to its perceived future growth prospects. Indeed, securities analysts that closely followed the Company noted at the start of the Class Period, in April 2021, that the "two key growth drivers" for Generac were "power outages," which boost HSB generator sales, and "rooftop solar deployments," which boost sales of Generac's complementary solar products.

4.      This case arises because during the Class Period, Defendants were aware of, but concealed from the investing public, negative trends in each of these two core businesses, that, when ultimately revealed, contributed to the stock price losing nearly 80% of its value.  Defendants made

---

[1]   Generac does not manufacture or sell solar panels, only complementary products for the capture and use of energy generated from solar panels.

false and misleading statements that provided investors with an overly optimistic assessment of Generac's performance, risks, and growth prospects, causing the stock price to be inflated until the truth was revealed through a series of disclosures. Specifically, Defendants concealed the following three negative trends:

- while "shelter-in-place" orders issued in response to COVID-19 caused an unprecedented surge in homeowner demand for HSB generators, that surge proved to be only temporary and demand was weakening in 2021, which Defendants concealed by assuring investors that the surge in demand was continuing as reflected in its purportedly large "backlog"[2] of orders while omitting that the composition of the backlog had changed as dealers were incentivized to pre-order above market demand;

- Generac's significant growth in solar product sales was a double-edged sword as the products suffered from a major defect that was leading to residential fires, product failures, and increased liabilities and warranty claims, which was concealed by Defendants' one-sided representations touting the success and growth of the solar business; and

- Generac's growth in solar product sales were highly consolidated through a single distributor, exposing Generac to massive risk of loss if the distributor went out of business (as it eventually did), which was concealed by Defendants repeatedly touting Generac's purportedly broad, diverse, and growing network of more than 2,000 solar dealers.

5.    When the true facts regarding these negative trends (weakening generator demand, a major solar defect, and over-exposure to a single distributor) began to be revealed through a series of disclosures, Generac's stock price collapsed, and investors lost billions of dollars. This action seeks to recover those losses pursuant to federal laws designed to protect the investing public.

**Defendants Concealed Weakening Demand in Generac's Home Generator Business**

6.    The Company sells generators through various "channel partners" that serve as the connection between the manufacturer (Generac) and the end customer (the homeowner). While such

---

[2]    "Backlog" refers to the orders received, but not yet shipped, by Generac. A backlog may be reported in terms of the number of weeks it would take for Generac to ship all the orders (*e.g.* 20 weeks), or in terms of the sales dollars that would be obtained once all the orders were shipped (*e.g.* $1 billion).

channel partners include retail chains, the Company's predominant channel partners are its network of thousands of independent authorized "dealers." In general, dealers will meet with homebuyers, either virtually or in the home, in order to market and sell generators. If a contract for sale is made, the dealer will then order the generator from Generac, obtain appropriate permitting, and, either through its own employees and/or additional contracted installers, install the generator at the home. Generac records revenue when the generator is delivered to the dealer. The dealer gets paid by the homeowner.

7.     As noted, it typically took severe weather to boost generator sales. However, prior to the Class Period, Generac experienced an unprecedented increase in generator demand and sales due to "shelter-in-place" orders issued in early 2020 in response to COVID-19. Basically, as more individuals worked and attended school from home, preventing power outages became a priority, and sales surged. Rather than attribute this to a temporary and unprecedented pandemic, Defendants attempted to portray the robust financial results as a sustained change in the business.

8.     Generac's performance was so outstanding that, during a February 2021 earnings call, analysts praised management, stating, "[w]e're running out of superlatives for Generac on your [2020] performance. Congratulations." In response, Defendant Jagdfeld agreed that the praise was warranted, responding, "I'm right alongside you on that one," and added that the growth was continuing, saying, "you talk about the loss of words and superlatives . . . but we don't see a ton of [order] cancellations. It's a very sticky [home generator] backlog."

9.     The demand surge caused by COVID-19 not only provided a boost to Generac, but also the dealers, as their revenue increased from skyrocketing customer contracts and installations. However, Generac's dealer count did not grow as fast as Generac's generator sales. For example,

Generac's Residential sales[3] grew by 110% from the first quarter ("1Q") 2020 to 1Q 2021, and shipments to dealers "more than doubled," but Generac's total number of dealers only grew by 18% in that time.

10. Moving roughly twice as many sales through only slightly more dealers meant that many dealers were being elevated to Generac's "Premier" status. The "Premier" Generac dealer designation was reserved for dealers with at least $1.5 million in annual sales. This was a significant benefit to those dealers because it entitled them to discounted pricing on the generators, increasing dealer profitability.

11. As Generac tried to bring on more dealers to deal with surging demand, it also attempted to ramp up production. Just prior to the start of the Class Period, Generac announced the opening of a new manufacturing facility to increase production of generators in response to COVID-19. When interest in generators spiked due to COVID-19, Generac did not immediately have the production capacity to keep pace with orders, resulting in long delays from the time dealers ordered generators to the time the generators were shipped and then installed. As the delays increased to several months, the lengthy delays discouraged homeowners from purchasing, and demand declined. Defendant Jagdfeld belatedly confirmed at the end of the Class Period that the long "lead times"[4] from order to shipment were "having a negative impact on close rates," meaning that initial "in-home consultations" ("IHCs") with homeowners that were considering buying a generator were not

---

[3]  Generac reports its revenue in segments based on the end customer use – *i.e.*, "Residential," "Commercial and Industrial," and "Other." Thus, Residential includes HSB generators, solar and energy storage products, portable generators, and other residential-use products.

[4]  "Lead time" can be used the same as "backlog" to refer to the time from which the dealer places an order until the product is shipped to the dealer (*e.g.*, 20 weeks). However, lead times are sometimes referred to as covering the entire period from order to installation and those times can include both delays from production (waiting for product ordered to be shipped to the dealer) and from delays in installation (waiting for an installer to become available to install the product at the customer's home).

being converted into actual sales ("close rates"). As Defendant Jagdfeld has acknowledged, demand for generators cannot be assessed on consultations or interest alone because "you[] have to take into consideration" the actual close rate.

12. The negative trend of long lead times beginning to suppress demand, as reflected in declining close rates, began to emerge by the start of the Class Period in 2021. For example, lead times were just "a couple of weeks" as of July 30, 2020 but increased to "28 weeks" (7 months) as of the start of the Class Period in April 2021. These long delays were negatively impacting the close rates which Defendants only admitted at the end of the Class Period, when they disclosed that close rates had declined in 2021 and ultimately "bottomed" out at the beginning of 2022. *See* ¶269.

13. Making matters worse, the weakening demand corresponded with Generac's efforts to boost production in response to the COVID-19 surge. Rather than admit that production did not match demand, in order to conceal the negative trends, Defendants continued to accept orders for and ship generators to dealers even though dealers did not have corresponding contracts with homeowners or capacity to install the generators, as was typical of legitimate sales. Dealers were incentivized to continue to place orders and receive shipment, despite not having allocated contracts to homeowners, because, for example: (i) doing so would allow them to retain the Premier status (requiring at least $1.5 million in orders) many of them had achieved in 2020 with the short term COVID-19 sales surge; (ii) Generac was imposing price increases every quarter, which served to encourage premature ordering to lock in lower pricing; and (iii) Generac had enacted lax cancellation policies allowing dealers to cancel orders and be protected from the risks of over-ordering. Because these pre-orders essentially pulled-forward potential future orders, they inflated short term results, and, once shipped, the generators flooded dealers with excessive inventory. Working through that excess inventory, in turn, suppressed new orders and hurt future results.

- 6 -

14.     Yet, during the Class Period, rather than admit the negative trend of weakening demand, Defendants concealed it by making false and misleading statements.  Defendant Jagdfeld claimed that Generac was experiencing "**_incredibly robust_**" and a "**_broad-based increase_**" in generator demand, and Defendant Ragen likewise emphasized that "**_demand for the category is still very, very strong_**."  Defendant Jagdfeld misleadingly highlighted, as further example, that "**_home consultations [were] increasing at a strong double-digit rate_**," while omitting to disclose that the close rates, representing actual homeowner contracts from those consultations, were declining.  Similarly, while concealing that Generac's backlog and shipments were inflated with orders placed without a customer, Defendant Jagdfeld claimed that "**_demand for home standby generators continues to outpace our ability to produce them, which has caused lead times to further grow to approximately 30 weeks_**," and that "**_order rates have remained very strong, leading to a further increase in our backlog, which currently is still well over $1 billion_**."  And, when discussing Generac's increasing production of generators, Defendant Ragen assured analysts that "**_there's buyers for those units that are in the field_**."  But, unbeknownst to investors, those order rates and backlog were made up of, in material part, orders that did not have an allocated customer contract – that is, the contract to sell had not been made.

15.     The scheme was eventually unraveled and the true facts were revealed through a series of partial corrective disclosures regarding slowing sales and dealer growth rates, a rapidly depleting backlog as bloated dealer inventories ultimately led to decreased orders and increased cancellations, poor close rates, and reduced financial guidance.  As a result, Generac's stock price declined precipitously, by roughly 80%, causing investors to suffer substantial losses.

**Defendants Concealed a Dangerous Product Defect in Generac's Solar Business**

16.     As noted, prior to the Class Period, Generac was not only riding a wave of unprecedented demand in its generator business, but also demonstrating success and growth in its

expansion into solar, leading to analysts running out of "superlatives" to describe the Company. However, at around the same time the Company's short term spike in generator sales from COVID-19 was failing to sustain itself, Generac suffered a massive setback in its solar business, as its products suffered from a dangerous defect.

17.     Specifically, Generac's products utilized a safety device known as "SnapRS" which connected one solar panel to another. This "SnapRS" device was designed to allow homeowners or first responders to rapidly shut down solar systems in dangerous situations, such as when firefighters needed access to a roof equipped with electrified solar panels. However, customer complaints began skyrocketing because the SnapRS had an unreasonably high defective rate, as it would overheat, melt, and even, in some cases, start fires. This defect led to tens of thousands of customer complaints and dealer service calls, resulting in mounting warranty and liability claims. In response, Generac sought to buy time by implementing a variety of temporary, and ultimately unsuccessful fixes that only increased the complaints, service calls, and warranty and liability claims.

18.     During the Class Period, rather than disclose the negative trend of increasing customer complaints, product defects, and associated liabilities and warranty claims, Defendants highlighted Generac's product safety and increasing sales, thereby projecting a one-sided view of its expansion into solar as an unmitigated success. For example, throughout the Class Period, Defendant Jagdfeld touted Generac's "***robust product safety function***" and that the Company "***regularly reviews any safety concerns associated with products in the field, including potential product recalls***." In addition to bragging about product safety, Defendant Jagdfeld misleadingly touted that its "***[solar] energy storage systems experienced tremendous growth***" and "***key performance indicators for [solar] energy products continue to show favorable trends***," and Defendant Ragen likewise emphasized that solar product sales "***grew at a dramatic rate***." Such

- 8 -

statements concealed that the increasing sales were exposing the Company to increasing warranties and liabilities, as the SnapRS defect posed a significant safety and recall threat.

19. The truth began to be revealed as dealer and customer complaints became public, lawsuits were filed, and Defendants were forced to admit the defect, belatedly record large warranty reserves in their financial statements, and reduce financial guidance for its solar business, as the business suffered financial and reputational harm from the SnapRS defect. These revelations of the concealed negative solar trends also contributed to removing the artificial inflation and to the significant declines in Generac's stock price.

**Defendants Concealed Generac's High Concentration of Sales in a Single Solar Dealer**

20. Finally, not only was Generac exposed to undisclosed risk and losses as a result of the SnapRS defect, but it was also exposed to substantial risks from its high concentration of an estimated (*see* ¶¶248-249) more than half of its solar product sales in a single dealer, PowerHome Solar, LLC n/k/a Pink Energy ("Pink Energy"). Concentration of sales is a well understood business risk because if a company relies on one dealer for an outsized portion of its sales, the loss of that dealer (including from ceasing operations), would have a disproportionate impact on the sales of the company. Here, the concentration risk was exacerbated by both Pink Energy's negative reputation for predatory sales practices that drew attention from investigative reporters and regulators and by the fact that as an outsized solar dealer, Pink Energy was particularly vulnerable to the risks and liabilities of the SnapRS defect.

21. But again, rather than disclose Generac's over-dependence on Pink Energy for the growth of its solar product business, Defendants concealed it by making false and misleading statements. Such statements assured investors that Generac's solar products were sold through a broad and diversified network of dealers, thereby limiting any such concentration risks. For example, throughout the Class Period, Defendant Jagdfeld misleadingly claimed that Generac was

successfully "***building out [its solar] installer network . . . [with] approximately 2,000 dealers***"; Defendant Ragen misleadingly tied the growth of Generac's solar business to "***building out [Generac's] distribution partners***"; and Defendants' SEC filings misleadingly claimed that Generac's "***global distribution network [wa]s a competitive advantage***," that the Company's distribution "***network is well balanced with no single customer providing more than 6% of our [total] sales***," and that the Company "***attempt[ed] to mitigate [risk] through . . . expanded distribution***."

22. The true facts regarding Generac's over-reliance on Pink Energy were revealed through a series of negative disclosures, including Generac slashing its solar revenue guidance when Pink Energy went out of business. As stated by analysts, the disclosures at the end of the Class Period revealed that Generac's "dependence on distributor Pink Energy was more significant than [previously] understood" and it was a "surprise" that "Pink Energy likely accounted for more than half of Generac's solar/energy storage sales," as Defendants had, in the past, "consistently indicated Generac works with many distributors in the solar and energy storage market, and that Generac ha[d] trained and certified over 2,000 dealers." The revelation of Generac's dependence on Pink Energy also contributed to Generac's stock price declining precipitously, causing investors to suffer substantial losses.

\*     \*     \*

23. Defendants' statements caused Generac's stock price to be artificially inflated during the Class Period by concealing the negative trends, and Defendants Jagdfeld and Ragen personally benefitted by selling more than $40 million of their stock at inflated prices. During the Class Period, Generac's stock price soared from around $340 in April 2021 per share to $500 by October 2021. Then, from November 2021 to November 2022, as the truth was revealed in a series of partial corrective disclosures, Generac's stock price declined an incredible 80%, from $506 per share to

- 10 -

$106 per share, resulting in more than $25 billion in investor market losses. The following chart demonstrates the dramatic decline in Generac's stock price as the truth was revealed:



### JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

26.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa. Generac maintains its principal place of business in this District, and certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

27.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

# PARTIES

**Plaintiffs**

28.     Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa ("Lead Plaintiff") purchased shares of Generac common stock during the Class Period and was damaged thereby. *See* ECF 10-3.

29.     Additional named plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Named Plaintiff") purchased shares of Generac common stock during the Class Period and was damaged thereby. *See* Ex. A.

30.     Lead Plaintiff and Named Plaintiff are collectively referred to herein as "Plaintiffs."

**Defendants**

31.     Defendant Generac describes itself as an "energy technology solutions company" headquartered in Waukesha, Wisconsin.  Generac's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GNRC."

32.     Defendant Jagdfeld has served as CEO of Generac since 2008 and as Chairman of the Board since 2016.

33.     Defendant Ragen has served as CFO of Generac since 2008.

34.     Defendants Jagdfeld and Ragen are collectively referred to herein as "Individual Defendants."  The Company and the Individual Defendants are collectively referred to herein as "Defendants."

# FACTUAL BACKGROUND

**Generac's Legacy Home Generator Business**

35.     For three decades, Generac built a business centered on manufacturing and selling portable generators that could move from location to location to provide temporary electricity using gasoline, diesel fuel, or liquid propane.  Then, in 1989, Generac launched its home standby, or

- 12 -

"HSB," generator business. A HSB generator is a permanent power generator connected to a home that provides a backup source of electricity in the case of a power outage. For example, if severe weather damages a power line and cuts off electricity to a home, a Generac standby generator uses the home's natural gas line to create electricity to provide power to all, or a portion, of the home until the main power is restored.

36. HSB generators are costly. Generac's website lists models ranging from $2,000 to over $15,000, not including installation or taxes. Generac's website states that "[a] simple installation might cost about $2,000." Thus, for an installed Generac HSB generator, homeowners would have to spend around $4,000 to $20,000.

37. The generators are also not essential. By design, they only provide electricity if there is a power outage, which is a relatively rare occurrence. According to the U.S. Energy Information Administration, electricity customers in the United States averaged just seven hours of power interruptions in all of 2021.

38. Given the expense and lack of need, the market for home standby generators has historically been relatively limited. When Generac went public through its initial public offering ("IPO") of common stock in 2010, Generac described its addressable market as "U.S. single-family, detached, owner-occupied households with a home value of over $100,000," thereby eliminating a large portion of American households from its available market. Generac noted that in 2010 (20 years after the introduction of HSBs), only approximately 2% of U.S. households in that market had been equipped with an HSB.

39. Unable to obtain widespread adoption of HSB generators, Generac has become largely dependent upon extreme weather to generate demand for its generators. For example, widespread power outages or repeated power failures that flood homes or cause inconvenience for homeowners without power, often as a result of extreme weather, have driven otherwise reluctant

4882-8376-1778.v2

consumers to pay the price to add a generator. Indeed, Generac emphasized in its IPO that increasing "[d]isruptions to the aging U.S. power grid" presented the Company with a "market opportunity" and that "[d]emand for [Generac's] products is significantly affected by unpredictable major power-outage events." Accordingly, a number of high-profile power outage events in the 2000s led to increased HSB sales. On the heels of that success, Generac went public, raising more than $240 million in its IPO.

**Generac's Expansion into Solar Energy**

40.     Recognizing the difficulty of growing generator sales and the need to show long term growth potential as a public company following the IPO, Generac implemented a number of strategies to expand beyond the generator market. Not long after the IPO, Generac launched a corporate strategy called "Powering Ahead," which focused on acquiring other businesses to "transition from primarily a North America focused, energy backup generator company into a more diversified industrial technology company." Then, in 2018, the Company launched its "Powering Our Future" corporate strategy that focused on acquiring businesses to provide "the initial foundation for the Company's evolution into an energy technology solutions company." The strategy of expanding into energy solutions, rather than remaining a generator company, led to Generac's entry into the solar energy storage industry.

41.     In March 2019, Generac acquired Neurio Technology, Inc. ("Neurio"), an energy data company. Generac explained that Neurio's "hardware and software solutions equip users with the intelligence to manage and control electrical loads, solar systems and batteries to optimize energy consumption and increase savings." Then, in April 2019, Generac acquired Pika Energy, Inc. ("Pika"), which Generac described as "a manufacturer of innovative battery storage technologies that capture and store solar or grid power for homeowners and businesses." At the time of the Pika acquisition, Defendant Jagdfeld said, "'Pika's integrated battery storage solutions are a crucial

- 14 -

component in developing a comprehensive system to store and consume clean energy' . . . . 'The visionary ideas and technology that Pika has developed give us a considerable edge as we expand into the rapidly developing market for energy storage.'"

42.     Later that year, Generac leveraged the technology acquired from Pika and Neurio to create "PWRcell" – a line of "clean energy products" that "captures and stores electricity from solar panels or other power sources and helps reduce home energy costs while also protecting homes from shorter duration power outages." Generac promotes PWRcell on its website as "not just a powerful battery, but is also the most flexible and scalable home energy system on the market." Basically, Generac's PWRcell products[5] are connected to solar panels (usually installed on a homeowner's roof) and they allow the homeowner to store and utilize electricity from solar power captured by the solar panels. Generac does not manufacturer or sell the solar panels themselves.

43.     The most significant component of PWRcell products to this case is the "SnapRS" device, which Generac advertised as "a simple way to satisfy rapid shutdown compliance for solar + storage systems." Under the 2017 National Electric Code ("NEC") and 2020 NEC, adopted by states throughout the country, solar panel systems are required to include a "rapid shutdown" function.

44.     The rapid shutdown function is a fundamental safety requirement. Solar panel conductors become electrically charged any time the sun is shining. Without a rapid shutdown device, there is no way to quickly turn off that live current, which poses an electrocution risk to anyone who comes into contact with the solar panel system, including first responders requiring

---

[5]     For reference, the PWRcell products that will be discussed herein include: (i) PWRcell, which is used to refer to the entire line of products for solar energy storage and sometimes used as shorthand to refer to the component battery used to store solar electricity for backup power; (ii) SnapRS, which is discussed extensively herein; (iii) "PV Link," which is the component used to link or connect multiple solar panels; and (iv) "PWRcell inverter," which converts the "direct current" electricity created by the panels to the "alternating current" used in homes. Generac and analysts refer to PWRcell products as being part of Generac's "solar" or "energy storage" business.

access to the roof.  A rapid shutoff allows homeowners or first responders to quickly reduce that current to a safe level.

45.     To comply with the NEC requirements, a single SnapRS is installed between each solar panel, and then between the solar panels and the PV Link.  The following diagram from Generac shows how SnapRS (shown as "RS") is intended to be installed and function with an eight-panel system, requiring eight SnapRS devices:



46.     Generac's website refers to PWRcell as "revolutionary technology."  Leading up to and during the Class Period Defendants' made public statements to confirm that PWRcell was a critical product to the Company's future sales growth and that they were succeeding in selling and becoming profitable in this new line of business.  For example, since its launch in late 2019, Defendants have discussed PWRcell at every one of Generac's quarterly earnings calls.  Likewise, in SEC filings, Generac has repeatedly listed "Solar, storage, and monitoring markets developing quickly" among the Company's most important "Strategic Growth Themes."

47.     Then, as PWRcell sales grew in 2020 and 2021, Defendants repeatedly highlighted the sales success and the product's importance to the Company's strategy.  On an October 28, 2020 earnings call discussing third quarter ("3Q") 2020 results, Defendant Jagdfeld said that "[s]hipments

of our PWRcell energy storage systems . . . were a key contributor to the company's year-over-year growth, and we are expecting a further significant sequential increase in shipments during the fourth quarter." Jagdfeld added that Generac "achieved profitability for these products during the month of September [2020]" and claimed the Company was "far ahead of the expectations" that Generac had laid out for PWRcell in 2019.

48.     The next quarter, during a February 11, 2021 earnings call, Defendant Jagdfeld highlighted that "shipments of our PWRcell energy storage systems met our aggressive expectations during the fourth quarter [of 2020], as revenue for these products continued to ramp as they increased approximately 75% on a sequential basis and were a key contributor to the company's year-over-year growth."  He explained that this "tremendous growth in energy storage from essentially a start-up business was due to the important advances we have made in growing our capabilities around marketing, distribution, product development and sourcing of these products."

49.     Thus, the importance of Generac's solar business was continually noted throughout the Class Period, making it clear to investors that solar was critical to the Company's future growth and that Defendants closely monitored Generac's solar products as a core business and growth driver.  Confirming as much, during a February 2023 podcast interview, a Senior Director of Engineering at Generac described the solar business as "the future of Generac's core business," adding that "you're seeing a transformation of the whole organization focusing really in on solar" and "[t]he decisions that we're making from a leadership level demonstrate our commitment, our focus, and our transition to the renewable energy sector."

**Generac's Product Dealers**

50.     Generac does not typically sell its generators or solar products directly to the end customer homeowner, nor does it install the products.  Instead, Generac sells generators and solar products to "channel partners," who in turn sell them to the end customer and arrange installation.

- 17 -

The most predominant channel partners for Generac are its network of thousands of independent authorized dealers. As stated in Generac's 2020 Form 10-K, "we depend on the services of independent distributors and dealers to sell our products and provide service and aftermarket support to our end customers."

51. As to generators, a homeowner interested in an HSB generator can utilize the "Dealer Locator" function on Generac's website. By entering their location, the homeowner will be provided the name of several dealers in the area, who can be contacted to visit the home for an "in-home consultation" ("IHC") or do a "virtual-home consultation" ("VHC"). Defendants track these consultations in order to track early-stage customer interest.

52. If the homeowner enters a contract to purchase a generator, the dealer will later install product, either with its employees or through outside contractors. Historically, a dealer would either install a generator it had in its inventory or place an order to Generac for delivery, generally with minimal or no delay for production. As noted, Generac does not immediately record revenue upon receiving an order from a dealer, but instead records revenue upon shipment or delivery to the distributor (its customer), who is paid by the homeowner (the end customer).

53. Once installed, the homeowner will activate the unit, upon which Generac will be notified that the activation is complete. This provides visibility to Defendants into when generators sold by Generac to channel partners are ultimately sold to end-users. Defendant Jagdfeld has stated that "[w]e track all the time fences between when an IHC occurs to when that turns into an order, to when that order turns into an installation, to when that installation turns into a first use of the product."

54. As to solar products, when Generac expanded into the solar market in late 2019, it applied a similar dealer-based process to grow the solar business. As explained in the 2020 Form 10-K, "we have been leveraging these [HSB dealer channel] practices to assist in growing our base

- 18 -

of solar contractors that install our complete energy storage systems.  In addition, we have been developing distribution relationships with national solar providers to offer our storage equipment in their portfolio of products and services."

