**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| OAKLAND COUNTY VOLUNTARY EMPLOYEES BENEFICIARY ASSOCIATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GENERAC HOLDINGS INC., AARON JAGDFELD, and YORK A. RAGEN, <br><br> Defendants. | Case No. 2:22-cv-01436-BHL <br><br> (Consolidated with Civil No. 2:23-cv-00081-BHL) <br><br><br> <u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**<u>MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**I.** PRELIMINARY STATEMENT ................................................................. 1

**II.** RELEVANT BACKGROUND ................................................................. 4

    **A.** Generac And Messrs. Jagdfeld And Ragen ........................................... 4

    **B.** Generac's Business And The Complaint's Allegations ......................... 5

        **1.** HSB generators ................................................................. 5

        **2.** Clean energy products and the SnapRS component .................................. 8

        **3.** Generac's product distribution channels ............................ 9

    **C.** The Causes Of Action ................................................................. 10

**III.** LEGAL STANDARDS ................................................................. 10

**IV.** ARGUMENT ................................................................. 12

    **A.** The Complaint Is An Impermissible Puzzle Pleading ......................... 12

    **B.** The Complaint Fails To Adequately Plead Falsity ............................. 13

        **1.** The Complaint fails to plead with particularity that the HSB Statements were false or misleading ................................ 14

        **2.** The Complaint fails to plead with particularity that the SnapRS Statements were false or misleading ................................ 20

        **3.** The Complaint fails to plead with particularity that the Dealer Statements were false or misleading ................................ 24

        **4.** Forward-looking statements are protected by the PSLRA safe harbor ................................................................. 26

        **5.** Statements expressing corporate optimism are not actionable ............... 28

        **6.** Allegations regarding SEC Regulation S-K do not plead falsity ............ 30

        **7.** Allegations of supposed GAAP violations do not plead falsity ............. 33

    **C.** The Complaint Fails To Adequately Plead Scienter ......................... 33

        **1.** Group pleading allegations are insufficient to plead scienter ............... 34

        **2.** The Complaint fails to plead actual knowledge ...................... 35

        **3.** Motive-and-opportunity allegations are insufficient to plead scienter ................................................................. 36

        **4.** Insider stock sales are insufficient to plead scienter ................ 37

        **5.** Allegations about status, access to information, and "core operations" are insufficient to plead scienter ......................... 39

**6**.    Allegations about the Individual Defendants' "public admissions" are insufficient to plead scienter ............................................................ 40

**D**.    The Alleged Misstatements And Omissions Were Immaterial............................ 41

**1**    Generac disclosed that HSB demand was significantly impacted by COVID, and remained uncertain and unpredictable................................ 41

**2**.    The Complaint does not (and cannot) allege that the SnapRS and Dealer Statements were material ............................................................ 42

**E**.    The Complaint Fails To Plead Loss Causation..................................................... 43

**F**.    The Complaint Fails To State A Claim For Control Person Liability ................. 45

**V**.    CONCLUSION.......................................................................................................................... 45

Case 2:22-cv-01436-BHL   Filed 10/09/23   Page 3 of 55   Document 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
9 F. Supp. 3d 175 (D. Conn. 2014)......................................................................20

*Anderson v. Abbott Labs*.,
140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott
Labs*, 269 F.3d 806 (7th Cir. 2001)..............................................................15, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................11

*Atlantis Cap. LLC v. AGS Specialist Partners*,
533 F. Supp. 2d 828 (N.D. Ill. 2008).................................................................36

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................40, 41

*Berg v. Velocity Fin., Inc.*,
2021 WL 268250 (C.D. Cal. Jan. 25, 2021) .......................................................32

*Boca Raton Firefighters' and Police Pension Fund v. Devry, Inc*.,
2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)......................................................43

*Brasher v. Broadwind Energy, Inc*.,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) .......................................................32

*In re Brightpoint, Inc. Sec. Litig*.,
2001 WL 395752 (S.D. Ind. Mar. 29, 2001)........................................................36

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) ..............................................................................17

*Catogas v. Cyberonics, Inc.*,
292 F. App'x 311 (5th Cir. 2008) ........................................................................44

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022).............................................19, 38, 39

*City Nat'l Bank v. Vanderboom*,
422 F.2d 221 (8th Cir. 1970) ..............................................................................41

*City of Birmingham Ret. and Relief Sys. v. A.O. Smith Corp.*,
468 F. Supp. 3d 1048 (E.D. Wis. 2020)............................................................4, 25

*Constr. Workers Pension Fund v. Navistar Int'l.*,
    114 F. Supp. 3d 633 (N.D. Ill. 2015) ...........................................................14, 21

*Cornielsen v. Infinium Capital Mgmt.*,
    LLC, 916 F.3d 589,599 (7th Cir. 2019)......................................................15, 34

*Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*,
    20 F.4th 303 (7th Cir. 2021) ...........................................................................11

*Desai v. General Growth Props.*,
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ..............................................................30

*DH2, Inc. v. Athanassiades*,
    359 F. Supp. 2d 708 (N.D. Ill. 2005) ..............................................................34

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).........................................................................................43

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ..........................................................................38

*Ennenga v. Starns*,
    677 F.3d 766 (7th Cir. 2012) .............................................................................4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)...............................................................................43

*Fryman v. Atlas Financial Holdings, Inc.*,
    462 F. Supp. 3d 888 (N.D. Ill. 2020) .................................................... *passim*

*Gaines v. Guidant Corp.*,
    2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) ...................................................40

*In re Guidant Corp. Sec. Litig.*,
    536 F. Supp. 2d 913 (S.D. Ind. 2008), *aff'd sub nom. Fannon v. Guidant
    Corp.*, 583 F.3d 995 (7th Cir. 2009) ...................................................... *passim*

*In re Harley–Davidson, Inc. Sec. Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009).................................................... *passim*

*Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth
    Third Bancorp*,
    2022 WL 1642221 (N.D. Ill. May 24, 2022)................................................3, 29

*Higginbotham v. Baxter Intern.*,
    495 F.3d 753 (7th Cir. 2007) ..............................................................12, 36, 42

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) ................................................................44

*Issen v. GSC Enters., Inc.*,
  508 F. Supp. 1278 (N.D. Ill. 1981) ..................................................................16

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) ...............................................................37

*Koplin v. Labe Federal Sav. and Loan Ass'n*,
  748 F. Supp. 1336 (N.D. Ill. 1990) ..................................................................17

*Kriendler v. Chem. Waste Mgmt., Inc.*,
  877 F. Supp. 1140 (N.D. Ill. 1995) ..................................................................30

*In re Livent, Inc. Sec. Litig.*,
  148 F. Supp. 2d 331 (S.D.N.Y. 2001) ..............................................................11

*Macovski v. Groupon, Inc.*,
  2021 WL 1676275 (N.D. Ill. Apr. 28, 2021) .............................................2, 12, 13

*MacPhee v. MiMedx Grp., Inc.*,
  73 F.4th 1220 (11th Cir. 2023) .......................................................................43

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..........................................................................22

*Martin v. GNC Holdings, Inc.*,
  2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir.
  2018) ..........................................................................................................44

*Menzies v. Seyfarth Shaw LLP*,
  943 F.3d 328 (7th Cir. 2019) ..........................................................................11

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .......................................................................44

*Michalski v. Weber, Inc.*,
  2023 WL 6290491 (N.D. Ill. Sept. 27, 2023) ...............................................19, 25

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ....................................................27, 28, 29

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth
  Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. 2016) .................................................................38

*In re Newell Rubbermaid Inc. Sec. Litig.*,
    2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .......................................................42

*Nielen-Thomas v. Concorde Inv. Servs., LLC*,
    914 F.3d 524 (7th Cir. 2019) .................................................................................1, 11

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006).......................................................................40

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ..................................................................................30

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015).........................................................................................18, 26

*Parnes v. Gateway 2000*,
    122 F.3d 539 (8th Cir. 1997) ....................................................................................42

*Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*,
    895 F.3d 933 (7th Cir. 2018) ..............................................................................36, 37

*Pierrelouis v. Gogo, Inc.*,
    414 F. Supp. 3d 1164 (N.D. Ill. 2019) ...............................................12, 21, 34, 36

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ....................................................................................25

*Plumbers & Pipefitters Local Union 719 Pension v. Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) ....................................................................................36

*Plumbers & Pipefitters Local Union v. Allscripts-Misys Healthcare Sols.*,
    778 F. Supp. 2d 858 (N.D. Ill. 2011) .......................................................................27

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
    2023 WL 3569068 (S.D.N.Y. May 19, 2023) .........................................................19

*Pugh v. Trib. Co.*,
    521 F.3d 686 (7th Cir. 2008) ..............................................................................37, 45

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ..........................................................................11

*Ret. Sys. v. MGIC Inv. Corp.*,
    2010 WL 5095294 (E.D. Wis. Dec. 8, 2010) ..........................................................15

*Ret. Sys. v. Walgreen Co.*,
    2016 WL 5720375 (N.D. Ill. Sept. 30, 2016) .........................................................30

*Ret. v. Anixter*,
 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) .................................................................37, 38

*Ret. v. Anixter Intern., Inc.*,
 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) .........................................................................37

*Roth v. OfficeMax, Inc.*,
 2006 WL 2661009 (N.D. Ill. Sept. 13, 2006) .......................................................................29

*Sapssov v. Health Mgmt. Assocs., Inc.*,
 22 F. Supp. 3d 1210 (M.D. Fla. 2014), *aff'd*, 608 F. App'x 855 (11th Cir.
 2015) ......................................................................................................................................44

*Schoenhaut v. Am. Sensors, Inc*.,
 986 F. Supp. 785 (S.D.N.Y. 1997) ........................................................................................28

*Schultz v. Tomotherapy Inc*.,
 2009 WL 2032372 (W.D. Wis. July 9, 2009) .......................................................................42

*Silverman v. Motorola, Inc*.,
 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ...........................................................28, 30, 44

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
 2011 WL 814932 (N.D. Ill. 2011) .......................................................................11, 20, 27, 28

*Stransky v. Cummins Engine Co.*,
 51 F.3d 1329 (7th Cir. 1995) ................................................................................................12

*In re Supreme Indus., Inc. Sec. Litig.*,
 2019 WL 1436022 (N.D. Ind. Mar. 29, 2019) ................................................................24, 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ...................................................................................................... *passim*

*Tricontinental Indus. v. PricewaterhouseCoopers*,
 475 F.3d 824 (7th Cir. 2007) ................................................................................................43

*Van Noppen v. InnerWorkings, Inc.*,
 136 F. Supp. 3d 922 (N.D. Ill. 2015) .......................................................................14, 15, 29

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
 495 F. Supp. 3d 622 (N.D. Ill. 2020) .......................................................................18, 31, 36

*Wietschner v. Monterey Pasta Co*.,
 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ................................................................................38

*In re Williams Sec. Litig.*,
 558 F.3d 1130 (10th Cir. 2009) .............................................................................................44

**Statutes**

15 U.S.C. § 78t(a) ........................................................................................................45

15 U.S.C.§ 78u-4(b)(1)-(2) .........................................................................................11

15 U.S.C. § 78u-4(b)(2)(A)..........................................................................................33

15 U.S.C. § 78u-5(i)(1) ................................................................................................27

15 U.S.C. § 78u-5(c)(1) ...............................................................................................27

Private Securities Litigation Reform Act of 1995 ("PSLRA")............................... *passim*

Securities Exchange Act of 1934 ........................................................................... *passim*

**Other Authorities**

17 C.F.R. § 229.105 .....................................................................................................31

17 C.F.R. § 303(b)(2)(ii)...............................................................................................31

Federal Rule of Civil Procedure 9(b)...................................................................1, 11, 12

https://securities.stanford.edu ........................................................................................1

Defendants Generac Holdings Inc. ("Generac" or the "Company"), Aaron Jagdfeld, and York A. Ragen (together, the "Individual Defendants" and, with Generac, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss (the "Motion") the Consolidated Class Action Complaint (ECF No. 42, the "Complaint") by Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa and Named Plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust (together, "Plaintiffs").

