UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION, et al., Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

GENERAC HOLDINGS INC., et al.,

Defendants.

Civil No. 2:22-cv-01436-bhl (Consolidated with Civil No. 2:23-cv-00081-bhl)

CLASS ACTION

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

---

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ....1

II. BACKGROUND ....3

A. Misleading Generator Statements ....3

B. Misleading Solar Product Statements ....6

C. Misleading Diversified Dealer Base Statements ....8

D. Corrective Disclosures ....9

E. Defendants' Admissions and Investor Reaction ....12

III. ARGUMENT ....14

A. The Complaint Adequately Alleges False or Misleading Statements ....14

1. Legal Standards ....14

2. The Generator Statements Were Misleading ....16

a. Defendants' Half-Truth Argument Is Meritless ....16

b. Defendants' Attack on the Early Class Period Statements Is Meritless ....18

c. Defendants' Factual Disputes Are Improper ....19

3. The Solar Product Statements Were Misleading ....19

4. The Diversified Dealer Base Statements Were Misleading ....22

5. The Statements Were Not Protected by the Safe Harbor ....24

6. The Statements Were Not Immaterial Puffery ....25

7. Defendants Violated Items 105 and 303 ....29

8. Defendants' Financial Statements Violated GAAP ....30

9. The Complaint Is Not a Puzzle ....31

B. The Totality of Factors Supports a Strong Inference of Scienter as to All Defendants ....32

**Page**

1. Defendants' Senior Positions and False Statements Contribute to a Strong Inference of Scienter ....33

2. The Core Operations Doctrine Supports Scienter ....34

3. The Magnitude of the Problems Supports Scienter ....35

4. Defendants' Admissions Support Scienter ....36

5. Defendants' Misleading Answers and Refusal to Answer Analyst Questions Support Scienter ....37

6. Defendants' Stock Sales and Motive Support Scienter ....38

7. There Is No Group Pleading ....40

C. Loss Causation Is Adequately Alleged ....41

D. Control Person Liability Under §20(a) Is Adequately Pled ....45

IV. CONCLUSION ....45

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ....................32

*Ala. Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)....................26

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) .................... *passim*

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001),
*aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)....................17

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) .................... *passim*

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................14

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................24, 36

*Bishins v. CleanSpark, Inc.*,
2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ....................44

*Bond v. Clover Health Invs., Corp.*,
2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)....................14

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ....................18, 37, 39, 42

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022)....................36

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578 (N.D. Ill. Jan. 23, 2012)....................31, 33, 39

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*,
114 F. Supp. 3d 633 (N.D. Ill. 2015)....................22

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ....................40

*Crespo v. Colvin*,
824 F.3d 667 (7th Cir. 2016) ....................42

**Page**

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ....................36

*DH2, Inc. v. Athanassiades*,
359 F. Supp. 2d 708 (N.D. Ill. 2005) ....................40

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................41

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ....................30, 31, 40, 45

*Fryman v. Atlas Fin. Holdings*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) ....................21, 39

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ....................33, 39, 45

*Fugman v. Aprogenex, Inc.*,
961 F. Supp. 1190 (N.D. Ill. 1997) ....................37

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ....................40, 42, 43

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*,
2022 WL 1642221 (N.D. Ill. May 24, 2022) ....................25

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .................... *passim*

*Higgenbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ....................28

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ....................19, 34, 38, 39

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)....................28

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ....................20

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)....................33

**Page**

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
403 F. Supp. 3d 712 (D. Minn. 2019)....................35

*In re Facebook, Inc. Sec. Litig.*,
2023 WL 8365362 (9th Cir. Dec. 4, 2023)....................21, 25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)....................42, 43

*In re GoHealth, Inc. Sec. Litig.*,
2022 WL 1016389 (N.D. Ill. Apr. 5, 2022)....................27

*In re Groupon, Inc. Sec. Litig.*,
2013 WL 12284524 (N.D. Ill. Sept. 18, 2013)....................30

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009)....................19, 32

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011)....................37

*In re Neopharm, Inc. Sec. Litig.*,
2003 WL 262369 (N.D. Ill. Feb. 7, 2003)....................19

*In re Obalon Therapeutics, Inc.*,
2019 WL 4729461 (S.D. Cal. Sep. 25, 2019)....................22, 23

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014)....................15

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003)....................34

*In re Spiegel, Inc. Sec. Litig.*,
382 F. Supp. 2d 989 (N.D. Ill. 2004)....................31

*In re Ulta Salon Cosms. & Fragrance, Inc. Sec. Litig.*,
604 F. Supp. 2d 1188 (N.D. Ill. 2009)....................35

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015)....................27

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
2019 WL 2724075 (D.N.J. June 30, 2019)....................40

**Page**

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....2

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)....32

*Johnson v. Tellabs, Inc.*,
262 F. Supp. 2d 937 (N.D. Ill. 2003)....39

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010)....34, 38

*Lindelow v. Hill*,
2001 WL 830956 (N.D. Ill. July 20, 2001)....16, 35

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)....29

*Macovski v. Groupon, Inc.*,
2021 WL 1676275 (N.D. Ill. Apr. 28, 2021)....31

*MacPhee v. MiMedx Grp., Inc.*,
73 F.4th 1220 (11th Cir. 2023)....42, 43

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006), *rev'd in part on other grounds*,
551 U.S. 308 (2007).... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008)....14, 24, 35, 41

*Martin v. GNC Holdings, Inc.*,
2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)....44

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....28

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)....25

*Michalski v. Weber*,
2023 WL 6290491 (N.D. Ill. Sept. 27, 2023)....17

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)....32, 39, 41

**Page**

*O'Driscoll v. Argosy Univ.*,
2014 WL 714023 (N.D. Ill. Feb. 25, 2014) .....20

*Pierrelouis v. Gogo, Inc.*
414 F. Supp. 3d 1164 (N.D. Ill. 2019) .....21

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) .....15

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (2011) .....27

*Ret. Fund v. Tile Shop Holdings, Inc.*,
94 F. Supp. 3d 1035 (D. Minn. 2015).....22, 30

*Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2nd Cir. 2015).....39

*Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) .....44

*Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2018 WL 844420 (N.D. Ill. Feb. 12, 2018) .....18, 25, 28

*Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) .....27, 38, 39

*Ret. Sys. v. MGIC Inv. Corp.*,
2010 WL 5095294 (E.D. Wis. Dec. 8, 2010) .....17

*Ret. Sys. v. Walgreen Co.*,
2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) .....43

*Ret. v. Anixter*,
2012 WL 1068761 (N.D. Ill. Mar. 29, 2012).....39

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)..... *passim*

*Schlifke v. Seafirst Corp.*,
866 F.2d 935 (7th Cir. 1989) .....16

*Schoenhaut v. Am. Sensors, Inc.*,
986 F. Supp. 785 (S.D.N.Y. 1997) .....27

**Page**

*SEC v. e-Smart Techs., Inc.*,
31 F. Supp. 3d 69 (D.D.C. 2014) ....... 41

*Shah v. Zimmer Biomet Holdings, Inc.*,
2019 WL 762510 (N.D. Ind. Feb. 20, 2019) ....... 15

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....... 18, 20

*Silverman v. Motorola, Inc.*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ....... 16, 36

*Silverman v. Motorola, Inc.*,
798 F. Supp. 2d 954 (N.D. Ill. 2011) ....... 44

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
775 F. Supp. 2d 227 (D. Mass. 2011) ....... 15

*Stransky v. Cummins Engine Co., Inc.*,
51 F.3d 1329 (7th Cir. 1995) ....... 14

*Swanson v. Interface, Inc.*,
2022 WL 2003990 (S.D.N.Y. June 6, 2022) ....... 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....... 2, 32, 33, 41

*The MJK Family LLC v. Corp. Eagle Mgmt. Servs.*,
2009 WL 4506418 (E.D. Mich. Nov. 30, 2009) ....... 18

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ....... 39

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ....... 19

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78(b) ....... 30, 45
§78t(a) ....... 45

Federal Rules of Civil Procedure
Rule 8 ....... 41
Rule 9(b) ....... 32

17 C.F.R.
§240.10b-5 ....................................................................................................................15
§240.10b5-1 ..................................................................................................................39

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
Pub. L. No. 104-67, 109 Stat. 737 (1995)..............................................................14, 15, 18, 32

Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa, and additional named plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust (together, "Plaintiffs"), respectfully submit this Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint. ECF 47.[1]

## I. INTRODUCTION

In arguing that their statements were immaterial and they could not predict the future after COVID-19 (DM at 3-4), Defendants move to dismiss a case that was never filed. Plaintiffs' claims are not based on immaterial matters (puffery) or failed predictions of future events. Far from being immaterial, Defendants' misleading statements related to Generac's two most critical product lines, generators and solar products. *See* ¶¶35-49, 256-259. These claims arise because Defendants made one-sided and overly positive statements about those key product lines, while omitting to disclose then-existing negative trends and data, which led to the Company's stock price being so inflated that it declined by 80%, from $500 a share during the Class Period, to only $100 a share after the truth was revealed. ¶¶23, 295. This market reaction shows how material these matters were to investors.

More specifically, during the Class Period, Defendants repeatedly touted favorable metrics like increased dealer orders and "robust" demand for home standby generators (the "HSB" business), which triggered a duty to also disclose the then-existing and offsetting negative metrics. *E.g.*, ¶¶109(a), (e), (h), 111(a)-(d). Yet, Defendants concealed the negative trend of declining close rates and that Generac had used tactics to incentivize dealers to order above market demand, leading to inflated dealer inventories for generators that were not selling to end customers. *See* ¶¶69-75.

---

1 Capitalized terms not defined herein have the meanings assigned in the Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint"). ECF 42. Citations to "¶__" and "¶¶___" refer to paragraphs in the Complaint. "DM" refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint. ECF 48. Citations to "Ex. __" refers to the exhibits attached to the accompanying declaration of Frank A. Richter. Unless otherwise indicated, emphasis is added, and internal citations are omitted.

Similarly, in boasting that solar product sales were increasing, that Generac's dealer network had grown to nearly 2,500 dealers, and about the robust safety and quality standards for the solar products (*e.g.*, ¶¶138(a)-(b), 163(a)), Defendants had a duty to disclose that the products suffered from a nearly 50% failure rate and sales were highly concentrated in a single dealer (*see* ¶¶76-107, 248-250). The Complaint adequately alleges scienter because Defendants closely monitored these key product line trends, selling millions of dollars of stock at inflated prices while the negative facts and trends were concealed from investors.

Defendants' attempt to defend their statements by arguing there were some positive trends, such as increasing in-home consultations ("IHCs") for generators and dealer growth for solar products, only serves to undermine their motion. *See, e.g.*, DM at 14 & n.8. Disclosing only the good without the bad is the essence of what the securities laws were designed to prohibit because "'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). Here, when Defendants chose to highlight the increased IHCs and solar sales, they were obligated to disclose the full story.

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). As the Seventh Circuit has stated, "the modern securities laws were designed . . . to 'substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *rev'd in part on other grounds*, 551 U.S. 308 (2007). By concealing the declining close rates for their generators, a dangerous and widespread defect in their


Case 2:22-cv-01436-BHL Filed 12/20/23 Page 12 of 57 Document 52

solar business, and the risky concentration of solar sales in a single dealer (*see* ¶¶109-171), Defendants failed to provide "'full disclosure'" and failed to meet the "'high standard of business ethics'" required of public companies. Thus, their motion to dismiss should be denied.

