UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CITY PENSION FUND FOR FIREFIGHTERS
AND POLICE OFFICERS IN THE CITY OF
TAMPA BAY and CITY OF MIAMI FIRE
FIGHTERS' AND POLICE OFFICERS'
RETIREMENT TRUST, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiffs,

    v.                                                  Case No. 22-cv-1436-bhl

GENERAC HOLDINGS INC., et al.

                    Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

---

Defendant Generac Holdings, Inc. (Generac) is a publicly traded company that sells a variety of energy-related products, including power generators, solar power storage systems, home electricity controls, and gasoline-powered tools. (ECF No. 42 ¶¶2, 31.) Coincident with the COVID-19 pandemic, Generac reported increased product sales, driven largely by orders for its home standby (HSB) generators. Demand for HSB generators surged amidst the stay-at-home orders and other anxieties associated with COVID-19, leading to substantial increases in Generac's orders and sales. In response, investors eagerly drove up Generac's stock price. As the pandemic continued, however, Generac had trouble keeping up with orders and, despite efforts to increase capacity, its sales stalled, its orders decreased, and demand for its HSB generators waned. The company's stock price then dropped precipitously, ultimately losing almost 80% off its peak value. Generac and its CEO and CFO, Defendants Aaron Jagdfeld and York A. Ragen, were then hit with a series of securities fraud lawsuits. The Court ordered the cases consolidated and appointed the City Pension Fund for Firefighters and Police Officers in the City of Tampa and the City of Miami Fire Fighters' and Police Officers' Retirement Trust as Lead Plaintiffs. (ECF Nos. 29 & 39.)

On July 31, 2023, Lead Plaintiffs filed a 139-page, 316-paragraph Consolidated Amended Complaint, alleging three different theories of securities fraud. (ECF No. 42.) Despite the length

of their pleading, Lead Plaintiffs do not identify *any* false statements of material fact made by Defendants. Instead, they accuse Defendants of fraudulent nondisclosure, alleging that Defendants concealed three "negative trends" concerning: (1) the weakening of demand for Generac's HSB generators as the pandemic continued; (2) a defect in Generac's SnapRS solar energy products; and (3) the risk arising from Generac's "highly consolidated" sales of solar energy products through a single distributor, Pink Energy. (*Id*. ¶¶4, 17.)[1] According to Lead Plaintiffs, when the "true facts" concerning these "trends" were made public, Generac's stock price collapsed, causing investors substantial damages and giving rise to this litigation. (*Id.* ¶¶4–5.)

Defendants have moved to dismiss. They accuse Lead Plaintiffs of playing "hindsight critics" who cite virtually every public statement Defendants made during the pandemic to support three contrived theories of securities fraud. (ECF. No. 48 at 10–11.) Based on the large number and repetitive nature of Lead Plaintiffs' allegations and their disconnected theories of fraud, Defendants label the Consolidated Amended Complaint an impermissible "puzzle pleading" and insist this alone warrants dismissal. (*Id*. at 11.) More substantively, Defendants contend that Lead Plaintiffs have failed to plead falsity, scienter, materiality, and loss causation with the particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. (*Id*. at 11–13.) Having spent considerable time sifting through the Consolidated Amended Complaint, the Court agrees that Lead Plaintiffs rely too heavily on speculation and have not adequately alleged falsity and scienter on their primary theory. The Court also agrees that Lead Plaintiffs have failed to satisfy the pleading requirements for falsity, scienter, and materiality on their remaining theories. Defendants' motion to dismiss will therefore be granted, but the Court will allow Lead Plaintiffs 30 days to file a further amended complaint to try to correct the pleading deficiencies identified in this Order.

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded facts as true and draw reasonable inference in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)). A complaint will survive if it "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility

---

[1] It is unclear how the second and third identified nondisclosures constitute "trends." This is just one of many unexplained assertions in Lead Plaintiffs' overly long pleading.

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Given the temptations of hindsight and second-guessing and the serious nature of allegations of fraud, the law has long required higher levels of pleading and proof for misrepresentation or nondisclosure claims. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *Chamberlain Mach. Works v. United States*, 270 U.S. 347, 349 (1926); *Gen. Elec. Cap. Corp. v. Lease Resol. Corp*, 128 F.3d 1074, 1078 (7th Cir. 1997). Pleadings asserting claims for securities fraud are subject to Federal Rule of Civil Procedure 9(b) and must "state with particularity the circumstances constituting" the fraud. As a result, a plaintiff claiming fraud "must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate." *Borsellino*, 477 F.3d at 507 (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999)). And the complaint "must provide 'the who, what, when, where, and how'" of the alleged fraud. *Id.* (quoting *United States ex rel. Gross v. AIDS Rsch. All.–Chi.*, 415 F.3d 601, 605 (7th Cir. 2005)).

Lead Plaintiffs' Consolidated Amended Complaint is also subject to the even higher pleading burden established in the Private Securities Litigation Reform Act (PSLRA). The PSLRA requires Lead Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The complaint must "state with particularity the facts—known to the speaker at the time—that render the statement false or misleading." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp. (Navistar II)*, 114 F.Supp.3d 633, 651 (N.D. Ill. 2015). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor . . . ." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). A misleading statement of fact is material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). The PSLRA also sets the bar higher for pleading scienter. The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In other words, a securities fraud plaintiff "must

plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) (emphasis in original).

## BACKGROUND[2]

Lead Plaintiffs are the City Pension Fund for Firefighters and Police Officers in the City of Tampa and City of Miami Fire Fighters' and Police Officers' Retirement Trust, government employee benefit plans that purchased Generac common stock during the 18-month period between April 29, 2021 and November 1, 2022. (ECF No. 42 ¶¶1, 28–29.) Generac is a publicly traded company headquartered in Waukesha, Wisconsin that sells a variety of energy-related products, including power generators, solar power storage systems, home electricity controls, and gasoline-powered tools. (*Id.* ¶¶2, 31.) During the relevant period, Generac generated roughly $4 billion in annual revenues. (ECF No. 49 at 289.) Since 2008, Jagdfeld has served as Generac's CEO and Ragen has served as its CFO. (ECF No. 42 ¶¶32–33.)

Lead Plaintiffs allege that Defendants committed securities fraud by concealing three "negative trends" from the investing public in order to artificially inflate Generac's stock price. (*Id.* ¶4.) According to the Consolidated Amended Complaint, Generac's stock stood at $340 per share in April 2021 and rose to $506 per share in November of that year. (*Id.* ¶¶23, 196.) In 2022, the stock price began to fall, ultimately bottoming out at $106 per share on November 2, 2022. (*Id.* ¶23.) Lead Plaintiffs contend they suffered losses from the decrease in Generac's stock price because Defendants engaged in securities fraud and seek to represent a class consisting of all purchasers of Generac common stock between April 29, 2021 and November 1, 2022 (the Class Period). (*Id.* ¶1.)

The Consolidated Amended Complaint offers three alternate securities fraud theories, all based on alleged fraudulent non-disclosures. (*Id.* ¶4.) Lead Plaintiffs allege Defendants misled investors by concealing three "trends." (*Id.*) They contend Defendants failed to disclose: (1) the weakening of demand for Generac's HSB generators as the pandemic continued and the company

---

[2] This Background is derived from Lead Plaintiffs' Consolidated Amended Complaint, (ECF No. 42), the factual allegations in which are presumed true when considering a motion to dismiss. *See Twombly*, 550 U.S. at 554–56. Additional facts are derived from public disclosure documents cited in the complaint, including Generac's Form 10-K annual report for 2021, (ECF No. 49). Defendants' Motion for Consideration of Documents, (ECF No. 50), will be granted as to those public disclosure documents cited in the Consolidated Amended Complaint, which are incorporated by reference, and as to Generac's Form 10-K for 2022, of which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Defendants' motion will be denied as to Jagdfeld's and Ragen's SEC Form 4 filings, which are irrelevant to the Court's analysis in any event.

had trouble satisfying orders; (2) a defect in Generac's SnapRS solar energy products that led to residential fires, product failures, and increased warranty claims; and (3) Generac's risk of loss due to its "highly consolidated" sales of solar energy products through a single distributor, Pink Energy, that later went bankrupt. (*Id*. at ¶¶4, 17.) Lead Plaintiffs' allegations related to each of these theories are summarized below.

