UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION, et al., Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

GENERAC HOLDINGS INC., et al.,

Defendants.

Civil No. 2:22-cv-01436-bhl (Consolidated with Civil No. 2:23-cv-00081-bhl)

CLASS ACTION

---

# AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................................................1

JURISDICTION AND VENUE .....................................................................................7

PARTIES ..................................................................................................................8

Plaintiffs ..................................................................................................................8

Defendants ...............................................................................................................8

FACTUAL BACKGROUND ........................................................................................8

Generac's Legacy Home Generator Business .........................................................8

Generac's Expansion into Solar Energy ...................................................................9

Generac's Product Dealers ....................................................................................11

COVID-19 Leads to Increased Generator Sales in 2020 .........................................13

DEFENDANTS CONCEALED DECLINING CLOSE RATES DURING THE CLASS PERIOD ....................................................................................................................16

Close Rates Were an Important Metric that Defendants Closely Monitored ..........16

Generator Close Rates Declined Significantly Leading Up to and During the Class Period ........................................................................................................................20

Defendants Made False and Misleading Statements that Concealed Generac's Declining Close Rates and the Attendant Risks Thereof ........................................23

Analyst Reaction to the False and Misleading Statements .......................................29

DEFENDANTS CONCEALED THE SUBSTANTIAL NUMBER OF DEFECTIVE SOLAR UNITS DURING THE CLASS PERIOD ...................................................29

The Importance and Defendants' Monitoring of Solar Product Sales .....................30

Generac's Solar Products Suffered from a Substantial Failure Rate .......................32

Defendants Made False and Misleading Statements that Concealed Generac's Solar Product Defect and Substantial Failure Rate ...................................................39

Analyst Reaction to the False and Misleading Statements .......................................44

DEFENDANTS CONCEALED THAT GENERAC'S SOLAR SALES WERE HIGHLY CONCENTRATED IN ONE DEALER THROUGHOUT THE CLASS PERIOD..........45

**Page**


The Importance of Customer Diversification to Investors ....45

Generac's Solar Sales Were Highly Concentrated in a Single Customer....47

Defendants Made False and Misleading Statements that Concealed Generac's Lack of Customer Diversification and High Concentration of Sales in a Single Solar Dealer and the Attendant Risks ....49

Analyst Reaction to the False and Misleading Statements ....54

THE TRUTH BEGINS TO EMERGE ....55

November 2021 Disclosures ....55

January 2022 Through April 2022 Disclosures ....56

June 2022 Disclosures....57

August 2022 Disclosures ....58

September 2022 Disclosures....61

October 2022 Disclosures....62

November 2022 Disclosures....66

ADDITIONAL SCIENTER ALLEGATIONS....70

The Individual Defendants Controlled the Company's Messaging to the Investing Public ....70

The Individual Defendants' SOX Certifications Support A Strong Inference of Scienter ....71

The Critical Importance of the Generator and Solar Businesses and Diversification of Dealers Supports a Strong Inference of Scienter....72

Defendants Were Aware of the Declining Close Rates ....74

Defendants Were Aware of the SnapRS Defect and Its Attendant Risks and Liabilities ....77

Defendants Were Aware that Solar Sales Were Highly Concentrated Through a Single Dealer....78

**Page**

The Individual Defendants' Public Statements Support a Strong Inference of Scienter ....................79

The Individual Defendants' Insider Sales and Incentive Compensation Support a Strong Inference of Scienter ....................80

LOSS CAUSATION AND ECONOMIC LOSS ....................82

PRESUMPTION OF RELIANCE ....................85

NO SAFE HARBOR ....................87

CLASS ACTION ALLEGATIONS ....................87

COUNT I ....................89

For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants Generac, Jagdfeld, and Ragen ....................89

COUNT II ....................90

For Violation of §20(a) of the Exchange Act Against Defendants Jagdfeld and Ragen ....................90

PRAYER FOR RELIEF ....................91

DEMAND FOR TRIAL BY JURY ....................91

Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa, and additional named plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust (together, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Generac Holdings Inc. ("Generac" or the "Company"); (ii) Company releases, quarterly earnings call transcripts, and other analyst or investor conference call transcripts; (iii) information posted on the Company's website; (iv) analyst reports, media reports, and online posts and commentary about the Company and the industry; (v) public court dockets and filings, including the complaint filed in *Power Home Solar, LLC d/b/a Pink Energy v. Generac Power Sys., Inc.*, No. 6:22-cv-00043 (W.D. Va.); (vi) insiders' trades of Generac stock; (vii) other publicly available media, news, and information; and (viii) information from Generac dealers and partners through analyst reports, online videos, and other public sources. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a securities class action on behalf of all purchasers of Generac common stock between April 29, 2021, and November 1, 2022, inclusive (the "Class Period"). This action is brought against Generac, its Chief Executive Officer ("CEO") Aaron Jagdfeld ("Jagdfeld"), and its Chief Financial Officer ("CFO") York A. Ragen ("Ragen" and, together with Generac and Jagdfeld, "Defendants") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2. By way of background, Generac is a publicly-traded company that sells a variety of energy-based products, such as power generators, solar power storage systems, home electricity controls, and gasoline-powered tools. While Generac manufactures and sells an array of products for both residential and commercial use, the Company made clear during the Class Period that its future growth and success is dependent on two core strategies: (1) growing its legacy business of home standby ("HSB") generators that provide backup electricity to residences; and (2) expanding into the rapidly growing residential solar power systems by manufacturing and selling products that capture and store energy from solar panels.[1]

3. Historically, growth in the HSB generator business was largely driven by unpredictable and severe storms that would lead homeowners to buy generators to avoid inconvenience and loss from power outages. Absent such storms, Generac struggled to find ways to significantly increase the very low percentage of households with generators. As a result, for years leading up to the Class Period, Defendants had been trying to make Generac more attractive to investors by transitioning it into a more broad-based energy company. This made Generac's late 2019 expansion into solar power products critical to its perceived future growth prospects. Indeed, securities analysts that closely followed the Company noted at the start of the Class Period, in April 2021, that the "two key growth drivers" for Generac were "power outages" (which boost HSB generator sales), and "rooftop solar deployments" (which boost sales of Generac's complementary solar products).

4. During the Class Period, Defendants made positive false and misleading statements about Generac's performance, risks, and growth prospects while concealing three categories of negative facts, causing the stock price to be inflated. The three categories of concealed negative

---

[1] Generac does not manufacture or sell solar panels, only complementary products for the capture and use of energy generated from solar panels.

facts were: (1) the rate at which Generac was closing sales for HSB generators was in a state of drastic decline; (2) Generac's solar products suffered from a widespread and dangerous defect resulting in a substantial failure rate and escalating costs; and (3) Generac's solar product sales were highly concentrated in a single dealer, posing elevated risks to the business that ultimately came to fruition when the dealer closed and Generac's solar sales plummeted. As the negative facts were revealed through a series of disclosures, Generac's stock price lost nearly 80% of its value.

5. First, beginning in fourth quarter 2020, Generac's "close rates" for HSB generators, *i.e.*, the rate at which sales consultations were converted into actual sales to homeowners, plummeted. As described herein, Defendants tracked a number of metrics important to monitoring their generator business, such as: (a) consultations (in-home or virtual sales pitches to potential buyers); (b) close rates (actual sales to buyers divided by consultations); (c) lead times (the time it took from a sale to a buyer to installation); and (d) dealer orders (which could be executed without a buyer contract and were cancelable). Defendants admitted that they closely monitored close rates, which were especially important because Generac's close rates showed, for example, whether increased marketing efforts to consult with homeowners were being matched by increased homeowner sales contracts. Since consultations and close rates are highly interrelated, Defendant Jagdfeld has observed "you have to take into consideration where our close rate is" when assessing consultation increases.

6. By way of hypothetical illustration, if 100 consultations resulted in 50 homeowner contracts, then a 20% increase to 120 consultations should correspond to a similar 20% increase in homeowner contracts, if the close rate remained the same. In contrast, if consultations and orders were increasing but homeowner contracts were not being executed, the close rate would decline, signaling that the consultations were not with high value leads or that dealers were preemptively

ordering without a homeowner contract in order to, for example, save their place in line in response to long lead times, increasing the likelihood of cancellation.

7. During the Class Period, Generac's consultations and dealer orders increased, but close rates were in a state of drastic decline. The claims in this case arise, in part, because Defendants chose to repeatedly report the increases in the front-end positive metrics (consultations and dealer orders), while concealing the sharp decline in the interrelated sales metric of close rates, which misled investors and violated Defendants' duty of full and fair disclosure. For example, Defendant Jagdfeld highlighted that "***key demand metrics have continued to trend even higher relative to prior year levels including home consultations increasing at a strong double-digit rate***" and Defendant Ragen misleadingly assured analysts that "***there's buyers for those units that are in the field*** . . . ***[b]ased on the [consultation] volume***," while failing to disclose the sharp drop in close rates.[2] Investors and analysts were shocked, and the stock declined, when, at the end of the Class Period, the Company's generator orders and revenue began to contract and Defendants admitted that the close rates had declined significantly much earlier, meaning sales would be hurt even more going forward as dealers sat with inflated inventories and canceled their prior orders.

8. Second, Generac's solar products suffered from a major defect that was leading to increased liabilities and warranty claims as the products needed to be replaced. More specifically, Generac's products included a required shut-off device designed for safety to turn solar panels off if emergency workers needed to access the roof. However, Generac's device was overheating, melting, or turning the units off, resulting in loss of energy generation and even residential fires. Customer complaints began skyrocketing because of the unreasonably high defective rate, leading to tens of thousands of dealer service calls and replacements and mounting warranty and liability claims. However, during the Class Period, Defendants represented that Generac had a "***robust***

---

[2] Unless otherwise indicated, emphasis is added.

***product safety function***" and that the Company "***regularly reviews any safety concerns associated with products in the field, including potential product recalls***," while concealing the defect and increased customer complaints. And, rather than warn investors of the specific harm, warranty costs, and elevated risks that had occurred from Generac's defective solar products, Defendants' securities filings included only generic warnings of theoretical risks from a potential "***increase in product and other liability claims or recalls***" that "***could affect our financial results***." Investors and analysts were again shocked, and the stock further declined, when, at the end of the Class Period, it was revealed not only that Defendants had to replace virtually all of its units due to the dangerous defect, but that sales were declining and would continue to decline due to the defect.

9. Third, Generac's solar product sales were highly concentrated in a single distributor with a questionable reputation, Pink Energy, which was suffering losses and business interruptions from Generac's solar product defect. Pink Energy ultimately went bankrupt. Diversification is a well-studied and understood concept that reduces financial risk for companies and investors. By contrast, if a single customer accounts for a large percentage of sales, a company faces increased financial risks, as the loss of that customer would disproportionally impact overall sales. Throughout the Class Period, Defendants created the false impression that Generac had a broad and diverse dealer customer base for its solar products. For example, Defendant Jagdfeld misleadingly claimed that Generac was successfully "***building out [its solar] installer network . . . [with] approximately 2,000 dealers***" while omitting to disclose that just one of those 2,000 dealers (Pink Energy) accounted for half of Generac's total solar sales. Defendants clearly understood the importance to investors of its customer-dealer diversification and the risks of concentration because Defendants' SEC filings claimed that Generac's product-wide distribution "***network is well balanced with no single customer providing more than 6% of our [total] sales***," and that the Company "***attempt[ed] to mitigate [risk] through . . . expanded distribution***." The combination of claiming

that the Company was mitigating risk through expanded distribution, disclosing that no customer accounted for more than 6% of total (*e.g.*, solar and other product) sales, and touting the over 2,000 solar dealers, created a misimpression that the solar sales were similarly diversified and did not suffer from customer concentration risk.

10. Thus, investors and analysts received a third shocking revelation, and the stock declined again, when, at the end of the Class Period, Defendants reported plummeting solar sales and slashed solar guidance due to Pink Energy's bankruptcy and closure, revealing that Pink Energy accounted for more than half of Generac's solar sales. Analysts confirmed that the market had been misled when, after these disclosures, they reported that Generac's "dependence on distributor Pink Energy was more significant than [previously] understood" and it was a "surprise" that "Pink Energy likely accounted for more than half of Generac's solar/energy storage sales," as Defendants had, in the past, "consistently indicated Generac works with many distributors in the solar and energy storage market, and that Generac ha[d] trained and certified over 2,000 dealers."

11. In total, as each of these three negative facts were revealed in a series of disclosures, Generac's stock price declined by roughly 80%, causing massive investor losses from the delayed disclosure. Had these negative facts been timely disclosed as they were occurring and not concealed, the investors that bought during the Class Period would not have suffered damages from Defendants' failure to provide the full and fair disclosure required by the securities laws. Analysts confirmed their disappointment in not having been provided timely disclosures when they accused Generac management of having a "credibility" problem.

12. While investors were buying at prices inflated by the failure to disclose the negative facts, Defendants sold more than $40 million of their stock at inflated prices while in possession of that material nonpublic information, which also violated the securities laws. From November 2021 to November 2022, as the declining close rates, widespread solar defect, and over-exposure to a

single distributor began to be revealed through a series of disclosures, Generac's stock price declined an incredible 80%, from $506 per share to $106 per share, resulting in substantial harm to investors.

13. This action seeks to recover the damages suffered pursuant to federal laws passed and upheld by the Supreme Court to protect the investing public and preserve the integrity of the United States stock markets. Defendants violated the securities laws when they chose to repeatedly tout positive metrics while omitting to disclose those three negative facts necessary to make their positive statements not misleading. The disclosures thus violated the securities laws, which "were designed . . . to 'substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) *vacated on other grounds*, 551 U.S. 308 (2007) (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963)).

**JURISDICTION AND VENUE**

14. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

16. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa. Generac maintains its principal place of business in this District, and certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

17. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

18. Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa ("Lead Plaintiff") purchased shares of Generac common stock during the Class Period and was damaged thereby. *See* ECF 12-3.

19. Plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Named Plaintiff") purchased shares of Generac common stock during the Class Period and was damaged thereby. *See* ECF 42-1.

20. Lead Plaintiff and Named Plaintiff are collectively referred to herein as "Plaintiffs."

### Defendants

21. Defendant Generac describes itself as an "energy technology solutions company" headquartered in Waukesha, Wisconsin. Generac's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GNRC."

22. Defendant Jagdfeld has served as CEO of Generac since 2008 and as Chairman of the Board since 2016.

23. Defendant Ragen has served as CFO of Generac since 2008.

24. Defendants Jagdfeld and Ragen are collectively referred to herein as "Individual Defendants." The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## FACTUAL BACKGROUND

### Generac's Legacy Home Generator Business

25. For three decades, Generac built a business centered on manufacturing and selling portable generators that could move from location to location to provide temporary electricity using gasoline, diesel fuel, or liquid propane. Then, in 1989, Generac launched its home standby, or

"HSB," generator business. A HSB generator is a permanent power generator connected to a home that provides a backup source of electricity in the case of a power outage. For example, if severe weather damages a power line and cuts off electricity to a home, a Generac standby generator uses the home's natural gas line to create electricity to provide power to all, or a portion, of the home until the main power is restored.

26. HSB generators are costly. For an installed Generac HSB generator, homeowners would have to spend around $4,000 to $20,000. The generators are also not essential. By design, they only provide electricity if there is a power outage, which is a relatively rare occurrence. Given the expense and lack of regular need, the market for home standby generators has historically been relatively limited. Generac noted that in 2010, only approximately 2% of U.S. households were equipped with an HSB generator. Unable to obtain widespread adoption of HSB generators, Generac has become largely dependent upon extreme weather to generate demand.

**Generac's Expansion into Solar Energy**

27. Recognizing the difficulty of growing generator sales and the need to show long term growth potential as a public company following its 2010 initial public offering ("IPO"), Generac launched a corporate strategy to "transition from primarily a North America focused, energy backup generator company into a more diversified industrial technology company." Then, in 2018, the Company launched its "Powering Our Future" corporate strategy that focused on acquiring businesses to provide "the initial foundation for the Company's evolution into an energy technology solutions company." The strategy of expanding into energy solutions, rather than remaining a generator company, led to Generac entering the solar energy storage industry.

28. In 2019, Generac acquired businesses involved in hardware, software, and battery technology for solar power, including Neurio Technology, Inc. ("Neurio") and Pika Energy, Inc. ("Pika"). Later that year, Generac leveraged the technology it acquired from Pika and Neurio to

create "PWRcell" – a line of "clean energy products" that "captures and stores electricity from solar panels or other power sources and helps reduce home energy costs while also protecting homes from shorter duration power outages." Generac's PWRcell products are connected to solar panels (usually installed on a homeowner's roof) and they allow the homeowner to store and utilize electricity from solar power captured by the solar panels.[3] Generac does not manufacturer or sell solar panels.

29. The most significant component of PWRcell products to this case is the "SnapRS" device, which Generac advertised as "a simple way to satisfy rapid shutdown compliance for solar + storage systems." Under the 2017 National Electric Code ("NEC") and 2020 NEC, adopted by states throughout the country, solar panel systems are required to include a "rapid shutdown" function. The rapid shutdown function is a fundamental safety requirement to quickly turn off that live current, which poses an electrocution risk to anyone who comes into contact with the solar panel system, including first responders requiring access to the roof.

30. To comply with the NEC requirements, a single SnapRS is installed between each solar panel, and then between the solar panels and the PV Link. The following diagram from Generac shows how SnapRS (shown as "RS") is intended to be installed and function with an eight-panel system, requiring eight SnapRS devices:

---

[3] For reference, the PWRcell products that will be discussed herein include: (i) PWRcell, which is used to refer to the entire line of products for solar energy storage and sometimes used as shorthand to refer to the component battery used to store solar electricity for backup power; (ii) SnapRS, which is discussed extensively herein; (iii) "PV Link," which is the component used to link or connect multiple solar panels to the PWRcell inverter; and (iv) "PWRcell inverter," which converts the "direct current" electricity created by the panels to the "alternating current" used in homes. Generac and analysts refer to PWRcell products as being part of Generac's "solar," "clean energy," or "energy storage" business.




