# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

OAKLAND COUNTY VOLUNTARY
EMPLOYEES BENEFICIARY
ASSOCIATION, et al.,

          Plaintiffs,

    v.

GENERAC HOLDINGS INC., AARON
JAGDFELD, and YORK A. RAGEN,

          Defendants.

Case No. 2:22-cv-01436-BHL

(Consolidated with Civil No. 2:23-cv-00081-BHL)

<u>CLASS ACTION</u>

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

# TABLE OF CONTENTS

**Page(s)**

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    LEGAL STANDARDS AND RELEVANT BACKGROUND ..................................... 2

     A.      The Court's Order Dismissing The FAC. ................................................ 3

     B.      The SAC's Amended Allegations. ....................................................... 5

III.    ARGUMENT ............................................................................................. 8

     A.      The SAC Fails To State A Claim As To The HSB Statements. .......................... 8

         1.     The SAC Fails To Plead Falsity As To The HSB Statements. ...................... 9

         2.     The SAC Fails To Plead Scienter As To The HSB Statements. ................. 13

         3.     The SAC Fails To Plead Loss Causation As To The HSB
            Statements. ........................................................................... 18

     B.      The SAC Fails To State A Claim As To The SnapRS And Dealer
        Concentration Statements. ............................................................... 20

         1.     The SAC Fails To Plead That The Statements Were Material. ................. 20

         2.     The SAC Fails To Plead That The SnapRS Statements Were False
            Or Misleading. ....................................................................... 21

         3.     The SAC Fails To Plead That The Dealer Concentration Statements
            Were False Or Misleading. ......................................................... 25

         4.     The SAC Fails To Plead Scienter As To The SnapRS And Dealer
            Concentration Statements. ......................................................... 28

         5.     The SAC Fails To Plead Loss Causation As To The SnapRS And
            Dealer  Concentration Statements. ............................................... 29

     C.      The Section 20(a) Claim Should Also Be Dismissed. ................................ 30

IV.    CONCLUSION .................................................................................... 30

Case 2:22-cv-01436-BHL     Filed 04/30/25     Page 2 of 37     Document 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom.* 269 F.3d 806 (7th Cir.
2001) ...................................................................................................................9

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ..............................................................17

*In re Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ...........................................18, 29, 30

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014)...............................................................18

*Catogas v. Cyberonics, Inc.*,
292 F. App'x 311 (5th Cir. 2008) .............................................................................30

*City of Birmingham Ret. and Relief Sys. v. A.O. Smith Corp.*,
468 F. Supp. 3d 1048 (E.D. Wis. 2020).....................................................................5

*City of Warren Police and Fire Ret. Sys. v. Foot Locker, Inc.*,
412 F. Supp. 3d 206 (E.D.N.Y. 2019) ......................................................................17

*Constr. Workers Pension Fund-Lake Cnty. and Vicinity v. Navistar Int'l*,
114 F. Supp. 3d 633 (N.D. Ill. 2015) ...............................................................10, 26

*Constr. Workers Pension Fund-Lake Cnty. and Vicinity v. Navistar Int'l Corp.*,
2014 WL 3610877 (N.D. Ill. July 22, 2014)..............................................................6

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ...................................................................................14

*D.E.&J Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005)..................19

*Ennenga v. Starns*,
677 F.3d 766 (7th Cir. 2012) .....................................................................................5

*Fort Worth Employers' Ret. Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009).......................................................................19

*In re Francesca's Holdings Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ..........................................................19

Case 2:22-cv-01436-BHL    Filed 04/30/25    Page 3 of 37    Document 74

*Fryman v. Atlas Fin. Holdings, Inc.*,
   462 F. Supp. 3d 888 (N.D. Ill. 2020) ...............................................................5, 15

*Gaines v. Guidant Corp.*,
   2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) .........................................................16

*Gallagher v. Abbott Labs.*,
   269 F.3d 806 (7th Cir. 2001) ...............................................................................10

*Garden City Ret. Sys. v. Anixter Int'l, Inc.*,
   2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)....................................................16, 17

*Goldman Sachs Grp, Inc. v. Arkansas Teacher Ret. Sys.*,
   594 U.S. 113 (2021)..........................................................................................19, 30

*In re Guidant Corp. Sec. Litig.*,
   536 F. Supp. 2d 913 (S.D. Ind. 2008), *aff'd*, 583 F.3d 995 (7th Cir. 2009) .................10, 13, 15

*In re Harley-Davidson, Inc. Sec. Litig.*,
   660 F. Supp. 2d 969 (E.D. Wis. 2009)....................................................13, 14, 15, 16

*Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth
   Third Bancorp*,
   2022 WL 1642221 (N.D. Ill. May 24, 2022).........................................................28

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...............................................................................20

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005)...................................................................20

*Jedrzejczyk v. Skillz Inc.*,
   2023 WL 2333891 (N.D. Cal. Mar. 1, 2023), *aff'd*, 2024 WL 1635568 (9th Cir.
   Apr. 16, 2024)......................................................................................................10

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ......................................................................21

*Macovski v. Groupon*,
   2021 WL 1676275 (N.D. Ill. Apr. 28, 2021) ..........................................................6

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)..............................................................................................10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007)......................13

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...........................................................................................30

*In re Newell Rubbermaid Inc. Sec. Litig.*,
  2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) .....................................................................20

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006).............................................................................15, 16

*Parnes v. Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) ...............................................................................................20

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  266 F. Supp. 3d 1154 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018) .........................17

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ...............................................................................................30

*In re Piedmont Lithium Inc. Sec. Litig.*,
  712 F. Supp. 3d 301 (E.D.N.Y. 2024) .................................................................................17

*Pierrelouis v. Gogo, Inc.*,
  414 F. Supp. 3d 1164 (N.D. Ill. 2019) .......................................................................21, 28, 29

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  679 F.3d 952 (7th Cir. 2012) ...............................................................................................16

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin.
  Holdings Ltd.*,
  886 F. Supp. 2d 328 (S.D.N.Y. 2012)..............................................................................18, 30

*Pugh v. Trib. Co.*,
  521 F.3d 686 (7th Cir. 2008) ...........................................................................................16, 30

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ......................................................................13

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
  2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ..........................................................................13

*In re Supreme Indus., Inc. Sec. Litig.*,
  2019 WL 1436022 (N.D. Ind. Mar. 29, 2019).................................................................16, 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................................5

*Toft v. Harbor Diversified, Inc.*,
  2025 WL 357776 (E.D. Wis. Jan. 31, 2025)........................................................................17

*Tyler v. Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011)..................................................................................17

*United States v. Spectrum Brands, Inc.*,
   218 F. Supp. 3d 794 (W.D. Wis. 2016), *aff'd,* 924 F.3d 337 (7th Cir. 2019)..........................24

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ....................................................................................13

*In re Williams Sec. Litig.*,
   558 F.3d 1130 (10th Cir. 2009) ............................................................................................19

**Statutes**

15 U.S.C. § 78t..........................................................................................................................30

15 U.S.C. § 78u-5 .....................................................................................................................25

15 U.S.C. § 2064........................................................................................................................24

**Other Authorities**

16 C.F.R. § 1115.4 ....................................................................................................................24

v

Defendants Generac Holdings, Inc. ("Generac" or the "Company"), Aaron Jagdfeld, and York A. Ragen (together, the "Individual Defendants" and, with Generac, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss (the "Motion") the Amended Consolidated Complaint (ECF No. 66, the "SAC") by Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa and Named Plaintiff The City of Miami Fire Fighters' and Police Officers' Retirement Trust (together, "Plaintiffs").

## I. PRELIMINARY STATEMENT

One would expect that the Court's well-reasoned and comprehensive Order Granting Defendants' Motion to Dismiss (ECF No. 63, the "FAC Order") would guide Plaintiffs' attempt to replead. The SAC instead doubles-down on the same liability theories that Plaintiffs advanced in their First Amended Complaint (ECF No. 42, the "FAC") and seemingly disregards much of the FAC Order's reasoning and its holdings.

The SAC continues to advance a case based entirely on alleged "half-truths." That is, once again, Plaintiffs do not allege any false statements of objective fact, but instead focus only on alleged omissions. In many instances, the SAC repeats and multiplies the same allegations that the Court has already found unconvincing. In other instances, the SAC adds allegations that are entirely irrelevant to the matters at issue (e.g., broad statements about "close rates" made eight years *before* the Class Period even began). Moreover, two of Plaintiffs' theories—related to SnapRS product issues and Generac's PWRcell distribution network—remain virtually unchanged. For those two theories, the SAC makes no meaningful additional factual allegations to cure the FAC's failure to plead falsity, scienter or materiality.

