UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

OAKLAND COUNTY VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION, et al., Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

GENERAC HOLDINGS INC., et al.,

Defendants.

Civil No. 2:22-cv-01436-bhl (Consolidated with Civil No. 2:23-cv-00081-bhl)

CLASS ACTION

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION FOR CONSIDERATION

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....1

II. THE AC ALLEGATIONS ....4

A. Defendants Concealed that Close Rates Declined ....5

1. Defendants' Close Monitoring and Reporting of Close Rates ....5

2. Defendants' Materially Misleading Statements ....7

3. Defendants' Admissions and Investor Reaction ....9

B. Defendants Concealed the Widespread Solar Defect ....10

1. The Defect Was Widespread, Affecting 50% of Products ....10

2. Defendants' Materially Misleading Statements ....12

C. Defendants Concealed Solar Customer Concentration ....13

1. The Solar Product Business Was Critical to Generac's Value ....13

2. Customer Concentration Is Material to Investors ....13

3. Defendants' Materially Misleading Statements ....13

4. Admissions and Investor Reaction to the Solar Disclosures ....14

III. ARGUMENT ....15

A. The AC Cures the Issues Raised in the Order ....15

B. The Complaint Alleges Materially False or Misleading Statements ....16

1. The Concealed Facts Were Material ....17

a. Legal Standards for Materiality ....17

b. The Stock Drop Supports Materiality ....18

c. The Investment Banks Confirm Materiality ....18

d. Defendants Admitted Materiality ....19

e. The Solar Sales Were Material to Generac's Business ....20

2. Defendants' Misleading Half-Truths Are Actionable ....21

**Page**


a. The Generator Sales Metrics Statements ....................................23

b. The Solar Risk and Safety Statements ........................................24

c. The Solar Dealer Statements ......................................................26

C. The AC Establishes a Strong Inference of Scienter ..............................27

1. Direct Evidence Is Not Required ..........................................................28

2. This Case Is Like *Gogo II*, Not *Gogo I* ....................................................29

3. The Totality of Allegations Support a Strong Inference of Scienter and None Should Be Dismissed as Meaningless ......................................31

a. Defendants' Direct Responsibilities, Close Monitoring, and Frequent Statements Support Scienter ..........................................32

b. The Core Operations Doctrine Supports Scienter..........................34

c. The Magnitude of the Problems Supports Scienter .......................35

d. Defendants' Admissions Support Scienter ....................................35

e. Defendants' Unusual Stock Sales Support Scienter ......................36

D. Loss Causation Is Adequately Alleged ..................................................37

E. Control Person Liability Under §20(a) Is Adequately Pled..................................40

IV. CONCLUSION..........................................................................................40

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)....................................................................................18

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ................................................................ *passim*

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ...............................................................24, 29, 35

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...........................................................................................3, 17

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
94 F. Supp. 3d 1035 (D. Minn. 2015)......................................................................27

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..........................................................................27, 35

*Bond v. Clover Health Invs. Corp.*,
2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)..........................................................28

*Butala v. Owlet, Inc.*,
2024 WL 3648141 (C.D. Cal. Aug. 5, 2024)............................................................29

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .......................................22, 24, 36, 37

*Chow v. Archer-Daniels-Midland Co.*,
2025 WL 790854 (N.D. Ill. Mar. 12, 2025)........................................16, 28, 29, 32

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
2012 WL 607578 (N.D. Ill. Jan. 23, 2012)...............................................................33

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)......................................................................21

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ........................................................16, 36

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)...................................................................................19, 20

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .......................................................................34

**Page**

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................................37

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) ....................................................................................18, 19

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ...........................................................30, 37

*Fugman v. Aprogenex, Inc.*,
961 F. Supp. 1190 (N.D. Ill. 1997) ..............................................................................36

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) .......................................................................................38

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017).......................................................39, 40

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)....................................................................34

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .....................................................16, 20, 32, 38

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) .......................................................................................33

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ...........................................................33, 37

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004).........................................................................................21

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ...........................................................................17

*In re Allaire Corp. Sec. Litig.*,
224 F. Supp. 2d 319 (D. Mass. 2002) ..........................................................................26

*In re BioVie Inc. Sec. Litig.*,
2025 WL 9647667 (D. Nev. Mar. 27, 2025) .................................................................25

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)....................................................................36

*In re Estée Lauder Co., Inc. Sec. Litig.*,
2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ........................................................22, 23

*In re Facebook, Inc. Sec. Litig.*,
2023 WL 8365362 (9th Cir. Dec 4, 2023) ..........................................................25, 26

*In re Firstenergy Corp*.,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ................................................................32

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) .........................................................................23

*In re Motorola Sec. Litig.*,
2004 WL 2032769 (N.D. Ill. Sept. 9, 2004) ................................................................34

*In re Obalon Therapeutics, Inc.*,
2019 WL 4729461 (S.D. Cal. Sep. 25, 2019) ..............................................................27

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ....................................................................................19, 35

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) ....................................................................32, 34

*In re Shopko Sec. Litig.*,
2002 WL 32003318 (E.D. Wis. Nov. 5, 2002) .............................................................16

*In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*,
604 F. Supp. 2d 1188 (N.D. Ill. 2009) ...................................................................18, 35

*In re Upstart Holdings, Inc. Sec. Litig.*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ...........................................................28

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2017 WL 1658822 (D.N.J. Apr. 28, 2017) ...................................................................16

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
2019 WL 2724075 (D.N.J. June 30, 2019) ...................................................................37

*In re Virtu Fin., Inc. Sec. Litig.*,
2025 WL 847824 (E.D.N.Y. Mar. 17, 2025) .................................................................25

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ...............................................................................22, 39, 40

**Page**

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)....................16

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)....................31

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010)....................32

*Kelsey v. Allin*,
2016 WL 825236 (N. D. Ill. Mar. 2, 2016)....................23

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)....................16

*Lindelow v. Hill*,
2001 WL 830956 (N.D. Ill. July 20, 2001)....................34

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)....................21

*Macovski v. Groupon, Inc.*,
553 F. Supp. 3d 460 (N.D. Ill. 2021)....................39

*Makor Issues & Rts., Ltd. V. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006)....................33

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008)....................16, 24, 34

*Marks v. CDW Comput. Ctrs, Inc.*,
122 F.3d 363 (7th Cir. 1997)....................17

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)....................37, 38

*Pierrelouis v. Gogo, Inc.*,
2021 WL 1608342 (N.D. Ill. Apr. 26, 2021).................... *passim*

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011)....................30

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011)....................22

*Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*,
886 F. Supp. 2d 328 (S.D.N.Y. 2012)....................39

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2018 WL 844420 (N.D. Ill. Feb. 12, 2018)....................20

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)....................18, 22, 32, 36

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)....................33

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007)....................32

*SEC v. Ustian*,
229 F. Supp. 3d 739 (N.D. Ill. 2017)....................19

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018)....................17

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017)....................1, 26

*Swanson v. Interface, Inc.*,
2022 WL 2003990 (S.D.N.Y. June 6, 2022)....................21

*Tellabs Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................27, 28, 32

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016)....................31

*Voit v. Wonderware Corp.*,
977 F. Supp. 363 (E.D. Pa. Sept. 8, 1997)....................25

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
2019 WL 4597518 (N.D. Ill. Sept. 23, 2019)....................38

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)....................40
§2064(b)(3)....................11, 15

Plaintiffs respectfully submit this opposition to Defendants' Motion to Dismiss the Amended Consolidated Complaint (ECF 74) ("MTD"), and Defendants' Motion for Consideration of Documents (ECF 77) ("MFC").[1]

## I. INTRODUCTION

The motion to dismiss should be denied because the AC addresses the reasons for the prior dismissal. The AC adds allegations and clarifies the claims to address shortcomings described in the Order, while also shortening its length. First, the Court dismissed statements concealing a decline in generator demand because it held demand is not measurable. Order at 16-17, 31. The AC narrows the statements to those that concealed close rates had declined by as much as 40%, which is indisputably a measurable fact. ¶55. Indeed, Defendant Jagdfeld received a daily "dashboard" – every morning at 7:00 a.m. – that detailed close rates from the prior day. ¶48. Before the Class Period, when close rates were improving, Defendants reported a trio of interrelated sales metrics: close rates, consultations, and dealer orders. ¶¶49-52. Defendants did so because, as Defendant Jagdfeld said, "you have to take into consideration where our close rate is" at in assessing consultations, because "[t]hat's part of the equation." ¶¶5, 67, 203. Yet, when close rates declined, Defendants continued to tout increased consultations and dealer orders, but concealed the decline in close rates, which misled the market into believing (and analysts reporting) that close rates had also increased. ¶¶60-69. Disclosing positive metrics while concealing interrelated negative metrics is a misleading half-truth that the securities laws prohibit. *See, e.g., Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1136-1137 (N.D. Cal. 2017) (holding disclosures of positive metrics were misleading for omitting related "flat or declining" metric).

---

1 Citations to "¶__" and "¶¶__" refer to paragraphs in the Amended Consolidated Complaint for Violations of the Federal Securities Laws (ECF 66) ("AC"). "Order" refers to this Court's prior order (ECF 63), dismissing the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 42) ("CC"). Unless otherwise indicated, emphasis is added, internal citations are omitted, and capitalized terms shall have the same meaning as set forth in the AC.

Second, as to the solar product defect, the Court (Order at 26-27) and now Defendants (MTD at 28-29) relied heavily upon a decision in *Pierrelouis v. Gogo, Inc.*, which found allegations that a product defect existed in "November or December 2017" were insufficient to establish falsity or scienter for statements made earlier in February 2017. 414 F. Supp. 3d 1164, 1173 (N.D. Ill. 2019) ("*Gogo I*"). However, in an amended complaint, the *Gogo* plaintiffs clarified that the problem was affecting "12%" of products by February 2017, and the court held this was of sufficient magnitude to support falsity and scienter, and denied the motion to dismiss. *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *6-*9 (N.D. Ill. Apr. 26, 2021) ("*Gogo II*").

