# EXHIBIT A

2025 WL 2426714
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

RIVIAN AUTOMOTIVE, INC., et al., Defendants.

Case No.: 2:24-cv-4566-CBM-JPR

|

Filed 08/20/2025

**ORDER RE: DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS' AMENDED COMPLAINT**

CONSUELO B. MARSHALL UNITED STATES DISTRICT JUDGE

**\*1** The matter before the Court is Defendants Rivian Automatic, Inc., Robert J. Scaringe, and Clair McDonough's (collectively, "Defendants' ") Motion To Dismiss Lead Plaintiffs' Amended Complaint. (Dkt. No. 66 (the "Motion").)

### I. BACKGROUND

This is a putative securities fraud class action. On October 24, 2024, the Court granted Kamil Kirio and Nada Badr-Kirio's (collectively, "Lead Plaintiffs' ") Motion to be appointed as lead plaintiffs. (Dkt. No. 49.) Lead Plaintiffs filed a First Amended Complaint ("FAC"), the operative complaint, which asserts: (1) violations of Section 10(b) of the Securities Exchange Act (the "Act") and Rule 10b-5 against all Defendants; and (2) violations of Section 20(a) of the Act against the Individual Defendants. [1] (Dkt. No. 57.)

[1] The "Individual Defendants" are Robert J. Scaringe and Claire McDonough.

### II. LEGAL STANDARD

**A. Fed. R. Civ. P. 12(b)(6)**

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted" pursuant to Federal Rule of Civil Procedure 12(b)(6). Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 663, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action will not suffice, and labels and conclusions are insufficient to meet the plaintiff's obligation to provide the grounds of his or her entitlement to relief. *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* If a complaint cannot be cured by additional factual allegations, dismissal without leave to amend is proper. *Id.* On a motion to dismiss for failure to state a claim, the court accepts as true all well-pleaded allegations of material fact and construes them in a light most favorable to the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-32 (9th Cir. 2008). The court may only consider the allegations contained in the pleadings, exhibits attached to or referenced in the complaint, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 1

**B. Pleadings Requirements for Section 10(b) and Rule 10b-5 Claims**

At "the pleading stage, a complainant stating claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act of 1995]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) governs all claims sounding in fraud, and requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, as applied to securities claims alleging fraud, Rule 9(b) requires the false statement or omission be pled with particularity. The Private Securities Litigation Reform Act of 1995 ("PSLRA") heightened the pleading standard applicable to putative class actions alleging securities fraud on the basis of misleading statements or omissions by adding a requirement that a plaintiff plead intent to defraud, otherwise known as scienter, with particularity. 15 U.S.C. § 78u-4(b)(1) and (2); *Metzler Invest. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). With respect to falsity, in "requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061 (emphasis in original). As to scienter, "in order to state a claim for securities fraud that complies with the dictates of the PSLRA, the complaint must raise a 'strong inference' of scienter – *i.e.*, a strong inference that the defendant acted with an intent to deceive, manipulate or defraud." *Id.*; *see also Zucco Partners*, 552 F.3d at 990. Moreover, "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

## III. DISCUSSION

**A. Defendants' Request for Judicial Notice**

 **\*2** Defendants filed a request for judicial notice (Dkt. No. 66-2),[2] wherein they request that the Court take judicial notice of 24 exhibits.[3] The 24 exhibits are incorporated by reference in the FAC.[4] Therefore, Defendants' Request for Judicial Notice is denied as moot because the Court may consider the exhibits based on the incorporation by reference doctrine. *See Ritchie*, 342 F.3d at 908.

[2]     Plaintiffs did not file an opposition to Defendants' request for judicial notice.

[3]     A list of the 24 exhibits which are the subject of Defendants' request for judicial notice is set forth in Dkt. No. 66 at 4-5.

[4]     *See* FAC ¶¶ 7, 60, 120, 135, 136-37, 138-39, 140-43, 145-46, 147-48, 149-51, 152-53, 154, 155-56, 157-67, 169-70, 172-74, 176-77, 178-79, 180-84, 185-86, 188-89, 190-91, 192-93, 194-97, 198-201, 202-04, 205-06, and 207-08.

**B. Section 10(b) of the Act and Rule 10b-5 (First Cause of Action)**

The elements of a securities fraud action pursuant to Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission of fact, (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss. *See Zucco Partners*, 552 F.3d at 990; *In re Daou Sys. Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). Falsity, scienter, and loss causation must each be pled with particularity. *See Metzler*, 540 F.3d at 1061; *Oregon Pub. Employees Ret. Fund*, 774 F.3d at 605.

 **(1) Falsity**

Defendants argue Plaintiffs fail to adequately plead falsity because Plaintiffs do not allege with particularity any contemporaneous undisclosed facts or facts contradicting Defendants' statements regarding customer demand and Rivian's projected "roadmap" to positive gross margins, and there are no allegations attributed to confidential witnesses, current or

former employees, nor allegations of the contents of internal reports, metrics, or statements showing that Rivian lacked sufficient demand to increase production during the class period, that its production ramp would fail, or that the Company would not achieve its projected gross margin goal by the end of 2024. A plaintiff has the duty of explaining why the statement is false or misleading, and a "litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler*, 540 F.3d at 1061, 1071. In pleading falsity, "a plaintiff must reveal the sources of her information." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) (internal quotations and citation omitted). However, "[a] securities plaintiff is not required to have confidential witnesses as a source for the allegations in the complaint." *In re Invensense, Inc. Sec. Litig.*, 2016 WL 1182063, at *4 (N.D. Cal. Mar. 28, 2016). As to identifying internal reports or metrics, the FAC alleges Defendants' Roadmap for production was "principally based" on a "backlog of preorders (the 'Backlog'), which" Defendants "admittedly 'closely watched – along with cancellation rates and macroeconomic factors – 'daily,' " and starting in November 2022, "Defendants stopped reporting Rivian's Backlog to the public" and "never reported Rivian's cancellation rates." (FAC ¶ 5.) Therefore, the FAC identifies the Backlog regarding preorders which Defendants stopped reporting publicly.

