CITY PENSION FUND FOR FIREFIGHTERS
AND POLICE OFFICERS IN THE CITY OF
TAMPA BAY and CITY OF MIAMI FIRE
FIGHTERS' AND POLICE OFFICERS'
RETIREMENT TRUST, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiffs,

      v.                                    Case No. 22-cv-1436-bhl

GENERAC HOLDINGS INC., et al.

                Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
## LEAD PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT

---

Defendant Generac Holdings, Inc., is a publicly traded company that sells a variety of energy-related products, including power generators, solar power storage systems, home electricity controls, and gasoline-powered tools. Generac's business was one of those that appeared to benefit from the COVID-19 pandemic. As a result of the stay-at-home orders and other associated anxieties, Generac saw increased product sales, driven largely by a surge in interest and orders for its home standby (HSB) generators. In response, Generac's stock price rose significantly, but only for a time. By 2022, the stock price had fallen, ultimately losing nearly 80% off its peak value. A number of securities fraud lawsuits targeting Generac, its CEO, Aaron Jagdfeld, and its CFO, York Ragen, soon followed. This Court ordered the cases consolidated, (ECF No. 29), and appointed the City Pension Fund for Firefighters and Police Officers in the City of Tampa as Lead Plaintiff, (ECF No. 39).

On July 31, 2023, Lead Plaintiffs filed a First Consolidated Amended Complaint, alleging three different theories of securities fraud. (ECF No. 42.) Lead Plaintiffs did not identify any affirmative misrepresentation of fact made by Defendants. Instead, they alleged that Defendants fraudulently concealed three "negative trends" in different sectors of Generac's business: (1) the weakening of demand for Generac's HSB generators as the pandemic continued, (2) a defect in

1

Generac's SnapRS solar energy products, and (3) risks arising from Generac's "highly consolidated" sales of solar energy products through a single distributor, Pink Energy. (*Id*. ¶¶4, 17.) On February 7, 2025, the Court granted Defendants' motion to dismiss that complaint, concluding that Lead Plaintiffs' securities fraud accusations failed because they had not adequately alleged falsity and scienter on their primary theory and had failed to allege falsity, scienter, and materiality on their second and third theories. (ECF No. 63.) The Court allowed Lead Plaintiffs the opportunity to address the Court's concerns in a further amended pleading. (*Id.* at 31.)

On March 10, 2025, Lead Plaintiffs filed a Second Consolidated Amended Complaint. (ECF No. 66.) As in their prior effort, Lead Plaintiffs again do not allege that Defendants made any affirmative misrepresentations. Instead, Lead Plaintiffs repackage their earlier theories and allege that Defendants concealed three "negative facts" (rather than "negative trends"): (1) the declining rate at which Generac was closing sales for HSB generators, (2) that Generac's "Snap RS" rapid shutoff device, a component of its PWRcell solar products, suffered from a widespread and dangerous defect, and (3) that Generac's solar product sales were highly concentrated in a single dealer, Pink Energy. (*Id*. ¶4.) Defendants again move to dismiss, arguing that the Second Consolidated Amended Complaint fails to adequately plead falsity, scienter, or loss causation as to Lead Plaintiffs' first theory and fails to allege materiality, falsity, scienter, or loss causation on their second and third theories. (ECF Nos. 73 & 74 at 7–8.) Lead Plaintiffs oppose the motion, insisting that the Second Consolidated Amended Complaint corrects the pleading deficiencies previously identified by the Court. (ECF No. 80 at 9.)

As explained below, the Court agrees with Defendants that the Second Consolidated Amended Complaint fails to satisfy the rigorous pleading standards applicable to securities fraud claims. Lead Plaintiffs have again failed to adequately plead falsity and scienter on their primary theory, and their amendments fail to cure the previously identified deficiencies as to their second and third theories. Accordingly, the Court will grant Defendants' motion to dismiss.

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded facts as true and draws reasonable inferences in the plaintiffs' favor. *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) (citing *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013)). A complaint will survive a motion to dismiss if it "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Lead Plaintiffs face a high burden. Given the temptations of hindsight and second-guessing, and the serious nature of these allegations, the law has long required higher levels of pleading and proof for fraud claims. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *Chamberlain Mach. Works v. United States*, 270 U.S. 347, 349 (1926); *Gen. Elec. Cap. Corp. v. Lease Resol. Corp*, 128 F.3d 1074, 1078 (7th Cir. 1997). Pleadings asserting claims for securities fraud are subject to two levels of heightened pleading standards. Federal Rule of Civil Procedure 9(b) requires the pleading to "state with particularity the circumstances constituting" the fraud. Fed. R. Civ. P. 9(b). As with any plaintiff claiming fraud, a securities fraud plaintiff "must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate." *Borsellino*, 477 F.3d at 507 (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999)). The complaint "must provide 'the who, what, when, where, and how'" of the alleged fraud. *Id.* (quoting *United States ex rel. Gross v. AIDS Rsch. All.–Chi.*, 415 F.3d 601, 605 (7th Cir. 2005)).

The Private Securities Litigation Reform Act (PSLRA) raises this burden even higher. The PSLRA requires Lead Plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief" and "state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B). The complaint must "state with particularity the facts—known to the speaker at the time—that render the statement false or misleading." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp. (Navistar II)*, 114 F.Supp.3d 633, 651 (N.D. Ill. 2015). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor . . . ." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). A misleading statement is considered material "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted). The PSLRA also sets the bar higher for pleading scienter. The complaint must "state with

3

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

## BACKGROUND[1]

Lead Plaintiffs are the City Pension Fund for Firefighters and Police Officers in the City of Tampa and City of Miami Fire Fighters' and Police Officers' Retirement Trust, government employee benefit plans that purchased Generac common stock during the 18-month period between April 29, 2021 and November 1, 2022. (ECF No. 66 ¶¶1, 18–19.) Generac is a publicly traded company headquartered in Waukesha, Wisconsin that sells a variety of energy-related products, including power generators, solar power storage systems, home electricity controls, and gasoline-powered tools. (*Id.* ¶¶2, 21.) For nearly 20 years, Jagdfeld has served as Generac's CEO and Ragen has served as its CFO. (*Id.* ¶¶22–23.)

Lead Plaintiffs allege that between April 29, 2021 and November 1, 2022 (the Class Period), Defendants made three categories of false or misleading statements causing Generac's stock price to be fraudulently inflated. (*Id*. ¶¶1, 4.) According to the Second Consolidated Amended Complaint, Generac's stock stood at $340 per share in April 2021 and rose to $506 per share in November of that year. (*Id.* ¶¶12, 216, 222.) In 2022, the stock price began to fall, ultimately bottoming out at $106 per share on November 2, 2022. (*Id.* ¶¶12, 183.) Lead Plaintiffs contend that they suffered losses from the decrease in Generac's stock price caused by Defendants' fraudulent statements.

Lead Plaintiffs accuse Defendants of intentionally misleading investors by concealing three "negative facts." (*Id*. ¶4.) They concede that Defendants reported a host of accurate metrics concerning Generac's business but contend that Defendants failed to disclose other facts necessary to prevent their reports from being misleading. These negative facts are that (1) the rate at which Generac was closing sales for HSB generators was "in a state of drastic decline," (2) Generac's SnapRS rapid shutdown devices suffered from a widespread defect resulting in a substantial failure rate and escalating costs; and (3) Generac's solar product sales were "highly concentrated in a single dealer," Pink Energy, posing elevated risks to the business that ultimately came to fruition

---

[1] This Background is derived from Lead Plaintiffs' Second Consolidated Amended Complaint, (ECF No. 66), the factual allegations in which are presumed true when considering a motion to dismiss, *see Twombly*, 550 U.S. at 554–56. Defendants again move for consideration of certain documents under the incorporation by reference doctrine. (ECF No. 76.) Because all the documents are both judicially noticeable matters of public record and referenced by Lead Plaintiffs in the Second Consolidated Amended Complaint, the Court will grant the motion. *See Tellabs, Inc. v. Makor Issues & Rights (Tellabs II)*, 551 U.S. 308, 322 (2007).

4

when the dealer went bankrupt.  (*Id*. ¶¶4, 7–9.)  Lead Plaintiffs' allegations related to each of these theories are summarized below.

### A. Generac's HSB Generators

HSB generators are electrical generators that are permanently installed in residential homes to serve as a backup source of electricity in the event of a power outage.  (*Id.* ¶25.)  Historically, the market for HSB generators has been limited because they are costly to buy and install and because prolonged power interruptions are rare.  (*Id.* ¶26.)  Beginning in March of 2020, however, when state and local governments issued stay-at-home orders in response to the COVID-19 pandemic, consumer interest in Generac's HSB generators surged.  (*Id.* ¶¶37–38.)  The impact on Generac's business was significant, and Defendants reported on the impact in their public disclosures.

During a July 30, 2020 earnings call, Defendant Jagdfeld reported that Generac's second quarter revenues had "dramatically exceeded" prior forecasts "primarily due to the higher-than-expected shipments of residential products."  (*Id.* ¶38.)  He noted that demand for residential products like HSB generators was "significantly benefiting" from the pandemic, as part of what Generac labelled the "Home as a Sanctuary" "megatrend" in which millions of people were "working, learning, shopping, entertaining and in general spending more time at home."  (*Id.* ¶¶39, 65(a), 67(a).)  Throughout 2020 and into 2021, Generac reported "dramatic growth" in residential sales.  (*Id.* ¶41.)  Defendants repeatedly referred to the underlying data points that informed their statements.  These metrics included the increased number of Generac's "residential dealers" offering HSB generators, the number of "in-home and virtual consultations" dealers were having with prospective customers, and HSB generator "activations" (the first use of a generator following installation).  (*Id.* ¶40.)  Lead Plaintiffs do not dispute that these metrics were accurately reported.