55.     Because Generac uses dealers to sell its generator and solar products, it also reports increases in dealers as indicative of increased demand.  For example, during a February 14, 2019 earnings call, Defendant Jagdfeld said that "you add dealers[,] [t]hey generally come on board as the market is – market demand cycle is higher."  To encourage dealers to increase sales, Generac provides benefits for higher sales volumes.  For example, according to securities analysts at BofA Securities who spoke with Generac dealers, top dealers who achieve "Premier" status get "discounted access to generators."[6]  The analysts reported that, to earn and maintain that status, "Premier dealers must demonstrate $1.5 [million] in sales annually."  Using an average of $10,000 per generator, that would require Premier dealers to sell 150 HSB generators a year.

**COVID-19 Results in Unprecedented Generator Sales in 2020**

56.     In March 2020, the World Health Organization declared COVID-19 a global pandemic.  In the lead up to and following that declaration, stay-at-home, or shelter-in-place, orders and guidance were implemented throughout the United States.  In Wisconsin, the state issued the first of its stay-at-home orders on March 24, 2020, prohibiting, among other things, nearly all gatherings of individuals from outside a single household, most non-essential office operations, and in-person K-12 education.

57.     While the pandemic had a devastating impact on some businesses, it provided a boost in sales to others.  Generac was one such business that saw its sales spike as a result of the shift to staying at home.  Just as severe weather would trigger homeowners to contemplate purchasing

---

[6]     The discounts can be substantial as an online forum post by a Generac dealer in June 2019 noted that Premier dealers pay "11.6% . . . less than the minimum advertised price."

generators to protect from loss of power, the need to work from home and conduct in-home schooling resulted in a surge in demand for generators to protect against power outages.

58.     The positive impact was both significant and immediate. For example, just after the pandemic started, during an earnings call on July 30, 2020, Defendant Jagdfeld touted the spike in sales, saying that "[r]elative to expectations, second quarter revenue dramatically exceeded our prior forecast . . . . primarily due to the higher-than-expected shipments of residential products."

59.     Jagdfeld explained that "[h]ome standby shipments came in significantly higher than our prior forecast, primarily driven by robust demand as a result of the heightened awareness of the need for backup power since the onset of the COVID-19 pandemic." Defendant Jagdfeld added that "what appears to be fairly clear to date is that demand for our residential products is significantly benefiting from an emerging trend that we are referring to as Home as a Sanctuary, where millions of people are working, learning, shopping, entertaining and, in general, spending more time at home." As a result of the unexpected windfall, Jagdfeld announced that Generac was "significantly increasing [its] full-year revenue and earnings outlook for 2020, including much higher expectations for the second half of the year."

60.     Notably, during the same July 30, 2020 earnings call, Jagdfeld admitted that management had clear visibility into sales and demand when he explained that "[s]everal key metrics that we monitor closely for home standby demand continued to be exceptionally strong during the second quarter." These metrics included increased "[a]ctivations" of the generators once sold, "in-home and virtual consultations" with prospective customers, and the number of "residential dealers." In addition, Jagdfeld confirmed they monitored "close rates" – the rate at which a consultation results in an end customer sale – when he noted that close rates "actually remained consistent with historical trends, which gives us confidence to raise the outlook for residential products for the full year."

- 20 -

61.     The sales spike continued into subsequent quarters.  During an October 28, 2020 earnings call, Defendant Jagdfeld reported that "home standby orders" were "about 2.5x greater than they were a year before," which was "massive" and resulted in a "backlog that we ended the [third] quarter with, and that's only continued to grow here in Q4."  Reinforcing the unprecedented nature of the growth, Jagdfeld said, "[w]e had a substantial backlog for home standby generators at the end of the third quarter, which continues to grow during the fourth quarter, and we expect to enter 2021 with a very high level of open orders for these products, far exceeding anything previously experienced."

62.     On February 23, 2021, Generac filed with the SEC its Annual Report on Form 10-K for full year 2020 (the "2020 10-K").  In this filing, Generac reiterated the "Home as a Sanctuary mega trend," stating:

> As working adults spend much more time working from home and school-age children learning from home, they become more sensitive to power outages due to lost productivity.  These trends combined with ongoing elevated power outage activity has led to a significant increased awareness, importance and need for backup power security.

63.     As a result, Generac claimed, "homeowners are also investing more into home improvement projects and outdoor project activity, which is leading to increased and broad-based demand for home standby generators as well as chore products used in a variety of property maintenance applications."  Throughout 2020 and into 2021, the Company reported massive growth in residential sales and worked to ramp up and maximize its production capabilities, resulting in more shipments and revenue.  Generac's Residential sales growth, which includes both generators and solar products (*see* n.3) is reflected in the following chart created from numbers publicly reported by Generac:

4882-8376-1778.v2



Residential Sales
Year-Over-Year Growth

64.    In discussing full year 2020 results during a February 2021 earnings call, Defendant Jagdfeld touted Generac's "tremendous finish to 2020," with "all-time record performance for both the quarter and full year net sales." He reported that the "revenue outperformance was primarily due to higher shipments of home standby generators."[7]

65.    As to HSB generator backlog, Defendant Jagdfeld noted that it was growing because "lead times for home standby generators continue to expand from the approximately 18 weeks at the end of 2020 to approximately 20 weeks today." He explained that, as a result, the Company was continuing to expand its production capabilities:

> With demand for home standby generators at all-time highs, we've continued to aggressively ramp our supply chain and production output, and we achieved progressively higher record daily build rates throughout the fourth quarter. We expect to further expand capacity for these products with our announcement yesterday of plans to open a new manufacturing, assembly and distribution operation in Trenton, South Carolina.

66.    The new facility, Jagdfeld explained, "is projected to increase home standby capacity by approximately 75% relative to our previous normal levels as we entered 2020, with the ability to further expand the facility well beyond its current size in the future."

---

[7]    He also noted that during the same period the Company was "pleased that shipments of PWRcell energy storage systems met our aggressive expectations."

4882-8376-1778.v2

67.	Generac's performance did not go unnoticed by analysts and the market. During the question and answer portion of the February 2021 earnings call, an analyst praised management saying "[w]e're running out of superlatives for Generac on your performance. Congratulations." In response, Defendant Jagdfeld agreed and said "I'm right alongside you on that one," and reassured analysts the spike was sustaining itself by adding "you talk about the loss of words and superlatives . . . but we don't see a ton of [order] cancellations. It's a very sticky [home generator] backlog."

68.	At the same time, the second prong of Generac's long-term success, the recently launched solar energy storage business, was also growing and performing well in the pandemic. Defendant Jagdfeld reported on the same February 2021 earnings call that "shipments of PWRcell energy storage systems increased significantly during the first year of commercial launch, particularly during the second half." He further highlighted the "tremendous growth in [clean] energy storage."

## NEGATIVE TRENDS DEVELOP LEADING UP TO AND INTO THE CLASS PERIOD

### Generator Demand Weakens in 2021

69.	The surge in generator sales following COVID-19 began to subside leading up to the second half of 2021 for several reasons. As demand and orders initially surged, Generac's production could not keep pace, creating long lead times from order to shipment to installation. As of the end of 2020, the lead time from order to shipment was 18 weeks. On top of the demand surge caused by COVID-19 throughout 2020 and into early 2021, Generac experienced another regional 1Q 2021 surge from a February 2021 power crisis that left millions of Texas households without electricity.[8] By April 29, 2021, lead times had reached 28 weeks *i.e.*, 7 months. The long delays began to discourage homeowners from buying new generators, as reflected in declining close rates.

---

[8]	*See* https://www.hsdl.org/c/tl/2021-texas-power-crisis/.

70.     This weakening demand could not have come at a worse time for Generac because management had made a reactive decision to boost production after the COVID-19 surge.  In response to skyrocketing demand early in the pandemic, Generac reported that it had been "aggressively ramp[ing] production levels" in 4Q 2020, and then, as noted, Generac announced in early 2021 that it was adding a facility in Trenton, South Carolina.  Yet, as production was finally going up, demand did not keep pace as Defendant Jagdfeld admitted at the end of the Class Period that close rates decreased in 2021 before bottoming out in the beginning of 2022.  Not only were the long lead times negatively impacting customer demand, but Defendant Jagfeld also admitted at the end of the Class Period that it was "having a negative impact on our ability to sign new channel partners" which hurt sales as growing channel partners was needed to grow sales.  *See* ¶¶238-239.

71.     With production and demand moving in different directions by in or around mid-2021, Generac was prematurely accepting orders for and shipping excess inventory to dealers in order to boost revenues, even though the dealers did not have corresponding closed contracts with homeowners or capacity to install the generators, as was typical of legitimate sales.

72.     Dealers were incentivized to place orders even with no allocation for customer contracts because:

- •  doing so would permit the dealers to maintain their "Premier" status and access to substantial purchase discounts, even if underlying demand did not support the sales like it did in 2020, as the dealers only needed to demonstrate a potential "pipeline" of sales rather than place orders based on actual customer contracts;

- •  Generac was implementing and threatening price increases quarter after quarter[9] to encourage dealers to pre-order before an actual need and lock in lower pricing;

---

[9]  In November 2021, Defendant Jagdfeld said, "[t]hroughout 2021, we have implemented multiple rounds of price increases across all product categories," with "roughly 4" HSB price increases in "December [2020] [or] January [2021]," "May [or] June," "September," and another one being "contemplat[ed] recently."

- as lead times from order to shipment were increasing throughout 2020 and early 2021, dealers realized they could submit additional orders to essentially reserve their place in line so they could reduce delays for any future potential (then non-existing) customers; and

- dealers were protected from over-ordering product by Generac's lax cancellation policies that permitted dealers to walk away from orders later on in the process.

73.     The orders described in ¶72 caused Generac's sales and backlog to be artificially inflated above normal market demand.  Dealers ordered generators without an allocated end customer contract (as would be reflected in Defendants' monitoring of order rates not aligning with declining close rates) in order to secure status and discounted pricing, avoid price increases, and save their place in line for not-yet-existent future needs.  Generac produced and shipped generators for these orders, recording sales revenue, even though dealers did not have allocated customer contracts and the volume exceeded what the dealer base had the capacity to install.  While these tactics to encourage excess ordering and shipments without corresponding end customer demand inflated Generac's short term results and backlog, it harmed the Company in the long run as Generac sold product at discounted prices to dealers who could not otherwise qualify for Premier status, the orders led to increased cancellations, and the orders created an artificial bubble in sales that ultimately caused sharp declines in future periods that were left with a hole from the pulled forward sales.

74.     These negative trends were only confirmed and explained by Defendants later and after the Class Period.  For example, Defendant Jagdfeld admitted at the end of the Class Period, "we knew" there was a "negative impact on close rates," "[w]e ramped up our production beyond what the installers could handle" and dealers' inventory got so high with uninstalled products that they "physically started to run out of room, run out of credit."  Of course, that mismatch between orders and end customer demand was clear from Generac's monitoring of close rates and activations during the Class Period.

- 25 -

75.     In addition, analysts from BofA Securities reported in September 2022 that "[d]ealers admit[ted] to significant pre-orders in 2021 given both bloated lead times, but also internal needs to demonstrate [Premier] sales status with [Generac]."  The analysts added in October 2022 that Generac's "backlog was outsized on the way up as dealers pre-emptively put orders into queue" in 2021, resulting in later sales "erosion from backlog cancellations."  In November 2022, analysts from Oppenheimer also commented on how once Generac's lead times normalized, "order cancelations ensued," confirming that Generac's "backlog overstated HSB installation demand."  In addition, analysts from Piper Sandler later commented in March 2023 on how the lax cancellation policies contributed to the over-ordering reporting, stating that during at least 2022, "supply-chain uncertainty and a lax order cancellation policy drove dealers to place large HSB orders (above and beyond customer orders)."

**Generac's Dangerous Solar Product Drastically Increases Risk and Liabilities**

76.     Prior to the Class Period, Generac became aware of the dangerous defect in its SnapRS device that threatened its solar business.  As discussed, Generac's SnapRS rapid shutoff device was meant to comply with important safety requirements designed to keep homeowners and first responders safe.  However, as detailed below, by early 2021, SnapRS units began failing across the country.  In short, the SnapRS units were defective and malfunctioning by turning on and off repeatedly, resulting in the units overheating and eventually deforming and melting during normal use.  This defect would cause the SnapRS units to stop working, thereby harming the solar panels' performance, and even caused residential fires.

77.     The SnapRS defect gave rise to tens of thousands customer complaints, with dealers being overwhelmed by services calls and costs of replacing units, and exposed Generac to massive risk and liabilities.  Ultimately, Generac's largest and most important solar dealer, Pink Energy, sued Generac in August 2022 for various breach of warranty, product liability, and breach of contract

- 26 -

claims (the "Pink Energy Lawsuit") stemming from the SnapRS defects. The Pink Energy Lawsuit alleged hundreds of millions of dollars in damage, including $39 million in unpaid invoices to Generac for service calls related to the defective SnapRS, $155 million in lost revenue from the defective SnapRS, and "hundreds of millions" in reputation and brand damage caused by the defective SnapRS. Soon after filing the lawsuit, Pink Energy was forced out of business and declared bankruptcy.

78.     By April 2021, according to the Pink Energy Lawsuit and a media packet published by Pink Energy in July 2022 (the "Media Kit"), Pink Energy had reported to Generac that it discovered melted SnapRS devices during a service call for a customer who had complained of a lack of system production. Pink Energy described the defect as an over-heating event in which SnapRS devices showed clear signs of heat deformation, charring, and melting. In addition to contacting Generac to alert it of the deformed SnapRS devices, Pink Energy also provided photos of the melted units.

79.     In its Media Kit, Pink Energy provided the following photo of melted SnapRS devices:



80.     In addition, in a video posted by Pink Energy on YouTube,[10] Pink Energy states that "in early 2021, we began to notice a significant increase in service calls related to solar system

_____
[10]   https://www.youtube.com/watch?v=r4RKeFLR7X4.

performance deficiencies and failures. These issues were traced back to a single component: the Generac SnapRS." The video adds that:

> SnapRS devices began to fail *en masse*. Due to some inherent fault, the devices began to experience thermal events that could ultimately lead to fire. Pink Energy at great expense began to replace tens of thousands of these units while Generac developed a firmware update that was supposed to be a permanent fix for these SnapRS failures.

81. The video likewise provides certain photos of melted SnapRS units, such as:



82. According to the Pink Energy Lawsuit, by Summer 2021, Pink Energy had become aware that "other solar installers using these same Generac products were experiencing high rates of failure with the SnapRS connectors and were noticing signs of heat deformation in the SnapRS units during service visits." As one example, "[i]n early August 2021, the President of Valley Solar, another solar installer using Generac's products, reached out to . . . inquire about whether [Pink Energy] had noticed issues with Generac SnapRS," and "Valley Solar informed [Pink Energy] that it had noticed a 'very high rate with SnapRS failing and needing replacement' and that the SnapRS units were showing signs of 'heat deformation and even charring.'"[11] Pink Energy further states that

---

[11] According to its website (https://valleysolar.solar/), Valley Solar is "one of the largest independent solar contractors in the state" of Massachusetts and advertises its team as "[b]attery [s]torage [e]xperts," highlighting that Valley Solar "installed among the most battery systems in the state in 2021."

- 28 -

"Valley Solar told [Pink Energy] that it had brought this issue to Generac's attention but had 'not gotten much of a response.'"

83.     By early August of 2021, a residential fire had been caused by the SnapRS defect. As detailed in the Pink Energy Lawsuit, "in August 2021, a fire occurred at the home of [Pink Energy] customer, Lonnie Bentley, in Lancaster, Kentucky . . . It was later determined that the fire was caused by overheating of the SnapRS units."

84.     In a phone call regarding the fire, a Generac executive did not dispute that SnapRS devices were overheating, as the Pink Energy Lawsuit states:

> On August 12, 2021, [Pink Energy] and Generac participated in a conference call during which [Pink Energy] inquired about the cause of the fire and potential hazards associated with SnapRS. During this conference call, Uwe Uhmeyer, Generac's Vice President of Engineering, informed [Pink Energy] that Generac was investigating the cause of the SnapRS overheating but had not yet identified the precise cause of the issue.

85.     Further confirming that the SnapRS defect had been widespread and required corrective action, Generac told Pink Energy during the same call that it "was investigating 'bulging and separation' issues associated with the SnapRS connectors and that it was in the process of developing and testing an updated model of the SnapRS which Generac referred to the 801A."

86.     Another residential fire was caused by a defective SnapRS unit on August 18, 2021, at the home of Pink Energy customer Stephen Nightingale in Lexington, South Carolina. According to the Pink Energy lawsuit, "[f]ollowing a fire inspection, the cause of the Nightingale claim was determined to be a melting and/or exploding SnapRS." In a lawsuit filed by Kristen and Stephen Nightingale against Generac on January 9, 2023, the Nightingales allege that "[o]n August 18, 2021, [their] home caught fire as a result of a failure in the solar panel system designed and manufactured by Generac. The fire did substantial damage to the Nightingales' home and their solar panel system." The Nightingales added that "[t]he solar panel equipment . . . was in a defective condition

- 29 -

[and] unreasonably dangerous as supplied by Generac," which "was due either to a design or manufacturing defect."

87.     The Pink Energy Lawsuit describes an email received the day after the Nightingale fire, in which Generac again confirmed the existence, and Generac's knowledge, of the overheating defect: "On August 19, 2021, Jeffrey McAndrew, Generac's Director of Sales for its East Region ("McAndrew"), informed [Pink Energy] that Generac had 'a fix in test' for the SnapRS overheating issues that it planned to release by late August 2021." The lawsuit continues:

> McAndrew informed [Pink Energy] that Generac discovered that a few SnapRS units were found to be overactive by turning on and off repeatedly when they should have been in either the "on" or "off" state, which condition generated heat in the unit causing them to "bubble out." McAndrew assured [Pink Energy] that Generac's new firmware would address the issue by keeping the signal constant (in the "on" position) until there is a forced rapid shutdown.

88.     According to the Pink Energy Lawsuit, this email was followed by another email later the same day, in which McAndrew "stated that Generac was sending the firmware updates 'today to a bunch of sites then the rest will happen over the next few days.' McAndrew closed this email by telling [Pink Energy] 'all good though. So glad that was resolved quickly.'"

89.     But the firmware update did not solve problems. First, it was only available to customers who had their solar systems connected to the internet. Many solar systems were not connected to the internet, and were therefore unable to receive the firmware update, and remained at risk of failed or dangerous performance. According to Pink Energy, Generac was "aware that a significant number of [Pink Energy]'s customers had not received the firmware update because their solar energy systems were not connected to the internet."

90.     And second, as explained in the Pink Energy Lawsuit:

> Beginning in late 2021, [Pink Energy] noticed a dramatic spike in complaints from customers claiming that their solar energy systems were not producing the energy output they had been promised, were not seeing noticeable savings on their monthly utility bills, and/or experiencing complete shutdowns of their solar energy systems indicated by error messages on their Generac inverters.

91.     Pink Energy then "investigated this issue and learned that the cause of its customers decreased production and/or system shutdown was what the Generac inverter coded as a 'PVRSS Lockout' system error." In its lawsuit, Pink Energy says it "learned that a PVRSS Lockout is caused when a PV Link or inverter detects a malfunctioning or overheating SnapRS in a particular array of solar panels. When this happens, the entire array goes into 'lockout mode' and the array does not generate any power until the lockout is cleared." As explained below, this lockout was caused by the firmware update and posed a significant problem, as "[c]learing a PVRSS Lockout generally requires a service technician to replace the SnapRS on the array that is in lockout mode." In late 2021, Generac also began supplying dealers with a second generation SpanRS to try to resolve the defect – the "SnapRS 801A." According to the Pink Energy Lawsuit, "Generac instructed [Pink Energy] to only replace the SnapRS units that were charred or melted and to leave any undamaged units in place," and "Generac represented to [Pink Energy] that the SnapRS 801A had been redesigned to fix the product defect in the SnapRS 801 that was causing the SnapRS to melt, burn, or otherwise malfunction." The lawsuit adds that Pink Energy "did not see any reduction in incidents of PVRSS Lockouts in customers after replacing the SnapRS 801s with 801As" but instead "continued to see the same defects in the 801As, including solar arrays going into PVRSS Lockout due to defective SnapRS 801As, resulting in [Pink Energy] service technicians removing burnt and melted 801As from its customers' solar energy systems."

92.     Thus, according to the Pink Energy Lawsuit, "[i]n late 2021 and into early 2022, [Pink Energy] experienced a massive increase in customer service calls and complaints related to the PVRSS Lockout that required [Pink Energy] to shift its business away from installation of new solar energy systems and toward maintenance of existing customers' systems that were experiencing PVRSS Lockouts and other issues caused by burning, melting, or otherwise malfunctioning SnapRS units."

- 31 -

93.     The widespread defect exposed Generac to substantial warranty and liability claims. According to the Pink Energy Lawsuit, in December 2021, Pink Energy entered into a contract with Generac through which "Generac agreed to defend, indemnify, and hold [Pink Energy] harmless from third-party claims arising from, or in connection with, manufacturing defects resulting in injury, death or damage to real or personal property." The Pink Energy Lawsuit states that "Generac acknowledged" that this agreement "would apply retroactively to any third-party claim relating to or involving defects in the SnapRS whether existing prior to, or after, the effective date."

94.     To place the SnapRS defect claims in numerical context, Pink Energy says that before "the PVRSS Lockout issues caused by Generac's firmware update, [Pink Energy] averaged approximately 800 phone calls into its customer service center per month," but "[a]fter the PVRSS Lockout issues began [in late 2021] and through the current date [August 1, 2022], [Pink Energy] has averaged approximately 30,000 calls into its customer service center per month, amounting to an approximately 3,650% increase in customer service calls during this period." Pink Energy further claims that, "[i]n total, [Pink Energy] has approximately 19,000 customers with solar energy systems that utilized the . . . SnapRS" and that "approximately half of these customers have experienced PVRSS Lockouts requiring replacement of the SnapRS."

95.     Generac continued to admit the SnapRS defects. For example, according to the Pink Energy Lawsuit:

(a)     In May 2022, "Generac finally agreed to send a letter to a selection of [Pink Energy]'s customers to address these product failures." The letter stated that Pink Energy customers "'may have experienced certain issues with a particular Generac component of your solar energy system, the SnapRS801 or 801A'" and that Generac had developed the new SnapRS802, which had been "'designed to replace the RS801 and RS801A, increasing performance and reliability.'"

- 32 -

(b)     On June 1, 2022, Defendant Jagdfeld "responded to an email regarding continued incidents of burned and melted SnapRS devices" stating, "'all of our testing has shown that as long as the system has the latest firmware protections, it is safe from any kind of thermal situation as the system would lock out the PV link and associated string - this was an interim solution until those 802 modules were on the market.'" This email confirmed that: (i) the firmware update was designed to cause the lockouts whenever a defective SnapRS was detected; and (ii) the firmware update was only an "interim solution" until the SnapRS 802 devices were available.

(c)     Also in June 2022, Generac "acknowledged a near 50% failure rate in the SnapRS units, accounting for the approximately 41% of [Pink Energy] customers that have experienced PVRSS Lockouts and another 8% that never received the firmware update."[12]

(d)     The next month, in July 2022, Generac informed Pink Energy that "a significant number of [Pink Energy]'s customers never even received the firmware update because their PWRcell system was not connected to the internet."

96.     In addition, following several disclosures toward the end of the Class Period revealing the SnapRS defect and impact on the Company (*see* ¶¶212-251), in December 2022, analysts from BofA Securities reported on their recent conversations with members of Generac's management team, including the "head of its Clean Energy Business." The analysts wrote that, regarding the "product challenges with PWRcell," management "noted that it needs to rebuild trust with industry participants and dealers after the product challenges that ensued shortly after launch," which, as discussed, was in late 2019 and early 2020.

---

[12]   The Pink Energy Lawsuit notes that, "[i]ncredibly, Generac made this admission as if to not fully understand or appreciate the magnitude of the problem, implying to [Pink Energy] that it was positive news that the failure rate was not yet close to 100%."

97.     Since the filing of the Pink Energy Lawsuit, there have been nine consumer class action complaints filed against Generac, between October 2022 and July 2023, detailing SnapRS failures, including during the Class Period.[13]

**Generac's Solar Sales Are Highly Concentrated in a Single Dealer**

98.     In addition to the SnapRS defect, Defendants were aware that another aspect of its solar business threatened its growth and success: Generac was overly dependent upon one solar dealer, Pink Energy, for the sales and installation of its solar products.  As discussed, after years of focusing primarily on HSB generators, Generac launched its PWRcell solar products in late 2019.  According to the Pink Energy Lawsuit, in late 2019 and January 2020, Generac met with and traveled to Pink Energy to solicit its business as a channel partner.

99.     After negotiations, the two sides reached a partnership whereby Pink Energy would purchase and install Generac PWRcell products.  The companies began to jointly market the new partnership, and Generac agreed to provide Pink Energy with leads for potential solar customers generated by Generac's marketing.

100.     Generac understood the need for a diversified network of dealers and routinely made public comments regarding its purported broad array of dealers for its solar business.  For example, even before it partnered with Pink Energy, a January 2020 Company press release claimed that the PWRcell products were "[o]ffered through [Generac's] vast network of partner installers."