## I.     PRELIMINARY STATEMENT

This is a putative shareholder class action. Plaintiffs contend that Generac, its CEO and its CFO committed securities fraud by misleading shareholders. To survive this Motion, the Complaint must plead facts sufficient to satisfy Federal Rule of Civil Procedure 9(b)'s demanding particularity standard. In addition, the Complaint must satisfy the unique, heightened pleading standards imposed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Congress enacted the PSLRA to curb meritless shareholder class actions, with the express intention to impose exceedingly high pleading standards on plaintiffs' complaints.[1] *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019). The Complaint here fails to satisfy Plaintiffs' pleading burdens.

For more than 60 years, Generac has offered products and technology solutions for home and business owners to secure a stable, uninterrupted power supply. Now, Plaintiffs play hindsight critics. Their 132-page Complaint is effectively three separate securities actions. Each quibbles over nearly every public statement that Defendants made during a 19-month period—amidst the unprecedented COVID-19 pandemic—concerning (1) consumer demand for Generac's home standby ("HSB") generators, (2) a specific solar energy component, or (3) the Company's dealer

---

[1] For example, in just the last decade, plaintiff firms have filed more than 2,500 federal securities class actions targeting publicly traded companies like Generac. *See* https://securities.stanford.edu.

distribution network. Tellingly, the Complaint does not allege that Defendants' statements were actually false. Instead, Plaintiffs complain that Defendants' public statements allegedly omitted information about which Plaintiffs now speculate in hindsight.

As a threshold matter, the Complaint commits a cardinal sin for which courts often order dismissal in shareholder class actions. The PSLRA requires that the Complaint identify with specificity each allegedly misleading statement ***and*** connect the specific reasons that each statement was allegedly misleading. Rather than satisfy that requirement, the Complaint quotes extensively from Defendants' public disclosures (118 statements in all), ticks off laundry lists of reasons the statements were supposedly misleading (22 purported reasons in all), and leaves the Court and Defendants to guess which reasons apply to which statements. This is exactly the kind of "puzzle pleading" warranting dismissal. *See, e.g.*, *Macovski v. Groupon, Inc.*, 2021 WL 1676275, at *5-6 & n.1 (N.D. Ill. Apr. 28, 2021) (dismissing shareholder class action complaint on "puzzle pleading" grounds alone, without reaching other arguments for dismissal).

Even assuming one can solve the Complaint's disjointed puzzle of allegations, none of the facts alleged in support of Plaintiffs' three separate theories come close to adequately pleading the requisite falsity, materiality, scienter or loss causation elements of a § 10(b) claim.

***First***, in 2020, the global pandemic boosted demand for Generac's HSB generators. The Company forthrightly attributed the strong demand to the stay-at-home environment. The Company further cautioned about the uncertainties COVID created for its HSB business. Notwithstanding these disclosures, and ignoring other metrics Generac discussed, Plaintiffs focus nearly exclusively on one metric and speculate that Defendants should have leapt to the conclusion that it indicated demand for its HSB products had peaked and was weakening.

Importantly, the Complaint does not make any particularized factual allegations to support

the speculative theory that demand was weakening. No one could predict the post-COVID future, and Defendants did not try. Indeed, the Complaint focuses almost entirely on accurate statements of historical fact or generalized statements of corporate optimism for the product's future—none of which are actionable. The Complaint also does not assert that HSB demand was actually declining, or explain how the challenged statements were misleading (particularly in context). Plaintiffs' acknowledgement that certain indicators continued to point to increasing demand, as well as their concession that the Company was *increasing* HSB production, contradict Plaintiffs' hindsight rank speculation that demand was declining. The Complaint also fails to adequately plead materiality, given that Generac made investors well aware of COVID's effects on HSB demand and the uncertainties that the pandemic created.

*Second*, Plaintiffs concede that Generac disclosed product issues with a new solar product component (the "SnapRS"). The Complaint nonetheless latches onto the Company's proactive remedies for those issues, and speculate that Defendants "must have known" *earlier* that those supposed issues exposed Generac to material liabilities. Again, the Complaint does not support this speculation with particularized facts to show that Defendants had contemporaneous knowledge that was inconsistent with their statements about the SnapRS. This pleading failure is compounded by the Complaint's further failure to plead that the solar business or the SnapRS liabilities were material to the Company's revenues (they very clearly were not). Here, Generac's core clean energy business was *less* than 5% of the Company's revenues, and SnapRS is only a subset of that business.

*Third*, the Complaint seeks to capitalize on Generac's loss of a solar products distributor after the dealer filed for bankruptcy. Plaintiffs speculate that Defendants' earlier generic statements regarding Generac's product-wide dealer distribution network were misleading because they did

not also detail the percentage of sales made through the later-to-be-lost solar dealer. The Complaint does not show that Generac had any legal duty to disclose such detail (it did not). Moreover, the Complaint relies on pieced-together guesses from after-the-fact third-party reports, while concealing from the Court the full context of Generac's public statements about its dealers. Those generalized statements referred to the distribution of broader segments of Generac's overall $4 billion business—not, as the Complaint misleadingly suggests, the far more narrow solar business. This liability theory also does not adequately plead materiality. Nor could it, because the solar products business generally, and the charge taken due to the dealer loss, were clearly immaterial.

*Further*, as to all three theories, Plaintiffs fail to plead with particularity—as the law requires—scienter and loss causation. The Complaint makes only boilerplate allegations that courts routinely reject as insufficient to plead a compelling inference that defendants knowingly or recklessly misled investors. The alleged corrective disclosures cited in the Complaint are a hodgepodge of disclosures that courts routinely reject as insufficient to plead loss causation.

The Complaint should be dismissed in its entirety.

## II.     RELEVANT BACKGROUND[2]

### A.     Generac And Messrs. Jagdfeld And Ragen

Generac is a leading energy technology company, headquartered in Waukesha, and traded

---

[2] For purposes of this Motion only, Generac takes the Complaint's allegations as true, while conceding none. On a motion to dismiss, the Court may consider documents that the Complaint incorporates by reference and matters of which this Court may take judicial notice, including filings made with the U.S. Securities and Exchange Commission ("SEC"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012); *see also City of Birmingham Ret. and Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1051 n.1, 1057, 1061 (E.D. Wis. 2020) (considering analyst reports and company's SEC filings in a securities class action); *Fryman v. Atlas Financial Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020) (considering SEC filings, including Form 4s, press releases, and call transcripts because they were incorporated in the complaint by reference). Documents properly considered here are exhibits to the Declaration of Jacqueline Vallette and referred to as "Ex. __."

4

on the New York Stock Exchange. ¶ 31.[3] During the relevant period, Generac employed more than 9,000 employees, including thousands of Wisconsinites, and generated around $4 billion in annual revenues. Ex. 1 at 13, 40. The Company designs, manufactures, and distributes a range of energy technology products and solutions, including backup and power generation systems, clean energy products, solar and battery storage solutions. ¶¶ 2, 31; Ex. 1 at 3. Since 2008, Mr. Jagdfeld has served as Generac's chief executive officer and Mr. Ragen has served as its chief financial officer.

## B.   Generac's Business And The Complaint's Allegations

The Complaint advances three separate securities fraud theories.

### 1.   HSB generators

Generac was founded in Wisconsin in 1959 to commercialize a line of affordable portable power generators. ¶ 35; Ex. 1 at 2. In 1989, the Company introduced its first residential standby generator (also referred to as "home standby" or "HSB" generator). ¶ 35. HSB generators are permanently installed at homes to serve as backup power during outages. *Id.*

Plaintiffs contend that Generac monitors several indicators of end-user consumer "demand" for its products. ¶ 60. For HSB generators, Generac has publicly discussed indicators such as the number of in-home and virtual consultations (or sales leads), product activations, incoming order rates, dealer partners, and close rates.[4] ¶¶ 109, 118, 123. No single indicator definitively establishes consumer "demand." *See* ¶ 123(g). And, of course, "demand" is not simply a singular figure that can be calculated from known or estimable metrics, because demand may

---

[3] Citations are to the Complaint by paragraph number.

[4] In-home and virtual consultations are meetings between third-party dealers and potential homeowner customers (¶¶ 51, 54); product activations occur upon the first use of the product post-installation (¶ 53); incoming orders refer to purchase orders from dealers, distributors, or other channel partners (and, rarely, end user customers) (Ex. 1 at 10, 45); dealer partners include Generac's network of third-party dealers who sell, install, and service generators, PWRcell systems and other products (Ex. 1 at 9-10); close rates refer to finalized customer sales (¶ 11).

not be quantifiable, is constantly fluid, and may be impacted at any time by numerous factors. For example, sales of and demand for HSB generators are significantly affected by unpredictable power outage events caused by thunderstorms, hurricanes, ice storms, blackouts, public safety power shutoffs, other power grid reliability issues, and customer preferences and experiences. ¶ 39, Ex. 1 at 16. Indeed, Generac communicated openly and frequently with shareholders about, for instance, the significant impact power outage events and consumer awareness have on HSB sales and demand. *See, e.g.*, ¶¶ 3, 39; Ex. 2 at 1, 5, 9, 20, 21 (first factor listed in the Company's Annual Report under "Factors that could affect our actual financial results and cause them to differ materially from those anticipated in the forward-looking statement," and addressed in at least four other sections of each annual report); Ex. 1 at 1, 6, 7, 16, 25 (same).

In early 2020, states issued stay-at-home orders, causing work, school, and other activities to dramatically shift to the household. ¶¶ 56-57. The COVID-19 pandemic thus significantly boosted demand for HSB generators to provide backup power. *Id*. The Company made clear to investors that increased HSB sales orders and shipments were primarily driven by consumers' heightened awareness of the need for backup power since the onset of COVID, labeled the trend "Home as a Sanctuary," and discussed these unprecedented demand dynamics extensively during investor calls and in SEC filings. *See, e.g.*, ¶¶ 59, 62, 118. The Company also communicated in detail about the uncertainties associated with COVID and its potential impact on future demand for Generac's products. *See, e.g.*, Ex. 2 at 9. The Company shared its observations that events causing increased product awareness may drive consumers to accelerate their purchase of an HSB generator. *Id*. at 20. The Company also informed investors that reduced consumer awareness can result in lower sales. *Id*. at 9. Generac made clear that, like COVID and weather events, consumer spending was variable, uncertain, and dependent on a number of factors. *Id*.

As HSB sales and demand increased in 2020 and 2021, a "backlog" of HSB generator orders accumulated.[5] ¶ 61. In response, Generac took proactive steps to increase production and add dealers. ¶¶ 9, 11, 65-66. In February 2021, the Company announced that it was opening a new manufacturing and distribution facility to ultimately increase capacity by 75% over pre-pandemic levels. ¶ 65-66; Ex. 4 at 4. The backlog continued to fluctuate in 2021 and 2022 while Generac worked to ramp production and resolve supply chain challenges to bring lead times down. ¶ 128.

During 2022, the Company allegedly began to observe potential effects from the elevated backlog, including lower close rates and impediments to Generac's ability to sign new channel partners. ¶ 239. To mitigate these issues, Generac continued to ramp production. ¶ 123, 128. By August 2022, the Company confirmed that close rates were improving, which supported Defendants' reasonable belief that demand remained strong and reducing lead time would reverse effects on close rates. Ex. 3 at 3.

Also during 2022, as the Company forthrightly disclosed, dealer installation capacity for HSBs was constrained by labor availability, permitting, and utility-related delays. ¶¶ 123, 231; Ex. 5 at 15; Ex. 3 at 4. While Generac was successfully reducing production lead times, the installation issues made it challenging to reduce project lead times. Ex. 3 at 4. This, in turn, created levels of dealer inventory that were higher than historical experience. ¶¶ 123, 231; Ex. 5 at 15; Ex. 3 at 4. The Company thus introduced a number of initiatives to increase installation bandwidth, including campaigns to add new HSB dealers, train non-dealer contractors, and decrease overall time required for installation. Ex. 3 at 4. Generac disclosed all of this.