## II. BACKGROUND

This section provides a representative selection of Defendants' false and misleading statements followed by a summary of the corrective disclosures and negative market reaction.[2]

### A. Misleading Generator Statements

For decades, the Company's HSB market was limited, and growth was largely dependent upon extreme weather events to motivate buyers to install generators at their homes. ¶¶36-39. However, following March 2020 shelter-in-place orders from COVID, Generac saw demand surge to all-time highs because more people needed secure energy as they worked and attended school from home. ¶¶57-64. Generac became very attractive to investors as a bright spot among businesses suffering from COVID shutdowns. *See* ¶¶8, 67. By July 2020, Defendant Jagdfeld was bragging that orders were "about 2.5x greater than they were a year before." ¶61.

However, Generac's production could not keep pace with this rapid growth in orders, creating lead times from order to shipment of 4 1/2 months by the end of 2020. ¶65. In February 2021, Defendant Jagdfeld said the Company would open a new facility to increase production and reduce lead times. *Id.* That was a mistake because end-customer demand began to revert. *See* ¶¶69-70. Specifically, Generac's close rates – the rate at which Generac converted a consultation into an actual sale to a homeowner – declined leading up to, and then throughout the Class Period, ultimately bottoming out near the beginning of 2022. ¶¶69-70, 74; *see also* Ex. A (Generac's

---

[2] All other false and misleading statements concealing: (a) weakening HSB demand, declining close rates, and use of tactics to inflate sales, are set forth in ¶¶109-130; (b) the dangerous and widespread solar defect are set forth in ¶¶131-154; and (c) the over-concentration of solar sales in one dealer are set forth in ¶¶155-171. *See also* DM, Appx. 1 (ECF 48-1).

September 2023 investor presentation admitting close rates began declining in late 2020, declined drastically leading up to July 2021, and, in total, "decline[d] over 40% as lead times grew – bottoming in Q1 2022"). Close rates are an essential indicator of end-customer demand. ¶¶11, 263.

Because the declining close rates coincided with Generac opening the new manufacturing facility, Generac was increasing production without corresponding end-customer contracts. ¶¶70-75. Thus, Generac began accepting orders and shipping inventory to dealers without customer contracts, which would boost short-term revenues because Generac recorded revenue upon shipment to the dealer, rather than upon installation with the end customer. ¶¶52, 71. Generac used promotional tactics to incentivize dealers to order above demand by: (i) easing entry into Generac's coveted "Premier" dealer status program, which entitled dealers to substantial discounts; (ii) shipping products without allocated homeowner contracts, as had been typically done; (iii) threatening future price increases to encourage early ordering; and (iv) employing lax cancellation policies that allowed dealers to walk away from orders later in the process. *E.g.*, ¶¶71-75, 206, 224, 228. Because it took several months to get the products, dealers could order excess inventory and simply cancel down the line if they could not find a customer without having to pay back the Premier status discounts that they might not have otherwise earned on products kept. *See* ¶¶13, 72-75. This allowed Defendants to create the illusion of continued robust demand and revenues by immediately recording orders and shipments regardless of end-customer contracts, and bought Defendants time to try to figure out what to do with the excess production from the new facility. *See id.* In essence, the Company was just moving inventory from Generac's warehouse to dealer warehouses, which was very different than shipping products to meet a continuing high volume of end-customer sales. *See id.*

However, during the Class Period, Defendants repeatedly touted the purportedly ongoing robust demand while concealing the declining close rates and their use of these tactics to inflate

revenues and earnings, which in turn inflated Generac's stock price. For example, despite the weakening end-customer demand that was apparent before July 2021, Defendant Jagdfeld repeatedly touted that "***we've been experiencing higher incoming order rates***" (¶109(g)); "***demand for home standby generators continues to outpace our ability to produce them***" (¶113(b)); and "***demand has been continuing just to be off the charts***" (¶113(e)). Defendant Jagdfeld reinforced those statements by claiming Generac monitored demand metrics but touting only the purportedly positive metrics, such as: "***home consultations or sales leads for home standby generators . . . increased approximately 50%***" (¶109(b)) and "***key demand metrics for home standby have continued to trend even higher . . . including home consultations increasing at a strong double-digit rate***" (¶109(d)). But increasing IHCs with dead-end leads not interested in buying, as reflected in declining close rates, was hardly as positive as Defendants made it seem.

When the close rates declined to their lowest levels ("bottomed") in early 2022, Defendant Jagdfeld was still bragging about the "***incredibly strong demand for home standby generators***" (¶118(a)) and how the dealer order rate "***we've seen already so far this year and as we exited 2021 has been really strong***" without mentioning the promotional tactics to boost demand or the declining close rates (¶118(c)). Defendant Jagdfeld doubled down on his positive assessments, telling investors that "***home consultations during the first quarter were nearly 3x higher than the levels seen***" in the prior year "***reinforcing our view that demand . . . has once again achieved and held a new and higher baseline level***." ¶123(a). When Defendant Ragen was asked about HSB trends, rather than disclose the mismatch between increasing consultations and declining close rates, he misleadingly said "***you really have to look at the IHCs to really understand what's going on with the end market demand***" and claimed IHCs had increased "***[o]ver 4x pre-pandemic levels***" showing "***underlying demand for the category is still very, very strong***." ¶128(e).

In addition to touting dealer orders and IHCs, Defendant Jagdfeld reassured investors that the new plant capacity was needed by saying it would "***provide much needed capacity***" because lead times "***remain elevated at approximately 28 weeks***" (¶109(c)) and that the purported order "***backlog remains well above $1 billion***" (¶123(b)). Yet, Defendants did not disclose that the backlog was growing with products with no end-customer contracts, meaning they were likely to either be returned through lax cancellation policies or to sit at dealer storage until an end-customer was found, leading to swelling dealer inventories. *E.g.*, ¶¶111(a)-(d), 125(a)-(f). Defendant Ragen added to the misrepresentation of reality, saying "***there's buyers for those units that are in the field***" and Defendant Jagdfeld added that "***[b]ased on the IHC volume, we think the demand is there to support what we're seeing in the field in terms of inventory***." ¶123(f). When directly asked if dealer inventories were high, Defendant Jagdfeld misleadingly claimed they were only "***a little at the high end of where they've been historically***" and then falsely blamed seasonality from "***coming out of the winter season***." ¶123(e). Further still, Defendant Jagdfeld denied using promotional tactics to boost orders, claiming that if management needed to they could "***pull[] on promotional levers, which we've, again, largely not done over the last several years***." ¶123(d).

### B. Misleading Solar Product Statements

Generac's other critical business line, solar products, was also suffering during the Class Period. ¶¶76-96. Generac's PWRcell solar storage product used a SnapRS device to rapidly shut off the solar system, but the SnapRS suffered from a defect that caused it to repeatedly toggle on and off, resulting in overheating. ¶76. Early in 2021, at the start of the Class Period, the "SnapRS devices began to fail *en masse*." ¶80. Generac's largest solar dealer, Pink Energy, reported to Generac that it discovered melted SnapRS devices and provided photographic evidence. ¶¶78-81. Pink Energy began to replace "tens of thousands of these units while Generac developed a firmware update that was supposed to be a permanent fix." ¶80. By summer 2021, Pink Energy learned that

"other solar installers using these same Generac products were experiencing high rates of failure with the SnapRS connectors and were noticing signs of heat deformation in the SnapRS units." ¶82.

Well aware of the defect, Generac was constantly working on fixes, telling Pink Energy it would have a fix by August 2021. *See* ¶87. In August 2021, the defect caused two residential house fires. ¶¶83, 86. In emails and calls the same month following the fires, members of Generac's senior leadership, including the Vice President of Engineering and a regional Director of Sales, acknowledged that Generac was well aware of the fires and that SnapRS units were overheating and "bulging" or "bubbl[ing] out" as a result of turning on and off repeatedly instead of correctly staying in the on or off position. ¶¶84, 87. Confirming the existing widespread and significant nature of the defect, the executives also admitted that Generac had already been working on and was testing a fix. ¶¶84, 87-88. Ultimately, the "fix" was a firmware update that would turn overactive units off, but that could only work for the limited customers with solar systems connected to the internet. ¶89. Moreover, when overactive units were shut off to avoid fires and melting, that turned off portions of the system, meaning panels were not producing adequate solar power. ¶¶89-91. Thus, the firmware "fix" actually caused a drastic spike in customer complaints of reduced production. ¶¶91-94.

Generac continued working on an updated SnapRS, which it developed in late 2021, but Pink Energy continued to receive complaints of the same defects and continued to spend increasing resources fixing units, rather than installing new products. *See* ¶¶91-94. The problems were so widespread and concerning that Pink Energy sought and received an indemnification agreement from Generac in December of 2021 that applied retroactively due to the high number of SnapRS manufacturing defects. ¶93. Pink Energy complaints increased from 800 per month to as high as 30,000 per month by August of 2022. ¶94. In June of 2022, Defendant Jagdfeld admitted that the firmware update was not intended as a complete fix but only a way to avoid fires until a new SnapRS

device could be made and Generac admitted to Pink Energy there was a nearly 50% failure rate in the SnapRS units. *See* ¶95(b)-(c). Later, an analyst spoke to the head of Generac's solar business who noted the Company had to "rebuild trust" within the industry, and added that Generac's solar "product challenges" did not arise late in the Class Period but "ensued shortly after launch" of the solar products in late 2019 and early 2020. ¶96.

Defendants chose to conceal the dangerous defect, high failure rate (*en masse*), and increased warranty obligations during the Class Period. Defendants did so by making only one-sided and overly positive statements regarding increased sales and the purported high quality and safety of the products. *See* ¶¶131-154. For example, during the Class Period, Defendant Jagdfeld highlighted that "***shipments of our PWRcell energy storage systems grew at a significant rate***" (¶132(a)); "***key performance indicators for our clean energy-related initiatives continue to show favorable trends***" (¶132(b)); "***clean energy-related revenue approximately doubled***" (¶142(b)); "***Generac maintains a robust product safety function that is involved in all aspects of product design and production***" (¶146(a)); and "***[w]e also regularly perform . . . testing to maximize the quality and value of our products***" (¶146(b)). Defendant Ragen also touted that PWRcell "***shipments obviously did grow dramatically***" (¶132(c)) and "***[s]hipments of PWRcell energy storage systems also grew at a dramatic rate***" (¶135(c)). At the same time, Generac's website[3] assured that the SnapRS was "***SAFE***" and "***rapid shutdown compliant.***" *See* ¶153. All the while, Defendants made no mention of the SnapRS defect, the high failure rate, or its negative impact on solar sales and costs.

**C. Misleading Diversified Dealer Base Statements**

Additionally, in describing solar as the future of Generac's success, Defendants emphasized that the solar business would need to grow through a broad base of many dealers selling the

---

[3] Public statements required approval by the Individual Defendants or General Counsel. ¶253.

products. *See* ¶¶100-102. Defendant Ragen told analysts that Generac needed "very broad channels of distribution" for a successful entry into solar. ¶101. To that end, Defendants repeatedly emphasized having over 2,000 solar dealers which, on average, would each account for roughly 0.05% of sales. ¶104 n.14. In truth, however, Generac's solar business did not have a diversified dealer base, and just one dealer, Pink Energy, accounted for half of solar sales. *See* ¶¶107, 241-250. Overdependence on a single dealer was a significant business risk because that dealer's poor reputation, bankruptcy, or departure would have a dramatic negative impact on solar sales. *See* ¶¶103-106. In fact, all of that happened, as Pink Energy had a negative reputation and eventually went bankrupt due to the solar product defects. ¶¶105-106. Losing Pink Energy, just one of the purported over 2,000 dealers, caused Generac to reduce its solar guidance by $185 million (from an estimated $350 million to $165 million). *See* ¶¶107, 248-249. Analysts reported that "Pink Energy likely accounted for more than half of Generac's solar/energy storage sales." ¶¶22, 248.