### 1. Generac's HSB Business

HSB generators are electrical generators that are permanently installed in residential homes to serve as a backup source of electricity in the event of a power outage. (*Id*. ¶35.) Generac introduced its first HSB generator in 1989. (*Id*.) Historically, the market for HSB generators has been limited because they are costly to buy and install and because power interruptions necessitating their use are relatively rare. (*Id*. ¶¶36–38.) By 2010, only about 2% of United States households with a home value of more than $100,000 had an HSB generator. (*Id*.¶38.)

The COVID-19 pandemic changed things in a dramatic way. When state and local governments issued stay-at-home or shelter-in-place orders, and the federal government issued related guidance, consumer interest in Generac's HSB generators surged. (*Id*. ¶¶56–57.) The impact of the pandemic on Generac's business was not a secret. During the company's July 30, 2020 earnings call, just after the pandemic began, Defendant Jagdfeld reported that the company's second quarter revenues had "dramatically exceeded" prior forecasts "primarily due to the higher-than-expected shipments of residential products." (*Id*. ¶58.) He noted that the company was "significantly benefiting" from increased demand for its residential products as a result of the pandemic and what Generac labelled the "Home as a Sanctuary" "megatrend" in which millions of people were "working, learning, shopping, entertaining and in general spending more time at home." (*Id*. ¶59.) Based on this increased demand, Generac significantly increased its full-year revenue and earnings outlook for 2020. (*Id*.)

The company repeated similar statements about the increased demand for its products as a result of the pandemic in its public disclosures for all quarters in 2020 and 2021 and in its year-end statements for both 2020 and 2021. (ECF No. 49 at 8–9, 11, 89, 93, 97.) In Generac's Form 10-Q for the second quarter of 2021, for example, the company noted that it continued "to experience a broad-based increase in demand for residential products, specifically home standby generators" as a result of the pandemic. (*Id*. at 387.) But it cautioned that "the further extent of the impact of COVID-19 on our business is dependent on future developments, including the

duration of the pandemic, our ability to operate during the pandemic, actions taken by domestic and foreign governments to contain the spread of the virus, and the related length of its impact on the global economy and our customers." (*Id.*; ECF No. 42 ¶110.) The company made similar statements in subsequent filings on Form 10-Q. (ECF No. 42 ¶¶114, 124.) The company also listed COVID-19 as a "risk factor" in its annual Form 10-K for 2020 and 2021. (ECF No. 49 at 23, 96–97.)

Along with these statements about the strong demand for HSB generators, Defendants repeatedly referred to the underlying data points that informed their statements. During the July 30, 2020 earnings call, Jagdfeld mentioned several "key metrics" that indicated strong demand for Generac's products. (*Id.* ¶60.) He discussed the company's tracking of HSB generator "activations" (the first use of a generator following installation), the number of "in-home and virtual consultations" Generac and its dealers were having with prospective customers, and the increased number of Generac's residential dealers offering HSB generators. (*Id.*) Jagdfeld also referred to the company's "close rates" – the rate at which consultations with potential customers actually resulted in a sale. (*Id.*) The company also reported on the numbers of HSB generator orders it was receiving, the increases in those orders, and the increased "backlog" in received orders waiting to be filled. (*Id.* ¶61.)

Over the course of the pandemic, Generac continued to report strong demand, increased backlogs in orders, and increased lead times. Backlog refers to the length of time between a dealer placing an order with Generac and the company actually shipping the order. (*Id.* ¶11 n.4.) Lead time is used to describe the same period or to the full period from order to installation. (*Id.*) In connection with its second quarter 2021 results, Jagdfeld reported that demand for HSB generators remained "incredibly robust" and that lead times "remain[ed] elevated at approximately 28 weeks." (*Id.* ¶109.) During a September 29, 2021 Virtual Investor Day, Jagdfeld reported increased manufacturing capacity while indicating that the backlog for orders had risen to "somewhere around 32 weeks." (*Id.* ¶112.) After reporting the company's third quarter 2021 results, Jagdfeld told investors in an earnings call that production levels were at an all-time high and yet demand for HSB generators continued "to outpace [the company's] ability to produce them" with lead times at about 30 weeks and a backlog of orders projected to be exceeding $1 billion entering 2022. (*Id.* ¶113.) The company also noted, however, that revenues for its residential products, including HSB generators, had fallen short of projections by 30 million and

that "lead times" had been reduced from 32 to 30 weeks. (*Id*. ¶¶193–94.) Generac's press release accompanying its 2021 year-end Form 10-K reported a 50% increase in net sales to a company record $3.75 billion for 2021 based on "exceptional demand." (*Id*. ¶117.) In a corresponding earnings call, Jagdfeld discussed "very strong" order rates, leading to a further increase in the company's backlog, which he reported remained over $1 billion, even as the company's production capacity increased. (*Id*. ¶118.) The company's 2021 Form 10-K likewise reported "increased demand" and "extended lead times," while cautioning that "a significant decrease in the demand" for Generac's products "could cause actual results to differ" from estimates. (ECF No. 49 at 33, 38.) In the company's press release for its first quarter 2022 results, Generac reported a 41% increase in net sales to a record $1.14 billion for the quarter. (ECF No. 42 ¶122.) In the follow up earnings call, Jagdfeld noted that home consultations with dealers for the quarter were three times higher than in the first quarter of 2020, "reinforcing" his belief that demand for HSB generators had risen to a new higher baseline level. (*Id*. ¶123.) He also noted that the backlog of orders remained "well above $1 billion." (*Id*.) Generac similarly reported "positive underlying demand trends" and an "elevated backlog" in its press release accompanying the announcement of its second quarter 2022 results. (*Id*. ¶127.)

The pandemic-led surge in demand for HSB generators created challenges for Generac. The company lacked the manufacturing capacity to meet the onslaught of orders, leading to increases in both the backlog of generator orders and the lead times between the company's receipt of an order and the final installation. (*Id*. ¶¶65, 69.) These challenges were exacerbated in early 2021 when a well-publicized power outage in Texas caused a further spike in demand. (*Id*. ¶69.)

The company disclosed the steps it was taking to respond. In early 2021, Defendant Jagdfeld announced that Generac had "continued to aggressively ramp our supply chain and production output" and had achieved "progressively higher record daily build rates throughout the fourth quarter" of 2020. (*Id*. ¶65.) Generac also announced plans to open a new manufacturing facility in Trenton, South Carolina, a plant it projected would increase HSB generator manufacturing capacity by 75% compared to the company's production level at the start of 2020. (*Id*. ¶¶65–66.)

Generac's ability to deal with the surge in demand was also limited by its distribution channels. The company does not typically sell its generators or solar products directly to end customers/homeowners, nor does it install the products. (*Id*. ¶50.) Instead, Generac sells

generators and solar products to "channel partners," who in turn sell them to end customers and arrange for installation. (*Id.*) The most predominant channel partners for Generac are its network of thousands of independent authorized dealers. (*Id.*) Generac's website provides a "Dealer Locator" function allowing interested homeowners to identify dealers near their location. (*Id.* ¶51.) If the homeowner contracts to purchase a generator, the dealer will later install the product, either with its employees or through outside contractors. (*Id.* ¶52.) Historically, a dealer would either install a generator from its inventory or place an order to Generac for delivery, generally with minimal or no delay for production. (*Id.*) The surge in demand for HSB generators caused by the pandemic outpaced Generac's ability to add dealers capable of taking orders and installing generators. (*Id.* ¶9.) In a May 4, 2022 earnings call to discuss the company's first quarter 2022 results, Defendant Jagdfeld noted the continued backlog on orders and the delays in installation and reported on the company's efforts to work with existing and new dealers to increase their ability to install products more quickly and to deal with labor shortages. (*Id.* ¶123.) Like many manufacturers, Generac incentivized its dealers to obtain orders and sell products. Generac granted dealers special privileges if they maintained "Premier" status by securing at least $1.5 million in orders. (*Id.* ¶13.) To encourage them to seek out customers, Generac also allowed dealers to cancel orders with protections against the risks of over-ordering. (*Id.*)

While continuing its efforts to meet the increased demand, Generac simultaneously reported increased sales and revenues over the course of the pandemic. In its quarterly filings to the SEC on Form 10-Q, its quarterly press releases and earnings calls with analysts, and its annual filings on Form 10-K, the company reported dramatic revenue growth, particularly in its residential product segment. (*Id.* ¶¶62–63.)