31. Leading up to and during the Class Period, Defendants made public statements to confirm that PWRcell was a critical product to the Company's future sales growth. For example, after its launch in late 2019, Defendants discussed PWRcell at every one of Generac's quarterly earnings calls through the end of the Class Period. Likewise, in SEC filings, Generac has repeatedly listed "[s]olar, storage, and monitoring markets developing quickly" among the Company's most important "Strategic Growth Themes." Analysts also tracked and understood the importance of the solar business. For example, on February 16, 2021, Northcoast Research reported positively about the "growing adoption of Generac's PWRcell energy storage system," which "had a strong impact on growth with shipments continuing to significantly ramp during the quarter" and "will be a critical driver of [growth] within the clean energy solutions." Similarly, on June 8, 2021, Piper Sandler reported on Generac's view that PWRcell "sales could reach ~$500M in revenue over the next few years" and that "[l]ong term[,] G[enerac] thinks that their clean energy storage segment could be as large as HSB."

**Generac's Product Dealers**

32. Generac does not typically sell its generators or solar products directly to the end customer homeowner, nor does it install the products. Instead, the Company sells generators and

solar products through various "channel partners" that serve as the connection between the manufacturer (Generac) and the end customer (the homeowner). While such channel partners include retail chains, the Company's predominant channel partners are its network of thousands of independent authorized "dealers" who sell the products to the end customers and arrange installation. As stated in Generac's annual report on Form 10-K for the year ended December 31, 2021 ("2021 Form 10-K"), "[w]e depend on the services of independent distributors and dealers to sell our products and provide service and aftermarket support to our end customers."

33. As to generators, a homeowner interested in an HSB generator can utilize the "Dealer Locator" function on Generac's website. By entering their location, the homeowner is provided the name of several dealers in the area, who can be contacted to visit the home for an "in-home consultation" ("IHC") or do a "virtual-home consultation" ("VHC"). Defendants track these consultations in order to track early-stage customer interest.

34. If the homeowner enters a contract to purchase a generator, the dealer will typically then order the generator from Generac and later install product, either with its employees or through outside contractors. Generac records revenue upon shipment or delivery to the distributor (its customer), who is paid by the homeowner (the end customer). To encourage dealers to increase sales, Generac provides benefits for higher sales volumes. For example, according to securities analysts at BofA Securities who spoke with Generac dealers, top dealers who achieve "Premier" status get "discounted access to generators."[4] BofA reported that, to earn and maintain that status, "Premier dealers must demonstrate $1.5 [million] in sales annually."

35. Once installed, the homeowner will activate the unit, upon which Generac will be notified that the activation is complete. Defendant Jagdfeld has stated that "[w]e track all the time

---

[4] The discounts can be substantial as an online forum post by a Generac dealer in June 2019 noted that Premier dealers pay "11.6% . . . less than the minimum advertised price."

fences between when an IHC occurs to when that turns into an order, to when that order turns into an installation, to when that installation turns into a first use of the product."

36. When Generac expanded into the solar market in late 2019, it applied a similar dealer-based process to grow the solar business. As explained in the 2021 Form 10-K, "we have been leveraging these [HSB dealer channel] practices to assist in growing our base of solar contractors that . . . install . . . our complete energy storage systems." Because Generac uses dealers to sell its generator and solar products, it also reports increases in dealers to its investors as an important metric.

**COVID-19 Leads to Increased Generator Sales in 2020**

37. In March 2020, the World Health Organization declared COVID-19 a global pandemic. In the lead up to and following that declaration, stay-at-home, or shelter-in-place, orders and guidance were implemented throughout the United States. While the pandemic had a devastating impact on some businesses, it provided a boost in sales to others. Generac was one such business that saw its sales spike as a result of the shift to staying at home. Just as severe weather would trigger homeowners to contemplate purchasing generators to protect from loss of power, the need to work from home and conduct in-home schooling resulted in a surge in demand for generators to protect against power outages.

38. The positive impact was both significant and immediate. For example, four months after stay-at-home orders were issued, during an earnings call on July 30, 2020, Defendant Jagdfeld touted a spike in sales, saying that "[r]elative to expectations, second quarter revenue dramatically exceeded our prior forecast . . . . primarily due to the higher-than-expected shipments of residential products."

39. Defendant Jagdfeld explained that "[h]ome standby shipments came in significantly higher than our prior forecast, primarily driven by robust demand as a result of the heightened

awareness of the need for backup power since the onset of the COVID-19 pandemic." Defendant Jagdfeld added that "what appears to be fairly clear to date is that demand for our residential products is significantly benefiting from an emerging trend that we are referring to as Home as a Sanctuary, where millions of people are working, learning, shopping, entertaining and, in general, spending more time at home."[5]

40. Notably, during the same July 30, 2020 earnings call, Defendant Jagdfeld admitted Generac had clear visibility into sales and demand when he explained that "[s]everal key metrics that we monitor closely for home standby demand continued to be exceptionally strong during the second quarter." These metrics included increased number of "residential dealers," "in-home and virtual consultations" with prospective customers, and "[a]ctivations" of the generators after installed. In addition, Defendant Jagdfeld confirmed Defendants monitored "close rates" – the rate at which a consultation results in an end customer contract prior to installation and activation – when he noted that close rates "actually remained consistent with historical trends, which gives us confidence to raise the outlook for residential products for the full year."

41. Throughout 2020 and into 2021, the Company reported dramatic growth in residential sales. Generac's Residential sales growth, which includes both generators and solar products, is reflected in the following chart created from numbers publicly reported by Generac:

---

5 Generac reports its revenue in segments based on the end customer use – *i.e.*, "Residential," "Commercial and Industrial," and "Other." Thus, Residential includes HSB generators, solar and energy storage products, portable generators, and other residential-use products.




42. Generac's improved performance did not go unnoticed by analysts and the market. During the question and answer portion of Generac's February 2021 earnings call, an analyst praised management, saying "[w]e're running out of superlatives for Generac on your performance. Congratulations." In response, Defendant Jagdfeld agreed and said "I'm right alongside you on that one," and reassured analysts the spike was sustaining itself by adding "you talk about the loss of words and superlatives. . . . but we don't see a ton of [order] cancellations. It's a very sticky [home generator] backlog."[6]

43. At the same time, the second prong of Generac's long-term success, the recently launched solar energy storage business, was also growing and performing well. Defendant Jagdfeld reported on the same February 2021 earnings call that "shipments of PWRcell energy storage systems increased significantly during the first year of commercial launch, particularly during the second half." Two months later, Generac issued a release announcing its first quarter ("1Q") 2021 results, which quoted Defendant Jagdfeld as stating: "shipments of our PWRcell energy storage systems also grew at a significant rate as compared to the prior year, and with the considerable

[6] "Backlog" referred to the amount of dealer orders received, but not yet delivered for generators, and could be expressed in terms of weeks (*e.g.*, 28 weeks of backlog) or dollar amount (*e.g.*, $1 billion of backlog).

momentum we have in the marketplace, we are increasing our outlook for these products for the remainder of the year."

## DEFENDANTS CONCEALED DECLINING CLOSE RATES DURING THE CLASS PERIOD

44. The claims in this case arise because, during the Class Period, Defendants publicly reported positive trends and metrics in Generac's operations while concealing three categories of negative facts, thereby creating an impression of the state of Generac's business and risks that was materially different from what actually existed. One such concealed fact was that close rates for HSB generators had declined drastically leading up to and during the Class Period.

### Close Rates Were an Important Metric that Defendants Closely Monitored

45. Generac's process for selling an HSB generator includes multiple steps, from lead generation, to consultations, closing on a contract, and installation and activation. More marketing does not necessarily mean more sales and lead quality can vary, as can the effectiveness of sales pitch consultations. Whether sales pitches result in actual sales to buyers is measured by Generac's close rate.

46. For illustrative purposes, if consultations increased from 100 to 125 to 150 to 175 to 200 in four consecutive quarters, and the close rate remained constant at 50%, that would indicate that the new consultations and leads were as effective as historical rates and sales would double from 50 to 100 (from the first to last quarter). In contrast, if close rates declined each quarter it would signal the increased consultations were not productive or effective in convincing end-customers to purchase a generator. So, using the same illustration, if the 50% close rate declined, to 45% then 40%, then 35%, then 30% in those quarters, the doubling of consultations would only lead to sales increasing from 50 to 60 from the first to last quarter. In other words, doubling consultations will not necessarily lead to doubling end customer sales. Generac's reported metric of consultations only

provides an accurate description of its operations and sales when considered together with the close rates.

47. Given the importance of Generac's close rates, Defendants have closely monitored close rates for at least a decade. For example, "[i]n 2012, management introduced greater structure to the company's sales funnel, which provided a platform to monitor specific regions, dealers and close rates: data that identified close rate optimization opportunities."[7] That year, Generac launched "PowerPlay," a tablet-based program through which Generac sent leads to dealers and then tracked the sales process through installation. In July 2013, Defendant Jagdfeld admitted he closely monitored close rates when an analyst asked about "closure rate improvements seen from PowerPlay," and he responded that it is "[s]omething we're watching very closely as we roll this out," and "[w]e really like what we see in closure rates." Later, in an earnings call on February 11, 2015, Defendant Jagdfeld stated that "the information flow coming back" from PowerPlay "is really powerful . . . in terms of just giving us, dealer by dealer, specific close rates."

48. Getting even more specific, on September 7, 2017, Generac's former Chief Marketing Officer, Russel Minick, admitted that Defendant Jagdfeld and senior executives monitored close rates on a daily basis, stating:

> [E]very morning, at 7 o'clock in the morning, we get a dashboard, Aaron [Jagdfeld] and I get it, *exactly what happened the day before*, how much it cost to make the phone ring, how many of those converted into in-home visit, *how many of those converted into a sale*, what markets, what DMAs [designated market areas], the whole 9 yards *every single day*, all automated.[8]

---

7 Cannacord Genuity documented this information from its "sit down" conversation with Defendants Jagdfeld and Ragen on August 14, 2024.

8 Mr. Minnick further stated that improving close rates was so important that Generac had created an algorithm to "send[] more leads to guys that close better."

49. After the Class Period, on November 1, 2023, Defendant Jagdfeld again admitted that the HSB dealer channel "is the channel that we can measure close rates" and "we get really good visibility into close rates by dealer, by product, by region."

50. In addition to admitting to closely monitoring close rates, Defendants emphasized the importance of close rates to the investing public. For example, on February 14, 2017, Defendant Jagdfeld said that "improving close rates" was "a really big focus area" and that "we've adjusted some of our programs this year to reflect the importance of close rate in the rankings of residential dealers." Defendant Jagdfeld stressed the importance of close rates to Generac's financial health, adding that "if we could just see even a slight improvement in close rates, it's a material impact" and would "have a nice impact on overall home stand-by demand," and concluding, "I think that's really the game for us, and our focus is that end of the market."

51. In addition to admitting to closely monitoring close rates and their importance, Defendants often shared positive trends in close rates with investors and analysts, particularly if consultations did not perform as well. For example, in October 2013, Defendant Jagdfeld stated, "[w]e remain encouraged by the rollout of PowerPlay thus far, as we continue to see a notable improvement in our sales closure rates for dealers using this new and innovative sales tool." Later, on May 4, 2016, after Defendant Jagdfeld reported that IHCs "are somewhat flattish" versus prior year, he added more positive news that "I think the one underlying difference when I look at IHCs, our close rate has actually improved a bit" and that "the improving close rate underlying IHCs" provided management confidence "around our guidance here for the balance of the year."

52. Leading up to the Class Period, Defendant Jagdfeld continued to report improvements in close rates, for example:

- On August 1, 2019, Defendant Jagdfeld stated that, in addition to "in-home consultations continu[ing] to be robust in the quarter. . . . our close rates have been trending higher for the last several years and hit an all-time high in the second

quarter." Days later, Oppenheimer noted that "[r]ecord dealer levels, close rate and lead generation trends drive standby growth."

- On September 4, 2019, Defendant Jagdfeld said "our first pass close rate has improved by 50%" since 2014 and close rates are a "really important metric[]."[9] These comments were accompanied by a slide showing the close rate growth, which Defendant Jagdfeld described as "one of the more important slides in the deck in terms of just progress that we've made and kind of how we think about the future." He added that "improvements in close rates and reducing cost of IHCs have some really meaningful impacts on the business." Following the Investor Day presentation, Northcoast Research wrote that Generac's "considerable increase in the close rate and a simultaneous decline in the cost of these interactions . . . have been a clear and direct driver of the growth."

- On October 31, 2019, Defendant Jagdfeld responded to a question about generator sales growth in California by referencing "IHC numbers [that] are kind of off the charts now," and saying "we look at that [the IHC numbers] and we look at our close rates and that translates really well to strong demand in the – over the next several quarters."

- In April 2020, Generac was "actively working to convert [the] traditional in-home consultation process into . . . virtual home consultation[s]," and then Defendant Jagdfeld reported a month later, on May 15, 2020, that "the early read" was that the close rates for "the initial virtual home consultations were similar to in home consultations." He assured analysts that "we're going to continue to watch it, obviously, throughout the quarter here."

- On July 30, 2020, Defendant Jagdfeld stated that, following the pivot to virtual consultations (VHCs), the "overall close rates have actually remained consistent with historical trends, which gives us confidence to raise the outlook for residential products for the full year." Following that call, Oppenheimer noted that "[a]s IHCs have moved virtual, VHCs are delivering similar close rates and sales cycle times."

53. In short, leading up to the Class Period, Defendants made clear to investors and analysts that close rates were important, closely monitored, and generally improving or maintaining prior trends.

---

9 "First pass" close rate refers to the rate at which initial consultations result in contracts. Generac uses data on unclosed deals to then re-approach the homeowner and attempt to close the deal on subsequent passes.

**Generator Close Rates Declined Significantly Leading Up to and During the Class Period**

54. Generac's HSB close rates began declining in fourth quarter ("4Q") 2020 and bottomed out in 1Q 2022, as reflected in the following chart from Generac:[10]




55. In fact, as reflected in the lines added to the graphic below, close rates began sharply declining after third quarter ("3Q") 2020 and by July 2021 were their lowest in three years, and the close rates never rebounded to pre-COVID 2020, 2019, or even much of 2018 levels:

10 The graphic is excerpted from Slide 30 of Generac's Investor Day September 27, 2023 Presentation, published after the Class Period.




56. Contrary to Defendants repeatedly touting improvements in close rates (¶¶50-52), as discussed below, when close rates declined, Defendants stopped reporting them. Defendants continued to report the positive trends (increases) in consultations and dealer orders, while omitting to disclose that the previously touted positive trends in close rates had reversed and turned negative.

57. Normally, declining close rates and customer contracts would discourage dealers from ordering and storing more products than they could sell. However, Generac offered incentives to boost dealer orders that, combined with lax cancellation policies, led to dealers placing orders without actual customer contracts. More specifically:

- as close rates were falling in 2021, dealers were placing orders even without end customer contracts to maintain their "Premier" status and access to substantial purchase discounts, as Generac did not require proof of actual customer contracts to accept dealer orders and apparently did not claw back price discounts for shipped products if subsequently canceled orders resulted in dealers falling below Premier status;[11]

---

[11] BofA Securities issued a report in September 2022 noting that "[d]ealers admit[ted] to significant pre-orders in 2021 given both bloated lead times, but also internal needs to demonstrate [Premier] sales status with [Generac]." Years later, in 2025, Defendant Jagdfeld announced that

- by July 2021, Generac used actual and threatened price increases[12] to encourage dealers to pre-order generators at lower pricing with the ability to cancel, rather than wait for a customer contract when prices had increased;

- by July 2021, since lead times from order to shipment were continuing to increase, dealers realized they could submit additional orders to essentially reserve their place in line so they could reduce delays for any future potential (then non-existing) customers with the ability to later cancel;[13] and

- dealers were protected from the risks of over-ordering product by Generac's lax cancellation policies that permitted dealers to walk away from orders later on in the process.[14]

58. Thus, dealers had much to gain (Premier status price discounts, lower prices, and reduced customer wait times) and little to lose (from the cancellation policy) by ordering more generators than they had allocated customer contracts. Not disclosing the declining close rates was designed to and did prevent analysts and investors from understanding the true state of the HSB generator business and the increased risk of declining generator orders, cancelations, and elevated dealer inventories that later materialized.

59. At the end of the Class Period, the consequences of declining close rates began to be revealed as dealer inventories swelled, dealer orders decreased, backlog shrunk, and Defendants

---

Generac had since "changed [a] number of our order policies" to keep dealers "from placing orders for products that they hadn't sold yet."

12 In November 2021, Defendant Jagdfeld said, "[t]hroughout 2021, we have implemented multiple rounds of price increases across all product categories," with "roughly 4" HSB price increases in "December [2020] [or] January [2021]," "May [or] June," "September," and another one being "contemplat[ed] recently."

13 BofA Securities issued a report in October 2022, which stated that Generac's "backlog was outsized on the way up as dealers pre-emptively put orders into queue" in 2021, resulting in later sales "erosion from backlog cancellations."

14 *See id.* In addition, Piper Sandler later commented in March 2023 on how the lax cancellation policies contributed to the over-ordering, reporting that during at least 2022, "supply-chain uncertainty and a lax order cancellation policy drove dealers to place large HSB orders (above and beyond customer orders)." In November 2022, Oppenheimer also commented on how "order cancelations ensued," confirming that Generac's prior "backlog overstated HSB installation demand."

reported disappointing results. Only after the Class Period did Defendants confirm and explain that close rates had declined and bottomed out much earlier. When Defendant Jagdfeld belatedly disclosed that the close rates had been declining during the Class Period, he also admitted to having been aware of the negative close rates and taking steps to try to improve them as they were occurring, stating: "we wanted to bring our lead times down, because we knew that, that was having a negative impact on close rates."[15] Moreover, Defendant Jagdfeld further admitted to being aware of the mismatch between dealer orders and declining close rates when he acknowledged that he and others had been working with dealers "for several quarters" to address their increased inventory levels.

**Defendants Made False and Misleading Statements that Concealed Generac's Declining Close Rates and the Attendant Risks Thereof**

60. During the Class Period, Defendants made statements that highlighted positive metrics of increased consultations and dealer orders while concealing the fact that close rates had drastically declined.[16]

61. By July 2021, Generac's close rates had declined in three straight quarters and had fallen below pre-COVID-19 levels. On July 28, 2021, Defendants Jagdfeld and Ragen convened an earnings call to discuss Generac's second quarter ("2Q") 2021 results, during which Defendant Jagdfeld emphasized that "[d]emand for home standby generators remains incredibly robust due to a variety of factors." Within that positive assessment of the quarter with regard to generators, Defendants made the following statements that created a misleading impression and failed to provide

---

15 Lead times increased from just "a couple of weeks" as reported in July 2020 to "28 weeks" by the start of the Class Period as reported in April 2021. Thus, any "negative impact" that Defendant Jagdfeld "knew" lead times were having on close rates was established by April 2021. Moreover, given the lead times, reported activations after April 2021 related to activating generators at customers' homes from orders nearly seven months earlier.