The third theory—related to HSB generator sales—is the same FAC theory in disguise. Recognizing that allegations concerning statements about HSB product "demand" are a dead end after the FAC Order, the SAC assiduously avoids statements about "demand" to instead complain

1

Case 2:22-cv-01436-BHL    Filed 04/30/25    Page 7 of 37    Document 74

that Defendants did not always disclose "close rates" when discussing HSB "sales"—in some instances, even shifting the SAC's bold italics to other ***portions*** of the exact same HSB Statements the FAC quoted (and the Court previously dismissed). This is not a substantively different theory, and the Court should not be led to believe otherwise. Indeed, the FAC Order (at 23-24) addressed and rejected the FAC's substantially similar allegations regarding close rates. Further, the SAC again fails to plead falsity and scienter as to the HSB Statements. First, the SAC fails to establish that Defendants had a duty to disclose the close rates metric that Plaintiffs cherry-pick in hindsight. Next, the SAC alleges no facts to back up Plaintiffs' speculation that close rates declined significantly during the Class Period, that Defendants knew as much ***at the time***, and that Defendants knew that the single close rates metric somehow rendered their statements about overall HSB sales misleading. Finally, Plaintiffs' focus on close rates creates a new pleading shortfall: the SAC fails to plead loss causation because the vast majority of alleged corrective disclosures revealed nothing at all about close rates, and the SAC pleads no facts to connect the alleged misstatements to investor losses.

In sum, the SAC does not resolve the pleading concerns the FAC Order highlighted. Even with their attempts to use hindsight to manufacture a securities fraud theory, Plaintiffs are unable to cobble together factual allegations to sufficiently plead any claim against any Defendant. The Court need not allow Plaintiffs any more opportunities to replead, as the SAC makes clear that further amendment would be futile. The SAC should be dismissed with prejudice.

## II.     <u>LEGAL STANDARDS AND RELEVANT BACKGROUND</u>

The Court is already familiar with the legal standards governing this Motion and the relevant factual background to which this Motion applies. In their motion to dismiss the FAC (ECF No. 48, the "FAC MTD"), Defendants described the applicable legal standards, including the heightened pleading burdens the PSLRA imposes on Plaintiffs. *See*, *e.g.*, FAC MTD at 10-12 (pleading standards); 13-14 (falsity); 26-27 (safe harbor for forward-looking statements); 28-29 (statements of

corporate optimism); 33-34, 36-37, 39 (scienter); 41, 42 (materiality); 43 (loss causation). The Court's FAC Order likewise discussed the applicable standards. *See, e.g.*, FAC Order at 2-4 (pleading standards); 12, 16-17, 21 (falsity); 17, 19, 26 (statements of corporate optimism); 22-24 (scienter); 26, 27-28 (materiality).

Defendants' FAC MTD and the Court's FAC Order also addressed the relevant factual background, as alleged in the FAC. *See, e.g.*, FAC MTD at 4-10; FAC Order at 4-12.

### A. The Court's Order Dismissing The FAC.

Applying the relevant pleading standards to the FAC's factual allegations, the Court dismissed the FAC in its entirety on February 7, 2025, but gave Plaintiffs leave to amend, "to try to correct the pleading deficiencies" the Court identified in its order. FAC Order at 2. Plaintiffs filed the SAC on March 10, 2025.

The FAC Order described the FAC's three theories of liability as: "Defendants concealed three 'negative trends' concerning: (1) the weakening of demand for Generac's HSB generators as the pandemic continued; (2) a defect in Generac's SnapRS solar energy products; and (3) the risk arising from Generac's 'highly consolidated' sales of solar energy products through a single distributor, Pink Energy." *Id*. at 2. The Court dismissed the FAC because it failed to plead any actionable misstatement under any theory. *See, e.g.*, *id.* at 1-2 ("Despite the length of their pleading, Lead Plaintiffs do not identify *any* false statements of material fact made by Defendants."); *see also id.* at 19, 22, 26, 29.

*First*, the Court dismissed Plaintiffs' HSB Demand theory on falsity and scienter grounds. The Court recognized that Plaintiffs did not contend that any of the alleged misstatements were actually false; rather, Plaintiffs posited that Defendants' optimistic statements about HSB demand omitted to disclose a "trend" of "weakening demand." *Id*. at 15, 16. The Court explained that the

3

alleged misstatements amounted only to general observations of "robust" demand—i.e., information that is not objective fact and therefore not capable of supporting a claim for fraudulent misrepresentation. *Id.* at 16-17. The Court further noted that Defendants disclosed the underlying metrics on which they relied—which metrics Plaintiffs did not challenge. *Id.* at 19. Similarly, as to scienter, the Court correctly concluded that Plaintiffs' allegations were nothing more than "fraud by hindsight," and found that Plaintiffs failed to allege any facts to plead that Defendants actually knew, at the time the alleged misstatements were made, that demand was waning. *Id.* at 23-24.

*Second*, the Court dismissed Plaintiffs' SnapRS theory on falsity, scienter, and materiality grounds. The Court rejected Plaintiffs' argument that a later-disclosed warranty-related matter with the SnapRS device rendered misleading Defendants' statements concerning Generac's safety practices and clean energy product shipments. *Id.* at 25-26. The Court emphasized that Plaintiffs' allegations concerning the product issue that ultimately materialized were not particularized allegations showing *when* Defendants became aware of the issue. *Id.* at 26-28. Accordingly, Plaintiffs failed to plead falsity or scienter because they failed to plausibly allege with particularity that Defendants knew, at the time the alleged misstatements were made, of the pervasiveness of the alleged product issue and that it would expose the Company to material liabilities. *Id.* at 27. The Court also held that Plaintiffs failed to plead materiality, as the Court recognized the "relatively minor revenue associated with Generac's solar product line[.]" *Id.* at 27-28. The Court thus concluded that the omission of one defect in one component of one solar product was unlikely to mislead a reasonable investor. *Id.* at 28.

*Third*, the Court also dismissed Plaintiffs' Dealer Concentration theory on falsity, scienter, and materiality grounds. The Court correctly recognized that omitting to state that *solar* sales were concentrated in a single dealer did not render misleading Defendants' statements, which addressed

4

Generac's *overall* installer network and distribution partners. *Id.* at 29-30. As with Plaintiff's

SnapRS theory, the Court also correctly concluded that, given the small portion of revenues for

which solar sales account, the alleged sales concentration in one dealer was "simply immaterial." *Id.*

The Court further reasoned that Defendants did not disclose the concentration of solar sales simply

"because it was of little consequence," rendering Plaintiffs' scienter allegations insufficient. *Id.*

### B.      The SAC's Amended Allegations.[1]

Plaintiffs' SAC changes very little to cure the FAC's pleading deficiencies.

***First***, while the SAC removes many alleged misstatements, it still alleges 42 false or

misleading statements. The FAC included 40 of those 42 statements—all of which the Court

previously dismissed.[2] The Court observed that the FAC comprised 139 pages and 316 paragraphs,

and noted the "large number and repetitive nature of Lead Plaintiffs' allegations and their

disconnected theories of fraud," requiring the Court to "spen[d] considerable time sifting through

the [FAC]." FAC Order at 1-2. The SAC does not solve this problem. The SAC still shifts the burden

to the Court and Defendants to sift through 91 pages and 249 paragraphs of disconnected theories of

fraud. The 42 statements that the SAC quotes are again followed by often identical lists of supposed

reasons these statements were false or misleading, but does not connect any specific statement to the

---

[1] For purposes of this Motion, Defendants take the SAC's allegations as true, while conceding none. On a motion to dismiss, the Court may consider documents that the complaint incorporates by reference and matters of which this Court may take judicial notice, including filings made with the U.S. Securities and Exchange Commission ("SEC"). FAC Order at 4 n.1. *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012); *City of Birmingham Ret. and Relief Sys. v. A.O. Smith Corp.*, 468 F. Supp. 3d 1048, 1051 n.1, 1057, 1061 (E.D. Wis. 2020) (considering analyst reports and company's SEC filings in a securities class action); *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020) (considering call transcripts and SEC filings, including press releases). Documents properly considered here are exhibits to the Declaration of Jacqueline Vallette and referred to as "Ex. __."