Here, Plaintiffs made similar amendments. The AC adds allegations that the Company reported the defect as a significant problem to the CPSC in November 2021 (¶88) and removes alleged misleading statements before that time (*compare* ¶98 *with* CC at ¶109). That combines with the allegations that the defect impacted nearly 50% of products, the defect began "shortly after launch" in 2019, it was reported to Generac leadership by mid-2021, the Company was working on a solution to "fix" the defect by August 2021, an attempted fix resulted in massive shutdowns starting in late 2021, and the Company agreed to indemnify its largest dealer over the problem in December 2021. ¶¶79-95. Thus, like *Gogo II*, it is clear the defect was sufficiently widespread at the time of the remaining alleged misleading statements in February through August of 2022.

Third, the primary reason the Court dismissed both the second category of false statements (solar product defect) and the third category (solar sales concentration) was its holding that no reasonable investor could find those matters important because solar sales were too small. *See* Order at 30 ("Defendants failed to disclose their concentration of solar sales through Pink Energy because it was of little consequence."); *see also* MTD at 20-21. Respectfully, that was contrary to the alleged stock declines, bank analyst findings, and Defendants' admissions. *See infra* §III.B.1.

Plaintiffs alleged the stock declined after disclosure of the concealed solar facts (defects and sales concentration) and cited cases supporting such declines establish materiality. ECF 52 at 26. However, the Court inferred that the actual reason the stock declined was because "Generac's stock price skyrocketed during the COVID-19 pandemic," but "[a]s the pandemic waned" it "led investors to abandon the company, and Generac's stock price fell." Order at 30-31. That conclusion was unsupported by facts or expert evidence and contradicted the Court's acknowledgment that "no reasonable investor would have believed that the surge in demand from the pandemic would continue indefinitely." *Id.* at 19. That the pandemic would not continue indefinitely was baked into the stock price, so it could not have been the unexpected surprise that caused the stock drop. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (holding "most publicly available information is reflected in market price").

Rather than "speculation" (Order at 2), the investment banks, whose job it was to report on such matters, confirmed the solar sales concentration and defect were unknown and important facts that warranted lowering Generac's target stock price, for example:

- **William Blair** stated: "Management has consistently indicated Generac works with many distributors in the solar and energy storage market" and "certified over 2,000 dealers . . . [so] [w]e believe it will come as a surprise to many investors that Pink Energy likely accounted for more than half of Generac's solar/energy sales" (¶186), "[t]he realization of customer concentration makes it clear that Generac has not been as successful as we believed at attracting distribution partners in the solar market, and recent quality issues will make building that distribution even more challenging" (¶188), "[t]hese realizations regarding clean energy hurt management's credibility, given there was no indication Generac had material customer concentration in this business" (*id.*), and "[w]e now also believe the quality issues Generac has been experiencing with solar components, particularly a rapid shutdown device called the SnapRS, are severe enough that the company's reputation in the solar industry has been damaged" (*id.*).

- **Roth Capital** cut its stock price guidance by 75%, reporting that: "[m]anagement gave us a double whammy yesterday with its HSB business weak through mid-2023 and the clean energy business warranty expense/bad debt," adding that "some dealers are suggesting there may be a need for a national recall." ¶171.

- **Bank of America** issued a report titled: "The Other Shoe (Clean Energy) Drops," reporting that Generac "is facing greater challenges with its clean energy segment than we previously understood" with "product quality issues and a lost major customer." ¶¶184-185.

- **JP Morgan** cut its stock price target by 50%, citing the "elevated channel inventory" for generators and also the "one-time charges related to the bankruptcy of a material customer for the nascent clean power business." ¶172.

- **Morningstar** described the Pink Energy and solar defect issues as "a setback in Generac's efforts to prove itself within the clean energy market." ¶174.

Those assessments show that the solar defect and sales concentration had been concealed and that their revelation caused stock declines, which establish their materiality.

Indeed, the investment banks recognized solar was key to Generac's future, as materiality is also based on a qualitative assessment. Here, clean energy was expected to grow to equal the revenues of generators and reduce the Company's dependence upon weather events to spur growth (¶¶25-27, 31); clean energy was projected to account for $500 million of revenue (roughly 12% of total sales) in 2022 before the loss of Pink Energy (¶¶160, 178-179); and Defendants repeatedly emphasized and separately reported solar results (¶¶197, 199-200, 214). Even Defendants admitted that Pink Energy represented "the loss of a major customer" that "negatively impacted" solar and "hurts us definitely in the year," and that "diversification of our customer base" was something "we should have been doing all along." ¶¶178-181. In addition, the AC adds financial literature explaining that customer concentration increases investment risk and diversification is important to investors. ¶¶112-113. At this stage, the allegations are sufficient to establish materiality. *See, e.g.*, *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *8 (N.D. Ill. Feb. 10, 2023) (holding materiality is a fact intensive issue that is "'rarely appropriate at the summary judgment stage, let alone on a motion to dismiss'"). The motion should be denied.

## II. THE AC ALLEGATIONS

The AC addresses the issues raised by the Order and sufficiently *pleads* securities fraud.

### A. Defendants Concealed that Close Rates Declined

Close rates are a critical metric that allow Defendants and investors to assess whether increased consultations and dealer orders are resulting in actual end-customer contracts, rather than increased dealer inventory. ¶¶46-52. After close rates were disclosed as increasing with the other metrics for years, they declined and dealer inventories reached "double" healthy levels during the Class Period, which led to orders declining. *See* ¶¶54-59, 177, 184. Yet, Defendants kept touting the interrelated positive metrics as increasing while concealing the declining close rates. ¶¶61-68. That was misleading.

#### 1. Defendants' Close Monitoring and Reporting of Close Rates

Defendants have closely monitored close rates since at least 2012 and continued to do so through 2023. *See* ¶¶47-50 (Defendant Jagdfeld stating Generac received "specific close rates" on a "dealer by dealer" basis and that in 2017, "improving close rates" was "a really big focus area" and "we've adjusted some of our programs this year to reflect the importance of close rate in the rankings of residential dealers"). In November 2023, Defendant Jagdfeld reiterated that HSB "is the channel that we can measure close rates" with "really good visibility . . . by dealer, by product, by region." ¶49. Defendant Jagdfeld has stressed the importance of close rates to Generac's financial health, stating that "if we could just see even a slight improvement in close rates, it's a material impact." ¶50. He emphasized that an improvement in close rates would "have a nice impact on overall home stand-by demand," adding "that's really the game for us, and our focus is that end of the market." *Id.*

Defendants also historically disclosed improvements in close rates to investors and analysts. ¶¶51-52 (citing disclosures back to October 2013). For example, on May 4, 2016, Defendant Jagdfeld reported that generator "close rate has actually improved a bit," which provided management confidence "around our guidance here for the balance of the year." ¶51. On August 1,

2019, Defendant Jagdfeld said in addition to "in-home consultations continu[ing] to be robust in the quarter. . . . our close rates have been trending higher for the last several years and hit an all-time high in the second quarter." ¶52. Analysts took note, with Oppenheimer reporting that "[r]ecord dealer levels, close rate and lead generation trends drive standby growth." *Id.*

Again, on September 4, 2019, Defendant Jagdfeld reported close rates had "improved by 50%" since 2014 and close rates are a "really important metric[]." *Id.* He added that "improvements in close rates and reducing cost of IHCs have some really meaningful impacts on the business." *Id.* On October 31, 2019, Defendant Jagdfeld further emphasized the interrelation between consultations and close rates, stating "we look at that [the IHC numbers] and we look at our close rates and that translates really well to strong demand in the – over the next several quarters." *Id.* During the pandemic, Generac shifted to virtual consultations and, on May 15, 2020, Defendant Jagdfeld reported that close rates for "virtual home consultations were similar to in home consultations" and said "we're going to continue to watch it, obviously." *Id.* On July 30, 2020, Defendant Jagdfeld confirmed that "overall close rates have actually remained consistent with historical trends." *Id.* In short, leading up to the Class Period, Defendants assured investors that the interrelated metrics of consultations and close rates were moving in the same direction (*i.e.*, they were improving).

However, in late 2020, close rates began declining. ¶¶54-55. By July 2021, close rates had declined sharply for several quarters, reaching the Company's lowest level in more than three years. *Id.* That decline continued through Q1 2022 when close rates "bottomed out" with an overall 40% decline from their peak. ¶¶54-59, 207. Close rates remained at the drastically declined (and near bottomed-out levels) through May 2022. ¶¶54-55. While close rates increased slightly in the last months of the Class Period, they were still far short of the touted increases in 2019 and 2020 and remained around early 2018 levels. *Id.*

As dealer orders continued to increase but close rates declined, dealer inventories swelled. ¶¶57-59, 177. In essence, many of the Company's reported sales involved just moving inventory from Generac's warehouse to dealer warehouses, which was very different than shipping products to meet a continuing high volume of end-customer sales. ¶¶57-59. Defendants were aware of the increased inventories, which reached "double" healthy levels, and had been discussing them with dealers "for several quarters" prior to November 2022. ¶¶59, 177.

**2. Defendants' Materially Misleading Statements**

Rather than disclose the declining close rates or even remain silent about the three interrelated sales metrics, Defendants made a decision to continue to tout positive increases in consultations and dealer orders without revealing the negative decrease in close rates. By the time of the first alleged misleading statement on July 28, 2021, close rates had been declining for nine months (¶¶54-55), yet, Defendant Jagdfeld falsely and misleadingly stated "*these key demand metrics for home standby have continued to trend even higher . . . including home consultations increasing at a strong double-digit rate*." ¶61(b). This statement was false because close rates were a "key demand metric" and, according to Defendant Jagdfeld, "really the game for us," but close rates had, in fact, substantially declined. ¶¶47-55, 62.

Defendant Jagdfeld also made the following misleading statements: "*we've been experiencing higher incoming order rates*" (¶61(c)); and "*home consultations or sales leads for home standby generators . . . increased approximately 50%*" (¶61(a); *see also* ¶61(d) (similar)). These statements created a misleading impression that close rates were also increasing and dealer inventories were not swelling because they concealed that close rates had declined and were no longer moving in the same direction as consultations and dealer orders, as previously reported. ¶¶47-55, 62. Then, in November 2021, after close rates had declined for a year, Defendant Jagdfeld stated, "*demand has been continuing just to be off the charts*" based on "*everything from our leading*

*indicators like I[H]Cs to our lagging indicators like activations and then obviously, the incoming orders*." ¶63. That statement was false because close rates were a key demand indicator, but they had substantially declined. ¶¶47-55, 64.