With respect to pleading falsity, "[a]lthough plaintiffs do not need to prove at the pleading stage that [a] statement is false or misleading, pursuant to Rule 9(b) and the PSLRA, they must plead with enough particularity to make the falsity or the misleading character of the statement plausible." *In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *4 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046 (9th Cir. 2014); *see also Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1112 (C.D. Cal. 2012). Here, Plaintiffs allege each of the 32 challenged statements in the FAC [5] is materially misleading because (1) Defendants lacked a reasonable basis to assume there was sufficient demand to warrant increased production or that produced units would be sold at a profit as required to achieve gross-margin profitability in 2024; (2) preorder backlog was not a reliable indicator of demand because preorders were fully cancellable; (3) Rivian's preorder backlog included a large number of pre-March 1, 2022 preorders, which Rivian had committed to fulfilling at lower prices that would undermine profitability; (4) macroeconomic factors, including rising inflation and interest rates, were adversely affecting demand; and (5) Rivian was experiencing supply chain and production issues that presented a challenge for ramping production and achieving gross margin profits by 2024. (*See* FAC ¶¶ 5, 54, 141, 143, 163.) Accepting these allegations as true and in the light most favorable to Plaintiffs, the Court finds Plaintiffs sufficiently plead falsity to survive the motion to dismiss stage because the statements created an impression of a state of affairs that differed in a material way from what actually existed. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023); *see also Laborers Dist. Council Constr. Indus. Pension Fund v. Sea Ltd.*, 743 F. Supp. 3d 1083, 1106 (D. Ariz. 2024); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024).

5      A list of the 32 challenged statements alleged in the FAC is attached hereto as Exhibit A.

### (2) Risk-Factor Disclosures

**\*3**  Defendants contend Plaintiffs' claims based on Rivian's risk-factor disclosures (Statement ("Stmt.") [6] Nos. 9, 18, 25, and 31) fail because the issues were disclosed to the market and the FAC does not include particularized allegations showing Rivian had already experienced a material undisclosed decline in demand at the time the statements were made. Stmt. Nos. 9, 18, 25, and 31, each stated the following:

> Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures.

(*See* Stmt. No. 9, FAC ¶ 155; Stmt. No. 18, FAC ¶ 176; Stmt. No. 25, FAC ¶ 190; Stmt. No. 31, FAC ¶ 203.) Despite the risk disclosures in Stmt. Nos. 9, 18, 25 and 31, Plaintiffs plausibly allege Defendants made positive statements about increases in demand based on the preorder Backlog which was allegedly misleading to investors. (*See, e.g.*, FAC ¶¶ 52, 136, 140, 142, 145-46, 150, 164-65.) *See Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *11 (D. Ariz. Feb. 2, 2023); *Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at *5 (C.D. Cal. Dec. 2, 2021); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1148.

6      "Statement" or "Stmt." as used herein refers to a challenged statement alleged in the FAC as set forth in Exhibit A attached hereto.

### (3) Safe Harbor

Defendants also contend 23 of the 32 challenged statements (Stmt. Nos. 1, 3-4, 7-8, 10-17, 19-21, 23-24, 26-29, and 32) are not actionable because they are forward-looking statements protected under the Act's Safe Harbor provision and the "bespeaks-caution doctrine."

The Safe Harbor provision of the Act provides:

[A] person ... shall not be liable with respect to any *forward-looking statement*, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) *identified as a forward-looking statement, and is accompanied by meaningful cautionary statements* identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made *with actual knowledge by that person* that the statement was false or misleading; or

(ii) if made by a business entity;[,] was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1) (emphasis added). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer– Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5(i)). "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d at 1112. If, however, a forward-looking statement is not identified as such or is unaccompanied by meaningful cautionary statements, then the statement is actionable only if the plaintiff proves that the forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). To the extent that any of the statements at issue in the instant case contain both forward-looking and non-forward-looking statements, the Court examines them "as a whole" to determine whether they relate "to future expectations and performance." *Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014). Moreover, the PSLRA's Safe Harbor provision also protects forward-looking statements that were not made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c).

Case 2:22-cv-01436-BHL    Filed 08/26/25    Page 5 of 15    Document 83-1

**\*4** Defendants contend Stmt. Nos. 1, 3-4, 7-8, 10-17, 19-21, 23-24, 26-29, and 32 are forward-looking statements protected under the Safe Harbor because they are statements regarding future production goals and profitability projections. However, Stmt. Nos. 1, 3-4, 7-8, 10-17, 19-21, 23-24, 26-29, and 32 include non-forward-looking statements about existing/present or prior conditions/facts rather than the future. Therefore, the Safe Harbor does not apply to such statements. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1142.

Even if Stmt. Nos. 1, 3-4, 7-8, 10-17, 19-21, 23-24, 26-29, and 32 include forward-looking statements, the forward-looking statement must be accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement to be protected under the Safe Harbor. *See* 15 U.S.C. § 78u-5(c). While "blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim," "precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus" do not constitute a misrepresentation. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994). Thus, to be adequate under the cautionary-language prong of the Safe Harbor provision, the caution must "discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Here, the Court finds the general cautionary language identified by Defendants [7] is insufficient to support a determination as a matter of law at this stage that Defendants' statements were not misleading. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (June 21, 1996). [8]

[7]    *See* Motion at 14 (citing Ex. 4 at 13-14; Ex. 11 at 15-16; Ex. 12 at 10-11; Ex. 14 at 13; Ex. 16 at 21); Motion at 15 (citing Ex. 2 at 2-3, 15-17, 25-37; Ex. 5 at 2-3, 16-18, 26-39; Ex. 1 at 2-6, 12-20; Ex. 6 at 2-3, 17-19, 27-40; Ex. 7 at 2-3, 17-19, 27-40; Ex. 8 at 2-3, 17-19, 28-41; Ex. 13 at 3; Ex. 15 at 3).

[8]    *See also In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1155-56 (C.D. Cal. 2022); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 920 (N.D. Cal. 2012), *on reconsideration in part* (Jan. 10, 2013).

Defendants also argue the Company warned that its "ability to develop and manufacture vehicles on a large scale is unproven"; that "preorders for our vehicles are cancellable and fully refundable"; that it "may experience significant delays in the manufacture and delivery of ... vehicles"; that its "pricing decisions may affect our community, preorders, and demand negatively," which Defendants contend protect their statements under the bespeaks-caution doctrine. However, the FAC's allegations, accepted as true, demonstrate the alleged statements are not protected under the PSLRA's Safe Harbor provision or bespeaks-caution doctrine. (*See* FAC ¶¶ 2, 53, 54.) *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1148; *Borteanu*, 2023 WL 1472852, at \*11; *Farrar*, 2021 WL 5768479, at \*5; *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at \*4 (N.D. Cal. Sept. 4, 2012); *see also Berson*, 527 F.3d at 987.