In their statements, Defendants also referred to HSB backlog, lead times, and, occasionally, close rates.  Backlog refers to the amount of dealer orders received, but not yet delivered, or the length of time between a dealer placing an order with Generac and the company actually shipping the order; executives discussed it both in terms of weeks and dollar values.  (ECF No. 66 ¶42 n.6.)  Lead time is used to describe the full period from order to installation or how long a customer would need to wait to receive a new generator.  (*Id.* ¶5.)  Close rates are the rate at which consultations with potential customers resulted in a sale.  (*Id.*)

Over the course of 2021 and into 2022, Generac reported strong demand and extended lead times (typically between 20 and 30 weeks). The company's representatives also reported a backlog of orders that provided insight into future sales and made it more difficult both to implement price increases and to respond to logistics and supply chain issues. Generac noted the uncertainty of increasing production at a time when supply chain disruptions were common, and logistics costs variable. (*See, e.g.,* ECF No. 75-2 at 14–15 (February 11, 2021 earnings call discussing supply chain disruptions, logistics problems, and noting long lead times for HSB generators); ECF No. 75-6 at 5, 12 (November 2, 2021 earnings call in which Jagdfeld noted that HSB generator lead times had increased to 30 weeks, and that long lead times were "not what we want to see for our customers" and discussing constraints posed by logistics and supply chain disruptions in response to an analyst question about Generac's HSB generator backlog). Jagdfeld also noted, in July 2020, before the start of the Class Period, that close rates, as measured at that point, had remained consistent with historical trends, despite the company pivoting to virtual home consultations and adjusting the sales process to account for the COVID-19 pandemic. (ECF No. 66 ¶¶52, 204.)

The company disclosed steps it was taking to address increased lead times. During Generac's February 11, 2021 earnings call Jagdfeld announced that Generac had "continued to aggressively ramp our supply chain and production output" and had achieved "progressively higher record daily build rates throughout the fourth quarter" of 2020. (ECF No. 75-2 at 5.) Generac also announced plans to open a new manufacturing facility in Trenton, South Carolina, and projected that it would increase HSB generator manufacturing capacity significantly compared to its production level at the start of 2020. (*Id.*) In connection with its second quarter 2021 results, Jagdfeld reported in Generac's July 28, 2021 earnings call that demand for HSB generators remained "incredibly robust" and that lead times "remain[ed] elevated at approximately 28 weeks." (ECF No. 66 ¶61; Transcript of Q2 2021 Generac Holdings Inc Earnings Call--Final, FD (Fair Disclosure) Wire (July 28, 2021), https://plus.lexis.com/api/permalink/ce5ade79-6db0-4413-ae67-695d0850296d/?context=1530671.)

After reporting the company's third quarter 2021 results during a November 2, 2021 earnings call, Jagdfeld related that production levels were at an all-time high and yet demand for HSB generators continued to outstrip the company's record production, with lead times at about 30 weeks and a backlog of orders projected to exceed $1 billion entering 2022. (ECF No. 66 ¶63; ECF No. 75-6 at 5.) The company also noted, however, that revenues for its residential products,

6

including HSB generators, had fallen short of projections by 30 million and that its backlog began to shrink for the first time since the start of COVID-19. (ECF No. 66 ¶¶138.) The company's 2021 Form 10-K likewise reported "increased demand" and "extended lead times," (ECF No. 75-5 at 28), while cautioning that "a significant decrease in the demand" for Generac's products "could cause actual results to differ" from estimates, (*id.* at 33).

In its May 4, 2022 earnings call, Generac accurately reported a 41% increase in net sales to a record $1.14 billion for the quarter. (ECF No. 82-1 at 4.) Jagdfeld also noted that home consultations for the quarter were three times higher than in the first quarter of 2020, "reinforcing" his view that demand for HSB generators had risen to a new higher baseline level. (*Id.*) He also noted that the backlog of orders remained "well above $1 billion." (*Id.*) Jagdfeld also cautioned that lead times remained far higher than normal (27 to 20 weeks) and Generac wished to increase the rate at which dealers installed HSB generators, describing installation rates as a "struggle point for the channel." (ECF No. 66 ¶67(c)–(d).)

Generac's ability to deal with the surge in demand was also limited by its distribution channels. Generac does not typically sell generators or solar products directly to end customers or homeowners, nor does it install the products. (*Id.* ¶32.) Instead, Generac sells generators and solar products to "channel partners," who in turn sell them to end customers and arrange for installation. (*Id.*) The most predominant channel partners for Generac are its network of thousands of independent authorized dealers. (*Id.*) Generac's website provides a "Dealer Locator" function allowing interested homeowners to identify dealers near their location. (*Id.* ¶33.) If the homeowner purchases a generator, the dealer will later install the product, either with its employees or through outside contractors. (*Id.* ¶34.) Historically, a dealer would either install a generator from its inventory or place an order to Generac for delivery. (*Id.*) In addition to delays caused by production, constraints on installation added further delays to customers. In a May 4, 2022 earnings call to discuss the company's first quarter 2022 results, Defendant Jagdfeld noted the continued backlog on orders and the delays in installation and reported on the company's efforts to work with new and existing dealers to increase their ability to install products more quickly and to deal with labor shortages. (*Id.* ¶67.) Like many manufacturers, Generac incentivized its dealers to obtain orders and sell products. Generac granted dealers special privileges if they maintained "Premier" status by securing at least $1.5 million in orders. (*Id.* ¶34.) To encourage them to seek out customers, Generac also allowed dealers to cancel orders with protections against the risks of

over-ordering. (*Id.* ¶57.) As the backlog grew, this allowed dealers to potentially reduce their later wait times, and avoid later price increases, by placing orders for generators before they had end-customer contracts in place. (*Id.* ¶58.)

According to Lead Plaintiffs, close rates are an important metric for investors because they measure the rate at which an initial sales pitch results in an actual sale to buyers. (*Id*. ¶¶45–46.) In 2012, Generac launched a "tablet-based program" called "PowerPlay," which allowed it to send leads to dealers and track the sales process (including observing close rates) through installation. (*Id.* ¶47.) Over the next decade, Defendants mentioned close rates, their importance, and their reliance upon PowerPlay in a handful of public disclosures.[2] (*Id.* ¶¶47–52.)

In their latest pleading, Lead Plaintiffs allege that close rates for HSB generators began declining in the fourth quarter of 2020. (*Id*. ¶54.) By July 2021, close rates "were their lowest in three years" and never rebounded to pre-COVID levels. (*Id*. ¶55.) Although declining close rates would ordinarily discourage dealers from ordering more products than they could expect to sell, Lead Plaintiffs allege that Generac's dealer incentives encouraged further orders. These incentives included substantial purchase discounts for preferred dealers, "lax [dealer] cancellation policies" that permitted dealers to cancel orders later in the process, without losing price discounts for shipped products if subsequently cancelled orders resulted in dealers falling below "Premier" status, and actual and threatened price increases, all of which, Lead Plaintiffs contend, led dealers to place orders for HSB generators without actual customer contracts in place and led to growth in dealer inventories. (*Id*. ¶¶ 57–58.)

---

[2] In July 2013, Jagdfeld responded to an analyst's question about "closure rate improvements seen from PowerPlay," by stating "we're watching" close rates "very closely," and "really like what we see." (ECF No. 66 ¶47.) Seventeen months later, in a February 11, 2015 earnings call, Jagdfeld mentioned how PowerPlay provided helpful information "giving us, dealer by dealer, specific close rates." (*Id*.) Two and one-half years after that, on September 7, 2017, Generac's former Chief Marketing Officer, Russel Minick, stated that Jagdfeld and senior executives monitored the information provided by PowerPlay daily. (*Id*. ¶48.) In other communications, Defendants commented on the importance of close rates. For example, on February 14, 2017, Jagdfeld stated that "improving close rates" was "a really big focus area" and noting that "even a slight improvement in close rates," and would "have a nice impact on overall home stand-by demand." (*Id*. ¶50.) In October 2013, Jagdfeld stated that with the rollout of PowerPlay "we continue to see a notable improvement in our sales closure rates for dealers using this new and innovative sales tool." (*Id*. ¶51.) On May 4, 2016, after reporting that consultations "are somewhat flattish" compared to the prior year, Jagdfeld stated that "our close rate has actually improved a bit" and that "the improving close rate underlying [the consultations]" provided management confidence "around our guidance here for the balance of the year." (*Id*.) Jagdfeld also mentioned improvements in close rates in statements made in August 2019, September 2019, October 2019, April 2020, and July 2020. (*Id*. ¶52.)

8

Generac's positive reporting of results came to an end in late 2022. On November 2, 2022, Generac issued a press release and held an earnings call to discuss results for third quarter of 2022, confirming that Generac's residential sales "were weaker than expected in the quarter, driven by lower shipments of home standby generators and clean energy products relative to our prior expectations." (*Id.* ¶176.)