---

[13]     Industry professionals likewise turned on Generac.  In January 2023, after previously touting the PWRcell system, the founder of "Solar Surge" stated in an online video that he is "no longer promoting Generac as our preferred whole home battery backup solution."  He stated that "the big reason" was "service and reliability."  Specifically, he said that SnapRS devices were "overheating and melting and causing normal functioning solar systems to cut out."  He added that "these devices failed by the tens of thousands," and that Pink Energy, a "primary Generac dealer and one of the largest installers nationwide," ultimately filed for bankruptcy "in large part because of the unexpected warranty service cost associated with the SnapRS device repair."

101.     During a May Goldman Sachs Industrials and Materials Conference, Defendant Ragen emphasized the importance of a broad and diversified network of solar dealers to the Company's solar power growth and success, stating:

> When in a very underpenetrated market, you need to have . . . very broad channels of distribution and a large pipe to be able to sell your products through. And we did that on the legacy residential power generation side. . . . So we extended -- we are extending that philosophy into clean energy and building out a broad distribution network as we speak. We started in the back half of 2019, and we continue to do that today.

102.     When asked about the "number of [solar] distribution partners that you folks have today," Defendant Ragen emphasized that "we've trained over 1,000 independent solar installers" and that "[i]t's ramping nicely." Two months later, during a July 30, 2020 earnings call, Defendant Jagdfeld said, "[w]here we have had a lot of really great success is signing new partners for our clean-energy initiatives, so solar dealers on a direct basis."

103.     But, unbeknownst to the public, Generac was disproportionately dependent on Pink Energy, rather than growing through a "broad" and diversified dealer network. Pink Energy was pushing hard to sell Generac products. A November 2020 *Business Insider* article based on conversations with Pink Energy sales representatives and customers reported that Pink Energy "reps are required to add" PWRcell batteries "to most [solar system] configurations."

104.     Generac's undisclosed over-reliance on Pink Energy was significant for several reasons. First, it caused Generac's solar business to be tied in large part to the success of Pink Energy. Whereas a company with a diversified dealer network of more than 2,000 dealers providing similar levels of orders would be relatively unaffected by the sudden underperformance or

termination of any one dealer, Generac was at risk of being severely impacted by the sudden underperformance or termination of Pink Energy.[14]

105.    Second, by being so heavily tied to a single distributor, Generac was at risk of suffering reputational harm from that distributor's reputation and business practices.  And Pink Energy reportedly had a poor reputation in the solar industry for engaging in predatory marketing and business practices.  Pink Energy was profiled by *Business Insider* in 2020 for its "misleading tactics to lure customers into home solar deals," such as "tout[ing] [a federal] tax incentive when selling systems to homeowners" even if the sales representative knew those customers were "unlikely to get the credit" and "exhibit[ing] a pattern of inflating the benefits of its products."

106.    Third, the dangerous solar product defects compounded the risks of Generac's over-reliance on Pink Energy, because it put Generac's sales and Pink Energy's business at risk.  As noted, Pink Energy was an aggressive seller of Generac's products as it required representatives to add the products to solar installations.  As those products became defective, Pink Energy was required to dedicate time and energy to resolving the defect, rather than selling Generac products.  Here, as detailed above (¶¶76-97), defect in SnapRS products caused Pink Energy to be overwhelmed with service calls and forced to spend its own money and resources to try to rectify the defect.  Ultimately, Pink Energy declared bankruptcy and ceased operations as a result of the SnapRS defect, stating in an announcement:

> Due to rampant consumer discontent resulting from faulty Generac solar equipment, Pink Energy has been forced to close its doors permanently.
>
> We exhausted all avenues to find a way forward that would allow us to service all past, present and future customers and are devastated that we can't do so.

---

[14]   Averaging sales across the 2,000 solar dealers would result in each dealer accounting for 0.05% of solar sales.  Yet, Pink Energy accounted for what analysts estimated to be more than half.  Put differently, Pink Energy would have sold more than the other 1,999 dealers combined.

4882-8376-1778.v2

107.    Yet this high sales concentration in a single dealer was not disclosed until near the end of the Class Period.  And it was only at the end of the Class Period that Defendant Jagdfeld admitted Pink Energy was actually "a large customer" and a "really important customer for [Generac]."  In a September 2022 press release, Pink Energy confirmed that Generac's "SnapRS units . . . have been part of nearly every Pink Energy solar energy equipment installation since 2020."  Then, after Pink Energy ceased operations in October 2022, Generac attributed a stunning $185 million reduction in guidance to the loss of Pink Energy.  According to analysts from William Blair, the existing guidance assumed "core clean energy" sales – *i.e.*, PWRcell products – of $350 million, meaning that "Pink Energy likely accounted for more than half of Generac's solar/energy storage sales."

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

108.    During the Class Period, Defendants were aware of the negative trends set forth above regarding: (i) weakening demand for Generac's HSB generators, as reflected by declining close rates and increasing orders that did not have allocated end customer contracts and exceeded dealers' needs and ability to install; (ii) the dangerous and significant defect in Generac's SnapRS devices and resulting customer complaints, liabilities, and warranty claims; and (iii) the over-concentration of solar sales through Pink Energy.  However, rather than disclose these negative trends, Defendants made the following false and misleading statements that concealed the trends from the investing public.

**False and Misleading Statements Concealing the Weakening Generator Demand**

109.    On July 28, 2021, Generac issued a press release reporting its second quarter ("2Q") 2021 results ("2Q 2021 Release").  The 2Q 2021 Release reported "exceptional . . . growth of 68% leading to all time record revenue of $920 million."  On the same day, July 28, 2021, Defendants

Jagdfeld and Ragen held an earnings call to discuss the 2Q 2021 results, and made the following statements:

(a)     Defendant Jagdfeld emphasized that "*[d]emand for home standby generators remains incredibly robust* due to a variety of factors, including *continued traction with the Home as a Sanctuary mega trend*, as well as significantly higher power outage activity over the past several quarters."[15]

(b)     Defendant Jagdfeld further added that:

> despite strong prior year comparisons *due to the emergence of the Home as a Sanctuary mega trend* and elevated outage levels, *home consultations or sales leads for home standby generators remained strong during the second quarter and increased approximately 50%* as compared to the second quarter of 2020. . . . Activations of home standby generators, which are a proxy for installations, also grew again at a strong rate compared to the prior year with broad-based strength across all U.S. regions, including exceptional growth in the Northeast and South Central regions.

(c)     Defendant Jagdfeld stated that Generac "start[ed] production of home standby generators at our new manufacturing facility in Trenton, South Carolina," which he claimed "*will provide much-needed capacity* to further ramp our daily home standby build rates in an effort to reduce *lead times*, which *remain elevated at approximately 28 weeks*."

(d)     Defendant Jagdfeld claimed that the metrics monitored by Defendants showed growing demand, saying:

> *Early in the third quarter, these key demand metrics for home standby have continued to trend even higher* relative to prior year levels, *including home consultations increasing at a strong double-digit rate*.

(e)     Defendant Ragen likewise touted HSB growth, focusing on increased production: "*home standby generator sales continue to experience robust growth*, which nearly

---

[15]   Bold and italics are added herein to identify the particular statements alleged to be false and misleading.

doubled during the second quarter, *as shipments benefitted from much higher production levels for these products as compared to the prior year*."

(f)     Defendant Ragen added that the Company was increasing its guidance because in part "the *company continues to make better-than-expected progress in increasing production rates for home standby generators*."

(g)     During the question and answer portion, an analyst asked about the Company's 28-weeks backlog, which was the same as reported the previous quarter despite the Company producing more generators.  Defendant Jagdfeld responded:

> So when we're giving that update again this quarter and the fact that it hasn't changed, yet we have higher production levels in the future, we've also, as we indicated in the prepared remarks, *we've been experiencing higher incoming order rates*.  So that kind of matches up with the higher expected production at this stage.

(h)     Defendant Jagdfeld added:

> [A]t this stage, it's -- *the demand has been incredibly robust*.  We said this in the prepared remarks as well.  [E]ven here in the third quarter in July, *our IHCs or home consultation sales leads for home standby are up again on very difficult comps compared to last year*.
>
> So I mean, it's just -- *it continues to amaze us, the interest level in the category and how that's translating into real demand*.

110.     On <u>August 3, 2021</u>, Generac filed with the SEC its quarterly report on Form 10-Q for 2Q 2021 ("2Q 2021 10-Q").  The 2Q 2021 10-Q was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen.  The 2Q 2021 10-Q included the following statements:

(a)     The 2Q 2021 10-Q highlighted the purported "mega-trend" following the onset of the COVID-19 pandemic that the Company described as "Home as a Sanctuary" and claimed that "[a]s a result of spending more time at home, homeowners are also investing more into home improvement projects and outdoor project activity, *which is leading to increased and broad-based demand for home standby generators*" (the "Increased HSB Demand Statement").

(b)　　　The 2Q 2021 10-Q added "*[w]e continue to experience a broad-based increase in demand for residential products, specifically home standby generators*, created by a significant increase in the awareness, importance and need for backup power security as people are working, learning, shopping, entertaining, and spending more time at home" (the "Broad-Based HSB Demand Statement").

(c)　　　The 2Q 2021 10-Q further stated that although the Company historically experienced some "seasonality" in its HSB business depending primarily on power outage activity, ever since the emergence of the "Home as a Sanctuary" trend, the HSB "*increased demand has resulted in extended lead times for these products*, and as a result, our net sales during 2021 are expected to be more level-loaded throughout the year relative to historical seasonal patterns" (the "HSB Lead Times Demand Statement").

111.　　The statements set forth in ¶¶109-110 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)　　　The statements touting the "incredibly robust" demand for generators as a result of traction with the "Home as a Sanctuary mega trend," the "broad-based increase in demand" for generators, and the "increased demand [that] has resulted in extended lead times" for generators that "remain elevated at approximately 28 weeks" despite increased production were misleading because they concealed that: (i) the temporary boost in sales and demand from COVID-19 was not a sustainable trend; (ii) demand was weakening as the increasing lead times were causing close rates to decline; (iii) Generac's significant discounts for high dealer order volumes, continuing price increases, and lax cancellation policies had incentivized dealers to order above normal market demand without allocations to end customer contracts; (iv) the change in orders inflated Generac's orders and backlog, and rendered them incomparable to prior periods, as they consisted of orders increasingly likely to be cancelled or result in unsold dealer inventory; and (v) Generac was selling

- 40 -

into its dealers more than they could sell through to end customers and the sales orders materially reflected excess inventory accumulating at dealers rather than increased end customer demand.

(b)     The statements of "robust growth" in generator sales, "higher incoming order rates" and backlog of "28 weeks" were misleading for the same reasons, including that the sales, orders, and backlog included, in significant part, generators being ordered and shipped with no allocation to an end customer contract.

(c)     The statements touting the "strong" and "trend[ing] even higher" "demand metrics for home standby," including the purported "50%" and "double-digit" increases in consultations that "continue[] to amaze us" were misleading for the same reasons, including because they concealed that end customer generator demand had weakened as increasing lead times were causing close rates to decline, which reflect actual contracts with end customers rather than just consultations.

(d)     The statements emphasizing Generac's "much-needed" additional "capacity," "higher production levels," and "progress in increasing production rates" were misleading for the same reasons, including because they concealed that the increased capacity and production did not correlate to end customer generator demand, which had weakened, as lead times were causing close rates to decline and the increasing output of generators would, in significant part, add to dealer inventory with no allocated end customer contract.

112.     On September 29, 2021, Generac hosted its annual Virtual Investor Day conference. During that conference, Defendant Jagdfeld highlighted that "***our capacity for residential standby is going to be -- is going to go to basically 4x where we exited 2019***, Q1 of 2020 . . . [s]o 4x, effectively 2x from where we exited the second quarter of this year by the second quarter of next year," and emphasized that despite increasing production, the ***HSB "backlog"*** was currently "***somewhere around 32 weeks***."

- 41 -

113. On <u>November 2, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's reported 3Q 2021 results. As described in ¶¶193-196, certain disclosures partially revealed waning demand for HSB generators, but the full scope and magnitude of the weakening demand continued to be concealed. To offset and allay any investor concern, Defendants made the following statements assuring investors that demand was still surging:

(a) Defendant Jagdfeld emphasized that HSB generator production levels were the highest ever, "with ***shipments of home standby generators increasing at a substantial rate*** over the prior year" and added that "[e]ven with the higher output levels, ***demand remained very strong and broad-based leading to higher backlog levels, particularly for home standby generators***."

(b) Defendant Jagdfeld claimed that the "***demand for home standby generators continues to outpace our ability to produce them, which has caused lead times to further grow to approximately 30 weeks***" from the prior earnings call and touted that "our ***home standby backlog [is] projected to be well over $1 billion*** entering next year."

(c) Defendant Jagdfeld represented that long lead times were not impacting end customer demand, stating "***there's, call it, an acceptance level . . . I think people are somewhat accepting of the fact that they have to wait***."

(d) Defendant Jagdfeld further emphasized that "we're going to have a bigger backlog coming into '22 than we originally thought ***because demand has been stronger, I mean it's outstripping supply. We're hitting record output levels on HSB***."

(e) In response to an analyst question about prior expectations that Generac would be able to get the backlog back to a "normalized level" by the end of 2022, Defendant Jagdfeld said he was "less optimistic that we're going to be able to catch the full backlog . . . as we exit the year," claiming that "***[t]he demand has outstripped here over the last in the more recent period here as we ended Q3 and as we have come into Q4***," and emphasized that "***the demand has been***

- 42 -

*continuing just to be off the charts*" with "***everything from our leading indicators like I[H]Cs to our lagging indicators like activations and then obviously, the incoming orders that are outstripping our kind of record production levels here***," indicating sustained demand.

114.    On <u>November 4, 2021</u>, Generac filed with the SEC its quarterly report on Form 10-Q for 3Q 2021 ("3Q 2021 10-Q"). The 3Q 2021 10-Q was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 3Q 2021 10-Q included the same ***Increased HSB Demand Statement*** (¶110(a)), ***Broad-Based HSB Demand Statement*** (¶110(b)), and ***HSB Lead Times Demand Statement*** (¶110(c)) as in the 2Q 2021 10-Q.

115.    The statements set forth in ¶¶112-114 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

        (a)    The statements repeatedly touting the "very strong and broad-based" generator demand that was "off the charts" and "outpac[ing] our ability to produce them" and "outstripping supply" were misleading because they concealed that: (i) the temporary boost in sales and demand from COVID-19 was not a sustainable trend; (ii) demand was weakening as the increasing lead times were causing close rates to decline; (iii) Generac's significant discounts for high dealer order volumes, continuing price increases, and lax cancellation policies had incentivized dealers to order above normal market demand without allocations to end customer contracts; (iv) the change in orders inflated Generac's orders and backlog, and rendered them incomparable to prior periods, as they consisted of orders increasingly likely to be cancelled or result in unsold dealer inventory; and (v) Generac was selling into its dealers more than they could sell through to end customers and the sales orders materially reflected excess inventory accumulating at dealers rather than increased end customer demand.

        (b)    The statements of generator shipments "increasing at a substantial rate," "orders that [we]re outstripping" production, and "higher backlog levels" of "30 weeks," "32

weeks," or "well over $1 billion" were misleading for the same reasons, including that the shipments, orders, and backlog included, in significant part, generators being ordered and shipped with no allocation to an end customer contract.

(c)     The statement touting the "leading indicators like I[H]Cs" was misleading for the same reasons, including because it concealed that end customer generator demand had weakened as increasing lead times were causing close rates to decline, which reflect actual contracts with end customers rather than just consultations.

(d)     The statements emphasizing Generac's quadrupling of "capacity for residential standby" and "record production levels" were misleading for the same reasons, including because they concealed that the increased capacity and production did not correlate to end customer generator demand, which had weakened, as lead times were causing close rates to decline and the increasing output of generators would, in significant part, add to dealer inventory with no allocated end customer contract.

(e)     The Increased HSB Demand Statement, Broad-Based HSB Demand Statement, and HSB Lead Times Demand Statement were misleading for the same reasons, including as set forth in ¶¶111(a)-(d).

116.    As described in ¶198, a January 2022 analyst report contained certain disclosures that partially revealed waning demand for HSB generators, but the full scope and magnitude of the weakening demand continued to be concealed. To offset and allay any investor concern, Defendants continued to make statements assuring investors that demand was still surging.

117.    On <u>February 16, 2022</u>, Generac issued a press release reporting its full year 2021 results ("FY 2021 Release"). The FY 2021 Release reported that net sales "increased 50% to a record $3.75 billion during 2021" and quoted Defendant Jagdfeld as stating, "*[w]e continued to experience exceptional demand* during the fourth quarter and *achieved record quarterly shipments*

*and production levels* as we exited 2021," adding, "[w]e enter 2022 with considerable visibility and momentum *given ongoing robust home standby demand*, an expanding Energy Technology solutions portfolio, and strong global demand for our C&I products."

118. On the same day, <u>February 16, 2022</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the FY 2021 results, and made the following statements:

(a) Defendant Jagdfeld stated that "important megatrends" such as "*Home as a Sanctuary*" had "*continue[d] to drive incredibly strong demand for home standby generators*. As a result, *home consultations or sales leads increased again in the fourth quarter* over the robust prior year comparison."

(b) Defendant Jagdfeld added that "*home standby order rates have remained very strong, leading to a further increase in our backlog, which currently is still well over $1 billion*" and emphasized that HSB "demand has remained strong."

(c) In response to an analyst question about the HSB backlog, Defendant Jagdfeld stated, "*we're going to end the year with a pretty substantial backlog yet of HSB because we anticipate the order rate, which we've seen already so far this year and as we exited 2021 has been really strong, . . . so strong that even though we've taken our production capacity up, we've continued to outstrip that and grow the backlog*."

(d) Defendant Jagdfeld further touted that, "*phenomenally, I mean, for the whole quarter, [IHCs were] up double digits* again for the quarter across the country. So just a *really strong read on IHCs*."

119. On <u>February 22, 2022</u>, Generac filed with the SEC its annual report on Form 10-K for full year 2021 ("2021 10-K"). The 2021 10-K was signed by Defendants Jagdfeld and Ragen and contained the following statements:

- 45 -

(a)    The 2021 10-K included the same ***Broad-Based HSB Demand Statement*** (¶110(b)) in the 2Q 2021 10-Q.

(b)    The 2021 10-K further stated that although the Company historically experienced some "seasonality" in its HSB business depending primarily on power outage activity, ever since the emergence of the "Home as a Sanctuary" trend, the HSB "***increased demand has resulted in extended lead times for these products*** as of December 31, 2021, and as a result, ***our net sales during 2022 are expected to experience an increasing trend*** on a quarterly basis ***as we increase our production capacity***" (the "2022 HSB Lead Times Demand Statement").

(c)    The 2021 10-K likewise purported to warn that "***a significant decrease in the demand for our products***" merely "***could cause actual results to differ***" from estimates.

120.    The statements set forth in ¶¶117-119 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)    The statements touting the "exceptional," "robust," "increased," and "incredibly strong" demand for generators, or the "increasing [sales] trend" for generators, driven by the "Home as a Sanctuary" mega trend were misleading because they concealed that: (i) the temporary boost in sales and demand from COVID-19 was not a sustainable trend; (ii) demand was weakening as the lengthy lead times had caused close rates to decline and ultimately bottom out at the beginning of 2022; (iii) Generac's significant discounts for high dealer order volumes, continuing price increases, and lax cancellation policies had incentivized dealers to order above normal market demand without allocations to end customer contracts; (iv) the change in orders inflated Generac's orders and backlog, and rendered them incomparable to prior periods, as they consisted of orders increasingly likely to be cancelled or result in unsold dealer inventory; and (v) Generac was selling into its dealers more than they could sell through to end customers and the sales

- 46 -

orders materially reflected excess inventory accumulating at dealers rather than increased end customer demand.

(b)    The statements of "record quarterly shipment[s]," "increase[d]" production capacity, "very strong" or "really strong" order rates, or orders that "outstrip production," were resulting in "extended lead times," or were "leading to a further increase" in the "substantial backlog" that was "still well over $1 billion" were misleading for the same reasons, including that the shipments, orders, and backlog included, in significant part, generators being ordered and shipped with no allocation to an end customer contract.

(c)    The statements touting the "increased," "phenomenal[]," or "double-digits" increase in consultations were misleading for the same reasons, including because they concealed that end customer generator demand had weakened as lengthy lead times had caused close rates, which reflect actual contracts with end customers rather than just consultations, to decline and ultimately bottom out at the beginning of 2022.

(d)    The statement purporting to warn that a decrease in demand "could" impact the Company's financial results was misleading for the same reasons, including because it concealed the then-existing decline in end customer demand for generators, as the lengthy lead times had caused close rates to decline and ultimately bottom out at the beginning of 2022.

(e)    The Broad-Based HSB Demand Statement was misleading for the same reasons, including as set forth in ¶¶111(a)-(d).

121.    As described in ¶¶200-202, an April 2022 analyst report contained certain disclosures that partially revealed waning demand for HSB generators, but the full scope and magnitude of the weakening demand continued to be concealed.  To offset and allay any investor concern, Defendants continued to make statements assuring investors that demand was still surging.

- 47 -

122.     On <u>May 4, 2022</u>, Generac issued a press release reporting its 1Q 2022 results ("1Q 2022 Release"). The 1Q 2022 Release reported that net sales "increased 41% to a record $1.14 billion during the first quarter." The 1Q 2022 Release quoted Defendant Jagdfeld as stating, "[w]e continue[] to experience robust and broad-based growth during the first quarter, and ***strong execution pushed shipments to new records***."

123.     On the same day, <u>May 4, 2022</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the 1Q 2022 results, and made the following statements:

(a)     Defendant Jagdfeld claimed that the HSB business "continues to benefit from the convergence of multiple megatrends," highlighting that "***home consultations during the first quarter were nearly 3x higher than the levels seen in the first quarter of 2020, reinforcing our view that demand for the home standby category has once again achieved and held a new and higher baseline level***."

(b)     Defendant Jagdfeld further stated that "***output levels are driving an . . . improvement in lead times***, which have been declining" and emphasized that "[d]espite the ongoing improvements in build rates and lead times, ***home standby backlog remains well above $1 billion***."

(c)     Later in the call, Defendant Jagdfeld reiterated that "***the combination of increased output and then the demand being in line still puts us with an incredible backlog for HSB***, well above kind of where we would have thought we would be at this point. . . . So pretty exciting times for the HSB category."

(d)     An analyst also asked Defendants about what they might do to drive generator demand in a post-COVID environment, and Jagdfeld stated that to date, "***demand has been strong***" so the Company had "hesitated to kind of roll out bigger things right now," but noted that the Company could later "***pull[] on promotional levers, which we've, again, largely not done over the***

*last several years*" including "***extended warranty promotions***, which Generac had "***done a lot less of them over the last 2 years. So that would be another lever to pull***."

(e)     Another analyst asked whether "HSB dealer inventories [were] normalized yet?" and Defendant Jagdfeld responded, "***we're seeing days of inventory be a little at the high end of where they've been historically***" but explained it away as "***[t]hat happens kind of seasonally about now – it's coming out of the winter season*** . . . [s]o it's been difficult to get out and install product at the kind of pacing we want to see."

(f)     Continuing their response on the same question, Defendant Jagdfeld and Ragen engaged in the following back and forth, essentially assuring investors that there were end customers allocated for the generators being shipped to dealers:

> [Jagdfeld:]     But we need to increase the install pace because output is increasing. So that is a massive area of focus for us. And we're working hard with our existing dealers, but also with new dealers in terms of increasing their ability to install products more quickly. And they're struggling also, by the way with labor. That's another struggle point for the channel out there. So it is something we're watching closely. But we are seeing install rates move up. We just need to see it move up even faster.

> [Ragen:]     Yes. And we believe ***there's buyers for those units that are in the field***. So I think that . . .

> [Jagdfeld:]     Well, ***absolutely. Yes, the IHC***.

> [Ragen:]     ***Based on the IHC volume***.

> [Jagdfeld:]     ***Based on the IHC volume, we think the demand is there to support what we're seeing in the field in terms of inventory***.

> [Ragen:]     ***Going to increase the install bandwidth***.

> [Jagdfeld:]     Right.

(g)     Later in the call, an analyst asked whether "home consultations being 3x above 2020 level" should be thought about as "the 'normalized' baseline level," to which Defendant Jagdfeld responded:

I would tell you that **you'd have to take into consideration where our close rate is at. That's a part of that equation**. And recall that IHCs are not our full – that's not everything we do, right? So it's – we think it's representative or proxy for the HSB market, but that just is a portion of what we do.

124. On <u>May 9, 2022</u>, Generac filed with the SEC its quarterly report on Form 10-Q for 1Q 2022 ("1Q 2022 10-Q"). The 1Q 2022 10-Q was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2022 10-Q included the same **Broad-Based HSB Demand Statement** (¶110(b)) as in the 2Q 2021 10-Q and the same **2022 HSB Lead Times Demand Statement** (¶119(b)) as in the 2021 10-K.