---

[5] "Backlog" refers to orders received but not yet shipped by Generac. ¶ 4 n.2. Backlog is also referred to as "production lead time," which refers to the time between receipt of an order and Generac's shipment of the order. Ex. 3 at 4. "Project lead time" separately refers to the time between the signed contract and the installation date. *Id*. These are sometimes referred to more generally, both individually and combined, as "lead time." ¶ 11 n.4; Ex. 3 at 4.

During this period, the Company also continued to observe and disclose increases in many key HSB demand indicators, including home consultations, incoming order rates, and activations. ¶¶ 118, 123, 128; Ex. 3 at 3. Plaintiffs, however, seize on the Company's disclosure at the end of the Class Period that, with extended lead times constraining dealer growth and installation constraints lagging production output— and despite continued strength in end-customer demand— the Company did not hit HSB order expectations in Q3 2022. ¶ 238; Ex. 6 at 4. Plaintiffs then look backward and speculate that Defendants' accurate statements about historical HSB sales were nonetheless misleading, because (1) Plaintiffs speculate that HSB "demand" was actually weakening; (2) some unspecified number of HSB sales orders were driven in part by dealers that over-ordered; and (3) Defendants supposedly did not disclose that the demand boost caused by COVID was unsustainable (together, the "**HSB Theory**"). ¶¶ 6-15, 72, 276.

### 2. Clean energy products and the SnapRS component

In 2019, Generac began manufacturing the PWRcell solar and battery storage system ("PWRcell system"). ¶¶ 2, 41-42. The PWRcell system connects to rooftop solar panel arrays to convert and store electricity. ¶ 42. The system can include an inverter (to convert direct current to alternating current), a photovoltaic link substring optimizer, a battery cabinet, and a rapid shutdown device known as the SnapRS. *Id.* One SnapRS component connects to each solar panel, making it possible to shut down power to the panels rapidly when necessary. ¶¶ 44-45.

Generac supplied a limited warranty for the PWRcell system, with a duration of 25 years for the SnapRS components, under which "Generac will, at its discretion, repair or replace any part(s) which, upon evaluation, inspection, and testing by Generac" or an authorized third party "is found to be defective." ¶ 182. In its financial statements, the Company records a liability for standard product warranty obligations accounted for as assurance warranties at the time of sale to a customer based upon historical warranty experience. The Company also records a liability for

specific warranty matters when they become known and are reasonably estimable. ¶ 140(a).

The Complaint alleges that Defendants' general statements regarding sales growth, performance, and safety of the PWRcell system, as well as financial statement disclosures related to warranty reserves, were misleading because they allegedly did not timely disclose that a purported defect in the SnapRS exposed the Company to significant liabilities (the "***SnapRS Theory***"). ¶¶ 48, 137, 141, 145, 149, 152, 154. The Complaint relies primarily on unsubstantiated allegations made in a lawsuit by one solar product dealer ("Pink Energy"). ¶¶ 77, 212; Ex. 7 at 69. The Complaint also points to consumer class actions related to purchases of Generac clean energy products, including the SnapRS, and a $37 million pre-tax charge taken at the end of the Class Period for clean energy product warranty-related matters. ¶¶ 97, 231. The Complaint does not, however, plead any facts to show that Defendants knew any ***earlier*** that such warranty liabilities would accrue and were reasonably estimable, as required for such disclosures.

### 3. Generac's product distribution channels

Generac distributes its many products through an extensive global distribution network with numerous channels. The network includes independent residential dealers, industrial distributors and dealers, national and regional retailers, electrical/HVAC/solar wholesalers, solar installers, e-commerce partners, catalogs, equipment distributors and rental companies. ¶¶ 6, 164. In its annual report, the Company describes each of the networks in further detail. *See, e.g.*, Ex. 1 at 9. For HSB generators, Generac has a residential dealer network made up of electrical and HVAC contractors that sell, install and service residential and light commercial generators to consumers. ¶ 50; Ex. 1 at 9. For clean energy products and PWRcell systems, Generac works with solar installers and national solar providers to offer its products. ¶ 54.

Generac viewed its distribution network as a competitive advantage (¶ 164) and spoke to investors about its importance to the Company's clean energy business (*see, e.g.*, ¶ 163). Generac

likewise informed investors of the Company's reliance on distribution partners to sell its products, provide service and aftermarket support, and drive awareness. ¶¶ 50, 164. Accordingly, the Company warned that "[i]mpairment of our relationships with our distributors, dealers or large customers [or] loss of a substantial number of these distributors or dealers or of one or more large customers . . . could materially reduce our sales and profits." ¶ 164. Generac also cautioned investors that the Company's "ability to successfully realize our growth strategy is dependent in part on our ability to identify, attract and retain new distributors at all layers of our distribution platform, including increasing the number of energy storage distributors, and we cannot be certain that we will be successful in these efforts." *Id*.

Plaintiffs concede that the Company provided accurate data regarding its distribution network, including the number of and growth in distributors. *See, e.g.*, ¶ 195. Plaintiffs nonetheless complain that Generac should have disclosed that its solar product sales were supposedly "highly concentrated" with Pink Energy (the "***Dealer Concentration Theory***"). ¶¶ 20-21, 276. Although the Complaint does not describe any duty to make such a disclosure, Plaintiffs point to Pink Energy's Chapter 7 bankruptcy petition, and Generac's resulting announcement that it was recording an $18 million bad debt expense, at the end of the Class Period. ¶¶ 106, 230.

### C.     The Causes Of Action

The Complaint asserts two causes of action on behalf of those who purchased Generac securities during the period April 29, 2021 through November 1, 2022 (the "Class Period"), for alleged violations of section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 against all Defendants (Count I); and for alleged control person violations of section 20(a) of the Securities Exchange Act against the Individual Defendants (Count II).

## III.   LEGAL STANDARDS

On this Motion to Dismiss, the Court must "accept the allegations in the complaint as true,

and . . . draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021). "Yet the complaint must still include 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 308 (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state an actionable claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Securities fraud complaints are subject to Rule 9(b), which requires all averments of fraud or mistake to be plead "with particularity." *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *4 (N.D. Ill. 2011); *see also Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (each fraud allegation must be alleged with "precision and some measure of substantiation").

Section 10(b) claims are further subject to the even higher pleading requirements imposed by the PSLRA. 15 U.S.C.§ 78u-4(b)(1)-(2); *see Tellabs*, 551 U.S. at 319. Congress adopted the PSLRA "as a check against abusive litigation by private parties" in securities class actions like this one. *Tellabs*, 551 U.S. at 313. Such "abusive class-action litigation was injuring 'the entire U.S. economy'" via "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulations by class action lawyers of the clients whom they purportedly represent.'" *Nielen-Thomas*, 914 F.3d at 528. Congress therefore expressly intended to impose uniquely high hurdles on plaintiffs attempting to bring securities fraud claims. *Id.*; *see also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1251 (N.D. Ill. 1997) (Congress intended PSLRA to impose higher pleading standard than Rule 9(b)); *In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 354 (S.D.N.Y. 2001) (Congress intended PSLRA to make it "substantively harder for plaintiffs to bring securities fraud cases").

The PSLRA requires dismissal of any complaint that fails to meet its heightened pleading standards. *Tellabs*, 551 U.S. at 320. A shareholder complaint must (1) "specify each statement alleged to have been misleading;" (2) detail the specific "reason or reasons why [each] statement is misleading;" and (3) allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* The required state of mind is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Intern.*, 495 F.3d 753, 756 (7th Cir. 2007). Plaintiffs here must plead **with particularity facts** giving rise to a "strong inference" that each Defendant acted with scienter. *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1172 (N.D. Ill. 2019). In addition, the Complaint must plead facts showing that each alleged misstatement was material, a connection with the purchase or sale of a security, justifiable reliance, and that reliance on each alleged misstatement proximately caused Plaintiffs' losses. *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

## IV.    ARGUMENT

### A.    The Complaint Is An Impermissible Puzzle Pleading

As a threshold matter, the Court should dismiss the Complaint because it relies on "puzzle pleading" and thereby fails to meet the heightened pleading requirements imposed by the PSLRA and Rule 9(b). Puzzle pleading "improperly places the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Harley–Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 983-84 (E.D. Wis. 2009). "Courts [in this Circuit] have found so-called puzzle pleadings where the complaint quotes the defendant at length and then uses a stock assertion that the statement is false or misleading for reasons stated in an earlier paragraph." *Macovski v. Groupon, Inc.*, 2021 WL 1676275, at *5 (N.D. Ill. Apr. 28, 2021). "Courts have also dismissed complaints whose net effect is to leave the reader . . . jumping from page to

page in an attempt to link the alleged statements to the background that supposedly makes them false or misleading." *Id*. Merely organizing alleged misrepresentations chronologically and emphasizing certain statements in bold or italicized typeface is not enough to avoid dismissal. *Id*.

Plaintiffs here subject the Court and Defendants to precisely this kind of puzzle pleading. The Complaint quotes a whopping 118 statements across at least 63 paragraphs, almost all of which contain numerous subparts (¶¶ 108-171), and then repeats similar and often identical lists of 22 purported reasons the statements were supposedly misleading, without ***any*** particularization or attempt to connect each specific statement to one or more specific reasons (*see* ¶¶ 111, 115, 120, 125, 130, 137, 141, 145, 149, 152, 154, 159, 162, 165, 171). Plaintiffs' formulaic lists leave the Court and Defendants to somehow decipher which purported facts elsewhere in the Complaint support Plaintiffs' general contention that each challenged statement was misleading.

The Court can and should dismiss the Complaint on this basis alone, and need not reach the other reasons for dismissal described in this Motion. *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008) (grounds for dismissal include listing "lengthy quotations" followed by "a similar (in most cases identical) laundry list of 'specific' reasons the statements are allegedly false"), *aff'd sub nom. Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009).

### B.     The Complaint Fails To Adequately Plead Falsity

Even if the Complaint did adequately connect each alleged statement with the specific reason(s) the statement was allegedly misleading (it does not), the Complaint must also describe particularized facts to show the reason each statement was misleading. *Harley–Davidson*, 660 F. Supp. 2d at 983 ("The plaintiff must then 'support with particularity . . . the falsity of the statement of fact or the omission, and its materiality.'"). Because omissions, too, must be pleaded with particularity, "plaintiffs must point to a specific statement that is made misleading by an omission, *and offer specific, contradictory information known to Defendants sufficient to establish that*

*Defendants made any misleading statements.*" *Constr. Workers Pension Fund v. Navistar Int'l.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015). Courts often engage in a "statement-by-statement" analysis to apply these standards and to thus "determin[e] whether Plaintiffs have alleged their securities fraud claims sufficiently." *See, e.g., Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 932 (N.D. Ill. 2015) (analyzing statements separately and individually).[6]

> **1.    The Complaint fails to plead with particularity that the HSB Statements were false or misleading**

The Complaint first challenges both generalized and factually accurate statements concerning Generac's HSB sales, demand, and related indicators (the "HSB Statements").[7]

> a)    *Defendants' disclosures of historical facts are not actionable*

The vast majority of the HSB Statements were disclosures of mere historical information, including various operational and financial metrics regarding HSBs.[8] The Complaint does not allege that any of the historical information was inaccurate. Instead, Plaintiffs claim that Defendants "omitted" information predicting how these historical metrics might look in the future.

---

[6] To aid the Court's analysis, Appendix 1, filed herewith, lists each alleged misstatement in the Complaint and summarizes the specific reasons each fails to state a claim.