Yet, during the Class Period, Defendant Jagdfeld assured investors that the Company had a diversified sales base, claiming they had "***success further building out our [solar] installer network as we've trained and certified approximately 2,000 dealers*** . . ." (¶155(a)), which Defendant Ragen reinforced by claiming "***we continue to make further progress in building out distribution partners in the clean energy market***" (¶155(b)). Defendant Jagdfeld later reported Generac had "***built out our clean energy installer network***" up to "***nearly 2,500 trained and certified dealers***" (¶163(a)), which Defendant Ragen again reinforced by touting increased sales of solar products through "***our expanding distribution continu[ing] to drive growth for our clean energy solutions***" (¶163(c)).

**D. Corrective Disclosures**

The truth leaked out in a series of corrective disclosures that increasingly revealed the scope and magnitude of the negative facts and trends. ¶¶192-251, 282-294. But, as information began to be disclosed, Defendants successfully prevented the full truth from being known by making

additional false and misleading statements. *See* ¶¶113-130, 143-154, 168-171, 282-294. Ultimately, by the end of the Class Period, Defendants had revealed that generator end-customer demand had plummeted leading up to early 2021 and throughout the Class Period and that Class Period orders had been placed and shipped without end-customer contracts (¶¶215-218, 238-39), that Generac's defective solar products had led to substantially reduced sales and increased warranty liabilities (¶¶230-234, 240-244), and that Generac's solar sales had been overly-concentrated through Pink Energy, the loss of which required a complete reset for the solar business (*id.*).

The truth about HSB demand began to leak out on November 2, 2021, when Generac disclosed a decreasing rate of dealer additions, which signaled softening demand, a declining backlog from 32 to 30 weeks, and missed HSB sales expectations. ¶¶193-195. Then on January 26, 2022, analysts reported from dealer checks that there was a deceleration in sales growth and customers were pausing on their decision to buy because of long lead times. ¶198. Shortly after, the truth about the solar defects began to be disclosed, with analysts reporting on February 17, 2022 that there were some SnapRS issues but also reporting that a solution was put in place. ¶199.

On April 28, 2022, the HSB concerns grew as analysts reported on channel checks with dealers, where some reported that demand had hit a lull as Generac was pumping out product and one dealer said it had enough generators and could install an end-customer order in just 2-3 weeks. ¶¶200-201. A June 22, 2022 report from a research firm reported that the booming demand was waning and that COVID was a "black swan" event, expressing concerns that Generac would be stuck with excess capacity and resorted to offering greater warranties to lure customers. ¶¶204-206. As to the solar business, the same report began to reveal sales concentration issues and questioned how much of Generac's sales were going through Pink Energy. ¶¶208-210.

In August 2022, the extent of the HSB and solar problems were disclosed to be still larger than expected. *See* ¶¶212-221. That month, Pink Energy filed its lawsuit against Generac, claiming Generac was concealing the SnapRS defect. ¶¶212-213. Also, on an August 3, 2022 conference call, Defendant Jagdfeld reported the HSB backlog had declined to 8-10 weeks, and Defendants refused to disclose the value of the backlog that they had previously claimed was over $1 billion. ¶¶215-218. The next day, analysts reported on the estimated 50% reduction in backlog value, citing Defendants' refusal to disclose the dollar value of backlog. ¶¶220-221.

On September 12, 2022, Pink Energy issued a press release announcing massive layoffs because of Generac's product defect, and an analyst reported that dealers reported declining demand and that promotional tactics had led to dealer pre-orders to get Premier status discounts. ¶¶223-224. On September 22, 2022, media reported that Pink Energy was shutting down from the financial difficulties caused by the Generac products. ¶226. On October 6, 2022, analysts reported that dealers had communicated softening HSB demand, and the analysts cited opaque disclosures, promotional activity, and pre-emptive dealer orders as supporting their growing concerns on order cancellations. ¶228. In light of all this, on October 19, 2022, Generac issued its own press release reporting a 26% decline in residential sales, a 56% decline in net income, a $37 million warranty charge related to defective SnapRS units, and a 40% reduction to sales guidance, and Defendant Jagdfeld admitted there were higher dealer inventories and lower generator orders. ¶¶230-231.

In November 2022, the full extent of the negative facts and trends was revealed. *See* ¶¶238-250. Defendant Jagdfeld reported, for example, lower shipments of HSB and solar products, drastically high HSB field inventory levels, the high "failure rate" of the SnapRS devices requiring full replacement for customers, and that the loss of Pink Energy and solar defect "warranty-related issue" required a substantial reduction in sales guidance for the year. ¶¶238-240.

## E. Defendants' Admissions and Investor Reaction

Investors and analysts reacted with shock and expressed the need for management to repair its credibility as the truth leaked out, the stock price crashed, and management admitted knowing of the problems sooner. *See, e.g.*, ¶¶233-237, 246-251.

***First***, as to the HSB business, on a November 2, 2022 conference call, Defendant Jagdfeld admitted that Defendants had tried "to bring our lead times down, because we knew that, that was having a negative impact on close rates." ¶239. He also admitted to knowing for a long time that dealer orders were not translating to sales, saying "we could see field inventory building" and "we had been talking to our channel partners for several quarters about this coming." *Id.* Defendant Jagdfeld added that dealers "physically started to run out of room" because "field inventory levels are about double where they should be." *Id.* Even after the Class Period, in May 2023, he acknowledged that close rates were worse than before COVID, stating they are "still well off of our pre-pandemic close rates" after having "bottomed the beginning of last year [2022]." ¶269.

Analysts were shocked to learn that the increased dealer orders just meant product was sitting in dealer warehouses. *E.g.*, ¶¶217-220, 224, 228. As the truth leaked out over time, a research firm published detailed analyses and stated that Generac would be "stuck with excess capacity" (¶204), and analysts said generator "demand is worse than we thought" (¶236). Analysts also uncovered undisclosed promotional tactics used to boost orders. Bank of America reported in September 2022 that "[d]ealers admit[ted] to significant pre-orders in 2021 given both bloated lead times, but also internal needs to demonstrate [Premier] sales status with [Generac]." ¶¶75, 224. The analysts added on October 6, 2022 that Generac's "backlog was outsized on the way up as dealers pre-emptively put orders into queue" in 2021, resulting in later sales "erosion from backlog cancellations." ¶¶75, 228.

Rather than being aware of the negative trends, following the October 19, 2022 disclosures, analysts reported that the results were a "negative surprise," that "demand is worse than we thought,"

and that despite the earlier partial corrective disclosures, "[w]e didn't appreciate the magnitude of the inventory build" for generators. ¶¶235-236. Other analysts were likewise "surprised by the magnitude of" Generac's financial guidance reduction and "[w]eakness" in the generator business near the end of the Class Period, adding that "we expect it to take time for management to re-establish credibility." ¶237. A month later, after the November 2022 disclosures, analysts similarly stated that "underlying HSB demand" was even "weaker than previously expected." ¶246. Analysts also reported that "backlog overstated HSB installation demand" with rising cancelations. ¶75.[4]

***Second***, as to the solar business, Defendants belatedly revealed the high concentration of sales and extent of solar product defects when they slashed clean energy sales guidance, revealing a more than 50% decline in expected solar sales. ¶¶240-244, 248-250. Defendant Jagdfeld also admitted that Generac "continued to address certain warranty-related matters" from the defective products (¶241) and acknowledged the high concentration of sales through Pink Energy, stating "[t]he majority of the market [loss] is related to the loss of the customer. It was a really important customer for us" (¶243). After having bragged about the purported 2,500 solar-dealer base (*e.g.*, ¶163(a)), Defendant Jagdfeld now claimed that "diversification of our customer base is going to be the primary focus here going forward" (¶243). As the increasingly bad news leaked out, analysts were shocked, reporting that Generac was "facing greater challenges with its clean energy segment than we previously understood" (¶247), that dependence on Pink Energy was "more significant than we understood" and that it would "come as a surprise to many investors that Pink Energy likely accounted for more than half of Generac's solar/energy storage sales" (¶248). Analysts said the belated disclosures had made "clear that Generac has not been as successful as we believed [in]

---

4 Later, in March 2023, analysts commented on how the lax cancellation policies contributed to the over-ordering and that during 2022, "supply-chain uncertainty and a lax order cancellation policy drove dealers to place large HSB orders (above and beyond customer orders)." ¶75.

attracting distribution partners in the solar market, and [the] recent quality issues will make building that distribution even more challenging" and the disclosures "hurt management's credibility, given there was no indication Generac had material customer concentration in this business." ¶250. Having been unaware of the negative facts and trends, investors were stunned by the HSB and solar disclosures, which together caused an 80% stock price decline. ¶¶23, 251, 295.

## III. ARGUMENT

In moving to dismiss, Defendants contest falsity, scienter, and loss causation (DM at 12-45) all of which are established by the well-pled facts. By attaching over 30 exhibits with their motion, Defendants seek to dispute those factual allegations. ECF 49. But, at this stage, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*").

### A. The Complaint Adequately Alleges False or Misleading Statements

#### 1. Legal Standards

Although the PSLRA raised the level of specificity required at the pleading stage, it did not move the trial up to the pleading stage. *See Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *22 (M.D. Tenn. Feb. 28, 2022) (finding PSLRA's pleading standards "are still ***pleading*** standards – not evidentiary ones" and relying upon allegations from third-party short-seller report in denying motion to dismiss) (emphasis in original). A statement is actionable if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Thus, "[i]f one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). Here, by choosing to make statements placing HSB demand, solar product success, and the diversification of the solar dealer base at issue, those statements imposed a duty of full and truthful disclosure (§§IIA.-C.), and

Defendants are incorrect that the Complaint "does not describe any duty to make [the omitted] disclosure[s] . . ." (DM at 10). Indeed, on a motion to dismiss, the Court does not need to "'determine whether [Defendants'] statements were in fact misleading," but "'need only determine that plaintiff has alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud.'" *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *4 (N.D. Ill. Sept. 7, 2021). Accordingly, contrary to Defendants' arguments about purportedly "unsubstantiated allegations" (DM at 9), allegations from lawsuits and other sources satisfy the PSLRA. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 620-22 (S.D.N.Y. 2014) (granting plaintiffs' motion to amend complaint to add allegations based on another lawsuit because plaintiffs may "find admissible evidence to support those allegations at a later stage").[5]

Finally, once the Court finds that Plaintiffs have alleged a false or misleading statement by each Defendant, the falsity element has been met, and the Court need not rule on all statements. *See Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *8 (N.D. Ill. Oct. 30, 2012) (holding that because plaintiffs "met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category" of statements). Applying the correct standards, the Complaint adequately pleads false and misleading statements by each Defendant.