Residential Sales
Year-Over-Year Growth

(*Id.*)

These revenue figures were based on actual shipments of products, not mere orders. Generac records revenue for HSB generator sales only upon shipment or delivery to the distributor (its customer), who is paid by the homeowner (the end customer).  (*Id.* ¶6.)  The company does not report revenue upon the mere receipt of an order from a dealer.  (*Id.*)

Generac's positive reporting of results came to an end as the pandemic waned in late 2022. On November 2, 2022, Generac issued a press release and held an earnings call to discuss results for the third quarter of 2022.  (ECF No. 49 at 235–257.)  On the call, Jagdfeld reported that residential product sales were weaker than expected in the quarter, driven in part by lower shipments of HSB generators.  (*Id.* at 237.)  He announced that HSB generator sales "grew at a mid-teens rate over the prior year" and, while in-home consultations (IHCs) were lower in the quarter than the prior year (which included Hurricane Ida), the quarter was still tied for the second highest IHC numbers since Generac began tracking the metric in 2013.  (*Id.*)  Jagdfeld further stated that Generac had added about 300 dealers in the quarter and that activations continued to grow compared to the prior year, but installation capacity for HSB generators lagged behind production output, with installing contractors facing the same labor, permitting, and utility, and materials-related constraints.  (*Id.*)  He continued that growth in Generac's dealer base was constrained in prior quarters by extended lead times and those factors "resulted in elevated levels of field inventory and lower-than expected orders from our channel partners despite the continued strength in end customer demand."  (*Id.*)

## 2.  Generac's Solar Business

Generac entered the solar energy storage business in 2018, as part of a new corporate strategy.  (*Id.* ¶40.)  After acquiring several energy companies the following year, Generac developed the "PWRcell" line of products, designed to "capture[] and store[] electricity from solar panels or other power sources and help[] reduce home energy costs while also protecting homes from shorter duration power outages."  (*Id.* ¶¶41–42.)  A significant component of PWRcell products is the "SnapRS" device, which Generac advertised as "a simple way to satisfy rapid shutdown compliance for solar + storage systems."  (*Id.* ¶43.)  A rapid shutdown device is required in solar panel systems to alleviate the risk of electrocution.  (*Id.* ¶44.)  As PWRcell sales grew in 2020 and 2021, Defendants highlighted the success of the product and its importance to the company, with Jagdfeld stating in October 2020 that "[s]hipments of our PWRcell energy storage systems . . . were a key contributor to the company's year-over-year growth."  (*Id.* ¶47 (alteration in original).)

By early 2021, SnapRS devices began to fail by turning on and off repeatedly, resulting in units overheating and eventually deforming and melting.  (*Id.* ¶76.)  The units then stopped working, harming the solar panels' performance, and causing fires in customers' homes.  (*Id*. ¶¶76, 83, 86.)  This led to tens of thousands of customer complaints, overwhelming dealers and exposing Generac to risks and liabilities.  (*Id*. ¶77.)

In August 2022, one of Generac's dealers, PowerHome Solar LLC n/k/a Pink Energy filed suit against Generac over the SnapRS defects, claiming damages of several hundred million dollars.  (*Id.*)  According to Pink Energy's lawsuit, it first reported the defect to Generac by April 2021.  (*Id.* ¶78.)  Pink Energy further claimed that by August 2021 other dealers were also complaining to Generac about the defect and the high failure rates associated with the SnapRS device.  (*Id*. ¶82.)  A Generac executive did not dispute the overheating problem and told Pink Energy representatives that the company was investigating the cause.  (*Id.* ¶¶84–85.)

Generac's efforts to resolve problems with the device did not immediately work.  The company first developed a firmware update to fix the issue, but it did not solve the problem.  (*Id.* ¶87–89.)  Many customers' systems were not connected to the internet and they therefore did not receive the update.  (*Id.* ¶89.)  Generac also tried to fix the issue by developing an updated version of the SnapRS device in late 2021, but the updated version suffered from similar issues.  (*Id.* ¶¶91–92.)

According to Pink Energy's lawsuit, "approximately half" of Pink Energy's 19,000 customers whose systems utilized the SnapRS device experienced issues that required replacement of the devices. (*Id.* ¶94.) Pink Energy's lawsuit also alleges that Generac agreed in December 2021 to retroactively indemnify Pink Energy from all claims arising from manufacturing defects resulting in injury or damage to property. (*Id.* ¶93.) Shortly after filing suit, Pink Energy went out of business and declared bankruptcy. (*Id.* at ¶77.) Additionally, nine consumer class action complaints relating to SnapRS failures were filed against Generac between October 2022 and July 2023. (*Id.* ¶97.) In October 2022, Generac reported $55 million in pre-tax charges from the SnapRS defect, including $37 million from clean energy product warranty-related matters. (*Id.* ¶230.)

### 3. Overreliance on Pink Energy

After years of focusing primarily on HSB generators, Generac launched its PWRcell solar products in late 2019. (*Id.* ¶98.) In late 2019 and January 2020, Generac met with and traveled to Pink Energy to solicit its business as a channel partner. (*Id.*) After negotiations, the two sides reached a partnership whereby Pink Energy would purchase and install Generac PWRcell products. (*Id.* ¶99.) The companies began to jointly market the new partnership, and Generac agreed to provide Pink Energy with leads for potential solar customers generated by Generac's marketing. (*Id.*)

Generac regularly disclosed its intention to build out its solar installer network. In April 2021, Jagdfeld highlighted that Generac had trained and certified 2,000 dealers. (*Id.* ¶155.) Jagdfeld continue to report on the growth of Generac's solar dealer network, disclosing that the network had grown to approximately 2,200 dealers by July 2021, 2,300 by November 2021, 2,500 by February 2022, 2,600 by May 2022, and 2,800 by August 2022. (*Id.* ¶¶157, 160, 163, 166, 169.) Generac also regularly disclosed its efforts to expand its distribution network it its SEC filings. (*Id.* ¶¶156, 158, 161, 164, 167, 170.) In 2022, Jagdfeld reported that Pink Energy was a "large" and "really important customer for [Generac]." (*Id.* ¶107 (alteration in original).) Pink Energy had a negative reputation for predatory sales. (*Id.* ¶20.)

Pink Energy filed for bankruptcy on October 7, 2022. (*Id.* ¶229.) In October 2022, Generac reported $18 million in bad debt expense related to Pink Energy's bankruptcy. (*Id.* ¶230.) Generac also increased its pre-existing warranty balance by $38.6 million in its Form 10-Q for the

third quarter of 2022.  (*Id.* ¶191.)   After Pink Energy's bankruptcy, Generac reduced its guidance on "core energy sales" by $185 million.  (*Id.* ¶107.)

## ANALYSIS

Lead Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission (SEC)'s Rule 10b-5 by making false or misleading statements to inflate Generac's stock price.  (ECF No. 42 ¶¶308–12.)  They contend that Jagdfeld and Ragen are individually liable for Generac's securities fraud under Section 20(a) of the Exchange Act.[3]  (*Id.* ¶¶313–16.)

Section 10(b) prohibits the use or employment, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" SEC rules.  15 U.S.C. § 78j(b).  Rule 10b-5 prohibits any "untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plausibly allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460–61 (2013)).

Lead Plaintiffs do not allege that Defendants made any false statements of objective fact in the challenged disclosures; their claims are all based on fraudulent non-disclosures or omissions. In these circumstances, Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete."  *Macquarie Infra. Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).  The rule prohibits "half-truths," or "representations that state the truth only so far as it goes, while omitting critical qualifying information."  *Id.* (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)).  According to the Consolidated Amended Complaint, Defendants defrauded investors by accurately reporting

---

[3] Section 20(a) of the Act, 15 U.S.C. § 78t(a), imposes joint and several liability on "controlling persons" for violations of securities laws.  To state a claim against Jagdfeld or Ragen under Section 20(a), Lead Plaintiffs "must first adequately plead a . . . violation of [Section] 10(b) and Rule 10b-5."  *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).  Because Lead Plaintiffs have not adequately pleaded violations of Section 10(b) and Rule 10b-5, their Section 20(a) claims will be dismissed as well.

Generac's historic sales and orders for its products, while failing to disclose three "negative trends": (1) the weakening demand for Generac's HSB generators; (2) a major defect in Generac's SnapRS solar energy products; and (3) the "overconcentration" of Generac's sales of solar energy products through a single distributor, Pink Energy. (ECF No. 42 ¶108.) Defendants contend that Lead Plaintiffs have failed to state actionable claims under any of these three theories.