16 Bold and italics are added herein to identify the particular statements alleged to be false and misleading.

investors with full and fair disclosure by touting positive metrics of increased in-home consultations and dealer orders, while omitting the substantial decline in close rates since peaking in 3Q 2020:

(a) Defendant Jagdfeld stated: "despite strong prior year comparisons due to the emergence of the Home as a Sanctuary mega trend and elevated outage levels, ***home consultations or sales leads for home standby generators remained strong during the second quarter and increased approximately 50%*** as compared to the second quarter of 2020."

(b) Defendant Jagdfeld also touted positive sales and demand related metrics monitored by Defendants, saying, "[e]arly in the third quarter, ***these key demand metrics for home standby have continued to trend even higher relative to prior year levels, including home consultations increasing at a strong double-digit rate***."

(c) During the question and answer portion, an analyst asked about the Company's 28-weeks backlog, and Defendant Jagdfeld responded, in part:

> So when we're giving that update again this quarter and the fact that it hasn't changed, yet we have higher production levels in the future, we've also, as we indicated in the prepared remarks, ***we've been experiencing higher incoming order rates***. So that kind of matches up with the higher expected production at this stage.

(d) Defendant Jagdfeld added:

> [A]t this stage, it's – the demand has been incredibly robust. We said this in the prepared remarks as well. ***[E]ven here in the third quarter in July, our IHCs or home consultation sales leads for home standby are up again on very difficult comps compared to last year***.
>
> So I mean, it's just – it continues to amaze us, the interest level in the category and how that's translating into real demand.

62. The foregoing statements were false and misleading in that they emphasized that "consultations," "sales leads," and orders were increasing and that "these key demand metrics for home standby have continued to trend even higher relative to prior year levels, including home consultations," creating a false impression of generator sales because they omitted to disclose the fact that close rates (a key interrelated metric showing actual sales to end customers), had drastically

declined and were continuing to decline, reflecting that increased consultations and leads were not resulting in correlating increased sales and that increased orders were not being matched with end market contracts, as set forth in ¶¶45-59.

63. By November 2021, close rates had declined even further, representing four straight quarters of declines, dropping to far below pre-COVID-19 levels. On November 2, 2021, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's reported 3Q 2021 results. In response to an analyst question about prior expectations that Generac would be able to reduce its backlog to a "normalized level" by the end of 2022, Defendant Jagdfeld emphasized:

> ***[T]he demand has been continuing just to be off the charts***.
>
> ***I mean there's really no two ways to say it. I mean everything from our leading indicators like I[H]Cs to our lagging indicators like activations and then obviously, the incoming orders that are outstripping our kind of record production levels here***.[17]

64. The foregoing statement was false and misleading in that it claimed "demand has been continuing just to be off the charts" based on "everything" from "leading indicators like IHCs" to "lagging indicators like activations" and "orders," creating a false impression of generator sales because it omitted to disclose the fact that close rates (an essential part of "everything" between leading and lagging indicators of demand that showed actual sales to end customers), had drastically declined and were continuing to decline, reflecting that increased consultations were not resulting in correlating increased sales and increased orders were not being matched with end market contracts, as set forth in ¶¶45-59.

---

17 "Lagging" in this context refers to a metric observable later in time, not one that is declining. As explained by Defendant Jagdfeld on August 2, 2017, "there's a lag, obviously, from when we launch[] a promotion to when an in-home consultation [i]s scheduled to when a product is purchased and then ultimately installed, so there's some time for that activation. The activation is actually a lagging indicator by all measures internally . . . ."

65. By February 2022, close rates had continued to decline, bottoming out after five straight quarters of declines. On February 16, 2022, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's full year 2021 results. Defendants made the following statements that similarly created a misleading impression and failed to provide investors with full and fair disclosure by continuing to tout positive metrics of increased consultations and dealer orders, while omitting the substantial decline in close rates since peaking in 3Q 2020:

(a) Defendant Jagdfeld stated that "important megatrends" such as "Home as a Sanctuary" had "continue[d] to drive incredibly strong demand for home standby generators. As a result, ***home consultations or sales leads increased again in the fourth quarter over the robust prior year comparison***."

(b) In response to an analyst question about the HSB backlog, Defendant Jagdfeld stated:

> [W]e're going to end the year with a pretty substantial backlog yet of HSB because we anticipate ***the order rate, which we've seen already so far this year and as we exited 2021 has been really strong, . . . so strong that even though we've taken our production capacity up, we've continued to outstrip that and grow the backlog***.

(c) Defendant Jagdfeld further touted that, "***phenomenally, I mean, for the whole quarter, [IHCs were] up double digits again for the quarter across the country***. So just a really strong read on IHCs."

66. The foregoing statements were false and misleading in that they touted the "robust" and "double digit" increases in consultations and increased order rate as compared to prior periods, creating a false impression of generator sales because they omitted to disclose the fact that close rates (a highly interrelated metric showing actual sales to end customers), were not similarly increasing by double digits from prior year but had drastically declined to the lowest point in years, reflecting that increased consultations were not resulting in correlating increased sales and that orders were not being matched with end market contracts, as set forth in ¶¶45-59.

67. By May 2022, Generac's close rates remained far below first quarter 2020 and pre-COVID-19 levels. On May 4, 2022, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's 1Q 2022 results. Defendants made the following statements that continued to create a misleading impression and failed to provide investors with full and fair disclosure by touting positive metrics of increased in-home consultations and dealer orders, while omitting the substantial decline in close rates since peaking in 3Q 2020:

(a) Defendant Jagdfeld claimed that the HSB business "continues to benefit from the convergence of multiple megatrends," highlighting that "***home consultations during the first quarter were nearly 3x higher than the levels seen in the first quarter of 2020, reinforcing our view that demand for the home standby category has once again achieved and held a new and higher baseline level***."

(b) During the call, an analyst asked about Generac's price increases and "how elastic demand is for home standby," and Defendant Jagdfeld responded, "when we look at th[e] project costs, ***we're able to then look at the close rates that we're seeing***, and that helps us kind of gauge the impact of each round of pricing. ***To date, we're not seeing any significant impact on pricing***."

(c) In response to an analyst question about whether "HSB dealer inventories [were] normalized yet," Defendant Jagdfeld responded, "***we're seeing days of inventory be a little at the high end of where they've been historically***" but explained it away as "***[t]hat happens kind of seasonally about now – it's coming out of the winter season***. . . . [s]o it's been difficult to get out and install product at the kind of pacing we want to see."

(d) Continuing their response on the same question, Defendants Jagdfeld and Ragen engaged in the following back and forth, assuring investors that close rates were correlating to

IHC and VHCs, such that there were end customers allocated for the generators being shipped to dealers:

> [Jagdfeld:] But we need to increase the install pace because output is increasing. So that is a massive area of focus for us. And we're working hard with our existing dealers, but also with new dealers in terms of increasing their ability to install products more quickly. And they're struggling also, by the way with labor. That's another struggle point for the channel out there. So it is something we're watching closely. But we are seeing install rates move up. We just need to see it move up even faster.
>
> [Ragen:] Yes. And we believe ***there's buyers for those units that are in the field***. So I think that . . .
>
> [Jagdfeld:] Well, ***absolutely. Yes, the IHC***.
>
> [Ragen:] ***Based on the IHC volume***.
>
> [Jagdfeld:] ***Based on the IHC volume, we think the demand is there to support what we're seeing in the field in terms of inventory***.
>
> [Ragen:] Going to increase the install bandwidth.
>
> [Jagdfeld:] Right.

(e) Later in the call, an analyst asked whether "home consultations being 3x above 2020 level" should be thought about as "the 'normalized' baseline level," to which Defendant Jagdfeld responded:

> I would tell you that ***you'd have to take into consideration where our close rate is at. That's a part of that equation***. And recall that IHCs are not our full – that's not everything we do, right? So it's – we think it's representative or proxy for the HSB market, but that just is a portion of what we do.

68. The foregoing statements were false and misleading in that they touted that consultations were "3x" higher than prior periods resulting in a "higher baseline" level of demand, that pricing actions had not had any "significant impact" on close rates, that there were "buyers" for the units in dealer inventory "based on the IHC volume," that increased dealer inventory was the result of seasonal changes, and that to understand IHCs "you'd have to take into consideration where our close rate is at," creating a false impression of generator sales because they omitted to disclose

the fact that close rates (a highly interrelated metric that had to be "take[n] into consideration"), had declined for five quarters to a much lower level than prior to COVID, which was a substantial factor contributing to increased inventories, as set forth in ¶¶45-59.

**Analyst Reaction to the False and Misleading Statements**

69. That Defendants' false and misleading statements touting positive metrics while concealing the negative metric of declining close rates created a false impression of the state of generator sales that materially differed from reality is clear from analyst reactions. For example, on July 28, 2021, J.P. Morgan recommended that "investors should buy" Generac stock because "end-customer [HSB] demand remains at record levels," but, unbeknownst to J.P. Morgan, end-customer sales rates had drastically declined. Likewise, on February 16, 2022, Oppenheimer reported that its "base case" assumptions for the Company included that "[r]ecord dealer levels, close rate and lead generation trends drive standby growth." That was a false understanding because, far from achieving record highs, close rates had declined by 40% since 3Q 2020 to their lowest point in years. And, on May 5, 2022, William Blair reported that "management believes that demand for the home standby category has achieved a new baseline level due to first-quarter home consultations being three times the levels seen in the first quarter 2020," and added that "[m]anagement examines close rates [for HSB and solar] in the field to gauge the impact of each round of pricing, and to date, there has been no significant impact." However, rather than suffering no significant impact and contrary to the three-time increase in consultations from 1Q 2020 to 1Q 2022, close rates had plummeted from 1Q 2020 to 1Q 2022.

## DEFENDANTS CONCEALED THE SUBSTANTIAL NUMBER OF DEFECTIVE SOLAR UNITS DURING THE CLASS PERIOD

70. The second negative fact concealed during the Class Period was that Generac's highly-touted clean energy products suffered a widespread and dangerous defect, resulting in

massive customer complaints and replacements as well as escalating warranty liabilities and reputational harm.

**The Importance and Defendants' Monitoring of Solar Product Sales**

71. As discussed, Defendants claimed that Generac's solar business (and particularly the launch and growth of PWRcell energy storage systems), was critical to Generac's growth and publicly-touted Company strategy. For example, during an October 28, 2020 earnings call discussing 3Q 2020 results, Defendant Jagdfeld said that "[s]hipments of our PWRcell energy storage systems . . . [were] a key contributor to the company's year-over-year growth, and we are expecting a further significant sequential increase in shipments during the fourth quarter."

72. Defendants repeatedly tracked and reported on the positive sales growth of solar products. As further example, the next quarter, during a February 11, 2021 earnings call, Defendant Jagdfeld again highlighted that "shipments of our PWRcell energy storage systems . . . were a key contributor to the company's year-over-year growth." He explained that this "tremendous growth in energy storage from essentially a start-up business was due to the important advances we have made in growing our capabilities around marketing, distribution, product development and sourcing of these products." Further, in July 2021, Defendant Jagdfeld highlighted that "key performance indicators for clean energy continue to show favorable trends," including that "activations, which are a proxy for installation and commissioning, grew at a tremendous rate during the second quarter as compared to the prior year and also improved on a sequential basis." Defendant Ragen similarly highlighted that "[s]hipments of PWRcell energy storage systems also grew at a dramatic rate." In short, the increased solar sales represented a success story for Generac that was not driven by the pandemic.

73. However, with increased sales came increased warranty liabilities. As discussed, Generac's solar PWRcell products included a "SnapRS" rapid shutoff device that was meant to

comply with important safety requirements designed to keep homeowners and first responders safe. Generac was exposed to a long-term warranty on SnapRS, which also reflected the purported safety and reliability of the product. Generac's online brochure for its PWRcell products state that Generac provides a 25-year warranty on its SnapRS devices:

| SnapRS™ (APKE00011) | |
|---|---|
| PV MODULE MAX VOC: | 75 V |
| EFFICIENCY: | 99.8%[3] |
| MAX INPUT CURRENT: | 13 A |
| MAX TOTAL QTY IN SUBSTRING: | 10 |
| SHUTDOWN TIME: | < 10 Seconds |
| ENCLOSURE RATING: | NEMA 6P |
| OPERATING TEMPERATURE - FAHRENHEIT (CELSIUS): | -40 to 158 °F (-40 to 70 °C) |
| CERTIFICATIONS: | UL1741 |
| PROTECTIONS: | PVRSE |
| WARRANTY: | 25 Years |

74. A copy of the "Generac Power Systems Limited Warranty for Generac PWRcell" is available online through a solar distributor's website.[18] The warranty provides that Generac "warrants that its Generac PWRcell products will be free from defects in material and workmanship for the items and period set forth below," and that "Generac will, at its discretion, repair or preplace any part(s) which . . . is found to be defective." For the SnapRS device, the warranty period is listed at "25 years."

75. Given the Company's exposure, Defendants assured investors that they were monitoring and responding to any product safety and potential recall issues. For example, on September 28, 2021, the Company published its inaugural Environmental, Social, and Governance ("ESG") Report (the "Inaugural ESG Report") signed by Defendant Jagdfeld. In a release announcing the report, Defendant Jagdfeld said that Generac "'want[s] this document to be a helpful resource for our stakeholders to evaluate our success as a sustainable business'" and that one of the goals of the Company was to "'hold[] ourselves accountable to our stakeholders.'" Under the

18 https://sunwatts.com/content/warranty/Generac-Warranty-PWRcell.pdf.

heading "Product Safety," the report stated that a committee was established to regularly review safety concerns, stating:

> Generac maintains a robust product safety function that is involved in nearly all aspects of product design and production. We have a Product Safety Committee that participates in our new product introduction in an effort to ensure that our products meet all applicable safety standards and internal engineering design standards, including those issued by the Consumer Product Safety Commission. This Committee also regularly reviews any safety concerns associated with products in the field, including potential product recalls.

76. Under the heading "Product Quality," the report added that top management was involved in product quality, stating:

> Our Quality Management System is certified to ISO 9001, helping to ensure a strong customer focus, the motivation and involvement of top management to ensure product quality, and an emphasis on a process approach and continuous improvement. Excellence is one of our Corporate Values, and our product quality team exemplifies this value through vigorous involvement in both our new product introduction and production processes. We also regularly perform design reviews and testing to maximize the quality and value of our products for our customers.

**Generac's Solar Products Suffered from a Substantial Failure Rate**

77. By early 2021, SnapRS units had begun failing at a substantial rate across the country. In short, the SnapRS units were defective and malfunctioning by repeatedly turning on and off, resulting in the units overheating, deforming, melting, or turning off and failing to work during normal use. This defect even caused residential fires.

78. Details regarding the substantial numbers of product failures were provided in a lawsuit filed by Generac's largest solar dealer, Pink Energy.[19] By April 2021, according to the Pink

---

[19] Pink Energy sued Generac in August 2022 for various breach of warranty, product liability, and breach of contract claims (the "Pink Energy Lawsuit") stemming from the SnapRS defects. The Pink Energy Lawsuit alleged damages that included $39 million in unpaid invoices to Generac for service calls related to the defective SnapRS, $155 million in lost revenue from the defective SnapRS, and "hundreds of millions" in reputation and brand damage caused by the defective SnapRS. Soon after filing the lawsuit, Pink Energy was forced out of business and declared bankruptcy. Pink Energy created a media packet (the "Media Kit") further documenting the SnapRS failures.

Energy Lawsuit and Media Kit, Pink Energy had already reported to Generac that it discovered melted SnapRS devices during a service call for a customer who had complained of a lack of system production. Pink Energy described the defect as an over-heating event in which SnapRS devices showed clear signs of heat deformation, charring, and melting. In addition to contacting Generac to alert it of the deformed SnapRS devices, Pink Energy also provided photos of the melted units. In its Media Kit, Pink Energy provided the following photo of melted SnapRS devices:



79. Pink Energy made clear that the problem extended beyond one failure or the number of devices in the photo, and instead the products were failing "*en masse*." In a video posted by Pink Energy on YouTube,[20] Pink Energy stated that "in early 2021, we began to notice a significant increase in service calls related to solar system performance deficiencies and failures. These issues were traced back to a single component: the Generac SnapRS." The video adds that:

> SnapRS devices began to fail *en masse*. Due to some inherent fault, the devices began to experience thermal events that could ultimately lead to fire. Pink Energy at great expense began to replace tens of thousands of these units while Generac developed a firmware update that was supposed to be a permanent fix for these SnapRS failures.

80. Nor were the problems confined to units installed by Pink Energy. Rather, according to the Pink Energy Lawsuit, by summer 2021, Pink Energy had become aware that "other solar installers using these same Generac products were [also] experiencing high rates of failure with the SnapRS connectors and were noticing signs of heat deformation in the SnapRS units during service

---

[20] https://www.youtube.com/watch?v=r4RKeFLR7X4.

visits." Pink Energy said that, "[i]n early August 2021, the President of Valley Solar, another solar installer using Generac's products, reached out to . . . inquire about whether [Pink Energy] had noticed issues with Generac SnapRS," and "Valley Solar informed [Pink Energy] that it had noticed a 'very high rate with SnapRS failing and needing replacement' and that the SnapRS units were showing signs of 'heat deformation and even charring.'"[21]

81. Importantly, the dealers notified Generac of the problem. In addition to Pink Energy's reports to Generac, "Valley Solar told [Pink Energy] that it had brought this issue to Generac's attention but had 'not gotten much of a response.'" Although Valley Solar did not get much of a response, it is clear Generac was aware that the SnapRS defect was not a limited issue and was aware of the high rate of failure because Generac began working on a global fix, as discussed hereafter. Generac management has since confirmed that "the [PWRcell] product challenges [had] ensued shortly after launch."[22]

82. In addition to the high rate of failure requiring unit replacements, the melting and overheating could also lead to more serious claims of residential fires. As detailed in the Pink Energy Lawsuit, "in August 2021, a fire occurred at the home of [Pink Energy] customer, Lonnie Bentley, in Lancaster, Kentucky . . . . It was later determined that the fire was caused by overheating of the SnapRS units."