[2] The SAC adds only two new alleged misstatements. The SAC repeats several of the same statements that the FAC quoted; however, in several instances, the SAC changes the portions of the statements that were allegedly misleading (based on the SAC's use of bold italics).

specific factual allegation to plead that the statement was actually false or misleading.[3] The SAC simply repeats the same purported omissions as a reason the statements were false or misleading, even where the alleged omissions have no connection to the challenged statements.[4]

**Second**, the SAC continues to advance three liability theories virtually identical to those in the FAC. The SAC does not change the SnapRS or Dealer Concentration theories at all. The SAC changes the HSB theory in form only. That is, rather than specifying that Defendants concealed "weakening demand," the SAC engages in verbal gymnastics to dress up the theory to allege that Defendants concealed allegedly declining close rates, "creating a false impression of generator sales." *See, e.g.*, ¶¶ 62, 64.[5] It is unclear how the "concealed weakening demand for generators by omitting close rates" theory is substantively different than the "gave false impressions of generator sales by omitting close rates" theory. In the end, the SAC's omission-based theory concerning HSB sales remains the same: Defendants' statements about HSB sales were allegedly misleading because they emphasized certain metrics and omitted others. *Compare* FAC ¶¶ 109-130 *with* ¶¶ 44-69.

**Third**, the SAC's factual allegations on which each of the three theories is based likewise reflect few changes. The SAC, like the FAC, bases its HSB theory on allegations that Defendants highlighted certain positive demand metrics while omitting negative trends. In a superficial attempt to pivot in response to the Court's dismissing the FAC's HSB demand theory, the SAC zeroes in on one particular demand metric: close rates. *See, e.g.*, ¶ 44. Specifically, the SAC claims that close

---

[3] *See Constr. Workers Pension Fund-Lake Cnty. and Vicinity v. Navistar Int'l Corp.*, 2014 WL 3610877, at *5 (N.D. Ill. July 22, 2014) ("The PSLRA requires plaintiffs not only to identify specific false or misleading statements, but also to explicitly connect those statements to factual allegations demonstrating that they are false."); *Macovski v. Groupon*, 2021 WL 1676275, at *6 (N.D. Ill. Apr. 28, 2021).

[4] *See, e.g.*, ¶¶ 67(e), 68 (statement that "you'd have to take into consideration where our close rate is at. That's a part of that equation" was allegedly false or misleading because it did not disclose purportedly declining close rates).

[5] Paragraph citations are to the SAC by paragraph number, unless otherwise noted.

rates are an important metric to accurately evaluate Generac's HSB operations and sales, and one that Defendants monitored "closely." ¶¶ 46-49. However (as the SAC's theory goes), although close rates were supposedly declining during the Class Period, Defendants did not always mention close rates while touting other "robust" demand-related metrics, such as in-home consultations and dealer orders. ¶¶ 44, 60-61. The SAC thus alleges that omitting information about allegedly declining close rates rendered misleading statements highlighting "positive metrics of increased consultations and dealer orders." ¶¶ 60-61. The SAC's factual allegations concerning close rates echo those in the FAC, which alleged that Defendants' statements concerning generator sales omitted key trends regarding weakening demand. *See* FAC Order at 15.

Next, the SAC adds only three new factual allegations in support of its SnapRS theory. First, the SAC alleges that Generac submitted a report to the Consumer Product Safety Commission ("CPSC") on November 12, 2021, regarding a "***potential*** defect" in SnapRS 801 devices, which, according to the SAC, demonstrates Defendants' knowledge that the alleged defect was "widespread." ¶ 88 (emphasis added). Second, the SAC alleges that Generac's decision to voluntarily replace all customer purchases of an earlier SnapRS model with a later, updated model was an "attempted fix." ¶¶ 100, 103, 168. Third, the SAC alleges that the positive analyst reactions to Generac's statements concerning robust safety reviews, allegedly understated warranty liabilities, and product liability risks reflect the misleading nature of the challenged statements. ¶ 110.

Finally, the SAC adds little to Plaintiffs' Dealer Concentration theory. The SAC adds generalized allegations concerning the risk of customer concentration (¶ 112), and also alleges that Defendants were able to "easily" monitor sales by solar dealer through Generac's Powerplay Clean Energy sales program. ¶ 114. Like with Plaintiffs' SnapRS theory, the SAC adds allegations regarding certain securities research reports discussing Defendants' distribution network for solar

energy productions. ¶¶ 113, 118, 135-136.

### III.     ARGUMENT

In total, the SAC's shifting HSB theory and few newly-added allegations do not cure the pleading deficiencies that the Court detailed in its FAC Order.[6]

### A.     The SAC Fails To State A Claim As To The HSB Statements.

Presumably recognizing the Court's holding that statements about product "demand" do not reference an objective fact that can be fraudulent (*see* FAC Order at 16-17), the SAC drops the vast majority of alleged misstatements *specifically* referencing HSB demand. The SAC shifts more focus to comments about various "key demand metrics," such as in-home consultations and order rates. ¶¶ 7, 61(a), 61(c), 65(b), 65(c), 67(d), 67(e). The SAC then claims that these comments—*embedded in the same statements that the FAC challenged*[7]—were misleading because Defendants did not always discuss close rates when describing various demand-related metrics. *See, e.g.*, ¶ 62.

It appears that Plaintiffs believe they can save their claim by simply relabeling their theory and placing *more emphasis* on a metric (close rates) than they emphasized in the dismissed FAC. The SAC, however, fails to draw any meaningful distinction between specific references to demand and related discussions about certain metrics the Company considered when gauging demand. Indeed, as in the FAC, the SAC does not allege that any of the challenged statements were false. The SAC thus effectively concedes that Defendants' statements about historical demand were accurate, Defendants' statements about the metrics they considered were accurate, and Defendants' statements

---

[6] To aid the Court's analysis, Appendix 1, filed herewith, lists each alleged misstatement in the SAC and summarizes the specific reasons each fails to state a claim. Statements No. 1-13 relate to the SAC's HSB theory (the "HSB Statements"). Statements No. 14-22 relate to the SAC's SnapRS theory (the "SnapRS Statements"). Finally, Statements No. 23-42 relate to the SAC's Dealer Concentration theory (the "Dealer Concentration Statements").

[7] The alleged misstatements on which the SAC relies for its HSB theory are essentially the same as those in the FAC. *See* App'x 1. The SAC does add one alleged misstatement from Generac's Q1 2022 earnings call. *See* ¶ 67(b). That statement was neither false nor misleading.

about future demand were just that—projections of future performance based on a host of variables and requiring considerable judgment. *See* FAC Order at 15, 20.

Moreover, while the FAC focused on specific references to demand, the FAC's HSB Demand theory *did* rely on the *same* claim that Defendants failed to always disclose changes in close rates. The Court found that claim insufficient to support the FAC's theory, and should do the same with regard to the SAC's same theory: "Like Lead Plaintiffs' falsity allegations, their scienter allegations suggest at most only that Jagdfeld knew, at some point, that close rates were declining and inventory was growing. They do not support a strong inference that [he] was aware (or even should have been aware), at the time he made any specific statement, that close rates were so low, or dealer inventory so high, as to make his positive statements about HSB backlog and demand false or misleading to investors." FAC Order at 23-24.

In short, the SAC's relabeled HSB theory fails for the same reasons as before—i.e., the SAC fails to plead falsity and scienter with the requisite factual particularity. In addition, by focusing so intently on close rates, Plaintiffs have walked themselves into two new pleading problems.

### 1. The SAC Fails To Plead Falsity As To The HSB Statements.

It is again the case that most HSB Statements were "[a]ccurate statements of historical fact," which "are not actionable."[8] *Anderson v. Abbott Labs*., 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001), *aff'd sub nom.* 269 F.3d 806 (7th Cir. 2001). While the SAC refers to certain HSB Statements as "false," it actually explains the alleged falsity by asserting an omission—i.e., the HSB Statements allegedly "creat[ed] a false impression of generator sales because they omitted to disclose the fact that close rates . . . had drastically declined and were continuing to decline." ¶ 62.