After close rates had declined to their lowest levels ("bottomed" out to a 40% drop) in early 2022 (¶¶54-55, 207), Defendants made the following false and misleading statements in May 2022:

- Defendant Jagdfeld said "*home consultations during the first quarter were nearly 3x higher than the levels seen*" in the prior year "*reinforcing our view that demand . . . has once again achieved and held a new and higher baseline level*." ¶67(a).

- Defendant Jagdfeld responded to a question about "how elastic demand is for standby" generators with respect to pricing by stating, "*we're able to look at the close rates that we're seeing,* and . . . *we're not seeing any significant impact on pricing*." ¶67(b).

- When asked whether "home consultations being 3x above 2020 level" should be thought about as "the 'normalized' baseline level," Defendant Jagdfeld responded, "*you'd have to take into consideration where our close rate is at. That's a part of that equation*." ¶67(e).

- Defendant Ragen said "*there's buyers for those units that are in the field [i.e., dealer inventory]*." ¶67(d).

- Defendant Jagdfeld added that "*[b]ased on the IHC volume, we think the demand is there to support what we're seeing in the field in terms of inventory*." ¶67(d).

- When directly asked if dealer inventories were high, Defendant Jagdfeld misleadingly claimed they were only "*a little at the high end of where they've been historically*" and then, rather than acknowledge declining close rates, falsely blamed seasonality from "*coming out of the winter season*." ¶67(c).

Again, these statements continued to misrepresent the sales metrics as universally positive. *See also* ¶¶65(a)-(c) (alleging similar statements in February 2022 as close rates had bottomed out). While consultations were 300% to 400% higher, Generac was converting far less of those consultations to end-customer sales as the close rates, which Defendants admitted "have to [be] take[n] into consideration" with the other metrics (¶67(e)), had declined 40% and were below pre-pandemic levels. ¶¶54-55. Similarly, it was not true that there were "buyers" for the generators sitting in dealer inventories because Defendants knew close rates had declined and had been

discussing the inflated inventories with dealers for "several quarters" before November 2022. ¶¶177, 203-207. As such, the order increases did not have correlating end-customer sales, causing inflated field inventories that were not just "a little high" from seasonality but were "double" healthy levels from declined end customer orders. *See id.*

### 3. Defendants' Admissions and Investor Reaction

It is clear that these statements misled investors into believing the trio of metrics had increased significantly, resulting in correlating end-market sales, because even though Defendants stopped reporting close rates, in February 2022, Oppenheimer stated that the Company's "[r]ecord dealer levels, close rate and lead generation trends [*i.e.*, consultations]" drove generator growth. ¶69. Similarly, J.P. Morgan reported after the misleading July 2021 statements that "end-customer [HSB] demand remains at record levels," even though the specific metric to track "end-customer" demand, close rates, had declined. *Id.* Similarly, after the May 2022 misleading statements, William Blair reported that, in order to gauge the impact of price increases on sales, "[m]anagement examines close rates" and reported "to date, there has been no significant impact," even though close rates had declined 40% and bottomed out. *Id.*

The truth started to leak out in a series of disclosures from November 2021 through June 2022, as the risks of the declining close rates partially materialized in negative Company results and analysts began reporting on dealer "checks" and other information indicating fewer end-customer contracts. *See* ¶¶138-149. Then, in August 2022, Defendant Jagdfeld further implied that close rates had declined by saying "close rates on our sales leads have begun to improve" and they were "seeing improved close rates off of IHCs." ¶153. In September 2022, the consequences of declining close rates, including inflated dealer inventories, continued to leak, with Bank of America reporting that "Dealers admit to significant pre-orders in 2021." ¶162. On October 6, 2022, Bank of America further reported on how declining close rates materialized in the sales chain, reporting on sales

"erosion from backlog cancellations," "growing concerns on order cancellation," and that there was "[s]tepping down underlying demand" for generators. ¶¶57, 166.

Then, later, in October 2022, Defendant Jagdfeld disclosed disappointing generator sales which he attributed to "'higher field inventory levels and lower home standby generator orders.'" ¶169. Cowen confirmed investors had been unaware of the declining close rates and increased dealer inventories, stating "[w]e didn't appreciate the magnitude of the inventory build" for generators, and J.P. Morgan cut its stock price target by more than 50% due to "elevated channel inventory," among other reasons. ¶172.

Finally, in November 2022, Defendant Jagdfeld belatedly admitted to knowing of the issue before its disclosure, stating, "we could see field inventory building" and "had been talking to our channel partners for several quarters about this coming," adding that dealers "physically started to run out of room" as "field inventory levels are about double where they should be." ¶177. He added that Generac had been trying to reduce order lead times "because we knew that, that was having a negative impact on close rates." *Id.*

### B. Defendants Concealed the Widespread Solar Defect

Despite Generac working on three attempted nationwide fixes for the widespread solar product failures (¶¶86, 89, 93, 100), Defendants concealed the problem from investors (¶¶97-109).

#### 1. The Defect Was Widespread, Affecting 50% of Products

Generac began selling solar products in 2019. ¶¶28, 114-116. The products contained a SnapRS device that suffered from a defect that caused it to repeatedly toggle on and off, resulting in overheating and melting. ¶77. These "product challenges [had] ensued shortly after launch" in 2019. ¶81. By early 2021, Generac's largest solar dealer (Pink Energy) noticed that the "SnapRS devices began to fail *en masse*." ¶79. Pink Energy informed Generac of melted SnapRS devices and provided photographs. ¶¶78-79. Pink Energy began to replace "tens of thousands of these units

while Generac developed a firmware update that was supposed to be a permanent fix." ¶79. By summer 2021, "other solar installers using these same Generac products were [also] experiencing high rates of failure . . . and were noticing signs of heat deformation in the SnapRS units." ¶80.

Generac told Pink Energy it would have a fix by August 2021. ¶86. That month, the defect caused two residential house fires. ¶¶83-86. In emails and calls the same month, members of Generac's senior leadership, including the Vice President of Engineering and a regional Director of Sales, acknowledged that Generac was aware of the fires and that SnapRS units were overheating and "bulging" or "bubbl[ing] out" as a result of turning on and off repeatedly instead of correctly staying in the on or off position. ¶¶83-87. While there were only two fires, the defect, and resulting loss of power and customer complaints, were widespread. *E.g.*, ¶¶80-84, 96. In fact, rather than instructing Pink Energy to just replace the few bad units with new devices, Generac's executives told Pink Energy they had already been working on and testing a fix. ¶¶84-87. The "fix" was a firmware update that would turn overactive units off, but this "fix" did not work and there was a drastic spike in customer complaints due to reduced energy production. ¶¶91-92.

Generac started working on a complete replacement of the device, an updated SnapRS, which it developed in late 2021. ¶93. On November 23, 2021, Generac submitted a report notifying the CPSC of a "potential defect" in SnapRS 801 devices. ¶88. Notably, such a report was only required when a manufacturer "obtains information which reasonably supports the conclusion that [its] product contains a defect which could create a substantial product hazard." 15 U.S.C. §2064(b)(3).

In December 2021, Generac agreed to provide full indemnification for the defect to Pink Energy, which applied retroactively. ¶95. Following the failed fix in late 2021, Pink Energy customer complaints increased by approximately 3,650%, from 800 per month to as high as 30,000 per month. ¶96. By in or around April 2022, Generac had developed the SnapRS 802 device (a third attempted fix) and initiated the "SnapRS Replacement Program," which has (so far) resulted in

the replacement of over half a million SnapRS 801 and 801A devices in the field. ¶100. In June 2022, Defendant Jagdfeld said the firmware update was never intended as a complete fix but only a way to avoid fires until a new SnapRS device could be made (¶92 n.24) and Generac admitted to Pink Energy there was a nearly 50% failure rate (¶96).

**2. Defendants' Materially Misleading Statements**

While Generac acknowledged the SnapRS defect and substantial risks to Pink Energy and the CPSC, Defendants concealed the defect and attendant risks from investors by making the same, unchanged, boilerplate warnings in its SEC filings. In February 2022, Defendants Jagdfeld and Ragen signed the 2021 Form 10-K that only identified potential risks that "*our existing products, may have technical failures*" and "*may not be well accepted by our customers*" and of the potential "*increase in product and other liability claims or recalls*," adding that "*[s]hould one or more of these risks or uncertainties materialize*" it "*could affect our actual financial results*." ¶98(a)-(c); *see also* ¶¶104, 106 (similar alleged misleading statements in May and August 2022). Notably, those warnings were substantially the same as in 2019 and were not updated. ¶98(a)-(c). And, at the same time, Generac's website assured that the SnapRS was "*SAFE*" and "*rapid shutdown compliant*" even though it was not. ¶¶108-109.

In April 2022, Defendant Jagdfeld issued a report stating, "*Generac maintains a robust product safety function that is involved in all aspects of product design and production*" in an effort "*to ensure that our products meet all applicable . . . safety standards, including those issued by the Consumer Product Safety Commission*," and "*[w]e also regularly perform . . . testing to maximize the quality and value of our products*." ¶101. These statements contributed to the false impression that Generac's solar products were safe and rapid shutdown compliant even though the Company was aware of the widespread defect and had reported it to the CPSC.

### C. Defendants Concealed Solar Customer Concentration

Over half of Generac's solar sales were concentrated in just one dealer, Pink Energy, which accounted for more sales than all other roughly 2,800 reported solar dealers combined. ¶¶119, 186. Yet, Defendants never disclosed this concentration risk during the Class Period. ¶¶120-134.

#### 1. The Solar Product Business Was Critical to Generac's Value

Unlike Generac's HSB business, Generac's expansion into solar provided a revenue stream not dependent upon bad weather. ¶¶25-28, 31. Solar was critical to analysts and investors as it represented the future, not the past, and was expected to grow to "be as large as HSB." ¶¶31, 110, 135. Because it was so important, Defendants repeatedly reported on, and analysts asked about, solar sales during the Class Period. ¶¶31, 43, 71-72, 124, 130, 197, 199-201.