Defendants further contend Plaintiffs fail to allege Defendants had actual knowledge that any of the forward-looking statements were false when made. However, the FAC alleges sufficient facts regarding Defendants' actual knowledge that the challenged statements were false or misleading. (*See* FAC ¶ 54, 137, 143.) [9] *See Washtenaw Cnty. Emps. Ret. Sys.*, 2012 WL 3835078, at \*4.

[9]    *See also* FAC ¶¶ 146, 151, 153, 156, 158, 160, 161, 163, 165, 167, 170, 173, 175, 177, 179, 181, 183, 186, 189, 191, 193, 195, 197, 199, 201, 204, 206.

### (4) Puffery

**\*5** Defendants also contend 16 of the 32 challenged statements (Stmts. Nos. 1, 3, 4-5, 8, 10, 13, 19, 22-23, 26-30, and 32) are non-actionable corporate puffery. "[M]ildly optimistic, subjective assessment[s]" do not "amount[ ] to a securities violation" because "[w]hen valuing corporations,[ ] investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Lit.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "A statement is 'puffing' or

'puffery' if it expresses an opinion that is 'not capable of objective verification' and if it is lacking in the specificity that 'a reasonable investor could expect the [speaker] to be pegged.' " *In re Arrowhead Pharm., Inc. Sec. Litig.*, 2017 WL 5635422, at *4 (C.D. Cal. Sept. 20, 2017) (citations omitted). [10] However, "even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Id.* (internal quotations and citations omitted).

[10]     "Examples of 'mere corporate puffery' include statements such as 'the opportunity for system placement at hospitals is still very, very large,' and that a company 'will come out stronger' and 'is in a pretty good position' despite the economic crisis.' " *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143 (citations omitted); *see also In re Arrowhead Pharm., Inc. Sec. Litig.*, 2017 WL 5635422, at *4; *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), *aff'd*, 95 F.3d 922 (9th Cir. 1996); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001).

Here, the Court finds Stmt. Nos. 1, 3, 4-5, 8, 10, 13, 19, 22-23, 26-30, and 32 are not corporate puffery because they are not vague statements of optimism. Rather, these statements address metrics such as increasing demand and increased production which the FAC alleges Defendants stated they monitored "daily" and/or are objectively verifiable. [11] *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014); *Glazer Cap. Mgmt., L.P.*, 63 F.4th at 770; *Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143-44; *cf. In re Arrowhead Pharm., Inc. Sec. Litig.*, 2017 WL 5635422, at *4.

[11]     *See, e.g.*, FAC ¶¶ 2, 5, 53, 91, 123, 182, 185.

### (5) Opinion Statements

Defendants also argue 26 of the 32 challenged statements (Stmt. Nos. 1, 3-5, 7-8, 10-17, 19-24, 26-30, and 32) are non-actionable opinions. There are three different standards for pleading falsity of opinion statements. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175 (2015)). "First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue.' " *Id.* (citing *Omnicare*, 575 U.S. at 185-86). "Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.' " *Id.* "Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.' " *Id.* (citing *Omnicare*, 575 U.S. at 194).

The parties disagree as to whether these 26 challenged statements (Stmt. Nos. 1, 3-5, 7-8, 10-17, 19-24, 26-30, and 32) are statements of opinion or statements of fact. The Court finds Stmt. Nos. 1, 3, 5, 8, 10, 12, 13, 16, 19, 20, 21, 22, 23, 24, 26, 28, and 30 are statements of fact, and are not "a statement of opinion" which "conveys only an uncertain view as to a thing." *Omnicare*, 575 U.S. at 176. Even assuming these statements are statements of opinion, Plaintiffs plead sufficient facts that these statements regarding customer demand would be misleading to an investor where Defendants omitted facts regarding the reliability of the Backlog as a basis for demand. *See Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *12 (D. Or. June 27, 2017), *report and recommendation adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017); *Weston v. DocuSign*, 669 F. Supp. 3d 849, 880-81 (N.D. Cal. 2023).

**\*6** As to the remaining challenged statements (Stmt. Nos. 4, 7, 11, 14, 15, 17, 27, 29, and 32), those statements include either mixed opinion and fact, or embedded facts about demand based on monitoring the Backlog, but omitted that the Backlog was not a reliable indicator for demand to support ramping production. Even assuming the statements regarding ramping production included opinion statements, Plaintiffs plead sufficient facts that Defendants omitted that the Backlog was not a reliable basis for "strong demand" and did not support ramping production for the duration of the Roadmap. Therefore, Plaintiffs plead sufficient facts that these statements regarding profitability from ramping up production (even if they constitute opinion statements) are

actionable. *See Omnicare*, 575 U.S. at 194; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*, 856 F.3d at 615 (citing *Omnicare*, 575 U.S. at 185-86, 188-89). [12]

[12]    *See also In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 927, 938-42 (N.D. Cal. 2022).

**(6) Scienter**

To state a claim for private securities fraud, Plaintiffs must also allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To plead scienter, a complaint must allege "particular facts in the complaint [that], taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors." *Ronconi*, 253 F.3d at 429. [13] Deliberate recklessness means that the reckless conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A] court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

[13]    *See also In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012).

Defendants argue the FAC lacks any particularized fact showing the Individual Defendants knew of information contradicting the challenged statements as required to plead scienter. Defendants contend Plaintiffs rely on conclusory allegations to plead scienter, and Plaintiffs do not identify confidential witnesses or descriptions of meetings, reports, or data reviewed by Defendants that was inconsistent with the Company's projections or statements regarding its demand, and Plaintiffs do not allege any Defendant engaged in insider trading. However, "[a] securities plaintiff is not required to have confidential witnesses as a source for the allegations in the complaint." *In re Invensense, Inc. Sec. Litig.*, 2016 WL 1182063, at \*4. Furthermore, courts have rejected a defendant's contention that a plaintiff must identify specific sales reports or documents to sufficiently plead scienter where the defendants allegedly had access to and review of such data. *See Stadium Cap. LLC*, 2024 WL 456745, at \*6; *San Antonio Fire & Police Pension Fund*, 732 F. Supp. 3d at 320.