## B. Generac's SnapRS Units

In 2018, Generac entered the solar energy storage business as part of a new corporate strategy called "Powering Our Future." (*Id.* ¶27.) After acquiring several energy companies in 2019, Generac launched the "PWRcell" line of products, designed to "capture[] and store[] electricity from solar panels or other power sources and help[] reduce home energy costs while also protecting homes from shorter duration power outages." (*Id.* ¶28.) A significant component of PWRcell products is the "SnapRS" device, which Generac advertised as "a simple way to satisfy rapid shutdown compliance for solar + storage systems." (*Id.* ¶29.) Rapid Shutdown Systems are "a fundamental safety requirement" in solar panel systems to mitigate the risk of electrocution for first responders, like firefighters, who may need to access a building's roof. (*Id.*) To comply with applicable safety standards, a single SnapRS unit is installed between each solar panel and between the solar panels and the link to the system that generates electricity in the customer's home, meaning that an eight-panel system requires eight SnapRS units. (*Id.* ¶30.)

As PWRcell sales grew in 2020 and 2021, Defendants highlighted the success of the product and its importance to the company. For example, on an October 28, 2020 earnings call discussing third quarter of 2020 results, Jagdfeld stated that "[s]hipments of our PWRcell energy storage systems . . . [were] a key contributor to the company's year-over-year growth." (*Id.* ¶71 (alteration in original).) Because Generac provided a 25-year warranty on its SnapRS devices, increased sales of PWRcell products resulted in increased warranty liabilities. (*Id.* ¶¶73–74.)

In early 2021, SnapRS model 801 units began to fail by turning on and off repeatedly, resulting in units overheating, deforming, or melting. (*Id.* ¶77.) The defect was later determined to be the cause of two August 2021 residential fires. (*Id.* ¶¶ 82, 85.)

In August 2022, one of Generac's solar dealers, Pink Energy, sued Generac over the SnapRS defects, claiming damages of several hundred million dollars. (*Id.* at 36 n.19.) According to allegations in the lawsuit, Pink Energy first reported the defect to Generac by April 2021 when it discovered melted SnapRS units during a service call to a customer. (*Id.* ¶78.) Pink Energy

9

claimed that by August 2021 other dealers were also complaining to Generac about the defect and the high failure rates associated with the SnapRS device. (*Id.* ¶¶80–81.) Pink Energy also claimed that on an August 12, 2021 conference call, a Generac executive did not dispute the overheating problem, noted that Generac had not identified the precise cause, and confirmed that the company was investigating the issue. (*Id.* ¶83.) On August 19, 2021, another Generac executive informed Pink Energy that it was testing a firmware update for SnapRS units to address the overheating issue and that it planned to release the fix by late August 2021. (*Id.* ¶86.) The firmware update did not resolve the issue because the update was only available to customers with solar systems connected to the internet, which many did not, and the update caused units to shut down when a malfunctioning or overheating SnapRS unit was detected, causing the solar systems to stop producing energy. (*Id.* ¶¶89–92.)

In "late 2021," Generac began supplying dealers with an updated model of the SnapRS 801, which Generac referred to as the SnapRS 801A. (*Id.* ¶93.) According to the Pink Energy lawsuit, Generac instructed its dealers to replace only the SnapRS units that were charred or melted and leave undamaged units in place. (*Id.*) The updated model also failed to resolve the issues, as the 801A units contained the same defects as the 801 units. (*Id.* ¶94.)

On November 23, 2021, Generac submitted a report notifying the Consumer Product Safety Commission ("CSPC") of a "potential defect" in its SnapRS devices, as required by the Consumer Product Safety Act. (*Id.* ¶88.) "In or around April 2022," Generac released an updated SnapRS 802 unit. (*Id.* ¶100.) "Shortly thereafter," Generac instituted the "SnapRS replacement program," the goal of which was to "ultimately replace" all SnapRS 801 and 801A units with SnapRS 802 units. (*Id.*) According to the Pink Energy lawsuit, Generac sent a letter to "a selection of Pink Energy's customers" who "may have experienced certain issues" with their SnapRS units in May 2022, informing them that Generac developed the SnapRS 802 unit to replace the 801 or 801A units. (*Id.* ¶103.)

According to Pink Energy's lawsuit, "approximately half" of Pink Energy's 19,000 customers whose systems utilized the SnapRS device experienced issues that required replacement of the devices. (*Id.* ¶96.) Pink Energy's Lawsuit further claimed that Generac "acknowledged a near 50% failure rate in the SnapRS units, accounting for the approximately 41% of [Pink Energy] customers . . . that have experienced PVRSS Lockouts and another 8% that never received the firmware update." (*Id.*) Pink Energy's lawsuit also alleges that Generac agreed in December 2021

10

to retroactively indemnify Pink Energy from all claims arising from manufacturing defects resulting in injury or damage to property.  (*Id.* ¶95.)  In October 2022, Pink Energy went out of business and declared bankruptcy.  (*Id.* at 36 n.19.)

### C. Generac's Overreliance on Pink Energy

Generac does not sell its products directly to its customers.  (*Id.* ¶32.)  Instead, Generac sells its products through various "channel partners" that connect Generac with its end customer. (*Id.*)  Generac's predominant channel partners are its "network of thousands of independent authorized 'dealers' who sell the products to the end customers and arrange for installation."  (*Id.*) Generac adopted a similar dealer-based process when it entered the solar energy market in late 2019.  (*Id.* ¶36.)  By March 2020, Generac had an agreement with Pink Energy under which Pink Energy would purchase and install Generac PWRcell products in customer's home solar systems. (*Id.* ¶115.)

Generac regularly disclosed its intention to build out its solar installer network.  In an April 29, 2021 earning call, Jagdfeld highlighted that Generac had trained and certified 2,000 dealers as of the end of Quarter 1 2021.  (*Id.* ¶122.)  Jagdfeld continue to report on the growth of Generac's solar dealer network, disclosing that the network had grown to approximately 2,200 dealers by July 2021, 2,300 by November 2021, 2,500 by February 2022, 2,600 by May 2022, and 2,800 by August 2022.  (*Id.* ¶¶124, 126, 128, 130, 132.)  Generac also regularly disclosed its efforts to expand its distribution network in general in its SEC filings.  (*Id.* ¶¶123, 125, 126, 127, 129, 131, 133.)  In 2022, Jagdfeld reported that Pink Energy was a "large" and "really important customer" for Generac.  (*Id.* ¶121.)  Pink Energy had a negative reputation for predatory and misleading sales tactics.  (*Id.* at 52 n.32.)

Pink Energy accounted for what analysts estimated to be more than 50% of Generac's PWRcell solar product sales.  (*Id.* ¶120.)  In October 2022, as the SnapRS defect caused Pink Energy to be overwhelmed with service calls, requiring a diversion of resources to servicing and replacing old units rather than selling and installing new units, Pink Energy declared bankruptcy and ceased operations.  (*Id.* ¶¶120–121.)  Generac later attributed "a stunning $185 million reduction to its $350 million solar guidance" to the loss of Pink Energy as a dealer.  (*Id.* ¶121.)

# ANALYSIS

Lead Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission (SEC)'s Rule 10b-5 by making false or misleading statements for the purpose of inflating Generac's stock price. (ECF No. 66 ¶¶241–45.) They contend that Jagdfeld and Ragen are individually liable for Generac's securities fraud under Section 20(a) of the Exchange Act. (*Id.* ¶¶246–49.)

Section 10(b) prohibits the use or employment, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" SEC rules. 15 U.S.C. §78j(b). Rule 10b-5 prohibits any "untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460–61 (2013)). Section 20(a) of the Act, 15 U.S.C. § 78t(a), imposes joint and several liability on "controlling persons" for violations of securities laws. To state a claim against Jagdfeld or Ragen under Section 20(a), Lead Plaintiffs "must first adequately plead a . . . violation of [Section] 10(b) and Rule 10b-5." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Lead Plaintiffs' claims are based on allegedly fraudulent non-disclosures or omissions.[3] In these circumstances, Rule 10b-5 "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). In other words, the rule prohibits "half-truths," or "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Id.* at 263 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*,

---

[3] Lead Plaintiffs insist they *do* allege false statements of material fact. (ECF No. 80 at 29–30 (citing ECF No. 66 ¶¶61(b), 63, 108.) This is but a semantics game. Their latest pleading continues to frame the challenged statements as false and misleading because they "omitted to disclose" information Lead Plaintiffs assert was necessary to make them not misleading. (ECF No. 66 ¶¶62, 64, 107–109.) Lead Plaintiffs do not identify any inaccuracy in any of the metrics Defendants disclosed about HSB generators. (*See id.* ¶¶60–68.)

12

579 U.S. 176, 188 (2016)).  Like their prior pleading, Lead Plaintiffs' Second Consolidated Amended Complaint offers three different theories of securities fraud, all based on alleged material nondisclosures.  (ECF No. 66 ¶4.)  Lead Plaintiffs' primary theory is that Defendants failed to disclose declining close rates for Generac's HSB generators, while continuing to report increases in other metrics, such as consultations and dealer orders.  (*Id.* ¶7.)  Lead Plaintiffs also allege that Defendants failed to disclose a major defect in Generac's SnapRS solar energy products and the resulting customer complaints.  (*Id.* ¶8.)  Last, they allege that Defendants failed to disclose that Generac's solar product sales were highly concentrated in a single distributor, Pink Energy, while creating the false impression that Generac had a broad and diverse dealer customer base.  (*Id.* ¶9.)

Defendants contend that Lead Plaintiffs fail to state an actionable claim under any of these theories.  (ECF No. 74.)  The Court agrees with Defendants and will dismiss Lead Plaintiffs' claims for violations of Section 10(b) and Rule 10b-5.  Because Lead Plaintiffs have not adequately pleaded any underlying violations of Section 10(b) and Rule 10b-5, their Section 20(a) claims will also be dismissed.