125. The statements set forth in ¶¶122-124 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a) The statements touting the "higher baseline level" for generator demand, and the "strong" and "in line" generator demand were misleading because they concealed that: (i) the temporary boost in sales and demand from COVID-19 was not a sustainable trend; (ii) demand had weakened as the lengthy lead times had caused close rates to decline and ultimately bottom out at the beginning of 2022; (iii) Generac's offer of extended warranties, significant discounts for high dealer order volumes, continuing price increases, and lax cancellation policies had incentivized dealers to order above normal market demand without allocations to end customer contracts; (iv) the change in orders inflated Generac's orders and backlog, and rendered them incomparable to prior periods, as they consisted of orders increasingly likely to be cancelled or result in unsold dealer inventory; and (v) Generac was selling into its dealers more than they could sell through to end customers and the sales orders materially reflected excess inventory accumulating at dealers rather than increased end customer demand.

(b) The statements of "increased output," "incredible backlog," or "backlog [that] remains well above $1 billion" were misleading for the same reasons, including that the output and

backlog included, in significant part, generators being ordered and shipped with no allocation to an end customer contract.

(c)     The statements touting the "3x" increase in IHCs, that there were "buyers for [HSB] units . . . in the field," and that "demand is there" to support orders and shipments "based on the IHC volume," while noting that "close rate" is "part of that equation," were misleading for the same reasons, including because they concealed that demand had weakened, as close rates for generators had been declining in 2021 and bottomed out by beginning of 2022, and generators were being ordered and shipped without contracts with buyers in the field (homeowners).

(d)     The statement claiming that Generac had additional "promotional levers," including "extended warrant[ies]," to use to boost demand but had "hesitated" to use them and were not using them was misleading for the same reasons, including because it concealed that Generac had been using several promotional levers, including extended warranties, lax cancellation policies, and generous discounts to incentivize orders above normal market demand without allocations to end customer contracts.

(e)     The statement assuring analysts that although Generac was "seeing days of inventory . . . at the high end," that elevation was normal and "happens kind of seasonally" was misleading for the same reasons, including because the excess inventory was not the result of seasonality, but instead of weakening demand as lengthy times had caused close rates to decline and ultimately bottom out at the beginning of 2022, and Generac's extended warranties, lax cancellation policies, and generous discounts to encourage orders had incentivized dealers to order above normal market demand without allocations to end customer contracts.

(f)     The Broad-Based HSB Demand Statement and the 2022 HSB Lead Times Demand Statement were misleading for the same reasons, including as set forth in ¶¶111(a)-(d) and 120(a)-(e).

- 51 -

126.     As described in ¶¶203-221, certain disclosures in a June 2022 research report and during Generac's August 3, 2022 earnings call continued to partially reveal the weakened demand for HSB generators, but the full scope and magnitude of the weakened demand continued to be concealed.  To offset and allay any investor concern, Defendants continued to make statements assuring investors that demand was still surging.

127.     On August 3, 2022, Generac issued a press release reporting its 2Q 2022 results ("2Q 2022 Release"), which stated that "[n]et sales increased 40% to a record $1.29 billion during the second quarter."  The 2Q 2022 Release quoted Defendant Jagdfeld as stating, "***[g]iven the positive underlying demand trends and elevated backlog***, we are maintaining our sales growth and adjusted EBITDA margin guidance for the full-year 2022."

128.     On the same day, August 3, 2022, Defendants Jagdfeld and Ragen held an earnings call to discuss the 2Q 2022 results, and made the following statements:

(a)     In declining to provide a number value associated with the Company's HSB backlog, Defendant Jagdfeld instead claimed that "***[p]ositive underlying demand trends led to continued backlog strength*** with C&I products and ***home standby backlog***, both providing us with considerable visibility for the quarters ahead."

(b)     When asked to provide "some context to what that backlog bleed has looked like" and to "put that in context for the visibility that you have," Defendant Jagdfeld stated "[w]e've been in a backlog situation now for close to 2 years as we've been working to ramp production and tackle these supply chain challenges, which we've been doing.  ***That backlog is still significant***," adding that "we're still not going to catch that [backlog] by the end of the year.  And we'll continue to bring the lead times down, but ***the backlog is still significant for home standby***."

(c)     In response to an analyst question asking "to what degree" has Generac received order cancellations in its HSB backlog, Defendant Jagdfeld stated:

As far as cancellations . . . our policy around orders has always been a pretty, I'll call it, a liberal policy that way. So the ability to cancel or defer an order is – you'll see that in those smaller dealers that are coming up against some of those constraints as you point out.

I would say **on balance, it's not a material number when you look at the total**. But we work through that and it's kind of dealer by dealer.

(d)     When asked by an analyst "whether IHCs were up sequentially from first quarter to second quarter," Defendants Jagdfeld and Ragen stated the following:

[Jagdfeld:]     I don't have that in front of me but we did not – they were up, yes. Mike's pointing up. So yes, they were up sequentially. **They've [IHCs] been on a tear here in Q2**, specifically to the catalyst that I mentioned. But it's been – **we've been surprised by the robustness of the end market demand, to be very frank**. I mean, it's something that has – I think it speaks to how the category continues to move into more of a mainstream – as more of a mainstream appliance, if you will, for homeowners.

[Ragen:]     In fact, **they were up very nicely sequentially**.

[Jagdfeld:]     Sequentially, yes.

[Ragen:]     Very nice.

(e)     In response to an analyst question about "put[ting] into . . . context" "a finer point around the order trends in standby," Defendant Ragen stated that "**you really have to look at the IHCs to really understand what's going on with the end market demand and having those up nicely year-over-year here in the quarter and up . . . [o]ver 4x pre-pandemic levels. So the underlying demand for the category is still very, very strong**."

(f)     And, when asked once more about whether the HSB backlog is "in line with that [$1 billion] range [from the last quarter] or different," Defendant Jagdfeld reiterated that "[a]gain, we've talked about **8 to 10 weeks of orders in the backlog and it's sizable. It's a big backlog**," adding that "we expect to still have backlog as we exit the year, **even that's in spite of the increased production rate**. So **it's a sizable number**."

- 53 -

129.     On <u>August 8, 2022</u>, Generac filed with the SEC its quarterly report on Form 10-Q for the 2Q 2022 (the "2Q 2022 10-Q").  The 2Q 2022 10-Q was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen.  The 2Q 2022 10-Q included the same ***2022 HSB Lead Times Demand Statement*** (¶119(b)) as in the 2021 10-K.

130.     The statements set forth in ¶¶127-129 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements touting the "positive underlying demand trends and elevated backlog" for generators and the "robustness of the end market demand" for generators were misleading because they concealed that: (i) the temporary boost in sales and demand from COVID-19 was not a sustainable trend; (ii) demand had weakened as the lengthy lead times had caused close rates to decline and ultimately bottom out at the beginning of 2022; (iii) Generac's offer of extended warranties, significant discounts for high dealer order volumes, continuing price increases, and lax cancellation policies had incentivized dealers to order above normal market demand without allocations to end customer contracts; (iv) the change in orders inflated Generac's orders and backlog, and rendered them incomparable to prior periods, as they consisted of orders increasingly likely to be cancelled or result in unsold dealer inventory; and (v) Generac was selling into its dealers more than they could sell through to end customers and the sales orders materially reflected excess inventory accumulating at dealers rather than increased end customer demand.

(b)     The statements suggesting that the decline in the generators backlog was the result of Generac "working to ramp production" and "increas[ing] production rate" was misleading for the same reasons, including because it concealed that the backlog was declining due to a lack of orders and increase in cancellations, as demand had weakened, and after placing significant orders with no allocation to an end customer contract, dealers had excessive inventory with no ability to install or buy more generators.

- 54 -

(c)     The statements touting that HSB generator demand was "robust" and "very, very strong" based on "look[ing] at the IHCs" and that IHCs "were up very nicely" were misleading for the same reasons, including because they concealed that demand had weakened, as close rates for generators had been declining in 2021 and bottomed out at the beginning of 2022, and generators were being ordered and shipped without end customer contracts.

(d)     The 2022 HSB Lead Times Demand Statement was misleading for the same reasons, including as set forth in ¶¶120(a)-(e).

**False and Misleading Statements Concealing Generac's Dangerous and Defective Solar Product**

131.    On <u>April 29, 2021</u>, Generac issued a press release reporting its 1Q 2021 results ("1Q 2021 Release").  The 1Q 2021 Release quoted Defendant Jagdfeld as stating, "*[s]hipments of our PWRcell® energy storage systems also grew at a significant rate* as compared to the prior year, and with the considerable momentum we have in the marketplace, we are increasing our outlook for these products for the remainder of the year."

132.    On the same day, <u>April 29, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the 1Q 2021 results, and made the following statements:

(a)     Defendant Jagdfeld provided an "update on our rapidly growing clean energy product offering," repeating in part, "*shipments of our PWRcell energy storage systems grew at a significant rate* as compared to the prior year, and demand paced ahead of our expectations during the first quarter."

(b)     Defendant Jagdfeld added that multiple "*key performance indicators for our clean energy-related initiatives continue to show favorable trends*," including that "*activations*, which are a proxy for installation and commissioning *also grew at a tremendous rate* during the first quarter as compared to prior year," and that "*orders for clean energy products were very strong* on a sequential basis during the first quarter, and this strength has continued here in April."

- 55 -

(c)     During the question and answer portion of the call, an analyst asked if Defendants "could talk about how much your PWRcell production was up in the quarter," to which Defendant Ragen stated, "***shipments obviously did grow dramatically . . . [and] orders or demand actually was up sequentially from Q4 to Q1***, actually better than expectations."

133.    On <u>May 4, 2021</u>, Generac filed with the SEC its Quarterly Report on Form 10-Q for 1Q 2021 (the "1Q 2021 10-Q"). The 1Q 2021 10-Q was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2021 10-Q included the following statements:

(a)     Emphasizing that Generac's "PWRcell" products and solar expansion were among the Company's key "[b]usiness [d]rivers and [t]rends," the 1Q 2021 10-Q stated:

> ***The capabilities provided by Pika and Neurio have enabled us to bring an efficient and intelligent energy-savings solution to the energy storage and monitoring markets, which enabled us to quickly ramp shipments for these clean energy solutions during 2020***, and which we believe will position Generac as a key participant going forward. Although different from the emergency backup power space, we believe this market will develop similarly as the home standby generator market has over the past two decades given both products can provide power resiliency to homeowners (the "Pika Capabilities Statement").

(b)     In describing the Company's risk factors, the 1Q 2021 10-Q claimed that an "***increase in product and other liability claims or recalls***" merely "***could affect our actual financial results***" (the "Product Liability Risk Statement").

134.    On <u>July 28, 2021</u>, Generac issued the 2Q 2021 Release. The 2Q 2021 Release quoted Defendant Jagdfeld as stating, "***Our PWRcell® energy storage systems were also up dramatically compared to the prior year as well as sequentially*** as these products continued to gain important traction in the rapidly expanding clean energy market."

135.    On the same day, <u>July 28, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the 2Q 2021 results, and made the following statements:

- 56 -

(a)     Defendant Jagdfeld highlighted that "*shipments of PWRcell energy storage systems experienced tremendous growth*, both over the prior year and sequentially as demand for clean energy solutions continues to rise alongside the rapidly expanding solar-plus-storage market."

(b)     Defendant Jagdfeld added that "*key performance indicators for clean energy continue to show favorable trends*," including that "*activations*, which are a proxy for installation and commissioning, *grew at a tremendous rate* during the second quarter as compared to prior year and also improved on a sequential basis."

(c)     Further, Defendant Ragen highlighted that "*[s]hipments of PWRcell energy storage systems also grew at a dramatic rate*."

136.    On <u>August 3, 2021</u>, Generac filed with the SEC its 2Q 2021 10-Q, which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen.  The 2Q 2021 10-Q included the same *Pika Capabilities Statement* (¶133(a)) and *Product Liability Risk Statement* (¶133(b)) as in the 1Q 2021 10-Q.

137.    The statements set forth in ¶¶131-136 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements touting that Generac's solar product sales "grew at a significant rate," "gr[e]w dramatically," and were "rapidly growing," with "key performance indicators" including "activations" for solar products "continu[ing] to show favorable trends" were misleading because they concealed: (i) the dangerous and defective SnapRS devices, which were overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance and increased service calls by Generac's dealers; (ii) that the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures and heat deformation by summer of 2021, and Generac had been developing an attempted fix for

overheating to release in August 2021; and (iii) that the increased sales were also exposing Generac to increased liabilities, warranty claims, and reputational harm as a result of the SnapRS defect.

(b)     The statement highlighting that "[t]he capabilities provided by Pika" had "enabled [Generac] to bring an efficient and intelligent energy-savings solution to the energy storage and monitoring markets" was misleading for the same reasons, including because it concealed the dangerous and defective SnapRS devices which, among other things, were reducing the efficiency of energy storage by causing reduced performance.

(c)     The generic warning that a possible "increase in product and other liability claims or recalls" in the future merely "could" affect the Company's financials was misleading for the same reasons, including because it failed to disclose that the dangerous and defective SnapRS product that was, at that time, installed on tens of thousands of homes, was resulting in a significant increase in service calls to Pink Energy (Generac's largest and most important solar dealer), and had already exposed the Company to increased liabilities and reputational harm.

138.     On September 28, 2021, the Company published its inaugural Environmental, Social, and Governance (ESG) report (the "2021 ESG Report"). The 2021 ESG Report was signed by Defendant Jagdfeld. In a release announcing the 2021 ESG Report, Defendant Jagdfeld said that Generac "'want[s] this document to be a helpful resource for our stakeholders to evaluate our success as a sustainable business'" and that one of the goals of the Company was to "'hold[] ourselves accountable to our stakeholders.'"

(a)     Under the heading "Product Safety," the 2021 ESG Report stated:

> *Generac maintains a robust product safety function that is involved in nearly all aspects of product design and production.* We have a Product Safety Committee that participates in our new product introduction in an effort to ensure that our products meet all applicable safety standards and internal engineering design standards, including those issued by the Consumer Product Safety Commission. *This Committee also regularly reviews any safety concerns associated with products in the field, including potential product recalls.*

(b)     And, under the heading "Product Quality," the 2021 ESG Report stated:

*Our Quality Management System is certified to ISO 9001, helping to ensure a strong customer focus*, the motivation and involvement of top management to ensure product quality, and an emphasis on a process approach and continuous improvement. Excellence is one of our Corporate Values, and *our product quality team exemplifies this value through vigorous involvement in both our new product introduction and production processes. We also regularly perform design reviews and testing to maximize the quality and value of our products for our customers*.

139.    On <u>November 2, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's 3Q 2021 results, and made the following statements:

(a)     Defendant Jagdfeld highlighted that "the increasing penetration of solar installations are also driving *rapid growth for our clean energy product offering*" and that "*shipments of our power cell energy storage systems grew significantly* as compared to the prior year and also grew at a double-digit rate sequentially."

(b)     Defendant Jagdfeld further highlighted that the Company's "*clean energy products [solar] . . . growth [was] well above the broader U.S. residential solar market*, driven by ongoing increases in storage attachment rates and continued market share gains," that "*key performance indicators for clean energy products continue to show favorable trends*," and that "*[s]ystem activations*, which are a proxy for installations and commissioning, *more than doubled in the third quarter* as compared to the prior year and also increased sequentially."

140.    On <u>November 4, 2021</u>, Generac filed with the SEC its 3Q 2021 10-Q, which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 3Q 2021 10-Q included the following statements:

(a)     The 3Q 2021 10-Q reported changes in preexisting warranty reserves of approximately $1 million and noted that "*[t]he Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale of the product to a customer based upon historical warranty experience. The Company also records a liability for*

- 59 -

*specific warranty matters when they become known and are reasonably estimable*" (the "Warranties and Liabilities Statement").

(b)     The 3Q 2021 10-Q included the same *Pika Capabilities Statement* (¶133(a)); and *Product Liability Risk Statement* (¶133(b)) as in the 1Q 2021 10-Q.

141.    The statements set forth in ¶¶138-140 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements repeatedly touting that Generac's solar product sales "grew significantly" and were "well above the broader U.S. residential solar market," with "key performance indicators" including "activations" for solar products "continu[ing] to show favorable trends" were misleading because they concealed: (i) the high and increasing number of customer complaints due to the dangerous and defective SnapRS devices, which were overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance, property damage (including residential fires), and increased service calls by multiple Generac dealers; (ii) that the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures and heat deformation, and Generac had not only created a firmware update but were developing an updated SnapRS model to try to remedy the problem; (iii) a dramatic spike in complaints that solar systems were not producing the promised energy output (as a result of the SnapRS defect) had become apparent by late 2021; and (iv) that the increased sales were also exposing Generac to increased liabilities, warranty claims, and reputational harm as a result of the product defect.

(b)     The statements touting Generac's "robust product safety function" and "certified" quality management system and claiming that Generac "regularly reviews any safety concerns" and "potential product recalls" and also "regularly perform[s] design reviews and testing to maximize the quality" of its products were misleading for the same reasons, including because

they omitted to disclose the then-existing massive safety, product quality, product recall, and warranty and liability issues with the SnapRS devices, which were failing at a high rate, had been installed on tens of thousands of residential homes, and were causing increasing complaints and services call.

(c)     The statement recording only a $1 million change in warranty reserves and assuring investors that the "records a liability" for "assurance warranties" and for "specific warranty matters when they become known and are reasonably estimable" was misleading for the same reasons, including because it concealed the significant and increasing liabilities and warranty claims from the SnapRS defect.

(d)     The Pika Capabilities Statement and Product Liability Risk Statement were false and misleading for the same reasons, including as set forth in ¶¶137(a)-(c).

142.    On <u>February 16, 2022</u>, Defendants Jagfeld and Ragen held an earnings call to discuss the Company's 4Q and full year 2021 results, and made the following statements:

(a)     Defendant Jagfeld reported that the Company's net sales for 4Q 2021 increased by 40%, driven by "continued momentum in PWRcell energy storage shipments," emphasizing that "the further build-out of our clean energy market opportunity was a key highlight during the year as *we significantly grew shipments of our PWRcell energy storage systems* through the expansion of our supply chain, increased targeted marketing efforts, growth in our distribution network and the introduction of several exciting new products."

(b)     Defendant Jagfeld later reemphasized that "*shipments of our PWRcell energy storage systems grew significantly* in the quarter as compared to the prior year and also grew at a strong double-digit rate sequentially" and that "[d]espite industry-wide supply chain and logistics challenges impacting our clean energy solutions, *full year 2021 clean energy-related*

- 61 -

*revenue approximately doubled* as end-user demand remains robust for our PWRcell energy storage systems."

(c)     Defendant Jagdfeld highlighted that "***key performance indicators for clean energy products continue to show favorable trends***," including that "[h]ome consultation and system ***activations*** both ***increased at a strong rate***."

(d)     And Defendant Ragen touted that "***[s]hipments of PWRcell energy storage systems also grew at a significant*** rate as compared to the prior year as overall solar market growth, rising storage attachment rates and our expanding distribution continue to drive growth for our clean energy solutions."

143.    As described in ¶199, a February 17, 2022 analyst report contained certain disclosures that partially revealed "some SnapRS issues" but the full scope and magnitude of the SnapRS defect and its impact on the Company continued to be concealed.  To offset and allay any investor concern, Defendants continued to make statements assuring investors that the solar business was growing without downside and concealing the rising complaints, failures, warranties and liabilities from the widespread SnapRS defect.

144.    On <u>February 22, 2022</u>, Generac filed with the SEC its 2021 10-K, which was signed by Defendants Jagdfeld and Ragen and contained the following statements:

(a)     In describing the Company's risk factors, the 2021 10-K further described its potential exposure to product liability legal proceedings, without describing the then-existing massive exposure to warranty costs and product recalls of SnapRS, claiming that Generac

> ***face[s] a risk of exposure to current and future product liability claims alleging to arise from the use of our products and that may purportedly result in injury or other damage***.  Although we currently maintain product liability insurance coverage, we may not be able to obtain such insurance on acceptable terms in the future, if at all, or obtain insurance that will provide adequate coverage against potential claims.

(b)     In the 2021 10-K, Generac reported changes in preexisting warranty reserves of ***approximately $4.4 million*** and kept its product warranty obligations disclosure unchanged, including the same ***Warranties and Liabilities Statement*** as in the 3Q 2021 10-Q (¶140(a)).

(c)     The 2021 10-K also included the same ***Product Liability Risk Statement*** (¶133(b)) as in the 1Q 2021 10-Q.

145.    The statements set forth in ¶¶142-144 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements repeatedly touting that Generac's solar product sales "doubled" and grew "significantly" and at a "significant rate," with "key performance indicators" including "activations" for solar products "continu[ing] to show favorable trends" were misleading because they concealed: (i) the high and increasing number of customer complaints due to the dangerous and defective SnapRS devices, which were overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance, property damage (including residential fires), and increased service calls by multiple Generac dealers; (ii) that the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures and heat deformation, and Generac had not only created a firmware update but also an updated SnapRS model to try to remedy the problem; (iii) that the attempted fixes failed and caused widespread "lockouts" resulting in even higher customer complaints and tens of thousands of service calls to Generac's dealers; and (iv) the increased sales were also exposing Generac to increased liabilities, warranty claims, and reputational harm as a result of the product defects, which exposure was compounded by Generac entering into a contract with Pink Energy, Generac's largest dealer, to indemnify and hold Pink Energy harmless for past and future claims arising from the SnapRS defects (the "Indemnification Agreement," ¶93).

- 63 -

(b)     The statement vaguely purporting to warn that the Company faces a "risk of exposure to current and future product liability claims" were misleading for the same reasons, including because it omitted to disclose the then-existing massive liabilities posed by the SnapRS defects and Indemnification Agreement.

(c)     The Warranties and Liabilities Statement and Product Liability Risk Statement were false and misleading for the same reasons, including as set forth in ¶¶137(a)-(c) and 141(a)-(d).

146.     On April 26, 2022, the Company published its "Environmental, Social, and Governance (ESG) report" for the full year 2021 (the "FY 2021 ESG Report"). The FY 2021 ESG Report was signed by Defendant Jagdfeld.

(a)     Under the heading "Product Safety," the 2022 ESG Report stated:

*Generac maintains a robust product safety function that is involved in all aspects of product design and production*. We have a Product Safety Committee that participates in our new product development process in an effort to ensure that our products meet all applicable internal engineering design and safety standards, including those issued by the Consumer Product Safety Commission. *This team performed 22 hazard reviews for products under development in 2021, and also regularly reviews any safety concerns associated with products in the field, including potential product recalls*. Our engineering team maintains rigorous design standards that account for product safety at every stage of product development, and products go through multiple rounds of design review to ensure that safety is paramount.

(b)     And, under the heading "Product Quality," the 2022 ESG Report stated:

*Our Quality Management System is certified to ISO 9001, helping to ensure a strong customer focus*, the motivation and involvement of top management to ensure product quality, and an emphasis on a process approach and continuous improvement. Excellence is one of our Corporate Values, and *our product quality team exemplifies this value through vigorous involvement in both our new product development and production processes. We also regularly perform design reviews and testing to maximize the quality and value of our products for our customers*.

147.     On May 4, 2022, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's 1Q 2022 results, and made the following statements:

(a)     In touting the Company's "residential sales growth," Defendant Jagdfeld emphasized that Generac's "[c]lean [e]nergy products contributed meaningfully to overall growth in the first quarter as *shipments of our PWRcell energy storage systems grew significantly* from the prior year period."

(b)     Defendant Jagdfeld further highlighted that "residential sales growth *was again driven by a substantial increase in shipments of* both home standby generators and *PWRcell energy storage systems*."

(c)     Defendant Ragen likewise emphasized that "*[s]hipments of PWRcell energy storage systems also grew at a significant rate* as compared to prior year as the U.S. residential solar plus storage market continues to grow and as we expand our distribution network for our Clean Energy solutions."

148.    On <u>May 9, 2022</u>, Generac filed with the SEC its 1Q 2022 10-Q, which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen.  The 1Q 2022 10-Q included the following statements:

(a)     The 1Q 2022 10-Q reported changes in preexisting warranty reserves of approximately *negative $1.1 million* and kept its product warranty obligations disclosure unchanged, including the same *Warranties and Liabilities Statement* as in the 3Q 2021 10-Q (¶140(a)).

(b)     The 1Q 2022 10-Q included the same *Product Liability Risk Statement* (¶133(b)) as in the 1Q 2021 10-Q.

149.    The statements set forth in ¶¶146-148 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements touting that Generac's solar product sales "grew significantly" and at a "significant rate" were misleading because they concealed: (i) the high and increasing number of customer complaints due to the dangerous and defective SnapRS devices, which were

overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance, property damage (including residential fires), and increased service calls by multiple Generac dealers; (ii) that the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures and heat deformation, and Generac had not only created a firmware update but also an updated SnapRS model to try to remedy the problem; (iii) that the attempted fixes failed and caused widespread "lockouts" resulting in even higher customer complaints and tens of thousands of service calls to Generac's dealers; and (iv) the increased sales were also exposing Generac to increased liabilities, warranty claims, and reputational harm as a result of the product defects, which exposure was compounded by Generac entering into the Indemnification Agreement with Pink Energy.