[7] *See* ¶ 109(a) (Q2 2021) ("Demand for home standby generators remains incredibly robust due to a variety of factors, including continued traction with the Home as Sanctuary mega trend."); *see also* ¶ 110 (Q2 2021); ¶ 114 (Q3 2021); ¶¶ 117, 119 (Q4 2021); ¶¶ 123-24 (Q1 2022); ¶¶ 127-29 (Q2 2022). ¶ 109(b), (d), (h) (Q2 2021) ("key demand metrics" for HSB, including home consultations or sales leads "remained strong" and/or increased); *see also* ¶ 113 (Q3 2021); ¶ 118 (Q4 2021); ¶ 123 (Q1 2022); ¶ 128 (Q2 2022). ¶ 109 (e), (g) (Q2 2021) (shipments and/or sales orders for HSB were increasing); *see also* ¶ 113 (Q3 2021); ¶¶ 117-19 (Q4 2021)); ¶ 122 (Q1 2022). ¶ 109 (Q2 2021) ((production rates for HSB were increasing); *see also* ¶ 113 (Q3 2021); ¶¶ 117-19 (Q4 2021)). ¶¶ 109-10 (Q2 2021) (information related to lead times or backlog for HSB, which were sometimes characterized as "elevated" or "extended," and prior to Q1 2022 were stated to be increasing, and at Q1 2022 and after were stated to be "declining"); *see also* ¶¶ 112-14 (Q3 2021); ¶¶ 118-19 (Q4 2021)); ¶¶ 123-24 (Q1 2022); ¶¶ 127-29 (Q2 2022).

[8] *See* ¶ 109(d) ("Early in the third quarter, these key demand metrics have continued to trend even higher relative to prior year levels, including home consultations increasing at a strong double-digit rate."); ¶ 118(a) (home consultations or sales leads increased again in the fourth quarter"); ¶ 118(d) ("for the whole quarter, [IHCs were] up double digits"); *see also* ¶¶ 109(b), 109(e), 109(g), 109(h), 110(c), 112, 113(a), 113(d), 113(e), 117, 118, 119(b), 122, 123(a), 128(a), 128(d).

It is well established, however, that "[a]ccurate statements of historical fact, such as past financial results, are not actionable." *Anderson v. Abbott Labs*., 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Labs*, 269 F.3d 806 (7th Cir. 2001). Further, a statement that is "simply a true statement of historical fact" does not lead reasonable investors toward any conclusion about the future. *See Fulton Cnty. Ems.' Ret. Sys. v. MGIC Inv. Corp*., 2010 WL 5095294, at *9 (E.D. Wis. Dec. 8, 2010) (statement about available cash "did not lead reasonable investors toward any conclusion about whether the amount of cash would be sufficient to cover future margin calls"). Here, it is even more unreasonable for Plaintiffs to contend that Defendants' statements of historical fact could have misled investors about the future of HSB sales and demand, because Generac also made extensive cautionary disclosures about the uncertainties surrounding future sales and demand. *See* Sections IV(B)(1)(c), IV(B)(4), *infra*. The 19 statements identified in footnote 8 are not actionable and should be dismissed.[9]

> b) *The Complaint does not allege facts to show that the HSB Statements were misleading*

The Complaint also does not adequately explain how the HSB Statements were supposedly misleading, as the PSLRA requires. *See Cornielsen v. Infinium Capital Mgmt.*, LLC, 916 F.3d 589,599 (7th Cir. 2019). The Complaint instead relies on two speculative arguments, neither of which shows that any HSB Statement was misleading.

*First*, Plaintiffs speculate that HSB demand was actually weakening when Defendants made the HSB Statements during a thirteen month period from July 2021 to August 2022. Even if Plaintiffs' speculation and interpretations were accurate (they are not), the earliest Generac could have made any inferences about weakening demand was in November 2021, six months **after** the

---

[9] A court may evaluate and dismiss misstatements individually, rather than by theory of liability. *See Van Noppen Inc.*, 136 F. Supp. 3d. at 935 (examining and ruling on statements individually rather than categorically).

Class Period began. ¶¶ 193-95. This alone eliminates the alleged misstatements on July 28, 2021, August 3, 2021, and September 29, 2021—during the period when there are no allegations, or even speculation by Plaintiffs, that HSB demand was weakening. ¶¶ 109-112, 115.

Additionally, Plaintiffs do not allege any facts to show that HSB demand actually was weakening, or that Defendants knew that. Rather, Plaintiffs allege only that Defendants knew, at some point later than many of the alleged misstatements, that "close rates"—which Plaintiffs now claim were relevant to "the demand equation"—were declining. *See* ¶¶ 239, 269. From that speculation, Plaintiffs jump to the conclusion that overall HSB product demand must have been weakening when Defendants made their earlier statements. *See* ¶¶ 111, 115, 120, 125, 130.

"Demand" is not a defined or fixed financial term. There are many ways to assess "demand." In fact, the Complaint concedes that Defendants informed investors that there were "*[s]everal* key metrics that [Generac] monitor[s] closely for home standby demand." ¶ 60 (emphasis added). As the Company explained, "close rate . . . is ***part*** of that equation." ¶ 123(g) (emphasis added). Thus, even assuming that Plaintiffs' speculation that close rates were declining earlier is on point, the Complaint's own allegations demonstrate that there was a mix of many other metrics—including home consultations, incoming order rates, and product activations—used to assess "demand." *See, e.g.*, ¶¶ 123, 128. Moreover, the Complaint makes no allegations to challenge Generac's further disclosures that those other indicators pointed to continued ***strong*** HSB demand. *See* ¶¶ 111, 115, 120, 125, 130. The securities laws did not require Defendants to interpret and characterize the collection of metrics as Plaintiffs now do. *See Issen v. GSC Enters., Inc.*, 508 F. Supp. 1278, 1290 (N.D. Ill. 1981) ("[I]t is not deceptive for corporate insiders to fail to characterize the transaction . . . with pejorative nouns or adjectives or fail to draw adverse inferences from the facts disclosed. A reasonable shareholder may be required to draw his or her

16

own inferences."); *Koplin v. Labe Federal Sav. and Loan Ass'n*, 748 F. Supp. 1336, 1342-43 (N.D. Ill. 1990) ("[i]f the underlying facts are provided, shareholders can then draw their own conclusions" and "[d]efendants need not provide their own evaluations").

Even if close rates were the only true indicator of demand (they were not), Plaintiffs' self-serving speculation that close rate declines must be interpreted as weakening demand is also wrong. For example, declining close rates may be caused by extended lead times, all while consumer demand remains strong. Reducing lead times through increased production output may therefore reverse the close rate trend without reducing demand. This is precisely how the Company publicly interpreted the indicators. As the Complaint concedes, in Q2 2021, the Company started producing HSB units at a new facility, providing "much-needed capacity . . . to reduce lead times." ¶ 109(c). Increasing production more likely shows that Defendants believed that doing so was necessary to meet strong or increasing demand—*i.e.*, the Complaint does not explain why Generac was increasing production if Defendants secretly believed that demand was falling. *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[C]ourts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim.").

**Second**, the Complaint advances a convoluted theory, claiming that Defendants misrepresented HSB demand because they should have disclosed that HSB orders and backlog were "inflated" by certain sales practices. However, Plaintiffs simply speculate that sales promotions were causing dealers to order HSB units that were not allocated to end customers, that some unspecified portion of those orders were therefore likely to be cancelled or result in excess inventory, and that the Company's disclosures thus gave false impressions that demand was strong. *See, e.g.*, ¶ 120. In essence, Plaintiffs suggest that Generac engaged in channel stuffing, but their

17

Complaint does not come close to alleging facts to show that such a scheme actually existed. More importantly, courts in this Circuit have dismissed securities claims based on alleged channel stuffing where the allegations were far stronger. *See Harley-Davidson*, 660 F. Supp. 2d at 986-87 (dismissing misstatements based on alleged channel stuffing where complaint failed to "set forth statistics to place the allegations of 'excess dealer inventory' in context" and did not allege that defendant "was feeding product into distribution channels to boost numbers for a specific reporting period with the possibility that the product will be sent back soon after"); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 642 (N.D. Ill. 2020).

Moreover, the Complaint's allegations do not support Plaintiffs' speculation that sales were inflated. The Complaint noticeably does not allege that sales, in fact, were inflated, or that Defendants knew that. Rather, the Complaint alleges only that, at some unspecified point in 2022, "field inventory" was increasing. *See* ¶ 239. Inventory increases do not necessarily equate to inflated or artificial sales orders, as Plaintiffs speculate. Increased inventory may result from delays moving the product from dealer to end user, for example. Indeed, the Complaint elsewhere concedes that Defendants explained that HSB demand and orders were outpacing installation capacity during 2022, which directly contradicts Plaintiffs' theory. *See* ¶¶ 123(e). In that instance, inventory increases could signal precisely the strong demand that Defendants described.

<blockquote>c) <em>Context makes clear that the HSB Statements were not misleading</em></blockquote>

Plaintiffs' speculative theories also do not and cannot explain any reason the HSB Statements were misleading because, when read in context, they were not. The Supreme Court has emphasized that context is critical to the falsity inquiry in securities class actions. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) (courts must evaluate whether each alleged misstatement is false or misleading "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information"); *see also Chandler v.*

*Ulta Beauty, Inc.*, 2022 WL 952441, at *19 (N.D. Ill. Mar. 30, 2022) (on motion to dismiss, determining that statement was not false or misleading when read in context).

The Complaint's most befuddling theory is that the HSB Statements omitted to disclose to investors that the HSB demand uptick caused by COVID "was not a sustainable trend." ¶ 111(a); *see* ¶¶ 115(a), 120(a), 125(a), 130(a). This theory disintegrates when Defendants' full disclosures are considered. Put simply, Defendants *did* disclose both that the consequences of an unprecedented pandemic was driving increased HSB demand *and* that future demand was dependent on future developments that could not be predicted. (*See, e.g.*, ¶ 59 (Generac acknowledging that "home standby shipments [were] . . . primarily driven by robust demand as a result of the heightened awareness of the need for backup power since the onset of the COVID pandemic"); Ex. 1 at 15 ("the impact of COVID-19 on . . . demand for our products . . . may precipitate or exacerbate other risks and/or uncertainties . . . which may have a significant impact on the Company's operating results and financial condition, although we are unable to predict the extent or nature of these impacts at this time"). In fact, Generac's SEC filings devoted entire sections to discussing the unique "[i]mpact of COVID" and "[r]isk factors related to COVID-19." *See, e.g.*, Ex. 1 at 15; Ex. 2 at 19. There can be no doubt that investors were well aware that the increased HSB demand was driven by once-in-a-lifetime circumstances beyond Generac's control, and no reasonable investor could have read Defendants' disclosures to suggest that such unprecedented demand was indefinitely sustainable. *See Michalski v. Weber, Inc.*, 2023 WL 6290491, at *3 (N.D. Ill. Sept. 27, 2023) (dismissing similar claims concerning the sustainability of increased sales due to COVID-19); *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *11 (S.D.N.Y. May 19, 2023) (dismissing similar claims, regarding company's ability to manage changes in commodities prices during pandemic, as classic fraud by hindsight).

Separately, the Complaint's other allegations about supposed weakening demand also fall apart when the Company's statements are read together and in full, rather than considered in a vacuum, as the Complaint misleadingly does. For example, the Complaint alleges that on both November 2, 2021 and August 3, 2022 the Company concealed weakening demand while *simultaneously* disclosing the exact information Plaintiffs interpret to infer weakening demand. *Compare* ¶ 113 *with* ¶¶ 194-95; *compare also* ¶ 127 *with* ¶¶ 215, 218. Plaintiffs' contradictory pleading makes clear that, when read in context, the HSB Statements were not misleading. *See St. Lucie*, 2011 WL 814932 at *6 (no liability "where the facts and circumstances allegedly 'omitted or represented have actually been disclosed'"); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 195 (D. Conn. 2014) (company "had no duty to disclose the allegedly omitted information in light of the information that was [already] disclosed during the class period").

### 2. The Complaint fails to plead with particularity that the SnapRS Statements were false or misleading

The Complaint separately challenges general statements allegedly promoting Generac's PWRcell energy storage system (including statements about the system's sales growth, solution efficiency, and safety), and financial statement disclosures related to warranty and related liability reserves concerning the PWRcell.[10] The Complaint must plead facts to show that Defendants knew the scope and severity of the alleged SnapRS product issues at the time Defendants made their general statements, and that they also contemporaneously knew the alleged defects were exposing Generac to "significant and increasing liabilities." *See Pierrelouis*, 414 F. Supp. 3d at 1174 (without specific facts to demonstrate that an alleged product defect was "of 'a sufficient

---

[10] *See, e.g.*, ¶ 132(a) ("shipments of our PWRcell energy storage systems grew at a significant rate"); ¶ 133(a) ("capabilities by Pika and Neurio have enabled us to bring an efficient and intelligent energy-savings solution to the energy storage and monitoring markets"); ¶¶ 144(b), 148(a) (reporting changes in preexisting warranty reserves); s*ee also* ¶¶ 131-36, 138-40, 142, 144, 146-48, 151, 153, 169(b).

magnitude,' . . . plaintiffs' allegations do not support a reasonable belief that defendants' statements were false, misleading, or without a reasonable basis at the time they were made").