---

5 *See also Shah v. Zimmer Biomet Holdings, Inc.*, 2019 WL 762510, at *1, *7-*9 (N.D. Ind. Feb. 20, 2019) (refusing to certify for appeal order denying motion to strike because "it is hard to say how facts taken from the allegations of another case's complaint are materially different from alleging facts from any other third-party source, such as a leaked internal document, a news article, an academic journal, a witness interview, or even an SEC filing"); *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 238 (D. Mass. 2011) (holding a "complaint copied directly from another complaint can survive dismissal, even in light of the PSLRA and its heightened pleading requirements"). In addition, the allegations are corroborated by Defendant admissions (§II.E.) and additional facts (*e.g.*, ¶¶86, 97 & n.13, 103, 199, 208, 233-234, 248-250), which distinguishes this case from those relied on by Defendants. *See* DM at 20-25 (citing, *e.g.*, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 445 (7th Cir. 2011) (not crediting allegations from other complaint where plaintiffs failed to provide corroborating or contextual allegations and other complaint alleged fraud in irrelevant locations)).

### 2. The Generator Statements Were Misleading

Defendants' statements touting generator demand, cherry-picked demand metrics, and the robust backlog were misleading because they omitted to disclose the then-existing contrary negative facts and trends. *See* §II.A.; *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (finding statements that new product launches were "'on track'" were misleading in light of "defendants' omissions regarding the problems plaguing the 3G rollout"). In moving to dismiss, Defendants argue the statements were: (a) half-truths of accurate, historical facts; (b) not misleading at the start of the Class Period; and (c) not misleading based on their counter-narrative. *See* DM at 14-20. These arguments lack merit.

#### a. Defendants' Half-Truth Argument Is Meritless

Defendants' claim that aspects of their statements were true or not "actually false" (DM at 2, 15) is unavailing. It is well-established that half-truths are actionable. *See, e.g., Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (stating "incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements"); *Career Educ.*, 2012 WL 5363431, at *6 (holding "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation"). As discussed, once Defendants chose to speak, they had a duty to tell the full truth. *See, e.g.*, §III.A.1; *Lindelow v. Hill*, 2001 WL 830956, at *2-*3 (N.D. Ill. July 20, 2001) (holding that even "[t]hough some statements complained of by plaintiffs could be read as literally accurate, plaintiffs have sufficiently alleged that the statements were misleading in context").

Here, Defendants argue they accurately reported positive "historical" metrics, like increased IHCs, and they were not required to predict how IHCs "might look into the future" (*see* DM at 14), as "no reasonable investor" would have interpreted their statements to promise "that such unprecedented demand was indefinitely sustainable" (*see id.* at 19). In support, Defendants rely on

irrelevant cases holding that the disclosure of historical financial results do not serve as guarantees or predictors of future results, and other inapposite cases where defendants provided the "underlying facts" and merely failed to "characterize the collection of metrics" in a certain way. *See* DM at 15 (citing, *e.g.*, *Fulton Cnty. Emps.' Ret. Sys. v. MGIC Inv. Corp.*, 2010 WL 5095294, at *9 (E.D. Wis. Dec. 8, 2010) (dismissing claim that disclosure of current cash would lead to conclusions about adequacy of future cash)).[6] But, Defendants' attacks are to a case that was never brought. The statements here are not alleged to be misleading for failing to predict the future, for suggesting the same demand would continue forever, or for failing to characterize metrics in a certain way.

Instead, the statements were misleading because by specifically highlighting only positive metrics and dealer orders (*e.g.*, ¶¶123, 128) Defendants had an obligation to disclose the then-existing negative metrics, including the declining close rates and lack of end-customer contracts, the promotional tactics being used to artificially inflate dealer orders above market demand, and that products were simply being transferred from Generac to dealer warehouses. *See* ¶¶69-75, 125, 130; *Okla. Firefighters Pension & Ret. Sys. vs. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (finding "demand" statements misleading because "a reasonable investor would likely have found it significant that . . . revenues were driven by inflated channel inventory and not increased end-user demand because those forces fundamentally differ in sustainability"). In short, the statements were misleading because they did not disclose those negative facts, thereby precluding investors from drawing their own conclusions, not because they failed to negatively "characterize"

[6] *See also* DM at 15-16, 19 (citing, *e.g.*, *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001) (holding accurate "past financial results" did not impose duty to disclose FDA compliance issues), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *Michalski v. Weber*, 2023 WL 6290491, at *3 (N.D. Ill. Sept. 27, 2023) (finding statements saying recent results might not be repeated were not misleading); *Issen v. GSC Enters.*, Inc., 508 F. Supp. 1278, 1290 (N.D. Ill. 1981) (holding no liability for "fail[ing] to draw adverse inferences from the facts disclosed")).


Case 2:22-cv-01436-BHL Filed 12/20/23 Page 27 of 57 Document 52

the disclosed facts. *See, e.g.*, *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *3-*4 (N.D. Ill. Feb. 27, 2018) (holding statement that defendants were "not concerned that [a spike in claims] was a quality issue" was misleading given the "failure to mention Allstate's reduction in underwriting standards").[7]

**b. Defendants' Attack on the Early Class Period Statements Is Meritless**

Defendants also attempt to dismiss the earliest HSB Class Period statements by claiming the close rates only fell at the end of the Class Period. *See* DM at 7, 15-16. But the PSLRA "requires no proof as opposed to plausible allegations." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at *3 (N.D. Ill. Feb. 12, 2018) (rejecting argument that plaintiff failed to allege statements were "false at the time they were made"). Here, the Complaint adequately alleges that close rates declined in the months leading up to the first generator statement in July 2021 as lead times drastically increased to 7 months by April 2021. *E.g.*, ¶¶11-12, 69. Those allegations were confirmed by Defendant Jagdfeld's admissions that the close rates were declining during the Class Period, bottomed out in early 2022, and never recovered (¶¶239, 269). The close rates could not have "bottomed" in early 2022 if they had not been declining before that time. *Allstate*, 2018 WL 1071442, at *6 (rejecting "'fraud by hindsight'" argument because defendant's admission "does not merely indicate" his statements "were incorrect in retrospect; it suggests that they were incorrect when made"). And, Generac has now admitted that close rates declined drastically in the months leading up to July 2021, and, in total, "decline[d] over 40%." Ex. A.

---

7 Defendants concede that close rates were part of the "key metrics that [Generac] monitor[s] closely for home standby demand," and that they disclosed other positive "key metrics" while omitting close rates. DM at 16. That is securities fraud. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1136-37 (N.D. Cal. 2017) (holding disclosures of positive metric were misleading for omitting "flat or declining" additional metric); *The MJK Family LLC v. Corp. Eagle Mgmt. Servs.*, 2009 WL 4506418 (E.D. Mich. Nov. 30, 2009) (finding disclosure of two conflicts of interest misleading for failing to disclose a third).

#### c. Defendants' Factual Disputes Are Improper

Finally, Defendants are wrong to claim that "Plaintiffs simply speculate that sales promotions were causing dealers to order HSB units that were not allocated to end customers" and that the dealer "orders were therefore likely to be cancelled." DM at 17. Far from speculation, independent analysts uncovered that "dealers pre-emptively put orders into [the] queue" (¶228), that dealers "admit to significant pre-orders in 2021 given . . . needs to demonstrate" Premier status for "discounted access to generators" (¶224), and that industry experts "confirm incremental promotions from [Generac] in recent quarters" (¶228), before later expressing their shock that they "didn't appreciate the magnitude of the inventory build" at dealers (¶235). Defendant Jagdfeld also admitted after the fact that Defendants "could see field inventory building" to "about double where they should be" and "had been talking to our channel partners for several quarters about this coming" (¶239) – he just was not sharing the same information with investors.[8]

### 3. The Solar Product Statements Were Misleading

Defendants' Class Period statements touting Generac's product safety efforts and exceptional solar sales (*e.g.*, ¶¶132, 139, 142, 146-147) triggered a duty to disclose the negative product defects (at a rate of nearly 50%) that led to rising customer and dealer complaints and left the Company scrambling to come up with a global fix (*see* ¶¶76-95). *See In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (finding statements about clinical trials were misleading because they "downplayed" existing problems); *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *5

---

8 Such specific allegations based on reports from dealers and admissions distinguish this case from Defendants' cases. DM at 18 (citing *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 985-91 (E.D. Wis. 2009) (finding conclusory allegations of "channel stuffing" and "violat[ing] GAAP" were too devoid of detail); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 642 (N.D. Ill. 2020) (finding "speculative" allegations, which failed to show "excess product inventory" or "rights of return," were "plague[d]" by "lack of detail").

(N.D. Ill. Sept. 1, 2020) (finding statement that "'I don't want to get specifically on what our marketing programs are'" was misleading due to omission of kickbacks).

Defendants claim that statements in this category were neither false nor misleading because the SnapRS defect was not of sufficient magnitude to mention or for Defendants to be aware of during the Class Period. *See* DM at 20-24. Scienter is addressed separately below (§III.B.), and factual disputes as to the magnitude of the problem are premature. *See O'Driscoll v. Argosy Univ.*, 2014 WL 714023, at *5 (N.D. Ill. Feb. 25, 2014) ("As the Seventh Circuit explained approximately 27 years ago, 'the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations.'"); *see also Twitter*, 282 F. Supp. 3d at 1137 (holding allegations "g[a]ve rise to the inference" that decline existed "during the Class Period" and "[t]he fact that . . . it [was] difficult to say when ***within*** the Class Period the decline occurred does not defeat that inference" (emphasis in original)). Nevertheless, the argument is wrong.

Generac began selling solar products that included the defective SnapRS product in 2019 and 2020, well before the start of the Class Period. *See* ¶¶54, 98. Nearly 50% of all units sold were defective (*e.g.*, ¶95(c)) which is of sufficient magnitude and a two year runway of production is sufficient to infer the problem was known during the Class Period. *See Grubhub*, 2021 WL 4077327, at *4 (drawing reasonable inferences in plaintiff's favor); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 330-32 (D. Mass. 2002) (denying motion to dismiss where the "proof offered . . . that the product did not work at time 'x' is that, at time 'x+1,' the product did not work"). But beyond inference, Generac management told analysts "that [Generac] needs to rebuild trust with industry participants and dealers after the product challenges that ensued ***shortly after launch***." ¶96. That confirms the defect was prevalent for more than a year leading up to the Class Period.

These facts and admissions are further corroborated by the fact that Pink Energy (which accounted for half of solar sales (§III.A.4.)) and other dealers contacted Generac's senior leaders about the defect (¶¶78-88), and Generac was working on a broad based firmware update for all of the devices early in 2021 that started to be sent out by August 2021 (*see* ¶¶80, 85, 87-88). Thus, Defendants' one-sided positive statements were misleading for omitting the significant and widespread defect, even if the full extent of all ensuing problems were not known. *See In re Facebook, Inc. Sec. Litig.*, 2023 WL 8365362, at *9 (9th Cir. Dec. 4, 2023) (holding the "law does not require harm to have materialized for a statement to be materially misleading" because it "could be misleading even if the magnitude of the ensuing harm was still unknown").[9]

Defendants ignore all of this to argue there was only a "single instance" of a failure prior to August 2021. DM at 22. But Defendants ignore that the defect was already impacting end customers of its largest dealer by "early 2021" (¶80), as well as the massive complaints by customers and dealers (¶¶80-82, 94), the efforts by Generac to produce a global firmware fix and replacements (¶¶80, 85-88, 91, 95) and the fact that by the end of 2021, the Company agreed to indemnify Pink Energy for all prior sales of defective parts (¶93). It defies logic to suggest the Company would replace all previously sold parts and agree to indemnify Pink Energy for all prior sales if only "one" or just a "few" of the thousands of products were defective. Nothing in the 34 exhibits attached by Defendants suggests that only the parts manufactured late in the Class Period suffered from the defect, and in contrast, management said the issues began shortly after launch. ¶86; *see also* ¶¶77-

---

[9] The detailed allegations from Generac's partners, customers, and executives establishing the existence and significance of the defect here sets the Complaint apart from the cases relied on by Defendants. *See* DM at 21, 24 (citing, *e.g.*, *Pierrelouis v. Gogo, Inc.* 414 F. Supp. 3d 1164, 1175 (N.D. Ill. 2019) (holding complaint lacked "sufficient facts" to establish plausibility because it merely alleged that problems "may have" began after winter and became significant at "some time prior" to the corrective disclosure); *Fryman v. Atlas Fin. Holdings*, 462 F. Supp. 3d 888 (N.D. Ill. 2020) ("*Fryman I*") (finding subjective "reserves" statement not misleading where complaint did not allege any "information and data" that would "establish that reserve amounts were inadequate")).