## I. The Consolidated Amended Complaint Is Unnecessarily Long and Convoluted but Will Not be Dismissed on that Ground.

Defendants first argument for dismissal is a global challenge to the Consolidated Amended Complaint. Defendants insist Lead Plaintiffs have filed an improper "puzzle pleading," which must be dismissed on that ground alone. (ECF No. 48 at 21–22.) The term puzzle pleading is not found in Rule 12(b)(6), Section 10(b) of the Act, or SEC Rule 10b-5. The Seventh Circuit also does not appear to have ever used the term. But district courts have embraced it as a means of describing and dismissing securities fraud complaints that fail to adequately connect alleged misstatements with the reasons the plaintiff contends those statements are false or misleading, as required by the PSLRA. *See Macovski v. Groupon, Inc.*, No. 20 C 2581, 2021 WL 1676275, at *5 (N.D. Ill. Apr. 28, 2021) (collecting cases). The underlying rationale is that such complaints "improperly place[] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Id.* (quoting *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, No. 13 C 2111, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014)).

Defendants highlight the Consolidated Amended Complaint's "whopping 118 statements across at least 63 paragraphs, almost all of which contain numerous subparts," its repetition of "similar and often identical lists of 22 purported reasons the statements" were allegedly misleading, and its failure to provide "*any* particularization or attempt to connect each specific statement to one or more specific reasons." (ECF No. 48 at 22 (emphasis in original).) They insist this firehose approach to pleading forces both Defendants and the Court to undertake the unnecessary burden of searching the Consolidated Amended Complaint for specific facts that may support Lead Plaintiffs' "formulaic lists" of allegedly misleading statements. (*See id.*) Defendants contend that Lead Plaintiffs' "puzzle pleading" alone is a sufficient basis for dismissal. (*Id.* (citing *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008), *aff'd sub nom. Fannon v. Guidant Corp.*, 583 F.3d 995 (7th Cir. 2009)).)

The Court is sympathetic to Defendants' argument – the Consolidated Amended Complaint is unnecessarily lengthy. Lead Plaintiffs' approach flies in the face of the "short and plain" statement contemplated by Federal Rule of Civil Procedure 8(a)(2). The Consolidated Amended Complaint cites, often with an extensive quotation, virtually every public disclosure Defendants made during the relevant period. This goes far beyond a mere "belt and suspenders" approach, which might be annoying but otherwise understandable. Lead Plaintiffs appear to be throwing everything at the wall in the hopes that they can convince the Court that they have support for their fraudulent nondisclosure theories based on sheer volume if nothing else. This approach is unhelpful and antithetical to the purposes of Rule 8, Rule 9, and the PSLRA. A pleading should provide clear notice of the parties' claims so the opposing parties and the court have no doubt about the basis for the parties' claims. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994) ("[A] complaint 'must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is.'" (quoting *Wade v. Hopper*, 993 F.2d 1246, 1249 (7th Cir. 1993))). This requirement is even more important in the context of allegations of securities fraud. *See Tellabs*, 551 U.S. at 313 (noting that the PSLRA and its "[e]xacting pleading requirements" were enacted as a "check against abusive litigation by private parties").

Lead Plaintiffs cite, quote, and highlight in bold more than 115 separate affirmative statements that Defendants made in multiple public disclosures during the Class Period. Unhelpfully, many of these statements say the same thing over and over again. Many statements are also cited, quoted, and highlighted multiple times. This approach, and the sheer number of statements quoted serves only to highlight Lead Plaintiffs' remarkable failure to identify any statement that was actually false. Instead, the Consolidated Amended Complaint labels these largely uncontroversial and accurate statements "misleading." The end result is that discerning any specific objective facts that Lead Plaintiffs contend were not disclosed is made unnecessarily challenging.

In the end, however, the Court declines to dismiss the Consolidated Amended Complaint as a "puzzle pleading," at least as presented by Defendants. As discussed below, the fundamental problem with the pleading is not its use of confusing and repetitive cross references but rather its failure, despite its length and repetitiveness, to offer specific plausible allegations of falsity, scienter, and materiality, all required elements of the securities fraud claims pleaded.

## II. The Consolidated Amended Complaint Fails to Plead a Viable Securities Fraud Claim Based on Defendants' Alleged Concealment of Weakening HSB Generator Demand.

Lead Plaintiffs' primary theory of securities fraud is that Defendants misled the investing public about "weakening demand" for Generac's HSB generators during the Class Period. The Consolidated Amended Complaint flags parts of 42 separate statements made by Defendants in various press releases, earnings calls, and company reports during the Class Period. (ECF No. 42 ¶¶109–30.) Defendants emphasize that, even with all these citations, Lead Plaintiffs have still not identified with particularity any false or misleading statements of material fact. (ECF No. 48 at 22–42, 50–52.) Defendants also argue that Lead Plaintiffs allegations as to scienter and loss causation are insufficient. (*Id.* at 42–50, 52–55.)

### A. Lead Plaintiffs Have Not Plausibly Alleged Falsity to Support their HSB Demand Non-Disclosure Theory.

In support of their main theory, Lead Plaintiffs highlight (with bold and italics) parts of multiple disclosures that Defendants made during the Class period related to HSB generator demand. As Defendants underscore, Lead Plaintiffs do not contend that any of these flagged statements were actually false. (*Id.* at 22–23.) By and large, the highlighted statements relay Defendants' professed belief that interest in HSB generators had surged during the pandemic, along with references to underlying metrics supporting that belief.

With respect to statements made in 2021, Lead Plaintiffs flag parts of eleven statements Defendants made in connection with Generac's second quarter 2021 results. (ECF No. 42 ¶¶109–110.) In the portions highlighted, Defendants noted "robust" demand for HSB generators as a result of the pandemic, continued growth in HSB generator production and sales, and increased "lead times" for these products. (*Id.*) The Consolidated Amended Complaint next quotes a statement from the company's Virtual Investor Day in which Jagdfeld discussed the company's efforts to increase capacity to satisfy the increase in demand for HSB generators, while also emphasizing that even with the increases to production the backlog on orders had increased to "somewhere around 32 weeks." (*Id.* ¶112.) Lead Plaintiffs cite another eight statements made by Defendants related to Generac's third quarter results. (*Id.* ¶¶113–14.) In these statements, Defendants similarly indicated their belief that demand for HSB generators remained strong, with shipments substantially exceeding the prior year's figures and demand outpacing production

capacity, resulting in lead times growing to "approximately 30 weeks" and a projected backlog of orders exceeding $1 billion entering 2022. (*Id*.)

Lead Plaintiffs cite still more statements of largely the same nature made in 2022. The Consolidated Amended Complaint cites eight statements made in February 2022 in connection with Generac's press release, earnings call, and 10-K. (*Id*. ¶¶117–19.) These statements include Jagdfeld's confirmation that the company continued to experience exceptional demand during the fourth quarter of 2021 while achieving record production and shipments of products, results the company continued to attribute to the pandemic. (*Id*.) The company also noted that orders remained strong and continued to outstrip production, resulting in a further increase to the order backlog and to extended lead times for the company's products. (*Id*.) Lead Plaintiffs highlight ten similar statements from public disclosures made in connection with Generac's first quarter 2022 results. (*Id*. ¶¶122–24.) These statements included the company's continued belief that demand remained strong along with reports of record product shipments, increases in home consultations, and improvements to build rates and lead times. (*Id*.) Jagdfeld also told investors that the backlog for HSB generators remained well above $1 billion, despite increases in output, "reinforcing" the company's belief that demand had reached a new "higher baseline level." (*Id*. ¶123.) Jagdfeld also noted that dealer inventories had grown but explained that the volume of in-home consultations suggested that demand remained strong. (*Id*.) Finally, the Consolidated Amended Complaint cites eight statements of the same ilk from public disclosures made in connection with Generac's second quarter 2022 results. (*Id*. ¶¶127–29.) These statements reported the company's positive view of underlying demand, a continued large backlog, and the year-over-year increase to in-home consultations. (*Id*.) Jagdfeld also disclosed the company's "liberal policy" toward order cancellations while indicating he did not believe that the number of cancellations in the company's large backlog was a "material number." (*Id*. ¶128.)