83. In a phone call regarding the Kentucky fire, a Generac executive did not dispute that SnapRS devices were overheating. As the Pink Energy Lawsuit states:

---

[21] According to its website (https://valleysolar.solar/), Valley Solar is "one of the largest independent solar contractors in Massachusetts" and advertises its team as "[s]olar [b]attery [e]xperts," highlighting that Valley Solar "installed hundreds of solar battery systems in western Massachusetts since 2020."

[22] This confirmation was documented in a December 14, 2022 report issued by BofA Securities "following conversations with [Generac's] mgmt" including the "head of its Clean Energy business."

> On August 12, 2021, [Pink Energy] and Generac participated in a conference call during which [Pink Energy] inquired about the cause of the fire and potential hazards associated with the SnapRS. During this conference call, Uwe Uhmeyer, Generac's Vice President of Engineering, informed [Pink Energy] that Generac was investigating the cause of the SnapRS overheating but had not yet identified the precise cause of the issue.

84. Further confirming Generac knew the problem was widespread, Generac told Pink Energy during the same call that it "was investigating 'bulging and separation' issues associated with the SnapRS connectors and that it was in the process of developing and testing an updated model of the SnapRS which Generac referred to as the 801A." Given the high rate of defect and risk of residential fires that could expose Generac to massive warranty and casualty liabilities, Generac needed to act quickly.

85. Then, on August 18, 2021, a defective SnapRS caused another residential fire, this time at the home of Pink Energy customer Stephen Nightingale in Lexington, South Carolina. According to the Pink Energy Lawsuit, "[f]ollowing a fire inspection, the cause of the Nightingale claim was determined to be a melting and/or exploding SnapRS." In a lawsuit filed by Kristen and Stephen Nightingale against Generac, the Nightingales allege that "[o]n August 18, 2021, [their] home caught fire as a result of a failure in the solar panel system designed and manufactured by Generac. The fire did substantial damage to the Nightingales' home and their solar panel system." The Nightingales added that "[t]he solar panel equipment . . . was in a defective condition [and] unreasonably dangerous as supplied by Generac," which "was due either to a design or manufacturing defect."

86. The Pink Energy Lawsuit provided further support that Generac was aware the defect put all installed units at risk and had begun working on a global fix by summer of 2021. More specifically, Pink Energy described an email received the day after the Nightingale fire, as follows: "On August 19, 2021, Jeffrey McAndrew, Generac's Director of Sales for its East Region

("McAndrew"), informed [Pink Energy] that Generac had 'a fix in test' for the SnapRS overheating issues that it planned to release by late August 2021." The lawsuit continues:

> McAndrew informed [Pink Energy] that Generac discovered that a few SnapRS units were found to be overactive by turning on and off repeatedly when they should have been in either the "on" or "off" state, which condition generated heat in the unit causing them to "bubble out." McAndrew assured [Pink Energy] that Generac's new firmware would address the issue by keeping the signal constant (in the "on" position) until there is a forced rapid shutdown.

87. While there had been two known residential fires, Generac was well aware of the need to fix all installed units as McAndrew acknowledged in an email later the same day that "Generac was sending the firmware updates 'today to a bunch of sites then the rest will happen over the next few days.'"

88. As further proof that Generac knew the issue was widespread and created a "substantial risk," on November 23, 2021, Generac submitted a report notifying the Consumer Product Safety Commission ("CSPC") of a "potential defect" in SnapRS 801 devices.[23] Such a report is only required where a manufacturer (Generac) "obtains information which reasonably supports the conclusion that [its] product contains a defect which could create a substantial product hazard." 15 U.S.C. §2064(b)(3).

89. However, the firmware update did not solve the problem both because it did not work and because it was only available to customers who had their solar systems connected to the internet. According to Pink Energy, Generac was "aware that a significant number of [Pink Energy]'s customers had not received the firmware update because their solar energy systems were not connected to the internet."

---

[23] Generac confirmed the report in a brief and declaration filed on its behalf in a consumer class action brought against Generac arising from the SnapRS defect. *In re Generac Solar Power Sys. Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2:23-md-03078 (E.D. Wis. Oct. 21, 2024), ECF 43 at 2-3 n.1 & ECF 45, ¶2. The materials submitted by Generac to the CSPC were filed under seal.

90. Moreover, soon after the update, it became clear it was not a fix as it was shutting down the units, causing them to fail to produce energy. As explained in the Pink Energy Lawsuit:

> Beginning in late 2021, [Pink Energy] noticed a dramatic spike in complaints from customers claiming that their solar energy systems were not producing the energy output they had been promised, were not seeing noticeable savings on their monthly utility bills, and/or experiencing complete shutdowns of their solar energy systems indicated by error messages on their Generac inverters.

91. Pink Energy "investigated this issue and learned that the cause of its customers decreased production and/or system shutdown was what the Generac inverter coded as a 'PVRSS Lockout' system error." In its lawsuit, Pink Energy says it "learned that a PVRSS Lockout is caused when a PV Link or inverter detects a malfunctioning or overheating SnapRS in a particular array of solar panels. When this happens, the entire array goes into 'lockout mode' and the array does not generate any power until the lockout is cleared." As explained below, this lockout was caused by the firmware update and posed a significant problem, as "[c]learing a PVRSS Lockout generally requires a service technician to replace the SnapRS on the array that is in lockout mode."

92. The firmware update only shut off defective units, rather than fix them, leading to more service calls. As set forth in the Pink Energy Lawsuit:

> [i]n late 2021 and into early 2022, [Pink Energy] experienced a massive increase in customer service calls and complaints related to the PVRSS Lockout that required [Pink Energy] to shift its business away from installation of new solar energy systems and toward maintenance of existing customers' systems that were experiencing PVRSS Lockouts and other issues caused by burning, melting, or otherwise malfunctioning SnapRS units.

Generac was apparently aware that this would happen, as Defendant Jagdfeld subsequently admitted in an email that the firmware update was actually designed to cause the lockouts whenever a defective SnapRS was detected and was only an "'interim solution'" until a replacement SnapRS was created.[24]

---

[24] Specifically, on June 1, 2022, Defendant Jagdfeld "responded to an email regarding continued incidents of burned and melted SnapRS devices" by stating, "'all of our testing has shown

93. In a second attempt to fix the issue, in late 2021, Generac began supplying dealers with a second generation SnapRS to try to resolve the defect – the "SnapRS 801A." However, according to the Pink Energy Lawsuit, "Generac instructed [Pink Energy] to only replace the SnapRS units that were charred or melted and to leave any undamaged units in place," and "Generac represented to [Pink Energy] that the SnapRS 801A had been redesigned to fix the product defect in the SnapRS 801 that was causing the SnapRS to melt, burn, or otherwise malfunction."

94. The decision to only replace melted units was risky as it left units that had not yet failed installed on customer roofs. Moreover, like the software update, this second attempt at a fix also failed. The lawsuit adds that Pink Energy "did not see any reduction in incidents of PVRSS Lockouts in customers after replacing the SnapRS 801s with 801As" but instead "continued to see the same defects in the 801As, including solar arrays going into PVRSS Lockout due to defective SnapRS 801As, resulting in [Pink Energy] service technicians removing burnt and melted 801As from its customers' solar energy systems."

95. Given that it was Generac's largest dealer and given how widespread the defect was, Pink Energy sought indemnification. In December 2021, according to the Pink Energy Lawsuit, Pink Energy entered into a contract with Generac through which "Generac agreed to defend, indemnify, and hold [Pink Energy] harmless from third-party claims arising from, or in connection with, manufacturing defects resulting in injury, death or damage to real or personal property." The Pink Energy Lawsuit states that "Generac acknowledged" that this agreement "would apply retroactively to any third-party claim relating to or involving defects in the SnapRS whether existing prior to, or after, the effective date."

---

that as long as the system has the latest firmware protections, it is safe from any kind of thermal situation as the system would lock out the PV link and associated string - this was an interim solution until those 802 modules were on the market'" (emphasis omitted).

96. To place the SnapRS defect claims in numerical context, Pink Energy says that before "the PVRSS Lockout issues caused by Generac's firmware update, [Pink Energy] averaged approximately 800 phone calls into its customer service center per month," but "[a]fter the PVRSS Lockout issues began [in late 2021]" Pink Energy "averaged approximately 30,000 calls into its customer service center per month, amounting to an approximately 3,650% increase in customer service calls during this period." Pink Energy further claims that, "[i]n total, [Pink Energy] has approximately 19,000 customers with solar energy systems that utilized the . . . SnapRS" and that "approximately half of these customers have experienced PVRSS Lockouts requiring replacement of the SnapRS." According to the Pink Energy Lawsuit, Generac has "acknowledged a near 50% failure rate in the SnapRS units, accounting for the approximately 41% of [Pink Energy] customers . . . that have experienced PVRSS Lockouts and another 8% that never received the firmware update."

**Defendants Made False and Misleading Statements that Concealed Generac's Solar Product Defect and Substantial Failure Rate**

97. By early 2022, Generac was facing substantially increased warranty liabilities and had been notified of the substantial failure rate of its solar products by its largest dealer and others, two residential fires had occurred, Generac had agreed to indemnify its largest dealer for the defect, Generac had reported the defect to the CSPC, and Generac had attempted two fixes that had not worked. However, Defendants kept investors in the dark, making misleading statements regarding safety and potential risks that omitted to disclose actual widespread product failures, and the attendant risks and liabilities.

98. On February 22, 2022, Generac filed with the SEC its 2021 Form 10-K, which was signed by Defendants Jagdfeld and Ragen and contained the following statements that were misleading because they only purported to warn investors of product liability risks and events that *could* occur while failing to warn them of the SnapRS defect and substantial failure rate described in

¶¶71-96 that were then occurring and resulting in significant increases to Generac's warranty risks and liabilities:

(a) The 2021 Form 10-K used substantially the same boilerplate risk warnings that the Company had included for 2019 and 2020 prior to the discovery of the substantial rate of defects, which merely listed a potential "***increase in product and other liability claims or recalls***" that "***could affect our actual financial results***," adding that "***[s]hould one or more of these risks or uncertainties materialize***, or should any of these assumptions prove incorrect, our actual results may vary in material respects from those projected in any forward-looking statements" ("Product Liability Risk Statement").

(b) The 2021 Form 10-K similarly repeated substantially the same prior Form 10-K disclosures for 2019 and 2020 that:

> ***We may incur costs and liabilities as a result of product liability claims***.
>
> ***We face a risk of exposure to current and future product liability claims alleging to arise from the use of our products and that may purportedly result in injury or other damage***. Although we currently maintain product liability insurance coverage, we may not be able to obtain such insurance on acceptable terms in the future, if at all, or obtain insurance that will provide adequate coverage against potential claims. . . . . In addition, we believe our business depends on the strong brand reputation we have developed. ***If our reputation is damaged, we may face difficulty in maintaining our market share and pricing with respect to some of our products***, which could reduce our sales and profitability.

(c) The 2021 Form 10-K also repeated prior Form 10-K disclosures for 2019 and 2020 that: "***[n]ew products, or refinements and improvements to our existing products, may have technical failures***, delayed introductions, higher than expected production costs ***or may not be well accepted by our customers***."

99. These unchanged, theoretical and boilerplate statements of risks that could or may occur were false and misleading because they were not modified to inform investors of the actual widespread technical failures and defects, reputational damage, and increased warranty costs and

liabilities that had already occurred from having defective SnapRS devices installed on thousands of homeowner rooftops, Generac's two failed attempts to fix the defect, the substantial customer complaints, and the indemnification agreement with Generac's largest dealer.[25]

100. In or around April 2022, according to a declaration signed by Generac's Director of Engineering, Generac released its third attempted fix, the SnapRS 802 and "[s]hortly thereafter" instituted the "SnapRS replacement program," the goal of which was to "ultimately replac[e] all SnapRS 801 and 801A devices with SnapRS 802 devices."[26]

101. On April 26, 2022, the Company published its "ESG report" for the full year 2021 (the "FY 2021 ESG Report"). The FY 2021 ESG Report was signed by Defendant Jagdfeld, and contained the following false and misleading statements which omitted to disclose the defect and substantial failure rate, stating under the heading "Product Safety":

> ***Generac maintains a robust product safety function that is involved in all aspects of product design and production***. We have a Product Safety Committee that participates in our new product development process in an effort ***to ensure that our products meet all applicable internal engineering design and safety standards, including those issued by the Consumer Product Safety Commission. This team performed 22 hazard reviews for products under development in 2021, and also regularly reviews any safety concerns associated with products in the field, including potential product recalls***. Our engineering team maintains rigorous design standards that account for product safety at every stage of product development, and products go through multiple rounds of design review to ensure that safety is paramount.

* * *

[25] After the Class Period, in Generac's November 7, 2022 quarterly report filed with the SEC, Generac belatedly added new language to its purported risk factors, stating that Generac may incur costs from "product liability *and product warranty claims*" and that the Company had experienced, and may continue to experience, "higher warranty costs" and "warranty claims," including with respect to "certain clean energy products" – *i.e.*, SnapRS.

[26] Declaration of Michael Morris, *In re: Generac Solar Power Sys. Mktg. Sales Pracs. & Prods. Liab. Litig.*, No. 23-md-3078 (E.D. Wis. Oct. 21, 2024), ECF 54, ¶12. In total, the program has resulted in the replacement of more than 500,000 SnapRS 801 and 801A devices. *Id.*, ¶14.

***We also regularly perform design reviews and testing to maximize the quality and value of our products for our customers***.

102. The foregoing statements were false and misleading because, while reassuring investors that Generac had a robust safety and quality function to ensure compliance with CPSC standards, and a team that reviewed safety and potential recall concerns, Defendants omitted to disclose the substantial rate of defect in the solar products that led Generac to indemnify its largest dealer, report the SnapRS defect to the CPSC, develop and launch an updated SnapRS 802 model, and determine full replacement of thousands of installed units was required.

103. In May 2022, according to the Pink Energy Lawsuit, "Generac finally agreed to send a letter to a selection of [Pink Energy]'s customers to address these product failures." The letter stated that Pink Energy customers "'may have experienced certain issues with a particular Generac component of your solar energy system, the SnapRS801 or 801A'" and that Generac had developed the new SnapRS802, which had been "'designed to replace the RS801 and RS801A, increasing performance and reliability.'"

104. On May 9, 2022, Generac filed with the SEC its quarterly report on Form 10-Q for 1Q 2022 ("1Q 2022 Form 10-Q"), which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2022 Form 10-Q included the following false and misleading statements which omitted to disclose the solar product defect and substantial rate of failure: the 1Q 2022 Form 10-Q reduced its preexisting warranty reserves by approximately ***$1.1 million*** and kept its risk disclosures unchanged from prior periods by including the same ***Product Liability Risk Statement*** contained in the 2021 Form 10-K (¶98(a)) and stating, "***[t]here have been no material changes in our risk factors since the February 22, 2022 filing of our Annual Report*** on Form 10-K for the year ended December 31, 2021."

105. The foregoing statements reducing warranty reserves and repeating unchanged, theoretical and boilerplate statements of risks that could or may occur were false and misleading

because they were not modified to inform investors of the actual widespread technical failures and defects, reputational damage, and increased warranty costs and liabilities that that had already occurred from having defective SnapRS devices installed on thousands of homeowner rooftops, Generac's two failed attempts to fix the defect, Generac's development and rollout of the SnapRS 802 to replace all existing SnapRS field units, the substantial customer complaints, and the indemnification agreement with Generac's largest dealer.

106. On August 8, 2022, Generac filed with the SEC its quarterly report on Form 10-Q for 2Q 2022 ("2Q 2022 Form 10-Q"), which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 2Q 2022 Form 10-Q included the following false and misleading statements which omitted to disclose the solar product defect and substantial rate of failure: the 2Q 2022 Form 10-Q kept its risk disclosures unchanged by including the same ***Product Liability Risk Statement*** contained in the 2021 Form 10-K (¶98(a)) and stating, "***[t]here have been no material changes in our risk factors since the February 22, 2022 filing of our Annual Report*** on Form 10-K for the year ended December 31, 2021."

107. These unchanged, theoretical and boilerplate statements of risks that could or may occur were false and misleading because they were not modified to inform investors of the actual widespread technical failures and defects, reputational damage, and increased warranty costs and liabilities that had already occurred from having defective SnapRS devices installed on thousands of homeowner rooftops, Generac's two failed attempts to fix the defect, Generac's development and rollout of the SnapRS 802 to replace all existing SnapRS field units, the substantial customer complaints, and the indemnification agreement with Generac's largest dealer.

108. In addition to the foregoing false and misleading statements, the 2021 Form 10-K directed Generac investors to the Company's website for additional available information. At the time of the 2021 Form 10-K and throughout the Class Period thereafter, Generac included on its

website a "PWRcell Solar + Battery Storage System" brochure,[27] which described the "SnapRS Rapid Shutdown Device" as "***SAFE***" and "***rapid shutdown compliant***" (the "Brochure Statements").

109. The Brochure Statements touting SnapRS as "SAFE" and "rapid shutdown compliant" were false and misleading at the time of the 2021 Form 10-K and throughout the Class Period thereafter because they concealed the substantial rate of SnapRS defects installed on thousands of homeowner rooftops that had resulted in widespread failures (and even fires), an indemnification agreement with Generac's largest dealer, multiple failed attempted fixes, and the development, launch, and rollout of SnapRS 802 to replace all existing SnapRS field units.

**Analyst Reaction to the False and Misleading Statements**

110. That Defendants' false and misleading statements touting Generac's robust safety reviews, understated warranty liabilities, and theoretical product liability risks misled investors and created a false impression of the Company's solar business and risks that materially differed from reality is clear from analyst reactions. For example, on February 17, 2022, Northcoast Research reiterated its "buy" recommendation for Generac stock and noted, "Generac continues to rapidly expand its product offering" and "[w]e remain extremely bullish on the [product] solution suite Generac has established," adding that "PWRcell energy storage" helped lead the Company's "strong core sales growth" without making any mention of the substantial product failures. Similarly, when Northland Securities initiated coverage on Generac on May 25, 2022, it rated Generac to "[o]utperform" expectations with a price target of $370 (compared to a then trading price of $215), in part, because Generac "is ideally positioned to . . . get the most out of its burgeoning clean energy

---

[27] Using the internet archive service "Wayback Machine" (https://archive.org/web/), demonstrates that the version of the brochure referenced herein, which has a "REV" (revised) date of "10/20" (October 2020) was available on Generac's website as of February 2021. Then, another version with a revised date of "8/21" (August 2021) was available on Generac's website as of October 2022. Both versions contain the false and misleading statements alleged herein.

business" without listing the substantial rate of defect among a litany of thirteen different "Risks to the achievement of price target."