As an initial matter, by latching onto alleged omissions of close rate data, the SAC must first

---

[8] *See* ¶¶ 61(a), 61(b), 61(c), 61(d), 63, 65(a), 65(b), 65(c), 67(a), 67(b)* (newly alleged misstatement), 67(c).

establish that Defendants had a legal duty to disclose close rates, because there is no affirmative duty to disclose all information that might affect a company's stock price. *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 928 (S.D. Ind. 2008), *aff'd*, 583 F.3d 995 (7th Cir. 2009); *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001). More specifically, here, Defendants "were not obligated to disclose any and all metrics relevant to their business." *Jedrzejczyk v. Skillz Inc*., 2023 WL 2333891, at *4 (N.D. Cal. Mar. 1, 2023), *aff'd*, 2024 WL 1635568 (9th Cir. Apr. 16, 2024). This is because generalized statements—e.g., about projected future "generator sales"—may depend on a variety of factors, which executives assess and weigh in a variety of ways, to arrive at some judgment. Executives are not required to disclose every factor they considered, the weight they assigned to each, or all of the nuances of the judgments that they make. No matter how robust the disclosures, shareholder plaintiffs could always apply hindsight to criticize executives for not disclosing more or differently.

Moreover, as the Supreme Court recently confirmed, alleged omissions must be pleaded with particularity, and omission-based claims can only proceed if plaintiffs first "identify[ ] affirmative assertions (i.e., 'statements made')" and then allege "other facts [ ] needed to make those statements 'not misleading.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 258 (2024); FAC Order at 3, 12 (citing *Macquarie*). In other words, Plaintiffs here "must point to a specific statement that is made misleading by an omission, ***and offer specific, contradictory information known to Defendants sufficient to establish that Defendants made any misleading statements***." *Constr. Workers Pension Fund-Lake Cnty. and Vicinity v. Navistar Int'l*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015) (emphasis added) (internal quotations omitted); FAC Order at 3. The SAC, however, alleges no facts to support Plaintiffs' speculation that close rates declined significantly during the Class Period, that Defendants knew as much ***at the time***, and that Defendants

knew that (supposedly) declining close rates somehow rendered misleading their statements about "generator sales" (even to the extent that can credibly be interpreted as different than "demand"). Indeed, the SAC does not allege a single fact to show that, had close rates always been discussed, management's judgments about future sales and demand would or should have been any different than they disclosed.

Moreover, during the Class Period, close rate data may have given investors a misimpression of the true state of affairs, given observations about other metrics, and given multiple intervening factors. While the SAC spends pages claiming the "importance" of close rates, the SAC's allegations actually demonstrate that "understanding the true state of the HSB generator business" (*see* ¶ 58) requires far more than looking to just the close rate metric. For example:

- The SAC admits that even with declining close rates, the doubling of IHCs would mean that sales were still increasing. *See* ¶ 46 ("So, using the same illustration, if the 50% close rate declined, to 45% then 40%, then 35%, then 30% in those quarters, the doubling of consultations ***would only lead to sales increasing from 50 to 60 from the first to last quarter***." (emphasis added)).

- The SAC demonstrates that close rate data (predictably) lagged IHC data such that, during periods of change (e.g., during the COVID pandemic and post-pandemic eras) the Company had to operate with limited close rate information and take a wait-and-see approach (*see* ¶ 52, bullet 4).

- The SAC concedes that there were other phenomena at play (increased lead times (¶ 57), substantial backlog (¶ 65(b)), and installation capacity constraints (¶ 67(c))); and, as Generac later understood and explained, it was these factors (not general issues with demand or "sales") that impacted close rates. *See* ¶ 59.

In fact, the very PowerPoint slide to which the SAC continues to point as supposed evidence of declining close rates (¶¶ 54-55) belies the theory that omitting close rate data misled investors about generator sales. *See* FAC Order at 19-20 ("Lead Plaintiffs' premise is rebutted by the very same disclosures they cite"). The slide shows that close rates began ***increasing*** again in May 2022, well before the end of the Class Period. The slide also includes a comment noting that "[c]lose rates

decline . . . as lead times grew." ¶ 55; *see also* ¶ 54; Ex. 1 ("Close rates recover over [the] balance of 2022" and "Close rate improvement drives market penetration"). In other words, the slide illustrates the effect lead times had on close rates and how that effect was reversed when the Company increased output by opening a new facility in Q2 2021. Ex. 2 at 4. It was not demand, sales, or close rates that were ever the adversity for HSBs—it was lead times, a metric the Company discussed *ad nauseum* with its investors. *E.g.*, Ex. 3 at 3-4; ¶ 65(b). Accordingly, discussing close rates with investors may have masked the true challenges HSB sales faced—challenges that the Company disclosed and explained how it was addressing.

In fact, the Court already considered—and rejected—the ***very same theory*** Plaintiffs now spotlight with respect to close rates. Specifically, the Court examined and analyzed Plaintiffs' contention that demand was "in fact weakening as the lengthy lead times had caused close rates to decline and ultimately bottom out at the beginning of 2022." FAC Order at 20 (quoting FAC ¶ 111(a)(ii)). The Court considered the ***same*** post-Class Period slide discussed in the SAC and above, and reviewed two statements regarding close rates from November 2022 and May 2023 that are also realleged in the SAC. FAC Order at 20; *see also* ECF No. 52 at 3-4; ECF No. 53-1. The Court found that Plaintiffs' selective quotation of "isolated statements and an after-the-fact retrospective of close rates do not plausibly support the inference that HSB generator demand was declining," because Defendants had in fact disclosed "multiple metrics that supported their belief that demand remained strong. And Lead Plaintiffs concede that these metrics were accurate." *Id*. For the same reason, Defendants' statements about "generator sales"—based also on the same "multiple metrics that supported their belief that demand remained strong"—were not misleading.[9]

---

[9] The SAC also reiterates the same halfhearted channel stuffing allegations that the FAC made. *See* ¶ 57. The Court already found that this "backhanded channel stuffing theory" was not adequately pleaded. FAC Order at 21-22. The SAC again alleges that Generac offered incentives, implemented

Finally, the statements that were generalized observations about "robust" demand are, again, not statements of objective fact that can support a fraud claim.[10] *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007); FAC Order at 17, 19. Courts have consistently found similar statements to be "immaterial, non-actionable corporate puffery." *See* FAC Order at 19 ("statements concerning Defendants' belief that demand remained "incredibly robust" fall directly under *Tellabs'* teaching that such generalized statements are "meaningless" to investors and nonactionable"); *Guidant*, 536 F. Supp. 2d at 928 n.15. (statements expressing "confiden[ce]" about market growth and performance were non-actionable puffery); *see also St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *7 (N.D. Ill. Feb. 28, 2011); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *9 (N.D. Ill. Sept. 23, 2008).

### 2. The SAC Fails To Plead Scienter As To The HSB Statements.

The Court dismissed the FAC because it also failed to allege particularized facts to support a strong inference that any Defendant knew or recklessly disregarded that any HSB Statement was false or misleading. FAC Order at 23, 28, 30. The SAC also does not cure this deficiency.

#### a. *The SAC fails to plead actual knowledge or recklessness.*

The SAC fails to plead—as it must—that Messrs. Jagdfeld and Ragen, ***at the time they made the statements***, had actual knowledge of specific facts that contradicted their statements or would

---

price increases, and had lax cancellation policies, but the SAC does not allege that these were implemented after Defendants knew about declining close rates, to conceal decreasing demand, or that they were altered as compared to prior to the Class Period. Those deficiencies are fatal to any channel stuffing allegations. *See id.*; *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 986-87 (E.D. Wis. 2009); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 642 (N.D. Ill. 2020).

[10] *See, e.g.*, ¶ 63 (HSB demand "has been continuing just to be off the charts"); ¶ 61(b) ("key demand metrics . . . have continued to trend even higher"); ¶ 65(b) ("the order rate . . . has been really strong"); ¶¶ 61(a); 61(d); 65(a) (describing indicators of HSB demand as "increased," "Up again," or "robust"); *see also* App'x 1.

have put them on notice that they were false or misleading. As an initial matter, to the extent Plaintiffs again seek to infer scienter against Messrs. Jagdfeld or Ragen from the SAC's allegations pointing to undifferentiated "Defendants Jagdfeld and Ragen," "Individual Defendants," or "Defendants,"[11] that effort fails. *See, e.g.*, *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 601-02 (7th Cir. 2019) (rejecting group pleading as insufficient to plead scienter).