#### 2. Customer Concentration Is Material to Investors

The AC adds allegations that it is a well-understood investment concept that concentration increases, and diversification reduces, investment risk. ¶¶112-113. Investing a retirement account in a single stock is much riskier than holding a diversified group of stocks. ¶112. Similarly, it is riskier to invest in a business whose sales are concentrated in one or few customers because the loss of that customer (or customers) could be catastrophic. ¶¶112-113, 120. Defendants knew diversification was important to investors, specifically reporting in SEC filings that no dealer accounted for more than 6% of total sales. ¶113. In addition, Defendants reported having approximately 7,000 generator dealers and 2,000 solar dealers, and repeatedly emphasized dealer growth. ¶¶122-133. Indeed, Defendant Ragen told analysts that Generac needed "very broad channels of distribution" for a successful entry into solar. ¶116.

#### 3. Defendants' Materially Misleading Statements

Defendants did not disclose that one customer, Pink Energy, accounted for more than 50% of solar sales. ¶¶119-121, 186-188. Instead, Defendants created a misleading impression that solar

sales were diversified by touting that: (1) "*no single customer provid[ed] more than 6% of [total] sales in 2021*" (¶129(a)); (2) Generac was mitigating risk through "*expanded distribution*" (¶¶123(b), 125, 127, 129(b), 131, 133); and (3) total solar dealers exceeded 2,000, supporting growth (¶¶122, 124, 126, 128, 130, 132). For example, Defendant Jagdfeld stated that Generac had "*success further building out our [solar] installer network as we've trained and certified approximately 2,000 dealers*" (¶122); Defendant Jagdfeld claimed that "*[s]upporting [the solar business's] rapid growth [wa]s the continued build-out of our installer network as we ended the first quarter with more than 2,600 trained and certified dealers*" (¶130(a)); and Defendant Ragen emphasized that "*[s]hipments of PWRcell energy storage systems also grew at a significant rate . . . as we expand our distribution network for our Clean Energy solutions*" (¶130(b)).[2]

**4. Admissions and Investor Reaction to the Solar Disclosures**

Investors began to learn about the widespread SnapRS defect and undisclosed solar sales concentration, and Generac's stock price declined, through a series of disclosures, including that the SnapRS defect caused Pink Energy to go bankrupt and Generac's solar sales and guidance crashed from the materialization of this risk. *See* ¶¶150-152, 161-165, 168-170, 178-188. Losing 1 out of 2,800 dealers should not have mattered, but losing Pink Energy contributed to Generac reducing its solar guidance by 53% (from an estimated $350 million to $165 million). ¶¶178-181, 186-188.

In August 2022, Pink Energy filed its lawsuit against Generac, alleging harm from the SnapRS defect. ¶¶150-151. On September 22, 2022, media reported that Pink Energy was shutting down from the financial difficulties caused by the SnapRS defect. ¶164. On October 19, 2022, Generac issued a release reporting a 56% decline in net income, a $37 million warranty charge

[2] Defendants incorrectly claim these statements related to total dealers (MTD at 26), but they specifically refer to the clean energy (solar) segment, the clean energy sales platform ("PowerPlay CE [Clean Energy]"), or refer to the over 2,000 solar dealers – not the over 7,000 total dealers – and analysts understood the statements related to solar dealers. ¶¶114, 118, 122 & n.33, 128 & n.34.

related to defective SnapRS units, and a 40% reduction to sales guidance and analysts thereafter commented on both the defect and loss of a "material customer" in the solar business. ¶¶168-169, 171-172. In November 2022, Defendant Jagdfeld confirmed that the loss of Pink Energy and a solar defect "warranty-related issue" had required the substantial reduction in sales guidance for the year. ¶¶176, 178-181. Defendant Jagdfeld also admitted "[t]he majority of the market [loss] is related to the loss of the customer. It was a really important customer for us." ¶181. Despite having touted the diversified customer base of 2,800 dealers, Defendant Jagdfeld conceded over-concentration and claimed that "diversification of our customer base is going to be the primary focus here going forward." *Id.* Investment banks reported that the solar defect and sales concentrations were unknown and the cause of significant stock declines. *See supra* §I; ¶¶173-174, 180, 185-188.

## III. ARGUMENT

The AC makes clear that the concealed facts existed at the time of each false and misleading statement, their omission rendered the statements made materially misleading, the totality of allegations support a strong inference of scienter, and the concealed facts caused the stock price to decline. Thus, the motion to dismiss should be denied in its entirety.

### A. The AC Cures the Issues Raised in the Order

In addition to dismissing the CC, the Court criticized its drafting as "unnecessarily long and convoluted," consisting of "throwing everything at the wall," and alleging "virtually every public disclosure Defendants made" as misleading. Order at 13-14. Such criticisms, which Defendants now rely on in moving to dismiss the AC (MTD at 5), were unwarranted. The CC did not allege "virtually every public disclosure" to be misleading, as the Company's SEC filings, conference calls, and website statements were several hundred pages long. *See* ECF 49 (defense counsel submitting more than 600 pages of materials with their prior motion to dismiss). And, alleging similar statements as false and misleading each time they were made is common and warranted, as each

supports an individual claim and they collectively determine the length of the Class Period and its members. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 524 (S.D.N.Y. 2011) (noting plaintiffs presented "fifty-seven sets of statements" to a jury). Moreover, courts hold that the more Defendants speak on a topic, the stronger the inference of scienter. *See infra* §III.C.3(a).

Securities law is complex, and the CC and AC are lengthy due to the need to provide sufficient context regarding the Company's business as well as background regarding accounting, financial, and economic matters, in addition to setting forth class certification and loss causation allegations, while also establishing the elements of falsity, materiality, and scienter.[3] In any event, the AC is shorter while also adding allegations to address the reasons for dismissal.

**B. The Complaint Alleges Materially False or Misleading Statements**

Even after the PSLRA, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"). To the extent Defendants' Motion for Consideration seeks to have any exhibit considered for its truth or to argue their interpretation of documents (*see* MFC at 2-5), it should be denied, as such exhibits can only be considered to show that, for example, certain disclosures were made. *See, e.g.*, *In re Shopko Sec. Litig.*, 2002 WL 32003318, at *2 (E.D. Wis. Nov. 5, 2002) (holding that where courts take judicial notice of SEC filings on a motion to dismiss, "they considered them only to determine what disclosures the defendants made").[4] In short,

---

3 For example, another court upheld, without criticism, the most recent complaint filed by Lead Counsel in this Circuit, which was of similar length and style as the CC. *See Chow v. Archer-Daniels-Midland Co.*, 2025 WL 790854, at *1 (N.D. Ill. Mar. 12, 2025) (upholding 129 page complaint and supplement). Much longer securities complaints have been upheld without such criticism as well. *See, e.g.*, *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) (224 page complaint); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822 (D.N.J. Apr. 28, 2017) (282 page complaint with over 200 misleading statements).

4 *See also City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *12 (N.D. Ill. Feb. 13, 2013) (rejecting request to judicially notice "the truth of that sales data" in a public filing); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (holding

"resolution of [fact] dispute[s] must wait for another day, after plaintiffs have had an opportunity to conduct discovery." *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 840 (N.D. Ind. 2018) (denying motion to dismiss and rejecting counter-narrative that undisclosed problems "did not occur until the very end of the third quarter").

**1. The Concealed Facts Were Material**

Defendants rely on the prior Order to argue that the solar defect and sales concentration were immaterial to investing in Generac. MTD at 20-21; *see also* Order at 30 (holding the "failure to disclose that one solar energy dealer accounted for a significant portion of their moderate solar energy-related sales is simply immaterial" and the "most reasonable inference that can be made . . . is that Defendants failed to disclose their concentration of solar sales through Pink Energy because it was of little consequence"); *see also id.* at 26 (stating there was no "material falsity with respect to the SnapRS defect"). However, each of the concealed facts were material to investors.

**a. Legal Standards for Materiality**

For securities claims based on misleading omissions, the question is whether there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic*, 485 U.S. at 231-32. Since it is fact intensive, "'a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss.'" *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 814-15 (N.D. Ill. 2017) (quoting *Marks v. CDW Comput. Ctrs, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (reversing dismissal)).

---

"[i]t is improper to judicially notice a transcript when the substance of the transcript 'is subject to varying interpretations, and there is a reasonable dispute as to what the [transcript] establishes'") (alteration in original)).

#### b. The Stock Drop Supports Materiality

Courts repeatedly find the "fact that the price of the stock plummeted shortly after disclosure demonstrates" the concealed information was material to investors. *In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009). Here, as a series of disclosures revealed the concealed facts (declining close rates, massive solar defects, and customer concentration) and the materialization of the associated risks (dealer generator inventories reaching "double" healthy levels, Pink Energy's bankruptcy, increased solar liabilities and reputational damage, and a substantial decrease in financial results and guidance), Generac's stock declined. ¶¶137-189. Thus, "[t]he market's negative reaction further tends to show that defendants' alleged misstatements were material." *See Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6, *12 (N.D. Ill. Oct. 30, 2012) (denying motion to dismiss).[5] In holding no reasonable investor could care about the solar defect and sales concentration because total solar sales were too small, the Court drew an unsupported inference in Defendants' favor that the stock declined because the "pandemic waned." Order at 30-31. But, no reasonable investor expected the pandemic to last forever (*see* Order at 19), so that was baked into the stock price (*see supra* §I). Thus, the stock drops support materiality.