Here, the FAC identifies the Backlog as the metric which Defendants stated they reviewed "daily," and which is the data Plaintiffs contend Defendants materially misrepresented to investors. (*See* FAC ¶¶ 2, 5, 53, 91, 123, 182.) The FAC alleges Defendant Scaringe stated he watched the Backlog metric "daily." (*Id.* ¶¶ 123, 182, 215.) Moreover, the FAC alleges Defendant McDonough stated: "[W]e compare current daily order rates relative to what we saw maybe a year ago." (*Id.* ¶ 185.) Therefore, the FAC sufficiently pleads scienter. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1145 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*, 856 F.3d at 620); *Weston*, 669 F. Supp. 3d at 884; *see also In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at \*19 (W.D. Wash. Apr. 19, 2019).

**\*7** Moreover, the FAC also alleges "Rivian had numerous suspiciously timed resignations." (FAC ¶¶ 222-26.) The timing of multiple high-level executives' resignations between and after Defendants' disclosures and who were familiar with production and demand (*see id.* ¶¶ 222-25) constitutes additional support for an inference of scienter. *See In re Fibrogen, Inc.*, 2022 WL 2793032, at \*25 (N.D. Cal. July 15, 2022); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 4859099, at \*5 (N.D. Cal. Oct. 2, 2019); *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at \*8 (C.D. Cal. Sept. 6, 2017).

The FAC also alleges Defendants were "motivated to commit fraud" to "ensure the success of Rivian's two suspiciously timed Class Period bond offerings." (FAC ¶¶ 227-31.) The FAC's allegations that Rivian's "free cash flow" was "around negative $1.5 billion per quarter" at the time of the bond offerings, and allegations that "the Company was still racing against time to slow its bleeding of cash and finally generate a profit" at the time of the bond offerings, accepted as true, show the Company's strained financial situation and Defendants' motive, which further support an inference of scienter. (*See id.* ¶¶ 78, 79, 109, 110, 111.) *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 n.8 (9th Cir. 2000); *Abdo v. Fitzsimmons*, 2021 WL 616324, at \*13 (N.D.

Cal. Feb. 17, 2021); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at \*8 (C.D. Cal. Oct. 20, 2011); *see also In re Ibis Tech. Secs. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006).

The FAC also alleges the Individual Defendants' "compensation was heavily dependent on" the "value of Rivian stock" (FAC ¶ 235), Defendant Scaringe's $13.99 million compensation in 2023 was 5% salary and 95% stock and options (*id.* ¶ 235), and McDonough's $4.86 million in compensation in 2023 was 10% salary and 90% stock and options (*id.*). Such allegations that the Individual Defendants' compensation based on stock and options far exceeded their compensation based on salary establishes a strong correlation between the Company's financial performance and the Individual Defendants' compensation, and provides additional support raising an inference of scienter. *See Tellabs*, 551 U.S. at 325; *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at \*19 (C.D. Cal. Oct. 1, 2013).

Accordingly, the Court finds Plaintiffs plead sufficient facts to raise a strong inference of scienter.

## C. Section 20(a) of the Act (Second Cause of Action)

Plaintiffs' second cause of action is asserted against Individual Defendants Scaringe and McDonough for violation of Section 20(a) of the Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly Induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Defendants argue because Plaintiffs fail to allege a predicate violation under Section 10(b) here, Plaintiffs' Section 20(a) claim also fails. Because Plaintiffs plead sufficient facts to state a claim under Section 10(b), Plaintiffs state a claim under Section 20(a).

## IV. CONCLUSION

 **\*8** Accordingly, the Court **DENIES** Defendants' Motion to Dismiss the FAC.

**IT IS SO ORDERED.**

## EXHIBIT A

**STMT.NO.** 1. 2. 3. 4. 5. 6. 7. 8. 9. 10. 11. 12. 13. 14. 15. 16. 17. 18. 19. 20. 21. 22. 23. 24. 25. 26. 27. 28. 29. 30. 31. 32. **ALLEGED MISLEADING STATEMENT / OMISSION** "We remain focused on fully ramping our 150,000 installed annual units of capacity in Normal, Illinois to meet the strong demand for our products. Our net consumer preorder backlog as of June 30, 2022 was approximately 98,000 and momentum continues to increase." (FAC ¶ 136) "We may not be able to accurately estimate the supply and demand for our vehicles, which could result in a variety of inefficiencies in our business and hinder our ability to generate revenue and profits. If we fail to accurately predict our manufacturing requirements, we could incur additional costs or experience delays." (FAC ¶ 138) "The Rivian team delivered strong second quarter results despite the challenging supply chain environment. We produced and delivered over 4,400 vehicles across the RIT, RIS, and EDV 700. We have also recently started production validation builds of our EDV 500, which is a narrower and shorter version of the EDV and well-

Case 2:22-cv-01436-BHL     Filed 08/26/25     Page 9 of 15     Document 83-1

positioned for markets and applications where smaller form factors are needed. Our key focus remains ramping our normal facility to its full 150,000 units of installed capacity. While we continue to manage supply chain constraints, we are encouraged by the progress we are making, which is important for us to be able to add a second shift for general assembly towards the end of this quarter. Equally as important is the continued strong demand for our products. As of June 30, we had about 98,000 net preorders and reservations for our R1 vehicles. Our daily preorder rate accelerated in the second quarter compared to the first quarter, and as a reminder, these orders are for the United States and Canada only and are net of deliveries and cancellations. In June, we hosted a media venture showcasing the capabilities of our R1S in both on and off-road settings. It has been great to see the feedback from various media sources and customers as more of our R1S vehicles get out on the road." (FAC ¶ 140) **Rod Lache** "Hi, everybody. I'd like to just ask two questions. One is for Claire. A lot has obviously happened financially over the past year or so with inflation and supply chain issues. But could you maybe take a minute and maybe just take a step back and talk to us about the bridge to achieving positive gross margin from where we are at right now? We know that it consists of pricing and cost and volume, but if you could give us some thoughts on the components of that and the timing?..." **Defendant McDonough** "Thanks, Rod. This is Claire speaking. And I wanted to hit on your first question in terms of what that path to positive gross profit and positive unit economics looks like for Rivian in particular.