## I.    Lead Plaintiffs Fail to Allege Facts to Support Falsity and Scienter on their Primary Theory.

In place of their previous claim that Defendants fraudulently misled investors by failing to disclose a decline in *demand* for HSB generators, Lead Plaintiffs now allege that Defendants failed to disclose a decline in *close rates* for HSB generators.  (ECF No. 66 ¶¶44–68.)  They allege that before the Class Period, Defendants reported a trio of interrelated sales data points—in-home-consultations, dealer orders, and close rates—but that Defendants stopped reporting close rates during the Class Period, as they decreased, while reporting increases in in-home-consultations and dealer orders.  (*Id.* ¶¶56–67.)  According to Lead Plaintiffs, Defendants concealed declining close rates to prevent analysts and investors from understanding the "true state" of the HSB generator business and to hide the increased risk of declining generator orders, cancellations, and elevated dealer inventories that later materialized.  (*Id.* ¶¶58–69.)

Defendants insist that Lead Plaintiffs' switch from falling demand to falling close rates does not cure their failure to allege with particularity any statement of material fact by Defendants that was rendered false or misleading by any alleged omission.  (ECF No. 74 at 14–19.)  Defendants further assert that Lead Plaintiffs' allegations as to scienter and loss causation are insufficient.  (*Id.* at 19–26.)  In the end, while the Second Amended Complaint is a (minor)

improvement on Lead Plaintiffs' prior effort, the Court agrees with Defendants that this latest pleading is still inadequate to overcome the significant pleading burdens applicable to accusations of securities fraud.

### A. The Challenged HSB Statements Were not Misleading or False.

The Second Amended Complaint identifies thirteen statements made by Defendants in earnings calls during the Class Period. (ECF No. 66 ¶¶61(a)–(d), 63, 65(a)–(c), 67(a)–(c)). Twelve of these statements were included in the First Amended Complaint, and the Court found they were not fraudulent or misleading. (*Compare* ECF No. 66 ¶¶61(a)–(d), 63, 65(a)–(c), 67(a), (c)–(e) *with* ECF No. 42 ¶¶109(b), (d), (g), (h), 113(e), 118(a), (c), (d), 123(a), (e), (f), (g).) All thirteen challenged statements were made during earnings calls and are summarized below:

- July 28, 2021 earnings call

  - Jagdfeld reported that in-home-consultations or sales leads for HSB generators remained strong and increased approximately 50% as compared to the second quarter of 2020. (ECF No. 66 ¶61(a).)
  - Jagdfeld stated that "key demand metrics for home standby" had continued to trend higher compared to prior years, and in-home-consultations were "increasing at a strong double-digit rate." (*Id.* ¶61(b).)
  - Jagdfeld reported that Generac was "experiencing higher incoming order rates." (*Id.* ¶61(c).)
  - Jagdfeld stated that demand was robust and in-home-consultations were "up again" compared to the last year. (*Id.* ¶61(d).)

- November 2, 2021 earnings call

  - Jagdfeld stated that demand remained high and "leading indicators like [in-home-consultations]" and "lagging indicators" like activations and incoming orders were exceeding Generac's increased production levels. (*Id.* ¶63.)

- February 16, 2022 earnings call

  - Jagdfeld stated that "important megatrends" continued to drive demand for HSB generators, and that in-home-consultations increased compared to the prior year. (*Id.* ¶65(a).)
  - Jagdfeld stated that Generac would end the year with a substantial backlog because the anticipated order rate was strong, and that the backlog had continued to grow despite increased production. (*Id.* ¶65(b).)
  - Jagdfeld stated that in-home-consultations were "up double digits again for the quarter across the country." (*Id.* ¶65(c).)

14

- May 4, 2022 earning call

  - Jagdfeld stated that Generac's HSB business benefited from "megatrends," in-home-consultations had increased again, and Generac thought demand for HSB generators was at a new, higher, baseline level. (*Id.* ¶67(a).)
  - Jagdfeld also responded to a question about demand for HSB generators after price increases and stated that Generac considered close rates to "gauge the impact of each round of pricing" and had not seen a significant impact. (*Id.* ¶67(b).)
  - Jagdfeld also stated dealer inventory was high compared to prior levels, and blamed winter weather for a slow installation pace. (*Id.* ¶67(c).)
  - Jagdfeld commented that Generac needed to "increase the install pace because output is increasing" and that labor and installation were a "struggle point for the channel" that Generac was monitoring. (*Id.* ¶67(d).) Ragen also stated he believed there were buyers for the units in dealer inventory based on the demand shown by in-home-consultations, and Jagdfeld concurred. (*Id.*)
  - Jagdfeld also responded to an analyst question asking if the increase in-home-consultation volume indicated demand for HSB generators had reached a new baseline level, stating "you'd have to take into consideration where our close rate is at." (*Id.* ¶67(e).)

Critically, Lead Plaintiffs do not allege that any of these statements, or the metrics disclosed therein, were inaccurate or false. Instead, they reach for a fraudulent omission approach. According to Defendants, these accurate statements created a false impression that a higher number of end customer contracts would come into being because Defendants did not include additional statements that close rates for HSB generators had decreased. (ECF No. 66 ¶¶62, 64, 66, 68.)

In pursuing a non-disclosure theory, Lead Plaintiffs have a high bar to clear. There is no affirmative duty to disclose *all* information that might affect a company's stock price. *Macquarie*, 601 U.S. at 264 ("It once again 'bears emphasis that §10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.'") (citing *Siracusano*, 563 U.S. at 44.) Unless positive law creates a duty to disclose, a company can remain silent about both good and bad news concerning its business. *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001). Rule 10b-5 only requires the disclosure of information necessary to ensure any affirmative statements made are clear. In other words, the law prohibits a defendant from telling "half-truths" or making statements that omit critical qualifying information. *Macquarie*, 601 U.S. at 263. As explained above, courts determine whether a nondisclosure renders a statement misleading from the perspective of a reasonable investor. *OmniCare Inc.*, 575 U.S. at 190. A reasonable investor considers both the content and the context of a statement. *Id.* An omission makes a statement

15

materially misleading when it creates an impression of a state of affairs that differs in a material way from the one that actually exists. *SEC v. Ustian*, No. 16 C 3885, 2019 WL 7486835, *28 (N.D. Ill. Dec. 13, 2019); *Kelsey v. Allin*, No. 14 C 7837, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Lead Plaintiffs have, again, not cleared this hurdle. They have not pleaded facts sufficient to show that Defendants' many statements, including those concerning HSB demand and those accurately describing the increased rates of in-home-consultations and incoming dealer orders, were misleading by the nondisclosure of close rates. Lead Plaintiffs' allegations suffer from at least three major failings.

First, when read in context, none of the challenged statements created a materially misleading picture of the HSB generator sector, even without any discussion of close rates. The record of those disclosures confirms, and Lead Plaintiffs do not contest, that Defendants affirmatively disclosed accurate metrics, made predictions about demand based on those accurate metrics, and repeatedly shared challenges facing their HSB generator business. *See Anderson v. Abbott Labs.*, 140 F.Supp. 2d 894, 909 (N.D. Ill. 2001) *aff'd sub nom.* 269 F.3d 806 (7th Cir. 2001) (reiterating that accurate statements of historical fact are not actionable); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 597 (7th Cir. 2006) (holding that general statements about robust demand or growth, or positive feelings about a business are not actionable). Thus, contrary to the implication Lead Plaintiffs seek to impose, Defendants did not paint an unduly rosy picture. When the challenged disclosures are read in full, they demonstrate that Defendants repeatedly qualified their positive statements and disclosed potential problems with their efforts to deal with the rapid increase in HSB generator demand. The disclosures told investors about increased lead times and installation constraints, and even linked those issues to lower close rates. For example, in the July 28, 2021 earnings call, Jagdfeld noted the need to increase production to meet increased dealer orders, and that higher orders had led to longer lead times, despite increased production. Transcript of Q2 2021 Generac Holdings Inc Earnings Call--Final, FD (Fair Disclosure) Wire (July 28, 2021), https://plus.lexis.com/api/permalink/ce5ade79-6db0-4413-ae67-695d0850296d/?context=1530671. During the November 2, 2021 earnings call, Jagdfeld again identified that increased lead times, which had grown to approximately 30 weeks, and overall challenges to the supply chain were pressuring the HSB generator business. (ECF No. 75-6 at 5.) In the February 16, 2022 earnings call, Jagdfeld noted that lead times had decreased

16

by about 4 to 5 weeks from 32 weeks.  Transcript of Q4 2021 Generac Holdings Inc Earnings Call-
-Final, FD (Fair Disclosure) Wire (Feb. 16, 2022), https://plus.lexis.com/api/permalink/fcf48b66-
ae67-4e2a-9101-4fbe9b5e4a31/?context=1530671.  Jagdfeld also noted that Generac expected to
end the year with improved lead times but still expected to carry significant backlog into the next
year.  *Id.*  Ragen discussed implementing pricing increases and the problems of operating with a
significant backlog and significant inflation.  *Id*.  In response to a question asking him to quantify
the HSB backlog and identify a "normalized level of orders" for HSB generators Jagdfeld noted
that it would be difficult to give an accurate estimate, because later incoming orders would vary
based on the "outage environment", but that even with increased production, Generac could *not*
get back to a "normal kind of 1-to-2-week lead time" by the end of the year.  *Id*.