(b)     The statements touting Generac's "robust safety function" and "certified" quality management system and claiming that Generac "regularly reviews any safety concerns" and "potential product recalls" and also "regularly perform[s] design reviews and testing to maximize the quality" of its products were misleading for the same reasons, including because they omitted to disclose the then-existing massive safety, product quality, product recall, and warranty and liability issues with its SnapRS devices, which were failing at a high rate, had been installed on tens of thousands of residential homes, and were causing increasing complaints and services call.

(c)     The Warranties and Liabilities Statement and Product Liability Risk Statement were false and misleading for the same reasons, including as set forth in ¶¶137(a)-(c) and 141(a)-(d).

150.     As described in ¶¶212-214, Pink Energy filed a lawsuit against Generac, which partially revealed the SnapRS defect issues, but, to offset and allay any investor concern, Defendants continued to conceal the full scope and magnitude of the SnapRS defect and its impact on the Company.

151.    On <u>August 8, 2022</u>, Generac filed with the SEC its 2Q 2022 10-Q, which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 2Q 2022 10-Q included the following statements:

(a)    The 2Q 2022 10-Q reported changes in preexisting warranty reserves of approximately $5.6 million and kept its product warranty obligations disclosure unchanged, including the same ***Warranties and Liabilities Statement*** as in the 3Q 2021 10-Q (¶140(a)).

(b)    The 2Q 2022 10-Q included the same ***Product Liability Risk Statement*** (¶133(b)) as in the 1Q 2021 10-Q.

152.    The Warranties and Liabilities Statement and Product Liability Risk Statement were false and misleading for the same reasons, including as set forth in ¶¶137(a)-(c) and 141(a)-(d).

153.    In addition to the foregoing false and misleading statements, by the start of the Class Period on April 29, 2021, and throughout the Class Period thereafter, Generac included on its website a "PWRcell Solar + Battery Storage System" brochure,[16] which described the "SnapRS Rapid Shutdown Device" as "***SAFE***" and "***rapid shutdown compliant***" (the "Brochure Statements").

154.    The Brochure Statements touting SnapRS as "SAFE" and "rapid shutdown compliant" were false and misleading throughout the Class Period because they concealed the dangerous and defective nature of the SnapRS devices, as well as the drastic negative financial and operational impact they were having on Generac, its dealers, and end customers, as detailed in ¶¶76-97.

---

[16]    Using the internet archive service "Wayback Machine" (https://archive.org/web/), demonstrates that the version of the brochure referenced herein, which has a "REV" (revised) date of "10/20" (October 2020) was available on Generac's website as of February 2021. Then, another version with a revised date of "8/21" (August 2021) was available on Generac's website as of October 2022. Both versions contain the false and misleading statements alleged herein. The current version on Generac's website, with a revised date of "12/22" (December 2022) describes the SnapRS, but no longer includes the emphasized false and misleading statements.

**False and Misleading Statements Concealing Generac's High Concentration of Sales in a Single Solar Dealer**

155. On, <u>April 29, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the 1Q 2021 results, and made the following statements:

(a) Focusing on Generac's purportedly diversified and broad network of channel partners for its solar products, Defendant Jagdfeld highlighted that the Company "***ha[s] had encouraging success further building out our [solar] installer network as we've trained and certified approximately 2,000 dealers as of the end of the quarter***."

(b) Further, Defendant Ragen tied the purported growth and breadth of the solar dealer network to the success of the solar business, stating that the Company was increasing its 2021 guidance in part, ***due to the "higher demand for our PWRcell energy storage systems as we continue to make further progress in building out distribution partners in the clean energy market***."

156. On <u>May 4, 2021</u>, Generac filed with the SEC its 1Q 2021 10-Q, which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2021 10-Q included the following statements:

(a) The 1Q 2021 10-Q stated that Generac's products, including solar "***energy storage systems . . . are available globally through a broad network of independent dealers***, distributors, retailers, e-commerce partners, wholesalers, and equipment rental companies" (the "Available Through Dealers Statement").

(b) The 1Q 2021 10-Q stated that "[r]esidential products," including solar "***energy storage and monitoring solutions . . . are predominately sold through independent residential dealers***, national and regional retailers, e-commerce merchants, electrical/HVAC/solar wholesalers, solar installers, and outdoor power equipment dealers.

(c)     In describing the Company's risk factors, the 1Q 2021 10-Q noted that Generac is "subject to various factors that can affect [its] result of operations, ***which [the Company] attempt[s] to mitigate through factors we can control, including*** continued product development, ***expanded distribution***, pricing, cost control, and hedging" (the "Mitigating Risk Through Expanded Distribution Statement").

157.    On <u>July 28, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the 2Q 2021 results, and made the following statements:

(a)     Focusing on Generac's purportedly diversified and broad network and channel partners for its solar products, Defendant Jagdfeld highlighted that the Company had "***further built out our [solar] installer network during the quarter, and we ended the first half of the year with approximately 2,200 trained and certified dealers***."

(b)     Further, Defendant Ragen tied the "build out" of the solar distribution network to the success of the solar business, stating that "***[s]hipments of PWRcell energy storage systems also grew at a dramatic rate . . . as we build out our*** marketing and ***distribution capabilities selling into the clean energy space***."

158.    On <u>August 3, 2021</u>, Generac filed with the SEC its 2Q 2021 10-Q, which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen.  The 2Q 2021 10-Q included the following statements:

(a)     The 2Q 2021 10-Q stated that "[r]esidential products," including "***energy storage and monitoring solutions . . . are predominately sold through independent residential dealers***, national and regional retailers, e-commerce merchants, electrical/HVAC/solar wholesalers, solar installers, and outdoor power equipment dealers."

(b)     The 2Q 2021 10-Q also included the same ***Available Through Dealers Statement*** (¶156(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶156(c)) as in the 1Q 2021 10-Q.

159.    The statements set forth in ¶¶155-158 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements emphasizing that the Company was "building out" and had "built out" its solar dealer network by growing to "2,000 dealers" and then "2,200 trained and certified dealers," that solar products' "higher demand" was due to "building out distribution partners," and that solar products were sold "through a broad network of independent dealers" and "predominantly sold through independent residential dealers" were misleading because they concealed that solar product sales were highly concentrated in a single dealer, Pink Energy, which accounted for what analysts estimated to be more than half of Generac's solar product sales, exposing Generac to significant business and reputational risks.

(b)     The claim that the Company attempts "to mitigate" risk through "expanded distribution" was misleading for the same reasons, including because Company subjected itself to enhanced risk by concentrating its solar product sales in one dealer, Pink Energy, which accounted for what analysts estimated to be more than half of Generac's solar product sales, thereby compounding (rather than mitigating) the Company's business risks.

160.    On <u>November 2, 2021</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's 3Q 2021 results, during which Defendant Jagdfeld emphasized the importance of Generac's solar dealer growth as a "key performance indicator," and stating, "***we further built out our installer network as we entered the third quarter with approximately 2,300 trained and certified dealers***."

161.    On <u>November 4, 2021</u>, Generac filed with the SEC its 3Q 2021 10-Q, which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 3Q 2021 10-Q included the following statements:

(a)    The 3Q 2021 10-Q stated that "[r]esidential products," including "***energy storage and monitoring solutions . . . are predominately sold through independent residential dealers***, national and regional retailers, e-commerce merchants, electrical/HVAC/solar wholesalers, solar installers, and outdoor power equipment dealers."

(b)    The 3Q 2021 10-Q also included the same ***Available Through Dealers Statement*** (¶156(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶156(c)) as in the 1Q 2021 10-Q.

162.    The statements set forth in ¶¶160-161 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)    The statements that the Company had "built out" its solar installer network by growing to "2,300 trained and certified dealers" was misleading because it concealed that solar product sales were highly concentrated in a single dealer, Pink Energy, which accounted for what analysts estimated to be more than half of Generac's solar product sales, exposing Generac to significant business risks, including reputational risks from being so heavily tied to Pink Energy which had been accused of predatory practices, and loss of significant solar business if Pink Energy decreased sales or went out of business, which was compounded by the fact that Pink Energy had installed tens of thousands of SnapRS devices and was then diverting significant resources to service calls and support regarding the SnapRS defect.

(b)    The Available Through Dealers Statement and Mitigating Risk Through Expanded Distribution Statement were false and misleading for the same reasons, including as set forth in ¶¶159(a)-(b).

- 71 -

163. On <u>February 16, 2022</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's 4Q and full year 2021 results, and made the following statements:

(a) Defendant Jagdfeld highlighted that "***we further built out our clean energy installer network as we ended the fourth quarter with nearly 2,500 trained and certified dealers***."

(b) Defendant Jagdfeld further highlighted that "***[a] key component of future growth for our clean energy offerings is establishing and developing our distribution network***, including partnering with large national solar providers." Choosing to highlight a single significant distributor, Defendant Jagdfeld stated that "***[w]e recently announced an expansion of our partnership with Sunnova*** that adds even more of Generac's industry-leading technology to its current suite of offerings."

(c) Defendant Ragen tied the purported growth and breadth of the solar dealer network to the success of the solar business, stating that "[s]hipments of PWRcell energy storage systems also grew at a significant rate as compared to prior year as overall solar market growth, rising storage attachment rates and ***our expanding distribution continue to drive growth for our clean energy solutions***."

164. On <u>February 22, 2022</u>, Generac filed with the SEC its 2021 10-K, which was signed by Defendants Jagdfeld and Ragen and contained the following statements:

(a) The 2021 10-K claimed:

> ***We distribute our products through a variety of different distribution channels*** to increase awareness of our product categories and brands, and to ensure our products reach a broad, global customer base. ***This omni-channel distribution network includes independent residential dealers, industrial distributors and dealers, national and regional retailers, e-commerce partners, electrical/HVAC/solar wholesalers (including certain private label arrangements), solar installers, catalogs, equipment rental companies, and equipment distributors***.

(b) The 2021 10-K further emphasized:

> ***We believe our global distribution network is a competitive advantage that has strengthened over the years as a result of adding, expanding and developing***

*the various distribution channels through which we sell our products*. We offer a broad set of tools, programs, factory support, and sales leads to help our distribution partners be successful. *Our network is well balanced with no single customer providing more than 6% of our sales in 2021*.

(c) Addressing sales and distribution of solar products, the 2021 10-K stated:

Since 2020, *we have been leveraging these dealer development practices to assist in growing our base of solar contractors that sell, install and service our PWRcell energy storage systems*. We continue to train and certify solar installers to offer our products, and we have built out our Power Play selling system to also offer energy storage solutions. Leveraging our decades of expertise in partnering with our residential generator dealers, we believe we can continue to expand our solar installer network and increase mind-share for Generac's products, helping us to win in the clean energy market. In addition, *we have been developing distribution relationships with national solar providers to offer our equipment in their portfolio of products and services*.

(d) In describing the Company's risk factors, the 2021 10-K noted that Generac

"depend[s] on the services of independent distributors and dealers to sell our products," and stated:

[W]e sell our products to end users through private label arrangements with leading home equipment, electrical equipment and construction machinery companies; arrangements with top retailers and equipment rental companies; and our direct national accounts with telecommunications and industrial customers. Our distribution agreements and any contracts we have with large national, retail and other customers are typically not exclusive, and many of the distributors with whom we do business offer competitors' products and services. *Impairment of our relationships with our distributors, dealers* or large customers, *loss of a substantial number of these distributors or dealers* or of one or more large customers, or an increase in our distributors' or dealers' sales of our competitors' products to our customers or of our large customers' purchases of our competitors' products *could materially reduce our sales and profits*. Also, *our ability to successfully realize our growth strategy is dependent in part on our ability to identify, attract and retain new distributors at all layers of our distribution platform, including increasing the number of energy storage distributors*, and we cannot be certain that we will be successful in these efforts.

(e) The 2021 10-K stated that "[r]esidential products," including "*energy storage systems [and] energy management solutions . . . are predominantly sold through independent residential dealers*, national and regional retailers, e-commerce merchants, electrical/HVAC/solar wholesalers, solar installers, and outdoor power equipment dealers."

(f)     The 2021 10-K also included the same *Available Through Dealers Statement* (¶156(a)) and *Mitigating Risk Through Expanded Distribution Statement* (¶156(c)) as in the 1Q 2021 10-Q.

165.    The statements set forth in ¶¶163-164 above were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements touting Generac's "variety of different distribution channels" and "global distribution network" as a "competitive advantage," that its distribution "network is well balanced with no single customer providing more than 6% of our sales," that the Company had "built out" its solar installer network by growing to "2,500 trained and certified dealers," and that the Company grew its solar product revenue through "growth in our distribution network" and "our expanding distribution" were misleading because they concealed that solar product sales were highly concentrated in a single dealer, Pink Energy, which accounted for what analysts estimated to be more than half of Generac's solar product sales, exposing Generac to significant business and reputational risks, which were compounded by the fact that Pink Energy had installed tens of thousands of SnapRS devices and was then diverting significant resources away from sales and to thousands of service calls and support regarding the SnapRS defect.

(b)     The statement purporting to warn that "impairment" of Generac's "relationships with [its] distributors" or the "loss of a substantial number of these distributors or dealers" could "reduce our sales and profits" was misleading for the same reasons, including because it omitted to disclose that: (i) the loss of just one dealer alone, Pink Energy, would drastically reduce Generac's solar product sales as Pink Energy accounted for what analysts estimated to be more than half of those sales; and (ii) Generac's relationship with Pink Energy was already impaired as a result of the massive SnapRS defect and service issues, which was causing Pink Energy to spend money on and divert significant resources to thousands of service calls.

- 74 -

(c)     The Available Through Dealers Statement and Mitigating Risk Through Expanded Distribution Statement were false and misleading for the same reasons, including as set forth in ¶¶159(a)-(b).

166.    On May 4, 2022, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's 1Q 2022 results, and made the following statements:

(a)     In touting the Company's "residential sales growth," Defendant Jagdfeld emphasized that Generac's "[c]lean [e]nergy products contributed meaningfully to overall growth in the first quarter as shipments of our PWRcell energy storage systems grew significantly from the prior year period" and that "*[s]upporting this rapid growth is the continued build-out of our installer network as we ended the first quarter with more than 2,600 trained and certified dealers*."

(b)     Defendant Ragen likewise emphasized that "[s]hipments of PWRcell energy storage systems also grew at a significant rate as compared to the prior year as the U.S. residential solar plus storage market continues to grow and *as we expand our distribution network for our Clean Energy solutions*."

167.    On May 9, 2022, Generac filed with the SEC its 1Q 2022 10-Q, which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2022 10-Q included the following statements:

(a)     The 1Q 2022 10-Q stated that [r]esidential products," including "*energy storage systems [and] energy management solutions . . . are predominately sold through independent residential dealers*, national and regional retailers, e-commerce merchants, electrical/HVAC/solar wholesalers, solar installers, and outdoor power equipment dealers."

(b)     The 1Q 2022 10-Q also included the same *Available Through Dealers Statement* (¶156(a)) and *Mitigating Risk Through Expanded Distribution Statement* (¶156(c)) as in the 1Q 2021 10-Q.

168.     As described in ¶¶203-211, certain disclosures in a June 2022 research report began to partially reveal Generac's reliance on Pink Energy for solar sales. To offset and allay any investor concern, Defendants continued to make statements assuring investors that its solar products were sold through a broad, diverse, and expanding network of dealers.

169.     On <u>August 3, 2022</u>, Defendants Jagdfeld and Ragen held an earnings call to discuss the Company's 2Q 2022 results, and made the following statements:

(a)     Discussing the Company's clean energy products, Defendant Jagdfeld stated, "[a]s we work to capture this demand, ***our residential clean energy installer network continues to grow as we ended the second quarter with approximately 2,800 trained and certified technicians***."

(b)     Defendant Jagdfeld further touted the Company's growth in clean energy and increased guidance, stating that "***[f]or the full year 2022, we expect net sales of these clean energy products and solutions to approximately double from the prior year to more than $500 million*** in sales, with strong core and inorganic growth contributions and an even larger opportunity in the years ahead."

170.     On <u>August 8, 2022</u>, Generac filed with the SEC its 2Q 2022 10-Q, which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 2Q 2022 10-Q included the following statements:

(a)     The 2Q 2022 10-Q stated that "[r]esidential products," including "***energy storage systems [and] energy management devices & solutions . . . are predominately sold through independent residential dealers***, national and regional retailers, e-commerce merchants, electrical/HVAC/solar wholesalers, solar installers, and outdoor power equipment dealers."

(b)     The 2Q 2022 10-Q also included the same ***Available Through Dealers Statement*** (¶156(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶156(c)) as in the 1Q 2021 10-Q.

- 76 -

171.     The statements set forth in ¶¶166-167 and 169 above were false and misleading when made.  The true facts, which Defendants knew or recklessly disregarded, were:

(a)     The statements emphasizing that the Company's solar product sales growth was supported by the "continued build-out of our installer network" that had increased to "2,600" and then "2,800 trained and certified dealers" and that the solar product shipments increased as the Company "expand[ed] [its] distribution network" were misleading because they concealed that solar product sales were highly concentrated in a single dealer, Pink Energy, which accounted for what analysts estimated to be more than half of Generac's solar product sales, exposing Generac to significant business and reputational risks, which were compounded by the fact that Pink Energy had installed tens of thousands of SnapRS devices, had spent millions of dollars on servicing the SnapRS defect, and was then diverting significant resources away from sales and to thousands of service calls and support regarding the SnapRS defect.

(b)     That claim that "we expect net sales of these clean energy products and solutions to approximately double from the prior year to more than $500 million" was false and misleading because a substantial portion of those sales were attributable to Pink Energy, which (i) was subject to massive warranty and product liability claims and service issues as a result of having installed thousands of SnapRS devices, nearly 50% of which were defective; (ii) had sued Generac for hundreds of millions of dollars in damages; and (iii) had informed Generac, through the Pink Energy Lawsuit, that its business had drastically declined as customers were cancelling "appointments and signed installation contracts" as a result of the SnapRS defect, Pink Energy was also experiencing "a significant decrease in its close rate" for new contracts due to the SnapRS defect, and Pink Energy was "having to shift its installation teams away from installing new solar energy systems to generate revenue for the company, to performing service for existing customers to address the onslaught of SnapRS-related problems."

(c) Defendants' Available Through Dealers Statement and Mitigating Risk Through Expanded Distribution Statement were false and misleading for the same reasons, including as set forth in ¶¶159(a)-(b).

## GENERAC'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING BECAUSE THEY FAILED TO DISCLOSE REQUIRED INFORMATION

172. In addition to the foregoing false and misleading statements, Generac's annual report and quarterly reports filed with the SEC during the Class Period were misleading also because Defendants failed to disclose required information in violation of (i) SEC Regulation S-K; and (ii) generally accepted accounting principles ("GAAP").

**Defendants Failed to Disclose Information in Violation of SEC Disclosure Requirements**

173. Item 7 of SEC Regulation S-K required that Generac's annual reports on Form 10-K and quarterly reports on Form 10-Q contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). According to the SEC, MD&A is intended to "give investors an opportunity to look at the [Company] through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with particular emphasis on the [Company's] prospects for the future."

174. Pursuant to Item 303 of SEC Regulation S-K ("Item 303"), Generac's Class Period Form 10-K and Form 10-Qs were required to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §303(b)(2)(ii). And, pursuant to Item 105 of SEC Regulation S-K ("Item 105"), Generac's Class Period Form 10-K and Form 10-Qs were required to provide "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105.

- 78 -

175.    In violation of Item 303 and Item 105, the *1Q 2021 10-Q*, signed or certified by Defendants Jagdfeld and Ragen, was materially false and misleading because it failed to disclose the following trends, uncertainties, and risks:

(a)    Generac's SnapRS devices were overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance and increased customer complaints and service calls by Generac's dealers, including Pink Energy (Generac's largest dealer), which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to: (i) income from increased costs of developing and implementing fixes for, replacing, paying warranty obligations and liabilities for, and writing off large volumes of SnapRS devices; and (ii) revenue and income from reduced revenue as a result of the SnapRS defects jeopardizing Generac's relationships with dealers (including Pink Energy) who accounted for the vast majority of Generac's solar business revenues, and as a result of reputational damage across existing and potential solar dealers from the SnapRS defects.

(b)    Generac's solar product sales were highly consolidated in a single dealer, Pink Energy, such that any disruption in this relationship would reasonably likely have a materially unfavorable impact on, and posed a significant risk to, revenue and income from Generac losing the massive solar product sales through Pink Energy, which trend, uncertainty, and risk was compounded by the SnapRS defects having a disproportionate impact on Pink Energy's customers and business.

176.    In violation of Item 303, the *2Q 2021 10-Q*, signed or certified by Defendants Jagdfeld and Ragen, was materially false and misleading because it failed to disclose the following trends, uncertainties, and risks:

(a)    End customer HSB generator demand was weakening, as close rates were declining and generators were being ordered and shipped without allocations to end customer

- 79 -

contracts, and the weakening end customer demand was reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, Generac's income and revenue from reduced HSB generator sales.

(b)     Generac was incentivizing dealers to place (and dealers were placing) orders without allocations to end customer contracts, which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, income and revenue from reduced sales because: (i) such orders that were shipped to dealers resulted in elevated dealer inventories which would need to be sold through to end customers before placing new orders; and (ii) such orders that had not been shipped could be easily cancelled by the dealers before shipment – *i.e.*, before being recorded as revenue.

(c)     Generac's SnapRS devices were overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance and increased customer complaints and service calls by Generac's dealers, including Pink Energy (Generac's largest dealer), which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to: (i) income from increased costs of developing and implementing fixes for, replacing, paying warranty obligations and liabilities for, and writing off large volumes of SnapRS devices; and (ii) revenue and income from reduced revenue as a result of the SnapRS defects jeopardizing Generac's relationships with dealers (including Pink Energy) who accounted for the vast majority of Generac's solar business revenues, and as a result of reputational damage across existing and potential solar dealers from the SnapRS defects.

(d)     Generac's solar product sales were highly consolidated in a single dealer, Pink Energy, such that any disruption in this relationship would reasonably likely have a materially unfavorable impact on, and posed a significant risk to, revenue and income from Generac losing the massive solar product sales through Pink Energy, which trend, uncertainty, and risk was

compounded by the SnapRS defects having a disproportionate impact on Pink Energy's customers and business.

177.    In violation of Item 303 and Item 105, the ***3Q 2021 10-Q***, signed or certified by Defendants Jagdfeld and Ragen, was materially false and misleading because it failed to disclose the following trends, uncertainties, and risks:

(a)    End customer HSB generator demand was weakening, as close rates were declining and generators were being ordered and shipped without allocations to end customer contracts, and the weakening end customer demand was reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, Generac's income and revenue from reduced HSB generator sales.

(b)    Generac was incentivizing dealers to place (and dealers were placing) orders without allocations to end customer contracts, which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, income and revenue from reduced sales because: (i) such orders that were shipped to dealers resulted in elevated dealer inventories which would need to be sold through to end customers before placing new orders; and (ii) such orders that had not been shipped could be easily cancelled by the dealers before shipment – *i.e.*, before being recorded as revenue.

(c)    The device failures, customer complaints, and dealer service calls from the SnapRS defects (¶175(a)) were increasing, the SnapRS defects had caused residential fires, and the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures, heat deformation, and customer complaints and service calls, and Generac had not only created a firmware update but was also developing an updated SnapRS model to try to remedy the problem, all of which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to: (i) income from increased costs of developing and

implementing fixes for, replacing, paying warranty obligations and liabilities for, and writing off large volumes of SnapRS devices; and (ii) revenue and income from reduced revenue as a result of the SnapRS defects jeopardizing Generac's relationships with dealers (including Pink Energy) who accounted for the vast majority of Generac's solar business revenues, and as a result of reputational damage across existing and potential solar dealers from the SnapRS defects.

(d)     Generac's solar product sales were highly consolidated in a single dealer, Pink Energy, such that any disruption in this relationship would reasonably likely have a materially unfavorable impact on, and posed a significant risk to, revenue and income from Generac losing the massive solar product sales through Pink Energy, which trend, uncertainty, and risk was compounded by the SnapRS defects having a disproportionate impact on Pink Energy's customers and business.

178.     In violation of Item 303 and Item 105, the ***2021 10-K*** and ***1Q 2022 10-Q***, signed or certified by Defendants Jagdfeld and Ragen, was materially false and misleading because it failed to disclose the following trends, uncertainties, and risks:

(a)     End customer HSB generator demand was weakening, as close rates had declined and bottomed out at the beginning of 2021 and generators were being ordered and shipped without allocations to end customer contracts, and the weakening end customer demand was reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, Generac's income and revenue from reduced HSB generator sales.

(b)     Generac was incentivizing dealers to place (and dealers were placing) orders without allocations to end customer contracts, which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, income and revenue from reduced sales because: (i) such orders that were shipped to dealers resulted in elevated dealer inventories which would need to be sold through to end customers before placing new orders; and (ii) such orders that

- 82 -

had not been shipped could be easily cancelled by the dealers before shipment – *i.e.*, before being recorded as revenue.