As an initial matter, Plaintiffs have not established that Defendants had a duty to disclose information about the alleged SnapRS issues. There is no affirmative duty to disclose all information that could affect a company's stock price. *Guidant*, 536 F. Supp. 2d at 928; *Abbott Lab*, 269 F.3d. at 808 ("[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose.").

The Complaint further fails to "offer specific, contradictory information known to Defendants" when they made their statements. *See Navistar*, 114 F. Supp. 3d at 651; *Harley–Davidson*, 660 F. Supp. 2d at 1000. "When one of the circumstances indicating falseness is the alleged existence of contemporaneous information inconsistent with a particular statement that was allegedly known only to the defendants, some detail about the alleged information, other than that its substance contradicted the substance of the identified statement, must be provided." *Pierrelouis*, 414 F. Supp. 3d at 1173-74. In *Pierrelouis*, the plaintiffs alleged that Gogo concealed a defect in its in-flight internet connection system that was inhibiting the product's performance, rendering statements optimistically describing the product and outlook misleading. *Id*. at 1168-69. The court granted the defendants' motion to dismiss. *Id*. at 1177. The court found that merely alleging that the defendants tracked and had access to reports from which service outages "would have been apparent" was not sufficient "to demonstrate that the [system] problems showed themselves to be of 'a sufficient magnitude'" and failed to provide "specific and particularized information about *when* the data revealed that the . . . [problem impacted performance], or when it became clear that costly remediation efforts were necessary." *Id*. at 1174. Here, while the Complaint alleges misstatements concerning the SnapRS beginning in April 2021, the Complaint's

allegations do not suggest that the Company knew about the scope and severity of alleged SnapRS issues until late in the Class Period. In addition, there are no allegations that do (or could) suggest that the alleged defect was exposing Generac to "significant liabilities."

Prior to August 2021, the Complaint alleges only a ***single instance*** of a SnapRS product supposedly failing. ¶ 78. Plaintiffs do not allege to whom at Generac (if anyone) the dealer supposedly reported this single failure, or that the Individual Defendants or other senior executives knew about this single failure. This alone renders the Complaint's allegations insufficient to plead knowledge of a misleading statement prior to August 2021. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) ("To establish corporate liability for a violation of Rule 10b–5 requires looking to the state of mind of the individual corporate official or officials who make or issue the statement."). The Court should thus dismiss all claims concerning the SnapRS statements on April 29, 2021, May 4, 2021, and July 28, 2021. *See* ¶¶ 131-35, 137.

For the period between August 2021 and "late 2021," the Complaint alleges that an unspecified "Generac executive" participated in an August 2021 conference call wherein a residential fire was discussed; the unnamed executive allegedly stated that Generac was investigating bulging and separating in the SnapRS, and was developing and testing an updated SnapRS model. ¶¶ 84-85. Also in August 2021, a Generac sales employee allegedly told a dealer that "a few" SnapRS units were found to be overactive and new firmware would address the issue. ¶ 87. The Complaint, however, does not allege any facts to suggest that there was yet a known severe or pervasive problem, or any reason to then conclude that the issue exposed the Company to "significant liabilities." In fact, the Complaint concedes that the sales employee believed that firmware updates would resolve the issue "quickly," and that the unnamed "Generac executive" made clear in August 2021 that the Company "had not yet identified the precise cause of the

[SnapRS overheating] issue." ¶¶ 84, 88. This eliminates the alleged misstatements on August 3, 2021, September 28, 2021, November 2, 2021, and November 4, 2021. *See* ¶¶ 136-41.

Between "late 2021" and May 2022, the Complaint alleges only that: (a) in late 2021, Generac began supplying dealers with a second generation SnapRS "to try to resolve the defect," (b) in December 2021, Generac and Pink Energy entered into an indemnification agreement, to include SnapRS-related claims, and (c) in May 2022, Generac agreed to send notices to certain Pink Energy customers. ¶¶ 91, 93, 95(a). Although Plaintiffs make claims about what ***Pink Energy*** supposedly knew, none of those allegations demonstrate that ***Defendants*** knew the scope or severity of the alleged product issues, or the potential liabilities associated with them, during this period. The alleged misstatements on February 16, 2022, February 22, 2022, April 26, 2022, May 4, 2022, and May 9, 2022 should be dismissed. *See* ¶¶ 142-149.

After May 2022, the Complaint alleges that: (a) in June 2022, Mr. Jagdfeld responded to an email regarding "continued incidents of burned and melted SnapRS devices" and related firmware updates; (b) in June 2022, Generac "acknowledged a near 50% failure rate in the SnapRS units;" and (c) in July 2022, Generac informed Pink Energy that numerous customers did not receive the firmware update. ¶ 95. Even if these allegations were sufficient to demonstrate that Generac was becoming aware of more widespread SnapRS problems, the Complaint still makes no allegation that potential liabilities were significant enough to require disclosure at that time, thus eliminating the last alleged misstatements on August 8, 2022. *See* ¶ 151.

The Complaint then concedes that Generac did ultimately conclude in October 2022 that the liabilities became more certain and estimable, and did make disclosures consistent with these conclusions. ¶ 230. Thus, the Complaint's entire theory is nothing more than Plaintiffs second-guessing the ***timing*** of Generac's disclosures, without any facts to show that earlier disclosures

were required. That is not enough to state a claim. *Fryman*, 462 F. Supp. 3d at 896-900 (allegations of misleading statements and omissions in connection with adequacy of loss reserves were insufficiently pleaded where they alleged no contemporaneous knowledge by defendants of any specific information inconsistent with the adequacy of the reserves).

### 3. The Complaint fails to plead with particularity that the Dealer Statements were false or misleading

Plaintiffs separately take issue with general statements about the Company's distribution network, including its breadth and Generac's expansion efforts (the "***Dealer Statements***").[11] The Complaint claims that the statements omitted to disclose that a single dealer, Pink Energy, supposedly accounted for more than half of Generac's solar product sales. These allegations fail because (1) Defendants had no duty to disclose such granular sales volume data; (2) the Complaint does not establish any reason the Dealer Statements were misleading; and (3) the Complaint takes the Dealer Statements out of context.

#### a) *No duty to disclose sales figures on a dealer-by-dealer basis*

Defendants had no affirmative duty to disclose the details of Generac's agreements with distributors or the volume of sales each contributed, and the Complaint cites none. *In re Supreme Indus., Inc. Sec. Litig.*, 2019 WL 1436022, at *3 (N.D. Ind. Mar. 29, 2019) (failure to disclose the breakdown of the backlog figure did not render the figure "so incomplete as to be misleading").

#### b) *The Complaint fails to explain how the Dealer Statements were supposedly misleading*

The Complaint also fails to satisfy the PSLRA because it does not allege any facts to support Plaintiffs' speculation that solar product sales were highly concentrated in Pink Energy. Rather, the Complaint cobbles together disparate, unverified guesses to jump to Plaintiffs' "high

---

[11] *See* ¶¶ 155-58, 160-61, 163-64, 166-67, 169(a), 170.

concentration" conclusion. The Complaint first cites a purported "*estimate*" from an October 19, 2022 third-party analyst report of "~30k" in "total number of deployed GNRC PWRcell systems." ¶ 234. Neither the analyst or the Complaint explain what "deployed" means, the time period this estimate covers, or the source, assumptions, or methodologies used to make the estimate. Then, the Complaint cites a ***different source***—Pink Energy's August 1, 2022 lawsuit—and cherry-picks an unverified allegation that Pink Energy had "approximately 19,000 customers with solar energy systems that utilized the . . . SnapRS." ¶ 94. The Complaint again does not explain the period this number allegedly covers or how the number is comparable to the analyst's "deployed" systems figure. The Complaint then divides apples into oranges—19,000 into 30,000—and concludes therefore that "Pink Energy accounted for more than half of Generac's solar revenue." ¶ 248, n.23. Such allegations cannot create a plausible inference that Pink Energy indeed accounted for more than half of Generac's solar revenue. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 445 (7th Cir. 2011) (affirming dismissal because allegations relied on other complaints against company and plaintiffs' data lacked context); *A.O. Smith*, 468 F. Supp. 3d at 1061 (allegations that company should have disclosed dealer relationship were not misleading, in part, because plaintiffs did not explain source of data or conclusion about associated sales volume); *Michalski*, 2023 WL 6290491, at *5 (omission theory flawed; relied on an "apples-to-oranges comparison" of statistics that measured "different things").

In any event, the Complaint takes the Dealer Statements entirely out of context. The Complaint's theory relates specifically to the concentration of sales for "solar products." *See, e.g.*, ¶ 159. However, all but one[12] of the 34 Dealer Statements discussed a much broader group of products—the installer network and distribution partners for:

- All of Generac's products, including references to the "global distribution network" and "expanded distribution" generally. ¶¶ 156(a), 156(c), 158(b), 161(b), 164, 167(b), 170(b).

- Residential products, which includes standby generators, portable and inverter generators, portable battery solutions, outdoor power equipment, turf care products, clean energy products, smart home energy management devices, and sensors. ¶¶ 156(b), 158(a), 161(a), 164(e), 167(a), 170(a).

- Clean energy products and solutions, which includes solar, battery storage, and grid services applications. ¶¶ 155, 157(a), 157(b), 163, 166, 169.

The Complaint fails to explain how general statements describing Generac's product-wide distribution network could mislead a reasonable investor about the far more narrow universe of dealers for solar products. *See Omnicare*, 135 S. Ct. at 1330.

### 4. Forward-looking statements are protected by the PSLRA safe harbor

Several of the alleged misstatements regarding each of Plaintiffs' three theories are quintessential forward-looking statements protected by the PLSRA's safe harbor provisions.[13] A

---

[12] As explained in Section IV(B)(5) and footnote 15, *infra*, a February 22, 2022 statement concerning "solar contractors," ¶ 164(c), was merely a general statement about growing the base of solar contractors.

[13] Such statements include (emphases added): "our net sales during 2021 ***are expected to be***" (¶ 110(c)); "our capacity for residential standby is going to be" (¶ 112); "home standby backlog ***projected to be***" (¶ 113(b)); "we ***anticipate*** the order rate . . . [to be]" (¶ 118(c)); "our net sales during 2022 are ***expected to*** experience an increase[ed] trend" (¶ 119(b)); "as we continue to make further progress in building out" (¶ 155(b)); "as we build out" (¶ 157(b)); and "[f]or the full year 2022, we ***expect*** net sales of these clean energy products and solutions to approximately double" (¶169(b)); *see also* Appendix 1.

forward-looking statement is defined broadly, and includes projections, "plans and objectives of management for future operations," disclosures about "future economic performance," and assumptions underlying such statements. 15 U.S.C. § 78u-5(i)(1). Forward-looking statements are **not** actionable when they are either (1) accompanied by meaningful cautionary language **or** (2) the complaint fails to plead that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1); *see Plumbers & Pipefitters Local Union v. Allscripts-Misys Healthcare Sols.*, 778 F. Supp. 2d 858, 876 (N.D. Ill. 2011) ("A plain reading of the statutory safe harbor language reveals that it contains two prongs which are joined by the disjunctive 'or.'").