82. Defendants have failed to refute that the "'facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *Tellabs I*, 437 F.3d at 595.[10]

### 4. The Diversified Dealer Base Statements Were Misleading

By emphasizing it was critical to have a diversified solar dealer base and assuring investors that Generac had a diversified and growing base of 2,000 to 2,500 solar dealers, Defendants had a duty to disclose that Generac's solar sales were highly concentrated through just one dealer. *See* §II.C.; §III.A.1; *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1048 (D. Minn. 2015) (holding company was required to disclose that more than 30% of sales were through single entity because such concentration "could have a material effect on [defendant company's] financial condition if that relationship was somehow compromised"). Defendants seek to dismiss these misleading statements with three meritless arguments.

First, Defendants argue they were not required to disclose "granular" sales figures for every dealer. DM at 24. But, again, the Complaint does not claim Defendants had a duty to disclose granular sales for all 2,000 to 2,500 dealers. Rather, the Complaint alleges it was misleading to repeatedly assure investors that Generac was selling solar products through a diversified base of thousands of dealers, when in fact, solar sales were highly concentrated in a single dealer. *See* ¶¶155-171; *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *8 (S.D. Cal. Sep. 25, 2019) (holding statements about "increasing . . . reorder sales" were misleading for failing to disclose "that

---

10 Defendants cite to *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633 (N.D. Ill. 2015) (DM at 21), but it actually supports Plaintiffs. There, defendants' statement that truck engines "'meet [the] emissions [standard] in the cylinder,'" while true, was misleading because it omitted that the company only met the standard by using emissions credits and, in "context, a reasonable investor could have understood" the statement to mean the engine "met the . . . emission standard without the use of emission credits." *Id.* at 657-58. So too here, Defendants' statements touting their safety efforts (*e.g.*, ¶¶146, 153) and increased solar sales (*e.g.*, ¶¶132, 142), even if true, were still misleading as a reasonable investor would not have understood those statements to reveal half the products were defective.

reorder sales were concentrated in a small number of clients" because omission of that information "gave the impression of healthy and equally distributed reorder accounts").

Second, Defendants dispute the allegation that Pink Energy had a high concentration of sales as just "speculation." *See* DM at 24-25. But it is established by Defendants' belated admissions that: (i) after Pink Energy went bankrupt, Generac had to reduce solar guidance by $185 million, more than half of the prior estimated $350 million (*see* ¶¶107, 249); (ii) Pink Energy had been a "major" "large," and "really important" customer for Generac; (¶¶240-243); (iii) Pink Energy accounted for the "majority" of Generac's solar market sales loss (¶243); and (iv) after the Pink Energy loss, "diversification of [Generac's] customer base [was] going to be the primary focus [for Generac] ***going forward***" (*id.*). Pink Energy and analysts corroborated and confirmed the high concentration of sales in Pink Energy. *See* ¶¶92-95, 103, 106, 208-210, 248-250 & n.23.[11]

Third, Defendants claim that all but one of their statements was referring to the distribution network for all products, rather than "solar products." DM at 26. But the "clean energy" dealers were the "solar products" dealers, not generators or other product dealers. *See* ¶¶54, 101-102, 164(c); *see also* DM at 9. The statements specifically referred to the "***higher demand for our PWRcell energy storage systems as we continue to make further progress in building out distribution partners in the clean energy market***" (¶155(b)), having "***built out our clean energy installer network as we ended the fourth quarter with nearly 2,500 trained and certified dealers***" (¶163(a)), and "***our clean energy offerings . . . distribution network***" (¶163(b)).[12] Analysts

---

[11] This case is not like *City of Birmingham Ret. and Relief System v. A.O. Smith Corp.* (*see* DM at 25) because there, the defendant's disclosures did "[n]othing" to support the claim that an entity was a "'material customer'" and the short-seller reports relied on by plaintiff contradicted themselves and undermined that claim. 468 F. Supp. 3d 1048, 1061 (E.D. Wis. 2020).

[12] *See also, e.g.*, ¶156(a) (referring to "energy storage systems . . . independent dealers"); ¶164(c) (referring to "growing our base of solar contractors that sell . . . our PWRcell energy storage systems"); ¶156(b) (referring "energy storage" systems dealers); ¶161(a) (same). Defendants

(correctly) understood the statements to be referring to solar dealers. *See* ¶¶248-250. Like all of Defendants' factual disputes, this argument must await trial. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one").

### 5. The Statements Were Not Protected by the Safe Harbor

To try to claim protection for forward-looking statements, Defendants manipulate the Complaint. DM at 26-27. For example, the Complaint added bold and italics to identify present and past tense portions of Defendants' statements as misleading. *See, e.g.*, ¶110(c) ("***increased demand has resulted in extended lead times for these products***"). Yet, engaging in trickery, Defendants remove that emphasis and add emphasis to other language not alleged to be false and misleading. DM at 26 n.13 (changing emphasis in ¶110(c) to "our net sales during 2021 ***are expected to be*** . . ."). Again, moving to dismiss a complaint that was never brought is a waste of time and pointless distraction. Moreover, it is well-established that even "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs III*, 513 F.3d at 705 (finding mixed statement that sales were "still going strong" contained element of prediction but its commentary on current sales was not protected by safe harbor); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *15 (N.D. Ill. Aug. 11, 2021) (holding statements with verbs such as "is," "are now," and "are increasing" were "describing the Company's current status and actions, and a single reference to 'the future' does not yank the entirety of the utterance into the realm of a forward-looking statement").

---

concede that the statements referring to specific numbers of dealers and installers were referring to "[c]lean energy" – *i.e.*, solar dealers. DM at 26 (citing ¶¶155, 157(a)-(b), 163, 166, 169).

The safe harbor would not be available anyway because Defendants did not provide sufficient "cautionary language." Defendants made generic warnings of potential product lawsuits (¶133(b)), as opposed to the specific and then-existing SnapRS melting and warping defect (§II.B.; §III.A.3); of "loss of a substantial number of" dealers (¶164(d)), as opposed to the massive risks of losing just one dealer, Pink Energy (§II.C.; §III.A.4); and that COVID could impact future performance (DM at 32), as opposed to the risks posed by then-existing declining close rates and use of promotional tactics (§II.A.; §III.A.2). Generic warnings are insufficient to alert investors to specific risks. *See Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *7 (N.D. Ill. Feb. 10, 2023) (stating "[c]ourts have rejected the 'argument that such general warnings effectively satisfy the duty to disclose specific'" risks); *Treehouse Foods*, 2018 WL 844420, at *3 (rejecting safe-harbor defense where "[d]efendants did not disclose any specific concerns, but instead offered generic statements"). Moreover, theoretical warnings of what could happen are insufficient to alert investors to what was actually happening. *See, e.g.*, *Facebook*, 2023 WL 8365362, at *9 (holding risk statements were "inadequa[te]" because risk was presented "as purely hypothetical when that exact risk had already transpired" such that investors would have understood the risk to be "merely conjectural").[13]

### 6. The Statements Were Not Immaterial Puffery

Since certain of the above-discussed statements are actionable and are not challenged on "puffery" grounds, "the Court need not address whether other statements alleged in the complaint falling within the same category of . . . statements are puffery." *Oak Street*, 2023 WL 1928119, at

---

13 *See also Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (explaining "[o]ne cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors"). Defendants' reliance on *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *21 (N.D. Ill. May 24, 2022) is misplaced. There, allegations of pre-Class Period conduct "only support[ed] the inference that a relatively small number of unauthorized accounts existed," rather than the magnitude of in Class Period issues concealed here (*see* ¶¶69-108).

*5 n.1. Moreover, a determination of what investors would consider material is "'rarely appropriate at the summary judgment stage, let alone on a motion to dismiss.'" *Akorn*, 240 F. Supp. 3d at 815 (citing Seventh Circuit caselaw). Thus, Defendants' materiality arguments should be rejected as premature. If considered, the arguments can quickly be disposed of for several reasons.

First, courts have found that negative investor reaction to the concealed information is itself sufficient to show the statements were material to investors. *See Ala. Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (finding "materiality of the alleged misrepresentations [was] self-evident when we look at the market's negative reaction" after truth was disclosed); *Career Educ.*, 2012 WL 5363431, at *6 (same). Here, the stock declined by 80% and analysts reacted negatively to the disclosure of the concealed information. ¶¶283-295; §II.E.

Second, just as Defendants manipulated statements to argue they were forward looking (*see* §III.A.5.), Defendants do the same to argue some statements are puffery. For example, whereas the Complaint highlighted "***[w]e continued to experience exceptional demand***," we "***achieved record quarterly shipments and production levels***," and "***ongoing robust home standby demand***," (*see* ¶117), Defendants ignore the highlighted factual representations to quote only vaguer portions that were not alleged to be misleading. *E.g.*, DM at 29 n.15 (quoting "[w]e enter 2022 with considerable visibility and momentum" from ¶117). This gamesmanship undermines Defendants' motion because they have no answer for the claims actually alleged. *See also Kraft Heinz*, 2021 WL 3566602, at *10 (rejecting puffery argument and holding that portions of statements "may be vague and upbeat, but that is not enough to get the alleged statement (much less any claim in the complaint) thrown out").

Third, the alleged misrepresentations spoke to core aspects of Generac's business, were in response to analyst questions or made in SEC filings, and, in context, provided investors with the impression that HSB demand was increasing, dealer orders were legitimate and increasing, and the

solar business was experiencing unqualified growth and success through a diversified distribution network. *See* §II.A.-C.; ¶¶109-171. Such statements are not puffery. *See In re GoHealth, Inc. Sec. Litig.*, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022) (holding statements which "identified factors that would positively impact [the company's] performance metrics" were not puffery, and that even if some phrases "'did lean toward hopeful fluff'" context "is integral to the question of materiality" so "'at this early stage . . . it is not appropriate for the Court to rule definitively that these statements are mere puffery'"); *Kraft Heinz*, 2021 WL 3566602, at *10 (holding statements that were "generally factual, specific, and in response to questions from analysts" were not puffery).[14]

Fourth, Defendants' standalone section directed at HSB materiality (DM at 41-42), repeats their attempt to attack a claim never brought by arguing that no one could predict "what consumer behavior would look like when the world emerged from the pandemic" and that investors "understood" the same information as Generac. DM at 41. As discussed, Defendants did not need to predict the future, they just needed to disclose the then-existing negative facts and trends. §III.A.2.a. Defendants' statements highlighting increased IHCs and dealer orders as indicative of robust demand were materially misleading without this information. *See, e.g., Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 879-80 (2011) (holding "rollout [was] going very well" was actionable because

---

[14] *See also In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 651 (E.D. Pa. 2015) (holding statements that "impl[ied] that there [wa]s a strong demand for [certain] products" were not puffery); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (holding "'Hospira believes that its facilities and equipment are in good operating condition'" was not puffery because it "refer[red] to the present condition" and was in the context of SEC filing). By contrast, the statements in Defendants' cases either conveyed hopeful expectations or lacked context showing they would mislead investors. DM at 28-30 (citing, *e.g.*, *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 791-92 (S.D.N.Y. 1997) (holding "'continued strong demand,'" alone, conveyed only "vague expectations" and lacked "indicia of performance")).