Having highlighted portions of more than 40 public disclosures, Lead Plaintiffs accuse Defendants of misleading the investing public by concealing the "trend" that demand for HSB generators was in fact declining. Lead Plaintiffs' reliance upon Defendants' alleged concealment of declining demand is potentially problematic. The law has long recognized that "[o]nly statements or omissions of *fact* can be fraudulent." *Eckstein v. Balcor Film Invs.*, 8 F.3d 1121, 1132 (7th Cir. 1993) (emphasis added). Demand for a particular product is not a set data point that can be objectively known at a given point in time; it is something that is estimated based on

underlying objective facts. As Defendants note, demand is not "a defined or fixed financial term" and can be assessed in many ways, using a variety of metrics. (ECF No. 48 at 25.) Expert witnesses can debate for hours the proper measure of a product's demand during a specified time period. That being said, the law is also clear that a party's false statements concerning its "beliefs" about the demand for a particular product can be statements of fact for purposes of securities fraud if those beliefs "are open to objective verification." *Eckstein*, 8 F.3d at 1132. But if the statements of belief "had a reasonable basis when made," the defendants did not commit fraud. *Id*.

The Seventh Circuit has held that a company's general observations about "robust" demand for its products are not statements of *objective fact* that can support a claim for fraudulent misrepresentation or nondisclosure. In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007), the Seventh Circuit affirmed a district court's determination that generalized statements that a company feels good about "robust growth" for its products cannot support a claim of securities fraud. Similarly, statements that company executives viewed demand for a product as "exceeding our expectations" was essentially "meaningless" and would not be relied upon by a reasonable investor. *Id*. The court of appeals distinguished such general positive statements from more specific representations that are objectively verifiable and therefore actionable. Thus, positive statements concerning the specific amount and growth rate of sales of specific products could support a securities fraud claim. *Id*. Similarly, statements that product sales data showed the product "continue[s] to *maintain its growth rate*" and that sales were "still going strong" could be actionable if false. *Id*. (emphasis in original).

The disclosures highlighted by Lead Plaintiff fall into the former, non-actionable, category. Paragraph 109 of the Consolidated Amended Complaint, identifying disclosures made in connection with Generac's second quarter 2021 results, is emblematic. The entirety of this lengthy allegation is quoted below, with Lead Plaintiffs highlighting in bold and italics the statements they contend are false and misleading:

(a) Defendant Jagdfeld emphasized that "*[d]emand for home standby generators remains incredibly robust* due to a variety of factors, including *continued traction with the Home as a Sanctuary mega trend*, as well as significantly higher power outage activity over the past several quarters."

(b) Defendant Jagdfeld further added that:

despite strong prior year comparisons ***due to the emergence of the Home as a Sanctuary mega trend*** and elevated outage levels, ***home consultations or sales leads for home standby generators remained strong during the second quarter and increased approximately 50%*** as compared to the second quarter of 2020. . . . Activations of home standby generators, which are a proxy for installations, also grew again at a strong rate compared to the prior year with broad-based strength across all U.S. regions, including exceptional growth in the Northeast and South Central regions.

(c) Defendant Jagdfeld stated that Generac "start[ed] production of home standby generators at our new manufacturing facility in Trenton, South Carolina," which he claimed "***will provide much-needed capacity*** to further ramp our daily home standby build rates in an effort to reduce ***lead times***, which ***remain elevated at approximately 28 weeks***."

(d) Defendant Jagdfeld claimed that the metrics monitored by Defendants showed growing demand, saying:

> ***Early in the third quarter, these key demand metrics for home standby have continued to trend even higher*** relative to prior year levels, ***including home consultations increasing at a strong double-digit rate***.

(e) Defendant Ragen likewise touted HSB growth, focusing on increased production: "***home standby generator sales continue to experience robust growth***, which nearly doubled during the second quarter, ***as shipments benefitted from much higher production levels for these products as compared to the prior year***."

(f) Defendant Ragen added that the Company was increasing its guidance because in part "the ***company continues to make better-than-expected progress in increasing production rates for home standby generators***."

(g) During the question and answer portion, an analyst asked about the Company's 28-weeks backlog, which was the same as reported the previous quarter despite the Company producing more generators. Defendant Jagdfeld responded:

> So when we're giving that update again this quarter and the fact that it hasn't changed, yet we have higher production levels in the future, we've also, as we indicated in the prepared remarks, ***we've been experiencing higher incoming order rates***. So that kind of matches up with the higher expected production at this stage.

(h) Defendant Jagdfeld added:

> [A]t this stage, it's -- ***the demand has been incredibly robust***.
> We said this in the prepared remarks as well. [E]ven here in the
> third quarter in July, ***our IHCs or home consultation sales leads***
> ***for home standby are up again on very difficult comps***
> ***compared to last year***.
>
> So I mean, it's just -- ***it continues to amaze us, the interest level***
> ***in the category and how that's translating into real demand***.

(ECF No. 42 ¶109 (emphases in original).)

The highlighted statements concerning Defendants' belief that demand remained "incredibly robust" fall directly under *Tellabs'* teaching that such generalized statements are "meaningless" to investors and nonactionable. 437 F.3d at 597. Moreover, to the extent Defendants made specific statements about the basis for their beliefs, they affirmatively disclosed the metrics on which they were relying. In the very disclosures that Lead Plaintiffs purport to rely upon, Defendants reported "robust growth" in the actual sales of HSB generators, "which nearly doubled during the second quarter." Defendants also referred to increases in home consultations/sales leads and generator activations, elevated lead times, increased order rates and high backlogs in orders. Tellingly, Lead Plaintiffs do not allege that any of these statements about the underlying metrics were untrue. This undercuts any plausible claim that Defendants' statements concerning demand were false or misleading. It instead shows that Defendants had a "reasonable basis" for their beliefs about the strength of HSB generator demand when the statements were made. *See Eckstein*, 8 F.3d at 1132. Indeed, Defendants also disclosed that Generac was increasing HSB generator production and increasing HSB generator pricing at the same time these underlying metrics suggested "incredibly robust" demand, further undercutting any notion that Defendants did not believe the truth of what they were reporting.

Lead Plaintiffs' efforts to cast these optimistic and admittedly accurate statements as misleading fail for the lack of allegations of specific facts that would render them misleading. Lead Plaintiffs first contend that the highlighted statements are false and misleading because "the temporary boost in sales and demand from COVID-19 was not a sustainable trend." (ECF No. 42 ¶111(a)(i).) This contention is far from plausible support for a claim that Defendants committed fraud. As an initial matter, no reasonable investor would have believed that the surge in demand from the pandemic would continue indefinitely. Moreover, Lead Plaintiffs' premise is rebutted by

the very same disclosures they cite. Defendants refer to the "Home as a Sanctuary mega trend" throughout their disclosures, a term they explain relates to the impact the pandemic was having on HSB generator demand. (ECF No. 42 ¶¶59, 62, 109(a), (b), 110(a), (c), 118(a), 119(b).) Generac also specifically alerted investors that "the further extent of the impact of COVID-19 on our business is dependent on future developments, including the duration of the pandemic, our ability to operate during the pandemic, actions taken by domestic and foreign governments to contain the spread of the virus, and the related length of its impact on the global economy and our customers." (ECF No. 49 at 32, 105, 387.) The company also listed COVID-19 as a "risk factor" in its annual Form 10-K for 2020 and 2021. (*Id.* at 23, 96–97.) Lead Plaintiffs cannot plausibly accuse Defendants of fraudulently misleading investors about the pandemic's impact on HSB generator demand.

The Consolidated Amended Complaint next alleges that Defendants' factually accurate disclosures concerning demand were false and misleading because demand for HSB generators was in fact "weakening as the lengthy lead times had caused close rates to decline and ultimately bottom out at the beginning of 2022." (ECF No. 42 ¶111(a)(ii).) Lead Plaintiffs main factual support for this assertion is a post-Class Period statement from May 2023 in which Jagdfeld indicated that close rates, one of many metrics the company disclosed, were "still well off of our pre-pandemic close rates" and had "bottomed the beginning of last year, so about a year ago," (i.e. in early 2022). (*Id*. ¶269.) Lead Plaintiffs also cite a November 2022 statement in which Jagdfeld acknowledged that long lead times – delays in fulfilling orders – were having a negative impact on close rates and on the company's ability to sign new distributors and installers. (*Id.*) Lead Plaintiffs also include a slide from a Generac presentation given after the Class Period indicating that "close rates decline[d] over 40% as lead times grew – bottoming in Q1 2022." (ECF No. 53-1 at 3.)