## DEFENDANTS CONCEALED THAT GENERAC'S SOLAR SALES WERE HIGHLY CONCENTRATED IN ONE DEALER THROUGHOUT THE CLASS PERIOD

111. The final negative fact concealed during the Class Period was that Generac's solar product customer base was not diversified, and its sales were instead highly concentrated in and were overly dependent upon one solar dealer, Pink Energy.

### The Importance of Customer Diversification to Investors

112. It is well understood in the investment industry that the more concentrated a company's customer base, the more risky it is an investment. Analysis shows that when sales are concentrated in fewer customers, it creates greater risk that loss of such customers will have a significant negative impact.[28] Put differently, if two companies have 100 customers, and the first has each customer representing 1% of sales and the latter has one customer representing 99% of sales with the 99 other customers accounting for just 1% of sales, that latter company is considered a riskier investment. In fact, customer concentration risk is comparable to the risk of individuals not

[28] Dhaliwal, et al., "Customer Concentration Risk and the Cost of Equity Capital," *Journal of Accounting and Economics* (March 23, 2015) ("Depending on a major customer for a large portion of sales can be risky for a supplier for two primary reasons. First, a supplier faces the risk of losing substantial future sales if a major customer becomes financially distressed or declares bankruptcy, switches to a different supplier, or decides to develop products internally. . . . Further, a customer's weak financial condition or actions could signal inherent problems about the supplier's viability to its remaining customers and lead to compounding losses in sales. Second, a supplier faces the risk of losing anticipated cash flows from being unable to collect outstanding receivables if the customer goes bankrupt."); Ma, et al., "Corporate customer concentration and stock price crash risk," *Journal of Banking and Finance* (July 24, 2020) (noting customer concentration can also "negatively affect[] a firms' profitability because the major customers [can] exploit their advantageous bargaining power" with the firm and finding that empirical study based on a sample of publicly-traded firms from 1984 to 2007 "indicat[ed] that firms with a concentrated corporate customer base are more likely to experience future stock price crashes").

diversifying their retirement funds and instead concentrating in one or a few stocks.[29] Thus, the increased risk created by customer concentration will have a negative impact on stock price whereas customer diversification will have a positive impact on stock price.[30]

113. Here, both Generac and analysts following Generac noted the importance of diversification of Generac's overall dealer and solar dealer customer base. *See* ¶¶116-118, 122, 136, 186-188. For example, in referring to total customers for all products, Generac reported that: "Our network is well balanced with no single customer providing more than 6% of our sales in 2021." ¶129(a).

114. Defendants were also able to easily monitor sales by solar dealer through Generac's "Powerplay Clean Energy" (aka "Powerplay CE") sales program. As explained during Generac's September 2019 Investor Day, Powerplay CE is similar to Generac's Powerplay system for generators (*see* ¶¶47, 51), but was created "for solar and battery installation" and, when a contractor

---

[29] *See, e.g.*, Allianz Trade US, "Avoid High Customer Concentration Risk," *available at https://www.allianz-trade.com/en_US/insights/avoid-high-customer-concentration.html* ("Customer concentration risk is the level of revenue risk your portfolio holds as a result of relying on a small pool of customers. The bigger the client, the greater the risk your revenue holds. Like the saying goes, don't put all your eggs in one basket. By diversifying your portfolio, you decrease your revenue risk.").

[30] *See, e.g.*, Mercer Capital, "Valuation and Business Concentrations," *available at https://mercercapital.com/article/valuation-and-business-concentrations/* (business valuation firm explaining that "[t]he presence and magnitude (or absence) of business concentrations," such as reliance on a single customer for a large portion of sales, "are major considerations in assessing a subject company's risk profile and financial outlook," such that, "other things being equal, the presence of significant concentrations frequently results in a lower value than otherwise might be expected because the appraiser considers it necessary to apply a higher discount rate or required return, a lower forecast of future earnings, a lower expected earnings growth rate, and/or a lower capitalization factor (earnings or cash flow multiple) in developing his opinion of value"); Morgan & Westfield, "Reducing Concentrations of Risk Before Selling Your Business," *available at https://morganandwestfield.com/knowledge/reducing-concentrations-of-risk-before-selling-your-business/* (mergers and acquisitions firm explaining that "[t]he higher the customer concentration in your business, the more risk this presents to the buyer" but, "[o]n the other hand, the greater your customer diversity, the less risk a buyer will view in your business").

completes or does not complete a sale, "we see it."[31] However, during the Class Period, Defendants never disclosed that for solar products, one single customer accounted for more than 50% of its sales.

**Generac's Solar Sales Were Highly Concentrated in a Single Customer**

115. In late 2019 and January 2020, Generac met with and traveled to Pink Energy to solicit its business as a channel partner and eventually reached an agreement by March 2020.

116. That Defendants understood the need not just to increase sales, but to increase them through an increased and diversified network of dealers is clear because they routinely made public comments regarding Generac's purported broad array of dealers for its solar business. During a May 2020 Goldman Sachs Industrials and Materials Conference, Defendant Ragen emphasized that Generac was applying its strategy of having a diversified base of dealers for generators to its solar products, stating:

> When in a very underpenetrated market, you need to have . . . very broad channels of distribution and a large pipe to be able to sell your products through. And we did that on the legacy residential power generation side. . . . So we extended -- we are extending that philosophy into clean energy and building out a broad distribution network as we speak. We started in the back half of 2019, and we continue to do that today.

117. When an analyst asked for the "number of [solar] distribution partners that you folks have today," Defendant Ragen replied that:

> [I]f you think about the progression of rolling out our distribution partners on the clean energy side, we have been talking to -- we've trained over 1,000 independent solar installers to sell, install and service our products. We rolled out -- in January, we rolled out PowerPlay. So those on the line that are familiar with PowerPlay, that's our in-home selling system on the residential home standby generator side. We rolled out a PowerPlay Clean Energy, similar system in January. There's roughly, call it, 400 solar installers using that today and only the first quarter launch.

---

31 During Generac's February 13, 2020 earnings call, Defendant Jagdfeld described Powerplay CE as "the industry's first complete solar plus storage sales and lead management tool for installers and dealers," which "starts at the sizing of the rooftop solar array" and "help[s] the independent contractor take that through to a final proposal."

So I think that's . . . ramping nicely. And like I said, we've trained over 1,000 of these installers. So that will continue to ramp.

118. Then, on a July 30, 2020 earnings call, Defendant Jagdfeld said, "[w]here we have had a lot of really great success is signing new partners for our clean-energy initiatives, so solar dealers on a direct basis." Analysts took note of the strategy to build a diversified solar base. For example, on October 6, 2020, JMP Securities wrote that "Generac entered the [solar] storage space following the acquisition of Pika and Neurio [their solar acquisitions] in 2019 and has spent the last two years building out the necessary . . . distribution network."

119. Although Generac purportedly had many solar dealers, sales were highly concentrated in a single dealer, Pink Energy. Averaging sales across 2,000 solar dealers would result in each dealer accounting for far less than 1% of sales, at 0.05% of solar sales. Yet, Pink Energy accounted for what analysts estimated to be more than 50% of Generac's solar product sales. Put differently, assuming there were 2,000 solar dealers, Pink Energy sold more than the other 1,999 dealers combined.

120. However, during the Class Period, Defendants did not disclose the concentration of sales. Generac's undisclosed dealer concentration created several risks. First, half of Generac's solar sales were at risk of loss from the sudden underperformance or loss of Pink Energy as a dealer. Losing Pink Energy would not only have a far greater impact on Generac than losing any one of the other 1,999 dealers, but would have a greater impact on Generac than losing every one of its other 1,999 dealers at the same time. Second, given its heavy reliance on and association with Pink Energy, Generac was at risk of suffering reputational harm from Pink Energy's reputation and business practices.[32] Third, the substantial rate of solar product defects amplified the concentration

[32] Notably, Pink Energy was profiled by *Business Insider* in 2020 for its "misleading tactics to lure customers into home solar deals," such as "tout[ing] [a federal] tax incentive when selling systems to homeowners" even if the sales representative knew those customers were "unlikely to get the credit" and "exhibit[ing] a pattern of inflating the benefits of its products."

risks because it exposed Pink Energy to the risk of catastrophic liabilities and bankruptcy and hindered its ability to sell. As detailed above (¶¶90-96), the SnapRS defect caused Pink Energy to be overwhelmed with service calls and forced to divert its resources to servicing and replacing old units rather than selling new units. In a September 2022 press release, Pink Energy confirmed that Generac's "SnapRS units . . . have been part of nearly every Pink Energy solar energy equipment installation since 2020." Ultimately, Pink Energy declared bankruptcy and ceased operations as a result of the SnapRS defect, stating in an announcement:

> Due to rampant consumer discontent resulting from faulty Generac solar equipment, Pink Energy has been forced to close its doors permanently.
>
> We exhausted all avenues to find a way forward that would allow us to service all past, present and future customers and are devastated that we can't do so.

121. Despite the threat these risks posed on Generac's highly-touted solar business and revenue growth, and Defendants' statements assuring investors they would diversify its solar customers, Defendants concealed the high sales concentration in a single dealer until near the end of the Class Period when, for example, Defendant Jagdfeld admitted Pink Energy was actually "a large customer" and a "really important customer for [Generac]," and that "the diversification of our customer base is going to be the primary focus here going forward." Further quantifying how "large" of a customer Pink Energy was, when Pink Energy ceased operations in October 2022, Generac attributed a stunning $185 million reduction to its $350 million solar guidance to the loss of Pink Energy. Confirming the math, William Blair reported that reduction meant that "Pink Energy likely accounted for more than half of Generac's solar/energy storage sales."

**Defendants Made False and Misleading Statements that Concealed Generac's Lack of Customer Diversification and High Concentration of Sales in a Single Solar Dealer and the Attendant Risks**

122. On, April 29, 2021, Defendants Jagdfeld and Ragen convened an earnings call to discuss the 1Q 2021 results. In discussing the increased solar product (PWRcell) sales and

shipments, and referencing the previously disclosed strategy of solar product dealer diversification, Defendant Jagdfeld falsely and misleadingly reported that the Company "***ha[s] had encouraging success further building out our installer network as we've trained and certified approximately 2,000 dealers as of the end of the quarter***, with approximately 800 dealers registered on our Powerplay CE selling system."[33]

123. On May 4, 2021, Generac filed with the SEC its quarterly report on Form 10-Q for 1Q 2021 ("1Q 2021 Form 10-Q"), which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2021 Form 10-Q included the following false and misleading statements that concealed Generac's reliance on one dealer, Pink Energy, for approximately half of clean energy sales:

(a) The 1Q 2021 Form 10-Q stated that Generac's products, including solar "***energy storage systems . . . are available globally through a broad network of independent dealers***, distributors, retailers, e-commerce partners, wholesalers, and equipment rental companies" (the "Available Through Dealers Statement").

(b) In describing the Company's risk factors, the 1Q 2021 Form 10-Q noted that Generac is "subject to various factors that can affect [its] results of operations, ***which [the Company] attempt[s] to mitigate through factors we can control, including*** continued product development, ***expanded distribution***, pricing, cost control, and hedging" (the "Mitigating Risk Through Expanded Distribution Statement").

---

33 Analysts understood that this and similar disclosures related to Generac's solar (clean energy) products, *i.e.*, PWRcell, rather than, for example, distributors of generators, non-solar grid services, or other products. *See, e.g.*, 135, 186-188. Indeed, when referring to total dealers for HSB generators, Defendants referenced their network of over 7,000 dealers, so references to around 2,000 dealers could not refer to generator or total dealers. Moreover, the references to a subset of the around 2,000 dealers using Powerplay CE (*see* ¶114) makes clear Defendants were referring to solar dealer customers.

124. On July 28, 2021, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's 2Q 2021 results. In discussing the increased sales and shipments for Generac's "PWRcell energy storage systems," and referencing the previously disclosed strategy of solar product dealer diversification, Defendant Jagdfeld falsely and misleadingly reported that the Company had "***further built out our installer network during the quarter, and we ended the first half of the year with approximately 2,200 trained and certified dealers***, with nearly 900 of those dealers registered on our PowerPlay CE selling system."

125. On August 3, 2021, Generac filed with the SEC its quarterly report on Form 10-Q for 2Q 2021 10-Q ("2Q 2021 Form 10-Q"), which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 2Q 2021 Form 10-Q included the same ***Available Through Dealers Statement*** (¶123(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶123(b)) contained in the 1Q 2021 Form 10-Q.

126. On November 2, 2021, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's 3Q 2021 results, during which Defendant Jagdfeld continued to emphasize the importance of Generac's solar dealer growth as a "key performance indicator," and falsely and misleadingly reported that "***we further built out our installer network as we entered the third quarter with approximately 2,300 trained and certified dealers***, with nearly 1,000 of those dealers registered on our PowerPlay CE sales platform."

127. On November 4, 2021, Generac filed with the SEC its quarterly report on Form 10-Q for 3Q 2021 ("3Q 2021 Form 10-Q"), which was signed by Defendant Ragen and contained signed certifications by Defendants Jagdfeld and Ragen. The 3Q 2021 Form 10-Q included the same ***Available Through Dealers Statement*** (¶123(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶123(b)) contained in the 1Q 2021 Form 10-Q.

128. On February 16, 2022, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's 4Q and full year 2021 results, during which Defendant Jagdfeld again highlighted that "[a] key component of future growth for our clean energy offerings is establishing and developing our distribution network." In discussing Generac's clean energy "growth well above the broader U.S. residential solar market," and referencing the previously disclosed strategy of solar product dealer diversification, Defendant Jagdfeld falsely and misleadingly reported that "***we further built out our clean energy installer network as we ended the fourth quarter with nearly 2,500 trained and certified dealers***, with approximately 1,000 dealers registered on our PowerPlay sales platform."[34]

129. On February 22, 2022, Generac filed with the SEC its 2021 Form 10-K, which was signed by Defendants Jagdfeld and Ragen and contained the following false and misleading statements that concealed Generac's reliance on one dealer, Pink Energy, for approximately half of clean energy sales:

(a) The 2021 Form 10-K emphasized:

> ***We believe our global distribution network is a competitive advantage that has strengthened over the years as a result of adding, expanding and developing the various distribution channels through which we sell our products***. We offer a broad set of tools, programs, factory support, and sales leads to help our distribution partners be successful. ***Our network is well balanced with no single customer providing more than 6% of our sales in 2021***.

(b) The 2021 Form 10-K also included the same ***Available Through Dealers Statement*** (¶123(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶123(b)) contained in the 1Q 2021 Form 10-Q.

130. On May 4, 2022, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's 1Q 2022 results, and, referencing the previously disclosed strategy of solar product

---

34 These statements (like those referenced in ¶¶122, 124, 126, 130) were made particularly in the context of discussions regarding Generac's "PWRcell energy storage systems."

dealer diversification, made the following false and misleading statements that concealed Generac's reliance on one dealer, Pink Energy, for approximately half of clean energy sales:

(a) Defendant Jagdfeld emphasized that Generac's "[c]lean [e]nergy products contributed meaningfully to overall growth in the first quarter as shipments of our PWRcell energy storage systems grew significantly from the prior year period" and that "***[s]upporting this rapid growth is the continued build-out of our installer network as we ended the first quarter with more than 2,600 trained and certified dealers***, with approximately 1,100 registered on our PowerPlay sales platform."

(b) Defendant Ragen likewise emphasized that "***[s]hipments of PWRcell energy storage systems also grew at a significant rate*** as compared to the prior year as the U.S. residential solar plus storage market continues to grow and ***as we expand our distribution network for our Clean Energy solutions***."

131. On <u>May 9, 2022</u>, Generac filed with the SEC its 1Q 2022 Form 10-Q, which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen. The 1Q 2022 Form 10-Q included the same ***Available Through Dealers Statement*** (¶123(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶123(b)) contained in the 1Q 2021 Form 10-Q.

132. On <u>August 3, 2022</u>, Defendants Jagdfeld and Ragen convened an earnings call to discuss the Company's 2Q 2022 results, during which Defendant Jagdfeld stated, "[a]s we work to capture this [clean energy product] demand, ***our residential clean energy installer network continues to grow as we ended the second quarter with approximately 2,800 trained and certified technicians***, with approximately 1,150 registered dealers on our PowerPlay sales platform."

133. On <u>August 8, 2022</u>, Generac filed with the SEC its 2Q 2022 Form 10-Q, which was signed by Defendant Ragen, and contained signed certifications by Defendants Jagdfeld and Ragen.

The 2Q 2022 Form 10-Q included the same ***Available Through Dealers Statement*** (¶123(a)) and ***Mitigating Risk Through Expanded Distribution Statement*** (¶123(b)) contained in the 1Q 2021 Form 10-Q.

134. The statements set forth in ¶¶122-133 above were false and misleading when made because by repeatedly touting that Generac had success in "building out" its "broad network of independent" solar dealers and increasing them to "2,000" and all the way to "2,800 trained and certified dealers," that Generac's solar product shipments increased as the Company "expand[ed]" and "buil[t]" out its "broad" distribution network, and that Generac was able "mitigate" risk through "expanded distribution" with no customer accounting for more than "6%" of total sales, they created a false impression that Generac had succeeded in pursuing its pre-disclosed strategy of having a diversified base of solar dealer customers and omitted to disclose that half of Generac's solar sales were highly concentrated in a single dealer, Pink Energy, exposing Generac to the significant business and reputational risks set forth herein.

**Analyst Reaction to the False and Misleading Statements**

135. That Defendants' false and misleading statements touting their diversified solar product customer base of over 2,000 dealers, while omitting to disclose and concealing the concentration of half of sales in a single dealer, created a false impression that materially differed from reality is clear from analyst reactions. For example, on April 29, 2021, Oppenheimer wrote that "[Generac] also boosted the outlook for Energy Storage Solutions . . . with favorable dealer growth (2,000 trained and certified on PWRcell), solar growth, and [storage system] attachment rates." On October 1, 2021, J.P. Morgan stated Generac "now has over 2.2k distribution partners for its Clean Power products" and "w[e] continue to believe that [Generac's] product breadth, brand name, and distribution can result in a rather quick consolidation of the ~10% of the US residential solar inverter market not controlled by industry leaders." On October 14, 2021, Truist Securities

initiated coverage on Generac with a $500 price target (when Generac's stock was trading at $420), and stated that "[w]e continue to expect dealer growth as clean products scales up and in our view dealer growth will be a key metric to assess GNRC penetration into these new product markets. Notably, in 2020, no single customer provided more than 6% of Generac's sales."