Moreover, the SAC, just like the FAC, does not even attempt to make ***any factual allegations*** to show that Mr. Ragen had actual knowledge that any of his statements were false or misleading, or that he made any statement with reckless disregard for its falsity. With respect to Mr. Jagdfeld, the SAC still asks the Court to infer his knowledge of purportedly declining HSB demand based on his November 2022 and May 2023 ***post***-Class Period statements about allegedly declining close rates.[12] The Court has already considered and rejected these allegations for failure to "support a strong inference that [Mr.] Jagdfeld was aware (or even should have been aware), at the time he made any specific statement, that close rates were so low, or dealer inventory so high, as to make his positive statements about HSB backlog and demand false or misleading to investors." FAC Order at 14, 23-24. In addition, Mr. Jagdfeld's purported knowledge about declining close rates does not show he intended his ***accurate*** statements about certain demand metrics to be somehow false or misleading. *Harley-Davidson*, 660 F. Supp. 2d at 1000 ("Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made.").

> ### b. The SAC's circumstantial allegations of scienter remain generalized and insufficient.

Lacking actual knowledge allegations, the SAC again asks the Court to infer scienter based

---

[11] *See* ¶¶ 190-96, 198, 200-07, 209-15, 219.

[12] *Compare* FAC ¶ 269 *with* ¶¶ 207 n.39, 208.

on a host of boilerplate allegations that Plaintiffs have thrown against the wall in hopes that something will stick (see FAC Order at 23-24): Messrs. Jagdfeld and Ragen allegedly controlled Generac's messaging, represented that Generac's HSB business was important, closely monitored the HSB business, made certain "public admissions," sold stock, and were incentivized by their compensation to inflate Generac's stock price. *Compare* FAC ¶¶ 252-59, 261-63, 267-68, 272-76 *with* ¶¶ 190-93, 196-98, 202-06, 214-20. The Court also already considered and rejected these allegations as too generalized and insufficient to create a strong inference that any Defendant made *any* particular statement with knowledge of or a reckless disregard for its falsity. FAC Order at 24.

*First*, as the Court already held, supposed opportunities to commit fraud because the Individual Defendants "controlled Generac's strategy, decisions, and messaging to the investing public" (¶¶ 190-192) could be alleged against any executive. *See* FAC Order at 24. Likewise, the executives' roles in the Company and their supposed access to "confidential and proprietary" information (¶ 193) do not support a strong inference of scienter. *Guidant*, 536 F. Supp. 2d at 932.

*Second*, to the extent the SAC again attempts to invoke the "core operations" doctrine (¶¶ 196-99), it fares no better. The SAC must allege facts to establish the "core operations" and specific internal data that actually existed and contradicted the Individual Defendants' challenged statements. *Fryman*, 462 F. Supp. 3d at 902. The SAC alleges no such facts.

*Third*, vague allegations that Messrs. Jagdfeld and Ragen monitored demand metrics, including close rates (¶¶ 202-06), again, utterly fails to explain how this specifically put them on notice that positive statements about demand and *accurate* statements about HSB sales, IHCs, activation, and order rates were misleading. *Harley-Davidson*, 660 F. Supp. 2d at 1000.

*Fourth*, Messrs. Jagdfeld and Ragen's "public statements" are still insufficient to plead scienter. That they often spoke about HSB demand (¶ 214) remains too generalized. *See In re Nokia*

15

*Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (individual defendants' "holding themselves out as knowledgeable about Nokia's products" were generalized allegations insufficient to plead scienter). Likewise, allegations that Messrs. Jagdfeld and Ragen did not always voluntarily disclose close rates (¶ 215), while sometimes discussing other metrics they considered to assess demand, does not plead scienter. The "securities laws do not impose . . . an obligation of absolute and instantaneous disclosure" and, absent such an obligation, Plaintiffs cannot rest an inference of scienter on allegations that Defendants "should have disclosed more information." *Gaines v. Guidant Corp.*, 2004 WL 2538374, at *17 (S.D. Ind. Nov. 8, 2004).

**Fifth**, performance-based compensation and insider stock sales are still insufficient to plead scienter. The SAC's allegations in this regard are almost identical to those made in the FAC. *Compare* FAC ¶¶ 273-74 *with* ¶¶ 217-18. All of these allegations suffer from the exact same defects this Court considered in connection with the FAC MTD:

- This Court has already rejected the FAC's identical allegations that the Individual Defendants' performance-based compensation (¶¶ 219-20) pleads scienter. FAC Order at 24; *see also Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc*., 679 F.3d 952, 956 (7th Cir. 2012) (incentives to act "in order to keep their jobs, improve their bonuses, and increase the value of their stock options" were too generic).

- The SAC again fails to allege factual context sufficient to plead that Class Period stock sales were unusual or suspicious. *Pugh v. Trib. Co*., 521 F.3d 686, 695 (7th Cir. 2008).[13]

---

[13] Further, all of the Individual Defendants' sales were executed pursuant to Rule 10b5-1 plans, to satisfy tax obligations associated with restricted stock unit vesting or equity awards, or otherwise constituted a small percentage of total holdings. *See* FAC MTD at 37-39. Amazingly, the SAC asserts in a footnote that "Jagdfeld claimed that he made approximately $8.4 million of these sales to 'satisfy tax obligations,' but no such explanation was provided for the remaining $30 million in sales." ¶ 217 n.40. The SAC is wrong. Defendants explained in their FAC MTD all of Mr. Jagdfeld's stock sales during the Class Period. *See* FAC MTD at 37-38. Further, while the SAC alleges that Messrs. Jagdfeld and Ragen sold certain amounts of shares, (¶¶ 217, 218), it is conspicuously silent as to the holdings that they each retained, which did not materially change and remained significant throughout the Class Period. *See* FAC MTD at 38-39; *see also Harley-Davidson*, 660 F. Supp. 2d at 1001; *In re Supreme Indus., Inc. Sec. Litig*., 2019 WL 1436022, at *10 (N.D. Ind. Mar. 29, 2019) ("retain[ing] significant holdings weighs against any inference of scienter").

- The SAC again relies on gross sale proceeds rather than net profits, but "pleading only gross proceeds . . . is insufficient to support a strong inference of scienter." *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2012 WL 1068761, at \*14 (N.D. Ill. Mar. 29, 2012); *In re Piedmont Lithium Inc. Sec. Litig.*, 712 F. Supp. 3d 301, 312 (E.D.N.Y. 2024).

- The SAC again skirts around transaction timing—alleging timing *only* as to Mr. Ragen, but admitting he sold stock *after* information about supposedly declining HSB sales was allegedly revealed. ¶ 218. This weighs *against* scienter because it fails to show that Mr. Ragen sought to profit from a stock price that he supposedly knew was inflated by fraud during the Class Period. *City of Warren Police and Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 227 (E.D.N.Y. 2019) (sales after corrective disclosures do not support scienter).

Apparently grasping at straws, the SAC now twists logic to make a new claim that the Court can infer scienter because Messrs. Jagdfeld and Ragen did not *buy* Generac stock "at the artificially inflated prices in the open market." ¶¶ 217-18. These allegations do not raise a strong inference of scienter. *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 337 (S.D.N.Y. 2011) (rejecting argument that corporation's failure to purchase stock follows from rule that insider sales can, if unusual, establish scienter). Further, the SAC does not allege that not purchasing in the open market was unusual or irregular for either Messrs. Jagdfeld and Ragen. Moreover, it would not make any economic sense for Messrs. Jagdfeld and Ragen to purchase Generac stock in the open market; they received already annual stock options and exercised them regularly. *See* ¶ 219.

The SAC's *only* substantive addition to its scienter allegations is to now assert that the Individual Defendants' signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") show that they acted with fraudulent intent. ¶¶ 194-95. However, the SAC's failure to allege that the Individual Defendants were aware of material weaknesses in Generac's controls at the time they signed those statements makes the SOX certifications irrelevant to the scienter analysis. *Toft v. Harbor Diversified, Inc.*, 2025 WL 357776, at \*8 (E.D. Wis. Jan. 31, 2025) (SOX certifications insufficient to plead scienter); *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp.

3d 1154, 1167 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018) (same); *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *15 (N.D. Ill. Jan. 12, 2021) ("[T]o allow a [SOX certification] to create an inference of scienter . . . would eviscerate the pleading requirements for scienter set forth in the PSLRA" (internal quotation marks omitted)).

### 3. The SAC Fails To Plead Loss Causation As To The HSB Statements.

The Court can and should again dismiss the HSB Statements solely because the SAC fails to plead falsity and scienter. Independently, it is notable that, in their attempt to shift their theory from HSB "demand" to focus on the supposed omission of "close rates," Plaintiffs walked themselves into an additional pleading failure. The SAC does not plead loss causation—i.e., facts showing that the alleged "corrective" disclosures revealed the falsity of the newly-characterized misstatements.