#### c. The Investment Banks Confirm Materiality

Rather than the pandemic waning, the very banks responsible for reporting on such matters attributed the decline to the concealed facts. *See, e.g.*, ¶¶158, 160, 171-174, 184-188. Those banks were in the business of attending Generac's earnings calls (*e.g.*, ¶¶63, 67(b)-(c), 67(e)), participating in Generac's "Investor Day" events (*see* ¶52), reviewing the Company's public statements (*see, e.g.*, ¶¶110, 135), tracking solar and generator sales (*e.g.*, ¶¶61, 67, 69, 110, 135), and making investment

---

5 *See also E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 936-37 (9th Cir. 2023) (finding materiality supported where "[i]nvestors' and analysts' surprise was reflected in the precipitous [stock price] fall"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (stating as a result of 9% stock drop, "the materiality of the alleged misrepresentations [were] self-evident when we look at the market's negative reaction").

recommendations with respect to Generac (*e.g.,* ¶¶110, 171-172). Those banks concluded that the disclosure of the concealed facts were a surprise, were important to investors, and reduced their valuations of Generac's stock. *See supra* §§I, II.A.3, II.C.4; *infra* §III.B.2(c). The analyst conclusions should be credited at this stage. *See SEC v. Ustian*, 229 F. Supp. 3d 739, 761 (N.D. Ill. 2017) (stating "[c]ourts routinely consider analyst reports during motions to dismiss securities fraud claims to resolve questions about the materiality of the alleged misrepresentations and omissions").[6]

**d. Defendants Admitted Materiality**

In addition to the stock drop and analyst statements, Defendants admitted that generator close rates and the solar business, including the defects and customer concentration, were important business matters. *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 8, 9 (1st Cir. 2021) (holding that misstatements regarding the company's new product were material because "we need only take CFO Folger's word for it" where the CFO stated that the product "'is a really important product for us'") (emphasis omitted).

Defendant Jagdfeld admitted close rates are a "really important metric[]" that have "really meaningful impacts on the business." ¶52; *see also* ¶¶47-51. Defendants likewise touted dealer diversification, and the safety and quality, of its solar products in public statements. ¶¶75-76, 101, 108, 116-118, 122-133, 200. When Pink Energy closed, Defendant Jagdfeld admitted that "[t]he majority of the market [loss] is related to the loss of the customer," as Pink Energy "was a really important customer for us." ¶181. Similarly, Defendant Ragen admitted that Pink Energy represented "the loss of a major customer" (¶178), with Defendant Jagdfeld adding that the loss of Pink Energy had "negatively impacted" solar (¶179). Defendant Jagdfeld further admitted that the

---

6 *See also NVIDIA Corp.*, 81 F.4th at 936-937 (finding that "sophisticated professional analysts were surprised" by the disclosure supported materiality); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (reversing dismissal and finding that concealed fact was material where its disclosure resulted in a "sharp criticism from industry analysts").

"diversification of our customer base is going to be the primary focus here going forward," which was something "we should have been doing all along." ¶¶180-181.

#### e. The Solar Sales Were Material to Generac's Business

The AC adds allegations regarding the importance of sales diversification to investors as concentration increases investment risk. ¶¶112-113. In addition to the host of allegations addressed above, the following allegations further establish the materiality of the concealed solar facts.

As to qualitative materiality, the fact that Defendants separately and routinely discussed solar results (*e.g.*, ¶¶43, 71-72, 130(a)-(b), 199-200), and analysts asked about, and reported on, Generac building the diversified dealer network (*e.g.*, ¶¶117-118, 135-136), also shows those were important to investors. *See, e.g.*, *Kraft Heinz*, 2021 WL 3566602, at *10 (holding statements that were "in response to questions from analysts" were material); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods*, *Inc.*, 2018 WL 844420, at *2-*3 (N.D. Ill. Feb. 12, 2018) (holding statements that merger integration was doing "'good'" and "'great,'" and the team was doing "an 'incredible job'" were material because analysts reported on the statements and integration was significant to investors). In addition, the solar business was eventually expected to equal generator sales. *See* ¶31; *Carbonite, Inc.*, 22 F.4th at 8-9 (finding materiality because "a company certainly can consider a product important long before it contributes substantial revenue"). And, disclosure of the concealed facts and materialized risks gutted Generac's new and important business line and caused reputational harm far beyond the $180 million reduction in sales.[7]

Next, even as to quantitative materiality, to claim the clean energy business was only 4% of revenues (MTD at 20), Defendants focus on the reduced sales forecast, but the clean energy business guidance of $500 million (11%), of which $350 million (7.6%) was solar sales, exceeded 5% of total

---

[7] For example, ¶¶169, 170, 174, 179-180, 185, and 188 of the AC describe the negative financial impact caused by the loss of a "major customer" (Pink Energy) and the SnapRS defect, which hurt the solar business as well as "the company's reputation in the solar industry."

sales. ¶¶121, 160, 178 & n.36, 180. Courts look to the impact on the segment, not just total sales, and here, the solar guidance reduction was more than 50%, far above any 5% threshold. *See, e.g.*, *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (finding concealed investment that represented 9% of an important segment (but less than 5% of company) because "[e]ven where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality"). Moreover, "[d]efining materiality using some rigid percentage-based computation, especially one where the denominator is picked by defendants, would both permit Courts and defendants to move the goal posts and 'effectively sanction misstatements . . . so long as the net effect' was just below that threshold." *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *2 (S.D.N.Y. June 6, 2022).[8]

### 2. Defendants' Misleading Half-Truths Are Actionable

Defendants rely on the Order to argue the AC "advance[s] a case based entirely on alleged 'half-truths'" and "do[es] not allege any false statements of objective fact[s]." MTD at 1; Order at 12. First, that is not accurate as, for example, the statement that "*these key demand metrics for home standby have continued to trend even higher . . . including home consultations increasing at a strong double-digit rate*" (¶61(b)), was false because close rates were a key demand metric that trended lower but it was also misleading for omitting that fact. *See also supra* §II.A.2 (explaining statement in ¶63 was false for similar reasons). Also, the statements that the SnapRS was "*SAFE*" and "*rapid shutdown compliant*" (¶108) were false because they were melting and unsafe, but also misleading for omitting the widespread defect, massive customer complaints, steps to replace all units, and

---

8 *See also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) (reversing dismissal and finding omission concerning 2% of inventory material); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (denying motion to dismiss where fraud resulted in a 2.7% decrease in profits because "materiality is generally a mixed question of law and fact and is rarely a basis for dismissal on the pleadings").

increased warranty and replacement liabilities. ¶¶97-109. At this stage, inferences regarding the interpretation of statements are drawn in Plaintiffs' favor. *See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 879-80 (N.D. Ill. 2011) (holding "rollout [wa]s going very well" was actionable because "[w]hile the precise meaning of portions of this statement is unclear, what is clear is that a reasonable investor could have been misled by this statement" in light of the undisclosed problems).

Second, it is irrelevant whether a statement is false or misleading because both are prohibited by the securities laws. *See, e.g.*, *id.* at 879 (holding that statement was misleading even though it was not false). Misleading statements are treated no lesser than false statements because "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation." *Career Educ.*, 2012 WL 5363431, at *6. In fact, "[t]he telling of half-truths – that's what the securities laws don't tolerate." *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *3 (S.D.N.Y. Mar. 31, 2025); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("'[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'").

Here, by choosing to make positive statements regarding increased generator consultations and orders (¶¶60-68), the safety of its products and lack of risks (¶¶97-109), and increasing number of solar dealer-customers (¶¶122-134), Defendants were under a legal duty to tell the full truth and disclose the interrelated negative facts that close rates were declining, dealer inventories were increasing, there was a widespread solar defect and increasing customer complaints, and despite the addition of dealers, solar sales were heavily concentrated in just one dealer. *See, e.g.*, *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *3 (N.D. Ill. Feb. 27, 2018) (finding statement that defendants were not "'concerned that [a spike in an insurer's claims] was a quality issue'" was misleading because defendants failed "to mention Allstate's reduction in

underwriting standards").[9] Moreover, Defendants' puffery argument (MTD at 13, 25) is refuted by the importance Defendants and analysts placed on the statements and concealed facts (*supra* §§II.A-C, III.B.1) and by the statements themselves (¶¶61(a)-(b), 61(d), 63, 65(a)-(b), 67(a), (d), 101, 123(a), 125, 127, 129(b), 130(b), 131, 133), which focused on the specific metrics, product safety, lack of actual versus theoretical risks, and increased solar dealer network, rather than just vague hope or optimism. *See* ECF 52 at 26-27 (citing cases); *see also infra* §§III.B.2.a-c.

**a. The Generator Sales Metrics Statements**

Defendants misconstrue Plaintiffs' allegations to argue that concealing the decline in close rates did not mislead investors as to the "lead times" or the amount of historical generator sales. MTD at 11-12. Rather, it misled investors into believing that the increased consultations with end-customers and sales to dealers were being matched by correlating end-customer contracts (*i.e.*, increased close rates), when in fact generators were piling up in dealer inventories. ¶¶61-68. Defendants cannot escape their admission that consultations can only be understood in connection with close rates (¶¶51-52, 67(e)) or the fact that analysts were misled into reporting that close rates were improving (*see* ¶69). Their statements were a classic example of misleading half-truths. *See, e.g., Estée Lauder*, 2025 WL 965686, at *3 (finding statements were misleading where company "touted the reasons for its success while leaving out the parts of the truth it found inconvenient").

---

[9] *See also Kelsey v. Allin*, 2016 WL 825236, at *4 (N. D. Ill. Mar. 2, 2016) (holding that when defendants "elected" to provide positive information about an executive's background they had a duty to disclose the "lone 'negative' in [h]is background" and failure to do so "suggests an intent to deceive"); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (holding "'we hold the rights to the next three soccer World Cup's'" was misleading because "[e]ven if Televisa was not otherwise obligated to disclose that it or its subsidiary participated in bribing FIFA officials, speaking about the issue imposed a duty to do so").