As you called out, right, we have seen unprecedented levels of inflation, especially across our raw material inputs and lithium prices that have gone up north of 115% over – since the start of this year, in particular, coupled with COVID and other factors that have driven a challenging supply chain and inflationary environment as well as part of that. But as we look out to the future, as I mentioned in my prepared remarks, we have significant confidence in the long-term gross profit margin targets that we've set out for ourselves of approximately 25%. And I will give you a little bit of that path as we see from today going from our current state to that future state of positive unit economics. We see 2024 as really that pivotal year for us in driving a step change in terms of the underlying gross margin expectations within the business, as we have a couple of significant factors that are starting to impact our underlying unit economics. First and foremost, it's really driven by us ramping our plants and our productivity within our 150,000 units of installed capacity within Normal that allows us to really leverage all of those fixed overhead and costs associated with our large-scale production facility. Second, it's also our ability to introduce our next-generation technologies into our vehicles, first in our R1 products as well as in our EDVs. So those are things like in-sourcing of our motors, the introduction of our LFP pack, which will be introduced first in our commercial vehicles, that allow us to really drive a step change in terms of vehicle performance in that time frame, which enables us to increase pricing on the vehicles, given the fact we will have vehicles with added range and added performance and capabilities, but they also importantly drive significant cost-downs within our bill of materials as we look at that roadmap ahead. And then finally, the other core factor as we think about that step-stone from a gross profit perspective is also really the anniversarying or moving beyond those pre-March 1 pre-orders as well that allow us to move into our current ASPs. And as we reiterated our last earnings call, we have seen $93,000 plus ASPs with the preorders that we have had post pricing change." (FAC ¶ 142) "Over the recent months, we achieved key operational and strategic milestones. Production continued to ramp on our R1 and RCV platform lines; we produced 7,363 total vehicles during the quarter representing a 67% increase as compared to the second quarter of 2022. We recently initiated our second manufacturing shift and remain focused on ramping production to meet the strong demand for our products. As we navigate through these uncertain economic times, we are encouraged by the strong demand for our products as evidenced by our robust preorder backlog." (FAC ¶ 145) "We may not be able to accurately estimate the supply and demand for our vehicles, which could result in a variety of inefficiencies in our business and hinder our ability to generate revenue and profits.

If we fail to accurately predict our manufacturing requirements, we could incur additional cost or experience delays." (FAC ¶ 147) "[A]s we've talked about in the past, we expect to see a material step change in gross margin in that walk from current state to that 2024-time frame. And the biggest lever, not surprisingly, is really that fixed cost leverage as well as our opportunity to move beyond some of the start-up-related costs that you heard RJ and myself talk a bit about that we've already seen from a process perspective, Q3 versus Q2. That reflects about two-thirds of the margin walk. So just wanted to make sure that you had a sense for just the magnitude of how important ramp is from an overall unit economic perspective. The second key driver for us is associated with pricing. As we've talked about in the past, the post-Marh 1 configured preorders that we have in our order book reflect a $93,000 average ASP. And we've got a lot of really exciting next-generation technologies that will be coming into the fold as well that allows us to believe that, that ASP could even drive meaningfully higher on a go-forward basis as well.

Case 2:22-cv-01436-BHL Filed 08/26/25 Page 10 of 15 Document 83-1

So that's the second core lever in that economic walk. And then finally, last but certainly not least, is really all of the core focus and work that we're doing right now around the reduction of our bill of materials. So importantly, the engineering and design changes and the road map we have in place to drive meaningful cost savings within that bill of materials over the next couple of years.And then finally, all of the work that our procurement teams are doing around commercial cost-down opportunities as we continue to scale the business and importantly, work hand-in-hand with our supply chain partners and as Rivian continues to grow out its own manufacturing capacity and drive better unit economics for the business.... We'll continue to see ongoing performance and improvement as we scale, especially given the magnitude of how important ramp is across the board. And so the important piece here is that in 2024, you see each of these key levers really in place as it pertains to production ramp, as it pertains to Rivian moving to those post-March 1 preorder base, and importantly, as you think about the composition of a lot of the engineering design changes that we have from a road map perspective, that all come together to drive that meaningful step change in gross profit." (FAC ¶ 150) **Charles Coldicott -Redburn (Europe) Limited** "But RJ, I think where I'd like to kick off is asking about demand. So obviously, we've seen order intake slow materially at some other EV names, people like Lucid, even Tesla in certain regions. And a lot of customers are having a tough time right now. Are you confident that Rivian can sell everything it produces whatever the macro backdrop?" **Defendant Scaringe** "Yes. So it's a great question. It's foundational to the business to make sure that demand continues to exceed our production capacity. What we've been challenged with, really, over the last year that we've had such a large and growing demand backlog that managing customer expectations and making sure we're communicating appropriately to customers, some of which were going to be in the backlog or a line for over 2 years. That's been a really core focus. And as we sit here today, we have a very clear line of sight through 2024 in terms of demand, so we feel very confident about that, and we continue to see -and we talked about this on our last earnings call, we continue to see our backlog grow even as we're ramping deliveries." (FAC ¶152) "Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures." (FAC ¶ 155) "In the fourth quarter, we increased production over 10,000 units.

This represents a 36% increase over the third quarter of 2022. We maintain a vehicle backlog that provides clear demand visibility well into 2024." (FAC ¶ 157) "I want to reinforce the important steps we took during 2022 to drive towards profitability... We forecast reaching positive gross profit in 2024 and therefore expect by the end of 2024, we will no longer have material LCNRV inventory charges and losses on firm purchase commitments associated with the production at our Normal plant. In addition to LCNRV, there were factors which negatively impacted our cost of goods sold that we do not believe are reflective of our long-term cost structure. The most significant driver continues to be our production levels. The largest lever in our forecast is the swing from negative $ 1 billion of gross profit in Q4 2022 to a step change in positive gross margin in 2024. There are 3 key levers that enable this improvement. First, the most impactful driver is the per-unit reduction of labor overhead and ramp expenses as our large-scale plant produces a greater number of units. With the addition of our second shift, the plant in Normal is currently staffed to produce a significantly higher number of units than our current run rate. For context, these expenses represent 2/3 of the bridge from Our current COGS per unit to what we expect by the end of 2024. The second area is our material costs. We have a detailed road map of both engineering and commercial cost downs. As RJ mentioned, our recent Supplier Day demonstrated the win-win opportunity for our suppliers to participate in Rivian's growth. The final bucket is price. The implementation of our reservation system in early 2022 provides us the pricing flexibility to accommodate the introduction of new products, technologies and inflationary pressures. The final bucket is price." (FAC ¶ 159) **Rod Lache:** "[D]o you have any color on -as we're sort of bridging to profitability, for gross profit profitability, what kind of volume targets are you thinking about as you look out to 2024? You mentioned the 150,000 units of capacity, but do you think you can get to at least 100,000 in that time frame?... **Defendant McDonough:** "(Inaudible) directly on the volume question that you have there as well.