Lead Plaintiffs' theory also ignores similar context from later calls.  During the May 4,
2022 earnings call, Jagdfeld noted that lead times for HSB installation had improved from
approximately 27 weeks to 20 weeks, remaining far higher than normal, described the "supply
chain environment" as challenging, noted that the HSB backlog remained large, and stated that,
despite efforts to increase production, Generac would likely retain a large portion of its backlog
into 2023.  (ECF No. 82-1 at 4.)  Jagdfeld emphasized that Generac wanted to increase dealer
installation rates and described installation rates as a "struggle point for the channel."  (ECF No.
66 ¶67(c)–(d).)  At Generac's August 3, 2022 earnings call, which Lead Plaintiffs cite as a partial
disclosure of the decline in close rates, Jagdfeld expressed Generac's belief that reducing lead
times would improve close rates.  (ECF No. 75-3 at 4.)  Jagdfeld then went on to identify "build
rates and supply chain challenges" as previously constraining the HSB generator business's growth
and stated that Generac had increased production to meet these challenges.  (*Id.* at 4–5.)  Jagdfeld
then went on to state that dealer installation capacity—caused largely by labor shortages,
permitting delays, and material shortages—was now the major constraint, and that project lead
times for homeowners, the end customers, had not come down in proportion with production lead
times.  (*Id.* at 5.)

In sum, Defendants did not hide the ball during the class period; they disclosed what they
saw as the relevant pressures on the HSB generator business, high lead times and limited
installation capacity.  Moreover, Defendants' overall conclusion, that demand remained high,
based on the indicators they cited, was supported, as the Court noted in its first order.  (ECF No.
63 at 20.)  It is, as Defendants note, unclear what disclosing close rates would add to the accurate

17

picture already painted.  (ECF No. 74 at 18.)  Defendants effectively did what Lead Plaintiffs fault them for failing to do; they disclosed negative facts with the interrelated positive ones, just not by disclosing close rates as a metric measuring the effect of those negative facts.  Lead Plaintiffs' insistence that the lack of close rate metrics rendered Defendants' accurate statements misleading fails with a more thorough review of the full disclosures made.

Second, the record confirms that Defendants' accurate statements about positive metrics like in-home-consultations and dealer orders did not imply anything in particular about how close rates were faring, and a reasonable investor would not understand them to do so.  *See Chew v. Moneygram International, Inc.*, 2024 WL 4346522, at \*7–\*8 (N.D. Ill. Sep. 30, 2024) (declining to infer that a reasonable investor would understand positive statements about performance overall to imply that every area of the business was similarly positive).  Lead Plaintiffs have not explained why not discussing close rates, but discussing demand overall, and discussing other indicators of demand, would lead reasonable investors to draw conclusions *about close rates*.

Instead of a consistent, logical rationale, Lead Plaintiffs offer shifting theories on *how* the statements might have misled the public.  In their pleading, Lead Plaintiffs allege the statements created a "false impression of generator sales," by implying that increased in-home-consultations were resulting in "correlating increased sales" and "end market contracts[.]" (ECF No. 66 ¶64.) In their briefing, however, Lead Plaintiffs offer a different theory, arguing that the statements implied that close rates themselves were *also* increasing with the other metrics.[4]  (ECF No. 81 at 31.)  This confusion about what these statements led investors to believe belies the larger problem with Lead Plaintiffs' allegations; the statements did not imply anything in particular about close rates.  To reiterate, Lead Plaintiffs do not challenge any of the statements about net sales or revenue, and do not contend that those statements were inaccurate.  The Second Consolidated Amended Complaint also does not allege that Defendants ever stated or implied there was a direct correlation between in-home-consultations and close rates.  Rather, it even includes a statement in which Jagdfeld explicitly cautioned investors against making that assumption.  (ECF No. 66 ¶67(e).)

---

[4] Lead Plaintiffs assert that "Defendants misconstrue Plaintiffs' allegations to argue that concealing the decline in close rates did not mislead investors as to the 'lead times' or the amount of historical generator sales. [ECF No. 74 at 11–12.] Rather, it misled investors into believing that the increased consultations with end-customers and sales to dealers were being matched by correlating end-customer contracts (*i.e.*, increased close rates)[.]" (ECF No. 81 at 31.)

Lead Plaintiffs cite *Shenwick v. Twitter, Inc.,* 282 F.Supp.3d 1115, 1136–37 (N.D. Cal. 2017), for the proposition that "[d]isclosing positive metrics while concealing interrelated negative metrics is a misleading half-truth[.]" (ECF No. 80 at 9.) *Shenwick* does not support their theory here. In *Shenwick*, Twitter reported positive growth in its number of monthly average users but did not disclose that its daily average users had drastically decreased. *Id.* at 1137. There, the plaintiff succeeded in alleging that the omission was misleading because the omitted negative fact, declining daily average user trends, made Twitter's positive statements that monthly average users were growing at a rapid rate extremely implausible. *Id.* at 1138. That is not the case with the non-disclosed metric here. Declining close rates would not make an accurate statement about in-home-consultations implausible; the metrics are not linked in the same way. Consultations happen first. Close rates could then decrease or increase. While the metrics are linked, in that the number of in-home-consultations creates the group of buyers who could conceivably enter a contract, close rates also measure interest over a longer—here unspecified—period of time. Lead Plaintiffs' failure to offer a coherent reason that investors would have viewed Defendants' factually accurate statements as misleading based on the lack of close rate data undermines their fraudulent omission theory.

Third, Lead Plaintiffs' remaining arguments are conclusory and unsupported and do not support the existence of any duty on Defendants' part to disclose close rates. Lead Plaintiffs first contend that "Defendants cannot escape their admission that consultations can only be understood in connection with close rates[.] (ECF No. 80 at 31 (citing ECF No. 66 ¶¶51–52, 67(e)).) Lead Plaintiffs effectively assert that Generac was bound to disclose close rates in tandem with in-home-consultation rates because Jagdfeld once mentioned that the two metrics were related in an earnings call. They cite no authority in support of this approach, and the Court will not take it. That Defendants sometimes disclosed close rates in the past does not create an ongoing obligation to continue disclosing them. *See Chew,* 2024 WL 4346522 at *8 (holding that disclosing a metric or expenditure in the past does not create an obligation to "air every ounce of the corporation's dirty laundry"). Lead Plaintiffs next pronounce that Defendants' "statements were a classic example of misleading half-truths" and cite *In re Estee Lauder Co., Inc. Securities Litigation*, 23-cv-10669(AS) 2025 WL 965686, at *3 (S.D.N.Y. Mar. 31, 2025) in support, with no discussion of the facts of that case or how it applies here. It is not analogous. In *Estee Lauder*, the misleading half-truth was that the defendant had a profitable revenue stream in China; the omitted fact was

19

that the revenue came primarily from illegal gray market sales, and that the stream was about to dry up due to an imminent government crackdown. *Id.* at *1–3. Here, the allegedly misleading omitted fact is not that Generac was selling products improperly. Lead Plaintiffs' theory is that a lower percentage of interested homeowners, out of what had become a much larger group of potential buyers, were ultimately deciding to buy a generator. Defendants accurately disclosed the increased group of potential purchasers, as shown by increased in-home-consultations, and that satisfying that potential was creating specific challenges for the company. That is far different than the allegedly concealed facts in *Estee Lauder*. (*See* ECF No. 66 ¶46.)[5]

Overall, Defendants discussed HSB generator lead times, installation rates, and other challenges facing the HSB generator business. Their accurate statements of historical fact did not imply a state of affairs that was materially different from what actually existed. *Ustian*, 2019 WL 7486835; *Kelsey*, 2016 WL 825236, at *4; *Brody*, 280 F.3d at 1006. Lead Plaintiffs have failed to allege facts to support their assertion that Defendants' HSB Statements were misleading because they omitted close rate data during the class period.

**B. Lead Plaintiffs Have Not Alleged Particular Facts Giving Rise to a Strong Inference of Scienter.**

Section 10(b) and SEC Rule 10b-5 also require a plaintiff to identify "with respect to each act or omission alleged" the particular "facts giving rise to a strong inference" that the defendants knew their statements were false or misleading or were reckless in disregarding a substantial risk of falsity. 15 U.S.C. §78u-4(b)(2)(A); *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F.Supp. 2d 969, 994 (E.D. Wis. 2009). The required state of mind is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higgenbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). Courts define "recklessness" in this context as a "an extreme departure from the standards of ordinary care. . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711

---

[5] Lead Plaintiffs also cite three analysts' reports, which they contend show that Defendants' statements actually mislead investors. (ECF No. 80 at 17 (citing ECF No. 66 ¶69).) But the cited line from the J.P. Morgan report does not even mention close rates. (ECF No. 66 ¶69.) Similarly, the William Blair report refers to a specific statement about the impact of a round of pricing on close rates following the increase, not close rates in general. (*Id.*) While the Oppenheimer report states that "record dealer levels, close rate and lead generation trends drive standby growth" (*id.*) this one out of context statement cannot carry the day.

F.3d 754, 756 (7th Cir. 2013). The plaintiff "must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (*Tellabs II*), 551 U.S. 308, 328 (2007).

In analyzing scienter at the motion to dismiss stage, the Court must consider the complaint in its entirety and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 322–23 (emphasis in original). "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. The Court must further consider all plausible, nonculpable explanations for the defendant's conduct in determining whether the pleaded facts create a "strong" inference of scienter. *Id.* at 323–24. This analysis is particularized to each Defendant, at the time each statement was made. *Pugh*, 521 F.3d at 692–95. The Court agrees with Defendants that the Second Consolidated Amended Complaint fails to plausibly allege facts to support a strong inference of scienter.