(c)     The device failures, customer complaints, and dealer service calls from the SnapRS defects (¶175(a)) were increasing even further, the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures and heat deformation, and Generac had not only created a firmware update but also an updated SnapRS model to try to remedy the problem, but the attempted fixes had failed and caused widespread "lockouts" resulting in even higher customer complaints, tens of thousands of service calls to Generac's dealers, and Generac entering into the Indemnification Agreement with Generac, all of which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to: (i) income from increased costs of developing and implementing fixes for, replacing, paying warranty obligations and liabilities for, and writing off large volumes of SnapRS devices; and (ii) revenue and income from reduced revenue as a result of the SnapRS defects jeopardizing Generac's relationships with dealers (including Pink Energy) who accounted for the vast majority of Generac's solar business revenues, and as a result of reputational damage across existing and potential solar dealers from the SnapRS defects.

(d)     Generac's solar product sales were highly consolidated in a single dealer, Pink Energy, such that any disruption in this relationship would reasonably likely have a materially unfavorable impact on, and posed a significant risk to, revenue and income from Generac losing the massive solar product sales through Pink Energy, which trend, uncertainty, and risk was compounded by the SnapRS defects having a disproportionate impact on Pink Energy's customers and business.

179.    In violation of Item 303 and Item 105, the ***2Q 2022 10-Q***, signed or certified by Defendants Jagdfeld and Ragen, was materially false and misleading because it failed to disclose the following trends, uncertainties, and risks:

(a)    End customer HSB generator demand was weakening, as close rates had declined and bottomed out at the beginning of 2021 and generators were being ordered and shipped without allocations to end customer contracts, and the weakening end customer demand was reasonably likely to have materially unfavorable impact on, and posed a significant risk to, Generac's income and revenue from reduced HSB generator sales.

(b)    Generac was incentivizing dealers to place (and dealers were placing) orders without allocations to end customer contracts, which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to, income and revenue from reduced sales because (a) such orders that were shipped to dealers resulted in elevated dealer inventories which would need to be sold through to end customers before placing new orders; and (b) such orders that had not been shipped could be easily cancelled by the dealers before shipment – *i.e.*, before being recorded as revenue.

(c)    The device failures, customer complaints, and dealer service calls from the SnapRS defects (¶175(a)) were increasing even further, the scope and severity of the SnapRS defects were so significant that multiple dealers were experiencing a high rate of SnapRS failures and heat deformation, and Generac had not only created a firmware update but also an updated SnapRS model to try to remedy the problem, but the attempted fixes had failed and caused widespread "lockouts" resulting in even higher customer complaints, tens of thousands of service calls to Generac's dealers, and Generac entering into the Indemnification Agreement with Generac, all of which were reasonably likely to have a materially unfavorable impact on, and posed a significant risk to: (i) income from increased costs of developing and implementing fixes for, replacing, paying

- 84 -

warranty obligations and liabilities for, and writing off large volumes of SnapRS devices; and (ii) revenue and income from reduced revenue as a result of the SnapRS defects jeopardizing Generac's relationships with dealers (including Pink Energy) who accounted for the vast majority of Generac's solar business revenues, and as a result of reputational damage across existing and potential solar dealers from the SnapRS defects.

(d)    Generac's solar product sales were highly consolidated in a single dealer, Pink Energy, and the SnapRS defect had caused a significant disruption in this relationship culminating in the Pink Energy Lawsuit against Generac for hundreds of millions of dollars, which was reasonably likely have a materially unfavorable impact on, and posed a significant risk to, revenue and income from Generac losing the massive solar product sales through Pink Energy, which trend, uncertainty, and risk was compounded by the SnapRS defects having a disproportionate impact on Pink Energy's customers and business.

**Defendants Failed to Disclose Information in Violation of GAAP**

180.    According to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in compliance with GAAP[17] are presumed to be misleading and inaccurate.   Under GAAP, Financial Accounting Standards Board ("FASB"), Accounting Standards Codification ("ASC") 460 ("ASC 460") governs the accounting for "warranty obligations incurred in connection with the sale of goods or services."   In turn, ASC 460 states that because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a "loss contingency" as defined under ASC Topic 450 ("ASC 450").[18]

---

[17]    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.

[18]    ASC 450 defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

181.    Pursuant to <u>GAAP, and specifically ASC 450</u>, Generac's Class Period Form 10-K and Form 10-Qs were required to include disclosures regarding the SnapRS defects and the resulting potential losses from warranty obligations.  Generac's online brochure for its PWRcell products state that Generac provides a 25-year warranty on its SnapRS devices:

| SnapRS™ (APKE00011) | |
|---|---|
| PV MODULE MAX VOC: | 75 V |
| EFFICIENCY: | 99.8%³ |
| MAX INPUT CURRENT: | 13 A |
| MAX TOTAL QTY IN SUBSTRING: | 10 |
| SHUTDOWN TIME: | < 10 Seconds |
| ENCLOSURE RATING: | NEMA 6P |
| OPERATING TEMPERATURE - FAHRENHEIT (CELSIUS): | -40 to 158 °F (-40 to 70 °C) |
| CERTIFICATIONS: | UL1741 |
| PROTECTIONS: | PVRSE |
| WARRANTY: | 25 Years |

182.    In addition, a copy of the "Generac Power Systems Limited Warranty for Generac PWRcell" is available online through a solar distributor's website.[19]  The warranty provides that Generac "warrants that its Generac PWRcell products will be free from defects in material and workmanship for the items and period set forth below," and that "Generac will, at its discretion, repair or preplace any part(s) which . . . . is found to be defective."  For the SnapRS device, the warranty period is listed at "25 years."

183.    GAAP, namely ASC 450, required disclosures of obligations arising from this warranty as loss contingencies.  ASC 450 includes requirements for both disclosure of a loss contingency and the accrual of a loss contingency.

184.    As to disclosure, ASC 450 requires disclosure when the loss is "[r]easonably possible," which is defined as, "[t]he chance of the future event or events occurring is more than remote but less than likely."  Under ASC 450, the disclosure shall indicate the "nature of the

---

[19]    https://sunwatts.com/content/warranty/Generac-Warranty-PWRcell.pdf.

contingency" and "an estimate of the possible loss or range of loss or state that such an estimate cannot be made."

185.    As to accrual, ASC 450 requires that an estimated loss from a loss contingency (here, the warranty obligations), shall be accrued by a charge to income if both of the following conditions are met: (i) information available before the financial statements are issued indicates that it is probable that a liability had been incurred at the date of the financial statements (*i.e.*, it is probable that customers will make claims under warranties relating to goods or services that have been sold); and (ii) the amount of loss can be reasonably estimated.  Under ASC 450, "probable" is defined as "the future event or events are likely to occur."

186.    Here, by the time of the filing of the 1Q 2022 10-Q in May 2022: (i) Generac had sold millions of dollars' worth of PWRcell products that included SnapRS devices in 2020, 2021, and early 2022; (ii) the SnapRS devices were defective, as they were overheating, malfunctioning, melting, and combusting on homes, resulting in reduced performance, increased customer complaints, and residential fires; (iii) the defects had impacted Pink Energy, Generac's largest solar dealer, since at least early 2021 and multiple dealers since at least mid-2021; (iv) Generac had developed and delivered two attempted fixes for the SnapRS defect (a firmware update and an updated SnapRS model) both of which had failed to offset growing warranty liabilities and instead increased them by causing widespread "lockouts" resulting in tens of thousands of customer complaints and service calls to Generac's dealers; (v) Generac had entered into the Indemnification Agreement with Pink Energy, thereby materially increasing Generac's warranty exposure; and (vi) Generac had developed a redesigned the SnapRS802 product.  *See* ¶¶76-97.  Then, by the time of the filing of the 2Q 2022 10-Q in August 2022, Pink Energy had filed the Pink Energy Lawsuit, alleging hundreds of millions of damages relating to the SnapRS defects.

187.    Thus, by no later than the filing of the 1Q 2022 10-Q and 2Q 2022 10-Q, the requirements for accrual under ASC 450 had been met, and Generac was required under GAAP to increase its warranty reserves to account for the known pervasive product defects and the corresponding remediation costs.  Specifically, it was "probable" that losses had been incurred and the amount could be "reasonably estimated," as Generac knew of the scope of the defects, was incurring warranty obligations, and had already expended costs on two rounds of attempted fixes.

188.    In addition, even if the losses could not be reasonably estimated, it was clearly "more than remote" that losses had been incurred, and Generac was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state that such an estimate cannot be made."

189.    However, Generac did not accrue the warranty obligations or disclose that it was more than remote that the losses had been incurred.  Notably, in a given period, Generac can record "changes in estimates for pre-existing warranties," a discretionary adjustment to the pre-existing warranty balance covering all products sold in prior periods that are deployed in the field.  Therefore, Generac had the ability to adjust the warranty balance for defective SnapRS devices.  In the 1Q 2022 10-Q, rather than accruing for the SnapRS defects and making such an adjustment, Generac actually decreased the Company's pre-existing warranty reserve by over $1.1 million.  Moreover, while Generac made a modest increase in the 2Q 2022 10-Q, the combined change from the first two quarters only increased Generac's pre-existing warranty provision (*i.e.,* excluding additional warranty provisions added for new products sold during the period) by $4.49 million, which represented a less than 5% increase to its warranty balance at the beginning of the period.

190.    Therefore, in violation of GAAP, namely ASC 450, the ***1Q 2022 10-Q*** and ***2Q 2022 10-Q***, signed or certified by Defendants Jagdfeld and Ragen, were materially false and misleading because they failed to disclose that:

(a)     The financial statements included in the 1Q 2022 10-Q and 2Q 2022 10-Q materially understated the reported warranty balance.

(b)     The SnapRS warranty obligations constituted a loss contingency, and the financial statements further failed to disclose (i) an estimate of the possible loss or range of loss for the loss contingency; or (ii) state that such an estimate cannot be made.

(c)     The 1Q 2022 10-Q and 2Q 2022 falsely and misleadingly stated the financial statements were prepared "in conformity with U.S. generally accepted accounting principles," when, in fact, they violated GAAP.

191.    Ultimately, confirming the 1Q 2022 10-Q and 2Q 2022 10-Q violated GAAP, in 3Q 2022, Generac belatedly increased its pre-existing warranty balance by $38.6 million (including $37.3 million directly related to remediating the SnapRS defect), a 35% increase of its warranty balance at the beginning of the period.[20]  However, there were no significant changes to Generac's warranty exposure occurring solely in 3Q 2022 to justify this large increase.  Rather, Generac's liability had been accumulating throughout 2021 and early 2022, as the number of defective units, associated customer complaints, and attempted fixes continued to climb.

## THE TRUTH BEGINS TO EMERGE

192.    Starting in November 2021, the truth about the negative trends in the Company's two most critical businesses, generators and solar, began to materialize and/or leak into the market, including through a series of partial disclosures, resulting in massive declines in the price of Generac's common stock.  The truth regarding the generator business began to be revealed in late 2021 through 2022 as the weakened demand led to partial disclosures of disappointing financial results, declining dealer growth, reports of dealers acknowledging weakening demand, excess

---

[20]   During 3Q 2022, Generac recognized additional losses related to the SnapRS defect by recording a $17.9 million credit loss provision related to the bankruptcy of Pink Energy.

inventory, reduced guidance, and eventually a sharp drop in orders and backlog. The truth regarding the solar business began to be revealed in February 2022 through late 2022 as the dangerous defect led to partial disclosures increasingly revealing the massive scope and magnitude of the defect and its impact on dealers, increased warranty liabilities, and a massive reduction in financial guidance further revealing the over-concentration of sales in Pink Energy and failure to build a broad and diversified base of dealers.

**November 2021 Disclosures**

193. On November 2, 2021, Generac announced, and hosted an earnings call to discuss, financial results for 3Q 2021. The call began to partially reveal the weakening HSB generator demand had materialized in disappointing financial results. For example, Generac's reported revenue missed analyst expectations, and that miss was driven by sales for its residential products, which includes HSB generators, being reported at $609 million, short of consensus expectations of $639 million.

194. In addition, Defendant Jagdfeld reported that "lead times" for HSB generators were at "approximately 30 weeks," which was a two week decline from the "32 weeks" he had reported on September 29, 2021. Given that the lead times had been consistently increasing for several quarters, this reversal, together with Generac's sales of generators falling short of analyst expectations, started to signal a pull-back of orders and weakening demand. The backlog decline was noted by analysts following the Company. Analysts from BofA Securities reported on November 3, 2021 that although the Company had earlier "quoted the backlog figure closer to 32 weeks" it was now citing a "30-week backlog figure," and analysts from Truist Securities reported on November 4, 2021, that the 30-week backlog was "slightly down from ~32 weeks at last disclosure."

195. Also, after Generac had consistently added 200 to 400 HSB dealers in every quarter since 2Q 2020, which Generac disclosed as indicative of increasing demand, Generac disclosed

- 90 -

during the November 2, 2021 earnings call that it had added just 100 HSB dealers in 3Q 2021, signaling weakening demand. During the November 2 earnings call, Defendant Jagdfeld admitted that "[w]e need to find more dealers."

196.    After these disclosures, the price of Generac stock fell from $506 per share on November 1, 2021 to $484 per share on November 2, 2021, and the stock continued to fall to $453 the next day.

**January 2022 Through April 2022 Disclosures**

197.    Following the November 2, 2021 disclosures, additional information about declining HSB generator demand and the SnapRS defect were partially revealed to market.

198.    For example, on January 26, 2022, analysts from Northcoast Research reported on information from their "checks" with Generac dealers. The report stated that "[o]ur checks in December saw a continuation of the deceleration in sales growth" and "[w]e are seeing customers pausing their decision to buy based on the ongoing long lead times, which we believe averaged 25-27 weeks during December." The analysts noted that "[w]e continue to hear mixed responses from dealers about their ability to drive sales growth with long lead times," as only "54.5% of the respondents experienced some degree of growth in sales compared to last year." The report further added that, regarding the 2021 outlook, "[d]ealers noted that the long wait times are deterring some customers from placing orders even though interest remains strong." After these disclosures, the price of Generac stock fell from $276 per share on January 25, 2022 to $265 per share on January 26, 2022, and the stock continued to fall to $257 the next day. In total, from January 25, 2022 to January 27, 2022, Generac's stock declined by approximately 7%, erasing more than $1.2 billion in market capitalization.

199.    On February 17, 2022, analysts from Roth Capital Partners issued a report that began to partially reveal the SnapRS defect. The analysts reiterated their "Buy" rating and reiterated

Defendants statements touting "robust IHCs and demand for HSB," but noted that "[t]he one area of concern we have is for its Clean Energy segment as the company has been dealing with some SnapRS issues. A solution appears to have been put in place, but our checks suggest it'll still take some time to be resolved." After these disclosures, the price of Generac stock fell from $316 per share on February 16, 2022 to $303 per share on February 17, 2022, and the stock continued to $295 the next day.

200.    After trading closed on <u>April 28, 2022</u>, analysts from BofA Securities published a report regarding its "channel checks" with Generac dealers. The analysts noted that Generac's stock was "down 34%" since the start of the year and that the "[m]arket is worried on HSB backlog." The analysts reported concerns that production and demand could move in opposite directions, writing that "[t]he fear is that Generac gradually burns though its $1 [billion] home standby backlog at a faster than expected clip at the same time it is bringing significant new capacity onstream." Believing that demand had remained robust through 2021 (based on Defendants' false and misleading statements), the analysts noted the fear was for 2023 at the earliest, stating, "[i]f orders then slow significantly as the pandemic fades and weather moderates, this would potentially expose Generac to a sharp correction in its largest and most profitable business (home standby generators) in 2023/24."

201.    The analysts also reported that a dealer from one of Generac's more penetrated markets reported that "demand has hit a lull."[21] According to the analysts, this "[d]ealer's perception was that Generac is now 'pumping out gear left and right' and this particular dealer has more than enough inventory for the season," such that "[i]f a customer signs a contract today, they can get

---

[21]    As a caveat to the report, the analysts noted that "[i]t's difficult to get the true finger on the pulse of home standby generator demand without talking to dealers in every local region as outages often happen on a very local level, making dealer trends very different across state lines."

installed within 2-3 weeks b[ecause] the dealer has been steadily ordering and has built up ample inventory."

202.    After these disclosures, the price of Generac stock fell from $233 per share on April 28, 2022 to $219 per share on April 29, 2022.

**June 2022 Disclosures**

203.    On June 22, 2022, stock research firm Spruce Point Capital Management ("Spruce Point") published a research report challenging the market valuation of Generac common stock. The Spruce Point report included additional information partially revealing the scope and magnitude of declining demand in HSB generator demand, as well as information partially revealing Generac's concentration of solar sales through Pink Energy and its attendant risks.

204.    As to HSB, a press release issued by Spruce Point on the same day stated that Spruce Point found "evidence of core problems in Generac's 'Legacy Growth Drivers,' including home standby generators ('HSBs') and portable generators." Then, in the Spruce Point report, the analysts reported that the demand spike from COVID-19 had ended by writing, "[d]ue to the stay-at home effect from COVID-19 and the Texas power outage of [February] 2021, we believe Generac experienced a black swan demand event for its products, causing a surge in sales and profits." But, Spruce Point reported, that demand was not continuing, and Spruce Point "expect[s] Generac to be stuck with excess capacity."

205.    Spruce Point also analyzed the residential dealer counts reported by Generac, and noted that the lack of growth initially disclosed in November 2021 (*see* ¶195) had continued. Spruce Point stated that "[w]e observed that [the Company's] deal[er] growth started to stall in the middle of 2021 and has been flat now for three quarters. All the while Generac's financial condition has been deteriorating." The report included the following chart showing that dealer growth had gone stagnant:

| | | | | 2020 | | | | 2021 | | | | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Residential Dealers | 5,700 | 6,000 | 6,500 | 6,500 | 6,700 | 7,000 | 7,300 | 7,700 | 8,000 | 8,100 | 8,100 | 8,100 |
| *YoY Growth* | *5.6%* | *5.3%* | *8.3%* | *--* | *--* | *--* | *12.3%* | *18.5%* | *19.4%* | *15.7%* | *11.0%* | *5.2%* |
| *QoQ Growth* | *--* | *--* | *--* | *--* | *3.1%* | *4.5%* | *4.3%* | *5.5%* | *3.9%* | *1.3%* | *0.0%* | *0.0%* |

Source: Generac conference calls, investor presentations, and SEC filings

206.     Spruce Point further observed that weakening demand was reflected by the fact that Generac had resorted to providing greater warranty incentives to consumers. Spruce Point stated that "recent social media advertising on Facebook" showed that "Generac is offering a free 10 year extended warranty [in May 2022 – June 2022], whereas a year ago [in March 2021 – April 2021] it was only 7 months."

207.     Spruce Point also cited a November 2021 Generac investor presentation stating that the "Total US penetration rate" for HSB had been "estimated at ~5.75% by the end of 2021," but then was reduced in a May 2022 presentation and only "estimated at ~5.5% at the end of 2021."

208.     Turning to Generac's solar business, Spruce Point began to reveal concerns about concentration of dealers and risks of concentration in Pink Energy. Spruce Point reported that dealers (but not Pink Energy) were leaving Generac, writing, "[o]ur recent channel checks into twelve (12) Generac promoted large regional distributors indicates that only six (6) still carry its products."

209.     In addition, Spruce Point raised concerns about concentration of sales in Pink Energy given that it, and others, were "alleged to be using deceptive marketing practices to fuel sales growth." Most notably:

> Powerhome Solar (now dba as Pink Energy) one of Generac's largest partners in over 13 states, has had multiple investigations into its sales practices and has

allegedly overcharged for Generac batteries. Its CEO settled charges with a State Attorney General earlier in his career, while the Chief Marketing Officer settled charges by the FTC for deceptive marketing practices. A recent source says that Pink Energy is under FTC investigation.

210. Reflecting that the market was not aware of how dependent Generac was on Pink Energy and identifying the concern of the risks of concentration, Spruce Point rhetorically asked: "How much in sales has Generac done with this organization and why after numerous investigations showing the alleged fraudulent practices, does Generac continue to promote them as partners?"

211. After these disclosures, the price of Generac common stock declined from $220 per share on June 21, 2022 to $213 per share on June 22, 2022.

**August 2022 Disclosures**

212. On <u>August 1, 2022</u>, Pink Energy filed a lawsuit against Generac in the Western District of North Carolina, further partially revealing the scope and magnitude of the dangerous SnapRS defect. Pink Energy claimed that Generac had engaged in "wanton, willful, and reckless conduct . . . by":

> (i) concealing the SnapRS defects from [Pink Energy], (ii) failing to inform [Pink Energy] of the devastating effect the firmware update would have on its customers' solar energy system production, and (iii) fail[ing] to develop a suitable alternative to the defective SnapRS units [which] has had a devastating effect on [Pink Energy's] business.

213. In the Pink Energy Lawsuit, Pink Energy set forth the history of the SnapRS failures experienced by it and its customers, including the overheating and melting issues discovered in early 2021, the residential home fires caused by the SnapRS defect, Pink Energy's communications with Generac employees and executives, and the onslaught of customer complaints and issues caused by the SpanRS defect. Pink Energy alleged that it suffered a $155 million loss in revenue due to contract cancellations related to the SnapRS defect and millions of dollars in damages due to the unprecedented influx of customer service calls related to the faulty SnapRS units. *See* ¶¶76-97.

- 95 -

214.    Although the Pink Energy lawsuit was not widely reported on and was not immediately discussed in major publications or analyst reports, following the filing of the lawsuit, the price of Generac shares still declined from $268 per share on July 29, 2022 to $265 per share on August 1, 2022.

215.    On August 3, 2022, Defendants Jagdfeld and Ragen hosted a conference call to discuss 2Q 2022 results, which further revealed the scope and magnitude of the negative trend of declining HSB demand.  For example, although Generac reported revenue and margins results that beat analyst consensus estimates, Defendant Jagdfeld disclosed that the HSB backlog was just "8 to 10 weeks" as of August 3, 2022, meaning it had collapsed from 20 weeks as of May 4, 2022.

216.    Further concerns regarding the shrinking backlog were raised when, contrary to their prior practice, Defendants refused to disclose the value of the backlog, which they had previously touted as being "over $1 billion."  An analyst from UBS Investment Bank asked, "[a]nd just curious if you could quantify what the 8 to 10 weeks of backlog translates to in terms of value.  I didn't hear you mention that on the call," but Defendant Jagdfeld responded: "Yes, we don't disclose that. That's why you didn't hear it."  Wanting to avoid any follow up, Generac's head of investor relations jumped in and told the call operator: "I think we'd probably go [to] the next question."

217.    Another analyst from Credit Suisse noted the contradiction, stating that Generac had "said [the backlog was] more than $1 billion the last quarter" and asked "[i]s it somewhere in line with that range or different?  And I had a separate follow-up."  Jagdfeld ignored the question, stating that "Again, we've talked about 8 to 10 weeks of orders in the backlog and it's sizable.  It's a big backlog. . . .  But that 8 to 10 weeks is really how we would speak to the backlog."  Rather than allow the analyst to ask his follow up, the call ended.

218.    The market recognized that the backlog timeline reduction revealed more fully the scope and magnitude of the negative trend of declining demand.  For example, during the August 3,

2022 earnings call, an analyst noted that "[i]t sounds like based on your backlog comments, that net orders were about $200 million in the quarter compared to $500 million last quarter. Can you just comment on that?" In response, Defendant Ragen declined to answer, saying "[w]e haven't necessarily talked orders historically."

219. After these disclosures, the price of Generac stock fell from $267 per share on August 2, 2022 to $249 per share on August 3, 2022, and the stock continued to fall to $244 the next day.

220. On August 4, 2022, analysts from BofA Securities reported that "[t]he steady financial performance in 2Q22 was entirely overshadowed by higher than expected HSB shipments and a significant backlog reduction." The analysts added that:

> [T]he limited disclosure and opacity of [Generac]'s HSB orders and sales dynamics exacerbated the negative reaction to today's earnings call. We note that [management] did not disclose the dollar value of the backlog, which we argue was the most closely watched data point during the 2Q22 earnings cycle across our [clean technology] coverage.

Given the lack of disclosure, the analysts "outline[d] the math we observed" and calculated that "[s]ince the backlog was ~$1.1 [billion] in 1Q22 and lead times were 20 weeks, one can estimate ~$55 [million] of HSB orders a week. So, if lead times fell to 8-10 weeks, that suggests a backlog of ~$440-550 [million], which is a +50% reduction in backlog value." Although the analysts continued to rely on Defendants' false and misleading statements claiming that demand was robust, they reduced their "topline projections to account for greater execution risk in developing business units and weaker growth in HSB orders, due to limited disclosure from [management] and to derisk our estimates."

221. The same day, Wells Fargo noted the negative market reaction to the disclosures indicating declining demand, stating:

> GNRC is down 8.6% over the past two days after reporting earnings (versus an increase of 1.5% for the S&P 500) despite beating Consensus estimates for revenue/EPS and maintaining full-year guidance. We believe the weakness post earnings is tied to investor concern around (1) GNRC's backlog and a potential

softening of demand and (2) a poor FCF conversion ratio in Q2 due to working capital items. Management noted that lead time is down to 8-10 weeks from ~20 weeks at the end of Q1 and did not quantify the dollar amount of HSB backlog (we believe it is now in the $500MM-1B range, versus over $1B last quarter). This played into a bearish narrative being pushed by some investors that demand is slowing.