First, the forward-looking statements were accompanied by meaningful cautionary language, which warned investors that the stated expectations could be impacted by a number of factors, including COVID, consumer spending, "claims and lawsuits related to product design, safety, manufacture and performance liability," "product liability claims in the event that the use of our products is alleged to have resulted in injury or other damage," and impairment or loss of a dealer relationship. Ex. 1 at 17, 19; Ex. 7 at 19; Ex. 2 at 10, 19; *see also infra* at Section IV(B)(6). Such cautions cover each forward-looking statement that the Complaint alleges to be misleading, and are the type of cautionary language courts routinely find trigger the safe harbor. *See, e.g.*, *Plumbers*, 778 F. Supp. 2d at 875 (cautionary statements pointing to the principal contingencies that could have caused actual results to depart from projections); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1166-67 (N.D. Ill. 2004) (description of factors that could cause future operating results to be unfavorable); *St. Lucie*, 2011 WL 814932, at *10 (cautionary statements regarding product demand, growth, and negotiations with a key supplier).

Second, the challenged forward-looking statements were further protected by the safe harbor because the Complaint fails to allege any facts to plead actual knowledge of their alleged

falsity, and are thus not actionable. *See supra* at Section IV(B) and *infra* at Section IV(C)(2).

### 5. Statements expressing corporate optimism are not actionable

The vast majority (approximately 87) of the alleged misstatements under all three of Plaintiffs' theories were mere puffery, which courts routinely deem inactionable. General statements of corporate optimism or favorable characterizations of matters such as product growth, HSB demand, and dealer capabilities are "so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *See Midway Games*, 332 F. Supp. 2d at 1164.

Many of the alleged misstatements merely expressed general confidence in product demand, growth and success.[14] Courts in this Circuit and others have consistently found similar statements to be "immaterial, non-actionable corporate puffery." *See Guidant*, 536 F. Supp. 2d at 928 n.15. (statements expressing "confiden[ce]" about market growth and performance were non-actionable puffery); *see also St. Lucie*, 2011 WL 814932, at *7 (statements regarding "strong balance sheet" and "proven record of growth" are "immaterial puffery"); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *9 (N.D. Ill. Sept. 23, 2008) ("[s]tatements regarding . . . proven record of growth,' making 'Motorola well-positioned to continue creating value,' is [sic] so vague and unspecific that no reasonable investor would rely on it"); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 792 (S.D.N.Y. 1997) (statements of "continued strong demand" were "nothing more than loose prophecies of future performance communicating only vague expectations").

The Complaint's criticism of statements touting the Company's growth capabilities

---

[14] *See, e.g.*, ¶ 109(a) (HSB demand "remains incredibly robust"); ¶¶ 109, 110, 113-14, 117-19, 123-24, 127-29 (also discussing HSB demand); ¶¶ 109, 113, 118, 123, 128 (describing indicators of HSB demand as "strong" or "increased"); ¶¶ 132(b), 135(b), 139(b), 142(c) ("key performance indicators for our clean energy-related initiatives continue to show favorable trends"); ¶ 139(a) ("the increasing penetrations of solar installations are also driving rapid growth for our clean energy product offering"); *see also* Appendix 1.

through partnerships, strength of its dealer network, and ability to distribute products across many channels fare no better.[15] Broad statements hyping the company or expressing vague aspirations to drive growth and references to ability to distribute products across many channels are inactionable corporate puffery. *See Van Noppen*, 136 F. Supp. 3d at 940 (indefinite predictions of growth are puffery; optimistic rhetoric and hype is a form of puffery); *Midway Games*, 332 F. Supp. 2d at 1164 (non-actionable statements of puffery are "general, optimistic statements that are not capable of being objectively verified"); *Roth v. OfficeMax, Inc.*, 2006 WL 2661009, at *4 n.3 (N.D. Ill. Sept. 13, 2006) ("combined office products business will be strategically stronger and better able to deliver compelling value to its customers through all channels and across all segments of the market" was "merely unactionable puffery").

Finally, alleged omissions cannot make a statement misleading when it merely describes in general terms corporate policies or risk factors.[16] The allegedly misleading risk disclosures here are "too general to be actionable" and no reasonable investor would conclude that any one of them promised the events addressed had never or would never occur. *See Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *17 (N.D. Ill. May 24, 2022) (SEC filing included a risk factor about potential employee misconduct—

---

[15] *See, e.g.*, ¶ 117 ("we enter 2022 with considerable visibility and momentum"); ¶¶ 133(a), 136, 140(b) ("[t]he capabilities provided by Pika and Neurio have enabled us to bring an efficient and intelligent energy-savings solution"); ¶ 163(b) ("[a] key component of future growth for our clean energy offerings is establishing and developing our distribution network"):¶ 163(c) ("our expanding distribution continue to drive growth for our clean energy solutions"); ¶ 164(b) ("[w]e believe our global distribution network is a competitive advantage"); ¶ 164(c) ("we have been leveraging these dealer development practices to assist in growing our base of solar contractors").

[16] *See* ¶¶ 119 (c) ("a significant decrease in the demand for our products . . . could cause actual results to differ"); 133(b) ("increase in product and other liability claims or recalls . . . could affect our actual financial results"); 144(a) (risk factor regarding exposure to product liability claims); 156(c) (noting Company "attempt[s] to" mitigate risk factors through, among other things, expanded distribution); 164(d) (risk factor regarding impairment or loss of dealer relationship); 138, 146 (statements in annual ESG reports that Company maintains a "product safety function," regularly reviews product safety concerns, and regularly performs design reviews and testing).

even though company already knew employees did engage in misconduct; "[n]o reasonable investor would conclude that, in making this disclosure, [the company] promised that no employee misconduct had ever occurred"). Moreover, statements regarding company policies or codes of conduct are not actionable when, like here, they are inherently aspirational or do not imply compliance. *See Silverman*, 772 F. Supp. 2d at 932 (ethics code requiring executive to "diligently look for indications that unethical or illegal conduct has occurred and report it" is inherently aspirational); *Desai v. General Growth Props.*, 654 F. Supp. 2d 836, 857-59 (N.D. Ill. 2009) (ethics code that prohibited officers and directors from making loans to other officers and directors did not imply that all were in fact in compliance).

### 6. Allegations regarding SEC Regulation S-K do not plead falsity

Plaintiffs argue that Defendants are liable under § 10(b) because they supposedly omitted certain known trends and risks for which Items 303 and 105 of SEC Regulation S-K ("Reg S-K") required disclosure. ¶¶ 173-179. However, Items 303 and 105 do ***not*** confer an independent private right of action. *See, e.g.*, *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140, 1157 (N.D. Ill. 1995) ("violation of an exchange rule [governing disclosure] will not support a private claim" and "may [not] be imported as a surrogate for . . . analysis under § 10(b)"). Many circuits and courts within the Seventh Circuit have thus concluded that Reg S-K does not impose a duty that can give rise to a shareholder action under the Exchange Act (like this one). *See Abbott Labs.*, 140 F. Supp. 2d at 909 ("Item 303(a) does not give rise to private action under Rule 10b."); *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2016 WL 5720375, at *14 (N.D. Ill. Sept. 30, 2016) (dismissing statements because they were based on Reg S-K violations that do not give rise to a private right of action under § 10(b)); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of § 10(b)."). For this reason alone, the allegations in ¶¶ 173-179 do not save the Complaint's failure to adequately plead falsity.

In any event, the Complaint's allegations do not establish that such a violation occurred here. Item 303 requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on sales or revenues or income from continuing operations." 17 C.F.R. § 303(b)(2)(ii). The Complaint contends that Generac's financials did not disclose the HSB Demand, SnapRS, and Dealer Concentration Theories, but does not allege facts to show how any of these omission theories:

- constituted a *"trend"* or *"uncertainty,"* given that Plaintiffs failed to sufficiently allege the theories, and certainly do not allege facts to support that there was a sustained change related to any of them, as explained *supra* at Sections IV(B)(1)(b), (B)(2), (B)(3)(b);

- was a *"known"* trend or uncertainty, given both that one cannot know something that does not exist and because Plaintiffs failed to sufficiently allege knowledge, as explained *supra* at Section IV(B) and *infra* at Section IV(C)(2) (*see Conagra Brands*, 495 F. Supp. 3d at 647 ("Even if Plaintiffs could enforce Item 303's disclosure requirements through the federal securities laws, they do not adequately allege any known trend or uncertainty within Item 303's scope that Defendants failed to disclose.")); or

- could qualify as a trend or uncertainty that had, or that Defendants expected would have, "a *material* favorable or unfavorable impact on sales or revenues or income from continuing operations," in light of clear public knowledge regarding COVID's effect on HSB demand and the immateriality of clean energy sales, as explained *infra* at Section IV(D).

Item 105 requires SEC filings to include "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. The Complaint elsewhere concedes that Generac made risk disclosures. *See, e.g.,* ¶¶ 119(c), 133(b), 144(a), 164(d). But when attempting to plead falsity, the Complaint ignores the dozens of risk factors and discussions in Generac's SEC filings that squarely and repeatedly addressed the risks attendant to each of Plaintiffs' theories:

- With respect to the HSB Demand Theory –
  - "[E]levated power outage activity and the emergence of the 'Home as a Sanctuary'

trend driven by the COVID pandemic led to a significant increase in demand for home standby generators." Ex. 2 at 21; Ex. 1 at 25.

- "[T]he impact of COVID-19 on the economy, demand for our products, and impacts to our operations . . . may precipitate or exacerbate other risks and/or uncertainties . . . which may have a significant impact on the Company's operating results and financial condition, although we are unable to predict the extent or nature of these impacts at this time." Ex. 2 at 9; Ex. 1 at 15.

- "The further extent of the impact of COVID on our business is dependent on future developments, including the duration of the pandemic . . . and the related length of its impact on the global economy and our customers." Ex. 2 at 18-19; Ex. 1 at 24.

• With respect to the SnapRS Theory –

- "We are currently and, may in the future be, involved in various claims and lawsuits related to product design, safety, manufacture and performance liability." Ex. 1 at 19.

- "We may incur costs and liabilities as a result of product liability claims. We face a risk of exposure to product liability claims in the event that the use of our products is alleged to have resulted in injury or other damage." Ex. 2 at 10; Ex. 1 at 16; *see also* ¶ 144(a).

• With respect to the Dealer Concentration Theory –

- "Impairment of our relationships with our distributors, dealers or large customers, loss of a substantial number of these distributors or dealers or of one or more large customers . . . could materially reduce our sales and profits. Also, our ability to successfully realize our growth strategy is dependent in part on our ability to identify, attract and retain new distributors . . . and we cannot be certain that we will be successful in these efforts." ¶ 164(d); Ex. 2 at 10; Ex. 1 at 17.

Plaintiffs' preference-by-hindsight for a more granular breakdown of risk disclosures is irrelevant—that is not what the law requires. *See Brasher v. Broadwind Energy, Inc*., 2012 WL 1357699, at *15 (N.D. Ill. Apr. 19, 2012) ("[T]he complaint reads as if Plaintiffs believe Defendants should be held liable not for failing to disclose risks, but for failing to surround truthful disclosures with flashing lights and arrows. Investors might prefer that, but the securities laws do not require it."); *Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *9 (C.D. Cal. Jan. 25, 2021) (where key risk categories were disclosed, a demand under Items 303 and 105 for "a more granular breakdown of the [risk] data" failed).

### 7. Allegations of supposed GAAP violations do not plead falsity

Plaintiffs' other bootstrap falsity argument is that Generac's SEC filings did not comply with GAAP—specifically ASC 450—which allegedly rendered certain statements misleading. ¶¶ 180-91. ASC 450 requires that an estimated loss from a loss contingency shall be accrued if available information indicates that it is probable, and the amount of the loss can be reasonably estimated. ASC 450-20-25-2; ¶ 185. ASC 450 further requires that when accrual is not required, the loss contingency must be disclosed if it is reasonably possible; that is, if the likelihood that it will occur is more than remote but less than likely. ASC 450-20-50-3; 450-20-20 Glossary; ¶ 184. The Complaint grudgingly concedes that Generac *did* accrue a SnapRS-related loss in its Q3 2022 audited financial statements; Plaintiffs nonetheless speculate that the requirements for accrual were met two quarters earlier. ¶ 187.