"[w]hile the precise meaning of portions of this statement is unclear, what is clear is that a reasonable investor could have been misled by this statement" in light of undisclosed problems).

Fifth, Defendants' standalone section directed at solar materiality compares solar sales to total revenues and argues there is a rule that a "misstatement related to less than 5% of a financial statement item carries a presumption of immateriality." DM at 42. But there is no 5% rule because "[d]efining materiality using some rigid percentage-based computation, especially one where the denominator is picked by defendants, would both permit Courts and defendants to move the goal posts and 'effectively sanction misstatements . . . so long as the net effect' was just below that threshold." *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *2 (S.D.N.Y. June 6, 2022).[15] As such, courts have repeatedly denied motions to dismiss based on a 5% threshold. *See id.* (finding misstatements concerning less than 5% of expenses adequately pled as material); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) (reversing dismissal and finding omission concerning 2% of inventory adequately pled as material).

Qualitative materiality must also be considered and here the statements related to the Company's most important new line of business (solar), which was discussed by Defendants and repeatedly the subject of analyst questions, proving its importance to investors. *See* ¶¶131-171, 256-260, 264-267; *TreeHouse*, 2018 WL 844420, at *2-*3 (holding statements that merger integration was doing "'good'" and "'great,'" and the team was doing "an 'incredible job'" were not immaterial because analysts reported on the statement and integration was significant to investors). Moreover,

---

15 The Seventh Circuit has not, as Defendants suggest, established any 5% rule. *See Higgenbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 & n.1 (7th Cir. 2007) (noting "securities lawyers" sometimes use a 5% "rule of thumb," but stressing it is "not . . . a rule of law"); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (rejecting that omitted information must be "statistically significant" to be material). The SEC has made clear that "exclusive reliance on [5%] or any percentage or numerical threshold has no basis in the accounting literature or the law." SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 at 45,151-2, 152 (1999), available at https://www.sec.gov/interps/account/sab99.htm.

the alleged false and misleading statements were about the solar business, a core business of the Company, and the misstatements and omissions impacted 50% of solar sales, far exceeding 5%. *See, e.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (finding concealed investment accounting for less than 5% of investments was material because it accounted for 9% of an important segment and holding, "[e]ven where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality").[16]

**7. Defendants Violated Items 105 and 303**

As set forth in the Complaint: (i) Item 303 of Regulation S-K requires that quarterly and annual reports filed with the SEC "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (ii) Item 105 of Regulation S-K requires "a discussion of the most significant factors that make an investment in the [company] speculative or risky." ¶174.

Here, under Items 303 and 105, Defendants were required to disclose the declining close rates, the skyrocketing complaints and warranty liabilities from the defective products, and the over-concentration of solar sales through a single dealer. *See* ¶¶175-179. Defendants repeat their prior arguments regarding falsity, materiality, and risk disclosures (DM at 30-32), which fail for the reasons noted. *See* §III.A.2-4, 6. However, Defendants' primary argument is that violations of Items 303 and 105 cannot support a private cause of action. DM at 30. Although the Seventh

16 Defendants' citation to *In re Newell Rubbermaid Inc. Sec. Litig.* is irrelevant because there the court held that, from the perspective of shareholders of a company being acquired, disclosure of understated expenses impacting net income by less than 10% would be immaterial to the shareholders' vote in favor of the merger, as it "would make the [target] shareholder *more* likely to want the merger." 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) (emphasis in original). Here, by contrast, the negative market reaction (¶¶283-295; §II.E.) confirms that disclosure of the SnapRS defects and over-concentration of sales would have materially impacted investment decisions.

Circuit has not decided the issue, recent decisions within this Circuit and in other jurisdictions have upheld such claims. *See Oak Street*, 2023 WL 1928119, at *8 (agreeing with the Second Circuit's "'compelling'" reasoning for upholding §10(b) claims based on Items 303 and 105); *Tile Shop*, 94 F. Supp. 3d at 1048 (upholding §10(b) claim based on Item 303 violation for omitting concentration of sales in one entity); *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *7-*9 (N.D. Ill. Apr. 21, 2021) (upholding §10(b) claim based on Item 303 violation and citing cases in this District doing the same). Defendants ignore these cases and cite to older or out-of-circuit authority. DM at 30.

### 8. Defendants' Financial Statements Violated GAAP

Finally, under GAAP (ASC 450) Defendants were required to disclose potential losses from warranty expenses that were "more than remote," even if the amount could not be estimated. ¶184. Defendants were required to accrue for the losses if they were "probable" and "the amount of loss c[ould] be reasonably estimated." ¶185. Here, Generac has admitted that by 3Q 2022, losses from the SnapRS defect were material, "more than remote," "probable," and could be estimated by belatedly accruing $37.3 million losses for SnapRS warranty expenses. ¶191.

Defendants' 1Q22 and 2Q22 financial statements were false because all the factors justifying the 3Q 2022 increased losses for warranty expenses existed by no later than 1Q 2022, but rather than disclose or accrue for the losses, Defendants reduced those reserves by $1.1 million. ¶¶148(a), 186-190. For example, the significant failure rate was known through the repeated customer complaints reported by dealers (¶¶78-82, 90-95), Generac's multiple attempts to fix and replace the issue (¶¶85, 87-89), and Generac's agreement to indemnify Pink Energy (¶93). *See also* ¶186. Thus, disclosure was required because a loss was "more than remote" (and material, §II.A.6), and accrual was required because the losses were both probable and capable of estimation. Contrary to Defendants' argument (DM at 31-32), Plaintiffs are not required to provide more numerical specificity at this stage. *See In re Groupon, Inc. Sec. Litig.*, 2013 WL 12284524, at *2 (N.D. Ill. Sept. 18, 2013) ("At

this early stage in the litigation and without the benefit of extensive discovery, Plaintiff need not plead the specific amounts by which he alleges Defendants inflated revenue.").

#### 9. The Complaint Is Not a Puzzle

Unable to challenge the merits of the Complaint, Defendants resort to arguing it should be dismissed as an improper "puzzle pleading" because, they claim, there are a lot of false statements and the Complaint references a similar list of reasons for their falsity. DM at 12-13. But courts have repeatedly upheld similar complaints filed by Lead Counsel without any of the confusion feigned by Defendants.[17] Here, Defendants made many misleading statements that the Complaint fairly placed into three categories, and the "complaint identifies and quotes the statements alleged[] [to be] misleading, including bolding and italicizing the precise statements" and "then follows each set . . . with the factual basis for why the statements are false and misleading," which is common and appropriate. *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (rejecting puzzle pleading argument and noting the complaint "is divided into clear sections with headings and subheadings identifying two aspects of Baxter's business which plaintiffs alleged Baxter [made] misleading statements to investors"); *see also* ¶¶109-171.

Indeed, the bold and italics clearly enabled Defendants to understand and respond to the allegations because they have attacked each of the three categories of false statements and listed them on an appendix. *See* DM, Appx. 1; *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1012 (N.D. Ill. 2004) (rejecting puzzle argument and stating the defendants' "claim of prejudice is not well-taken" because "Defendants can fairly respond to the allegations"). To be sure, the cases relied on by Defendants are nothing like this one. *See Macovski v. Groupon, Inc.*, 2021 WL 1676275 (N.D. Ill. Apr. 28, 2021) (dismissing complaint that applied "liberal use of bold" to include

---

[17] *See, e.g.*, *Exelon*, 2021 WL 1561712; Ex. B (*Exelon* complaint); *Grubhub*, 2021 WL 4077327; Ex. C (*Grubhub* complaint); *Oak Street*, 2023 WL 1928119; Ex. D (*Oak Street* complaint).

statements made by analysts that plaintiff "cannot possibly be alleging [were] misleading" and failed to specify "which of the representations were [alleged as] misleading statements"); *Harley-Davidson*, 660 F. Supp. 2d at 984 (dismissing complaint that recited "pages of press releases" that left the Court to "distinguish the allegedly misleading assertions from those that are benign").

### B. The Totality of Factors Supports a Strong Inference of Scienter as to All Defendants

Defendants' scienter arguments suffer from two fatal flaws. First, they try to heighten the standard by arguing for direct evidence of knowledge (DM at 34-35), ignoring that circumstantial allegations showing "'reckless disregard of a substantial risk that the statement is false'" is also sufficient. *Oak Street*, 2023 WL 1928119, at *26 (rejecting that case law requires "allegations of specific reports, conversations, or meetings demonstrating the defendants' knowledge"); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) (stating plaintiffs do not need "evidence" because the "PSLRA did not . . . purport to move up the trial to the pleadings stage").

Second, Defendants cite cases holding that an individual allegation alone did not create a strong inference of scienter. *E.g.*, DM at 40 (arguing one factor "standing alone" is "insufficient to establish scienter"). But, "courts must consider the complaint in its entirety" and ask "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23 (emphasis in original).[18] Here, no single allegation must do the job alone because the totality of allegations are sufficient to allege scienter (¶¶252-276), especially since the inference "need not be

---

18 *See also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (reversing dismissal on scienter grounds and rejecting defendants' argument that "'[t]he sum of several zeros . . . is still zero'" because the "inferential significance of any single allegation can be determined only by reference to all other allegations"); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) (rejecting attempts at "'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA").

irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324; *see also Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *29-*30 (N.D. Ill. Apr. 18, 2022) ("*Fryman II*") (holding a "tie goes to the plaintiff").

### 1. Defendants' Senior Positions and False Statements Contribute to a Strong Inference of Scienter

In their roles as senior executives since 2008, the Individual Defendants oversaw the generator and solar business, had access to internal corporate documents and conversations with officers and employees involved in these matters (including the solar defect and attempted fixes), certified that the Company's financials were accurate and complied with GAAP, reviewed reports on the topics on which they spoke, and chose what the Company disclosed publicly. *See* ¶¶252-255, 260; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (stating "[a]s signatories to the SEC filings that contained the company's financials, each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations"). While Defendants dismiss the significance of these facts in isolation (DM at 39), the facts contribute to (with other factors) an inference of scienter. *See Tellabs I*, 437 F.3d at 603 (holding that "'[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate'"); *see Baxter*, 2012 WL 607578, at *4 (holding that "a reasonable person could infer that [the CEO] and the other corporate officer defendants at least acted with deliberate recklessness" where "by virtue of their positions the defendants had access to non-public and proprietary information concerning Baxter's operations, finances, and financial condition" and "controlled the content" of the statements); *Grubhub*, 2021 WL 4077327, at *5 (similar).