In the overall context, Jagdfeld's isolated statements and an after-the-fact retrospective of close rates do not plausibly support the inference that HSB generator demand was declining. Lead Plaintiffs themselves cite Defendants' repeated disclosure of multiple metrics that supported their belief that demand remained strong. And Lead Plaintiffs concede that these metrics were accurate. That one out of several metrics might raise a question about demand does not mean that demand was falling, as Lead Plaintiffs questionably speculate. Moreover, Lead Plaintiffs utterly fail to plausibly suggest that Defendants knew that demand was declining or that they were intentionally

misleading investors about customers' demand for their products. The PSLRA requires Lead Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). And they must "state with particularity the facts—known to the speaker at the time—that render the statement false or misleading." *Navistar II*, 114 F. Supp. 3d at 651. Given the multitude of accurate statements indicating that demand remained high, Lead Plaintiffs' conclusory assertions to the contrary fail to satisfy their heavy burden.

Lead Plaintiffs also seek to support the claimed falsity of Defendants' disclosures by accusing Defendants of intentionally selling more generators to Generac's dealers than the dealers could sell to customers and of manipulating and failing to disclose the incentives Generac provided those dealers. (ECF No. 42 at 111(a)(iii)-(v), (b), (d).) As Defendants point out, although Lead Plaintiffs avoid the term, these accusations amount to allegations of improper "channel stuffing." (ECF No. 48 at 26–27.) Channel stuffing describes a practice in which a company "ships 'to one's distributors more of one's product than one thinks one can sell.'" *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F.Supp.2d 969, 985 (E.D. Wis. 2009) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 709 (7th Cir. 2008)). Not all practices that might lead to this result are problematic, but channel stuffing can be fraudulent when a company engages in it intentionally, "to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Tellabs II*, 513 F.3d at 709.

Defendants argue that Lead Plaintiffs' channel stuffing allegations are speculative and made without sufficient supporting facts to establish the existence of such a scheme. (ECF No. 48 at 26–27.) They note that the only specific factual allegation supporting Lead Plaintiffs' theory is the assertion that Generac's field inventory was increasing at some unspecified point in 2022. (*Id.* at 27 (citing ECF No. 42 ¶239).) In reply, Lead Plaintiffs insist these are "factual disputes" that cannot be resolved at the motion to dismiss stage. (ECF No. 52 at 29.) Lead Plaintiffs also point to allegations citing analyst reports from late in the Class Period in which the analysts remark on increased dealer inventories resulting from pre-orders as dealers apparently tried to retain their "Premier" dealer status under Generac's promotional scheme. (ECF No. 42 ¶¶224, 228, 235.)

The Court agrees with Defendants that Lead Plaintiffs' backhanded channel stuffing theory is not adequately pleaded. The Consolidated Amended Complaint does not include specific factual

allegations that Defendants were knowingly engaged in improper channel stuffing. Nowhere does the pleading allege specific facts suggesting that Defendants altered the company's dealer incentives or its treatment of orders with the intention of inflating sales metrics or to conceal decreasing demand. Indeed, the allegations as a whole suggest Generac's handling of orders, including pre-orders, remained consistent prior to, during, and after the pandemic and the Class Period. There are simply no plausible, particularized allegations that Defendants were engaging in channel stuffing.

Lead Plaintiffs repeat these same falsity theories multiple times, with only minor variations.[4] (ECF No. 42 ¶¶111, 115, 120, 125, 130.) They do not gain in specificity or plausibility by their repetition. Because Lead Plaintiffs have not alleged, with particularly, any specific facts known to Defendants contemporaneously that made any of their HSB statements false or misleading, they have failed to properly allege falsity with respect to HSB generator demand and failed to state a claim based on this theory.

## B. Lead Plaintiffs Have Also Failed to Allege Scienter with Respect to the HSB Generator Demand Theory.

Section 10(b) and SEC Rule 10b-5 also require a plaintiff to identify "with respect to each act or omission alleged" the particular "facts giving rise to a strong inference" that the defendants knew their statements were false or misleading or were reckless in disregarding a substantial risk of falsity. 15 U.S.C. § 78u-4(b)(2)(A); *Harley-Davidson*, 660 F.Supp.2d at 994. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court explained how courts should analyze scienter allegations at the motion to dismiss stage. First, as with any motion to dismiss for failure to plead a claim, the Court must accept all factual allegations in the complaint as true. *Id.* at 322. Second, the Court must consider the complaint in its entirety and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 322–23 (emphasis in original). Third, the Court must consider plausible opposing inferences in determining whether the pleaded facts create a "strong" inference of scienter. *Id.* at 323–24. "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

---

[4] Lead Plaintiffs also allege that Generac violated Items 105 and 303 of SEC Regulation S-K by failing to report the negative "trends" that form the basis of their Consolidated Amended Complaint. (ECF No. 42 ¶¶172–79.) They have since dropped this argument following the Supreme Court's decision in *Macquarie Infra. Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), which confirms that pure omissions are not actionable under Section 10(b). (ECF No. 61 at 2.)

*Id.* at 314. The Supreme Court confirmed this demanding standard must be applied to give effect to the strong language Congress used in establishing the burden of pleading scienter under the PSLRA. *Id.*

Defendants argue that the Consolidated Amended Complaint's scienter allegations are "the kinds of boilerplate allegations" that courts routinely find insufficient to plead scienter. (ECF No. 48 at 45.) More specifically, they argue: (1) the Consolidated Amended Complaint impermissibly relies on group allegations; (2) the Consolidated Amended Complaint fails to plead actual knowledge; (3) motive-and-opportunity allegations are insufficient; (4) insider stock sales are insufficient; (5) allegations concerning status, access to information, and "core operations" are insufficient; (6) and Jagdfeld's and Rosen's "public admissions" are also insufficient. (*Id.* at 43–50.)

The Court agrees with Defendants that Lead Plaintiffs have provided insufficiently particularized allegations to support a strong inference of scienter. Much like their allegations as to falsity, Lead Plaintiffs' pleading failure lies in the generalized and conclusory nature of their allegations. The PSLRA requires Lead Plaintiffs to make particularized allegations "with respect to each act or omission alleged" to be false or misleading. § 78u-4(b)(2)(A). In the section of the Consolidated Amended Complaint dedicated to scienter, Lead Plaintiffs provide few additional allegations. With respect to Ragen, Lead Plaintiffs do not provide any particularized allegations supporting an inference that he made any of the challenged statements with knowledge that they were false or misleading, or with reckless disregard for their falsity. With respect to Jagdfeld, Lead Plaintiffs identify three statements he made during and after the Class Period. In March 2022, Jagdfeld stated during an interview that there was "probably a little bit of overbuying [from dealers] in the channel." (ECF No. 42 ¶270.) In November 2022, Jagdfeld stated that long lead times were having a negative impact on close rates and Generac's ability to sign new dealers. (*Id.* ¶269.) And in May 2023, after the Class Period, Jagdfeld disclosed that close rates were "still well off" pre-pandemic levels and had "bottomed [out]" sometime in early 2022. (*Id.*) These generalized statements are insufficient to support a strong inference of scienter.

Like Lead Plaintiffs' falsity allegations, their scienter allegations suggest at most only that Jagdfeld knew, at some point, that close rates were declining and inventory growing. They do not support a strong inference that Jagdfeld was aware (or even should have been aware), at the time he made any specific statement, that close rates were so low, or dealer inventory so high, as to

make his positive statements about HSB backlog and demand false or misleading to investors. As Defendants repeatedly disclosed to investors, the COVID-19 pandemic created unprecedented and unpredictable demand for HSB generators. Jagdfeld, Ragen, and Generac all made public statements to that effect. Without particularized allegations supporting a "strong" inference that Jagdfeld or Ragen knew in advance when that demand was waning and deliberately withheld that information from investors, Lead Plaintiffs' allegations amount to little more than "fraud by hindsight." *See Tellabs*, 551 U.S. at 320 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

In the absence of specific facts supporting a finding of scienter, Lead Plaintiffs suggest the Court should "infer" scienter because: Jagdfeld and Ragen controlled Generac's messaging to investors; Generac's HSB generator business was critically important to its financial success; Defendants closely monitored the HSB generator business; Jagdfeld and Ragen made public admissions suggesting they disregarded facts that made their statements false and misleading; and Jagdfeld and Ragen made stock sales during the Class Period and were incentivized through compensation packages to inflate Generac's stock price. (ECF No. 42 ¶¶252–76.) The inferences Lead Plaintiffs ask this Court to draw would undermine the high burden Congress placed on Lead Plaintiffs in the PSLRA. The CEO and CFO of a company almost always control its messaging and almost always monitor and make public disclosures about key parts of the company's business. And it is common for executive officers to have compensation tied to performance and to make transactions in the company's stock. If these facts were sufficient to infer scienter, this necessary element would be satisfied in virtually every securities fraud case and the scienter requirements of the PSLRA would be rendered meaningless. Lead Plaintiffs generalized allegations of scienter are insufficient to create a strong inference that any Defendant made any particular statement with knowledge of or a reckless disregard for its falsity. Their primary securities fraud theory thus fails for this reason as well.