136. William Blair similarly emphasized Generac's purported solar dealer growth as a positive without any mention of disproportionate concentration through any dealer, stating:

(a) On February 17, 2022, "[d]emand in the clean energy business remains robust, with Generac expecting revenue to increase by 'well north of 50%' in 2022" as it "continues to build out the dealer network for this business, with approximately 2,500 dealers trained and certified at the end of the quarter."

(b) On May 5, 2022, "Generac ended the first quarter with approximately 8,100 residential dealers, representing an increase of about 400 dealers over the last 12 months. Generac also ended the first quarter with 2,600 trained and certified dealers in the company's clean energy installer network."

## THE TRUTH BEGINS TO EMERGE

137. Starting in November 2021, the truth about the three categories of concealed negative facts in the Company's two most critical businesses, generators and solar, began to leak into the market and the concealed risks began to materialize, including through a series of partial disclosures, resulting in massive declines in the price of Generac's common stock.

### November 2021 Disclosures

138. On November 2, 2021, Generac announced, and convened an earnings call to discuss, the Company's 3Q 2021 financial results. The declining close rates began to be partially revealed, and the risks posed by declining close rates (orders being shipped with no allocated end-customer, excessive dealer inventories, order cancellations, and fewer orders and lower generator revenue)

began to partially materialize during the call as Generac disclosed disappointing financial results for generator sales. Generac reported revenue that missed analyst expectations, and that miss was driven by sales for its residential products, which includes HSB generators, being reported at $609 million, short of consensus expectations of $639 million. Generac also reported that its backlog, which had been growing, began to shrink for the first time since the start of COVID-19, from 32 weeks in September to 30 weeks in November.

139. After these disclosures, the price of Generac stock fell from $506 per share on November 1, 2021 to $484 per share on November 2, 2021, and the stock continued to fall to $453 the next day.

**January 2022 Through April 2022 Disclosures**

140. The declining close rates continued to be partially revealed, and the concealed risks of declining close rates continued to partially materialize, through a series of subsequent disclosures.

141. On January 26, 2022, Northcoast Research reported on its "checks" with Generac dealers, which indicated that generator sales and close rates were declining, noting that "[o]ur checks in December saw a continuation of the deceleration in sales growth" and "[w]e are seeing customers pausing their decision to buy based on the ongoing long lead times." After these disclosures, the price of Generac stock fell from $276 per share on January 25, 2022 to $265 per share on January 26, 2022, and the stock continued to fall to $257 the next day. In total, from January 25, 2022 to January 27, 2022, Generac's stock declined by approximately 7% as the market digested the disclosures.

142. On April 28, 2022, after trading closed, BofA Securities published a report that began by noting that Generac's stock was "down 34%" since the start of the year and that the "[m]arket is worried on HSB backlog" decline. The April 28, 2022 BofA report stated that, based on "channel checks" with Generac dealers, a dealer from one of Generac's more penetrated markets reported that

"demand has hit a lull." According to the report, this "dealer's perception was that Generac is now 'pumping out gear left and right' and this particular dealer has more than enough inventory for the season," such that "[i]f a customer signs a contract today, they can get installed within 2-3 weeks b[ecause] the dealer has been steadily ordering and has built up ample inventory."

143. After these disclosures, the price of Generac stock fell from $233 per share on April 28, 2022 to $219 per share on April 29, 2022.

**June 2022 Disclosures**

144. On June 22, 2022, stock research firm Spruce Point Capital Management ("Spruce Point") published a research report challenging the market valuation of Generac common stock. The Spruce Point report included additional information partially revealing the magnitude, and materialization of the risks, of declining close rates as well as information that began to partially reveal Generac's concentration of solar sales through Pink Energy and attendant risks.

145. As to close rates, a release issued by Spruce Point on the same day stated that Spruce Point found "evidence of core problems in Generac's 'Legacy Growth Drivers,' including home standby generators ('HSBs') and portable generators." Then, in the Spruce Point report, the firm stated that it "expect[s] Generac to be stuck with excess capacity," adding that "[w]e observe[d] that [the Company's generator] deal[er] growth started to stall in the middle of 2021 and has been flat now for three quarters."

146. Spruce Point further reported certain incentives by Generac to boost generator sales, stating that "recent social media advertising on Facebook" showed that "Generac is offering a free 10 year extended warranty [in May 2022-June 2022], whereas a year ago [in March 2021 – April 2021] it was only 7 months."

147. As to consolidation of solar sales, Spruce Point raised concerns about Generac's significant sales through Pink Energy and the reputational risks of concentration of sales in Pink

Energy given that it was "alleged to be using deceptive marketing practices to fuel sales growth." Most notably:

> Powerhome Solar (now dba as Pink Energy) one of Generac's largest partners in over 13 states, has had multiple investigations into its sales practices and has allegedly overcharged for Generac batteries. Its CEO settled charges with a State Attorney General earlier in his career, while the Chief Marketing Officer settled charges by the FTC for deceptive marketing practices. A recent source says that Pink Energy is under FTC investigation.

148. Spruce Point then questioned: "How much in sales has Generac done with this organization and why after numerous investigations showing the alleged fraudulent practices, does Generac continue to promote them as partners?"

149. After these disclosures, the price of Generac common stock declined from $220 per share on June 21, 2022 to $213 per share on June 22, 2022.

**August 2022 Disclosures**

150. On August 1, 2022, Pink Energy filed a lawsuit against Generac in the Western District of North Carolina, which partially revealed information, and the materialization of concealed risks, concerning the SnapRS defect and Generac's concentration of solar sales in one dealer. In the Pink Energy Lawsuit, Pink Energy claimed that Generac had engaged in "wanton, willful, and reckless conduct . . . by":

> (i) concealing the SnapRS defects from [Pink Energy], (ii) failing to inform [Pink Energy] of the devastating effect the firmware update would have on its customers' solar energy system production, and (iii) fail[ing] to develop a suitable alternative to the defective SnapRS units [which] has had a devastating effect on [Pink Energy's] business.

151. Pink Energy also asserted that the SnapRS failures, including the overheating and melting issues, were discovered in early 2021, and described the residential home fires caused by the SnapRS defect, Pink Energy's communications with Generac employees and executives, and the onslaught of customer complaints and issues caused by the SpanRS defect. Pink Energy alleged that it suffered a $155 million loss in revenue due to contract cancellations related to the SnapRS defect

and millions of dollars in damages due to the influx of customer service calls related to the faulty SnapRS units.

152. Following the filing of the Pink Energy Lawsuit, the price of Generac shares declined from $268 per share on July 29, 2022 to $265 per share on August 1, 2022.[35]

153. On August 3, 2022, Defendants Jagdfeld and Ragen convened a conference call to discuss 2Q 2022 results, which further partially revealed the magnitude, and materialization of the concealed risks, of declining close rates. After failing to disclose the decline in close rates for more than a year, Defendant Jagdfeld partially revealed and implied they had declined by touting that "close rates on our sales leads have begun to improve, supporting our belief that reducing our lead times will improve our ability to capture more of the new and higher baseline of home consultations or sales leads within our sales pipeline." Later in the call, he reiterated, "we're seeing improved close rates off of IHCs because we are bringing down lead times," adding, "that's part of our overall strategy here is if you're a customer and you're shopping the category and even if you hear 8 to 10 weeks on a product, you might be – you might kind of sit on the sidelines and see what happens." These disclosures partially revealed and implied that the close rates had previously declined and that customers were not purchasing consistent with the increased consultation and order rates Defendants had touted in prior calls.

154. Further, Defendant Jagdfeld partially revealed the consequence of the prior trend of declining close rates as dealer orders also fell, as reflected in his disclosure that the HSB backlog continued its decline to "8 to 10 weeks" as of August 3, 2022, representing a 50% reduction from 20 weeks reported as of May 4, 2022. Tellingly, contrary to their prior practice, Defendants refused to disclose the value of the backlog, which they had previously touted as being "over $1 billion." One

35 On August 8, 2022, one week later, Generac filed its 3Q 2022 Form 10-Q, but did not disclose the Pink Energy Lawsuit.

UBS analyst asked, "[a]nd just curious if you could quantify what the 8 to 10 weeks of backlog translates to in terms of value. I didn't hear you mention that on the call," but Defendant Jagdfeld responded: "Yes, we don't disclose that. That's why you didn't hear it." Wanting to avoid any follow up, Generac's head of investor relations tellingly jumped in and told the call operator: "I think we'd probably go [to] the next question."

155. Another analyst, from Credit Suisse, noted the contradiction, stating that Generac had "said [the backlog was] more than $1 billion the last quarter" and asked "[i]s it somewhere in line with that range or different? And I had a separate follow-up." Jagdfeld ignored the question, stating that "Again, we've talked about 8 to 10 weeks of orders in the backlog and it's sizable. It's a big backlog. . . . But that 8 to 10 weeks is really how we would speak to the backlog." Rather than allow the analyst to ask his follow up, the call ended.

156. The reduced backlog partially revealed the magnitude of the declining close rates, and the materialization of the risks posed by the declining close rates (orders being shipped with no allocated end-customer, elevated dealer inventories, order cancellations, and ultimately fewer orders and lower generator revenue), which the market recognized. For example, during the August 3, 2022 earnings call, an analyst noted that "[i]t sounds like based on your backlog comments, that net orders were about $200 million in the quarter compared to $500 million last quarter. Can you just comment on that?" In response, Defendant Ragen declined to answer, saying "[w]e haven't necessarily talked orders historically."

157. After these disclosures, the price of Generac stock fell from $267 per share on August 2, 2022 to $249 per share on August 3, 2022, and the stock continued to fall to $244 the next day as the market digested the disclosures.

158. On August 4, 2022, BofA Securities issued a report, which stated:

> [T]he limited disclosure and opacity of [Generac]'s HSB orders and sales dynamics exacerbated the negative reaction to today's earnings call. We note that

[management] did not disclose the dollar value of the backlog, which we argue was the most closely watched data point during the 2Q22 earnings cycle across our [clean technology] coverage.

159. BofA calculated that "in 1Q22 . . . one can estimate ~$55 [million] of HSB orders a week. So, if lead times fell to 8-10 weeks, that suggests a backlog of ~$440-550 [million], which is a +50% reduction in backlog value." BofA reduced its "topline projections to account for greater execution risk in developing business units and weaker growth in HSB orders, due to limited disclosure from [management] and to derisk our estimates."

160. The same day, Wells Fargo noted the negative market reaction to the disclosures stating that Generac's stock price "is down 8.6% over the past two days" and stated it was because, in part "GNRC's backlog and a potential softening of demand" and management's failure to "quantify the dollar amount of HSB backlog" which "played into a bearish narrative being pushed by some investors that demand is slowing." Wells Fargo, however, remained "positive" about Generac because, in part, "PWRcell battery storage could benefit from an acceleration in sales next year" and "[t]he company expects its clean energy business to generate more than $500 MM of revenue in 2022, which would double relative to 2021 contributions."

**September 2022 Disclosures**

161. On September 12, 2022, Pink Energy issued a release covered by multiple news outlets that further revealed the magnitude and materialization of the risks of the substantial rate of solar product failures and defects. The release stated Pink Energy had been forced to lay off approximately 500 employees "because of the same Generac product issues" alleged in the Pink Energy lawsuit. The release detailed that the SnapRS parts "have been part of nearly every Pink Energy solar energy equipment installation since 2020," have suffered "thousands of failures" at a rate that Generac had acknowledged was "more than 40%," "are believed to have caused at least two fires at Pink Energy customer homes," and have caused the "shut down [of] portions of customer

systems," resulting in Pink Energy experiencing "an influx of 30,000 inbound customer calls per month, many times higher than its historical level of only 800 calls per month."

162. On the same day, BofA Securities issued a report that further revealed the magnitude, and materialization of the risks, of declining close rates for generators as the firm uncovered and reported on tactics that had been used to incentivize over-ordering in 2021, stating:

> Dealers admit to significant pre-orders in 2021 given both bloated lead times, but also internal needs to demonstrate sales status with [Generac] – w[here] . . . Premier dealers must demonstrate $1.5mm in sales annually with status offering discounted access to generators. Given uncertainty on time of installation, we understand many pre-ordered in 2021 to demonstrate a "pipeline of sales" in *lieu* of realized installation. (Emphasis in original).

163. After the September 12, 2022 disclosures, the price of Generac stock fell from $238 per share on September 9, 2022 to $213 over the next two trading days as the market digested the disclosures.

164. On September 22, 2022, multiple media outlets reported regarding a letter from Pink Energy that further revealed the magnitude and materialization of the risks of customer concentration and substantial rate of solar product failures and defect when it informed employees that Pink Energy would shut down, citing "financial difficulties resulting from issues with Generac equipment."

165. After this disclosure, the price of Generac stock fell from $176 per share on September 21, 2022 to $171 per share on September 22, 2022. Notably, as the foregoing news leaked to the market (¶¶161-164), the price of Generac stock declined on every trading day from September 9, 2022 through September 22, 2022. In total, the stock declined in that time by more $65 per share as the market digested the disclosures.

**October 2022 Disclosures**

166. On October 6, 2022, BofA Securities issued a report further revealing the magnitude and materialization of the risks of declining close rates as it downgraded Generac from "Buy" to

"Neutral," citing "[s]tepping down underlying demand" for HSB generators. In the report, BofA wrote that its analysts "connected with numerous [Generac] dealers" and "the feedback from industry experts we spoke to, more dealers than not communicate softening demand." The report also stated that "we see further worsening data points" including "cryptic and opaque segment level disclosure," such as "omit[ting] the value of the backlog and fail[ing] to disclose clear direct indicators of the business' health (*i.e.* volumes, revenues, margin)," which "supports our growing concerns on order cancellation from backlog as lead times on equipment have fallen." BofA added: "Just as much as backlog was outsized on the way up as dealers pre-emptively put orders into [the] queue as they stretched to 1-yr+ last Fall, we see product backlog trends as having largely reversed themselves near entirely for many of their residential products today." The October 6, 2022 BofA report also identified "increased promotional activity across the dealer network; most notably a free 10-year warranty (previously paid). Feedback from multiple industry experts we spoke to confirm incremental promotions from GNRC in recent quarters." And, the report stated that "promotional activity . . . likely indicates weak demand or oversupply."

167. On this news, the price of Generac stock fell from $179 per share on October 5, 2022 to $169 per share on October 6, 2022, and the stock continued to decline to $154 on October 7, 2022, the day Pink Energy filed for bankruptcy.

168. On October 19, 2022, Generac published a release further revealing the magnitude and materialization of the risks arising from the three categories of concealed negative facts (declined close rates, SnapRS defect, and solar sales consolidation) as Generac reported disappointing financial results for 3Q 2022. For example, Generac reported a 26% decline from the prior quarter in residential sales and that "[p]reliminary net income attributable to the Company during the third quarter was approximately $58 million, or $0.83 per share, as compared to $132 million, or $1.93 per share, for the same period of 2021," representing a 56% year-over-year decline.

The Company further revealed the financial impact of the SnapRS defect, reporting a pre-tax charge of "approximately $37 million of clean energy product warranty-related matters and approximately $18 million of bad debt expense related to a clean energy product customer [*i.e.*, Pink Energy] that has filed for bankruptcy."

169. The release quoted Defendant Jagdfeld admitting the results "'fell short'" and attributed the poor sales numbers to "'[r]esidential product sales'" that were pressured due to "'higher field inventory levels and lower home standby generator orders from our channel partners'" and "'clean energy shipments [that] were negatively impacted by a large customer which ceased operations [*i.e.*, Pink Energy] and has since filed for bankruptcy protection.'" In addition, the Company reduced its full-year 2022 net sales growth guidance by nearly 40% as a result of "home standby order headwinds" that were "expected to persist during the fourth quarter and through the first half of 2023" as dealers "work down their extended backlogs and elevated field inventories." The Company likewise reduced its margin and earnings forecasts.

170. After these disclosures, the price of Generac stock fell from $148 per share on October 18, 2022 to $110 per share on October 19, 2022.

171. Later that day, Roth Capital Partners issued a report downgrading Generac from a "buy" to "sell" rating and slashing its price target for Generac by more than 75%. The report complained that "[m]anagement gave us a double whammy yesterday with its HSB business weak through mid-2023 and the clean energy business warranty expense/bad debt." As to solar, Roth Capital said "we believe the downside risk for the clean energy business could still be worse than expected." The report then summarized a webinar Roth Capital had with Dan Javan, the CEO of Suntuity, which bills itself as "One of America's Largest Solar Integrators with Growing National Reach" who complained about the solar defect, stating, "'[b]ecause they [Generac] come up with [solar] solutions. We deploy the solution, the solution doesn't work. They come up with another

firmware, you deploy the firmware, that doesn't work.'" Roth Capital added that "some dealers are suggesting there may be a need for a national recall" and that "there could be more warranty expense ahead."

172. Also on October 19, 2022, Cowen slashed its price target for Generac by more than 20% and issued a report stating that the preliminary results were "well below expectations." Confirming the market did not have an accurate understanding of the risks that had materialized from the concealed declining close rates, Cowen added, "[r]esidential sales were lower than expected" and "[w]e didn't appreciate the magnitude of the inventory build" for HSB generators. The same day, JP Morgan slashed its price target for Generac by more than 50%, citing the preliminary results that were "well below expectations" due to "elevated channel inventory" for HSB and "one-time charges related to the bankruptcy of a material customer for the nascent clean power business."

173. On October 20, 2022, BofA Securities called the results a "negative surprise" that it had not expected based on management's prior statements, reporting that, "[a]lthough likely one-time in nature, these [Pink Energy related] charges are worse than we previously expected, given [management's] limited comments around its exposure to issues with its clean energy products. Ultimately, net income comes in well below our prior expectations of $159 mn vs. $58 mn preliminarily reported." As to the HSB business, BofA similarly added that, "[u]nderlying demand is worse than we thought" and stated that "this guidance cut indicates markedly weaker HSB demand than our recently lowered expectations." BofA added that Defendants' "limited, opaque disclosure makes benchmarking more difficult."