First, a corrective disclosure must "possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement." *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012). That is, it "must have something do to with the circumstances that [the] prior false statements concealed or misrepresented." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *29 (N.D. Ill. Aug. 23, 2022). Thus, because the SAC claims the omission of close rates rendered the HSB Statements misleading, *see, e.g.*, ¶¶ 64, 66, 68, the alleged corrective disclosures must "reveal" that omission. *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *7-8 (C.D. Cal. Feb. 6, 2014).

The SAC, however, asserts only in conclusory fashion that the disclosures "revealed" the "declining close rates." *E.g.*, ¶¶ 138, 140. In actuality, the nine disclosures that the SAC alleges "corrected" the close rates omissions do not actually reveal anything about supposedly "declining close rates." *See* ¶¶ 138, 141, 142, 144, 153, 162, 166, 168, 176. Seven of the nine disclosures focused on demand, backlog, and inventory, and were ***entirely silent*** as to close rates—let alone

whether close rates were declining or had declined.[14] The disclosures thus did not provide investors with *any* basis to infer a fraudulent scheme based on the omission of close rate data from the statements at issue. *See In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *19 (S.D.N.Y. Mar. 31, 2015) ("Investors simply could not have inferred the falsity of the prior statements . . . from the September 4 Call."); *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009) (corrective disclosures must "reveal[] the existence of some alleged prior misrepresentation"); *see also Goldman Sachs Grp, Inc. v. Arkansas Teacher Ret. Sys.*, 594 U.S. 113, 123 (2021) (where "there is a mismatch between the contents of the misrepresentation and the corrective disclosure," "it is less likely that the specific disclosure actually corrected the general misrepresentation"). The remaining two disclosures announced disappointing earnings results, but were not "corrective." *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("[T]he standard cannot be so lax that every announcement of negative news becomes a potential corrective disclosure." (internal quotation marks omitted)). While the SAC homes in on passing references to close rates in the August 3 and November 2, 2022 earnings releases, they headlined disappointing revenue and reduced sales growth, margin, and earnings forecasts, (Exs. 3, 13), and charges related to SnapRS and Pink Energy, (Ex. 13). None of these issues was attributed to declining close rates. Indeed, even the analyst reports that the SAC cites did not mention close rates, and instead attributed the earnings results to factors such as a "potential softening of demand." ¶¶ 158-160, 184; *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005) (announcement of negative news was not a corrective disclosure where analysts attributed fall in stock prices to another cause). The SAC thus fails to allege facts

---

[14] *See* ¶¶ 141, 142-143, 144-149, 162-163, 166-167, 168-170; Ex. 6 (reporting earnings miss and discussing backlog); Ex. 7 (discussing a deceleration of sales growth); Ex. 8 (expressing a concern about slowdown in orders and backlog issues); Ex. 9 (highlighting excess capacity); Ex. 10 (discussing demand and backlog); Ex. 11 (same); Ex. 12 (same).

sufficient to show that the stock drops following these two announcements were related to the revelation of some "truth" about a fraudulent scheme, rather than to the disappointing, non-fraudulent news itself. *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect . . . It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme.") (emphasis in original)).

### B. The SAC Fails To State A Claim As To The SnapRS And Dealer Concentration Statements.

#### 1. The SAC Fails To Plead That The Statements Were Material.

In its FAC Order, the Court correctly recognized that the challenged SnapRS and Dealer Concentration Statements could not have been material to investors, because it is undisputed that only a tiny fraction of Generac's revenues derive from SnapRS sales. FAC Order at 28. The Seventh Circuit has recognized a 5% change in revenue or income as a basic "rule-of-thumb" for determining materiality. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 & n.1 (7th Cir. 2007). Here, Generac's clean energy business in 2022 accounted for *less than 4%* of the Company's revenues—and SnapRS is only a *subset* of that business.[15] Thus, statements related to Generac's SnapRS experience were simply immaterial. And, of course, the amount of revenue derived from PWRcell sales by *one dealer* could not have been material.

In an attempt to overcome this fatal deficiency, the SAC doubles downs on Plaintiffs' old

---

[15] Generac's FY2022 revenues were $4.56 billion. Ex. 14 at 26. The SAC admits that, as of November 3, 2022, analysts estimated 2022 revenue from the "core clean energy business (primarily residential solar storage)" would be approximately $150 million to $180 million—*less than 4% of revenues*. *See* ¶ 187. The SAC also again claims omissions of a $37 million pre-tax charge for clean energy product warranty-related matters and of an $18 million bad debt expense related to Pink Energy's bankruptcy. ¶ 168. Those each amount to *less than 1%* of Generac's annual revenues. Omissions concerning such facially minor issues are presumptively immaterial. *See In re Newell Rubbermaid Inc. Sec. Litig.,* 2000 WL 1705279, at *8 (N.D. Ill. Nov. 14, 2000) (expense constituting less than 10% of before-tax income "could not possibly have been material"); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997) (overstatement of assets by 2% not material).

claim that the solar business was an important part of Company's future. *See, e.g.*, ¶¶ 2, 3, 31, 43, 71, 72. But the Court already considered and rejected similar allegations. *See* FAC Order at 28; *see also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 14 (S.D.N.Y. 2016) (possibility of materiality in the future is insufficient). In sum, the SAC's failure to add any new factual allegations to demonstrate that the SnapRS and Dealer Concentration statements were material is fatal to each of these two theories, which can and should be dismissed on this ground alone.

### 2. The SAC Fails To Plead That The SnapRS Statements Were False Or Misleading.

Assuming counterfactually that the SAC pleads that the Clean Energy business was material to the Company—which it does not and cannot—the SnapRS claims still fail for the independent reason that the SAC does not plead any false or misleading statements. In fact, the SAC makes scarcely any additions to the SnapRS-related allegations that this Court previously found deficient.

Plaintiffs' pleading burden is carried only if they "plausibly plead, with particularity, that the SnapRS defect prevalence was of sufficient magnitude, and sufficiently known to Defendants, that their statements were false, misleading, or without a reasonable basis at the time they were made." FAC Order at 27 (*citing Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1174 (N.D. Ill. 2019)). Similarly, Plaintiffs must plead "sufficiently specific and detailed information" showing when Defendants were aware that the alleged defect exposed them to increased liabilities, warranty claims, and reputational damage. *Id*.

The vague assertion that Defendants had access to information "contradicting" the alleged statements is not enough. *Pierrelouis*, 414 F. Supp. 3d at 1173-74 ("When one of the circumstances indicating falseness is the alleged existence of contemporaneous information inconsistent with a particular statement that was allegedly known only to the defendants, some detail about the alleged information, other than that its substance contradicted the substance of the identified statement, must

21

be provided."). Likewise, it is not enough to merely refer to the same "relatively innocuous statements" (*see* FAC Order at 25) about increased shipments of PWRcell systems, Defendants' product safety and quality functions, and risk factor disclosures in SEC filings regarding general product liability claims. ¶¶ 97-108. Indeed, the SAC asserts that these statements were made misleading almost entirely by reference to the same set of allegedly omitted facts cited in the FAC at ¶¶ 77-85 and 109. These worn and retreaded allegations are insufficient to meet Plaintiffs' burden for the same reasons as this Court already gave in rejecting the FAC. *See* FAC Order at 27.

As to the statements made before August 2021, the SAC still refers only to a single instance in which Pink Energy purportedly told Generac about defective SnapRS devices on a single customer's PWRcell system. ¶ 78. The allegations copied from Pink Energy's lawsuit against Generac Power Systems do not help, as the Court already recognized (*see* FAC Order at 27), because they do not specify a time when the SnapRS devices allegedly began to fail "en masse" or allege Defendants' awareness of such a purported failure. *Cf.* ¶¶ 78-79 (alleging only Pink Energy's purported awareness of an increase in service calls in "early 2021"). The same is true of the vague allegation that an analyst reported that an unnamed member of "Generac management" stated in December 2022 that unspecified "product challenges" occurred "shortly after launch," ¶ 81.[16] This rephrased allegation—the sole "new" allegation related (possibly) to the period before August 2021—does nothing to change the Court's sound analysis that the allegations are insufficient "to provide specific, particularized support for a finding that Defendants were aware of a material defect involving the SnapRS device at the time they made the statements." *See* FAC Order at 26-27.