Next, Defendants argue the statements only concealed an alleged decline in demand, which the Court held could not be measured. MTD at 12-13.[10] But close rates indisputably can be (and were) measured, and they had declined. ¶¶54-55. Moreover, the AC makes clear that the decline in close rates was not uncovered from an "after-the-fact retrospective of close rates" as the Court previously inferred. Order at 20. Rather, given Defendants' statements before and after the Class Period about specific and daily monitoring of close rates (¶¶45-55, 202-208), the plausible inference, which must be drawn in Plaintiffs' favor at this stage, is that they also monitored close rates during the Class Period. *See, e.g.*, *Tellabs III*, 513 F.3d at 705. That fraud is belatedly disclosed does not mean the concealed facts were only uncovered at that time because "fraud is almost always detected after the fact" and is "typically based on evidence developed subsequent to the allegedly fraudulent statements." *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *1, *4 (N.D. Ill. Sept. 7, 2021) (denying motion to dismiss); *Allstate*, 2018 WL 1071442, at *6 (holding the "court disagrees" with "'fraud by hindsight'" argument because defendant's admissions "does not merely indicate" his statements "were incorrect in retrospect; it suggests that they were incorrect when made").[11]

**b. The Solar Risk and Safety Statements**

Courts recognize that for public companies "to warn that the untoward may occur when the event is contingent is prudent" but "to caution that it is only possible for the unfavorable events to

[10] *Cf. Okla. Firefighters Pension & Ret. Sys. vs. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 33 (S.D.N.Y. 2019) (finding "demand" statements misleading because "a reasonable investor would likely have found it significant that . . . revenues were driven by inflated channel inventory and not increased end-user demand").

[11] Defendants raise a host of improper fact disputes such as disclosing the decline in close rates would have masked the "challenges" the Company faced and noting that the (much lower) close rates slightly improved late in the Class Period. MTD at 11-12. Such disputes of interpretation are improper at this stage, and the suggestion that it would be misleading to disclose close rates is belied by the fact that Defendants did so before and after the Class Period. ¶¶47-52, 59, 203-205.

happen when they have already occurred is deceit." *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 371 (E.D. Pa. Sept. 8, 1997) (internal quotations omitted).

Here, Defendants' statements that the Company's products were safe and compliant while touting Generac's product safety efforts and warning only that product defects and warranty liabilities could arise, rather than disclosing the fact that such defects and liabilities had already arisen (¶¶97-109), were misleading. *See* §II.B.2.; *In re Facebook, Inc. Sec. Litig.*, 2023 WL 8365362, at *9 (9th Cir. Dec 4, 2023) (holding risk statements were "inadequa[te]" because risk was presented "as purely hypothetical when that exact risk had already transpired" such that investors would have understood the risk to be "merely conjectural"). Defendants had to warn of the solar defect that existed, not of some abstract future possibility. *See Oak St.*, 2023 WL 1928119, at *7 (stating "[c]ourts have rejected the 'argument that such general warnings effectively satisfy the duty to disclose specific'" risks). Accordingly, Defendants' "safe harbor" arguments (MTD at 25) are meritless because the statements not only included present representations of fact, but were also not accompanied by sufficient cautionary language to be subject to the safe harbor, as the risk warnings were misleading and actionable. *See* ECF 52 at 24-25 (citing cases).[12]

Again, Defendants seek dismissal by relying upon the Order, which drew another inference in their favor that the defects were not sufficiently widespread until they were disclosed. Order at 27 (stating just because "at some point, half of the SnapRS units were defective says nothing about when those devices began to malfunction in sufficient numbers to alert Defendants to the existence of a significant problem") (emphasis omitted). But to assume the 50% failure rate was the result of, for example, a 0% failure rate in earlier sold units and 100% failure rate in later sold units is

---

12 *See also In re BioVie Inc. Sec. Litig.*, 2025 WL 9647667, at *16 (D. Nev. Mar. 27, 2025) (finding risk statements actionable because the company "used hypothetical language to disclose [of] risks" that had already materialized); *In re Virtu Fin., Inc. Sec. Litig.*, 2025 WL 847824, at *20 (E.D.N.Y. Mar. 17, 2025) (holding potential warnings were misleading because they "related to a risk that had already transpired").

implausible and contrary to the AC. *See, e.g.*, *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 330-32 (D. Mass. 2002) (denying motion to dismiss where the "proof offered . . . that the product did not work at time 'x' is that, at time 'x+1,' the product did not work"). Moreover, the AC eliminated earlier statements in 2021 and added that the Company reported the defect as significant in November 2021 (¶88) and that Generac has replaced at least 500,000 defective SnapRS units (¶100 n.26). Those changes add to the existing allegations, which together further establish the defect was of sufficient magnitude at the time of the statements. *See supra* §§I, II.B.

The level of detail that will only become available through discovery is not required at the pleading stage where all reasonable inferences must be drawn in favor of Plaintiffs. *See Twitter*, 282 F. Supp. 3d at 1137 (holding allegations "g[a]ve rise to the inference" that decline existed "during the Class Period" and "[t]he fact that . . . it [was] difficult to say when *within* the Class Period the decline occurred does not defeat that inference") (emphasis in original); *Facebook*, 2023 WL 8365362, at *9 (holding the "law does not require harm to have materialized for a statement to be materially misleading" because it "could be misleading even if the magnitude of the ensuing harm was still unknown"). While the Court relied heavily upon *Gogo I* (Order at 26-27; *see also* MTD at 21-22), that case was only dismissed because allegations that Wi-Fi problems "may have" become significant "some time prior" to the corrective disclosures were insufficient. *Gogo I*, 414 F. Supp. 3d at 1174-75. However, when the complaint was amended to make clear the defect existed at the time of the alleged misleading statements, the court denied the motion to dismiss. *See Gogo II*, 2021 WL 1608342, at *6-*9. So too here, the product defect was widespread months before the alleged false and misleading statements in February through August of 2022. ¶¶97-107.

**c. The Solar Dealer Statements**

By emphasizing it was critical to have a diversified solar dealer base and assuring investors that Generac had a growing base of 2,000 to 2,800 solar dealers (¶¶116-133), Defendants had a duty

to disclose that Generac's solar sales were highly concentrated through just one dealer. *See supra* §§II.C., III.B.1-2; *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1048 (D. Minn. 2015) (holding company was required to disclose that more than 30% of sales were through single entity because such concentration "could have a material effect on [defendant company's] financial condition if that relationship was somehow compromised").

After the concentration was belatedly disclosed, analysts made clear both that customer concentration was material and that investors had been misled. *See supra* §I; ¶¶186-188 (William Blair reporting that "*it will come as a surprise to many investors* that Pink Energy likely accounted for more than half of Generac's solar/energy storage sales" and the "*realization of customer concentration* makes it clear that Generac has not been as successful as we believed at attracting distribution partners in the solar market" which "hurt management's credibility"); ¶¶172, 178-180, 187-188. Thus, these statements are actionable because they created a misleading impression that solar sales were increasingly being spread over a growing base of dealers, which reduced the risk of investing in Generac and inflated the stock price. *See In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *8 (S.D. Cal. Sep. 25, 2019) (holding statements about increased reorders were misleading for omitting to disclose "that reorder sales were concentrated in a small number of clients" because it "gave the impression of healthy and equally distributed reorder accounts"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (reversing dismissal and holding that "once defendants chose to tout the company's backlog" of work orders, "they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of").

**C. The AC Establishes a Strong Inference of Scienter**

Determining whether allegations give rise to a strong inference of scienter requires courts to "take into account plausible opposing inferences" because "[t]he inquiry is inherently comparative." *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007) ("*Tellabs II*"). A "strong

inference" is one that is "cogent and *at least as* compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

When courts find statements are not false or misleading, it necessarily follows they will not find scienter. So too here, in finding demand was immeasurable and the omitted solar defects and customer concentration facts were immaterial, the Court found investors were not misled and necessarily rejected the scienter allegations. Order at 30. However, the concealed facts were material and the totality of allegations establish that the inference of scienter is at least as compelling as the competing inference that Defendants were unaware of the declining close rates, solar product defect, and solar customer concentration. *See Archer-Daniels-Midland*, 2025 WL 790854, at *5 (denying motion to dismiss and rejecting defendants' "alternative explanations" and crediting "the inferences" of scienter that plaintiffs "ask the Court to draw").

**1. Direct Evidence Is Not Required**

Defendants overstate what is required by arguing the AC does not prove "actual knowledge" of the concealed facts. MTD at 13-14. The Court also implied direct evidence was required, such as internal documents showing exactly when and how Defendants learned of the concealed facts. *See* Order at 27 (finding the CC lacked "sufficiently specific and detailed information about when Defendants" became aware of the "pervasiveness of the [SnapRS] defect") (emphasis omitted).

But investors do not have access to internal records and a complaint need only raise a strong "inference" of scienter, not produce strong "evidence" of scienter, so circumstantial allegations are sufficient. *See In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *22-*23 (S.D. Ohio Sept. 29, 2023) (rejecting argument that scienter cannot be pled without "'confidential witnesses, [] accounts of conversations or meetings, [or] internal documents or reports'" because such details would "require[] a degree of omniscience that is unrealistic at the preliminary stages of the litigation process"); *Bond v. Clover Health Invs. Corp.*, 2022 WL 602432, at *22 (M.D. Tenn. Feb. 28, 2022)

(stating PSLRA's pleading standards "are still *pleading* standards – not evidentiary ones" and denying motion to dismiss) (emphasis in original).[13] At trial, "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence," much less at the pleading stage. *See, e.g.*, Seventh Circuit Pattern Civil Jury Instruction No. 1.12; *Archer-Daniels-Midland*, 2025 WL 790854, at *3 (holding that "although Plaintiffs do not allege direct evidence that Defendants knew the statements to the SEC about the accounting were false, the allegations of circumstantial evidence of their knowledge are strong").

### 2. This Case Is Like *Gogo II*, Not *Gogo I*

As discussed in §III.B.2(b) above, the fact that the concealed facts here existed at the time of Defendants' statements distinguishes this case from *Gogo I*, which the Court relied upon in its Order. *See* Order at 26-27. In *Gogo I*, the false statements were alleged to begin in February 2017 but the complaint only alleged the undisclosed problem (faulty Wi-Fi system) arose in "November or December 2017." 414 F. Supp. 3d at 1173. The court held the complaint could not allege falsity and scienter "without describing specific documents" or showing that "defendants were presented with any specific information" about the magnitude of the problem at the time of their statements. *Id.* at 1174, 1176. This Court reached similar conclusions. *See* Order at 27.