As I talked about in my prepared remarks, today we have 65,000 units of R1 capacity in the plant at Normal, and we're increasing that capacity so that 55% or call it, 85,000 units will become R1 capacity as we re-rate the lines midyear next year. And so next year, we'll have both the impact of having a multiweek shutdown as we re-rate the plant to add that incremental R1 capacity. And at that same time, we'll be introducing a number of the next generation technologies that RJ just talked about as well. And so we'll still be in a period whereby we'll be continuing to ramp out of that shutdown in midyear to produce more units

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

in the back half of the year, but it really won't be until full year 2025, where we'll be ramping up the then re-rated capacity from an R1 perspective." **Rod Lache:** "So just to clarify what you're saying, are you saying that you're not going to have the 85,000 units of R1 capacity available for 2024? Or will you?" **Defendant McDonough:** "It will be available. We're re-rating the lines midyear in 2024. And so from a full year perspective, we won't have the full year impact of that re-rate as we go through the process of a couple of weeks shutdown and then ramps back out of that shutdown in the back half of the year." **Rod Lache:** "Okay. But despite that, you're still thinking that you can get to gross profit in 2024?" **Defendant McDonough:** "That's right." (FAC ¶ 162) **George Gianarikas:** "I'd just like to piggyback on the previous demand question, that preorder question. I know you're not disclosing the preorders, but given there have been so many high-profile admissions of a weakening environment for demand, particularly for EVs, I'm curious as to whether you could shed any light or color as to how your net preorders have been tracking?" **Defendant Scaringe:** "Certainly what we're witnessing in the macro and what we're seeing in terms of interest rate is, I think, across the industry, having an effect of moderating overall demand. But what we would say is, and as we think about it, the demand backlog that we have is very robust. It gives us a clear line of sight until well into 2024." (FAC ¶ 164) "There are 3 key levers that enable this improvement. First, the most impactful driver is the per-unit reduction of labor overhead and ramp expenses as our large-scale plant produces a greater number of units. With the addition of our second shift, the plant in Normal is currently staffed to produce a significantly higher number of units than our current run rate. For context, these expenses represent 2/3 of the bridge from our current COGS per unit to what we expect by the end of 2024. The second area is our material costs. We have a detailed road map of both engineering and commercial cost downs.

As RJ mentioned, our recent Supplier Day demonstrated the win-win opportunity for our suppliers to participate in Rivian's growth. The final bucket is price. The implementation of our reservation system in early 2022 provides us the pricing flexibility to accommodate the introduction of new products, technologies and inflationary pressures." (FAC ¶ 166) **John Murphy -Bank of America Securities:** "One of the big things is getting the gross margin breakeven, right? I think you're talking about that and getting actually into positive territory into 2024. Is that purely a question of scale and in a certain level of production that's significantly above 50,000 units? I mean, how do you kind of envision getting there?" **Defendant McDonough:** "As we think about the gross profit bridge from Q4 2022 to Q4 of 2024, as you mentioned, we expect to see a true step-change not just to breakeven but to positive territory in that time frame. And about 2/3 of that overall bridge is driven by fixed cost leverage that's derived from put — having greater levels of volume running through our plant in Normal, Illinois. The other final 1/3 of that walk is split 50% based off of how we're effectively reducing our material costs. And so the material cost reductions are driven by design-related changes." (FAC ¶169) "Production: Increasing our production volume as we simultaneously leverage our fixed costs at our manufacturing plant in Normal, Illinois is the primary lever on our path to sell each vehicle profitably. Our 2023 production guidance of 50,000 vehicles remains on track, representing a 100% increase from 2022. While challenges remain, we have become a stronger, more agile company through this process." (FAC ¶ 172) "Drive to sell each vehicle profitably Our long-term success as a business will be determined by our ability to produce high volumes of vehicles profitably. The collective efforts across all our teams and functions are focused on delivering on this goal. Our target of generating positive gross profit in 2024 is composed of several drivers across the business. We expect approximately half of the improvement, excluding the impact of lower of cost or net realizable value ("LCNRV") and net losses on firm purchase commitments, will be driven by greater volume. Our 2023 production guidance of 50,000 units implies a doubling of capacity utilization which we believe will result in significantly lower fixed cost per vehicle, and we expect production volumes to increase further in 2024. The remaining half is split between material cost reduction and increases in average selling prices. Driving lower material costs will be enabled by two key factors: the integration of new technologies such as Enduro and LFP battery packs as well as commercial contract negotiations with our suppliers.

The increase in average vehicle selling prices is composed of the gradual improvements we expect to achieve as we complete the fulfillment of our pre-March 2022 preorder base as well as the introduction of new technologies that produce improved performance and capabilities, such as our Max pack." (FAC ¶ 174) "Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures." (FAC ¶ 176) "Overall, the progress we're making against our core value drivers of ramping production, driving costs down, developing

Case 2:22-cv-01436-BHL    Filed 08/26/25    Page 12 of 15    Document 83-1

new technologies and platforms and enhancing customer experience positions us well to continue executing on our goals for the remainder of the year as well as into 2024...." (FAC ¶ 178) "I also want to take this opportunity to reiterate our gross profit bridge from Q1 2023 to Q4 2024. We continue to target positive gross profit in 2024. Excluding the impact of LCNRV and firm purchase commitments, we expect approximately half of the improvement will be driven by greater volume and utilization of our installed capacity. ... Our 2023 production guidance of 50,000 units implies a doubling of capacity utilization, which will result in significantly lower fixed cost per vehicle, and we expect production volumes to increase further in 2024. The remaining half is split between increases in average selling prices and material cost reduction. Lower material costs will be enabled by the integration of new technologies such as Enduro and LFP battery packs which delivered about a 25% material cost reduction for our commercial vehicles in Q1 versus Q4. In addition to the engineering design-driven cost reductions we also expect to realize commercial cost savings as we negotiate with our suppliers. The increase in average selling prices is based upon the gradual improvements we expect to achieve as we complete the fulfillment of our pre-March 2022 preorder base as well as the introduction of new technologies that produced improved performance and capabilities. While gross margin is expected to remain negative in 2023, Q1 represented significant progress versus 04 2022 with gross profit loss per delivered vehicle nearly cut in half." (FAC ¶ 178) **Defendant Scaringe:** "So the biggest driver towards healthy margin structure on R1 is volume. So if you think about the path to our target state margin profile, about half is volume. And the reason for that is the fixed cost absorption in a large-scale plant when you're running a plant well under — at subscale is really [sic] high deal. So that's by far away..." **A.M. Sacconaghi – Sanford Bernstein:** "Now when you talk about fixed cost, is that depreciation? Is that overhead labor associated with that plant? Because again, at [this day], depreciation is $2,000 or $3,000 per car. So if your plant is theoretically half — running at half capacity, maybe $5,000 or $6,000 per car, it doesn't feel like a $20,000 difference.