As with their prior pleading, Lead Plaintiffs again ask the Court to infer scienter based on a number of circumstantial factors common to the leadership of almost any publicly traded company. Lead Plaintiffs base their scienter allegations on the fact that Jagdfeld and Ragen controlled Generac's messaging to the investing public, Generac's HSB generator business was critically important to its financial success, Defendants closely monitored the HSB generator business, Jagdfeld and Ragen made public admissions suggesting they disregarded facts that made their statements false and misleading, and Jagdfeld and Ragen made stock sales during the Class Period, thus incentivizing them, through their compensation packages, to inflate Generac's stock price. (ECF No. 66 ¶¶ 190–93, 196–208, 214–20.) As the Court previously explained:

> The inferences Lead Plaintiffs ask this Court to draw would undermine the high burden Congress placed on Lead Plaintiffs in the PSLRA. The CEO and CFO of a company almost always control its messaging and almost always monitor and make public disclosures about key parts of the company's business. And it is common for executive officers to have compensation tied to performance and to make transactions in the company's stock. If these facts were sufficient to infer scienter, this necessary element would be satisfied in virtually every securities fraud case and the scienter requirements of the PSLRA would be rendered meaningless. Lead Plaintiffs generalized allegations of scienter are insufficient to create a strong inference that any Defendant made any particular statement with knowledge of or a reckless disregard for its falsity.

(ECF No. 63 at 24.)

21

Lead Plaintiffs argue that the scienter analysis is more nuanced and their circumstantial allegations establish scienter. (ECF No. 80 at 39 (citing *Thomas v. Magnachip Semiconductor Corp.*, 167 F.Supp.3d 1029, 1045 (N.D. Cal. 2016).) They contend that the inferential significance of any single allegation depends on the entire context. (*Id.* at 39–40 (citing *Institutional Invs. Grp. v. Avaya*, *Inc.*, 564 F.3d 242, 273 (3d Cir. 2009).) Lead Plaintiffs are obviously correct in principle. But their scienter allegations and argument lump all three theories and all three categories of allegedly misleading statements together. This ignores the requirement that allegations of scienter be *particularized* to the actual conduct or statement alleged to be fraudulent or misleading. Under the PSLRA, Lead Plaintiffs are obligated to make particularized allegations "with respect to each act or omission alleged" to be false or misleading. 15 U.S.C. §78u-4(b)(2)(A).

*Tellabs II* requires that scienter allegations be read as a whole and permits a group of less precise allegations to be read together within a holistic review. 551 U.S. at 322. But the Supreme Court did not suggest that a plaintiff pleading multiple legal theories involving disparate parts of a business and wholly unrelated statements would properly plead scienter by grouping all their allegations of scienter together. In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* (*Tellabs III*), 513 F.3d 702, 706–07 (7th Cir. 2008), before the Seventh Circuit on remand, the plaintiffs alleged that the defendant's executives made materially false statements about two telecommunications switching systems that were the company's principal products: a new version that customers had rejected, and an old version that had greatly reduced sales. Many of the challenged statements discussed both products. *Id.* at 706. The statements were related to the same theory based on related statements in one area of the company's business. That is far different than the pleading presented to this Court.

Lead Plaintiffs' citation of *Thomas* also does not help them. The *Thomas* plaintiffs advanced a single theory based on false statements related to fraudulent accounting practices. 167 F.Supp.3d at 1037. In concluding that the plaintiffs sufficiently pleaded scienter, the district court reviewed statements related to that single theory and single category of statements. *Id.* at 1036–37; 1041–45. It did not need to consider allegations of scienter about unrelated statements and unrelated areas of the defendant company's business. *See id.* at 1041–45. Lead Plaintiffs do not identify any authority that would support applying scienter allegations across multiple legal theories involving unrelated statements in one all-encompassing analysis.

22

Lead Plaintiffs' remaining scienter arguments also fail to carry their burden. They argue that the HSB and solar product businesses were critical to Generac's core operations, and therefore scienter is supported because the Court can assume Ragen and Jagdfeld were aware of facts critical to these parts of Generac's business. (ECF No. 80 at 42.) But courts have recognized that the core operations doctrine alone is generally insufficient to plead scienter under the PSLRA. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (explaining that total reliance on a core-operations inference absent other particularized supporting allegations is insufficient to plead scienter). Lead Plaintiffs next assert that the magnitude of the problem, the 40% decline in close rates, supports an inference of scienter. (ECF No. 80 at 43 (citing *Azar v. Grubhub, Inc.*, Case No. 1:19-cv-07665, 2021 WL 4077327, at *5 (N.D. Ill. Sep. 7, 2021).) As explained in the Court's prior order, however, Lead Plaintiffs' allegations offer no plausible reason for the Defendants to have believed that disclosing admittedly accurate statements about positive metrics, which resulted in actual increases in sales, required them to disclose a different negative metric. (ECF No. 63 at 19.)

Lead Plaintiffs also assert that Defendant's post class period admissions support a strong inference of scienter. (ECF No. 80 at 43.) They point to allegations in which they contend Jagdfeld admitted that dealer inventory was well above healthy levels, and that leadership knew about the "negative impact on close rates," and that close rates had "bottomed" out in early 2022. (*Id.* at 43–44 (citing ECF No. 66 ¶¶177, 203–08, 47–55, 207.)) Lead Plaintiffs have still not provided particularized allegations supporting a strong inference that Jagdfeld knew that declining close rates at the time was the real issue threatening the HSB business, and not the lack of installation capacity, seasonal increases in dealer inventory, or increased lead times that he discussed in his statements. Lead Plaintiffs again effectively allege "fraud by hindsight." *See Tellabs II*, 551 U.S. at 320 (quoting *Shields v. Citytrust Bancorp, Inc.*, 225 F.3d 1124, 1129 (2d Cir. 1994)).

Lead Plaintiffs next try to seize upon what they characterize as Defendants' unusual stock sales to support scienter. (ECF No. 80 at 44–45 (citing ECF No. 63 at 24).) Lead Plaintiffs note that Ragen's sales occurred on November 11, 2021, but they do not specify when Jagdfeld's sales occurred, merely that he sold stock in multiple rounds throughout the Class Period. (ECF No. 66 ¶¶217–18.) These allegations continue to lack specifics sufficient to support a finding of scienter under the PSLRA. Lead Plaintiffs do not specify whether Ragen or Jagdfeld made similar sales in other years, and if they did, whether this pattern of sales appears unusual. As the Seventh Circuit

23

has explained, because executives sell stock frequently, stock sales must generally be shown to be unusual or suspicious to provide circumstantial evidence of scienter. *Pension Tr. for Operating Eng'rs*, 895 F.3d at 940 (citing *Pugh*, 521 F.3d at 695). Courts have required more context to draw an inference of scienter or for the sales themselves to appear so suspicious that they "resembled a smoking gun." *Id.* As described in the Second Consolidated Amended Complaint, these stock sales do not raise a strong inference of scienter. Similarly, Lead Plaintiffs' related allegations that Jagdfeld and Ragen did not purchase Generac stock while it was priced high are not compelling evidence of scienter. (ECF No. 66 ¶¶217–18.) Their compensation structures included stock options. (*Id.* ¶219.) It would be unusual for them *to purchase* Generac stock in this context.

Lead Plaintiffs newly allege that Jagdfeld and Ragen signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") show that they acted with fraudulent intent. (ECF No. 66 ¶¶194–95.) Lead Plaintiffs do not expound on the significance of these signed certifications in their briefing. Other courts have noted that similar allegations are not sufficient on their own but can be relevant combined with other allegations. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003–04 (9th Cir. 2009) (signatures of SOX certifications are not "substantial" in the scienter calculus). Other courts have noted that certifications are only probative of scienter where plaintiffs also allege additional facts showing that, at the time the certifications were made, the defendants knew or were reckless in failing to recognize that internal controls and procedures were ineffective. *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (finding SOX certifications regarding internal controls unpersuasive in the scienter analysis where the plaintiffs did not allege specific facts from which the court could infer that the individuals knew that the company's "internal accounting controls were deficient" when they made the certifications); *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *15 (N.D. Ill. Jan. 12, 2021). Lead Plaintiffs make no such allegations in their Second Consolidated Amended Complaint, and in connection with this allegation about SOX certifications assert only that none of the Defendants have claimed that the representations in the certifications were untrue. (ECF No. 66 ¶¶194–95.) Because there are no additional allegations, the SOX certifications do not suggest scienter.

In the end, the Second Consolidated Amended Complaint fails to connect the dots again. The various allegations do not give rise to a cogent and compelling inference of scienter. Instead,

the competing inference—that Defendants Jagdfeld and Ragen believed that the accurate metrics they disclosed suggested the potential for increased sales, and that the lack of installation capacity and long lead times were the bigger problems facing Generac's HSB business—is more compelling.

## II. The Second Consolidated Amended Complaint Fails to Remedy the Previously Identified Pleading Deficiencies as to Lead Plaintiffs' Alternate Theories.