**September 2022 Disclosures**

222.  In September, additional news continued to further reveal the true extent of the scope and magnitude of the negative trends from the solar product defects and Generac's waning HSB demand.

223.  On September 12, 2022, Pink Energy issued a press release, which was covered by multiple news outlets, that further revealed the scope and magnitude of product defects as Pink Energy stated it had been forced to lay off approximately 500 employees "because of the same Generac product issues" alleged in the Pink Energy lawsuit.

224.  On the same day, September 12, 2022, analysts from Bank of America issued a report confirming that the spike in HSB demand from the pandemic was an aberration and not a sustainable increase in demand and that Generac was still dependent upon severe weather and power outages. For example, the report stated that the analysts had engaged in "[f]urther discussions with [Generac] dealers" and that "in the dealers own words, lack of outage activity is the single largest problem for demand currently." The analysts also revealed the tactics that had been used to artificially inflate and incentivize over-ordering in 2021 with "pre-orders" not supported by closed deals or installations and that were used to qualify for "Premier" dealer status and discounts. The report stated:

> Dealers admit to significant pre-orders in 2021 given both bloated lead times, but also internal needs to demonstrate sales status with [Generac] – w[here] Premier dealers must demonstrate $1.5mm in sales annually with status offering discounted access to generators. Given uncertainty on time of installation, we understand many pre-ordered in 2021 to demonstrate a 'pipeline of sales' in *lieu* of realized installation.

- 98 -

225.    After these disclosures, the price of Generac stock fell from $238 per share on September 9, 2022 to $233 per share on September 12, 2022, and then continued to decline to $213 the next day.

226.    On September 22, 2022, multiple media outlets reported regarding a letter from Pink Energy that further revealed that the scope and magnitude of the SnapRS defect was larger than previously understood, as the letter informed employees that Pink Energy would shut down, citing "financial difficulties resulting from issues with Generac equipment."

227.    After these disclosures, the price of Generac stock fell from $176 per share on September 21, 2022 to $171 per share on September 22, 2022.  Notably, as news leaked to the market, the price of Generac stock declined on every trading day from September 9, 2022 through September 22, 2022.  In total, the stock declined in that time by more $65 per share.

**October 2022 Disclosures**

228.    On October 6, 2022, analysts from BofA issued a report downgrading Generac from "Buy" to "Neutral," citing "[s]tepping down underlying demand" for HSB generators.  In the report, the analysts wrote that they "connected with numerous [Generac] dealers to understand local demand trends," and, based on "the feedback from industry experts we spoke to, more dealers than not communicate softening demand.  We recognize that we have only connected with a small sample of [Generac's] dealer base, but we see further worsening data points."  For example, the analysts cited Defendants' "cryptic and opaque segment level disclosure," such as "omit[ting] the value of the backlog and fail[ing] to disclose clear direct indicators of the business' health (i.e. volumes, revenues, margin)," which "supports our growing concerns on order cancellation from backlog as lead times on equipment have fallen."  They added: "Just as much as backlog was outsized on the way up as dealers pre-emptively put orders into [the] queue as they stretched to 1-yr+ last Fall, we see product backlog trends as having largely reversed themselves near entirely for many of their

4882-8376-1778.v2

residential products today." The analysts also identified "increased promotional activity across the dealer network; most notably a free 10-year warranty (previously paid). Feedback from multiple industry experts we spoke to confirm incremental promotions from GNRC in recent quarters." The analysts stated that such promotions "partially offset the price increases that [Generac] has put through in the last 18 months" and that "promotional activity . . . likely indicates weak demand or oversupply."

229.     On this news, the price of Generac stock fell from $179 per share on October 5, 2022 to $169 per share on October 6, 2022, and the stock continued to decline to $154 on October 7, 2022, the same day Pink Energy filed for bankruptcy. However, various media in September and early October 2022 repeated a Generac statement blaming Pink Energy for SnapRS issues, stating:

> In certain situations, especially when product installation guidelines have not been followed, as appears to be the case with some Pink Energy installations, customers may have experienced certain issues with a particular Generac component of their solar energy system – the SnapRS 801 or 801A. . . . It is unfortunate that Pink Energy, as the installer and service provider of such products, has made the unilateral decision to quit offering Generac warranty support despite the availability of parts.

230.     Then, on October 19, 2022, Generac published a press release reporting preliminary disappointing financial results for 3Q 2022. For example, Generac reported just $664 million in residential sales, a 26% decline from the prior quarter, representing a massive decline in year-over-year growth. Generac further reported that "[p]reliminary net income attributable to the Company during the third quarter was approximately $58 million, or $0.83 per share, as compared to $132 million, or $1.93 per share, for the same period of 2021," representing a 56% year-over-year decline. The Company also further revealed the impact of the SnapRS defect, as the press release disclosed that the reported preliminary net income "includes pre-tax charges totaling approximately $55 million, including approximately $37 million of clean energy product warranty-related matters and approximately $18 million of bad debt expense related to a clean energy product customer [*i.e.*, Pink Energy] that has filed for bankruptcy."

231.    Further revealing the scope and magnitude of the weakened HSB demand and over-consolidation of sales in Pink Energy, in the press release, Defendant Jagdfeld admitted the results "'fell short'" and attributed the poor sales numbers to "'[r]esidential product sales'" that were pressured due to "'higher field inventory levels and lower home standby generator orders from our channel partners'" and "'clean energy shipments [that] were negatively impacted by a large customer which ceased operations [*i.e.*, Pink Energy] and has since filed for bankruptcy protection.'"   In addition, the Company reduced its full-year 2022 net sales growth guidance by nearly 40% as a result of "home standby order headwinds" that were "expected to persist during the fourth quarter and through the first half of 2023" as "distribution partners continue to increase installation capacity and work down their extended backlogs and elevated field inventories."   The Company likewise reduced its margin and earnings forecasts.

232.    After these disclosures, the price of Generac stock fell from $148 per share on October 18, 2022 to $110 per share on October 19, 2022.

233.    Later that day, analysts from Roth Capital Partners downgraded Generac from a "buy" to "sell" rating and slashed their price target for Generac by more than 75%.   The analysts explained that "[m]anagement gave us a double whammy yesterday with its HSB business weak through mid-2023 and the clean energy business warranty expense/bad debt."   As to HSB, the analysts added that their "[channel] [c]hecks post-announcement continue to suggest lead flow may be challenging in some regions such as the northeast with dealers experiencing leads being down 20% [year-over-year]."   As to solar, the analysts said "we believe the downside risk for the clean energy business could still be worse than expected."   The analysts then summarized a webinar they had with Dan Javan, the CEO of Suntuity, which bills itself as "One of America's Largest Solar Integrators with Growing National Reach."   The analysts wrote:

> In our recent Resi Solar Webinar #21 last Friday, Dan Javan, the CEO of Suntuity, highlighted that the problems persist.  Dan said, 'This is still an ongoing issue.  On

the smaller fleet that we've got, we're averaging seven truck rolls on a fix for a GNRC [system] – Seven. I mean that is an extremely high number. Because they come up with solutions. We deploy the solution, the solution doesn't work. They come up with another firmware, you deploy the firmware, that doesn't work.' In a follow-up with us, Dan indicated that they are closer to five truck rolls now. We wonder if the $37mn warranty expense is enough as this could be an ongoing problem that could serve as a drag.

234.     The analysts added that "some dealers are suggesting there may be a need for a national recall" and that Generac "may be compensating installer on average $750 per truck roll and each Snap RS may cost $15." Applying those estimates, the analysts noted:

> If we assume a typical system may need just two truck rolls instead of five, then at $750 per truck roll, the truck roll expense alone could be $1500 plus 20 Snap RS's for an incremental $300 resulting in a total cost of ~$1800. With an estimate of total number of deployed GNRC PWRcell systems of ~30k or 240MW, this results in a total potential warranty expense of ~$54mn compared with the $37mn warranty expense from yesterday, suggesting there could be more warranty expense ahead. If the number of systems or number of truck rolls is higher than this, the expense could be much higher.

235.     Also on October 19, 2022, analysts from Cowen slashed their price target for Generac by more than 20% and issued report stating that the preliminary results were "well below expectations." The analysts added, "[r]esidential sales were lower than expected" and "[w]e didn't appreciate the magnitude of the inventory build" for HSB generators. The same day, analysts from JP Morgan slashed their price target for Generac by more than 50%, citing the preliminary results that were "well below expectations" due to "elevated channel inventory" for HSB and "one-time charges related to the bankruptcy of a material customer for the nascent clean power business."

236.     The next day, October 20, 2022, analysts at BofA Securities called the results a "negative surprise" and commented on management's failure to be forthcoming, stating that, "[a]lthough likely one- time in nature, these [Pink Energy related] charges are worse than we previously expected, given [management's] limited comments around its exposure to issues with its clean energy products. Ultimately, net income comes in well below our prior expectations of $159 mn vs. $58 mn preliminarily reported." As to the HSB business, the analysts wrote, "[u]nderlying

demand is worse than we thought" and stated that "this guidance cut indicates markedly weaker HSB demand than our recently lowered expectations." The analysts added that Defendants' "limited, opaque disclosure makes benchmarking more difficult."

237. Also on October 20, 2022, analysts from Morningstar cut their fair value estimate for Generac by nearly half and reported that they were "surprised by the magnitude of the guidance cut given management reiterated guidance with second-quarter earnings two months ago." The analysts described the Pink Energy issues as "a setback in Generac's efforts to prove itself within the clean energy market" and noted that the "[w]eakness in home standby orders appears to be significantly lower than our prior expectations." Reflecting the view that management had not previously been candid, the analysts said, "we think investors should not rush to buy the weakness as we expect it to take time for management to re-establish credibility."

**November 2022 Disclosures**

238. On <u>November 2, 2022</u>, Defendants Jagdfeld and Ragen held a conference call to discuss the disappointing third quarter 2022 results. At the outset of the call, Defendant Jagdfeld further confirmed the negative impact of the weakening HSB demand, SnapRS defect, and Pink Energy over-consolidation, stating that the Company's residential sales "were weaker than expected in the quarter, driven by lower shipments of home standby generators and clean energy products relative to our prior expectations."

239. Regarding the HSB business, Defendant Jagdfeld admitted that at the same time Generac was "producing [generators] at a really high rate" earlier in the Class Period, Defendants "wanted to bring our lead times down, because we knew that, that was having a negative impact on close rates, it's having a negative impact on our ability to sign new channel partners." Defendant Jagdfeld also admitted that "we could see field inventory building" and "we had been talking to our channel partners for several quarters about this coming." He added that field inventories had been so

- 103 -

high that dealers "physically started to run out of room, run out of credit" and "field inventory levels are about double where they should be."

240.    As to clean energy, Defendant Ragen disclosed that, "the loss of a major customer during the quarter, along with the specific warranty-related issue, has impacted near-term demand and our [sales] outlook for the full year 2022.  He disclosed that the Company now expects clean energy to "deliver sales between $300 million to $330 million for the full year 2022, as compared to our previous guidance of approximately $500 million."

241.    Defendant Jagdfeld further revealed the full scope and magnitude of the product defects and concentration of sales through Pink Energy and realization of the attendant risks as he attributed the lowered guidance to "the loss of a major customer during the quarter, along with the specific warranty-related issue" – *i.e.*, the defective SnapRS component, which led to Pink Energy's bankruptcy.  He added:

> [S]hipments of PWRcell energy storage systems in the third quarter were negatively impacted by the significant liquidity challenges of a large customer that ceased operations and subsequently filed for bankruptcy.  Additionally, during the quarter, we continued to address certain warranty-related matters for the upgrade of a component within our PWRcell energy storage system.

242.    During the same November 2, 2022 earnings call, an analyst from William Blair stated that, "I think that energy storage business in '21 was around $220 million, $225 million"[22] and "[i]t looks like the guidance that you're giving us now . . . implies that that's down something like 30% or so this year."  The analyst asked, "[i]s that about right?  And what is the overall market growing and can you clarify . . . ."  In response, Defendant Jagdfeld did not dispute the analysts' estimates, and admitted that Generac had failed to build a diversified network of dealers, stating:

---

[22]   Both the prior guidance and revised guidance included revenue from ecobee Inc. ("ecobee"), a smart thermostat company Generac acquired at the end of 2021, which is not part of solar or energy storage sales.  During the November 2, 2022 earnings call, Defendant Jagdfeld stated that ecobee's revenue was approximately $125 million in 2021 and that it was "growing nicely" in 2022.

Yes, market is still growing, although there's some mixed comments out there about the market growth. But yes, the loss of that major customer of ours in the second half of the year here, they really ceased operations in July. So we've got to do the hard work that, honestly, we should have been doing all along of continuing to expand our channel to more channel partners, but that hurts us definitely in the year, Brian.

So yes, unfortunately, that's going to be down this year. Looking for that to return to growth next year, but as we kind of fill in with new customers, and we kind of reset, so '22 is going to end up being a reset year for us here on energy storage, which is disappointing, but I think -- and a rather painful learning lesson for us on just some of the trials and tribulations of that market, some of the customers and the dealer partners there, you're having to pick your partners carefully. Again, a lot of learning cycles we're going through there.

243. An analyst later asked for clarification on the revenue reduction stemming from the clean energy business, and whether that reduction was driven by Pink Energy's bankruptcy. Defendant Jagdfeld answered: "Yes. The majority of the market is related to the loss of the customer. It was a really important customer for us. And the diversification of our customer base is going to be the primary focus here going forward."

244. Another analyst asked for clarification on the "certain component needed to be upgraded," and Defendant Jagdfeld responded: "It's a rooftop mounted shutoff device, and that device is – the previous generation of that device, has a higher failure rate than what we'd like to see," which, of course, was reportedly near 50%. Defendant Jagdfeld was forced to admit that the Company was replacing the SnapRS as a result of the defect, stating: "So we're proactively replacing those devices for customers so they don't see an interruption of the production of their systems. . . . And that upgrade, the total effort there is what's reflected in that additional warranty reserve charge that we took here in the quarter."

245. On this news, Generac common stock fell again, from $115 per share on November 1, 2022 to $106 per share on November 2, 2022.

246. The next day, November 3, 2022, analysts at BofA Securities issued a report titled: "The Other Shoe (Clean Energy) Drops." The analysts wrote that, following the Company's recent

disclosures, "we maintain our assumption that FY23 HSB orders more closely reflect pre-COVID demand levels." The analysts noted that management disclosed that field inventories were double "healthy levels," and management "did not offer any details around the timing of these installations nor its expectation for sales of the remaining field inventory." The analysts also noted that despite management claiming that the elevated field inventory was the result of a lack of installer capacity, "over the course of our channel checks and those done by the investor community, we have not come across any dealers that have constrained installation capacity." The analysts instead stated that Generac's lack of "disclosure[s] of underlying demand, orders, and shipments" supported that "underlying HSB demand is weaker than previously expected."

247.    Turning to the solar business, the BofA analysts wrote that Generac "faces operational difficulties with ramping its PWRcell deployments, following product quality issues and a lost major customer." The analysts stated they were surprised by the November 2 disclosures, saying "we believe GNRC is facing greater challenges with its clean energy segment than we previously understood."

248.    The same day, November 3, 2022 analysts at William Blair likewise commented that Generac's "dependence on distributor Pink Energy was more significant than we understood," adding:

> Management has consistently indicated Generac works with many distributors in the solar and energy storage market, and that Generac has trained and certified over 2,000 dealers on the company's solar/energy storage product portfolio. We believe it will come as a surprise to many investors that Pink Energy likely accounted for more than half of Generac's solar/energy storage sales. Pink Energy filed for bankruptcy on October 7 and is no longer installing Generac products.[23]

---

[23]    That Pink Energy accounted for more than half of Generac's solar revenue is further supported by the estimate from Roth Capital Partners that the "total number [of] deployed" PWRcell systems was "~30k." ¶234. Pink Energy, in turn, had "19,000 customers with solar energy systems that utilized . . . the SnapRS" (¶94) – *i.e.*, 63% of the total PWRcell systems. Moreover, given that Generac had 2,000 solar installers in April 2021 versus 2,600 in May 2022, and that "SnapRS units . . . have been part of nearly every Pink Energy solar energy equipment installation since

249.    In further describing the impact Pink Energy had on Generac's solar business, the William Blair analysts noted that Generac's updated clean energy guidance of $300 million to $330 million "include[d] ecobee, which we estimate will generate about $150 million in revenue 2022." Therefore, the analysts explained, the updated guidance "for the core clean energy business (primarily residential solar) is approximately $150 million to $180 million, down from about $225 million in 2021." They added that, "[a]lthough the year-over-year decline is substantial, the situation looks even worse after deriving the run rate for this business expected in the second half of 2022," explaining:

> If management was previously expecting clean energy revenue of $500 million in 2022, then the expectation was approximately $350 million excluding ecobee. We estimate the $350 million for the year included approximately $150 million in the first half of 2022. These estimates, and implied revenue guidance of $150 million to $180 million for core clean energy in 2022, indicate revenue in the second half of the year is expected to be less than $30 million.

250.    The William Blair analysts stated that "[t]he realization of customer concentration makes it clear that Generac has not been as successful as we believed at attracting distribution partners in the solar market, and recent quality issues will make building that distribution even more challenging." The analysts continued, "[t]hese realizations regarding clean energy hurt management's credibility, given there was no indication Generac had material customer concentration in this business," and "[w]e now also believe the quality issues Generac has been experiencing with solar components, particularly a rapid shutdown device called the SnapRS, are severe enough that the company's reputation in the solar industry has been damaged." Explaining just how widespread the product SnapRS defect had been, the William Blair analysts estimated that Generac may be in the process of replacing about 300,000 SnapRS devices in the field. They also commented on the magnitude of liabilities associated with the product defects by observing that

---

2020," the concentration of sales through Pink Energy was likely the same or even higher at the start of the Class Period.

these replacements are extremely labor intensive and noted that Generac management publicly conveyed that replacement costs are "significantly weighted towards" labor, with hardware being the minority. They concluded: "We believe the valuation expansion driven by the solar business has essentially completely reversed."

251. In total, from November 1, 2021, the day before the facts about Generac's true business state and prospects began to be partially revealed, to November 2, 2022, the price for Generac's common stock fell an astonishing $400 per share, wiping out more than $25 billion of market capitalization.

## ADDITIONAL SCIENTER ALLEGATIONS

**The Individual Defendants Controlled the Company's Messaging to the Investing Public**

252. In their respective roles as CEO (Jagdfeld) and CFO (Ragen) since 2008, the Individual Defendants have long controlled the Company's strategies, decisions, and messaging to the investing public. The Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to Generac during the Class Period. Defendants Jagdfeld and Ragen signed or certified Generac's annual and quarterly reports filed with the SEC. *See, e.g.*, ¶¶110, 114, 119, 124. In addition, Defendants Jagdfeld and Ragen attended earnings calls and spoke on behalf of the Company throughout the Class Period. *See, e.g.*, ¶¶113, 118, 123, 128. Defendants Jagdfeld and Ragen are the only Generac employees to have signed or certified every annual and quarterly report filed with the SEC during the Class Period. And they are also the only Generac employees that answered analyst questions on behalf of the Company during Class Period quarterly earnings calls.

253. In fact, other Defendants were not generally authorized to speak on behalf of the Company, as the Company's Code of Conduct states, "[e]mployees, officers and directors who are contacted by a member of the financial community and/or media are not authorized to provide any

- 108 -

information regarding Generac or its business without prior approval" and "must immediately notify Investor Relations, the Legal Department, the CFO or CEO." As to Defendants Jagdfeld and Ragen, the Company's "Supplemental Code of Ethics for the CEO, CFO and other Senior Officers" required that they must "[p]roduce full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications" and act "without misrepresenting material facts."

254. Further, Defendants Jagdfeld and Ragen participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendants Jagdfeld and Ragen held themselves out as knowledgeable about generator demand, solar product sales and dealer networks and were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions. They are therefore liable for the misrepresentations and omissions therein.

255. As the most senior executive officers of Generac, Defendants Jagdfeld and Ragen were privy to confidential and proprietary information concerning Generac, the performance of its HSB generator and solar businesses, Generac's relationships with (and sales through) its largest dealers, and product defects. The Individual Defendants also: (i) had access to, *inter alia*, internal corporate documents and conversations with corporate officers, and employees; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants Jagdfeld and Ragen knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**The Critical Importance of the Generator and Solar Businesses Supports a Strong Inference of Scienter**

256.    In their roles as CEO (Jagdfeld) and CFO (Ragen) the Individual Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Generac's non-management directors apprised of the state of the Company's business, operations, and trends.  As discussed above, ¶¶35-49, Generac and the Defendants publicly acknowledged that the sales and success of both (i) Generac's legacy HSB generator business, and (ii) Generac's solar business (focused on the PWRcell solar storage products) were critical to Generac's operations and growth.  In short, the HSB business was the core of Generac's historical success, while the solar business was the core to Generac's future.  *See* ¶259.

257.    Given that Defendants had represented HSB and solar to be the most important businesses to Generac, information concerning sales and growth of Generac's HSB and solar businesses were essential information to the market.  For example, prior to the Class Period, Defendant Ragen presented at a May 2020 Goldman Sachs Industrials & Material Conference, and during that conference, the analyst hosting the event asked twenty-one questions, with all but one directed at the HSB business (ten questions) or solar business (nine questions).  Likewise, during a February 2021 earnings call just before the start of the Class Period, after Defendants Jagdfeld and Ragen made their opening remarks, all but one of the opening nine questions posed by analysts were directed at the HSB business (three questions) or solar business (five questions).

258.    More specifically, the state of HSB generator demand in 2021 and 2022, the growth of Generac's solar business through dealers, and the safety and quality of Generac's products were critical to Defendants and investors.  During the Class Period, Defendants repeatedly reported on and responded to analyst questions regarding HSB demand (*see, e.g.*, ¶¶113, 118, 123), Defendants emphasized the growth and importance of the solar product dealer network, including that they "need[ed] to have [] very broad channels of distribution and a large pipe to be able to sell [the]

- 110 -

products" (¶101); and they emphasized, through the ESG report signed by Defendant Jagdfeld, the Company's focus on "product safety" and "[p]roduct [q]uality" (*see* ¶¶138, 146). Given that earnings calls throughout the Class Period resulted in extensive discussion and questions and answers regarding HSB demand, solar performance, and the breadth of dealer networks (*see* ¶¶108-171), it is clear that Defendants prepared to address such questions and either knew or recklessly disregarded the concealed facts set forth herein.

259. The importance of HSB and solar remained constant throughout the entire Class Period. Indeed, during an October 2022 interview posted online (https://www.youtube.com/watch?v=sC-IIhtKjb8), Defendant Jagdfeld stated that while Generac's HSB business is still the Company's "core business" and "what pays the bills," that business has "allow[ed] [Generac] to make the investments" in solar energy, which is "super critical to where we go as a company." And during the November 2, 2022 earnings call, when asked about the reduced revenues for solar, Defendant Jagdfeld stated that "we're very committed to this" and "[w]e think it's the future" and "an important part of our strategy going forward."

260. Moreover, given the critical importance of growth in solar, it is clear that Pink Energy, given its high concentration of sales of solar products, was a critical dealer and closely monitored by Defendants. In addition, as reported by Pink Energy, it regularly communicated product defects to senior employees at Generac (who reported to the Defendants), communicated directly with Defendant Jagdfeld, and even sought and obtained an indemnification agreement that exposed Generac to material liabilities. Given that Defendant Jagdfeld and Defendant Ragen each signed or certified the financial statements which reported on warranty and related liabilities (*see, e.g.*, ¶¶140, 144, 148, 151), it is clear that Defendants either knew of or recklessly disregarded massive exposure Defendants faced regarding the SnapRS defect and Pink Energy.

**Generac and the Individual Defendants Closely Monitored the Generator and Solar Businesses**

261.    As leaders of Generac, Defendants Jagdfeld and Ragen determined business strategy and made and approved Generac's strategies and policies regarding HSB generator sales and demand, and solar product distribution. In their roles, Defendants Jagdfeld and Ragen understood the importance of monitoring and reporting on these core issues. In fact, before and during the Class Period, Defendants reassured investors that they were doing so.

262.    First, as to the HSB generator business, Defendants have admitted that they regularly and closely monitored numerous metrics regarding the sales process from consultations to activations that provided detailed insight into demand, dealer inventory, sales, activations, and dealer counts. *See* ¶¶109-130. In April 2020, Defendant Jagdfeld told analysts that "[w]e track all time fences between when an IHC occurs to when that [IHC] turns into an order, to when that order turns into an installation, to when that installation turns into a first use of the product." In particular, he confirmed that Defendants monitored close rates, stating that after transitioning from IHCs to VHCs, dealers were "experiencing similar close rates" as they were with IHCs. Then, in May 2022, Defendant Jagdfeld stated that the Company considers "the close rates that we're seeing" in predicting the impact of price increases.