None of the Complaint's allegations show that a potential SnapRS-related loss was either reasonably estimable or reasonably possible *before* Q3 2022. Indeed, the Complaint itself demonstrates that any potential liability was *not* estimable earlier, as it describes that Generac did *not* know by Q1 2022 the fix it was going to implement. ¶ 187. The Complaint also critically fails to allege that any potential loss from the SnapRS issue was likely to be material. *See* ASC 105-10-05-6 (ASC 450 does not apply to immaterial items). As discussed *infra* at Section IV(D), SnapRS-related revenue and the loss contingency the Company recorded in Q3 2022 were both immaterial.

### C. The Complaint Fails To Adequately Plead Scienter

Plaintiffs' securities fraud claim should be dismissed for the independent reason that the Complaint fails to state facts, with particularity, giving rise to a strong inference that Defendants acted with scienter. *See* 15 U.S.C. § 78u-4(b)(2)(A). The "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324. Accordingly, a complaint will survive only "if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. The standard applied to scienter is an incredibly high requirement for the Complaint to meet—indeed, the Supreme Court has noted that the PSLRA's "strong inference standard unequivocally raised the bar for pleading scienter." *Id*. at 321. Accordingly, courts routinely dismiss securities fraud claims for failure to clear the bar. *See Pierrelouis*, 414 F. Supp. 3d at 1176. Here, none of the Complaint's scienter allegations are the type of particularized, cogent, and compelling allegations required by the law. They are instead the kinds of boilerplate allegations that courts routinely find insufficient to plead scienter.

### 1. Group pleading allegations are insufficient to plead scienter

As a threshold matter, the Complaint fails because it impermissibly relies on group pleading allegations, claiming that the undifferentiated "Individual Defendants" or unspecified actors supposedly made misstatements with scienter.[17] The Seventh Circuit has expressly rejected group pleading as insufficient to allege scienter under the PSLRA. *See Cornielsen*, 916 F.3d at 601-02 (group pleading makes "it impossible to assess the statements any individual defendant made . . . against the information he allegedly possessed at the time he made them"); *DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708, 718 (N.D. Ill. 2005) ("Group pleading allegations are insufficient under the PSLRA to establish scienter on the part of each individual defendant.").

Relatedly, for each alleged misstatements attributed to "Generac" (*e.g.*, statements in the Company's SEC reports), the Complaint must identify the individual(s) responsible for the alleged misstatement **and** particularized facts giving rise to a strong inference of that individual's scienter. *See Cornielsen*, 916 F.3d at 599-601. The Complaint does not even attempt to identify the

---

[17] *See, e.g.*, ¶¶ 252 ("[t]he Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements"); 268 ("the Individual Defendants' refusal and reluctance to provide details on key demand metrics for Generac's HSB generators further supports a strong inference of scienter"); *see also* ¶¶ 252-58, 260-62, 264-67, 269-72, 275-76.

individual(s) responsible for any alleged misstatement attributed to Generac. For this reason alone, the alleged misstatements in ¶¶ 252-58, 260-62, 264-67, 269-72, 275-76 should be dismissed.

### 2. The Complaint fails to plead actual knowledge

As to the all of the alleged misstatements, the Complaint fails to allege facts to support a strong inference that Messrs. Jagdfeld or Ragen had actual knowledge of facts that allegedly contradicted their statements, or would have put them on notice that their statements were misleading, at the time they made the statements.[18] Plaintiffs' attempt to plead actual knowledge specific to Messrs. Jagdfeld or Ragen consist of only the following:

- As to the HSB Demand Theory, no allegations that either Messrs. Jagdfeld or Ragen knew HSB demand was weakening; only that (i) Mr. Jagdfeld stated that "we" knew about a negative impact on close rates by approximately May 2022 (¶¶ 239, 269), (ii) Mr. Jagfeld reported lead times for HSB in September 2021, which the Complaint alleges had decreased (¶ 194); and (iii) Mr. Jagdfeld stated in November 2022 that "we could see field inventory building" (¶ 239).

- As to the SnapRS Theory, no allegations that either Messrs. Jagdfeld or Ragen knew the scope of the alleged product issues or that they were exposing Generac to increased liabilities; only that, in June 2022, Mr. Jagdfeld responded to an email regarding certain incidents of SnapRS failures and firmware updates (¶ 95(b)).

- As to the Dealer Concentration Theory, no allegations of actual knowledge at all.

***None*** of these allegations concern Mr. Ragen. As to Mr. Jagdfeld, even accepting the allegations as true, knowledge of HSB close rates in early- to mid-2022, HSB lead times in late 2021, or HSB inventory in November 2022 would not have put Mr. Jagdfeld on notice that his HSB Statements were misleading at the time they were made, particularly when other indicators consistently suggested that HSB demand remained strong (*see* supra at Section IV(B)(1)(b)). Similarly, the only conclusion one could reach about knowledge in June 2022 about certain SnapRS incidents was that Mr. Jagdfeld was aware that the Company was conducting testing and

---

[18] The Complaint does not allege that any other individual made any of the alleged misstatements.

rolling out solutions to resolve the issue. *See* ¶ 95(b). These vague and limited allegations certainly do not support "an intent to deceive demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *See Higginbotham*, 495 F.3d at 756; *see Pierrelouis*, 414 F. Supp. 3d at 1176. Further, as in *Pierrelouis*, "the complaint contains so little factual detail about what defendants knew and when, there might be any of a number of different plausible explanations for why defendants did not disclose more facts about the [product issuers] to investors at an earlier date." *Id*.

### 3. Motive-and-opportunity allegations are insufficient to plead scienter

The Complaint's general allegations of financial motive and opportunity are insufficient to establish a strong inference of scienter. *See Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939-40 (7th Cir. 2018) ("[A] generalized motive common to all corporate executives is not enough to establish scienter."); *Atlantis Cap. LLC v. AGS Specialist Partners*, 533 F. Supp. 2d 828, 831 (N.D. Ill. 2008) (allegations that described the same motive and opportunity for every employee in the same role were insufficient). Specifically, the Complaint's allegations that the Individual Defendants could increase their compensation by driving Generac's stock price higher and by delivering on the Company's key initiatives (¶¶ 256-260, 275) are the kind of boilerplate allegations that are regularly rejected as insufficient to plead scienter. *See Plumbers & Pipefitters Local Union 719 Pension v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (incentives to act "in order to keep their jobs, improve their bonuses, and increase the value of their stock options" were too generic); *In re Brightpoint, Inc. Sec. Litig.*, 2001 WL 395752, at \*13 (S.D. Ind. Mar. 29, 2001) ("[A] plaintiff cannot allege scienter based merely upon a defendant's position within the company, a desire to increase incentive compensation, or similar factors that would be true for nearly all corporate executives."); *Conagra Brands*, 495 F. Supp. 3d at 665 (motive to increase company value is insufficient). In addition, the Individual Defendants'

alleged opportunity to commit fraud based on their "control[] [of] the Company's strategies, decisions, and messaging to the investing public" (¶¶ 252-54) is similarly insufficient; such allegations could again be made against any executive in America. *See Guidant*, 536 F. Supp. 2d at 932 (allegations that defendants "had direct involvement in day-to-day operations, and controlled the dissemination of information by the company" were "entirely conclusory").

### 4.    Insider stock sales are insufficient to plead scienter

As the Seventh Circuit has held, "because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Trib. Co*., 521 F.3d 686, 695 (7th Cir. 2008); *see Johnson v. Tellabs, Inc*., 262 F. Supp. 2d 937, 955 (N.D. Ill. 2003) ("[M]ere allegations of insider trading during the purported class period alone are not enough to sufficiently allege a strong inference of scienter."). Accordingly, the Complaint here (¶¶ 273-74) must provide context sufficient to demonstrate that the Individual Defendants' Class Period stock sales were unusual or suspicious. *Kohl's Corp.*, 266 F. Supp. 3d at 1168; *see Garden City Emps.' Ret. v. Anixter Intern., Inc.*, 2011 WL 1303387, at *30-31 (N.D. Ill. Mar. 31, 2011) (rejecting trading allegations for failure to provide context). "In determining whether the allegations rise to this level, the Court can consider the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history." *Fryman*, 462 F. Supp. 3d at 904.

Here, the Complaint's recitation of gross sale proceeds, rather than net profits, establishes nothing about scienter. *See Garden City Emps.' Ret. v. Anixter*, 2012 WL 1068761, at *14 (N.D. Ill. Mar. 29, 2012) ("pleading only gross proceeds . . . is insufficient to support a strong inference

of scienter"). The Complaint also says almost nothing about the context or timing of the sales.[19]
*See Ulta Beauty, Inc*., 2022 WL 952441, at *29 ("[T]he Seventh Circuit has emphasized that 'the probative value of stock sales depends greatly on timing.'"). This is unsurprising, given that all of the sales were executed either pursuant to Rule 10b5-1 plans[20], to satisfy tax obligations associated with restricted stock unit vesting or equity awards[21], or otherwise constituted a small percentage of total holdings[22]. Such sales do not plead scienter. *Guidant*, 536 F. Supp. 2d at 931 (no scienter where some sales were made pursuant to 10b5-1 plans and others were small percentage of defendants' holdings); *Garden City*, 2012 WL 1068761, at *13 (stock sales pursuant to a 10b-5 trading plan "negates an inference of scienter"); *see Elam v. Neidorff*, 544 F.3d 921, 928-29 (8th Cir. 2008) (same); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. 2016) (disposition of shares to pay taxes does not demonstrate motive to defraud); *see Harley-Davidson*, 660 F. Supp. 2d at 1002 (sales of 5.7%, 6.4%, and 18.1% of personal holdings were not suspicious).

Messrs. Jagdfeld and Ragen also retained significant holdings. Mr. Ragen's holdings actually ***increased*** during the Class Period, and Mr. Jadgfeld's holdings decreased by less than 8%. *Compare* Ex. 28 *with* Ex. 29; *compare* Ex. 9 *with* Ex. 27. This again ***refutes*** any inference of scienter. *Harley-Davidson*, 660 F. Supp. 2d at 1001 (noting one defendant "actually increased

---

[19] The Complaint discusses only one instance of timing, alleging a specific sale by Mr. Ragen during the Class Period that was made ***after*** information about supposedly declining HSB sales was allegedly revealed. ¶¶ 274. If anything, this weighs against an inference of scienter, as it does ***not*** suggest that Mr. Ragen sought to benefit from a stock price that he knew was inflated by fraud.

[20] A 10b5–1 plan is an agreement "which allows corporate insiders to set a schedule by which to sell shares" over time, and which can "raise an inference that the sales were pre-scheduled and not suspicious." *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003).

[21] *See* Exs. 9-28.

[22] Only one of each of Messrs. Jagdfeld's and Ragen's sales was not pursuant to a 10b5-1 trading plan or to satisfy tax obligations. Both sales were only small fractions of their total holdings. Ex. 18 (Mr. Jagdfeld's February 2022 sale of less than 5% of his total holdings); Ex. 28 (Mr. Ragen's November 2021 sales of approximately 8% of his total holdings).

personal holdings during the class period" and finding no inference of scienter even where other defendants sold stock); *Supreme Indus.*, 2019 WL 1436022, at *10 ("The fact that insiders retained significant holdings weighs against any inference of scienter.").