Further adding to the inference, Defendant Jagdfeld admitted that there were "[s]everal key metrics that we monitor closely for home standby demand," including the concealed close rates. ¶¶60, 261-263. The "we" included Defendant Ragen who attended the Class Period calls, at which Defendants assured investors they were executing on the HSB business and demand metrics were increasing. *See* §II.A.; *see also Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (finding fact that CEO was "'deeply involved'" in company's lending process supported inference he was aware of undisclosed financial troubles). Defendants Jagdfeld and Regan also often spoke about the purportedly diversified dealer network (*e.g.*, ¶¶157, 166), and increasing solar sales (*e.g.*, ¶¶132, 142). Their repeated representations on all three topics (*see* §II.A.-C.) makes it highly inferential they knew of or recklessly disregarded the underlying negative facts and trends. *Kraft Heinz*, 2021 WL 3566602, at *13 (finding defendants' "repeated references" to cost-cutting from synergies and post-merger efficiencies contributed to scienter).[19]

**2. The Core Operations Doctrine Supports Scienter**

Defendants claim the "core operations" factor alone is insufficient (DM at 39-40), but, again, courts find this factor contributes to scienter when plaintiffs "are not relying exclusively on the core operations inference." *Oak Street*, 2023 WL 1928119, at *10. Defendants cannot refute that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'" *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003); *Grubhub*, 2021 WL 4077327, at *6.

Here, Defendant Jagdfeld said the generator business was a "core business" that "pays the bills" and solar was "super critical to where we go as a company" because "it's the future." ¶259;

---

19 *See also AbbVie*, 2020 WL 5235005, at *5 (finding defendants' statements on sales practices were "strong circumstantial evidence that [they] had detailed information regarding" the practices); *Career Educ.*, 2012 WL 5363431, at *10 (finding from CEO's statements about an issue that "[o]ne may readily and reasonabl[y] infer" the CEO "made it his business to look into" the issue).

*see also* ¶49 (executive saying solar is "the future of Generac's core business"). During conference calls, much of Defendants Jagdfeld and Ragen's discussion and most questions were directed at HSB demand and solar sales. *See* ¶¶256-259, 267. They were particularly focused on both the size of the distribution channel and product safety for solar. *See, e.g.*, ¶¶155(a)-(b), 258, 265.

The fact that the misleading statements related to the most important aspects of Generac's business adds support to the strong inference of scienter. *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 731 (D. Minn. 2019) (finding scienter supported because it is "reasonable to assume that top management w[as] 'aware of matters central to that business's operation'"). As courts have explained, "it is strongly inferential that every officer or director . . . either had the knowledge" of such core matters "or, if not, that his failure to have such knowledge equated to reckless disregard." *Lindelow*, 2001 WL 830956, at *8. The competing inference that Defendants were just repeating lies fed to them is much less plausible. *See, e.g.*, *Tellabs III*, 513 F.3d at 709-11 (finding scienter adequately pled and stating "[i]s it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely"); *In re Ulta Salon Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (finding unpersuasive the competing inference that defendants "were essentially clueless as to the major problems existing within the company").

### 3. The Magnitude of the Problems Supports Scienter

"'[T]he more serious the error, the less believable are defendants['] protests'" that they were unaware of the truth "'and the stronger is the inference that defendants must have known about the discrepancy.'" *Grubhub*, 2021 WL 4077327, at *5. Here, the concealed declining close rates and weakening demand, skyrocketing HSB dealer inventory levels, widespread solar defects, and over-concentration in solar sales through Pink Energy had a long-lasting and catastrophic impact on

Generac's business. *See, e.g.*, ¶¶73-75, 93-97, 103-107, 231-251, 295; *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) ("While a Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue."); *Motorola, Inc.*, 2008 WL 4360648, at *14 (holding "it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch").[20] Far from being too minor to warrant Defendants' monitoring, these matters were of significant magnitude to attract attention from Defendants Jagdfeld and Ragen. *See Berson*, 527 F.3d at 987-89 (finding scienter inferred where concealed facts would have a "devastating effect on the corporation's revenue" and "it would be 'absurd to suggest' that top management was unaware of them").

#### 4. Defendants' Admissions Support Scienter

At the end of the Class Period, Defendant Jagdfeld admitted that "we knew" there was a "negative impact on close rates," and that they had "ramped up our production beyond what the installers could handle" with dealer inventory so high that they "physically started to run out of room." ¶¶74, 269. He admitted that Defendants saw "field inventory building" and had been in discussion with dealers about it "for several quarters." ¶239. He also admitted that the declining close rates "bottomed" out in early 2022. ¶¶12, 269. In addition, Defendant Jagdfeld has admitted that HSB demand could not be assessed without "tak[ing] into consideration" the close rates (¶263), which confirms he and Defendant Ragen took the declining close rates into consideration before making their repeated Class Period statements about HSB demand (*e.g.*, ¶¶109, 113, 118, 123).

[20] The scope and scale of these negative trends distinguishes this case from *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *25, *30 (N.D. Ill. Mar. 30, 2022), which lacked allegations "quantify[ing] the scale of" the omitted practice of re-selling used products.

Finally, both the Individual Defendants signed the Company's 3Q22 financial statements admitting that warranty expense and losses had substantially increased. *See* ¶¶191, 260.

These admissions support scienter. *See, e.g.*, *Allstate*, 2018 WL 1071442, at *5-*6 (denying motion to dismiss where defendant "played an active role" in earnings calls and admitted that concealed negative trends had been "expected"). That certain admissions occurred at the end of the Class Period does not make them "fraud by hindsight" (*see id.* at *6), as courts recognize that "[f]raud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 799, 809 (C.D. Cal. 2011) (denying motions to dismiss); *Grubhub*, 2021 WL 4077327, at *5. Defendants' brief concedes they were aware of the negative trends by attempting to justify the omissions, claiming they had a "reasonable belief that demand remained strong and reducing lead time would reverse effects on close rates." *See* DM at 7. But a reasonable belief that a negative trend might someday reverse does not justify withholding the underlying negative facts from investors, and any affirmative defense of good faith is premature at the pleading stage. *See, e.g.*, *Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1196 (N.D. Ill. 1997) (finding scienter alleged for statements that omitted problems "even if they honestly believed [the problems] would soon be rectified").[21]

### 5. Defendants' Misleading Answers and Refusal to Answer Analyst Questions Support Scienter

Just after close rates bottomed out, Defendant Jagdfeld dismissed analyst questions about cancellations by saying they were "not a material number" (¶128(c)) and that "[IHCs have] been on

---

[21] Defendants also argue that the "[i]nventory increases do not necessarily equate to inflated or artificial sales orders" but "may result from delays moving the product from dealer to end user, for example." DM at 18. Analysts refuted that, finding that "over the course of our channel checks and those done by the investor community, we have not come across any dealers that have constrained installation capacity" (¶246) and that some could get product "installed within 2-3 weeks [because] the dealer has been steadily ordering and has built up ample inventory" (¶201).

a tear here in Q2 [2022]" and "we've been surprised by the robustness of the end market demand, to be very frank" to which Defendant Ragen added that IHCs "were up very nicely sequentially" (¶128(d)). Yet, the gap was so large between dealer orders and end customer contracts that dealer inventory levels "double[d]." ¶239; *see also Corus*, 701 F. Supp. 2d at 1022 ("An inference of scienter is supported, first of all, by Corus's awareness of the discrepancy between its public statements about its finances and the corporation's true financial condition.").

In addition, Defendant Jagdfeld denied using promotional tactics to boost orders when in fact they had. *See* §II.A.; ¶123(d) (claiming Generac could "pull[] on promotional levers" but have avoided them "over the last several years"). Also, as noted herein, as close rates declined and cancellations increased causing backlog to shrink, Defendants focused only on IHCs while omitting close rates (*e.g.*, §II.A; ¶269) and stopped reporting the backlog value (*compare* ¶¶113(b), 118(b), 123(b), *with* ¶¶128(b), 128(f)). When analysts directly asked about the backlog reporting change, they refused to answer and moved on. ¶¶216-221. Defendants' opaque disclosures, denials, and refusal to answer "supports a strong inference of scienter." *Oak Street*, 2023 WL 1928119, at *10 (finding scienter supported by "allegation that, when asked to 'unpack'" an issue, the defendants were "'reluctan[t] to delve into details'"); *AbbVie*, 2020 WL 5235005, at *5 (similar).

**6. Defendants' Stock Sales and Motive Support Scienter**

Motive is not required because "there is little if any significance attributable to the absence of an allegation of a personal financial motive." *See Career Educ.*, 2012 WL 5363431, at *11. But, when present, "'motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference[.]'" *See Hospira*, 2013 WL 566805, at *16.

Here, Defendant Jagdfeld sold stock as high as $500 per share, cashing in $38 million, before the stock fell to around $100 after the truth was revealed. ¶273. Defendant Ragen sold shares as high as $440, cashing in $4.4 million at the inflated prices. ¶274. Such large sales, including near

Class Period high prices, are suspicious and unusual, and, together with the totality of factors, support an inference of scienter. *See Allstate*, 2018 WL 1071442, at *2, *5 (holding that gross stock sales of $33 million and $6.2 million contributed to inference of scienter). In addition, the Individual Defendants' compensation was tied to increasing the stock price, as Defendant Jagdfeld was paid over $14 million over 2021 and 2022 and Defendant Ragen was paid nearly $4 million during the same time. ¶¶275-276; *see also AbbVie*, 2020 WL 5235005, at *5 (finding executive compensation being "tied directly to" sales supporting scienter); *Ustian*, 2009 WL 2386156, at *10 (finding $2 million and $800,000 bonuses supported scienter because "this court does not regard . . . these particular sums to be insignificant").[22]

Defendants cannot add Form 4s and 10b-5 plans as substantive evidence to create a factual dispute. *See Hospira*, 2013 WL 566805, at *12-*13 (holding defendants' attempt to rely on Form 4s for "'the truth of their contents'" weighed against incorporation by reference); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 944 (N.D. Ill. 2015) (giving "no weight at [motion to dismiss] stage" to "Rule 10b5-1 trading plan"). Defendants also concede that Defendant Ragen did not have a 10b5-1 trading plan (DM at 38 n.22) and for many sales Defendant Jagdfeld's plan was created during the Class period, so it does not refute the suspicious nature of his sales. *See Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308-10 (2nd Cir. 2015) (finding sales were still timed to "take advantage of an inflated stock price [so] the plan provides no defense

---

[22] Defendants rely on distinguishable cases, like *Fryman I*, 462 F. Supp. 3d at 897-904, where the court initially did not even find defendants made a misleading statement, so they necessarily could not have acted with scienter. Defendants also ignore that while the sales in *Fryman I* were deemed too small to be suspicious ($700,000 and $500,000), the court later changed course and held that those small stock sales did support scienter. *Fryman II*, 2022 WL 1136577, at *29-*30 (denying motion to dismiss). Other cases cited by Defendants involve much smaller sales or even sales by non-speakers. *See* DM at 37-38 (citing, *e.g.*, *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 955 (N.D. Ill. 2003) (finding sales only by non-speakers did not support scienter); *Garden City Emps.' Ret. v. Anixter*, 2012 WL 1068761, at *14 (N.D. Ill. Mar. 29, 2012) (stating smaller stock sales did not support scienter after finding no statements had been adequately pled)).

to scienter allegations"). Finally, given the large amount of stock they sold, it is no defense at this stage that the Individual Defendants did not sell all their stock. *See In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *9-*11 (D.N.J. June 30, 2019) (rejecting argument that large sales were negated by holding of substantial number of shares due to possible alternate inferences, such as fear that selling more would cause suspicion); *see also* Plaintiffs' accompanying Opposition to Defendants' Motion to Consider at 3 (explaining how Defendants' exhibits undermine their arguments). In short, Defendants' motive to keep the stock price inflated for as long as possible while they sold tens of thousands of shares supports the inference of scienter.