## III. Lead Plaintiffs' Alternate Securities Fraud Theories Are Also Inadequately Pleaded.

The allegations Lead Plaintiffs offer in support of their secondary securities fraud theories are not as verbose as those supporting their lead theory, but they are nonetheless still overly long and repetitive. The Consolidated Amended Complaint dedicates 12 pages to allegedly false disclosures concerning the SnapRS defect "trend." (ECF No. 42 ¶¶131–54.) Lead Plaintiffs cover the allegedly false disclosures concerning the Generac dealer concentration "trend" in ten pages.

(*Id.* ¶¶155–171.)  Defendants challenge both theories, again invoking both Rule 9(b) and PSLRA and insisting Lead Plaintiffs have not alleged with particularity any false or misleading statements of material fact, scienter, materiality, and loss causation.

### A. Lead Plaintiffs Have Not Plausibly Alleged Falsity, Scienter or Materiality to Support Their SnapRS Defect Theory.

In support of the theory that Defendants failed to disclose a product defect in Generac's SnapRS device, Lead Plaintiffs again highlight in bold and italics parts of multiple disclosures from the Class Period.  The Consolidated Amended Complaint quotes statements from press releases, earnings calls, Generac's filings on Form 10-Q and Form 10-K, and the company's September 28, 2021 Environmental, Social and Governance (ESG) Report.  While Lead Plaintiffs quote from more than a dozen disclosures, as with their primary theory, the quoted language is largely the same over and over again.  According to the Consolidated Amended Complaint, Generac, its CEO, and its CFO repeatedly reported that "shipments" and sales of Generac's clean energy products, including its PWRcell systems, were increasing compared to prior time periods, while also cautioning that an "increase in product and other liability claims" could affect Generac's "actual financial results."  (*Id.* ¶¶131–33.)  The quoted text from the "Product Safety" and "Product Quality" portions of the ESG report states that Generac "maintains a robust produce safety function" and "regularly reviews any safety concerns associated with products in the field."  (*Id.* ¶138.)

Again, Lead Plaintiffs do not allege that any of these relatively innocuous statements were false.  They argue that the quoted statements were "misleading" because Defendants simultaneously failed to disclose a "dangerous and significant defect in Generac's SnapRS devices and resulting customer complaints, liabilities, and warranty claims."  (*Id.* ¶108(ii).)  Defendants maintain that Lead Plaintiffs have failed to allege facts plausibly suggesting that Defendants were aware of and affirmatively concealed any significant defect in the SnapRS device at the time the quoted disclosures were made.  (ECF No. 48 at 29–33.)  Defendants note that Generac affirmatively disclosed issues related to the SnapRS component in October 2022 and argue that Lead Plaintiffs' real complaint is that Defendants should have disclosed those issues sooner, with the benefit of hindsight.  (*Id.* at 32–33 (citing ECF No. 42 ¶230).)  Defendants also insist that even if a non-disclosure theory could be pursued, the relatively small size of Generac's PWRcell line renders any nondisclosure immaterial to investors as a matter of law.  (*Id.* at 51–52.)

The Court agrees that the Consolidated Amended Complaint does not sufficiently allege material falsity with respect to the SnapRS defect theory. A publicly traded company has a duty to disclose a product defect when it knows the scope and severity of the defect is material to the company's financial disclosures. *See Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1173–74 (N.D. Ill. 2019). But like all allegations of falsity, a duty to disclose a product defect cannot be pleaded in general terms. *Id.* In *Pierrelouis*, the defendant provided in-flight internet access to customers traveling by airplane. *Id.* at 1168. When a major partner airline started to complain that its new system was malfunctioning, the defendant did not immediately disclose the issue to investors, instead describing the company's outlook in "optimistic terms" and providing alternate explanations for a dip in a key metric. *Id.* at 1168–69. The court dismissed the plaintiff investors' Section 10(b) and Rule 10b-5 claims, concluding they had failed to allege "when the [defect] manifested itself as such a severe problem as to make defendants' statements to investors misleading." *Id.* at 1175. The court explained that while the plaintiffs argued that the seriousness of the defect "must have been apparent long before" the defendants eventually disclosed it, plaintiffs had failed to provide particularized factual allegations supporting their claim that the defendants' optimistic statements were false or misleading when made. *Id.* at 1173.

Lead Plaintiffs argue that Defendants' "statements touting Generac's product safety efforts and exceptional solar sales triggered a duty to disclose the negative product defects . . . that led to rising customer and dealer complaints and left [Generac] scrambling to come up with a global fix." (ECF No. 52 at 29 (internal citations omitted).) They accuse Defendants of mischaracterizing the Consolidated Amended Complaint, emphasizing that Generac began selling solar products that included the defective SnapRS device in 2019, well before the start of the Class Period, and pointing to allegations that nearly 50% of SnapRS units were ultimately found to be defective. (*Id.* at 30.) They insist that these allegations are sufficient to "infer" that Defendants knew about the problem during the Class Period. (*Id.*) Lead Plaintiffs also cite their allegation that Generac management told analysts that "the product challenges ensued ***shortly after launch***," which "confirms the defect was prevalent for more than a year leading up to the Class Period." (*Id.* (quoting ECF No. 42 ¶96 (emphasis in original)).)

Like the plaintiffs' allegations in *Pierrelouis*, Lead Plaintiffs' allegations fail to provide specific, particularized support for a finding that Defendants were aware of a material defect involving the SnapRS device at the time they made the statements Lead Plaintiffs contend were

misleading. An allegation that, at some point, half of the SnapRS units were defective says nothing about *when* those devices began to malfunction in sufficient numbers to alert Defendants to the existence of a significant problem. Of equal importance, this allegation says nothing about when Defendants became *aware* of the significance or pervasiveness of the issue. A generalized statement that "product challenges ensued shortly after launch" attributed to an unnamed member of Generac management similarly does not resolve this pleading deficiency. Moreover, nowhere does the Consolidated Amended Complaint actually allege that the SnapRS devices were malfunctioning prior to "early 2021." (*See* ECF No. 42 ¶¶76, 80.) And Defendants are correct that, prior to August 2021, the Consolidated Amended Complaint alleges that only a single instance of a SnapRS device overheating was brought to Generac's attention. (*See* ECF No. 48 at 31; ECF No. 42 ¶78.) That alone renders the first sets of challenged statements outside the realm of being misleading; all were made in April, May, and July 2021. (ECF No. 42 ¶¶131–35.) And it again demonstrates Lead Plaintiffs' global failings in alleging fraud by concealment.

Lead Plaintiffs cannot rescue their allegations by incorporating allegations from Pink Energy's complaint concerning its purported communications with Generac and Generac's efforts to address complaints about the SnapRS device. (ECF No. 52 at 31.) Lead Plaintiffs argue that "[i]t defies logic to suggest [Generac] would replace all previously sold parts and agree to indemnify Pink Energy for all prior sales if only 'one' or just a 'few' of the thousands of products were defective." (*Id.*) But this misunderstands their pleading failure. Lead Plaintiffs need to plausibly plead, with particularity, that the SnapRS defect prevalence was of sufficient magnitude, and sufficiently known to Defendants, that their statements were false, misleading, or without a reasonable basis at the time they were made. *See Pierrelouis*, 414 F. Supp. 3d at 1174. The Consolidated Amended Complaint fails to provide sufficiently specific and detailed information about when *Defendants* were not only aware of the pervasiveness of the defect, but also that it would expose them to the "increased liabilities, warranty claims, and reputational harm" alleged by Lead Plaintiffs. (*See e.g.* ECF No. 42 ¶137). The Consolidated Amended Complaint fails to tie specific allegations to specific statements made by Defendants that would plausibly render them materially misleading at the time they were made.