174. On the same day, Morningstar cut its fair value estimate for Generac by nearly half and also reported it had not expected the negative surprise based on prior management representations, reporting Morningstar was "surprised by the magnitude of the guidance cut given

management reiterated guidance with second-quarter earnings two months ago." Morningstar described the Pink Energy issues as "a setback in Generac's efforts to prove itself within the clean energy market" and noted that the "[w]eakness in home standby orders appears to be significantly lower than our prior expectations." Reflecting the view that management had not previously been candid, Morningstar said, "we think investors should not rush to buy the weakness as we expect it to take time for management to re-establish credibility."

**November 2022 Disclosures**

175. The magnitude and materialization of the risks of the concealed negative facts continued to be revealed in November 2022.

176. On November 2, 2022, Defendants Jagdfeld and Ragen convened a conference call to discuss the disappointing 3Q 2022 results. At the outset of the call, Defendant Jagdfeld stated that the Company's residential sales "were weaker than expected in the quarter, driven by lower shipments of home standby generators and clean energy products relative to our prior expectations."

177. Regarding the HSB business, Defendant Jagdfeld admitted to having known of the growing dealer inventories for several quarters, stating that Defendants "wanted to bring our lead times down, *because we knew that*, that was having a negative impact on close rates, it's having a negative impact on our ability to sign new channel partners." Defendant Jagdfeld also admitted to knowing of the problem for a long time stating that "*we could see field inventory building*" (which is a materialization of the risk of close rates declining) and "*we had been talking to our channel partners for several quarters about this coming*." He added that field inventories had been so high that dealers "physically started to run out of room, run out of credit" and "field inventory levels are about double where they should be."

178. As to solar, Defendants Ragen and Jagdfeld further revealed the magnitude, and the materialization of the risks, of the solar product defect and concentration of sales in Pink Energy,

with Defendant Ragen stating that, "the loss of a major customer during the quarter, along with the specific warranty-related issue, has impacted near-term demand and our [sales] outlook for the full year 2022." He disclosed that the Company now expects clean energy to "deliver sales between $300 million to $330 million for the full year 2022, as compared to our previous guidance of approximately $500 million."[36]

179. Defendant Jagdfeld added:

> [S]hipments of PWRcell energy storage systems in the third quarter were negatively impacted by the significant liquidity challenges of a large customer that ceased operations and subsequently filed for bankruptcy. Additionally, during the quarter, we continued to address certain warranty-related matters for the upgrade of a component within our PWRcell energy storage system.

180. During the same November 2, 2022 earnings call, an analyst from William Blair stated that, "I think that energy storage business in '21 was around $220 million, $225 million" and "[i]t looks like the guidance that you're giving us now . . . implies that that's down something like 30% or so this year." The analyst asked, "[i]s that about right?" In response, Defendant Jagdfeld stated, in part:

> But yes, the loss of that major customer of ours in the second half of the year here, they really ceased operations in July. So we've got to do the hard work that, honestly, we should have been doing all along of continuing to expand our channel to more channel partners, but that hurts us definitely in the year, Brian.
>
> So yes, unfortunately, that's going to be down this year. Looking for that to return to growth next year, but as we kind of fill in with new customers, and we kind of reset, so '22 is going to end up being a reset year for us here on energy storage, which is disappointing . . . .

181. An analyst later asked if the revenue reduction for solar was driven by Pink Energy's bankruptcy. Defendant Jagdfeld answered: "Yes. The majority of the market is related to the loss of

---

[36] An estimated $150 million of the clean energy guidance included "ecobee," Generac's recently-acquired thermostat business, so without ecobee, the core (solar storage) clean energy guidance was being reduced from approximately $350 million to approximately $165 million.

the customer. It was a really important customer for us. And the diversification of our customer base is going to be the primary focus here going forward."

182. With regard to the solar defect, Defendant Jagdfeld stated: "It's a rooftop mounted shutoff device, and that device is – the previous generation of that device, has a higher failure rate than what we'd like to see." Defendant Jagdfeld admitted that the Company was replacing the SnapRS as a result of the defect, stating: "So we're proactively replacing those devices for customers so they don't see an interruption of the production of their systems. . . . And that upgrade, the total effort there is what's reflected in that additional warranty reserve charge that we took here in the quarter."

183. On this news, Generac common stock fell again, from $115 per share on November 1, 2022 to $106 per share on November 2, 2022.

184. On November 3, 2022, BofA Securities issued a report titled: "The Other Shoe (Clean Energy) Drops: Lots of Moving Parts add to Challenges," noting that management disclosed that field generator inventories were double "healthy levels," and management "did not offer any details around . . . its expectation for sales of the remaining field inventory." The BofA report instead stated that Generac's lack of "disclosure[s] around underlying demand, orders, and shipments" supported that "underlying HSB demand is weaker than previously expected."

185. Turning to the solar business, the November 3, 2022 BofA report stated, "we believe GNRC is facing greater challenges with its clean energy segment than we previously understood" and Generac "faces operational difficulties with ramping its PWRcell deployments, following product quality issues and a lost major customer."

186. The same day, William Blair issued a report that noted the disconnect between Defendants' prior representations and recent disclosures because Generac's "dependence on distributor Pink Energy was more significant than we understood," reporting:

Management has consistently indicated Generac works with many distributors in the solar and energy storage market, and that Generac has trained and certified over 2,000 dealers on the company's solar/energy storage product portfolio. We believe it will come as a surprise to many investors that Pink Energy likely accounted for more than half of Generac's solar/energy storage sales. Pink Energy filed for bankruptcy on October 7 and is no longer installing Generac products.[37]

187. Detailing the math, William Blair explained the updated guidance "for the core clean energy business (primarily residential solar storage) is approximately $150 million to $180 million, down from about $225 million in 2021." The William Blair report added that, "[a]lthough the year-over-year decline is substantial, the situation looks even worse after deriving the run rate for this business expected in the second half of 2022," which William Blair estimated to be roughly $30 million compared to prior estimates of $200 million.

188. The November 3, 2022 William Blair report stated that "[t]he realization of customer concentration makes it clear that Generac has not been as successful as we believed at attracting distribution partners in the solar market, and recent quality issues will make building that distribution even more challenging." The report also highlighted how investors had been misled, stating "[t]hese realizations regarding clean energy hurt management's credibility, given there was no indication Generac had material customer concentration in this business," and "[w]e now also believe the quality issues Generac has been experiencing with solar components, particularly a rapid shutdown device called the SnapRS, are severe enough that the company's reputation in the solar industry has been damaged." Explaining just how widespread the product SnapRS defect had been, William Blair estimated that Generac may be in the process of replacing about 300,000 SnapRS devices in the field. The report also commented on the magnitude of liabilities associated with the product defects by observing that replacement costs are "significantly weighted towards" labor.

---

[37] That Pink Energy accounted for more than half of Generac's solar revenue is further supported by an estimate from Roth Capital Partners on October 19, 2022 that the "total number [of] deployed" PWRcell systems was "~30k." Pink Energy, in turn, had "19,000 customers with solar energy systems that utilized . . . the SnapRS" (¶96) – *i.e.*, 63% of the total PWRcell systems.

189. In total, from November 1, 2021, the day before the facts about Generac's true business state and prospects began to be partially revealed, to November 2, 2022, the price for Generac's common stock fell an astonishing $400 per share.

## ADDITIONAL SCIENTER ALLEGATIONS

### The Individual Defendants Controlled the Company's Messaging to the Investing Public

190. In their respective roles as CEO (Jagdfeld) and CFO (Ragen) since 2008, the Individual Defendants have long controlled Generac's strategy, decisions, and messaging to the investing public. The Individual Defendants were able to, and did, determine the content of Generac's various SEC filings and other public statements pertaining to Generac during the Class Period. Defendants Jagdfeld and Ragen signed or certified Generac's annual and quarterly reports filed with the SEC. *See, e.g.*, ¶¶98, 104, 106, 123, 125, 127. In addition, Defendants Jagdfeld and Ragen attended earnings calls and spoke on behalf of the Company throughout the Class Period. *See, e.g.*, ¶¶61, 65, 67, 122, 124, 128, 130, 132. Defendants Jagdfeld and Ragen are the only Generac employees to have signed or certified every annual and quarterly report Generac filed with the SEC during the Class Period. And they are also the only Generac employees that answered analyst questions on behalf of the Company during Class Period quarterly earnings calls.

191. In fact, other employees were not generally authorized to speak on behalf of the Company, as the Company's Code of Conduct states, "[e]mployees, officers and directors who are contacted by a member of the financial community and/or media are not authorized to provide any information regarding Generac or its business without prior approval" and "must immediately notify Investor Relations, the Legal Department, the CFO or CEO." As to Defendants Jagdfeld and Ragen, the Company's "Supplemental Code of Ethics for the CEO, CFO and other Senior Officers" required that they must "[p]roduce full, fair, accurate, timely, and understandable disclosure in reports and

documents that the Company files with, or submits to, the SEC, and in other public communications" and act "without misrepresenting material facts."

192. Further, Defendants Jagdfeld and Ragen participated in the drafting, preparation, and/or approval of Generac's public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, Defendants Jagdfeld and Ragen held themselves out as knowledgeable about generator demand, solar product sales, and dealer networks and were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions. They are therefore liable for the misrepresentations and omissions therein.

193. As the two most senior executive officers of Generac, Defendants Jagdfeld and Ragen were privy to confidential and proprietary information concerning Generac, the performance of its HSB generator and solar businesses, Generac's relationships with (and sales through) its largest dealers, and product defects. The Individual Defendants also: (i) had access to, *inter alia*, internal corporate documents and conversations with corporate officers, and employees; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants Jagdfeld and Ragen knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**The Individual Defendants' SOX Certifications Support A Strong Inference of Scienter**

194. Beyond having access to the concealed facts relating to their repeated statements regarding generator end customer demand, solar product safety, and diversification of solar customer sales, Defendants represented that they had designed controls to ensure they were informed of material matters. More specifically, Defendants Jagdfeld and Ragen each signed Certifications

Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that were attached to every Class Period quarterly report on Form 10-Q and the 2021 Form 10-K. The SOX Certifications represented that Defendants Jagdfeld and Ragen had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervisions, to ensure that material information relating to the [Company], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

195. At no point since the revelation of the three categories of negative facts discussed herein, have any of the Defendants claimed that those SOX Certification representations were untrue and that Defendants Jagdfeld and Ragen had not been informed about material information relating to the declining generator close rates, the SnapRS defect, or Generac's over- reliance on Pink Energy for solar sales.

**The Critical Importance of the Generator and Solar Businesses and Diversification of Dealers Supports a Strong Inference of Scienter**

196. In their roles as CEO (Jagdfeld) and CFO (Ragen), the Individual Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Generac's non-management directors apprised of the state of the Company's business, operations, and trends. As discussed above, Generac and the Defendants publicly acknowledged that the sales and success of both: (i) Generac's legacy HSB generator business; and (ii) Generac's solar business (focused on the PWRcell solar storage products) were critical to Generac's operations and growth. In short, the HSB business was the core of Generac's historical success, while the solar business was the core to Generac's future.

197. Given that Defendants had represented HSB and solar to be the most important businesses to Generac, information concerning sales and growth of Generac's HSB and solar businesses were essential information to the market. For example, prior to the Class Period, Defendant Ragen presented at a May 2020 Goldman Sachs Industrials & Material Conference, and

during that conference, the analyst hosting the event asked twenty-one questions, with all but one directed at the HSB business (ten questions) or solar business (nine questions). Likewise, during a February 2021 earnings call just before the start of the Class Period, after Defendants Jagdfeld and Ragen made their opening remarks, all but one of the opening nine questions posed by analysts were directed at the HSB business (three questions) or solar business (five questions).

198. More specifically, the state of HSB generator demand and sales in 2021 and 2022; the success, safety, and quality of Generac's solar products; and the growth of Generac's clean energy business through dealers, were critical to Generac's stock price and closely followed by analysts and investors. First, as to generator sales, Defendants repeatedly reported on, and responded to analyst questions regarding, HSB demand and sales metrics (*see, e.g.*, ¶¶61, 63, 65, 67), confirming the importance of HSB demand and close rates to the investing public. Indeed, during an October 2022 interview posted online,[38] Defendant Jagdfeld said that Generac's HSB business is still the Company's "core business" and "what pays the bills." Defendants have also, for many more years, advised the investing public as to the importance of close rates to HSB generator demand and growth, and made clear that close rates must be considered with consultations to understand generator sales and demand. ¶¶47, 51-52, 67. As stated by Defendant Jagdfeld, even a small change in close rates can have a material impact on Generac's revenue. ¶50.

199. Second, Generac's expansion into and success in clean energy was also repeatedly discussed during conference calls, confirming its importance to the investing public. ¶¶43, 71-72, 123-124, 126, 130, 132. During the February 2022 earnings call, analysts specifically asked about the growth rates in "clean energy" and Defendant Ragen touted that "[w]e doubled [the clean energy] business . . . from 2020 to 2021. We've got aggressive growth plans here in 2022, well north of 50%." In the above-referenced October 2022 interview, Defendant Jagdfeld emphasized

---

38 https://www.youtube.com/watch?v=sC-IIhtKjb8.

that solar energy was "super critical to where we go as a company." Likewise, during the November 2, 2022 earnings call, when asked about the reduced revenues for solar, Defendant Jagdfeld stated that "we're very committed to this" and "[w]e think it's the future" and "an important part of our strategy going forward."

200. Third, Defendants emphasized the growth and importance of a broad network of solar product dealers, with Defendant Ragen stating that the Company "need[ed] to have [] very broad channels of distribution and a large pipe to be able to sell [the] products" (¶116), and Defendants Jagdfeld and Ragen signing SEC filings stating that "our ability to successfully realize our growth strategy is dependent in part on our ability to identify, attract and retain new distributors at all layers of our distribution platform, including increasing the number of energy storage distributors." Given that the purported breadth and expansion of the solar dealer network was discussed during earnings calls throughout the Class Period (*see* ¶¶123-124, 126, 130, 132), it is clear that Defendants prepared to have sufficient knowledge to address the topic.

201. Moreover, given the critical importance of growth in solar and Pink Energy's high concentration of sales of solar products, Pink Energy was a critical dealer and closely monitored by Defendants. Pink Energy was by far Generac's largest clean energy customer, installed thousands of PWRcell products, and communicated directly with Generac executives. ¶¶82-96. During the Class Period, Defendants issued increased sales guidance which was comprised largely of and could not be met without Pink Energy's sales, as reflected by Generac failing to meet and drastically lowering guidance when Pink Energy closed. *See* ¶¶178-187.

**Defendants Were Aware of the Declining Close Rates**

202. Beyond having responsibilities for supervising these areas given their roles as leaders of Generac, Defendants Jagdfeld and Ragen assured investors that they were monitoring generator close rates. Moreover, both before the Class Period and at the end of the Class Period, when close

rates were improving, Defendant Jagdfeld disclosed them. In contrast, during the Class Period, when close rates were had been and were declining, they were not reported.

203. Defendants have admitted that they regularly and closely monitored numerous metrics regarding the generator sales process, from consultations to close rates to activations. *See* ¶40. In April 2020, Defendant Jagdfeld told analysts that "[w]e track all the time fences between when an IHC occurs to when that [IHC] turns into an order, to when that order turns into an installation, to when that installation turns into a first use of the product." Defendant Jagdfeld has made clear that, in assessing generator demand and consultations, Defendants "have to take into consideration where our close rate is at. That's part of the equation." Defendant Jagdfeld has also confirmed close rate is "a really important metric" and that Defendants "look at the close rates" when assessing price increases and determining guidance. *See* ¶¶52, 67(b).

204. Accordingly, Defendants closely monitor and track close rates. *See* ¶¶47-53. For example, Defendants have stated "we look at our close rates" and "we continue to see a notable improvement in our sales closure rate," and Generac's senior executives (including Defendant Jagdfeld) received dashboard reports showing close rates on a daily basis. ¶¶48, 51-52. Accordingly, in April 2020, Defendant Jagdfeld reported that after transitioning from IHCs to VHCs in April, dealers were "experiencing similar close rates" as they were with IHCs. Then, in July 2020, Defendant Jagdfeld confirmed that following the pivot to VHCs in April, "overall close rates have actually remained consistent with historical trends." And in November 2023, Defendant Jagdfeld stated that distribution through HSB dealers "is the channel that we can measure close rates" and "we get really good visibility into close rates by dealer, by product, by region."

205. Notably, despite repeatedly referencing close rate increases prior to the Class Period in 2019 and 2020 (*e.g.*, ¶¶51-52), after the trend had turned negative, Defendants manipulated Generac's reporting by concealing the negative close rate trend during the Class Period. And, only

in 2022 was it revealed that Defendants had stopped disclosing close rates because they had plummeted and did not correlate with the interrelated metrics Defendants had selectively chosen to report.

206. Relatedly, Defendants monitored dealer inventory levels, which showed whether dealer orders were the result of end customer sales, *i.e.*, closed consultations. For example, during the earlier April 2020 call, Defendant Jagdfeld confirmed that Defendants monitor dealers' inventory levels (also known as "field inventory"), stating that for "field inventory levels . . . Days on hand are lower than they were a year ago." He emphasized that field inventory levels was a "really cool statistic that we're able to be able to pull out" and that because "100% of all products get activated . . . we know 100% clarity to field inventory, which is, I think, unique." At the end of the Class Period, in November 2022, Jagdfeld further confirmed that Defendants had and monitored data "that suggests approximately half of all the field inventory is allocated to an active customer contract."

207. As discussed, Generac has admitted that close rates started plummeting in 4Q 2020, had declined below prior year and pre-COVID levels by July 2021, and bottomed out in 1Q 2022, resulting in generators being shipped without allocated end-customer contracts and elevated field inventory levels. ¶¶54-59.[39] Because Defendants closely monitored close rates, they knew or recklessly disregarded these facts at the time they made false and misleading statements that concealed the declining close rates.

208. Indeed, at the end of the Class Period in November 2022, Defendant Jagdfeld admitted that "we knew that [long lead times] was having a negative impact on close rates" and "a negative impact on our ability to sign new channel partners." The long lead times and declining

[39] During a post-Class Period earnings call in May 2023, Defendant Jagdfeld further admitted that close rates are "still well off our pre-pandemic close rates" and that close rates "bottomed the beginning of last year, so about a year ago."

close rates were well established before Defendants' first false and misleading statements concealing the decline in July 2021. *See* ¶59 & n.15.

**Defendants Were Aware of the SnapRS Defect and Its Attendant Risks and Liabilities**

209. After its launch at the end of 2019, Defendants repeatedly touted the rapid growth of its clean energy products, and particularly its PWRcell solar products. *E.g.*, ¶¶31, 43, 71-72, 124, 130. In order for that growth to be sustainable and profitable, it was imperative that the PWRcell products were safe, high quality, and free of defects.

210. Defendants were required to monitor product, including solar product, defects as part of signing off on the financial statements which included warranty liabilities, a description of Generac's business risks, and assurances that the financial statements complied with generally accepted accounting principles. In addition, Defendants were required to (and represented they did) closely monitor the quality, safety, and reliability of its PWRcell products, including matters that could threaten the Company's reputation in the solar market. For example, the Inaugural ESG Report and the 2021 ESG Report, signed by Defendant Jagdfeld, stated that Generac maintains a "robust product safety function" and that its Product Safety Commission "regularly reviews any safety concerns associated with products in the field," which would include PWRcell and SnapRS, "including potential product recalls." The ESG reports further highlighted the Company's "product quality team," the "motivation and involvement of top management [*e.g.*, Jagdfeld and Ragen] to ensure product quality," and that the Company "regularly perform[s] design reviews and testing to maximize the quality and value of our products."

211. As set forth above, starting in spring 2021, Generac's SnapRS devices began to fail *en masse*, caused residential fires in the summer of 2021, and were causing tens of thousands of customer complaints by late 2021. Pink Energy and other dealers notified Generac of the issue, and Generac attempted two fixes that failed before developing a full replacement SnapRS 802. The

emails and information provided by Pink Energy makes clear that senior managers and Defendants were aware of the problems or were extremely reckless in disregarding the substantial rate of failure. Moreover, Generac reported the defect to the CSPC in November 2021 (¶88), and agreed to indemnify Pink Energy in December 2021. The Pink Energy Lawsuit shows that Defendant Jagdfeld was personally involved in responding to the SnapRS defect and he knew about the firmware updates in 2021 and that they were merely an attempted "interim solution." *See* ¶92 & n.24. Given that Defendant Jagdfeld and Defendant Ragen each signed or certified the financial statements which reported on product defect risks, and warranty and related liabilities (*see, e.g.*, ¶¶98, 104, 106), Defendants either knew of or recklessly disregarded massive exposure Defendants faced regarding the SnapRS defect and Pink Energy.

**Defendants Were Aware that Solar Sales Were Highly Concentrated Through a Single Dealer**

212. Also as to the new solar business, Defendants have repeatedly admitted that they regularly and closely monitored numerous metrics regarding the sales process. In April 2021, Defendant Jagdfeld assured investors that Defendants were monitoring "key performance indicators," including "[i]n-home and virtual consultations," "orders," and "activations," which are a "proxy for installations." Defendants also confirmed throughout the Class Period they were monitoring Generac's solar dealer network, as they emphasized the network and reported on dealer counts quarter after quarter. Defendants also monitored the size of its customers, including Pink Energy, to be able to report on the size and diversification of Generac's customer base. *See, e.g.*, ¶129(a). Moreover, in a May 2021 investor slide presentation, Defendants demonstrated their monitoring of the specific dealers in Generac's network with a slide entitled, "Rapidly Building Clean Energy Distribution," which listed twenty dealers or distributors of Generac's solar products, including PowerHome Solar (Pink Energy).

213. As discussed, Generac's solar sales were highly concentrated in one customer, Pink Energy, which accounted for approximately half of clean energy sales. Because Defendants closely monitored its clean energy distribution, and the size of its distributors, Defendants knew or were extremely reckless in disregarding this fact at the time they made false and misleading statements concealing the high concentration of sales through Pink Energy. Indeed, at the end of the Class Period, Defendant Jagdfeld stated that the reliance on and loss of Pink Energy was "a rather painful learning lesson for us on just some of the trials and tribulations of that market, some of the customers and the dealer partners there, you're having to pick your partners carefully," adding that "we've got to do the hard work that, honestly, we should have been doing all along of continuing to expand our channel to more channel partners."

**The Individual Defendants' Public Statements Support a Strong Inference of Scienter**

214. Defendants Jagdfeld and Ragen held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, Generac's HSB generator and solar businesses. Their repeated statements to the investing public during the Class Period demonstrate knowledge of the topics on which they directly spoke, including: (i) HSB generator demand and sales metrics (*see, e.g.*, ¶¶61, 63, 65, 67); (ii) the Company's solar dealers and dealer network (*see, e.g.*, ¶¶122-130); (iii) the PWRcell product, launch, sales, and activations (*see, e.g.*, ¶¶31, 43, 71-72, 124, 130); and (iv) product safety and quality, including potential warranties and liabilities issues (*see, e.g.*, ¶¶75-76, 98, 101, 104, 106). The Individual Defendants' repeated statements regarding, and their direct involvement in the decisions impacting, these topics, supports an inference that at the time they spoke they were actively monitoring and had access to, and knew or recklessly disregarded, the facts that rendered their statements false and misleading.

215. In addition, the Individual Defendants' refusal and reluctance to provide details on key demand metrics for Generac's HSB generators further supports a strong inference of scienter.

Throughout the Class Period, Generac and the Individual Defendants were incentivized to advise the market of internal Company performance indicators and statistics to demonstrate that end-consumer demand for Generac's HSB generators remained strong. Defendants did discuss, and disclosed, the purported positive nature of multiple metrics, including the number of IHCs, dealers, and activations. *See, e.g.*, ¶¶61, 63 (Jagdfeld); ¶67(d) (Ragen). Moreover, leading up to the Class Period, Defendants repeatedly discussed and disclosed close rates in connection with such metrics (¶¶47-53), and, after the Class Period, Defendants have discussed close rates in every quarterly earnings call since November 2022 (through February 2025). Yet, they deliberately refused to disclose details on the Company's (i) close rates, which Defendant Jagdfeld admitted are an essential "part of the [demand] equation," and (ii) field inventory levels, which Defendant Jagdfeld has described as "a really cool statistic" for the HSB business. As revealed at the end of the Class Period, the Company's close rates and field inventories demonstrated negative demand and sales trends, and Defendants' refusal to provide that information while touting other metrics, further supports an inference of scienter.

**The Individual Defendants' Insider Sales and Incentive Compensation Support a Strong Inference of Scienter**

216. Defendants had a massive informational advantage over the investing public and were uniquely situated to gain enormous financial rewards by capitalizing on the skyrocketing stock price while the negative facts set forth herein were concealed. By portraying the Company in a positive light during the Class Period, and based on Defendants' Class Period statements, Generac's stock increased from around $340 per share at the start of the Class Period (April 29, 2021) to $400 per share by June 2021 and $500 per share in October 2021.

217. During the Class Period, when Generac stock was trading at artificially inflated prices, Defendant Jagdfeld engaged in multiple rounds of stock selloffs, including nearly 125,000 shares of Generac stock sold at prices as high as $500 per share, for more than $38 million in gross

insider sale proceeds.[40] All of Defendant Jagdfeld's insider sales occurred at prices far greater than the $106 price the shares had fallen to at the end of the Class Period. By contrast, during the Class Period, Defendant Jagdfeld did not purchase a single share of Generac stock at the artificially inflated prices in the open market.

218. Likewise, on November 11, 2021, just after information about declining HSB generator demand began to be partially revealed but Generac's stock remained near Class Period highs, Defendant Ragen sold off 10,000 shares at more than $440 per share, for more than $4.4 million in gross insider sales proceeds. By contrast, during the Class Period, Defendant Ragen did not purchase a single share of Generac stock at the artificially inflated prices in the open market.

219. Moreover, Generac's executive compensation plan was tied directly to increasing the Company's stock price and executing Generac's "Powering Our Future Strategy." For example, in discussing Generac's executive compensation for 2021 and 2022, Generac's Proxy Statements filed with the SEC on April 29, 2022 and April 28, 2023, stated that the Individual Defendants could receive "annual and long-term incentive opportunities" in the form of annual cash bonuses and stock options. Specifically, Generac's annual bonus plan awards bonuses based on, in part, "achievement of Generac's annual financial goals . . . and other qualitative and quantitative performance objectives." In other words, the Individual Defendants' annual bonuses increased based on, in part, delivering on the Company's key initiatives, including continued execution of its core HSB business and growing its solar business.

220. Under these compensation plans, Defendant Jagdfeld received $7.5 million and $6.8 million in total compensation for 2021 and 2022, respectively, and Defendant Ragen received $1.9 million and $1.8 million in total compensation for 2021 and 2022, respectively. Thus, the Individual

[40] Defendant Jagdfeld claimed that he made approximately $8.4 million of these sales to "satisfy tax obligations," but no such explanation was provided for the remaining $30 million in sales.

Defendants had significant incentive to conceal the declining close rates for Generac's HSB generators, the SnapRS defect, and the Company's over-reliance on Pink Energy for solar sales, particularly since the HSB and solar businesses are both critical to Generac's future.

## LOSS CAUSATION AND ECONOMIC LOSS

221. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to defraud that artificially inflated the price of Generac common stock and operated as a fraud or deceit on Class Period purchasers of Generac common stock by misrepresenting and concealing: (i) Generac's close rates for HSB generators, which had plummeted in 2021, resulting in inflated orders and inventories without allocations to end customer contracts, as Generac was incentivizing dealers to make cancelable orders above normal market need; (ii) Generac's solar products, which suffered a widespread defect that was leading to product failures, customer complaints, increased liabilities and warranty claims, and even residential fires; and (iii) Generac's sales through its purportedly broad and diverse solar dealer network, which were highly consolidated in one dealer, exposing Generac to massive risks.

222. Defendants' false and misleading statements and omissions, individually and collectively, had their intended effect and directly and proximately caused Generac's common stock to trade at artificially inflated levels, reaching a Class Period high of $506 per share.

223. As a result of Defendants' fraudulent conduct as alleged herein, the price at which Generac common stock traded was artificially inflated throughout the Class Period. When Plaintiffs and other members of the Class (defined below) purchased their Generac common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Generac common stock during the Class Period at artificially inflated prices Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

224. As a result of Defendants' materially false and misleading statements, Plaintiffs and other members of the Class relied to their detriment on such statements, documents, and omissions, and/or the integrity of the market, in purchasing their Generac common stock at artificially inflated prices during the Class Period. Had Plaintiffs and other members of the Class known the truth, they would not have taken such actions.

225. When the misrepresentations and omissions (and attendant risks) that Defendants had concealed from the market were leaked out, materialized, and revealed through the series of partial disclosures beginning on November 2, 2021 and continuing through November 2, 2022, it caused Generac's stock price to fall as the prior artificial inflation came out of the stock, causing substantial losses to investors.

226. The corrective impact of the partial disclosures and materialized risks during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements and concealment of the existence, magnitude, and scope of the negative facts and adverse information concerning HSB close rates (*see* ¶¶60-68), Generac's solar products (*see* ¶¶97-109), and sales through Generac's solar network (*see* ¶¶122-134), which made their statements false and misleading. Defendants' continued misrepresentations and omissions maintained the price of Generac common stock at a fraud-inflated level, inducing members of the Class to continue purchasing shares in Generac even after the partial disclosures and materializations of concealed risks.

227. As set forth above, partial disclosures and materializations of concealed risks began to enter the market on November 2, 2021 (¶¶138-139), and the nature, scope, extent, and materialization of the concealed information and risks continued to be disclosed through November 2, 2022 (¶¶140-189). After each partial disclosure, Generac's stock price declined, in an amount that contradicted or exceeded any change to the Standard & Poor's 500 Industrials Index ("S&P

Industrials Index"), which the Company identifies in SEC filings as its industry index. The following chart shows movements of Generac's stock and the S&P Industrials Index after each partial disclosure:

| Disclosure | Generac Stock | S&P Industrials |
|---|---|---|
| 11/02/21, ¶¶138-139 | 4% decline, from $506 on 11/01/21 to $484 on 11/02/21<br><br>Additional 6% decline to $453 on 11/03/21 | Essentially flat from 11/01/21 to 11/02/21<br><br>Essentially flat from 11/02/21 to 11/03/21 |
| 01/26/22, ¶141 | 4% decline, from $276 on 01/25/22 to $265 on 01/26/22<br><br>Additional 3% decline to $257 on 01/27/22 | 1% decline from 01/25/22 to 01/26/22<br><br>1% decline from 01/26/22 to 01/27/22 |
| 04/28/22, ¶¶142-143 | 6% decline, from $233 on 04/28/22 to $219 on 04/29/22 | 3% decline from 04/28/22 to 04/29/22 |
| 06/22/22, ¶¶144-149 | 3% decline, from $220 on 06/21/22 to $213 on 06/22/22 | 1% decline from 06/21/22 to 06/22/22 |
| 08/01/22, ¶¶150-152 | 1% decline from $268 on 07/29/22 to $265 on 08/01/22 | Essentially flat from 07/29/22 to 08/01/22 |
| 08/03/22, ¶¶153-160 | 7% decline from $267 on 08/02/22 to $249 on 08/03/22<br><br>Additional 2% decline to $244 on 08/04/22 | 1% increase from 08/02/22 to 08/03/22<br><br>Essentially flat from 08/03/22 to 08/04/22 |
| 09/12/22, ¶¶161-163 | 2% decline from $238 on 09/09/22 to $233 on 09/12/22<br><br>Additional 8% decline to $213 on 09/13/22 | 1% increase from 09/09/22 to 09/12/22<br><br>4% decline from 09/12/22 to 09/13/22 |
| 09/22/22, ¶¶164-165 | 3% decline from $176 on 09/21/22 to $171 on 09/22/22 | 1% decline from 09/21/22 to 09/22/22 |
| 10/06/22, ¶¶166-167 | 6% decline from $179 on 10/05/22 to $169 on 10/06/22<br><br>Additional 9% decline to $154 | 1% decline from 10/05/22 to 10/06/22<br><br>2% decline from 10/06/22 to |

| Disclosure | Generac Stock | S&P Industrials |
|---|---|---|
| | on 10/07/22 | 10/07/22 |
| 10/19/22, ¶¶168-174 | 25% decline from $148 on 10/18/22 to $110 on 10/19/22 | 1% decline from 10/18/22 to 10/19/22 |
| 11/02/22, ¶¶176-188 | 8% decline from $115 on 11/01/22 to $106 on 11/02/22 | 2% decline from 11/01/22 to 11/02/22 |

228. The timing and magnitude of the decline in the price of Generac common stock negates any inference that losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. From the close of trading on November 1, 2021 through the close of trading on November 2, 2022, during which time Generac's stock price fell by approximately 80% as a result of Defendants' fraud being leaked out and revealed through a series of partial disclosures and materializations of concealed risks, the S&P Industrials Index declined by just 12%.

229. As a result of their purchases of Generac common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**PRESUMPTION OF RELIANCE**

230. At all relevant times, the market for Generac common stock was an efficient market for the following reasons, among others:

(a) Generac common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) According to the Company's 3Q 2021 Form 10-Q, the Company had more than 63 million shares of common stock outstanding as of November 1, 2021, demonstrating a very active and broad market for Generac common stock;

(c) As a regulated issuer, Generac filed periodic public reports with the SEC;

(d) Generac regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e) Generac was followed by numerous securities analysts employed by major brokerage firms, such as BofA Securities, Canaccord Genuity, JP Morgan, Northcoast Research, Northland Securities, Oppenheimer & Co., Roth Capital Partners, Stephens, Inc., UBS Securities, Wells Fargo, and William Blair.

231. As a result of the foregoing, the market for Generac common stock promptly digested current information regarding Generac from publicly available sources and reflected such information in Generac's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of Generac common stock.

232. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Generac's business and operations, positive proof of reliance is not a prerequisite for recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

233. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, they were not accompanied by meaningful cautionary statements. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Generac's Class Period filings and oral disclaimers.

234. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Generac and the Individual Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Generac who knew that those statements were false or misleading when made.

## CLASS ACTION ALLEGATIONS

235. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Generac common stock during the Class Period. Excluded from the Class are: Defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

236. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Generac common stock was actively traded on the

NYSE. According to the Company's 3Q 2021 Form 10-Q, the Company had more than 63 million shares of common stock outstanding as of November 1, 2021. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

237. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

238. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

239. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c) whether the price of Generac common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

240. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them. Plaintiffs are not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants Generac, Jagdfeld, and Ragen

241. Plaintiffs incorporate the foregoing paragraphs by reference.

242. During the Class Period, Defendants Generac, Jagdfeld, and Ragen disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

243. Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of Generac common stock.

244. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Generac common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiffs and other members of the Class paid artificially inflated prices for Generac common stock and

experienced losses when the artificial inflation was released from Generac common stock as a result of the leakage and disclosure of information and price declines detailed herein. Plaintiffs and other members of the Class would not have purchased Generac common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the false and misleading statements.

245. By virtue of the foregoing, Defendants Generac, Jagdfeld, and Ragen have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

## For Violation of §20(a) of the Exchange Act Against Defendants Jagdfeld and Ragen

246. Plaintiffs incorporate the foregoing paragraphs by reference.

247. Defendants Jagdfeld and Ragen acted as controlling persons of Generac within the meaning of §20(a) of the Exchange Act.

248. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, practices, and business model, Jagdfeld and Ragen had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Jagdfeld and Ragen were provided with, or had unlimited access to copies of, the Company's public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

249. As set forth above, Generac violated §10(b) and SEC Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Jagdfeld and Ragen are liable

pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: March 10, 2025

ROBBINS GELLER RUDMAN
& DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
MICHAEL J. STRAMAGLIA

/s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
mstramaglia@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

Lead Counsel for Plaintiffs

ADEMI LLP
GURI ADEMI
JESSE FRUCHTER
JOHN D. BLYTHIN
3620 East Layton Avenue
Cudahy, WI 53110
Telephone: 414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com
jfruchter@ademilaw.com
jblythin@ademilaw.com

ATOLLES LAW, S.C.
K. SCOTT WAGNER
222 E Erie Street, Suite 210
Milwaukee, Wisconsin 53202
Telephone: 414/644-0391
414/278-7590 (fax)
swagner@atolles.com

Local Counsel

KLAUSNER, KAUFMAN, JENSEN
& LEVINSON
ROBERT D. KLAUSNER
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com

Additional Counsel for Plaintiffs