For statements made between August 2021 and the end of the Class Period, the SAC mostly

---

[16] Although newly phrased to suggest, misleadingly, that it is a quotation from a Generac source rather than an analyst report, this allegation is also a holdover from the FAC (*see* FAC ¶ 96) and the Court has already specifically held that this statement "does not resolve [Plaintiffs'] pleading deficiency." FAC Order at 27.

rehashes the same allegations that failed in the FAC to indicate the alleged scope or severity of the SnapRS issue. For example, the SAC asserts that, in August 2021, one dealer mentioned the "issue" to "Generac," that a Generac executive participated in a conference call with Pink Energy regarding a residential fire and stated that Generac was investigating SnapRS "overheating" and "bulging and separation," and that a Generac sales employee told Pink Energy that "a few" SnapRS devices had been found to be overactive in a manner that could be addressed by a firmware update. ¶¶ 81, 83-84, 86. These allegations do not begin to show a widespread product defect. Nor does the claim that Generac released a firmware update in August 2021—a quotidian event for companies that sell internet-linked products—support the giant leap to a conclusory allegation that "Generac was well aware of the need to fix all installed units." ¶ 87. The FAC's repeat allegations regarding a "second generation SnapRS" in late 2021, and an indemnification provision in a contract with Pink Energy in December 2021, likewise refer to common and unremarkable occurrences for any manufacturer, and hardly constitute particularized facts showing a pervasive product defect. ¶¶ 93-95. The same is true of the reincorporated allegations that Generac sent a letter to a non-quantified "selection" of Pink Energy customers in May 2022 noting that they "may have experienced certain issues" with SnapRS devices and observing that the new model SnapRS 802 "increas[ed] performance and reliability," and that Mr. Jagdfeld sent an email to Pink Energy on June 1, 2022 stating that Generac testing showed its products were safe when kept properly updated with firmware (¶¶ 103, 92 n.24). The Court has rightly held that none of these alleged facts renders any of the SnapRS Statements misleading. FAC Order at 26-27.

The SAC adds just two new allegations regarding the SnapRS issue during this later period, each of which is similar to those that this Court has already found insufficient. First, the SAC asks the Court to leap to the conclusion that the Individual Defendants each knew that there was an alleged

"widespread" product defect merely because a subsidiary, Generac Power Systems, reported a "potential defect" in SnapRS 801 devices to the CPSC on November 23, 2021. ¶ 88. However, as the Consumer Product Safety Act ("CPSA") makes clear, a manufacturer is obligated to report to the CPSC once a ***potential*** product defect creates a risk of injury; because the manufacturer cannot wait for a determination that a product is ***actually*** defective or has caused ***actual*** injury, a report to the CPSC does not necessarily demonstrate that a defect existed, much less its prevalence. *See* 15 U.S.C. 2064(b).[17] Notably, the SAC does not—and cannot—allege that the CPSC ever took any action against Generac before closing its report, or required (or that Generac ever undertook) a product recall.[18] In sum, Generac Power Systems's prudential report to the CPSC does not suffice to show a widespread product defect during the Class Period or, more importantly for the falsity and scienter analyses, that Messrs. Jagdfeld or Ragen had any knowledge of a widespread issue.

Second, the SAC adds an allegation that, in or around April 2022, Generac released the new model SnapRS 802 and "'[s]hortly thereafter' instituted the 'SnapRS replacement program,' the goal of which was to 'ultimately replac[e] all SnapRS 801 and 801A devices with SnapRS 802 devices.'" ¶ 100. Although it is included among the purportedly false or misleading statements, Plaintiffs appear to regard this allegation as a ground for asserting that other statements made in or after April 2022 were misleading. Precisely like the allegation that Generac began supplying the SnapRS 801A device in late 2021—which the Court previously found insufficient to plead falsity—the assertion

---

[17] *See also United States v. Spectrum Brands, Inc*., 218 F. Supp. 3d 794, 821 (W.D. Wis. 2016) ("the driving principle of the CPSA's reporting requirement" is that "companies are strongly encouraged not to wait to report until a potential defect causes a serious injury, but rather to report when they first appreciate that their product may contain a defect that could injure people, even when the risk of serious injury is in doubt") (emphasis added), *aff'd,* 924 F.3d 337 (7th Cir. 2019).

[18] CPSC regulations also specify that, "to further encourage reporting," a company "may specifically deny that the information it submits reasonably supports the conclusion that its consumer product … contains a defect." *Spectrum*, 218 F. Supp. 3d at 821 n.22 (quoting 16 C.F.R. § 1115.4(e)). The SAC is noticeably silent as to any admission or denial here.

that a new model 802 device became available in April 2022 does not plead a product defect of any magnitude, any Individual Defendant's awareness of such a defect, or anything other than Generac's efforts at product improvement. Likewise, the claim that "shortly thereafter," at some indeterminate time, Generac instituted a replacement program with a "goal" of "ultimately" replacing prior SnapRS models with the new model 802 device conveys no meaningful information about the time at which any Individual Defendant purportedly became aware of a substantial product defect or any associated liability. "Shortly thereafter" could well mean October 2022, when the Company determined and disclosed that certain warranty liabilities had become probable and estimable. Further, allegedly setting a "goal" cannot be equated with a decision to implement a formal replacement policy, and still less does it indicate that any Individual Defendant had ascertained any potential financial impact associated with alleged SnapRS replacement in or around April 2022.

Finally, certain of the SnapRS Statements, again, are forward-looking statements protected by the PLSRA's safe harbor provisions.[19] *See* 15 U.S.C. § 78u-5(c)(1) (a forward looking statement includes projections, disclosures about "future economic performance," and assumptions underlying such statements); FAC MTD at 26-27. Similarly, like the HSB Statements, many of both the SnapRS and Dealer Concentration Statements (*see infra* at 25-28) are also statements of corporate optimism that do not plead falsity.[20] *See supra* at 13; FAC MTD at pp. 28-30.

### 3. The SAC Fails To Plead That The Dealer Concentration Statements Were False Or Misleading.

The SAC's third theory—that Defendants allegedly omitted the alleged over-concentration

---

[19] *See, e.g.,* ¶ 98(a) ("increase in product and other liability claims or recalls . . . could affect our actual financial results"). These were accompanied by meaningful cautionary language, which warned investors that the stated expectations could be impacted by a number of factors, including COVID and consumer spending. *See* Ex. 4 at 18-21; Ex. 5 at 16, 19, 24-25.

[20] *See, e.g.,* ¶ 101 ("Generac maintains a robust product safety function"); ¶ 130(a) ("supporting this rapid growth is the continued build-out of our installer network"); *see also* App'x 1.

of the Company's sales through one dealer, Pink Energy, ¶¶ 122-134—is also based on few new allegations, and none that provide a plausible basis to claim that the quoted statements were misleading. In addition to neglecting to cure the FAC's failure to plead materiality, the SAC still does not offer, as it must, any "specific, contradictory information known to Defendants sufficient to establish that Defendants made any misleading statements." *Navistar*, 114 F. Supp. 3d at 651 (quotations omitted). Such information must show that the statements were "rendered misleading" by its omission "as opposed to simply lacking detail." *Supreme*, 2019 WL 1436022, at *5.

The SAC refers to the same statements about the dealer network "build-out," mitigating risk through "expanded distribution," and product availability (including, but not limited to, PWRcell systems) through a "broad" dealer network. ¶¶ 122-134. The SAC claims that these statements were misleading because "analysts estimated" that Pink Energy accounted for more than half of Generac's "solar product" sales. ¶ 119. The Court already addressed these same allegations and held that they do not establish that the statements were misleading. FAC Order at 29-30.

As the Court previously observed, many of these statements refer to Generac's distribution network for its products overall, without limitation to solar energy product dealers. *Id*. at 29. To respond to the Court's clear guidance on this matter, Plaintiffs attempt to present these statements as limited to the PWRcell system dealer network—including the statements labeled the "Available Through Dealers Statement" and the "Mitigating Risk Through Expanded Distribution Statement." This attempt "mischaracterize[s]" those statements and misleads the Court. *See id*. The same is true of the statement that no single customer provided more than 6% of Generac sales in 2021, which referred to sales of all "our products" for the Company as a whole. ¶ 129(a).

Plaintiffs seek to circumvent this problem in part by asserting that one subset of statements, which mention numbers of "around 2,000 dealers," were supposedly "understood" by "analysts" to

refer to "clean energy" product dealers alone, which Plaintiffs then simply equate with dealers of PWRcell systems. ¶ 122, n.33. But the Court expressly considered this "small handful of statements [that] address 'clean energy' dealers" and held that these statements were not misleading, because not one of them "speaks to the concentration or lack of concentration of sales in or among Generac's PWRcell product dealers." FAC Order at 29-30.

The small number of new allegations in the SAC serve as window-dressing that fails either to hide the bulk reuse of the same inadequately-pleaded FAC allegations, or to put those alleged facts in any new light. These allegations include certain theoretical statements about customer concentration risk in the abstract, which have no bearing at all on the question of whether Plaintiffs have adequately alleged particularized facts suggesting that the Dealer Concentration Statements were misleading. ¶¶ 112, n. 28-30. The SAC's references to "diversification" merely attempt to elide the difference between a "broad" and a "diversified" dealer network so as to distract from the fact that Defendants' statements quoted in the SAC never described the PWRcell dealer network as "diversified." *See* ECF No. 55 at 10-11 and n.11.

The SAC also alleges that Defendants could "monitor sales by solar dealer" through a sales and lead management tool called Powerplay CE. ¶ 114. Even assuming this tool could be used to compare solar energy product dealers' respective shares of PWRcell sales (which the SAC does ***not*** allege), this would not show that Defendants were aware of information showing that Generac's sales were highly concentrated with Pink Energy. The SAC does not allege that Defendants did (or even could) use Powerplay CE to compare sales volume by dealer. Rather, the SAC references Mr. Jagdfeld's description of Powerplay CE as "the industry's first complete solar plus storage sales and lead management tool ***for installers and dealers***." ¶ 114, n. 31 (emphasis added). Further, even if Powerplay CE did have such capability, the SAC is devoid of factual allegations regarding the

specific information that Powerplay CE did in fact show related to dealer concentration and who reviewed that information. The mere assertion that data was potentially available to Defendants does not suffice for an omission-based fraud theory. *See Pierrelouis*, 414 F. Supp. 3d at 1174-75.

### 4. The SAC Fails To Plead Scienter As To The SnapRS And Dealer Concentration Statements.

The SAC's SnapRS and Dealer scienter allegations suffer from the same defects as the HSB theory, because they remain devoid of particularized facts.

Regarding the Dealer Concentration theory, the SAC does not even attempt to allege facts sufficient to plead actual knowledge or recklessness.

As to the SnapRS theory, the SAC still fails to allege that either Messrs. Jagdfeld or Ragen knew that "the defect was so pervasive as to require disclosure to investors." *See* FAC Order at 28. Indeed, there are still no allegations of Mr. Ragen's actual knowledge at all. As to Mr. Jagdfeld, the SAC again mistakenly relies on Pink Energy's lawsuit allegations. *See* FAC Order at 27; *see also Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *22 (N.D. Ill. May 24, 2022) (rejecting allegations from a government lawsuit against the company as insufficient to infer scienter, especially because—*as here*—those allegations did not specifically name the executives or detail their personal knowledge). The SAC also again claims that on June 1, 2022, Mr. Jagdfeld responded to an email regarding issues with certain SnapRS devices. *Compare* FAC ¶ 95(b) *with* ¶ 92 n.24. But the only inference one could draw from his email is that Mr. Jagdfeld believed the product remained safe based on the testing and rollout of interim and permanent solutions—a far cry from suggesting knowledge or a belief that the Company faced a product defect so serious and widespread as to create material liabilities for Generac. Moreover, the SAC still does not allege *when* the SnapRS devices began to malfunction in *sufficient numbers* and with *sufficient pervasiveness* so as to alert Defendants to the existence of a significant

problem. *See* FAC Order at 27.

The SAC's circumstantial allegations of scienter as to the SnapRS and Dealer Concentration theories likewise fail for the same reason that the HSB scienter allegations fail. *See* ¶¶ 199-201 (importance of solar energy business); 210 (Defendants "were required" to monitor defects); 212 (Defendants monitored solar dealer network); *see supra* at 14-18. None of these allegations constitute particularized facts, which the Individual Defendants possessed and which allegedly alerted them as to the significance or pervasiveness of the SnapRS issues or that solar sales were purportedly so concentrated in Pink Energy as to have a material effect on the Company's financial position. *See Pierrelouis*, 414 F. Supp. 3d at 1176.

The SAC's only new addition to the SnapRS scienter allegations is Generac's subsidiary's November 2021 voluntary CPSC report. ¶¶ 88, 211. As explained above, this addition (which does ***not*** allege that Messrs. Jagdfeld or Ragen were even involved in the report) does not plead that either individual knew that there existed an issue so pervasive as to require public disclosure.

### 5. The SAC Fails To Plead Loss Causation As To The SnapRS And Dealer Concentration Statements.

In addition to the SAC's failure to plead materiality, falsity, or scienter, the SAC's four alleged "corrective" disclosures regarding the SnapRS and Dealer Concentration theories do not plead loss causation. The corrective disclosures do not match the alleged misstatements in substance or specificity. The August 1, 2022 Pink Energy lawsuit and September 12, 2022 Pink Energy Press Release (¶¶ 150-152, 161) purportedly disclosed customer complaints about a single sub-product (SnapRS), which does not "correct" more general statements concerning Generac's overall "robust product safety function." *See Boeing*, 2022 WL 3595058 at *29 n.13 (fact of an aircraft crash did not render false earlier general statements as to product safety). For the same reason, the September 22, 2022 media reports (¶¶ 164-165), which discussed Pink Energy's shutdown and challenges with

customer complaints, did not render false earlier general statements as to safety. *See Boeing*, 2022 WL 3595058, at *29 n.13. The November 2, 2022 earnings call (¶¶ 180-181), which discussed the end of Pink Energy's operations, did not reveal the falsity of any prior statement concerning Generac's dealer base.[21] *See Fairfax*, 886 F. Supp. 2d at 338. Indeed, the disclosure of "the loss of a major customer," (¶ 178), does not have a sufficiently close nexus to the alleged misstatements, which concerned Generac's dealer networks more generally (*E.g.*, ¶¶ 123, 124, 129) and did not speak to the concentration, or lack thereof, of sales specifically in or among PWRcell product dealers. *See Goldman*, 594 U.S. at 123; *Fairfax*, 886 F. Supp. 2d at 338.

> C.      **The Section 20(a) Claim Should Also Be Dismissed.**

To state a claim under Section 20(a), "a plaintiff must first adequately plead a primary violation of securities laws." *Pugh*, 521 F.3d at 693; 15 U.S.C. § 78t(a). Because the SAC fails to plead a Section 10(b) claim, the Court also should dismiss the Section 20(a) claim.

## IV.     **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully submit that the SAC should be dismissed in its entirety. The SAC's continued deficiencies and repeat reliance on previously rejected allegations demonstrate that further amendments would be futile. The SAC should thus be dismissed with prejudice. *See Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 942 (7th Cir. 2018) (affirming dismissal of initial securities fraud complaint with prejudice because any amendment would have been futile).

---

[21] The November 2, 2022 earnings call fails to plead loss causation for the additional reason that it did not disclose any "new information." *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008). While the earnings call discussed the SnapRS issue and the Pink Energy bankruptcy, by the SAC's own allegations, it merely "repackage[ed] . . . already-public information." *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013); *see, e.g.*, ¶¶ 161, 164, 168 (prior disclosures of information regarding the SnapRS defect and Pink Energy operational issues).

Dated: April 30, 2025                    Respectfully submitted,


By: _____
Glenn K. Vanzura
**WILLKIE FARR & GALLAGHER LLP**
2029 Century Park East, Suite 2900
Los Angeles, CA 90067
(310) 855-3000
gvanzura@willkie.com


By: _____
Jacqueline M. Vallette
**MAYER BROWN LLP**
333 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071
(213) 229-9500
jvallette@mayerbrown.com

Joseph De Simone
**MAYER BROWN LLP**
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2559
jdesimone@mayerbrown.com

Andrew J. Spadafora
**MAYER BROWN LLP**
1999 K Street NW
Washington, DC 20006
(202) 263-3043
aspadafora@mayerbrown.com

*Counsel for Defendants Generac Holdings Inc.,*
*Aaron Jagdfeld, and York A. Ragen*