However, after the *Gogo* plaintiffs amended the complaint to include former employees stating the problem and attempts to fix it did exist at the time of the statements, the Court denied the motion to dismiss and found the complaint adequately alleged falsity and scienter. *Gogo II*, 2021

---

13 *See also Butala v. Owlet, Inc.*, 2024 WL 3648141, at *7 (C.D. Cal. Aug. 5, 2024) (finding scienter adequately pled and rejecting argument that the complaint "'d[id] not point to any internal company communications'" because "such allegations are not required to establish scienter"); *Oak St.*, 2023 WL 1928119, at *10 (finding scienter adequately alleged and holding internal "reports, conversations, or meetings" are not required to plead scienter); *Grubhub*, 2021 WL 4077327, at *5 (holding scienter adequately pled in complaint lacking allegations of any internal company documents or confidential witnesses).

WL 1608342, at *6-*9.[14] In doing so, the court rejected the argument that direct evidence of scienter was required, holding the "claim need not be airtight to survive a motion to dismiss." *Id.* at *6 (noting "these allegations still lack certain specifics that might make plaintiff's claim more convincing").[15] Instead, the court inferred scienter because the "12%" failure rate was "[s]uch a high failure rate among 2Ku systems in the field" that it "would have been an extremely ominous sign" and, given the "scale of the internal effort to fix the de-icing problem," the court found it "unlikely" that the "individual defendants were unaware of the magnitude of the problem," adding that it did not matter that plaintiff could not """identify the precise moment at which the culpable inference overtook the innocent one" at this early stage.'" *Id.* at *6-*9.

Here, the solar defect impacted 50% (more than 12%) of SnapRS devices in the field (¶96), Pink Energy and other dealers reported the problem to Generac (¶¶80-81), Generac executives discussed the problem and the Company's awareness (¶¶83-84, 86-87, 92), Generac indemnified Pink Energy (¶95), Generac reported the defect as a substantial problem to the CPSC (¶88), and Generac had also engaged in multiple attempts to fix the issue (¶¶86, 89, 93, 100) – which shows the defect was of sufficient magnitude before the misleading statements. *See* ¶¶209-211. Similarly, the customer concentration and negative close rates existed before, and continued throughout, the Class Period, and they had a significant impact on the Company's sales, guidance, risks, and inventory levels. *See* ¶¶31, 46-52, 119-121, 177-188. Defendants monitored the SnapRS defect, solar dealer

---

[14] Unable to provide direct evidence of scienter, the most the former employees said was that one of the individual defendants attended "weekly meetings" where the "problem was discussed." *Gogo II*, 2021 WL 1608342, at *2.

[15] *See also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (noting courts must "remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail" without discovery); *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *17 (N.D. Ill. Apr. 18, 2022) (distinguishing *Gogo I* and stating that plaintiffs are not "require[d] . . . to have knowledge of contemporaneous internal [company] documents before discovery").

concentration, and declining close rates before and during the Class Period, and they have admitted knowledge of the concealed negative information. *See* ¶¶47-52, 73-76, 114, 202-213. As such, any inference that Defendants were unaware of such significant matters is "'exceedingly unlikely,'" and scienter is adequately pled. *See Gogo II*, 2021 WL 1608342, at *6, *11 (recognizing that "given the limited information available to plaintiff concerning *Gogo*'s internal deliberations," allegations were still sufficient, finding "it is hard to imagine that [the defendants] did not know that the de-icing issue was serious enough to require a reassessment of their expectations for the company's financial performance on some level").

### 3. The Totality of Allegations Support a Strong Inference of Scienter and None Should Be Dismissed as Meaningless

The Court rejected the circumstantial allegations, stating the "CEO and CFO of a company almost always control its messaging and almost always monitor and make public disclosures about key parts of the company's business" and "it is common for executive officers to have compensation tied to performance and to make transactions in the company's stock" such that relying upon these allegations would make scienter "satisfied in virtually every securities fraud case" and render the standard "meaningless." Order at 24; *see also* MTD at 14-18, 28-29 (advancing similar arguments). But, the analysis is more nuanced than choosing between finding such allegations are either always sufficient to establish scienter or they never do. *See, e.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045 (N.D. Cal. 2016) ("While each of these allegations alone might be insufficient to plead a 'cogent and compelling' claim of scienter, taken as a whole . . . they meet the standard under the PSLRA.").

The specific combination in each case matters because the more Defendants speak on a topic, the more important the matter is to the business, the larger the concealed problem, and the more stock defendants sold, the stronger the inference of scienter. *See also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (reversing dismissal on scienter grounds and rejecting

defendants' argument that "'[t]he sum of several zeros . . . is still zero'" because the "inferential significance of any single allegation can be determined only by reference to all other allegations"). The allegations have to be considered collectively and courts must reject attempts to "pick apart Plaintiffs' allegations and point to cases finding that each type of allegation Plaintiffs include in their complaint is insufficient in isolation to establish a strong inference of scienter." *Archer-Daniels-Midland*, 2025 WL 790854, at *4.[16] The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Tellabs II*, 551 U.S. at 324. Here, the allegations support a strong inference of scienter, and Defendants' one-sentence "group pleading" argument (MTD at 14) is still meritless (*see* ECF 52 at 40).

#### a. Defendants' Direct Responsibilities, Close Monitoring, and Frequent Statements Support Scienter

While executives are not assumed to know every bad fact in a company, since Defendants in this case publicly attested that material information was made known to them (¶¶194-195), controlled the Company's messaging and frequently spoke on the matters at issue (¶¶190-193, 197-200, 214-215), and claimed to be closely monitoring such matters (¶¶202-213), it supports an inference that they knew of what they spoke. *See Career Educ.*, 2012 WL 5363431, at *10 (finding from CEO's statements "[o]ne may readily and reasonable [sic] infer from these facts that [the CEO] made it his business to look into" it). The concealed facts did not relate to some remote aspect of the

---

16 To the extent the Order holds such circumstantial allegations are "meaningless" (Order at 24), that is a departure from these and a long line of cases holding the contrary. *See Kraft Heinz*, 2021 WL 3566602, at *13 (finding "repeated references" to the matter contributed to scienter); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (stating scienter supported "where the defendants either knew or had access to information showing that their public statements were not accurate"); *In re Firstenergy Corp.*, 2022 WL 681320, at *22 (S.D. Ohio Mar. 7, 2022) (finding SOX certifications contributed to inference of scienter); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (finding fact that CEO was "'deeply involved'" in company's lending process supported inference he was aware of undisclosed financial troubles); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Logically, defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements about the portfolio or signing off on SEC filings.").

business outside the Defendants' responsibilities. *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757-760 (7th Cir. 2007) (affirming dismissal and finding scienter not adequately alleged against U.S. executives where the concealed issue arose in the company's Brazilian subsidiary). Rather, Defendants frequently discussed generator sales metrics, including close rates, and admitted to monitoring them daily. ¶¶48-52, 61, 63, 65, 203-206. Similarly, the Company website referenced the SnapRS as "*SAFE*" and "*rapid shutdown compliant*" the entire Class Period and Defendants signed documents that touted their safety protocols and regular monitoring. ¶¶75-76, 101, 108. As for customer concentration, Defendants reported that no customer accounted for over 6% of total sales, stated they were mitigating risk through dealer diversification, and then repeatedly mentioned their tracking of the growth of total solar dealers. ¶¶113-119, 122-133, 212; *see also, e.g., Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *5 (N.D. Ill. Sept. 1, 2020) (finding defendants' "numerous statements" on AbbVie's sales practices were "strong circumstantial evidence that [they] had detailed information regarding" the concealed practices).

An inference of scienter is supported where, as here, the concealed matters are frequently discussed and monitored by, and fall directly within the responsibilities of, Defendants. *See, e.g., Makor Issues & Rts., Ltd. V. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006) ("'One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts *or had access to information* suggesting that their public statements were materially inaccurate.'"). To speak on a topic without knowing the facts, also supports scienter. *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (stating if defendant does not have actual knowledge about the subject, "it would be at least actionably reckless to reassure the public about these matters at all").[17]

---

[17] *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *4 (N.D. Ill. Jan. 23, 2012) (holding that "a reasonable person could infer that [the CEO] and the other corporate officer defendants at least acted with deliberate recklessness" where "by virtue of their positions the

### b. The Core Operations Doctrine Supports Scienter

Scienter is also supported where the concealed matters are important since "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'" *Sears*, 291 F. Supp. 2d at 727; *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) ("While a Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue.").

Here, Defendants monitored and reported on the critical generator and solar product businesses. ¶¶196-201. Defendant Jagdfeld said the generator business was a "core business" that "pays the bills" and solar was "super critical to where we go as a company" because "it's the future." ¶¶198-199; *see also Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (finding product that was only 0.3% of sales was part of "core operations" in light of importance of product and reputational risks posed by problems). Generator and solar sales were highlighted for investors and each were the topic of frequent discussion by Defendants, and questions by analysts, during conference calls. *See* ¶¶197-199, 214-215. Similarly, Defendants routinely discussed the growth in solar dealers. *See* ¶¶200, 214.

As courts have explained, "it is strongly inferential that every officer or director . . . either had the knowledge" of such core matters "or, if not, that his failure to have such knowledge equated to reckless disregard." *Lindelow v. Hill*, 2001 WL 830956, at *8 (N.D. Ill. July 20, 2001). The competing inference that Defendants were unware and making misleading statements based off lies fed to them by others is "conceivable" but "exceedingly unlikely." *Tellabs III*, 513 F.3d at 709-711;

---

defendants had access to non-public and proprietary information concerning Baxter's operations, finances, and financial condition" and "controlled the content" of the statements); *In re Motorola Sec. Litig.*, 2004 WL 2032769, at *27 (N.D. Ill. Sept. 9, 2004) (holding defendants' "'access to information contradicting their public statements'" supports a finding that they "'knew or, more importantly, should have known that they were misrepresenting material facts'").

*Ulta Salon*, 604 F. Supp. 2d at 1197 (finding unpersuasive the competing inference that defendants "were essentially clueless as to the major problems existing within the company").

**c. The Magnitude of the Problems Supports Scienter**

The magnitude of the concealed problems also support scienter because "'[t]he more serious the error, the less believable are defendants['] protests'" that they were unaware of the truth "'and the stronger is the inference that defendants must have known about the discrepancy.'" *Grubhub*, 2021 WL 4077327, at *5. Here, close rates declined by 40%, over half of solar products were defective, over half of solar sales were concentrated in 1 of the 2,800 dealers, and the SnapRS defect and Pink Energy closure also caused massive reputational harm in their "super critical" business, all of which resulted in significant financial harm to Generac, including slashed guidance and a 43% decline ($58 million vs. $132 million) in net income. *See, e.g.*, ¶¶168-169, 178-183. Far from being too minor to warrant Defendants' attention, the concealed problems caused a drastic decline in the Company's stock value once revealed. *See, e.g.*, *supra* §§I, II.A.3, II.C.4, III.B.1; *Berson*, 527 F.3d at 987-989 (finding scienter could be inferred when the concealed facts would have a "devastating effect on the corporation's revenue" because "it would be 'absurd to suggest' that top management was unaware of them").

**d. Defendants' Admissions Support Scienter**

A defendant's post-Class Period admissions can also support a strong inference of scienter. *See Scholastic*, 252 F.3d at 73 (reversing dismissal and stating that "post-class period data may be relevant to determining what a defendant knew or should have known during the class period"). Here, Defendant Jagdfeld admitted that "we knew" there was a "negative impact on close rates," dealer inventory was "double" healthy levels and so high that dealers "physically started to run out of room," and Defendants saw "field inventory building" and had been in discussion with dealers about it "for several quarters" before it was disclosed publicly. ¶¶177, 203-208. Defendant Jagdfeld

also monitored the close rate data on a daily basis and admitted that the declining close rates "bottomed" out in early 2022, and the Company published a chart showing it had declined months before the start of the Class Period. ¶¶47-55, 207. Similarly, the solar defect was reported to the CPSC as significant by November 2021 and Defendant Jagdfeld admitted being aware of attempts at a fix. ¶¶88, 92, 201. Likewise, for dealer concentration, Defendant Jagdfeld admitted tracking solar dealer sales and that they should have focused on diversifying sales away from Pink Energy much earlier. ¶¶181, 212.

These admissions support a strong inference of scienter. *See Allstate*, 2018 WL 1071442, at *5-*6 (finding scienter where defendant "played an active role" in earnings calls and admitted that concealed negative trends had been "expected"). That Defendants disclosed the problems at the end of the Class Period does not mean that is when they first learned of them. *See In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015) (holding "'fraud-by-hindsight'" argument required "particularized analysis," which "'is not something that the Court is tasked with tackling at this stage, given the inferences owed to the Plaintiff'"). Nor can Defendants conceal material information because they hoped to fix the problem. *See, e.g., Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1196 (N.D. Ill. 1997) (finding scienter for statements that omitted problems "even if they honestly believed [the problems] would soon be rectified").

**e. Defendants' Unusual Stock Sales Support Scienter**

Motive is not required because "there is little if any significance attributable to the absence of an allegation of a personal financial motive." *See Career Educ.*, 2012 WL 5363431, at *11. But, when present, "'motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference.'" *See Hospira*, 2013 WL 566805, at *16. The Court erred in discounting the specific magnitude and timing of the specific stock sales in this case as meaningless and existing in all cases. *See* Order at 24.

There is no data to show the stock sales in this case are typical of corporate officers. *See* ¶¶217-218 & n.40. Defendant Jagdfeld sold stock as high as $500 per share, cashing in $38 million, before the stock fell to around $100 after the truth was revealed. ¶217. Defendant Ragen sold shares as high as $440, cashing in $4.4 million at the inflated prices. ¶218. Such large sales during a period when the stock is inflated and negative facts are being concealed, is not a common occurrence, but are suspicious and unusual. *See Allstate*, 2018 WL 1071442, at *2, *5 (holding that gross stock sales of $33 million and $6.2 million contributed to inference of scienter). Moreover, it is no defense at this stage that the Individual Defendants did not sell all their stock. *See In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *9-*11 (D.N.J. June 30, 2019) (rejecting argument that large sales were negated by holding of substantial number of shares due to possible alternate inferences, such as fear that selling more would cause suspicion); *see also* ECF 54 at 3 (prior briefing explaining how Defendants' exhibits undermine their arguments). That the Individual Defendants' compensation was tied to increasing the stock price, leading to compensation of more than $14 million for Defendant Jagdfeld, and nearly $4 million for Defendant Ragen, over 2021 and 2022, also supports scienter. ¶¶219-220; *see also AbbVie*, 2020 WL 5235005, at *5 (finding compensation being "tied directly to" sales supported scienter); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (finding $2 million and $800,000 bonuses supported scienter because "this court does not regard . . . these particular sums to be insignificant").

### D. Loss Causation Is Adequately Alleged

"Loss causation is a fact-based inquiry that need not be proven until the later stages of litigation." *Fryman*, 2022 WL 1136577, at *33. Because loss causation is subject to Rule 8 notice pleading, a plaintiff need only provide a "'short and plain'" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 346-47 (2005); *see also Oak St.*, 2023 WL 1928119, at *11 ("Pleading loss causation is 'not meant to impose a great burden upon a plaintiff . . . .").

The AC clears this low standard by detailing how the negative close rate information, solar product defect, and solar sales concentration were revealed in a series of partial disclosures that included the materialization of the associated risks (such as increased dealer inventories and declining generator orders, increased warranty liabilities, and decreased solar sales and guidance), all of which caused the stock to suffer declines as the information was disclosed. ¶¶138-189, 224-229. These allegations are sufficient to plead loss causation. *See, e.g.*, *Ustian*, 2009 WL 2386156, at *5-*7 (finding loss causation adequately pled where plaintiffs "identified a series of disclosures – a leakage of information – which indicated that [the company's] financial statements and accounting practices were unreliable" and "share prices fell after each instance"). That analysts linked price declines to the new Company-specific information supports loss causation. *See, e.g.*, ¶¶154-160, 171-174, 184-188; *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019). Defendants' three arguments must be rejected.

First, as to close rates, Defendants incorrectly suggest that corrective disclosures must mirror the alleged false and misleading statements and specifically reference "close rates." MTD at 18-19. There is no such requirement, and the Seventh Circuit has instead held that the existence and magnitude of concealed problems can leak out over multiple disclosures. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421-24 (7th Cir. 2015) (upholding leakage theory); *Kraft Heinz*, 2021 WL 3566602, at *16-*17 (holding "loss causation may be pled on a theory of partial disclosures" and "'without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline'").[18] Here, the AC pleads that by concealing the

[18] Even *In re Boeing Co. Aircraft Sec. Litig.*, cited by Defendants, recognized that "corrective disclosures need not be 'mirror images' of the [] false statements" and instead merely "must have something to do with the circumstances that prior false statements concealed or misrepresented."

declining close rates, Defendants misleadingly portrayed generator sales as being supported by end-customer contracts (rather than just inflating dealer inventory), the truth of which was revealed by disclosures concerning the resulting reduced dealer orders, increased cancellations, increasing dealer inventory, and declining close rates (*see* ¶¶138-189), which is sufficient to plead loss causation. *See, e.g.*, *Vivendi*, 838 F.3d at 262 (holding "[w]hether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus"). At most, Defendants essentially claim that the connection between close rates and these disclosures "will turn out to be too attenuated," but that is a question "appropriate 'at a later stage in litigation' and after 'a highly fact intensive inquiry that need not be reached at this point.'" *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 489 (N.D. Ill. 2021) (denying motion to dismiss).

Second, as to the SnapRS defect, Defendants' attempt to rely upon a footnote in *Boeing* (MTD at 29) fails. There, after the defect caused a prior disclosed plane crash, the court stated that a second plane crash was not a corrective disclosure because the company "never represented that a second crash could not occur." *Boeing*, 2022 WL 3595058, at *3-*4, *29 n.13. Here, by contrast, Defendants' statements that the SnapRS was safe and compliant, the Company had robust safety practices, and providing only hypothetical risk warnings did not previously disclose the 50% failure rate and associated increased warranties and reputational harm revealed at the end of the Class Period. *See* ¶¶164-188; *see also Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *18 (M.D. Tenn.

---

2022 WL 3595058, at *29, *29 n.13 (N.D. Ill. Aug. 23, 2022). Thus, cases involving disclosures unconnected to the concealed facts are distinguishable. *See, e.g.*, MTD at 18-19 (citing such cases, including *Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012), where the court held that a disclosure about an investigation into reinsurance contracts did not reveal the company's "general accounting" practices forming the basis of the fraud claim.

Dec. 18, 2017) (holding allegations that losses resulted when a concealed or minimized risk "came to fruition" were sufficient to plead loss causation).

Third, Defendants claim that the disclosure of the loss of Pink Energy, which accounted for more than 50% of solar sales, did not correct the misstatements regarding the growing solar dealer base. MTD at 30. However, as explained above, the dealer statements imposed a duty to disclose the dealer concentration, and analysts confirmed that the statements regarding a growing solar dealer base concealed the concentration of sales in Pink Energy. *See supra* §§I, III.B.1(c), III.B.2(c); *see also Corr. Corp.*, 2017 WL 6442145, at *18; *Vivendi*, 838 F.3d at 262.

### E. Control Person Liability Under §20(a) Is Adequately Pled

Since the Complaint adequately pleads a claim under §10(b) of the Exchange Act, it likewise pleads a control person claim under §20(a). ¶¶248-249; *cf.* MTD at 30.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

DATED: June 18, 2025

ROBBINS GELLER RUDMAN & DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
MICHAEL J. STRAMAGLIA

s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
mstramaglia@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

Lead Counsel for Plaintiffs

ADEMI LLP
GURI ADEMI
JESSE FRUCHTER
JOHN D. BLYTHIN
3620 East Layton Avenue
Cudahy, WI 53110
Telephone: 414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com
jfruchter@ademilaw.com
jblythin@ademilaw.com

ATOLLES LAW, S.C.
ANDREW T. PHILLIPS
222 E Erie Street, Suite 210
Milwaukee, Wisconsin 53202
Telephone: 414/644-0391
414/278-7590 (fax)
aphillips@attolles.com

Local Counsel

KLAUSNER, KAUFMAN, JENSEN
& LEVINSON
ROBERT D. KLAUSNER
7080 NW 4th Street
Plantation, FL 33317
Telephone: 954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com

Additional Counsel for Plaintiffs