You know what I'm saying?" **Defendant Scaringe:** "Correct. So when I say a fixed, I'm bundling here for simplicity's sake. But if you think of when we're running at half capacity, the staffing --the land layout is not set up for half the capacity. So the number of people on the line, so it's — your variable cost is the same. So the number of people, the cost to run the plant is the same. All the nonpeople cost to run the plant remains the same. The depreciation, obviously, the overall not still the same, so it's divided by less vehicles. So when you put all those together, about half the reduction comes from volume. Now the other half is made up of really 2 parts. One is we have a step-up in our ASP that that - we're already beginning to see, and you can see this — you'll see this quarter-over-quarter happen, but we had pricing that we'd originally announced and locked to — or linked to, I should say, our early configured vehicles. And that early pricing had a big step-up that represents roughly another 25% of the step down **--** or step down --or step towards profitability. And we're already seeing that. So we're now stalling at the very beginning of blending in new orders, which are much higher pricing than the older orders. And then the third component for us is the bill of materials. So it's -that's achieved in really 2 ways. One is the commercial negotiations that we're having today with suppliers. And the other are some of the things we've spent some time talking about today, which are just technical changes we're making to the vehicle simplification, consolidation of componentry, new drive units. We just launched a new dual-motor drive unit, which is a considerable costdown relative to what we launched with. But all those things together get us to a healthy margin structure." (FAC ¶ 1800 **A.M. Sacconaghi -Sanford Bernstein:** "Okay. And you've talked about like orders extending into 2024. Can you talk at all about sort of the rate of change of orders or backlogs in a way that makes you confident about volumes going forward?... So I'm sure you look at daily orders and ready to change your backlog.

And is there anything on that, that I mean, qualitatively, I presume that's what provides some of your confidence? Is there anything on that dimension that you can share that would be helpful for investors?" Defendant Scaringe: "No. Just --I mean, as you said, I think we -we've watched the demand. I mean it is a daily thing that we watch. We have to be careful not to overinterpret discrete events that are happening and look at enough of a time horizon to pick the true trend. But last summer, I would say it was the most extreme where you just had — demand was almost — it was off the charts.... So we're watching really closely what's going to happen at the macro if that's going to introduce some major shifts, but we continue to see demand for the products, and the functionality of the products helps us here. It's not like this is a 2-seat sports car that's a purely discretionary purchase." (FAC ¶ 182) **Emmanuel Rosner** "What do you think in terms of consumer demand and receptiveness to your current pricing? So you're not disclosing backlog anymore, but can we get some sense of demand trends you're seeing recently, any signs of consumer slowdown?" Defendant McDonough: "Overall, we continue to have a really robust backlog of preorders that extends into 2024. We certainly have seen some impacts of the broader macroeconomic environment in 2023 as we compare

Case 2:22-cv-01436-BHL   Filed 08/26/25   Page 13 of 15   Document 83-1

current daily order rates relative to what we saw maybe a year ago. But we've seen really a stable environment throughout the course of this year from a demand vantage point." (FAC ¶ 185) "In the first half of 2023, we produced 23,387 vehicles which is in line with the production volumes we achieved for the full year 2022. Increasing our production is the primary lever in our path to profitability. The incorporation of our inhouse drive units has played and will continue to play an instrumental role in improving our production ramp and cost structure." (FAC ¶ 188) "Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures." (FAC ¶ 190) **Dan Levy - Barclays Bank:** "...I think one of the broader themes in the EV sales landscape today is just around demand. And I think there's questions broadly around some weakness of demand. Maybe you can give us a sense -- I know you've taken away the order backlog, but what confidence do you have that your backlog will sustain well into 2024 and that you're going to be supply constrained for the foreseeable future?" **Defendant Scaringe:** "...[W]e feel very confident in the continued backlog that we have. We have clear visibility into — deep into 2024 with that backlog that's established. And as more and more vehicles are on the roads, and we now have tens of thousands of Rls on the roads, it continues to feed the flywheel of awareness about the brand.

And as I said, some of our strongest advocates are people that are driving our vehicles every day. And so we're quite bullish on the continued strong demand we have for our products." (FAC ¶ 192) "First, as we look at gross profit itself, the key levers for us are continuing to ramp up production volumes within our normal production facility itself. That, as we provided in our Q1 earnings call, we provided a little bit of details or context on a bridge from where our current financial results were in Q1 to the end of 2024. As we think about the continued scaling and production of our facility in both the ramp of R1 vehicles and continued growth of our commercial van line as well. That's the single largest driver as we think about the path to positive gross profit for us. The other key factors for us are driven by introductions of new technologies within the vehicle." (FAC ¶ 194) **Mark Delaney - Goldman Sachs:** "That's very interesting. Maybe we can shift gears a little bit and talk on demand. And given what's been a long wait times to get an Rl, some customers tend to put in orders as well in advance, sometimes over a year long. So as you're notifying consumers to prepare for deliveries, what are you seeing in terms of conversion rates on that backlog? Are you seeing anything unusual in terms of cancellation rates? Or is the backlog holding up well?" **Defendant McDonough:** "The backlog has been holding up well. As we mentioned last quarter, we had the opportunity to have our first quarter where we had R1S production that outpaced R1T. And that's really important for us given the broader backlog for our vehicles have always been more heavily weighted towards S. And so we are now in a position to have our production volumes minor or match more closely with the backlog that we have from a demand standpoint. And so we're excited about bringing more and more vehicles to market. Actually one of the biggest inhibitors to purchase or the reason why someone cancels is wait time. So we're excited to continue to work through that backlog, get more of the community out there glowing and building awareness and excitement for the vehicles and the brand as well." (FAC ¶ 196) "And we've got a few big objectives, which I'll ladder into. I'm sure some of the core questions you're thinking about. But number one, we continue to focus on ramping production. And the ramping of production for our fu st set of products are flagship consumer products, R1T and TVNOS, which Adam is referring to, along with our commercial vans. That's really critical to achieve the level of fixed cost leverage or fixed cost absorption we need on the pathway to profitability in our normal facility, our fust production plant.... [W]e've done a really good job of creating a product portfolio that customers want.. .we then need to be able to produce products. And so the ability to ramp.. . is such an important part this." (FAC ¶ 198) "So we continue to see very strong demand backlog. We have market-leading residual values. If you buy our R1S today, you can sell it tomorrow for more than you bought it for. If you order an R1S today, you're not going to get until the end of next year.

That's a problem but a high-class problem. It's a good problem to have." (FAC ¶ 200) "Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures." (FAC ¶ 203) **Mark Delaney - Goldman Sachs:** "You reiterated your view to be gross margin positive in 2024, but I'm hoping to better understand if you're views in how Rivian will get there, have changed at all recently, given the volatility in the industry more broadly with competitors cutting EV vehicle prices, but also costs falling in Rivian, as you've

described, making so much progress on its own cost structure." **Defendant Scaringe:** "Thanks, Mark. I'll let Claire jump in on this as well. This is just such an important topic. And ultimately, there's – I just spoke to it a bit, but there's a few major levers. The first being, the continued ramp-up of our production facility and the fixed cost absorption that comes with that. We're seeing the benefits of that quarter-over-quarter as we continue to ramp. So it's numerically very easy to understand. The second, which is maybe less - it's not as easy to see without having a look into all of our supplier negotiations and discussions is the significant progress we're making contractually with redefining build material costs or material costs through negotiations with suppliers, through resourcing of new suppliers, or through changes to the component or system design to achieve those cost reductions.... And then lastly, which I spoke to a moment ago is growth in ASP. And that's going to be both due to the layering in or the feathering in of new pricing, which again, we'll just see quarter-over-quarter as more and more of our deliveries are associated with new pricing, meaning post-March 1, 2022, as we work through that. And then the other is the introduction of some of these new trim packages, Max Pack, is an example, we have some new trim configurations going to be coming out next year that will also help us grow ASP.

So it's a combination of ramp, material cost and ASP that give us a very high degree of confidence in our long-term for the business...." (FAC ¶ 205) **ALLEGEDSPEAKER** Rivian; McDonough Rivian; Scaringe; McDonough Scaringe McDonough Rivian; Scaringe; McDonough Rivian; Scaringe; McDonough McDonough Scaringe Rivian; McDonough; Scaringe Scaringe McDonough McDonough Scaringe McDonough McDonough Rivian; McDonough Rivian; McDonough Rivian; McDonough; Scaringe Scaringe McDonough Scaringe Scaringe McDonough Rivian; McDonough; Scaringe Rivian; McDonough; Scaringe Scaringe McDonough Scaringe Scaringe Rivian; McDonough; Scaringe Scaringe **SOURCE** Ex. 11 [14] - Second Quarter 2022 Shareholder Letter attached as exhibit to Second Quarter 2022 Form 10-Q (filed August 11, 2022) Ex. 2 - Second Quarter 2022 Form 10-Q (filed August 11, 2022) Ex. 3 - Second Quarter 2022 Earnings Conference Call (August 11, 2022) Ex. 3 - Second Quarter 2022 Earnings Confer ence Call (August 11, 2022) Ex. 12 - Third Quarter 2022 Shareholder Letter attached as exhibit to Third Quarter 2022 Form 10-Q (filed November 9, 2022) Ex. 5 - Third Quarter 2022 Form 10-Q (filed November 9, 2022) Ex. 10 - Third Quarter 2022 Conference Call (November 9, 2022) Ex. 19 - November 29, 2022 Redburn CEO Conference Ex. 1 - Fiscal Year 2022 Form 10-K (filed February 28, 2023) Ex. 13 - February 28, 2023 Earnings Conference Call Ex. 13 - February 28, 2023 Earnings Conference Call Ex. 13 - February 28, 2023 Earnings Conference Call Ex. 13 - February 28, 2023 Earnings Conference Call Ex. 13 - February 28, 2023 Earnings Conference Call Ex. 20 - April 4, 2023 Bank of America Automotive Summit Ex. 14 - First Quarter 2023 Shareholder Letter attached as exhibit to Form 8-K (filed May 9, 2023) Ex. 14 - First Quarter 2023 Shareholder Letter attached as exhibit to Form 8-K (filed May 9, 2023) Ex. 6 – First Quarter 2023 Form 10-Q (filed May 9, 2023) Ex. 15 – May 9, 2023 Earning Conference Call Ex. 15 – May 9, 2023 Earning Conference Call Ex. 21 – June 2, 2023 Sanford C Bernstein Strategic Decisions Conference Ex. 21 – June 2, 2023 Sanford C Bernstein Strategic Decisions Conference Ex. 22 - June 15, 2023 Deutsche Bank Global Auto Industry Conference Ex. 16 - Second Quarter 2023 Shareholder Letter attached as exhibit to Form 8-K (filed August 8, 2023) Ex.7 - Second Quarter 2023 Form 10-Q (filed August 8, 2023) Ex. 17 - August 8, 2023 Earnings Conference Call Ex. 23 - September 7, 2023 Goldman Sachs Communacopia + Technology Conference Ex. 23 - September 7, 2023 Goldman Sachs Communacopia + Technology Conference Ex. 24 - September 14, 2023 Morgan Stanley Laguna Conference Ex. 24 - September 14, 2023 Morgan Stanley Lagima Conference Ex. 8 - Third Quarter 2023 Shareholder Letter attached as exhibit to Form 8-K (filed November 7, 2023) Ex. 18 - November 7, 2023 Earnings Conference Call

14    Exhibits as used herein refer to the exhibits which are the subject of Defendants' request for judicial notice (*see* Dkt. No. 66-2 at 4-5.)

**All Citations**

Slip Copy, 2025 WL 2426714

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:22-cv-01436-BHL    Filed 08/26/25    Page 15 of 15    Document 83-1