As Defendants note, Lead Plaintiffs' second and third theories are substantially unchanged. The Second Consolidated Amended Complaint, like the prior Complaint, alleges that Defendants misled investors by failing to disclose a product defect in Generac's SnapRS device and by making statements touting the growing breadth of Generac's clean energy distribution networks, while concealing the fact that solar sales were highly concentrated in a single dealer. (ECF No. 66 ¶¶70–136.) Defendants assert that Lead Plaintiffs again fail to plead falsity, scienter, materiality, or loss causation as to either theory. (ECF No. 74 at 26–36.) Like the First Consolidated Amended Complaint, the Second Consolidated Amended Complaint fails to allege a materially false or misleading statement as to either theory.

### A. Lead Plaintiffs Again Fail to Plausibly Allege that Defendants Knew of the Scope or Severity of the SnapRS Defect at the Time the Challenged Statements Were Made.

In support of their second theory, Lead Plaintiffs highlight statements from Generac's Form 10-Q and Form 10-K filings. Lead Plaintiffs allege that in these filings, Defendants made "boilerplate" statements of risks that could occur as a result of product liability claims or recalls. (ECF No. 66 ¶¶98(a)–(c), 104, 106, 108.) They assert that these warnings in Generac's 2021 Form 10-K were substantially the same as warnings from previous years, despite the fact that Defendants were aware that the SnapRS units were defective. (*Id.* ¶¶ 98–99.) They further point to a statement in the 2021 Form 10-K directing investors to Generac's website, which during the Class Period contained a brochure that described the SnapRS Rapid Shutdown Device as "SAFE" and "rapid shutdown compliant," which Lead Plaintiffs assert was false or misleading considering the widespread failures, house fires, indemnification of Pink Energy, and the development of new SnapRS 802 units to replace all existing SnapRS units. (*Id.* ¶108–109.) Lead Plaintiffs also point to Generac's Q1 2022 and Q2 2022 Form 10-Q, which stated that "[t]here have been no material changes in our risk factors" since the filing of the 2021 Form 10-K. (*Id.* ¶¶104, 106.) Lead Plaintiffs contend that this language should have been modified to inform investors of the SnapRS

25

defect and the resulting reputational damage and increased warranty costs and liabilities that had already occurred.  (*Id.* ¶¶ 105, 107.)  Last, the Second Consolidated Amended Complaint quotes Generac's April 26, 2022 Environmental, Social and Governance (ESG) Report, signed by Jagdfeld, which stated under the "Product Safety" heading that Generac "maintains a robust product safety function" and "regularly reviews any safety concerns associated with products in the field, including potential product recalls."  (*Id.* ¶101.)

Lead Plaintiffs argue that these challenged statements were false or misleading because the statements failed to disclose the existing defects with the SnapRS units, which were known to Defendants at the time.  (ECF No. 80 at 32–34.)  Defendants disagree and assert that the Second Consolidated Amended Complaint fails to allege that Defendants' statements regarding the SnapRS defect were false or misleading for the same reasons previously recognized by this court. (ECF No. 74 at 27–31.)

As the Court explained in its prior order, a publicly traded company has a duty to disclose a product defect when it knows the scope and severity of the defect is material to the company's financial disclosures.  (ECF No. 63 at 26 (citing *Pierrelouis v. Gogo, Inc. (Gogo I)*, 414 F.Supp.3d 1164, 1173–74 (N.D. Ill. 2019)).)  However, like all allegations of falsity, "a duty to disclose a product defect cannot be pleaded in general terms."  (*Id.*)  Considering the allegations in the First Consolidated Amended Complaint, the Court concluded that Lead Plaintiffs failed to make specific, particularized allegations that supported a finding that Defendants were aware of a material defect involving the SnapRS units at the time they made the challenged statements.  (*Id.* at 26–27.)  The Court likened Lead Plaintiffs' allegations to support their SnapRS defect theory to the plaintiff investors' claims in *Gogo I*, which involved a defendant company's delay in disclosing to investors the malfunctioning of its new in-flight internet service.  (*Id.*)  The court in *Gogo I* dismissed the first complaint, concluding the plaintiff investors had failed to allege "when the [defect] manifested itself as such a severe problem as to make defendants' statements to investors misleading."  414 F.Supp.3d at 1175.  While the plaintiff investors had argued that the seriousness of the defect "must have been apparent long before" the defendants eventually disclosed it, the court concluded that plaintiffs had failed to provide particularized factual allegations to make their claims that the defendants knew the statements were false or misleading when made "plausible, rather than merely possible."  *Id.* at 1173, 1175.

26

Concluding that the First Consolidated Amended Complaint failed to allege a false or misleading statement in support of Lead Plaintiffs' SnapRS defect theory, this Court explained that:

> Lead Plaintiffs need to plausibly plead, with particularity, that the SnapRS defect prevalence was of sufficient magnitude, and sufficiently known to Defendants, that their statements were false, misleading, or without a reasonable basis at the time they were made. *See [Gogo I]*, 414 F.Supp.3d at 1174. The [First] Consolidated Amended Complaint fails to provide sufficiently specific and detailed information about when *Defendants* were not only aware of the pervasiveness of the defect, but also that it would expose them to the "increased liabilities, warranty claims, and reputational harm" alleged by Lead Plaintiffs. (*See e.g.* ECF No. 42 ¶137). The Consolidated Amended Complaint fails to tie specific allegations to specific statements made by Defendants that would plausibly render them materially misleading at the time they were made.

(*Id.* at 27.) The Court further noted that "[t]he relatively minor revenue associated with Generac's solar product line further undercuts Lead Plaintiffs' theory." (*Id.* at 27–28 (citing *Harley-Davidson*, 660 F.Supp.2d at 984; *Anderson*, 140 F.Supp.2d at 903)).) Noting that the Seventh Circuit has recognized a 5% change in revenue or income as a basic "rule-of-thumb" for determining materiality, the Court concluded that "the relatively small revenues generated by Generac's solar sales make omission of a defect in one component of the PWRcell system substantially less likely to mislead reasonable investors." (*Id.* at 28 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 n.† (7th Cir. 2007)).)

Lead Plaintiffs assert that their amendments cure the issues previously identified by the Court. They first invoke *Pierrelouis v. Gogo, Inc. (Gogo II)*, No. 18C4473, 2021 WL 1608342 (N.D. Ill. Apr. 26, 2021). (ECF No. 80 at 37–39.) In *Gogo II*, the court considered whether the plaintiff-investors' amended complaint remedied the shortcomings identified in *Gogo I*. 2021 WL 1608342 at *5–6. The amended complaint in *Gogo II* added several new factual allegations detailing the specifics of the defect that defendants allegedly concealed from the investing public. *See id.* at *1–3. Specifically, the amended complaint added allegations made by former employees demonstrating that the defect manifested prior to the class period, that it was pervasive, and that the defendants were aware of its scope and severity at the time the challenged statements were made. *Id.* The court concluded that these new, concrete allegations were sufficiently particular to support an inference that the defect was of a "sufficient magnitude" to make defendants' statements misleading at the time they were made. *Id.* at *6.

27

Plaintiffs' reliance on *Gogo II* is misplaced. The amended complaint in *Gogo II* added several new allegations of statements by five former employees demonstrating with particularity when the defect emerged, that the defendants were aware of the defect, and the severity of the defect. *See* 2021 WL 1608342 at *1–3. Unlike the amended complaint in *Gogo II*, Lead Plaintiffs' Second Consolidated Amended Complaint mostly repeats allegations previously deemed insufficient by this Court. As they did in the first complaint, Lead Plaintiffs allege that SnapRS units were later determined to have caused two residential fires in August 2021, (ECF No. 66 ¶¶82, 85), that Pink Energy and other dealers had notified Generac of the defect, (*id.* ¶¶78–81), that Generac attempted to address the issue with a firmware patch and updated models, (*id.* ¶¶86–88, 93–94, 100), that Generac sent a letter to Pink Energy customers, (*id.* ¶103), that Generac agreed to indemnify Pink Energy, (*id.* ¶95), and that nearly half of Pink Energy's customers experienced issues with their SnapRS units, (*id.* ¶96). For the reasons explained in the Court's previous order, these allegations fail to support a plausible inference that Defendants were aware of a material defect involving the SnapRS device at the time they made the challenged statements because they fail to provide specific, particularized facts demonstrating when Defendants became aware of the significance or pervasiveness of the defect. (*See* ECF No. 63 at 26–27.)

The Second Consolidated Amended Complaint adds only two new factual allegations in support of their SnapRS defect theory. First, Lead Plaintiffs newly allege that Generac reported a "potential defect" in its SnapRS defect to the CPSC on November 23, 2021. (ECF No. 66 ¶88). But as Defendants note, an obligation to submit such a report under the Consumer Product Safety Act arises whenever a company "obtains information which could reasonably support" the existence of a product defect that "could create" a substantial risk of injury to the public. *See* 15 U.S.C. §2064(b)(3), (a)(2); (ECF No. 74 at 29–30). The accompanying regulations also permit a company to "specifically deny" that the information it submits reasonably supports the conclusion that its product contains a defect. *See* 16 C.F.R. §1115.12(a). Lead Plaintiffs do not allege whether Ragen and Jagdfeld were even aware of the report or its contents. Given that the reporting requirements of 15 U.S.C. §2064(b) are easily triggered to encourage precautionary over-reporting, the mere existence of the CPSC report, without more, does not demonstrate that Defendants were aware the challenged statements were materially misleading at the time they were made. *See United States v. Spectrum Brands, Inc.*, 218 F.Supp.3d 794, 820–21 (W.D. Wis. 2016) (noting that a company's reporting obligation under the CPSC is easily triggered whenever a

28

company becomes aware of a substantial hazard posed by the product to the public and that a substantial hazard could consist of a minor risk that is widespread because of the prevalence of a product). Lead Plaintiffs analogize this new allegation to the additional allegations presented in *Gogo II*. (ECF No. 80 at 10.) Again, the new information at issue in *Gogo II* was multiple employees explaining that the company's leadership knew the magnitude of the failure of the company's new in-flight Wi-Fi device and when. *See* 2021 WL 1608342 at *1–3. In contrast, this new allegation is merely that Generac recognized it might have a significant enough problem to warrant filing a report, the contents of which are unknown, under the Consumer Product Safety Act.

Second, Lead Plaintiffs newly allege that Generac instituted a "SnapRS replacement program," the goal of which was to ultimately replace all SnapRS 801 and 801A units with the updated 802 model. (ECF No. 66 ¶100 ("In or around April 2022 . . . Generac released its third attempted fix, the SnapRS 802 and shortly thereafter instituted the SnapRS replacement program, the goal of which was to ultimately replace all SnapRS 801 and 801A devices with SnapRS 802 devices." (cleaned up)).) They allege that this program "resulted in the replacement of more than 500,000 SnapRS 801 and 801A devices," citing to a declaration submitted on October 21, 2024. (*Id.* ¶100 n.26 (citing "Declaration of Michael Morris, *In re: Generac Solar Power Sys. Mktg. Sales Pracs. & Prods. Liab. Litig.*, Case No. 23-md-3078, ECF No. 54 ¶¶12, 14 (E.D. Wis. Oct. 21, 2024).)) This new allegation also does not permit a plausible inference that Defendants knew that the challenged statements were misleading when made, as Lead Plaintiffs fail to allege *when* the SnapRS replacement program began. The Court cannot conclude that "shortly thereafter" April 2022 is sufficiently particularized to make plausible, rather than merely possible, Lead Plaintiffs' claim that Defendants knew the challenged statements were misleading when made. Additionally, the fact that this program ultimately resulted in the replacement of more than 500,000 SnapRS 801 and 801A units by October 2024 does not show what proportion of replacements were made during the Class Period and when they were made in relation to the challenged statements. Lead Plaintiffs fail to adequately plead a materially false or misleading statement.

In sum, Lead Plaintiffs' new allegations do not cure the previously identified pleading deficiencies. The Second Consolidated Amended Complaint fails to state a claim as to Lead Plaintiff's SnapRS defect theory.

**B. Lead Plaintiffs Again Fail to Plausibly Allege that Defendants' Failure to Disclose Pink Energy's Share of Generac's Solar Sales Rendered the Challenged Statements Materially False or Misleading.**

To support their final theory, Lead Plaintiffs highlight several statements[6] made by Defendants in Generac's SEC filings disclosing its efforts to expand its distribution network, (ECF No. 66 ¶¶123, 125, 126, 127, 129, 131, 133), and statements by Jagdfeld in earnings calls updating the investing public on the number of clean energy dealers, (*id.* ¶¶122, 124, 126, 128, 130, 132). Lead Plaintiffs do not allege any of the challenged statements are themselves false, but instead argue that the statements were materially misleading because they emphasized that Generac had "expanded and built out" a "broad" distribution network for its solar energy products, which created "a false impression" that Generac had a diversified base of solar dealer customers, but failed to disclose that half of Generac's solar sales were highly concentrated in a single dealer, Pink Energy. (*Id.* ¶134.)

In dismissing the First Consolidated Amended Complaint, the Court noted that "many of the quoted statements Lead Plaintiffs offer [did] not relate specifically to Generac's solar products," but rather concerned "Generac's *overall* installer network and distribution partners, encompassing all Generac products or all residential products, of which Generac's solar products were but a small part." (ECF No. 63 at 29.) The Court explained that:

> Upon closer examination, only a small handful of statements address "clean energy" dealers. These statements include reports that the company had "built out" its "clean energy installer network" at the end of year "with nearly 2,500 trained and certified dealers" and had "been leveraging these dealer development practices to assist in growing our base of solar contractors that sell, install and service our PWRcell energy storage systems." (ECF No. 42 ¶¶163(a), 164(c).) None of these statements speaks to the concentration or lack of concentration of sales in or among Generac's PWRcell product dealers.
>
> A statement is made misleading by omission only if that omission "make[s] the statement so incomplete as to be misleading." *Harley-Davidson*, 660 F.Supp.2d at 984 (quoting *Anderson*, 140 F.Supp.2d at 903). Generalized statements concerning the breadth of Generac's dealership base were not incomplete simply because they failed to disclose the concentration of sales within that base. "Omitting one detail— even a significant one—[does not] render the whole story inaccurate or

---

[6] All fifteen of these challenged statements were previously alleged in the First Consolidated Amended Complaint. (*Compare* ECF No. 66 ¶¶122, 123(a)–(b), 124, 125, 126, 127, 128, 129(a), (b), 130(a), (b), 131, 132, 133 *with* ECF No. 42 ¶¶155(a), 156(a), (c), 157(a), 158(b), 160, 161(b), 163, 164(a), (f), 166(a), (b), 167(b), 169(a), 170(b).) Aside from minor changes in quoted language and emphasis, Lead Plaintiffs' third theory is substantially unchanged.

misleading." *In re Supreme Indus., Inc. Sec. Litig.*, No. 17-CV-146-PPS/MMG, 2019 WL 1436022, at *3 (N.D. Ill. Mar. 29, 2019).

(*Id.* at 29–30.) The same is true for the Second Consolidated Amended Complaint. The challenged statements made in Generac's Form 10-Q and Form 10-K filings, (ECF No. 66 ¶¶123, 125, 127, 129, 131, 133), objectively concerned Generac's overall installer network and distribution partners, which cannot be considered incomplete simply because they failed to disclose that sales of its solar energy products were concentrated in one dealer. As for the remaining statements discussing the company's clean energy products more specifically, (*id.* ¶¶122, 124, 126, 128, 130, 132), reports that Generac had "built out" its "clean energy installer network" updating the investing public on the number of trained and certified dealers again describe nothing regarding the concentration or lack thereof in dealers of Generac's solar products. Omitting that fact does not render the statements false or misleading.

Lead Plaintiffs resist this conclusion. They point to new allegations in the Second Consolidated Amended Complaint that diversification of the company's customer base was material to the stock price, (*id.* ¶¶112–113), as well as an allegation that Defendants were able to "easily monitor sales by solar dealer through Generac's Powerplay Clean Energy' . . . sales program," (*id.* ¶114). Neither amendment renders the challenged statements false or misleading. That diversification of dealers could have been material to investors does not render generalized statements concerning Generac's dealership base false or misleading. Nor does the Defendants' access to the Powerplay CE program alter the outcome. At most, Lead Plaintiffs are alleging that the individual defendants could use this program to monitor sales of Generac's clean energy products. The Second Consolidated Amended Complaint does not allege that Defendants could, or did, monitor dealer concentration via this program. Nor does pleading that Defendants may have had access to this data, "without describing specific documents containing that data or otherwise alleging that the data was available to the defendants in some specific form," show that the challenged statements were misleading when made for omitting information related to that data. *See Gogo I*, 414 F.Supp.3d at 1174–75.

Lead Plaintiffs assert that Defendants had a duty to disclose that solar sales were highly concentrated through just one dealer. (ECF No. 80 at 34–35 (citing *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F.Supp.3d 1035, 1048 (D. Minn. 2015)).) As Defendants note, Lead Plaintiffs misread *Tile Shop Holdings*. In that case, the court considered whether the

defendant company had a duty to disclose that it purchased a significant volume of its products from a single supplier controlled by a related person under Item 303 of Regulation S-K. 94 F.Supp.3d at 1047–48. Because Lead Plaintiffs are no longer proceeding on their claim that Generac violated Item 303 of SEC Regulation S-K, (*see* ECF No. 63 at 22 n.4), their citation to *Tile Shop Holdings* is inapplicable here. Lead Plaintiffs do not cite, nor is the Court aware of, any binding precedent establishing that Defendants had an affirmative duty to disclose that Generac's solar sales were concentrated in a single dealer.

Last, as with the First Consolidated Amended Complaint, the challenged statements cannot be considered material. As previously noted, "Lead Plaintiffs' inclusion of multiple statements discussing Generac's dealer base across its operations highlights the lack of materiality to Defendants' alleged omissions." (ECF No. 63 at 30.) Because solar sales account for only a small portion of Generac's revenue, and because Defendants' disclosures concerning their dealership network related to their network across all product lines, the failure to disclose that one solar energy dealer accounted for a significant portion of Generac's moderate solar energy-related sales could not have been viewed by the reasonable investor as having "significantly altered the 'total mix' of information made available." *Siracusano*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). The Second Consolidated Amended Complaint fails to state a claim as to Lead Plaintiff's dealer over-concentration theory.

32

**CONCLUSION**

For the reasons explained above, the Second Consolidated Amended Complaint fails to plead a violation of Section 10(b) and Rule 10b-5 on any of Lead Plaintiffs' theories. As Lead Plaintiffs have already been given an opportunity to amend, the Court will dismiss this matter with prejudice and direct the Clerk of Court to enter final judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Consideration of Certain Documents Under the Incorporation by Reference Doctrine, ECF No. 76, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss the Second Consolidated Amended Complaint, ECF No. 73, is **GRANTED.** The Second Consolidated Amended Complaint is **DISMISSED WITH PREJUDICE** for failure to state a claim. The Clerk of Court shall enter final judgment accordingly.

Dated at Milwaukee, Wisconsin on April 30, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

33