263.    Defendant Jagdfeld has made clear that, in assessing generator demand, Defendants "have to take into consideration where our close rate is at. That's part of the equation." *See* ¶123(g). Also, during the earlier April 2020 call, Defendant Jagdfeld confirmed that Defendants monitor dealers' inventory levels (also known as "field inventory"), stating that for "field inventory levels . . . Days on hand are lower than they were a year ago." He emphasized that field inventory levels was a "really cool statistic that we're able to be able to pull out" and that because "100% of all products get activated . . . we know 100% clarity to field inventory." Defendant Jagdfeld also confirmed in the May 4, 2022 earnings call that Defendants "look at the close rates" when assessing

price increases. At the end of the Class Period, in November 2022, Jagdfeld further confirmed that Defendants had and monitored data "that suggests approximately half of all the field inventory is allocated to an active customer contract."

264. Second, as to the solar business, Defendants have repeatedly admitted that they regularly and closely monitored numerous metrics regarding the sales process that provided detailed insight into demand, dealer inventory, sales, activations, and dealer counts. *See* ¶¶131-154. In April 2021, Defendant Jagdfeld assured investors that Defendants were monitoring "key performance indicators," including "[i]n-home and virtual consultations," "orders," and "activations," which are a "proxy for installations." Defendants also confirmed throughout the Class Period that they were monitoring Generac's solar dealer network, as they emphasized the network and reported on dealer counts quarter after quarter. *See* ¶¶155-171. Moreover, in a May 2021 investor slide presentation, Defendants demonstrated their monitoring of the specific dealers in Generac's network with a slide entitled, "Rapidly Building Clean Energy Distribution," which listed twenty dealers or distributors of Generac's solar products, including PowerHome Solar (Pink Energy).

265. Third, Defendants also closely monitored product safety and quality issues. For example, the 2021 and 2022 ESG Reports, signed by Defendant Jagdfeld, stated that Generac maintains a "robust product safety function" and that its Product Safety Commission "regularly reviews any safety concerns associated with products in the field," which would include SnapRS, "including potential product recalls." The ESG Reports further highlighted the Company's "product quality team," the "motivation and involvement of top management [*e.g.*, Jagdfeld and Ragen] to ensure product quality," and that the Company "regularly perform[s] design reviews and testing to maximize the quality and value of our products." Moreover, the Pink Energy Lawsuit shows that Defendant Jagdfeld was personally involved in responding to the SnapRS defect and he knew about the firmware updates in 2021 and that they were merely an attempted "interim solution." *See* ¶95(b).

266. And fourth, Generac was able to monitor the performance of its PWRcell products, such that poor performance as a result of, for example, a defective product, could be identified. For example, owners and installers of PWRcell systems were given access to Generac's "PWRfleet" online dashboard which "gives granular insight into all of your installed PWRcell systems," including "real-time view of equipment status, error conditions, and connectivity." A Generac Senior Director of Engineering confirmed in a recent interview (*see* ¶49) that his "fleet analytics team" "keep[s] an eye on our system performance."

**The Individual Defendants' Public Admissions Support a Strong Inference of Scienter**

267. Defendants Jagdfeld and Ragen held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, Generac's HSB generator and solar businesses. Their repeated statements to the investing public during the Class Period demonstrate knowledge of the topics on which they directly spoke, including: (i) HSB generator demand (*see, e.g.*, ¶¶109, 113, 118, 123); (ii) the Company's solar dealers and dealer network (*see, e.g.*, ¶¶155, 157, 160 163); (iii) the PWRcell product, launch, sales, and activations (*see, e.g.*, ¶¶132, 135, 139, 142); and (iv) product safety and quality, including potential warranties and liabilities issues (*see, e.g.*, ¶¶138, 146). The Individual Defendants' repeated statements regarding, and their direct involvement in the decisions impacting, these topics, supports an inference that at the time they spoke they were actively monitoring and had access to, and knew or recklessly disregarded, the facts that rendered their statements false and misleading.

268. In addition, the Individual Defendants' refusal and reluctance to provide details on key demand metrics for Generac's HSB generators further supports a strong inference of scienter. Throughout the Class Period, Generac and the Individual Defendants were incentivized to advise the market of internal Company performance indicators and statistics to demonstrate that end-consumer demand for Generac's HSB generators remained strong. Defendants did discuss, and disclose, the

purported positive nature of multiple metrics, including the number of IHCs, dealers, and activations. *See* ¶¶118, 123, 128, 139, 156 (Jagdfeld); ¶¶109, 123, 128, 156 (Ragen). Yet, they deliberately refused to disclose details on the Company's (i) close rates, which Defendant Jagdfeld admitted are an essential "part of the [demand] equation," and (ii) field inventory levels, which Defendant Jagdfeld has described as "a really cool statistic" for the HSB business. As revealed at the end of the Class Period, the Company's close rates and field inventories demonstrated negative demand trends, and Defendants' refusal to provide that information while touting other metrics, further supports an inference of scienter.

269. And finally, Defendants' public admissions further support an inference of scienter. For example, at the end of the Class Period in November 2022, Defendant Jagdfeld admitted that "we knew that [long lead times] was having a negative impact on close rates [and] a negative impact on our ability to sign new channel partners." Then, during a post-Class Period earnings call in May 2023, Defendant Jagdfeld further admitted that close rates are "still well off of our pre-pandemic close rates" and that close rates "bottomed the beginning of last year, so about a year ago."

270. Notably, during the Class Period on March 18, 2022, Defendant Jagdfeld participated in an interview at an event sponsored by the *Milwaukee Business Journal*. The interview was posted online (https://www.youtube.com/watch?v=ogGd47oVVUw) and as of July 24, 2023, had fewer than 400 views. During the more than hour long interview covering a variety of topics, at one point the interviewer asked whether extended lead times for HSB generators were driven by orders and/or supply chain disruptions. While Defendant Jagdfeld did not reveal the lack of demand and degree of dealers ordering without an allocated contract, he did confirm his monitoring of and knowledge about why dealers were ordering products, stating "we do have a lot of channel partners who are buying products today because they're worried about not being able to get products, right? So, that's something that – there's probably a little bit of overbuying in the channel." But, Defendant Jagdfeld

reiterated his prior false and misleading statements by assuring attendees that "the end market demand is just incredibly strong."[24]

271.    As set forth above, the combination of Defendants speaking directly on the topics of the information concealed in this case, Defendants' refusal and reluctance to provide details on HSB demand metrics, and Defendants' admissions further support an inference of scienter.

**The Individual Defendants' Insider Sales and Incentive Compensation Support a Strong Inference of Scienter**

272.    Defendants had a massive informational advantage and were uniquely situated to gain enormous financial rewards by capitalizing on the skyrocketing stock price based on the purported demand brought about by the COVID-19 pandemic (for HSB generators) and the positive business results and prospects associated with Generac's solar products.  By positively portraying the Company in a positive light during the Class Period, and based on Defendants' Class Period statements, Generac's stock increased from around $340 per share at the start of the Class Period (April 29, 2021) to $400 per share by June 2021 and $500 per share in October 2021.

273.    During the Class Period, when Generac stock was trading at artificially inflated prices, Defendant Jagdfeld engaged in multiple rounds of stock selloffs.  During this time, Defendant Jagdfeld sold nearly 125,000 shares of Generac stock, including at prices reaching $500 per share, for more than $38 million in gross insider sale proceeds.  All of Defendant Jagdfeld's insider sales occurred at prices far greater than the $106 price the shares had fallen to at the end of the Class Period.

274.    Likewise, on November 11, 2021, just after information about declining HSB generator demand began to be partially revealed but Generac's stock remained near Class Period

---

[24]    Apparently assured by this comment, analysts from BofA Securities noted that they had viewed the March 16, 2022 interview with Defendant Jagdfeld and they "didn't hear anything in the video to suggest that home standby demand has taken a dramatic turn for the worse."

highs, Defendant Ragen sold off 10,000 shares at more than $440 per share, for more than $4.4 million in gross insider sales proceeds.

275.    Moreover, Generac's executive compensation plan was tied directly to increasing the Company's stock price and executing Generac's "Powering Our Future Strategy." For example, in discussing Generac's executive compensation for 2021 and 2022, Generac's Proxy Statements filed with the SEC on April 29, 2022 and April 28, 2023, stated that the Individual Defendants could receive "annual and long-term incentive opportunities" in the form of annual cash bonuses and stock options. Specifically, Generac's annual bonus plan awards bonuses based on, in part, "achievement of Generac's annual financial goals . . . and other qualitative and quantitative performance objectives." Likewise, Generac's stock option program awards equity based on, in part, "creating stockholder value over the long-term." In other words, the Individual Defendants' annual cash awards and equity offerings increased based on driving the stock price up and delivering on the Company's key initiatives, including continued execution of its core HSB business and growing its solar business.

276.    Under these compensation plans, Defendant Jagdfeld received $7.5 million and $6.8 million in total compensation for 2021 and 2022, respectively, and Defendant Ragen received $1.9 million and $1.8 million in total compensation for 2021 and 2022, respectively. Thus, the Individual Defendants had significant incentive to conceal the waning demand for Generac's HSB generators, the SnapRS defect, and the Company's over-consolidation of revenue with one solar dealer, particularly since the HSB and solar businesses are both critical to Generac's future.

### LOSS CAUSATION AND ECONOMIC LOSS

277.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Generac common stock and operated as a fraud or deceit on Class Period

purchasers of Generac common stock by misrepresenting and concealing: (i) Generac's HSB generator demand, which was weakening in 2021; (ii) Generac's HSB orders, shipments, and backlog, which were inflated with orders without allocations to end customer contracts, as Generac was incentivizing dealers to pull-forward sales above normal market need by allowing dealers to lock in lower pricing before price increases, employing a lax cancellation policy, and providing discounts based on volume of orders; (iii) the rapid growth of Generac's solar products, which was a double-edge sword because the products suffered a major defect that was leading to residential fires, product failures, customer complaints, and increased liabilities and warranty claims; and (iv) Generac's sales through its purportedly broad and diverse solar dealer network, which were highly consolidated in one dealer, exposing Generac to massive risks.

278.    Defendants' false and misleading statements and omissions, individually and collectively, had their intended effect and directly and proximately caused Generac's common stock to trade at artificially inflated levels, reaching a Class Period high of **$506 per share.**

279.    As a result of Defendants' fraudulent conduct as alleged herein, the price at which Generac common stock traded was artificially inflated throughout the Class Period. When Plaintiffs and other members of the Class (defined below) purchased their Generac common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Generac common stock during the Class Period at artificially inflated prices Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

280.    As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to Defendants, Plaintiffs and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in

- 118 -

purchasing their Generac common stock at artificially inflated prices during the Class Period. Had Plaintiffs and other members of the Class known the truth, they would not have taken such actions.

281. When the misrepresentations and omissions that Defendants had concealed from the market were leaked out, materialized, and revealed through the series of partial disclosures beginning on November 2, 2021 and continuing through November 2, 2022, it caused Generac's stock price to fall precipitously as the prior artificial inflation came out of the stock, causing substantial losses to investors.

282. The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued concealment of the existence, magnitude, and scope of the negative trends and adverse information concerning HSB demand (*see* ¶¶109-130), Generac's solar products(*see* ¶¶131-154), and sales through Generac's solar network (*see* ¶¶155-171), which made their statements false and misleading. Defendants' continued misrepresentations and omissions maintained the price of Generac common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Generac even after the partial disclosures.

283. Partial disclosures began to enter the market on November 2, 2021, when Defendants Generac and Jagdfeld disclosed disappointing 3Q 2021 revenue for its Residential (*e.g.*, HSB generator) business below analyst expectations, a rapid contraction of the Company's HSB generator backlog, and a sudden decline in the growth of Generac's total HSB dealers metric. *See* ¶¶193-196. After these disclosures, the price of Generac stock fell 4%, from $506 per share on November 1, 2021 to $484 per share on November 2, 2021, and the stock continued to fall an additional 6% on November 3, 2021, to $453 per share. By comparison, the Standard & Poor's 500 Industrials Index ("S&P Industrials Index"), which the Company identifies in SEC filings as its industry index, remained essentially flat on November 2, 2021 and November 3, 2021. The partial removal of

artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

284. A partial disclosure entered the market on January 26, 2022, when analysts from Northcoast Research reported that, based on the analysts' dealer "checks," HSB dealers "saw a continuation of the deceleration in sales growth" and "customers pausing their decision to buy," with only roughly half of the respondents saying they "experienced some degree of growth in sales" in 2021 compared to 2020. After these disclosures, the price of Generac stock fell 4%, from $276 per share on January 25, 2022 to $265 per share on January 26, 2022, and the stock continued to fall an additional 3% on January 27, 2022, to $257. By comparison, S&P Industrials Index remained essentially flat on January 26, 2022 and declined by 1% on January 27, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

285. A partial disclosure entered the market on February 17, 2022, when analysts from Roth Capital Partners reported that "one area of concern" for them was Generac's solar segment, "as the company has been dealing with some SnapRS issues," adding that "[a] solution appears to have been put in place, but our checks suggest it'll still take some time to be resolved." After these disclosures, the price of Generac stock fell 4%, from $316 per share on February 16, 2022 to $303 per share on February 17, 2022, and the stock continued to fall an additional 3% on February 18, 2022, to $295. By comparison, the S&P Industrials Index declined by 2% on February 17, 2022, and declined by 1% on February 18, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of

Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

286. A partial disclosure entered the market after trading closed on April 28, 2022, when analysts from BofA Securities reported about investor "worrie[s]" over Generator's HSB generator backlog and demand, and that based on their "channel checks," a dealer from one of Generac's more penetrated HSB markets reported that demand had hit a "lull," that Generac is "pumping out gear left and right," and that the dealer "has more than enough" inventory. After these disclosures, the price of Generac stock fell by 6%, from $233 per share on April 28, 2022 to $219 per share on April 29, 2022. By comparison, the S&P Industrials Index declined by 3% on April 29, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

287. A partial disclosure entered the market on June 22, 2022, when Spruce Point reported that it "expect[s] Generac to be stuck with excess capacity," noting the lack of HSB generator dealer growth, the use of incentives being provided to dealers, the Company's financial deterioration, and further reported on concerns about the concentration of Generac's solar dealer network and the inclusion of Pink Energy. After these disclosures, the price of Generac common stock fell by 3%, from $220 per share on June 21, 2022 to $213 per share on June 22, 2022. By comparison, the S&P Industrials Index declined by 1% on June 22, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

4882-8376-1778 v2

288.     A partial disclosure entered the market on August 1, 2022, when Pink Energy filed a lawsuit against Generac alleging various problems related to alleged SnapRS defects, including resulting performance issues, residential fires, customer complaints, and exposure to liabilities and warranty claims.  Although the Pink Energy lawsuit was not widely reported on and was not immediately discussed in major publications or analyst reports, following the filing of the lawsuit, the price of Generac shares fell by 1%, from $268 per share on July 29, 2022 to $265 per share on August 1, 2022.  By comparison, the S&P Industrials Index remained essentially flat on August 1, 2022.  The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

289.     A partial disclosure entered the market on August 3, 2022, when Defendants Generac and Jagdfeld disclosed a rapid contraction of the Company's HSB generator backlog and refused to provide information on the value of the backlog, which analysts linked to a potential softening demand.  After these disclosures, the price of Generac stock fell by 7%, from $267 per share on August 2, 2022 to $249 per share on August 3, 2022, and the stock continued to fall an additional 2% on August 4, 2022, to $244 per share.  By comparison the S&P Industrials Index increased by 1% on August 3, 2022 and remained essentially flat on August 4, 2022.  The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

290.     Additional partial disclosures entered the market on September 12, 2022, when: (i) Pink Energy issues a press release reporting the layoff of 500 employees "because of the same Generac product issues" alleged in the Pink Energy Lawsuit; and (ii) analysts from BofA Securities

reported on conversations with Generac HSB dealers, who reported that "lack of outage activity" was hurting demand, and that dealers had made "significant pre-orders in 2021 "given both bloated lead times" and "internal needs to demonstrate" a "pipeline of sales in *lieu* of realized installation" to maintain Premier status. After these disclosures, the price of Generac stock fell 2%, from $238 per share on September 9, 2022 to $233 per share on September 12, 2022, and then continued to fall an additional 8%, to $213 on September 13, 2022. By comparison, the S&P Industrials Index increased by 1% on September 12, 2022 and declined by 4% on September 13, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

291. A partial corrective disclosure entered the market on September 22, 2022, when media reported on a letter stating that Pink Energy would shut down, citing "financial difficulties resulting from issues with Generac equipment." After these disclosures, the price of Generac stock fell by 3%, from $176 per share on September 21, 2022 to $171 per share on September 22, 2022. By comparison, the S&P Industrials Index declined by 1% on September 22, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

292. A partial corrective disclosure entered the market on October 6, 2022, when analysts from BofA Securities reported that after "connect[ing] with numerous [Generac] dealers," most dealers were "communicat[ing] soft demand" and that the analysts were seeing "further worsening data points," adding that Defendants' "cryptic and opaque" disclosures supported "growing concerns on order cancellation from backlog," that "we see product backlog trends as having largely reversed

themselves near entirely," and that "increased promotional activity across the dealer network" further indicated "weak demand or oversupply." After these disclosures, the price of Generac stock fell by 6%, from $179 per share on October 5, 2022 to $169 per share on October 6, 2022, and the stock fell an additional 9% continued on October 7, 2022, to $154 per share. By comparison, the S&P Industrials Index declined by 1% on October 6, 2022 and declined by 2% on October 7, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

293. A partial corrective disclosure entered the market on October 19, 2022, when Defendants Generac and Jagdfeld further revealed the magnitude and scope of the weakening HSB demand, SnapRS defect, and over-consolidation with Pink Energy, as they reported: (i) a 56% decline in net income, which included $55 million in charges arising from solar warranty matters and bad debt from a bankrupt solar partner; (ii) that quarterly financial results "fell short" and guidance was being reduced due in part to "higher field inventory levels and lower home standby generator orders" and dealers needing to "work down their extended backlogs and elevated field inventories"; and (iii) that solar shipments results and guidance were also "negatively impacted by a large customer which ceased operations." After these disclosures, the price of Generac stock fell by 25%, from $148 per share on October 18, 2022 to $110 per share on October 19, 2022. By comparison, the S&P Industrials Index declined by 1% on October 19, 2022. The partial removal of artificial inflation from the price of Generac common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Generac common stock remained artificially inflated.

294.     On November 2, 2022, Defendants Generac and Jagdfeld further revealed the magnitude and scope of the weakened HSB demand, the SnapRS defect issues, and the over-consolidation of solar sales in Pink Energy, when they reported weaker than expected residential sales due to "lower shipments of home standby generators and clean energy products," admitted the negatively impacted HSB close rates and elevated "double" field inventory levels, and disclosed that that Generac was reducing its 2022 solar guidance from $500 million to $300-$330 million due to "the loss of major customer" and "the specific warranty-related issue," stating that Pink Energy's "significant liquidity challenges" and the SnapRS "warranty-related matters for the upgrade" negatively impacted solar sales, and adding that "[t]he majority of the market is related to the loss of the customer" and "diversification of our customer base is going to be the primary focus here going forward."  After these disclosures, Generac stock fell 8%, from $115 per share on November 1, 2022 to $106 per share on November 2, 2022.  By comparison, the S&P Industrials Index declined by 2% on November 2, 2022.

295.     The timing and magnitude of the decline in the price of Generac common stock negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  From the close of trading on November 1, 2021 through the close of trading on November 2, 2022, during which time Generac's stock price fell by approximately 80% as a result of Defendants' fraud being leaked out and revealed through a series of partial disclosures, the S&P Industrials Index declined by just 12%, as illustrated in the following chart:



Generac vs. S&P Industrials Index
November 1, 2021 through November 2, 2022

296.     As a result of their purchases of Generac common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PRESUMPTION OF RELIANCE

297.     At all relevant times, the market for Generac common stock was an efficient market for the following reasons, among others:

(a)     Generac common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     According to the Company's 3Q 2021 10-Q, the Company had more than 63 million shares of common stock outstanding as of November 1, 2021, demonstrating a very active and broad market for Generac common stock;

(c)     As a regulated issuer, Generac filed periodic public reports with the SEC;

- 126 -

(d)     Generac regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     Generac was followed by numerous securities analysts employed by major brokerage firms, such as BofA Securities, Canaccord Genuity, JP Morgan, Oppenheimer & Co., Roth Capital Partners, Stephens, Inc., and UBS Securities.

298.    As a result of the foregoing, the market for Generac common stock promptly digested current information regarding Generac from publicly available sources and reflected such information in Generac's common stock price.  Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of Generac common stock.

299.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Generac's business and operations, positive proof of reliance is not a prerequisite for recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

300.    The false and misleading statements alleged herein were not forward-looking.  To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply.  Many of the specific statements alleged were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements

- 127 -

accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Generac's Class Period filings and oral disclaimers.

301. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Generac and the Individual Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Generac who knew that those statements were false or misleading when made.

## CLASS ACTION ALLEGATIONS

302. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Generac common stock during the Class Period. Excluded from the Class are: Defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

303. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Generac common stock was actively traded on the NYSE. According to the Company's 3Q 2021 10-Q, the Company had more than 63 million shares of common stock outstanding as of November 1, 2021. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

304. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same

representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

305. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

306. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c) whether the price of Generac common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

307. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them. Plaintiffs are not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Defendants Generac, Jagdfeld, and Ragen

308. Plaintiffs incorporate the foregoing paragraphs by reference.

309. During the Class Period, Defendants Generac, Jagdfeld, and Ragen disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

310. Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)  employed devices, schemes, and artifices to defraud;

(b)  made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Generac common stock.

311. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Generac common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiffs and other members of the Class paid artificially inflated prices for Generac common stock and experienced losses when the artificial inflation was released from Generac common stock as a result of the leakage and disclosure of information and price declines detailed herein. Plaintiffs and other members of the Class would not have purchased Generac common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the false and misleading statements.

312.    By virtue of the foregoing, Defendants Generac, Jagdfeld, and Ragen have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Jagdfeld and Ragen

313.    Plaintiffs incorporate the foregoing paragraphs by reference.

314.    Defendants Jagdfeld and Ragen acted as controlling persons of Generac within the meaning of §20(a) of the Exchange Act.

315.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, practices, and business model, Jagdfeld and Ragen had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Jagdfeld and Ragen were provided with, or had unlimited access to copies of, the Company's public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

316.    As set forth above, Generac violated §10(b) and SEC Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Jagdfeld and Ragen are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: July 31, 2023

ROBBINS GELLER RUDMAN
 & DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
MICHAEL J. STRAMAGLIA


s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
mstramaglia@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 132 -

ADEMI LLP
GURI ADEMI
JESSE FRUCHTER
JOHN D. BLYTHIN
3620 East Layton Avenue
Cudahy, WI 53110
Telephone: 414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com
jfruchter@ademilaw.com
jblythin@ademilaw.com

ATOLLES LAW, S.C.
K. SCOTT WAGNER
222 E Erie Street, Suite 210
Milwaukee, Wisconsin 53202
Telephone: 414/644-0391
414/278-7590 (fax)
swagner@atolles.com

Local Counsel

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
STUART A. KAUFMAN
7080 NW 4th Street
Plantation, FL 33317
Telephone: 954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
stu@robertdklausner.com

Additional Counsel for Lead Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 31, 2023, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
Email: jbarz@rgrdlaw.com

# Mailing Information for a Case 2:22-cv-01436-BHL Oakland County Voluntary Employees Beneficiary Association et al v. Generac Holdings Inc et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon A Amjed**
  namjed@ktmc.com

- **James E Barz**
  jbarz@rgrdlaw.com,E_File_SD@rgrdlaw.com,pmitchell@rgrdlaw.com,pmitchell@courtdrive.com

- **John D Blythin**
  jblythin@ademilaw.com,jdbademimail@yahoo.com

- **Aaron L Castle**
  acastle@vmtlaw.com

- **Alec T Coquin**
  acoquin@saxenawhite.com

- **Ryan T Degnan**
  rdegnan@ktmc.com

- **Mary C Flanner**
  mflanner@crosslawfirm.com,clfw@crosslawfirm.com

- **Michael J Gill**
  mgill@mayerbrown.com,courtnotification@mayerbrown.com,ladocket@mayerbrown.com,7670085420@filings.docketbird.com

- **Avi Josefson**
  avi@blbglaw.com

- **David R Kaplan**
  dkaplan@saxenawhite.com,jjoseph@saxenawhite.com,e-file@saxenawhite.com,cwallace@saxenawhite.com,lmix@saxenawhite.com

- **Tamar B Kelber**
  kelber@gassturek.com,paszkiewicz@gassturek.com

- **Jerome C Mohsen**
  mohsen@gassturek.com,paszkiewicz@gassturek.com,eggert@gassturek.com

- **Frank A Richter**
  frichter1@gmail.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Hannah Ross**
  hannah@blbglaw.com,Khristine.DeLeon@blbglaw.com,Matthew.Mahady@blbglaw.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)