### 5. Allegations about status, access to information, and "core operations" are insufficient to plead scienter

The Complaint's allegations concerning the Individual Defendants' roles in the Company and their supposed access to "confidential and proprietary" information (¶¶ 255-260) also do not support an inference of scienter. *See Guidant*, 536 F. Supp. 2d at 932 (allegations that defendants were "core members of the senior management team" and "privy to proprietary information about [the company's] growth and financial condition, had direct involvement in day-to-day operations, and controlled the dissemination of information by the company" were "entirely conclusory" and do not plead scienter). The Complaint attempts to obscure its deficiency by devoting pages to allegations that the Individual Defendants closely monitored the HSB and solar businesses, yet it fails to plead any details about specific information that would have alerted them to an alleged misstatement. District courts in the Seventh Circuit routinely find allegations of scienter inadequate for this reason. For example, in *Chandler*, the court rejected allegations that "senior executives [] monitor[ed]" the levels of inventory and other metrics as insufficient to infer scienter because plaintiffs failed to identify which specific defendant possessed which specific information at which specific time that "would have meant either knew that any of the alleged misrepresentations were false." 2022 WL 952441 at *27-28; *accord Fryman*, 462 F. Supp. 3d at 902 (that defendants, through "close monitoring of claims, 'had access to information that undermined the veracity'" of their statements" failed to "state with particularity the information to

which defendants had access"); *Guidant*, 536 F. Supp. 2d at 932.[23]

### 6. Allegations about the Individual Defendants' "public admissions" are insufficient to plead scienter

The Complaint alleges that, because the Individual Defendants often spoke about HSB demand, the PWRcell system, and Generac's dealer network, the Court should infer scienter. ¶ 267. However, courts have repeatedly found that, standing alone, statements by defendants holding themselves out to the public as knowledgeable about the company are insufficient to establish scienter. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (individual defendants' "senior positions in the company" and "holding themselves out as knowledgeable about Nokia's products" were generalized allegations insufficient to plead scienter). Likewise, the Complaint's allegations that failing to voluntarily provide certain metrics or respond to analyst questions in a manner that Plaintiffs deem adequate in hindsight (¶ 268) does not raise a strong inference of scienter. The "securities laws do not impose . . . an obligation of absolute and instantaneous disclosure" and, absent such an obligation, Plaintiffs cannot rest inference of scienter on allegations that Defendants "should have disclosed more information." *Gaines v. Guidant Corp.*, 2004 WL 2538374, at *17 (S.D. Ind. Nov. 8, 2004).

Lastly, Plaintiffs' attempts to infer scienter through late Class Period statements (¶¶ 269-270) are nothing more than impermissible fraud by hindsight. *See Fryman*, 462 F. Supp. 3d at 899 (that reserves were increased later is insufficient for pleading defendants must have known earlier that they were inadequate; such a theory is "a classic example of impermissible fraud by

---

[23] Although not clear from the Complaint, to the extent Plaintiffs are attempting to invoke the "core operations" doctrine, it does not solve their failures to plead scienter. For example, although courts permit the inference that executives "must have known" certain facts where the subject at issue is critical to a business's core operations, the Complaint still must allege facts to establish the "core operation," and specific internal data that actually existed and contradicted the Individual Defendants' statements. *Fryman*, 462 F. Supp. 3d at 902. The Complaint does not allege that.

hindsight") (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990)).

### D. The Alleged Misstatements And Omissions Were Immaterial

Nonpublic information is considered "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Plaintiffs' theories fail because (1) investors knew that HSB demand was significantly impacted by COVID, and (2) the SnapRS and dealer issues were immaterial.

#### 1. Generac disclosed that HSB demand was significantly impacted by COVID, and remained uncertain and unpredictable

Even assuming Defendants omitted some information from their disclosures, such omissions are not actionable if the information is reasonably believed to be known to investors. *Id.*; *see also City Nat'l Bank v. Vanderboom*, 422 F.2d 221, 231 (8th Cir. 1970) (failure to disclose material facts "will not lead to liability under 10b-5 where the plaintiff himself has the ability and opportunity to discover those facts easily"). Here, the Complaint concedes that Generac disclosed that HSB demand was benefiting from a change in consumer behavior caused by COVID. *See, e.g.*, ¶ 59. Plaintiffs complain, however, that the Company did not expressly say that this demand boost was an "unsustainable trend." *See, e.g.*, ¶ 59. It is facially absurd to suggest that Generac knew not only how COVID would unfold, but also what consumer behavior would look like when the world emerged from the pandemic. No one knew that.

Moreover, analyst questions and commentary confirm that the investing market understood both that HSB demand increased due to COVID and that it may wane in the post-COVID world. For example, during Generac's May 4, 2022 earnings call, an analyst asked what the Company could do to drive HSB demand "next year once it's a 'normal environment.'" ¶ 123(d); Ex. 5 at 12. Similarly, an October 20, 2022 analyst report noted that it "view[ed] Generac's story as similar

to companies that realized COVID-related benefits" and that "[t]he market is now trying to determine the appropriate long-term growth rate for these businesses after a sharp increase in sales in recent years." ¶ 246; Ex. 30 at 2. In short, Plaintiffs' complaint that Defendants did not predict the future—accurately or otherwise—or warn investors of future uncertainty is contradicted by the Company's public disclosures and does not give rise to liability under the federal securities laws.

### 2. The Complaint does not (and cannot) allege that the SnapRS and Dealer Statements were material

A court may also properly determine on a motion to dismiss that an alleged misstatement was immaterial when the information allegedly omitted is "so obviously unimportant to an investor that reasonable minds [could not] differ on the question of materiality." *Schultz v. Tomotherapy Inc.*, 2009 WL 2032372, at *16 (W.D. Wis. July 9, 2009). The Seventh Circuit's general "rule of thumb" is that a misstatement related to less than 5% of a financial statement item carries a presumption of immateriality. *Higginbotham*, 495 F.3d at 759 & n.1. Here, Generac's core clean energy business was *less than 5%* of the Company's revenues, and SnapRS is only a subset of that business.[24] What's more, Plaintiffs' SnapRS Theory claims omission of a $37 million pre-tax charge for clean energy product warranty-related matters, and the Dealer Concentration Theory claims omission of an $18 million bad debt expense related to Pink Energy's bankruptcy. Those each amount to *less than 1%* of Generac's annual revenues. Statements allegedly omitting information concerning such facially minor issues are presumptively (and clearly) immaterial, and the Complaint makes no factual allegations to overcome this presumption. *See In re Newell*

---

[24] Generac's total revenues for fiscal year 2022 were $4.56 *b*illion. Ex. 7 at 26. The Complaint alleges that, as of November 3, 2022, analysts estimated that guidance for 2022 revenue from the "core clean energy business (primarily residential solar)" was approximately $150 million to $180 million—or, less than 4% of total revenues. ¶ 249; *see also* Ex. 34 at 16 (noting growth of 87.5% in clean energy sales in 2021 would be about a $100 million increase over 2020 sales, which equates to clean energy sales of approximately $114 million in 2020 out of total net sales of $2.49 billion, or less than 5% (Ex. 2 at 23)).

*Rubbermaid Inc. Sec. Litig.*, 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) (expense constituting less than 10% of before-tax income "could not possibly have been material"); *Parnes v. Gateway 2000*, 122 F.3d 539, 550 (8th Cir. 1997) (overstatement of assets by 2% not material).

### E.     The Complaint Fails To Plead Loss Causation

To succeed on a § 10(b) claim, Plaintiffs must allege and prove that Defendants' alleged misrepresentations proximately caused shareholders' losses. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). The Seventh Circuit requires Plaintiffs to identify specific statements that revealed the falsity of prior purported misstatements. *Tricontinental Indus. v. PricewaterhouseCoopers*, 475 F.3d 824, 843-44 (7th Cir. 2007). Here, the Complaint's 13 alleged "corrective" disclosures do not plead loss causation.[25]

First, courts do not allow plaintiffs to "have it both ways" by alleging that defendants made certain misstatements while also alleging that those misstatements were corrected within the same disclosure. *See In re Flag Telecom Holdings, Ltd. Sec. Litig*., 574 F.3d 29, 41 (2d Cir. 2009) ("[Plaintiffs] cannot allege that defendants made certain misstatements, namely, that [the company] was doing well compared to its competitors, and simultaneously argue that the misstatement itself constituted a corrective disclosure, that is, the fact that the other companies were not doing well exposed the public to the truth about [the] misstatements.); *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1244 (11th Cir. 2023) (rejecting argument that the disclosures revealed truthful information to the market, but continued to conceal fraud; alleged disclosures were not corrective). Accordingly, the November 2, 2021 and August 3, 2022 disclosures do not

---

[25] To aid the Court's analysis, Appendix 2, filed herewith, lists the alleged corrective disclosures and the alleged misstatement to which each relates, and summarizes the reasons each alleged corrective disclosure fails to plead loss causation.

plead loss causation.[26] *Compare* ¶ 113 *with* ¶¶ 193-195; *compare* ¶¶ 127-28 *with* ¶¶ 215-18.

Second, the six analyst reports cited in the Complaint (¶¶ 284-87, 290, 292) cannot constitute corrective disclosures, because the reports were based on already-public information and thus did not reveal a previously concealed truth.[27] *See Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) ("[C]onfirmatory information—that information already known to the market—may not constitute such a corrective disclosure."); *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013) ("Because a corrective disclosure 'obviously must disclose new information,' the fact that the sources used in the [analyst presentation] were already public is fatal to the Investors' claim of loss causation"; "mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure.").

Third, the Complaint's alleged corrective disclosures based on Pink Energy's lawsuit and statements (¶¶ 288, 290-91) do not plead loss causation, because unsubstantiated accusations and "allegations of unproven misconduct" are not corrective disclosures. *See Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017) (state attorney general complaint was not a corrective disclosure), *aff'd*, 757 F. App'x 151 (3d Cir. 2018); *see also Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1231 (M.D. Fla. 2014) (complaint in another case was not a corrective disclosure), *aff'd*, 608 F. App'x 855 (11th Cir. 2015).

Finally, the October 19, 2022 and November 2, 2022 statements (¶¶ 293-94) do not qualify as "corrective disclosures" because neither "reveal[ed] the falsity of a previous representation to

---

[26] Like alleged misstatements, courts may evaluate and dismiss alleged corrective disclosures individually rather than by theory of liability. *See Boca Raton Firefighters' and Police Pension Fund v. Devry, Inc.*, 2012 WL 1030474, at *13-19 (N.D. Ill. Mar. 27, 2012) (examining alleged corrective disclosures individually and finding none sufficient to support loss causation).

[27] *See, e.g.*, Ex. 31 at 1 ("On the call, management indicated" and "GNRC reported"); Ex. 30 at 1 ("On Oct. 19, Generac announced" and "[m]anagement cited"); Ex. 32 at 2 (report is "based upon interpretation of certain facts and observations, ***all of which are based upon publicly available information***") (emphasis added).

the market" and because there are other possible explanations for the allegedly associated stock price declines. *See Sapssov*, 608 F. App'x at 862; *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("[T]he standard cannot be so lax that every announcement of negative news becomes a potential corrective disclosure."); *Silverman*, 772 F. Supp. 2d 923, at 981 (earnings warning alone was not a corrective disclosure); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect. . . . It does not disclose the scheme . . . .").[28]

### F.     The Complaint Fails To State A Claim For Control Person Liability

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of section 10(b). 15 U.S.C. § 78t(a). However, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws." *Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Because the Complaint does not adequately plead all elements of the § 10(b) cause of action, the Court must summarily dismiss the § 20(a) cause of action.

## V.     CONCLUSION

For all of the foregoing reasons, Defendants respectfully submit that the Complaint should be dismissed in its entirety.

---

[28] Context also makes clear that the press release did not reveal the supposed truth of Plaintiffs' HSB Demand Theory. Ex. 33 at 1-3 (disclosing: (i) the higher inventory levels and lower HSB orders where caused by a lack of installation capacity "[a]s [the Company] discussed in [the] second quarter earnings call; and (ii) "end customer demand continues to be strong" for HSB). As to SnapRS and Dealer Concentration, the press release in no way suggested that the charges were based on anything other than information obtained by the Company *that same quarter*. *See* ¶ 293.

Dated: October 9, 2023

Respectfully submitted,

By: */s/ Glenn K. Vanzura*
Glenn K. Vanzura
Jacqueline M. Vallette
**MAYER BROWN LLP**
333 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071
(213) 229-9500
gvanzura@mayerbrown.com
jvallette@mayerbrown.com

Joseph De Simone
**MAYER BROWN LLP**
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2559
jdesimone@mayerbrown.com

Andrew J. Spadafora
**MAYER BROWN LLP**
1999 K Street NW
Washington, DC 20006
(202) 263-3043
aspadafora@mayerbrown.com

*Counsel for Defendants Generac Holdings Inc.,*
*Aaron Jagdfeld, and York A. Ragen*