**7. There Is No Group Pleading**

Defendants' "group pleading" argument (DM at 34-35) is ridiculous. The term "Individual Defendants" is used in the Complaint when an allegation is applicable to both Defendants Jagdfeld and Ragen. *E.g.*, ¶¶34, 256, 275-276. For facts that apply only individually, the Defendant is referred to by name. *E.g.*, ¶¶95(b), 109(a), 109(e)), 263, 273. There is no "group pleading." *See Exelon*, 2021 WL 1561712, at *10 (rejecting "group pleading" argument because plaintiff "attributed specific statements and actions to individual Defendants and entities").[23] Contrary to Defendants' claim that the Complaint fails to identify the "individual(s) responsible for any alleged misstatement attributed to Generac" (DM at 34-35), for each SEC filing, conference call, or press release statement, the Complaint identifies the speaker or signer. *E.g.*, ¶¶110, 123; *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) (holding "'[o]ne "makes" a statement by stating it'" and recognizing "long-standing rule that '[a] corporation is liable for statements by

[23] Defendants' cases are inapposite. DM at 34 (citing, *e.g.*, *DH2, Inc. v. Athanassiades*, 359 F. Supp. 2d 708, 717-18 (N.D. Ill. 2005) (stating plaintiffs had only "conclusory allegations against all Defendants"); *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 599, 602 (7th Cir. 2019) (affirming dismissal where plaintiffs conceded "they did not know which Individual Defendant said what" and had "a single paragraph" in the complaint discussing scienter collectively).

employees who have apparent authority to make them'"); *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014) ("Courts 'have consistently held that the signer of a corporate filing is its "maker."'").[24] Demonstrating a lack of careful reading, Defendants argue "the alleged misstatements in ¶¶252-58, 260-62, 264-67, 269-72, 275-76 should be dismissed" (DM at 35), but those paragraphs are in the scienter section (¶¶252-276), not the misleading statements section (¶¶108-171).

### C. Loss Causation Is Adequately Alleged

Defendants devote little space to their loss causation arguments (*see* DM at 43-45), likely because loss causation is subject to notice pleading under Rule 8, requiring only a "short and plain" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Oak Street*, 2023 WL 1928119, at *11 ("Pleading loss causation is 'not meant to impose a great burden upon a plaintiff . . . .").

Here, the Complaint pleads that losses were caused when facts and trends concealed by Defendants "were leaked out, materialized, and revealed through the series of partial disclosures." ¶281. The Complaint details how the concealed information gradually entered the market through those disclosures revealing the existence, and eventually scope and magnitude, of the negative HSB demand facts and trends, the SnapRS defect, and the over-concentration of sales through Pink Energy. *See* ¶¶193-245, 282-296. These allegations are sufficient to plead loss causation. *See, e.g.*, *Ustian*, 2009 WL 2386156, at *5-*7 (finding loss causation adequately pled where plaintiffs "identified a series of disclosures – a leakage of information – which indicated that [the company's] financial statements and accounting practices were unreliable" and "share prices fell after each instance"). In response, Defendants pose a scattershot of undeveloped arguments that should not be

---

[24] *See also Akorn*, 240 F. Supp. 3d at 821 (holding executives' scienter established corporate scienter). Generac's scienter can also be established by the state of mind of unnamed employees. *See Tellabs II*, 513 F.3d at 710 (stating "it is possible to draw a strong inference of corporate scienter" from unnamed "individuals who concocted and disseminated the fraud").

considered. DM at 44-45; *see also Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (holding that "'perfunctory and undeveloped arguments . . . are waived'"). The arguments also have no merit.

First, Defendants rely upon out of Circuit cases, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) and *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220 (11th Cir. 2023), to claim that, for the November 2, 2021 and August 3, 2022 disclosures, the Complaint improperly alleges that "defendants made certain misstatements while also alleging that those misstatements were corrected within the same disclosure." DM at 43. That is wrong. The Complaint alleges that *previous* misstatements and omissions were partially corrected on those dates, but that additional misstatements and omissions prevented disclosure of the full truth causing Generac's stock price to remain inflated (¶¶113, 126, 193-195, 215-221, 282-283, 289), which is proper. *See, e.g.*, *Allstate*, 2018 WL 1071442, at *4, *6 (upholding first partially corrective disclosure of "increasing claims frequency" and false and misleading statements made on same day that "continued to blame external factors"); *see also Household*, 787 F.3d at 415 (noting that "a stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more" if the full truth had been revealed).

Moreover, *Flag* was a class certification decision, where, unlike at the pleading stage, the parties present evidence and "courts may resolve contested factual issues." 574 F.3d at 39. And, in *Flag*, the alleged corrective disclosures were positive statements from which the plaintiff inferred a negative connotation (*id.* at 41), but here Defendants disclosed information partially revealing a decline in demand while making separate positive statements that continued to overstate demand and conceal the full extent of the negative facts and trends. *See* ¶¶113, 126-127.[25] The *MiMedx* case is

25 The November 2, 2021 disclosure partially revealed Generac's weakening generator demand by reporting that residential products (generators) drove missed revenue expectations (¶193) and Generac only added 100 generator dealers, despite previously adding 200 to 400 every quarter since

distinguishable because "MiMedx did not correct any 'falsehood' in any of the[] alleged disclosures." 73 F.4th at 1245. Here, the November 2021 and August 2022 disclosures ***did*** partially correct prior misleading statements regarding generator demand (*see* ¶¶193-196, 215-221, 283, 289).[26] To the extent Defendants suggest *Flag* or *MiMedx* hold that partially corrective information cannot leak out over time while the full magnitude of problems are concealed, that is inconsistent with Seventh Circuit law. *See Household*, 787 F.3d at 421-24 (upholding leakage theory); *Kraft Heinz*, 2021 WL 3566602, at *16 ("[L]oss causation may be pled on a theory of partial disclosures."); *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *7-*8 (N.D. Ill. Sept. 23, 2019) (denying motion to dismiss where disclosure "provided the full magnitude or scope of the [previously-disclosed] FY16 earnings shortfall and reasons for the shortfall").

Second, Defendants assert that six analyst reports cannot be corrective because they were "based on already-public information." DM at 44, 44 n.27. That is a truth on the market affirmative defense, which is inappropriate for a motion to dismiss. *Oak Street*, 2023 WL 1928119, at *11 (citing cases). Moreover, the analyst-based partial disclosures alleged here were all the result of analysts reporting on previously non-public information from their industry "checks" or providing independent analyses,[27] which is sufficient to plead loss causation and different than the mere

---

2Q 2020 (¶195), neither of which disclosures are alleged as false and misleading. The same is true for the August 2022 allegations in ¶216 and ¶218, further revealing the scope and magnitude of weakening demand, which are not alleged as false and misleading.

[26] In addition, in *MiMedx*, the only plaintiff sold all of its stock "months before" corrective disclosures, so it could not allege loss causation, which is not the case here. *See MiMedx*, 73 F.4th at 1245 n.10 & 1248; ¶¶28-29.

[27] *See* ¶198 (reporting information from analysts' "checks" and conversations with dealers); ¶199 (reporting undisclosed SnapRS issues from "checks"); ¶200 (reporting information from "channel checks" and conversations with dealers); ¶224 (reporting information from "discussions" with dealers including what dealers admitted to the analysts); ¶228 (reporting on "connect[ions]" with dealers, "feedback from industry experts," and analyses). Tellingly, Defendants erroneously cite to a report (DM, Ex. 30) that is not even alleged as a corrective disclosure (¶237), and try to

"confirmatory" information in the cases cited by Defendants. *See, e.g.*, *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 979 (N.D. Ill. 2011) (holding that analyst report describing negative information the analyst found from its industry "checks" provided sufficient evidence of loss causation to proceed to trial); *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *13 (S.D.N.Y. Jan. 5, 2023) (holding loss causation adequately pled based on report providing "third party analyses of previously public information," and citing cases holding similar); *Pub. Emps.' Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) (holding "'there is no requirement that a corrective disclosure take a particular form or be of a particular quality'" and finding loss causation adequately pled where corrective disclosures included a third-party report speculating about wrong-doing and third-party report based on public information).

Third, Defendants argue that "unsubstantiated accusations" are "not corrective disclosures." DM at 44. But Defendants cite to cases where such allegations stood alone and were not related to subsequent disclosures. *See, e.g.*, *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *18 (W.D. Pa. Sept. 8, 2017) (noting filing of a complaint, "without more," could not establish loss causation and finding plaintiff failed to tie the allegations in the complaint to subsequent earnings disclosure). Here, Pink Energy's allegations and statements were substantiated and confirmed by the Company's subsequent admissions (§II.E.) and additional corrective disclosures (*e.g.*, ¶¶230, 240-244). Thus, the "disclosure is significant . . . not because 'it simply put investors on notice of a potential future disclosures . . . but rather because it started a series of partial corrective disclosures revealing the alleged misrepresentations." *Oak Street*, 2023 WL 1928119, at *11 (holding same for announcement of investigation); *Amedisys, Inc.*, 769 F.3d at 325 (finding mere "[s]peculation of wrongdoing" in short-seller report was part of several adequately pled corrective disclosures).

---

suggest that another report (DM, Ex. 31) only reported information that was "announced" on a "call" when the SnapRS information alleged (¶199) was not discussed on any such call.

Fourth, Defendants claim that loss causation has not been pled because there "are other possible explanations for the . . . stock price declines." DM at 45. Defendants fail to give any such explanations or support, so the argument is waived. *Exelon*, 2021 WL 1561712, at *4 (holding undeveloped argument was waived). In any event, Plaintiffs "do not have to plead that all of their loss is attributed to the actions of the Defendants, only that Defendants' actions are a plausible cause of Plaintiffs' economic loss." *Fryman II*, 2022 WL 1136577, at *33 (rejecting defendants' argument that "normal market movements" following "disappointing reports" on same day as alleged correctives could have caused the stock declines). Each corrective disclosure here revealed additional negative news, followed by a stock decline, which is all that is required. *See Kraft Heinz*, 2021 WL 3566602, at *16-*17 (rejecting argument that "Plaintiffs fail to plead loss causation because they do not explain exactly which alleged misstatements the 'corrective disclosures' corrected" because loss causation can be pled "'without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline'").

**D. Control Person Liability Under §20(a) Is Adequately Pled**

Since the Complaint adequately pleads a claim under §10(b) of the Exchange Act, it likewise pleads a control person claim under §20(a) of the Exchange Act. *See* ¶¶314-315; *cf.* DM at 45.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

DATED: December 20, 2023

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
& DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
MICHAEL J. STRAMAGLIA
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
mstramaglia@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

Lead Counsel for Plaintiffs

ADEMI LLP
GURI ADEMI
JESSE FRUCHTER
JOHN D. BLYTHIN
3620 East Layton Avenue
Cudahy, WI 53110
Telephone: 414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com
jfruchter@ademilaw.com
jblythin@ademilaw.com

ATOLLES LAW, S.C.
K. SCOTT WAGNER
222 E Erie Street, Suite 210
Milwaukee, Wisconsin 53202
Telephone: 414/644-0391
414/278-7590 (fax)
swagner@atolles.com

Local Counsel

KLAUSNER, KAUFMAN, JENSEN
& LEVINSON
ROBERT D. KLAUSNER
STUART A. KAUFMAN
7080 NW 4th Street
Plantation, FL 33317
Telephone: 954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
stu@robertdklausner.com

Additional Counsel for Plaintiffs