The relatively minor revenue associated with Generac's solar product line further undercuts Lead Plaintiffs' theory. "Whether a fact is material and whether a statement omitting it is misleading are closely intertwined. The more important a fact would be to investors, the more

likely its omission will mislead them." *Harley-Davidson*, 660 F.Supp.2d at 984 (quoting *Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 903 (N.D. Ill. 2001)). The Seventh Circuit has recognized a 5% change in revenue or income as a basic "rule-of-thumb" for determining materiality. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 n.† (7th Cir. 2007). Lead Plaintiffs highlight that Generac stated that its PWRcell line of business, which includes the SnapRS device, was an important part of the company's future. But the Consolidated Amended Complaint also alleges that 2022 revenue guidance for that portion of Generac's revenue was only $150 – $180 million, or less than 5% of Generac's $4.56 billion total revenue for 2022. (ECF No. 42 ¶249; ECF No. 29 at 289.) And while Lead Plaintiffs are correct that there is no hardline 5% materiality rule in the Seventh Circuit, (ECF No. 52 at 38), the relatively small revenues generated by Generac's solar sales make omission of a defect in one component of the PWRcell system substantially less likely to mislead reasonable investors.[5]

Lead Plaintiffs' scienter allegations with respect to the SnapRS defect theory are also insufficient for much the same reason their falsity allegations and scienter allegations concerning HSB generator demand fail. The Consolidated Amended Complaint alleges that Defendants ultimately disclosed liabilities stemming from the SnapRS defect in October 2022. (ECF No. 42 ¶230.) Lead Plaintiffs ask the Court to infer that, sometime before those disclosures, Defendants "must have known" the defect was so pervasive as to require disclosure to investors. (ECF No. 52 at 46.) But they fail to provide specific allegations aimed at any specific statement made by either Jagdfeld or Ragen. Such non-particularized allegations of nondisclosure cannot satisfy § 78u-4(b)(2)(A) or *Tellabs*. Nor do Lead Plaintiffs' other generalized allegations as to scienter make up for their lack of specificity. (*See* ECF No. 42 ¶¶252–76.) The Court thus agrees that the Consolidated Amended Complaint does not include specific plausible allegations of falsity or scienter to support Lead Plaintiffs' secondary securities fraud theory concerning the SnapRS defect.

---

[5] Lead Plaintiffs also allege that Generac's Form 10-Q financial statements for the first and second quarters of 2022 were false because Generally Accepted Accounting Principles (GAAP), specifically ASC 450, required Defendants to disclose anticipated losses from the SnapRS defect. (ECF No. 42 ¶¶180–91.) ASC 450 requires that an estimated loss be accrued if, at the time of the financial statement, the loss is probable and its amount can be reasonably estimated. (*Id.* ¶185.) ASC 450 also requires disclosure of a loss contingency when the loss is "reasonably possible," including the nature of the contingency and an estimate of the range of loss. (*Id.* ¶184.) As the Court has explained, Lead Plaintiffs do not plead with particularity that Defendants were aware of a material defect in the SnapRS product at any specific time. Their failure to disclose anticipated losses prior to October 2022 thus cannot establish falsity.

### B. Lead Plaintiffs Fail to Adequately Plead that Defendants Fraudulently Concealed the Concentration of Generac's Solar Sales in Pink Energy.

Lead Plaintiffs' final theory of securities fraud challenges Defendants' statements touting the growing breadth of Generac's clean energy distribution networks during the Class Period. Lead Plaintiffs contend these statements were materially false or misleading because Defendants concealed "the over-concentration of solar sales through Pink Energy." (*Id.* ¶¶155–71.) To support this theory, Lead Plaintiffs again highlight parts from a dozen press releases, earnings calls, and Generac's filings on Form 10-Q and Form 10-K. (*Id.* ¶¶155–58, 160–64, 166–67, 169–70.) Lead Plaintiffs use bold and italics to emphasize that Defendants repeatedly stated that Generac's solar energy products were sold through a "broad network of independent dealers" that the company was working to "build[] out." (*Id.* ¶¶155–57, 166.)

As with their other theories, Lead Plaintiffs do not allege that any of the quoted statements were false. Instead, they argue the statements were misleading because Defendants failed to disclose that Generac's solar product sales were highly concentrated within a single dealer (Pink Energy), thus exposing the company to "significant business and reputational risks." (*Id.* ¶159.) Defendants argue this theory fails first because Defendants did not have any affirmative duty to disclose the details of Generac's agreements with its distributors, and, even if they did, the Consolidated Amended Complaint offers only speculative allegations that solar product sales were highly concentrated in Pink Energy. (ECF No. 48 at 33–34.) Defendants further contend that context makes clear that their statements were not misleading to a reasonable investor. (*Id.* at 35.) Defendants also insist that the small volume of Generac's PWRcell line renders any alleged nondisclosure immaterial to investors as a matter of law. (*Id.* at 48.)

As Defendants observe, many of the quoted statements Lead Plaintiffs offer do not relate specifically to Generac's solar products. Rather, Lead Plaintiffs highlight statements concerning Generac's *overall* installer network and distribution partners, encompassing all Generac products or all residential products, of which Generac's solar products were but a small part. (*See* ECF No. 42 ¶¶155–58, 160–64, 166–67, 169–70.) Lead Plaintiffs thus mischaracterize the record by ascribing these statements to PWRcell products and to the specific dealer base for those items. Upon closer examination, only a small handful of statements address "clean energy" dealers. These statements include reports that the company had "built out" its "clean energy installer network" at the end of year "with nearly 2,500 trained and certified dealers" and had "been

leveraging these dealer development practices to assist in growing our base of solar contractors that sell, install and service our PWRcell energy storage systems." (ECF No. 42 ¶¶163(a), 164(c).) None of these statements speaks to the concentration or lack of concentration of sales in or among Generac's PWRcell product dealers.

A statement is made misleading by omission only if that omission "make[s] the statement so incomplete as to be misleading." *Harley-Davidson*, 660 F.Supp.2d at 984 (quoting *Anderson*, 140 F.Supp.2d at 903). Generalized statements concerning the breadth of Generac's dealership base were not incomplete simply because they failed to disclose the concentration of sales within that base. "Omitting one detail – even a significant one – [does not] render the whole story inaccurate or misleading." *In re Supreme Indus., Inc. Sec. Litig.*, No. 17-CV-146-PPS/MMG, 2019 WL 1436022, at *3 (N.D. Ill. Mar. 29, 2019). Moreover, Lead Plaintiffs' inclusion of multiple statements discussing Generac's dealer base across its operations highlights the lack of materiality to Defendants' alleged omissions. As discussed above, solar sales account for only a small portion of Generac's revenue. Defendants' disclosures concerning their dealership network related to, with few exceptions, their network across all product lines, not simply solar energy. A failure to disclose that one solar energy dealer accounted for a significant portion of their moderate solar energy-related sales is simply immaterial.

As with their other theories of securities fraud, Lead Plaintiffs' scienter allegations are also insufficient. In addition to the problems discussed above, the lack of materiality of Generac's concentration of solar sales in Pink Energy cuts against any "strong inference" of scienter. The most reasonable inference that can be made from the totality of the Consolidated Amended Complaint is that Defendants failed to disclose their concentration of solar sales through Pink Energy because it was of little consequence, not as a means of defrauding the investing public. The Court thus agrees with Defendants that the Consolidated Amended Complaint does not sufficiently allege falsity or scienter with respect to this theory and, even if it did, the issue is simply not material as a matter of law. Lead Plaintiffs fail to state an actionable securities fraud claim with their final alternate theory as well.

## CONCLUSION

Generac's stock price skyrocketed during the COVID-19 pandemic as customer interest in HSB generators exploded and investors flocked to Generac as a bright spot in an otherwise troubled economy. As the pandemic waned, however, and the company was unable to keep up

with orders, demand dissipated, despite the company's demonstrated efforts to boost its production capacity and installer base. This led investors to abandon the company, and Generac's stock price fell. Perhaps unsurprisingly, Lead Plaintiffs and others filed suit against the company and its executive officers, accusing them of securities fraud. But misfortune does not necessarily equate with fraud. Lead Plaintiffs' overly long Consolidated Amended Complaint is heavy in the sheer number of its allegations and in its conclusory accusations of fraud. But the pleading is light on specific plausible factual allegations supporting a claim of actual securities fraud against any of the three Defendants. Because Lead Plaintiffs have failed to satisfy their heavy burdens under Rule 9(b) and the PSLRA, Defendants' motion to dismiss must be granted. The Court will allow Lead Plaintiffs 30 days to file an amended pleading that includes specific factual allegations supporting their accusations of fraud. If no amended pleading is filed within 30 days, the case will be dismissed with prejudice.

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, ECF No. 47, is **GRANTED.** If Lead Plaintiffs wish to continue this lawsuit, they must file a Second Consolidated Amended Complaint on or before **March 10, 2025**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Consideration of Documents, ECF No. 50, is **GRANTED in part** and **DENIED in part**.

Dated at Milwaukee, Wisconsin on February 7, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge